Nos. 22-1350, -1351

IN THE

# United States Court of Appeals for the Federal Circuit

APPLE INC.,

*Appellant,*

*v.*

COREPHOTONICS, LTD.,

*Appellee.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
Nos. IPR2020-00905 and IPR2020-00906

## NON-CONFIDENTIAL JOINT APPENDIX

Marc A. Fenster
Neil A. Rubin
James S. Tsuei
RUSS AUGUST & KABAT LLP
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA  90025
(310) 826-7474

*Counsel for Appellee*

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
(415) 773-5700

Mark S. Davies
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005

Alyssa Barnard-Yanni
Emily W. Villano
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

*Counsel for Appellant*

# TABLE OF CONTENTS

Final Written Decision, IPR2020-00905,
Paper No. 51, filed November 8, 2021.....................................Appx1-24

Final Written Decision, IPR2020-00906,
Paper No. 54, filed November 8, 2021...................................Appx25-45

Certified List of the Prosecution History of IPR2020-
00905 ......................................................................................Appx46-48

Certified List of the Prosecution History of IPR2020-
00906 ......................................................................................Appx49-51

Ex. 1001, U.S. Patent No. 10,225,479......................................Appx52-72

## IPR2020-00905

Petition for Inter Partes Review,
Paper No. 3, filed May 6, 2020 ...........................................Appx79-157

Patent Owner's Preliminary Response,
Paper No. 8, filed August 13, 2020............................Appx170, 179-182

Decision - Institution of Inter Partes Review,
Paper No. 10, filed November 12, 2020...........................Appx196, 207

Patent Owner's Response,
Paper No. 15, filed February 5, 2021
**(Filed Under Seal; Contains Confidential
Materials)** ........................................................Appx252, 270, 282-304

Petitioner's Reply,
Paper No. 23, filed May 7, 2021 .......................................Appx338, 349

Patent Owner's Sur-Reply,
Paper No. 32, filed June 22, 2021 ..............Appx408, 414-415, 417-419

Oral Hearing Transcript,
Paper No. 49, filed September 14, 2021............Appx570-571, 583-584,
588-589, 605-607, 621-622

Petitioner's Notice of Appeal,
    Paper No. 52, filed January 10, 2022 ................................ Appx693-698

## IPR2020-00906

Petition for Inter Partes Review,
    Paper No. 3, filed May 6, 2020 ......................................... Appx723-804

Decision - Institution of Inter Partes Review,
    Paper No. 10, filed November 12, 2020................................... Appx839

Patent Owner's Response,
    Paper No. 15, filed February 4, 2021 ..................... Appx896, 898, 913,
                                                                      930-933, 937-969

Petitioner's Reply,
    Paper No. 23, filed May 7, 2021 ......................... Appx1016, 1026-1036

Patent Owner's Oral Argument Demonstratives,
    Paper No. 46, filed August 9, 2021.............................. Appx1124, 1197

Petitioner's Notice of Appeal,
    Paper No. 55, filed January 10, 2022........................... Appx1326-1331

## EXHIBITS

Ex. 1003, Declaration of Dr. Fredo Durand Ph.D.,
    IPR2020-00905............................................................ Appx1748, 1798

Ex. 1003, Declaration of Dr. Fredo Durand Ph.D.,
    IPR2020-00906............................................................ Appx1846, 1865

Ex. 1005, U.S. Patent No. 7,859,588 to Parulski et al.
    ("Parulski") .................................................................... Appx1953-2001

Ex. 1006, JP Patent Application Publication No. 2007-
    259108 to Soga ("Soga"), English Translation,
    Declaration, and Original ............................................. Appx2002-2031

Ex. 1012, JPS5862609A to Kawamura ("Kawamura")..... Appx2378-2393

Ex. 1013, Richard Szeliski, COMPUTER VISION –
    ALGORITHMS AND APPLICATIONS (2011)
    ("Szeliski") .......................................................... Appx2394, 2400-2401

Ex. 1015, JP Pub. No. 2013-106289 to Konno et al.
    ("Konno"), Certified English translation and
    Original......................................................................... Appx2455-2513

Ex. 1020, Warren J. Smith, MODERN LENS DESIGN
    (1992) ("Smith").......................................... Appx2610, 2664-2669, 2678

Ex. 1021, Declaration of Dr. José Sasián, Ph.D. ..... Appx2698, 2717-2719,
                                                                        2722-2723, 2731-2736

Ex. 1022, ZEMAX Development Corporation, ZEMAX
    Optical Design Program User's Manual, February
    14, 2011 ("ZEMAX User's Manual")............................. Appx2761, 3014

Ex. 1026, U.S. Patent No. 5,546,236 to Ogata et al.
    ("Ogata") ...................................................................... Appx3645-3664

Ex. 1033, Product manual for Kodak Easyshare V610 ... Appx3715, 3782

Ex. 1038, Declaration of Dr. Fredo Durand, Ph.D. in
    support of Petitioner's Reply ................................ Appx3905, 3910-3912

Ex. 1039, Declaration of Dr. José Sasián, Ph.D. in
    support of Petitioner's Reply .. Appx3954, 3957-3958, 3961, 3970-3971

Ex. 2001, Declaration of John C. Hart, Ph.D. ........ Appx4248, 4269-4270,
                                                                                          4289

Ex. 2015, Declaration of Duncan Moore, Ph.D. ..... Appx4759, 4780-4781,
                            4783-4784, 4789, 4796-4798, 4802-4808, 4811-4812, 4817-4821

Ex. 2028, Tigran V. Galstian, Smart Mini-Cameras
    (2014) .......................................................................... Appx5062, 5069

Ex. 2029, Dmitry Reshidko and José Sasián, "Optical
analysis of miniature lenses with curved imaging
surfaces," Applied Optics, Vol. 54, No. 28, E216-
E223 (October 1, 2015)........................................................ Appx5076

Ex. 2034, Yufeng Yan, "Selected Topics in Novel
Optical Design," Ph.D. Dissertation (2019) ....... Appx5109, 5187, 5191

Ex. 2036, Transcript of January 26, 2021 Video-
Recorded Deposition of Fredo Durand, Ph.D............... Appx5364-5366,
5385-5386

Ex. 2041, Transcript of June 8, 2021 Video-Recorded
Deposition of Frédo Durand, Ph.D. ............ Appx5498-5499, 5549-5551

Ex. 2042, Transcript of May 28, 2021 Video-Recorded
Deposition of José Sasián, Ph.D. ................ Appx5591-5593, 5639-5640

## Statement Regarding Confidential Material Omitted

Pursuant to Federal Circuit Rule 25.1(e)(1)(B) and the Protective Order

entered by the Patent Trial and Appeal Board on June 21, 2021,

material has been redacted from Appx295-299.  The redacted materials

contain the confidential business information of Apple and

Corephotonics.

Trials@uspto.gov                                    Paper 51
571-272-7822                          Entered: November 8, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE, INC.,
Petitioner,

v.

COREPHOTONICS LTD.,
Patent Owner.

———————————

IPR2020-00905
Patent 10,225,479 B2

———————————

Before BRYAN F. MOORE, JOHN F. HORVATH, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

HORVATH, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00905
Patent 10,225,479 B2

# I.    INTRODUCTION

*A.    Background and Summary*

Apple, Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–16, 18, 23–38, and 40 ("the challenged claims") of U.S. Patent No. 10,225,479 B2 (Ex. 1001, "the '479 patent").  Paper 3 ("Pet."), 9.  Corephotonics Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").  Upon consideration of the Petition and Preliminary Response, we instituted *inter partes* review of all challenged claims on all grounds raised.  Paper 10 ("Dec. Inst.").

Patent Owner filed confidential (Paper 15) and public (Paper 39) versions of its Response to the Petition.  *See* Paper 39 ("PO Resp.").[1] Petitioner filed confidential (Paper 24) and public (Paper 40) versions of a Reply.  *See* Paper 40 ("Pet. Reply").  Patent Owner filed a Sur-Reply.  *See* Paper 32 ("PO Sur-Reply").  An oral hearing was held on August 12, 2021, and the hearing transcript is included in the record. *See* Paper 49 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b).  This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, we find Petitioner has failed to show by a preponderance of evidence that claims 1–16, 18, 23–38, and 40 of the '479 patent are unpatentable on the grounds raised in the Petition.

---

[1] Unless otherwise noted, we cite to the public versions of the papers in this proceeding.  Earlier public versions of Patent Owner's Response (Paper 16) and Petitioner's Reply (Paper 23) were rejected for redacting more information than needed to protect Patent Owner's confidentiality interest. *See* Paper 30, 7–8; Paper 31, 3–4.

2

IPR2020-00905
Patent 10,225,479 B2

### B. Real Parties-in-Interest

Petitioner and Patent Owner identify themselves, respectively, as the real parties-in-interest.  Pet. 1; Paper 5, 1.

### C. Related Matters

Petitioner and Patent Owner identify *Corephotonics Ltd. v. Apple Inc.*, 5:19-cv-04809 (N.D. Cal.), as a district court proceeding that can affect or be affected by this proceeding, and Petitioner also identifies IPR2020-00906 as an *inter partes review* that can affect or be affected by this proceeding. Pet. 1; Paper 5, 1.  In addition, we note that the '479 patent is part of a family of patents and patent applications that include at least U.S. Patent Nos. 10,326,942; 10,015,408; 9,661,233; and 9,185,291.  Ex. 1001, code (63).  Many of these patents were or currently are involved in *inter partes* review proceedings that could affect or be affected by a decision in this proceeding.

### D. Evidence Relied Upon[2]

| Reference | | Effective Date | Exhibit |
|---|---|---|---|
| Parulski | US 7,859,588 B2 | Dec. 28, 2010 | 1005 |
| Richard Szeliski, *Computer Vision Algorithms and Applications*, 468–503 (2011) ("Szeliski") | | 2011 | 1013 |
| Konno[3] | JP 2013/106289 A | May 30, 2013 | 1015 |
| Stein | US 8,908,041 B2 | Feb. 7, 2013[4] | 1023 |

[2] Petitioner also relies upon the Declarations of Fredo Durand, Ph.D. (Exs. 1003, 1038) and José Sasián, Ph.D. (Ex. 1021).

[3] Konno is a certified translation of a Japanese Patent Application originally published in Japanese.  *See* Ex. 1015, 34–59.

[4] Petitioner identifies Stein as prior art under 35 U.S.C. § 102(a)(2) based on the February 7, 2013 filing date of a provisional application to which Stein claims priority.  *See* Pet. 9.  Patent Owner does not dispute this.  *See* PO Resp. 1–47.

IPR2020-00905
Patent 10,225,479 B2

| Reference | | Effective Date | Exhibit |
|-----------|---|----------------|---------|
| Segall | US 8,406,569 B2 | Mar. 26, 2013 | 1024 |

### E. *Instituted Grounds of Unpatentability*

We instituted review on the following grounds:

| Ground | Claims | 35 U.S.C. § | References |
|--------|--------|-------------|------------|
| 1 | 1, 10–14, 16, 18, 23, 32–36, 38, 40 | 103(a) | Parulski, Konno |
| 2 | 2–4, 24–26 | 103(a) | Parulski, Konno, Szeliski |
| 3 | 5–9, 27–31 | 103(a) | Parulski, Konno, Szeliski, Segall |
| 4 | 15, 37 | 103(a) | Parulski, Konno, Stein |

## II.  ANALYSIS

### A. *The '479 Patent*

The '479 patent is directed to "a thin (e.g., fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses" that is configured to use "partial or full fusion to provide a fused image in still mode." Ex. 1001, 3:18–23.  Figure 1A, reproduced below, illustrates a dual-aperture zoom digital camera 100.



FIG. 1A

Figure 1A is a "block diagram illustrating a dual-aperture zoom" digital camera 100.  *Id.* at 5:64–65.  Camera 100 includes a wide imaging

IPR2020-00905
Patent 10,225,479 B2

subsystem consisting of wide lens 102, wide sensor 104, and wide image signal processor ("ISP") 106, and a tele imaging subsystem consisting of tele lens 108, tele sensor 110, and tele ISP 112. *Id.* at 6:24–29.

Camera 100 also includes controller 114, which includes sensor control 116, user control 118, video processing module 126 and still processing module 128. *Id.* at 6:33–37. User control 118 controls various camera functions, including, operational mode 120, region of interest ("ROI") 122, and zoom factor ("ZF") 124. *Id.* at 6:38–40. Zoom factor 124 allows a user "to choose a zoom factor." *Id.* at 6:50–51. Sensor control 116 chooses "which of the sensors is operational" based on the selected zoom factor. *Id.* at 6:41–45. ROI function 122 allows a user to "choose a region of interest," i.e., a sub-region "on which both sub-cameras are focused." *Id.* at 6:46–50.

The dual lenses allow camera 100 to take an image having a shallow depth-of-field ("DOF") "by taking advantage of the longer focal length of the Tele lens." *Id.* at 4:23–27. The image taken with the Tele lens can be enhanced "by fusing data from an image captured simultaneously with the Wide lens." *Id.* at 4:27–30. For example, the Tele lens can focus "on a subject of the photo" and the Wide lens can focus on "a closer distance than the subject so that objects behind the subject appear very blurry." *Id.* at 4:30–34. Then, a shallow depth-of-field image can be formed when "information from the out-of-focus blurred background in the Wide image is fused with the original Tele image background information, providing a blurrier background and even shallower DOF." *Id.* at 4:34–38.

The process for fusing images taken with the Wide and Tele lenses is shown in Figure 5 of the '479 patent, which is reproduced below.

5

IPR2020-00905
Patent 10,225,479 B2



IPR2020-00905
Patent 10,225,479 B2

Figure 5 is a flow chart depicting a method for acquiring a zoom image in a dual lens camera. *Id.* at 9:39–40. At step 502, separate images are captured by each of the Wide and Tele lenses. *Id.* at 9:40–44. At step 504, these images are aligned on an epipolar line. *Id.* at 9:46–47. At step 506, a registration map is generated. *Id.* at 9:47–49. At step 508, the registration map is used to resample the Tele image. *Id.* at 9:50–51. At step 510, Tele image pixel values are compared to Wide image pixel values, and if a significant difference is detected, the Wide image pixel values are chosen for the output image. *Id.* at 9:51–58. Finally, at step 512, a fused image is generated from the re-sampled Tele image and the Wide image. *Id.* at 9:58–60. The '906 patent discloses that by "register[ing] Tele image pixels to a matching pixel set within the Wide image pixels, . . . the output image will retain the Wide POV" or point-of-view. *Id.* at 5:23–26.

B. *Illustrative Claims*

Of the challenged claims, claims 1 and 23 are independent and substantially similar in scope. Claim 1 recites a dual-aperture digital camera configured to generate a fused image from images taken with wide angle and telephoto lenses, and claim 23 recites a method for generating such a fused image using a dual-aperture digital camera. *Compare* Ex. 1001, 13:22–50, *with id.* at 15:49–67. The remaining challenged claims depend directly or indirectly from claims 1 or 23. Claim 1 is illustrative of the challenged claims and is reproduced below.

1. A dual-aperture digital camera for imaging an object or scene, comprising:

a) a Wide camera comprising a Wide lens and a Wide image sensor, the Wide camera having a respective field of view

7

IPR2020-00905
Patent 10,225,479 B2

 $FOV_W$  and being operative to provide a Wide image of the object or scene;

b) a Tele camera comprising a Tele lens and a Tele image sensor, the Tele camera having a respective field of view  $FOV_T$  narrower than  $FOV_W$  and being operative to provide a Tele image of the object or scene, wherein the Tele lens has a respective effective focal length  $EFL_T$  and total track length  $TTL_T$  fulfilling the condition  $EFL_T / TTL_T > 1$ ;

c) a first autofocus (AF) mechanism coupled mechanically to, and used to perform an AF action on the Wide lens;

d) a second AF mechanism coupled mechanically to, and used to perform an AF action on the Tele lens; and

e) a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms and to process the Wide and Tele images to create a fused image,

wherein areas in the Tele image that are not focused are not combined with the Wide image to create the fused image and

wherein the camera controller is further operative to output the fused image with a point of view (POV) of the Wide camera by mapping Tele image pixels to matching pixels within the Wide image.

*Id.* at 13:22–50.

## C. *Level of Ordinary Skill in the Art*

Petitioner identifies a person of ordinary skill in the art ("POSITA") at the time of the invention as someone that would have had "a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including image processing and lens design." Pet. 6 (citing Ex. 1003 ¶ 13). In our Institution Decision, we adopted this description as our own. *See* Dec. Inst. 11–12.

IPR2020-00905
Patent 10,225,479 B2

Neither party disputes that preliminary finding, which we maintain for purposes of this decision. *See* PO Resp. 3–4; Pet. Reply 1–27.

### D. Claim Construction

In *inter partes* reviews, we interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, a claim is construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Only claim terms which are in controversy need to be construed and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

In the Institution phase of this proceeding, Petitioner proposed a construction for a "fused image with a point of view (POV) of the Wide camera," which Patent Owner did not dispute. *See* Dec. Inst. 12. Therefore, we declined to expressly construe that or any other claim term. *Id.* In the current phase of this proceeding, Patent Owner disputes Petitioner's proposed construction for this term and argues Petitioner has failed to demonstrate how this limitation is met when it is properly construed. *See* PO Resp. 8–13, 29–31. Accordingly, we construe this term.

### 1. Fused Image with a Point of View (POV) of the Wide Camera

Petitioner contends this term means "a fused image that maintains the Wide camera's field of view or the Wide camera's position." Pet. 8 (emphasis omitted). Patent Owner contends it means a "fused image in which the positions and shapes of objects reflect the POV of the Wide camera." PO Resp. 13. Petitioner responds that Patent Owner's construction is unhelpful because it "fails to provide any meaning to the

IPR2020-00905
Patent 10,225,479 B2

construed term 'point of view (POV).'" Pet. Reply 1.  Petitioner also

provides an alternative construction that the term means a "fused image in

which the positions or shapes of objects reflect those of the Wide camera."

*Id.* at 6 (emphasis omitted).  Patent Owner replies that this latter construction

is new and improper and also incorrect because it "ignores that the [step of]

registering pixels to matching pixels will necessarily address both position

(shift) and perspective (shape)."  PO Sur-Reply 2–3.

To resolve the parties' dispute, we turn to the Specification.  *See*

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)

("[T]he specification is always highly relevant to the claim construction

analysis.  Usually, it is dispositive; it is the single best guide to the meaning

of a disputed term.").  In relevant part, the Specification discloses:

> In a dual-aperture camera image plane, as seen by each sub-
> camera (and respective image sensor), a given object will be
> shifted and have different perspective (shape). This is referred
> to as point-of-view (POV). The system output image can have
> the shape and position of either sub-camera image or the shape
> or position of a combination thereof. If the output image retains
> the Wide image shape then it has the Wide perspective POV. If
> it retains the Wide camera position then it has the Wide position
> POV. The same applies for Tele images position and
> perspective. As used in this description, the perspective POV
> may be of the Wide or Tele sub-cameras, while the position
> POV may shift continuously between the Wide and Tele sub-
> cameras. In fused images, it is possible to register Tele image
> pixels to a matching pixel set within the Wide image pixels, in
> which case the output image will retain the Wide POV ("Wide
> fusion").

Ex. 1001, 5:10–26.

Petitioner argues this disclosure supports its construction because it

means "'*a point of view of the Wide camera*' . . . can mean one of two

things—either 'Wide perspective POV' (i.e., wide camera FOV) or 'Wide

10

position POV' (i.e., wide camera position)." Pet. 7 (citing Ex. 1003 ¶ 31). Patent Owner argues this disclosure teaches a camera's point-of-view "depends on the position and orientation of the camera" and "using a camera with a different POV can both shift an object (change its position in the image) and change the perspective of an object (change[] its apparent shape in the image)." PO Resp. 12 (citing Ex. 2001 ¶ 43). Thus, when the '479 patent refers to "Wide POV" it "is referring to the complete Wide POV, both perspective and position." *Id.* at 13 (citing Ex. 2001 ¶ 45).

We agree with Patent Owner. Although it is not a model of clarity, the Specification equates a camera's POV with how an object will appear in that camera's image plane, e.g., in an image taken from that camera. For example, it discloses that "a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV)." Ex. 1001, 5:10–12. Thus, the position *and* perspective (shape) of an object in an image depends on the POV of the camera that took the image.

The Specification further discloses that a fused image[5] that "retains the Wide image shape . . . has the Wide perspective POV" and a fused image that "retains the Wide camera position . . . has the Wide position POV." *Id.* at 5:15–18. Moreover, a fused image's "perspective POV may be of the Wide . . . sub-camera[], while the position POV may shift . . . between the Wide and Tele sub-cameras." *Id.* at 5:20–23. Thus, a fused image may have the Wide perspective POV and either (a) the Wide position POV, (b) the Tele position POV, or (c) an intermediate position POV. This suggests that a fused image has a Wide POV when it has both a Wide perspective POV

---

[5] A "fused" image is one that "combine[s] in still mode at least some of the Wide and Tele image data." Ex. 1001, 4:49–51.

IPR2020-00905
Patent 10,225,479 B2

and a Wide position POV. If the fused image did not have a Wide position
POV it could only be described as having a Wide perspective POV, not a
Wide POV.

Figure 5 of the '479 patent, which is the only Figure that describes a
method for generating a fused image, further suggests that a fused image has
a Wide POV when it has both a Wide perspective POV and a Wide position
POV. The method begins by aligning Wide and Tele images on an epipolar
line and "mapping between the Wide and Tele aligned images . . . to produce
a registration map." *Id.* at 9:46–49. Next, after a re-sampling step, "the re-
sampled Tele image and the Wide image are processed to detect errors in the
registration." *Id.* at 9:49–54. When an error is detected—i.e., when the
"Tele image data is compared with the Wide image data and . . . the
comparison detects significant dissimilarities"—the "Wide pixel values are
chosen to be used in the output image." *Id.* at 9:54–58. Thus, the fused
image contains only information from (a) the Wide image and (b) the Tele
image that matches information from the Wide image. The fused image
contains no information from the Tele image that differs from information
from the Wide image, e.g., information representing the different "shape" of
an object when photographed from the POV of the Tele camera. As stated
in the Specification, the process of "register[ing] Tele image pixels to a
*matching pixel set* within the Wide image pixels . . . will retain the Wide
POV." *Id.* at 5:23–26 (emphasis added).

For the reasons discussed above, we agree with Patent Owner that a
fused image having a Wide POV means a fused image in which the positions
and shapes of objects reflect the POV of the Wide camera. Accordingly, we
construe a fused image having a Wide POV to mean "a fused image having
a Wide perspective POV and a Wide position POV."

IPR2020-00905
Patent 10,225,479 B2

### E. Ground 1

Petitioner argues claims 1, 10–14, 16, 18, 23, 32–36, 38, and 40 are unpatentable as obvious over Parulski and Konno. *See* Pet. 10–41. Patent Owner disputes this. *See* PO Resp. 26–31, 35–47. For the reasons discussed below, Petitioner has failed to establish by a preponderance of evidence that claims 1, 10–14, 16, 18, 23, 32–36, 38, and 40 are unpatentable as obvious over Parulski and Konno.

### 1. Parulski

Parulski discloses "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." Ex. 1005, 1:8–10. A schematic illustration of Parulski's camera is shown in Figure 1, which is reproduced below.



***FIG. 1***

13

IPR2020-00905
Patent 10,225,479 B2

with a first image sensor, and a second zoom lens with a second image sensor." *Id.* at 8:28–30.

The camera includes "two imaging stages 1 and 2, both with zoom lenses 3 and 4." *Id.* at 12:42–43. "[Z]oom lens 3 is controlled by a first lens focus adjuster, e.g., zoom and focus motors 5a, and provides an image to a first image sensor 12." *Id.* at 12:47–49. "[Z]oom lens 4 is controlled by a second lens focus adjuster, e.g., zoom and focus motors 5b, and provides an image to a second image sensor 14." *Id.* at 12:49–52. Each of zoom lenses 3 and 4 could be "replaced with a fixed focal length lens." *Id.* at 13:3–6. Image sensors 12 and 14 can "have a variety of aspect ratios" and "do not have to have the same specifications." *Id.* at 13:26–32. "[C]ontrol processor and timing generator 40 [CPT 40] controls the first image sensor 12 . . . the second image sensor 14" and "the zoom and focus motors 5a and 5b." *Id.* at 13:37–42. Analog data from image sensors 12 and 14 are digitized by analog signal processors 22 and 24, respectively, and the digitized data is supplied to each of multiplexers 34 and 36. *Id.* at 13:48–59. CPT 40 controls multiplexer 34 to select digitized data from either sensor 12 or 14 as an image signal and controls multiplexer 36 to select digitized data from the other of sensors 12 or 14 as an autofocus image signal. *Id.* at 14:1–5. Image processor 50 processes the digitized data from multiplexer 34 to produce a digital image and processes the digitized data from multiplexer 36 to calculate "focus detection signals that drive the first and second focus adjusters, that is, the zoom and focus motors 5a and 5b." *Id.* at 14:15–16.

Parulski's dual-lens camera can be used to generate a distance or range map as illustrated in Figure 11, which is reproduced below.

14

IPR2020-00905
Patent 10,225,479 B2



**FIG. 11**

Figure 11 is a flow chart showing a method for processing images captured with a two-lens camera to generate a distance or range map. *Id.* at 19:49–51. At step 440, "a first autofocus image is captured with the lower focal length image capture stage," e.g., lens 3 and image sensor 12. *Id.* at 20:1–3. At step 442, this image is "cropped and upsampled so that corresponding features in the two autofocus images span the same number of pixels." *Id.* at 20:3–6. At step 448, "a second autofocus image is captured with the higher focal length image capture stage," e.g., lens 4 and image sensor 14. *Id.* at 20:6–8. At step 480, "the second autofocus image is correlated with the cropped and upsampled image to determine the pixel offset between the images for different portions of the images." *Id.* at 20:8–11. At step 482, these pixel offsets are "converted . . . to distances from the image capture device using the autofocus rangefinder calibration curve." *Id.* at 20:11–14. Finally, at step 484, a distance or range map is produced "showing the distances to different portions of the images." *Id.* at 20:14–15.

15

IPR2020-00905
Patent 10,225,479 B2

Parulski's range map can be "used to modify the captured image signal or the output image for a variety of purposes," including "to enable dynamic depth of field images by blurring of portions of the image that correspond to areas of the scene that lie outside of the desired depth of field." *Id.* at 20:51–53, 20:63–65. For example, the range map can be used to modify a picture having a dog in the foreground, a field of flowers in the mid-ground, and a mountain range in the background. *Id.* at 21:7–17. "[I]f the user really wants to emphasize the dog more than the beautiful scenery, the range data can be used to isolate the mountains and the flowers, which can then be blurred." *Id.* at 21:27–30.

### 2. Konno

Konno discloses "an imaging apparatus . . . [that] includes single-focus first and second imaging optical systems that face the same direction." Ex. 1015 ¶ 7. Such a system is shown, for example, in Figure 21 of Konno, which is reproduced below.



Figure 21 of Konna is "a schematic view . . . of digital equipment [e.g., a digital camera] including first and second imaging optical units." *Id.* ¶ 18. The digital camera includes optical units LU1 and LU2, which include

16

"single-focus first and second imaging optical systems [i.e., lenses] LN1 and LN2 . . . for forming optical images" and "first and second imaging devices [i.e., sensors] SR1 and SR2 for converting the optical images . . . into electrical signals." *Id.* ¶ 48. The camera also includes "a signal processing unit 1, a control unit 2, a memory 3, an operation unit 4, and a display unit 5." *Id.* ¶ 54. Control unit 2 "controls various functions including . . . a lens moving mechanism." *Id.* "[T]he first and second imaging optical systems [i.e., lenses] LN1 and LN2 have different focus movements in the case of whole feeding." *Id.* ¶ 50. Various characteristics of lenses LN1 and LN2 (e.g., focal length, lens length, field of view) are disclosed in Table 1 of Konno. *Id.* ¶ 76.

### 3. Reasons to Combine

Petitioner argues that it would have been obvious to combine the teachings of Parulski and Konno because "Parulski does not provide lens prescription data for either the first [wide] or second [tele] fixed-focus lenses in its cell phone" camera. Pet. 16. Thus, Petitioner argues, a skilled artisan "would have looked to Konno which provides a fixed-focal length, dual-lens system designed for digital equipment like cell phones." *Id.* at 16–17 (citing Ex. 1003 ¶ 57). Petitioner argues a person skilled in the art would have looked to Konno for lens prescription data because "Konno's system offers fixed-focal length wide and telephoto lenses in a thin format for incorporation in a mobile device," and "Parulski teaches the importance of keeping the 'z' dimension (i.e., thickness) of its cell phone embodiment small." *Id.* at 17; Ex. 1005, 24:20–27; Ex. 1015 ¶ 46. Patent Owner does not dispute these contentions. *See* PO Resp. 26–35.

We find Petitioner sets forth sufficient reasoning with rational underpinning to combine the teachings of Parulski and Konno. Parulski

IPR2020-00905
Patent 10,225,479 B2

teaches a cell phone having a dual-lens camera and the need to have thin lenses, but fails to give lens prescription data for the two camera lenses. Konno discloses lens prescription data for a dual-lens camera utilizing two thin lenses.  The combination, therefore, is one of familiar elements according to known methods to obtain predictable results or a substitution of one element for another known in the field to obtain a predictable result.  *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 416 (2007).

> 4. *Claims 1 and 23*

Claim 1 recites a dual-aperture digital camera having a Wide camera for providing a Wide image, a Tele camera for providing a Tele image, and a camera controller configured to process the Wide and Tele images to create a fused image.  Ex. 1001, 13:22–34, 13:40–46.  Claim 23 recites a method for acquiring a Wide image with a Wide sensor and a Tele image with a Tele sensor, and processing the Wide and Tele images to create a fused image. *Id.* at 15:49–64.

Figure 16A of Parulski discloses a dual-aperture camera having an assembly 610 that includes "a first fixed focal length lens 612 and a first image sensor 614, and a second fixed focal length lens 616 and a second image sensor 618," where "[t]he first lens 612 [is] preferably a fixed focal length wide angle lens . . . and the second lens 616 [is] preferably a fixed focal length telephoto lens."  Ex. 1005, 23:28-40.  Figure 14 of Parulski discloses "a method for enhancing the depth of field of an image by using images from both image capture stages," i.e., from the wide and tele lenses. *Id.* at 22:14–16.  After capturing images from each of the wide and telephoto lenses, Parulski "*combine[s]* [them] into a modified image with a broadened depth of field."  *Id.* at 28:45–53 (emphasis added).

IPR2020-00905
Patent 10,225,479 B2

Claim 1 further requires the camera controller to create and output the fused image with a point of view (POV) of the Wide camera by mapping Tele image pixels to matching pixels in the Wide image. Ex. 1001, 13:46–50. Claim 23 further requires the method of creating a fused image to include outputting the fused image with a point of view (POV) of the Wide camera by mapping Tele image pixels to matching pixels within the Wide image. *Id.* at 15:65–67.

To meet these limitations, Petitioner relies on several different disclosures in Parulski. *See* Pet. 26–30, 39, 40. For example, Parulski discloses modifying the depth of field of an image containing a dog in the foreground, a field of flowers in the mid-ground, and a snow-capped mountain in the background so that "the dog is in focus, the mountains are in focus and so are those great flowers." Ex. 1005, 21:9–13, 21:25–27. This is be done by combining information from two images, where one image "is captured . . . at one focus position [e.g., wide angle] and another image is captured . . . at another focus position [e.g., tele photo]." *Id.* at 28:45–53. The information to be combined can be obtained from the wide and tele images using a range map, which "improve[s] object identification within [an] image by identifying the continuous boundaries of the object so [its] shape . . . can be defined" and "enable[s] object extraction from an image by identifying the continuous boundaries of the object so it can be segmented within the image." *Id.* at 20:51–59. Petitioner argues that from these disclosures a person skilled in the art:

> would have understood that creating an enhanced image with both the mountains and the dog in focus would have meant that the pixel[s] corresponding to the dog from the telephoto image would have been identified by the range mapping process and then fused with the corresponding pixels in the wide image so

19

IPR2020-00905
Patent 10,225,479 B2

> that the dog would be sharpened in the wide image while
> maintaining the mountains in focus, thus broadening the wide
> image's depth of field.

Pet. 28 (citing Ex. 1003 ¶ 50).

Petitioner further argues Parulski's image fusing process maps Tele image pixels with matching pixels within the Wide image, as required by claims 1 and 23, because "Parulski's range map is generated by matching pixels from the telephoto image to matching pixels in the wide image." *Id.* at 30 (citing Ex. 1005, 20:1–15). Moreover, Petitioner argues, a person skilled in the art "would have understood that fusing portions of the telephoto image with the wide image . . . would have otherwise maintained the wide image, therefore outputting a fused image with the wide image's field of view." *Id.* at 29 (citing Ex. 1003 ¶¶ 50–51). That is, Petitioner argues that identifying and extracting pixels corresponding to the dog from the Tele image and fusing them with pixels corresponding to the dog from the Wide image would generate a fused image having the point of view (POV) of the Wide image because the resulting image would have the field of view (FOV) of the Wide image.

Patent Owner argues that Petitioner and Dr. Durand have failed to demonstrate that Parulski teaches "the 'fused image with a point of view (POV) of the Wide camera' limitation" because their "sole argument that Parulski meets this limitation is based on the output [image] having the 'wide image's field of view.'" PO Resp. 29 (citing Ex. 1003 ¶ 51). Patent Owner further argues that "[n]othing in Parulski suggests that whatever image data from the tele image that might be 'fused' into the output would be modified to have the shapes and positions from the wide image POV" and "nothing in Dr. Durand's declaration even attempts to establish [that] this

20

would be true." *Id.* at 30.  Lastly, Patent Owner argues that Dr. Durand admitted during his deposition that he had not provided an opinion about whether Parulski generates a fused image having both a Wide perspective POV and a Wide position POV.  *See* PO Sur-Reply 5 (citing Ex. 2041, 52:25–54:20).

We agree with Patent Owner.  As we explain in § II.D.1, *supra,* claims 1 and 23 require generating a fused image having a Wide perspective POV and a Wide position POV.  Petitioner's only argument for how the combination of Parulski and Konno teaches this limitation is Parulski's teaching of generating a fused image having a Wide position POV, i.e., having the field of view (FOV) of the Wide camera.  *See* Pet. Reply 13 ("Parulski teaches . . . producing an output image that *maintains the Wide position POV or the field of view* of the Wide camera when the image was captured.").  Petitioner fails to demonstrate how Parulski's image fusion method would also maintain the Wide perspective POV as required by independent claims 1 and 23.

Accordingly, for the reasons discussed above, Petitioner has failed to demonstrate by a preponderance of evidence that claims 1 and 23 are unpatentable as obvious over the combination of Parulski and Konno.

5. *Claims 10–14, 16, 18, 32–36, 38, and 40*

Claims 10–14, 16, and 18 depend, either directly or indirectly, from independent claim 1.  *See* Ex. 1001, 14:29–44, 50–53, 61–65.  Claims 32–36, 38, and 40 depend, either directly or indirectly, from independent claim 23.  *Id.* at 16:41–54, 16:59–61, 17:1–4.  Accordingly, for the reasons discussed in § II.E.4, *supra*, Petitioner has failed to demonstrate by a preponderance of evidence that claims 10–14, 16, 18, 32–36, 38, and 40 are unpatentable as obvious over the combination of Parulski and Konno.

IPR2020-00905
Patent 10,225,479 B2

### F.   Grounds 2–4

Petitioner argues claims 2–4 and 24–26 are unpatentable as obvious over Parulski, Konno, and Szeliski, claims 5–9 and 27–31 are unpatentable as obvious over Parulski, Konno, Szeliski, and Segall, and claims 15 and 37 are unpatentable as obvious over Parulski, Konno, and Stein.  *See* Pet. 42–70.  Patent Owner disputes this.  *See* PO Resp. 31–47.

Claims 2–9 and 15 depend, either directly or indirectly, from independent claim 1.  *See* Ex. 1001, 13:51–67, 14:1–28, 14:45–49.  Claims 24–31 and 37 depend, either directly or indirectly, from independent claim 23.  *Id.* at 16:1–40, 16:55–58.  Accordingly, for the reasons discussed in § II.E.4, *supra,* Petitioner has failed to demonstrate by a preponderance of evidence that claims 2–9, 15, 24–31, and 37 are unpatentable as obvious over the combination of Parulski, Konno, and one or more of Szeliski, Segall, and Stein.

## III. CONCLUSION

We have reviewed the Petition, Patent Owner Response, Petitioner Reply, and Patent Owner Sur-Reply.  We have considered all of the evidence and arguments presented by Petitioner and Patent Owner, and have weighed and assessed the entirety of the evidence as a whole.  We find, on this record, Petitioner has failed to demonstrate by a preponderance of evidence that claims 1–16, 18, 23–38, and 40 of the '479 patent are unpatentable.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 10–14, 16, 18, 23, 32–36, 38, 40 | 103(a) | Parulski, Konno | | 1, 10–14, 16, 18, 23, 32–36, 38, 40 |
| 2–4, 24–26 | 103(a) | Parulski, Konno, | | 2–4, 24–26 |

22

IPR2020-00905
Patent 10,225,479 B2

| | | | | |
|---|---|---|---|---|
| | | Szeliski | | |
| 5–9, 27–31 | 103(a) | Parulski, Konno, Szeliski, Segall | | 5–9, 27–31 |
| 15, 37 | 103(a) | Parulski, Konno, Stein | | 15, 37 |
| **Overall Outcome** | | | | 1–16, 18, 23–38, 40 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has failed to show on this record that claims 1, 10–14, 16, 18, 23, 32–36, 38, and 40 are unpatentable under 35 U.S.C. § 103(a) over Parulski and Konno; and

FURTHER ORDERED that Petitioner has failed to show on this record that claims 2–4 and 24–26 are unpatentable under 35 U.S.C. § 103(a) over Parulski, Konno, and Szeliski; and

FURTHER ORDERED that Petitioner has failed to show on this record that claims 5–9 and 27–31 are unpatentable under 35 U.S.C. § 103(a) over Parulski, Konno, Szeliski, and Segall; and

FURTHER ORDERED that Petitioner has failed to show on this record that claims 15 and 37 are unpatentable under 35 U.S.C. § 103(a) over Parulski, Konno, and Stein; and

FURTHER ORDERED that this Decision is final, and a party to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00905
Patent 10,225,479 B2

FOR PETITIONER:

Michael S. Parsons
Andrew S. Ehmke
Jordan Maucotel
HAYNES & BOONE, LLP
michael.parsons.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
jordan.maucotel@haynesboone.com


FOR PATENT OWNER:

Neil A. Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

kis

Trials@uspto.gov                                              Paper 54
571-272-7822                                    Date: November 8, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE, INC.,
Petitioner,

v.

COREPHOTONICS LTD.,
Patent Owner.

_____

IPR2020-00906
Patent 10,225,479 B2

_____

Before BRYAN F. MOORE, JOHN F. HORVATH, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

HORVATH, *Administrative Patent Judge.*

JUDGMENT
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00906
Patent 10,225,479 B2

# I.    INTRODUCTION

## A.    Background and Summary

Apple, Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 19–22 ("the challenged claims") of U.S. Patent No. 10,225,479 B2 (Ex. 1001, "the '479 patent"). Paper 3 ("Pet."), 10. Corephotonics Ltd. ("Patent Owner") filed a Preliminary Response. Paper 8 ("Prelim. Resp."). Upon consideration of the Petition and Preliminary Response, we instituted *inter partes* review of all challenged claims on all grounds raised. Paper 10 ("Dec. Inst.").

Patent Owner filed confidential (Paper 15) and public (Paper 16) versions of a Response to the Petition. *See* Paper 16 ("PO Resp.").[1] Petitioner filed confidential (Paper 24) and public (Paper 23) versions of a Reply. *See* Paper 23 ("Pet. Reply"). Patent Owner filed a Sur-Reply. *See* Paper 33 ("PO Sur-Reply"). An oral hearing was held on August 12, 2021, and the hearing transcript is included in the record. *See* Paper 52 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b). This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons set forth below, we find Petitioner has failed to demonstrate by a preponderance of evidence that claims 19–22 of the '479 patent are unpatentable on the grounds raised in the Petition.

## B.    Real Parties-in-Interest

Petitioner and Patent Owner identify themselves, respectively, as the real parties-in-interest. Pet. 1; Paper 5, 1.

---

[1] Throughout this Decision, unless noted otherwise, we cite to the public versions of the papers filed by the parties.

IPR2020-00906
Patent 10,225,479 B2

### C.    Related Matters

Petitioner and Patent Owner identify *Corephotonics Ltd. v. Apple Inc.*, 5:19-cv-04809 (N.D. Cal.), as a district court proceeding that can affect or be affected by this proceeding, and Petitioner also identifies IPR2020-00905 as an *inter partes review* that can affect or be affected by this proceeding. Pet. 1; Paper 5, 1.  In addition, we note that the '479 patent is part of a family of patents and patent applications that include at least U.S. Patent Nos. 10,326,942; 10,015,408; 9,661,233; and 9,185,291.  Ex. 1001, code (63).  Many of these patents were or currently are involved in *inter partes* review proceedings that could affect or be affected by a decision in this proceeding.

### D.    Evidence Relied Upon[2]

| Reference | | Effective Date | Exhibit |
|---|---|---|---|
| Parulski | US 7,859,588 B2 | Dec. 28, 2010 | 1005 |
| Soga[3] | JP 2007/259108 A | Oct. 4, 2007 | 1006 |
| Morgan-Mar | US 8,989,517 B2 | Mar. 24, 2015 | 1009 |
| Kawamura[4] | JP S5862609 A | Apr. 14, 1983 | 1012 |
| Ogata | US 5,546,236 | Aug. 13, 1996 | 1026 |

### E.    Instituted Grounds of Unpatentability

We instituted review on the following grounds:

| Ground | Claims | 35 U.S.C. § | References |
|---|---|---|---|
| 1 | 19, 20 | 103(a) | Parulski, Ogata, Kawamura, Soga |

[2] Petitioner also relies upon the Declarations of Fredo Durand, Ph.D. (Exs.1003, 1038) and José Sasián, Ph.D. (Exs. 1021, 1039).
[3] Soga is a *non-certified* translation of a Japanese Patent Application Publication originally published in Japanese. *See* Ex. 1006, 18–30.
[4] Kawamura is a certified translation of an Unexamined Japanese Patent Application Publication originally published in Japanese. *See* Ex. 1012, 10–16.

3

IPR2020-00906
Patent 10,225,479 B2

| Ground | Claims | 35 U.S.C. § | References |
|--------|--------|-------------|------------|
| 2 | 21, 22 | 103(a) | Parulski, Ogata, Kawamura, Soga, Morgan-Mar |

## II.    ANALYSIS

### A.    *The '479 Patent*

The '479 patent is directed to "a thin (e.g., fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses" that is configured to use "partial or full fusion to provide a fused image in still mode." Ex. 1001, 3:18–23.  Figure 1A, reproduced below, illustrates dual-aperture zoom digital camera 100.

**100**



FIG. 1A

Figure 1A is a "block diagram illustrating a dual-aperture zoom" digital camera 100.  *Id.* at 5:64–65.  Camera 100 includes a wide imaging subsystem consisting of wide lens 102, wide sensor 104, and wide image

4

IPR2020-00906
Patent 10,225,479 B2

signal processor ("ISP") 106, and a tele imaging subsystem consisting of tele lens 108, tele sensor 110, and tele ISP 112. *Id.* at 6:24–29.

Camera 100 also includes controller 114, which includes sensor control 116, user control 118, video processing module 126 and still processing module 128. *Id.* at 6:33–37. User control 118 controls various camera functions, including, operational mode 120, region of interest ("ROI") 122, and zoom factor ("ZF") 124. *Id.* at 6:38–40. Zoom factor 124 allows a user "to choose a zoom factor." *Id.* at 6:50–51. Sensor control 116 chooses "which of the sensors is operational" based on the selected zoom factor. *Id.* at 6:41–45. ROI function 122 allows a user to "choose a region of interest," i.e., a sub-region "on which both sub-cameras are focused." *Id.* at 6:46–50.

The dual lenses allow camera 100 to take an image having a shallow depth-of-field ("DOF") "by taking advantage of the longer focal length of the Tele lens." *Id.* at 4:23–27. The image taken with the Tele lens can be enhanced "by fusing data from an image captured simultaneously with the Wide lens." *Id.* at 4:27–30. For example, the Tele lens can focus "on a subject of the photo" and the Wide lens can focus on "a closer distance than the subject so that objects behind the subject appear very blurry." *Id.* at 4:30–34. Then, a shallow depth-of-field image can be formed when "information from the out-of-focus blurred background in the Wide image is fused with the original Tele image background information, providing a blurrier background and even shallower DOF." *Id.* at 4:34–38.

The process for fusing images taken with the Wide and Tele lenses is shown in Figure 5 of the '479 patent, which is reproduced below.

5

IPR2020-00906
Patent 10,225,479 B2



IPR2020-00906
Patent 10,225,479 B2

Figure 5 is a flow chart depicting a method for acquiring a zoom image in a dual lens camera. *Id.* at 9:39–40. At step 502, separate images are captured by each of the Wide and Tele lenses. *Id.* at 9:40–44. At step 504, these images are aligned on an epipolar line. *Id.* at 9:46–47. At step 506, a registration map is generated. *Id.* at 9:47–49. At step 508, the registration map is used to resample the Tele image. *Id.* at 9:50–51. At step 510, Tele image pixel values are compared to Wide image pixel values, and if a significant difference is detected, the Wide image pixel values are chosen for the output image. *Id.* at 9:51–58. Finally, at step 512, a fused image is generated from the re-sampled Tele image and the Wide image. *Id.* at 9:58–60.

### B.    Illustrative Claim

Claims 19 is the only independent claim challenged. *See* Ex. 1001, 14:66–15:32. Claims 20–22 depend directly or indirectly from claim 19. *Id.* at 15:33–15:48. Claim 19 is illustrative of the challenged claims and is reproduced below.

> 19.  A dual-aperture digital camera for imaging an object or scene, comprising:
>
> a) a Wide camera comprising a Wide lens and a Wide image sensor, the Wide camera having a respective field of view $FOV_W$ and being operative to provide a Wide image of the object or scene;
>
> b) a Tele camera comprising a Tele lens and a Tele image sensor, the Tele camera having a respective field of view $FOV_T$ narrower than $FOV_W$ and being operative to provide a Tele image of the object or scene, wherein the Tele lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T/TTL_T > 1$;
>
> c) a first autofocus (AF) mechanism coupled mechanically to, and used to perform an AF action on the Wide lens;

7

IPR2020-00906
Patent 10,225,479 B2

d) a second AF mechanism coupled mechanically to, and used
to perform an AF action on the Tele lens, wherein the Wide
and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$,
wherein the Wide and Tele image sensors have pixels with
respective pixel sizes Pixel size$_{Wide}$ and Pixel size$_{Tele}$ wherein
Pixel size$_{Wide}$ is not equal to Pixel size$_{Tele}$, and wherein the
Tele camera has a Tele camera depth of field ($DOF_T$)
shallower that a DOF of the Wide camera ($DOF_W$); and

e) a camera controller operatively coupled to the first and
second AF mechanisms and to the Wide and Tele image
sensors and configured to control the AF mechanisms, to
process the Wide and Tele images to find translations
between matching points in the images to calculate depth
information and to create a fused image suited for portrait
photos, the fused image having a DOF shallower than $DOF_T$
and having a blurred background.

*Id*. at 14:66–15:32.

C.    *Level of Ordinary Skill in the Art*

Petitioner identifies a person of ordinary skill in the art ("POSITA") at
the time of the invention as someone that would have had "a bachelor's or
the equivalent degree in electrical and/or computer engineering or a related
field and 2-3 years of experience in imaging systems including optics and
image processing." Pet. 7 (citing Ex. 1003 ¶ 13). In our Institution
Decision, we adopted this description as our own. *See* Dec. Inst. 9–10.
Neither party disputes that preliminary finding, which we maintain for
purposes of this decision. *See* PO Resp. 4–5; Pet. Reply 1–26.

D.    *Claim Construction*

In *inter partes* reviews, we interpret a claim "using the same claim
construction standard that would be used to construe the claim in a civil
action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this
standard, a claim is construed "in accordance with the ordinary and

8

IPR2020-00906
Patent 10,225,479 B2

customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Only claim terms which are in controversy need to be construed and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

The parties dispute the meaning of the camera controller limitation recited in claim 19. *See* Pet. 8–10; PO Resp. 9–11; Pet. Reply 1–4; PO Sur-Reply 2–3. We did not provide a preliminary construction for this term in our Institution Decision because Patent Owner initially did not dispute Petitioner's proposed construction or argue for an alternative construction. *See* Dec. Inst. 10–11. Although the parties currently dispute the meaning of this limitation, we need not construe it because our decision does not depend on its meaning. *See Nidec*, 868 F.3d at 1017.

   E.    *Patentability of Claims 19–21*

Petitioner argues claims 19 and 20 are unpatentable over Parulski, Ogata, Kawamura, and Soga, and claims 20 and 21 are unpatentable over Parulski, Ogata, Kawamura, Soga, and Morgan-Mar. Pet. 12–74. Patent Owner disagrees. PO Resp. 36–80.

For the reasons discussed below, we find Petitioner has failed to produce sufficient evidence to demonstrate that a person having ordinary skill in the art would have known that a scaled version of Ogata's lens could have been used in Parulski's camera with reasonable expectation of success. This failure is dispositive of all grounds in the Petition. Accordingly, we limit our analysis below to the evidence and argument presented regarding the teachings of Parulski, Ogata, and the reasons to combine these references.

9

IPR2020-00906
Patent 10,225,479 B2

### 1. *Parulski*

Parulski discloses "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." Ex. 1005, 1:8–10. A schematic illustration of Parulski's camera is shown in Figure 1, which is reproduced below.



*FIG. 1*

Figure 1 is "a block diagram . . . of a digital camera using a first zoom lens [3] with a first image sensor [12], and a second zoom lens [4] with a second image sensor [14]." *Id.* at 8:28–30, Fig. 1. Each of zoom lenses 3 and 4 could be "replaced with a fixed focal length lens." *Id.* at 13:3–6. Image sensors 12 and 14 can "have a variety of aspect ratios" and "do not have to have the same specifications." *Id.* at 13:26–32. Parulski's digital camera could be, for example, the Kodak Easyshare V610 dual lens digital camera, which uses a 6MP (megapixel) 1/2.5" charge coupled device (CCD) as an image sensor. *Id.* at 5:21–35; *see also* Ex. 1033, 62 (showing the Easyshare V610 uses a 6 MP 1/2.5" CCD). Charge coupled devices of this type were rectangular with a 7.18 mm diagonal. *See* Ex. 1030, 1.

10

IPR2020-00906
Patent 10,225,479 B2

In Parulski's digital camera, analog data captured by image sensors 12 and 14 are digitized by analog signal processors 22 and 24, respectively, and sent to multiplexers 34 and 36. Ex. 1005, 13:48–59. Control processor 40 uses multiplexer 34 to select data from one of image sensors 12 or 14 as image data and uses multiplexer 36 to select data from the other of image sensors 12 or 14 as autofocus data. *Id.* at 14:1–5. Image processor 50 generates an image from the selected image data and autofocus signals for first and second zoom lenses 3 and 4 from the selected autofocus data. *Id.* at 14:5–16.

### 2. *Ogata*

Ogata discloses "[a] wide-angle photographic lens system which has a short total length . . . a high aperture ratio and excellent optical performance, and is suited for use with the collapsible mount type cameras." Ex. 1026, 3:2–5. Ogata's wide-angle lens system is shown in Figure 1, which is reproduced below.



Figure 1 of Ogata is a schematic illustration of a first embodiment of Ogata's wide-angle lens system. *Id.* at 12:1–4.

11

IPR2020-00906
Patent 10,225,479 B2

Lens prescription data for the first embodiment of Ogata's lens is provided in tabular form in column 7. An annotated version of that table is reproduced below.

Embodiment I

$f = 35.0$, $f_B = 26.1$, F/2.9, $2\omega = 63.4°$

| | | | |
|---|---|---|---|
| $r_1 = 14.1000$ | | | |
| | $d_1 = 3.700$ | $n_1 = 1.79952$ | $v_1 = 42.24$ |
| $r_2 = 47.5750$ | | | |
| | $d_2 = 1.800$ | | |
| $r_3 = -81.2140$ | | | |
| | $d_3 = 1.000$ | $n_2 = 1.76182$ | $v_2 = 26.52$ |
| $r_4 = 12.0220$ (aspherical surface) | | | |
| | $d_4 = 1.000$ | | |
| $r_5 = 55.8920$ | | | |
| | $d_5 = 3.000$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = -11.3420$ | | | |
| | $d_6 = 1.000$ | $n_4 = 1.53172$ | $v_4 = 48.90$ |
| $r_7 = -106.9860$ | | | |
| | $d_7 = 1.000$ | | |
| $r_8 = \infty$ (stop) | | | |
| | $d_8 = 2.000$ | | |
| $r_9 = -10.4990$ | | | |
| | $d_9 = 1.500$ | $n_5 = 1.51633$ | $v_5 = 64.15$ |
| $r_{10} = -9.0360$ (aspherical surface) | | | |

aspherical surface coefficients

(4th surface)   $P = 1.0396$, $A_4 = 0.66373 \times 10^{-4}$
  $A_6 = 0.13983 \times 10^{-5}$, $A_8 = -0.97157 \times 10^{-8}$
  $A_{10} = 0.42114 \times 10^{-9}$

(10th surface)   $P = 1.3037$, $A_4 = 0.44302 \times 10^{-4}$
  $A_6 = -0.17498 \times 10^{-5}$, $A_8 = 0.10177 \times 10^{-6}$
  $A_{10} = -0.17446 \times 10^{-8}$

$D_R/f = 0.043$.; $f_R/f = 2.660$, $(R_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 1.347$,
$N_p = 1.717$, $r_{1a}/r_{2b} = 1.173$, $(r_{1b} - r_{2a})/r_{1b} + r_{2a}) = -3.829$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -3.188$

*Id.* at 7:35–62. The Figure shows lens prescription data in tabular form for the first embodiment of Ogata's lens, annotated to highlight the index of refraction ($n_3$) and Abbe[5] number ($v_3$) for the third lens element.

---

[5] An Abbe number is an approximate measure of how a material's index of refraction depends on the frequency of light passing through it. *See, e.g.*, Darryl Meister, Understanding Reference Wavelengths (April 12, 2010), available at http://www.opticampus.opti.vision/files/memo_on_reference_wavelengths.pdf (last visited October 18, 2021).

IPR2020-00906
Patent 10,225,479 B2

### 3. Reasons to Combine Parulski and Ogata

Petitioner argues that it would have been obvious to modify Parulski to include a scaled version of Ogata's wide-angle lens because "Parulski does not indicate lens prescription data for . . . [the] lens systems in its camera."  Pet. 29.  Thus, a skilled artisan would have looked to Ogata for "lens data that specifies the properties and configuration that teaches . . . how to construct a wide-angle lens unit."  *Id.* (citing Ex. 1003 ¶ 63).

Petitioner argues that a skilled artisan would have known that the wide-angle lens described in Parulski ("40 mm equiv.") would have had a 56.8 degree FOV[6] and focused its image onto the 43.27 mm diameter image plane of a 35 mm camera.  *Id.* at 29–30 (citing Ex. 1003 ¶ 68; Ex. 1005, 23:23–43; Ex. 1019, 107).  Petitioner further argues that such an artisan would have also known that scaling Ogata's lens to instead focus its image onto the 7.12 mm diameter image plane of a 1/2.5" CCD would have resulted in a scaled lens having a similar 63.4 degree FOV and 2.9 F-number, but a 5.72 mm effective focal length (EFL) and a 6.89 mm total track length (TTL).  *Id.* at 26–28 (citing Ex. 1005, 5:21–35; 1020, 57; Ex. 1021 ¶¶ 37–39; Ex. 1022, 254–255; Ex. 1026, 7:35–61, Fig. 1; Ex. 1029; Ex. 1030; Ex. 1033, 62).

Petitioner supports its argument with the testimonial evidence of Dr. Sasián.  *See* Pet. 26–27 (citing Ex. 1021 ¶ 38).  According to Dr. Sasián, a person skilled in the art could have used Zemax lens design software to scale Ogata's lens.  Ex. 1021 ¶ 39 (citing Ex. 1021, App'x, Figs. 3A–3C).  The appendix to Dr. Sasián's declaration includes a heading "C" entitled "Fig. 3 - Ogata scaled to fill a 1/2.5" image sensor using Zemax (v.02/14/2011)."

---

[6] Corresponding to a 28.40 degree HFOV or half field-of-view.

13

IPR2020-00906
Patent 10,225,479 B2

*Id.* at 34.[7]  The appendix also includes a heading "C.3" entitled "Figure 3C –
Prescription Data," followed by a "Lens Data Editor" spreadsheet, an
annotated version of which is reproduced below.[8]

### 3.    *Fig. 3C – Prescription Data*



The Figure is an annotated version of "Fig. 3C – Prescription Data" showing
lens prescription data entered into a "Lens Data Editor" spreadsheet and

---

[7] When citing to the appendix, we cite to the declaration page numbers.
[8] In Zemax, a "Lens Data Editor is the primary spreadsheet where the
majority of the lens data will be entered."  Ex. 1022, 789.

14

annotated to highlight the index of refraction (1.83) and Abbe number (26.5) of the third lens element in the "Glass" column.

A few inconsistencies between the lens prescription data for Ogata's first embodiment lens and the data entered into the "Lens Editor Data" spreadsheet are noticeable. First, the Abbe number for the third lens element is 42.72 in Ogata's first embodiment lens and 26.5 (i.e., 38% smaller) in the "Lens Data Editor" spreadsheet. *Compare* Ex. 1026, 7:46, *with* Ex. 1021, 36. Second, the data for the fourth and tenth aspherical surfaces are noticeably different. For example, the fourth order term ($A_4$) for the fourth aspherical surface is $0.66 \times 10^{-4}$ in Ogata's first embodiment lens and $151.69 \times 10^{-4}$ (i.e., 0.015) in the "Lens Data Editor" spreadsheet. *Compare* Ex. 1026, 7:55, *with* Ex. 1021, 36. Neither Petitioner nor Dr. Sasián explain these discrepancies.

Patent Owner identifies the Abbe number discrepancy for the third lens element between Ogata's first embodiment lens and the "Lens Data Editor" spreadsheet. *See* PO Resp. 31. Patent Owner argues that, due to this discrepancy, "Dr. Sasián's field curvature, distortion and OPD [optical path difference] fan plots on page 35 of his declaration do not accurately reflect the performance of a scaled version of Ogata's Embodiment 1 lens." *Id.* (citing Ex. 2015 ¶ 62). Moreover, Dr. Moore opines that "[a] significant change in the index of refraction or the Abbe number can change a highly performing lens design into an unacceptable design." Ex. 2015 ¶ 88.

Petitioner was provided an opportunity to try to explain or correct this Abbe number discrepancy in its Reply, but did not attempt to do so. *See* Pet. Reply, 1–26. Instead, Petitioner argued that "Petitioner and Dr. Sasián have provided detailed lens design software analysis, which confirms the viability of . . . Ogata's lens designs in Parulski and reinforces the Petition's

motivation to use the same." *Id.* at 15 (citing Pet. 21–24, 28–30; Ex. 1021 ¶¶ 35–45, App'x; Ex. 1039 ¶ 22, App'x).[9]  But Dr. Sasián's lens design analysis appears to be based on the erroneous data discussed above, calling into question Petitioner's contention that a person skilled in the art would have known that Ogata's lens could be scaled to work in Parulski's camera with a reasonable expectation of success.  Indeed, Petitioner criticized Patent Owner for offering opinions that were *not* based on lens design software analysis because a person skilled in the art "would have performed lens design software analysis and formed its opinion based on the lens design software." *Id.*

In an *inter partes* review, Petitioner is "master of its complaint." *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348, 1355 (2018).  Thus, the Petition is "the centerpiece of the proceeding both before and after institution." *Id.* at 1358.  Moreover, Petitioner "has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).  Petitioner's contention that a person skilled in the art would have found it obvious that Ogata's lens could have been scaled to work in Parulski's camera with a reasonable expectation of success is entirely based on Dr. Sasián's opinion, which is based on Dr. Sasián's Zemax lens design software analysis.  *See* Pet. 24–30; *see also* Ex. 1021 ¶¶ 35–39, App'x, 34–36.  But, as noted above, the lens prescription data used for that analysis appears to differ from the

---

[9] Petitioner cites paragraphs 50–55 and 61–65 of Dr. Sasián's declaration, which has 46 enumerated paragraphs. *See* Ex. 1021, 27.  Dr. Sasián analyzes scaling Ogata's lens in paragraphs 35–39 of his declaration and scaling Kawamura's lens in paragraphs 40–45.  We make that correction here.

IPR2020-00906
Patent 10,225,479 B2

lens prescription data for Ogata's first embodiment lens.[10]  *Compare*
Ex. 1026, 7:46, *with* Ex. 1021, 36.  We accept as true Petitioner's contention
that a person skilled in the art "would have performed lens design software
analysis and formed [an] opinion based on the lens design software."  Pet.
Reply 15 (citing Ex. 1039 ¶ 22).  A logical consequence of that contention is
that the opinion of a person skilled in the art will be only as reliable as the
lens design software analysis that person performed, which will be only as
reliable as the data used to perform that analysis.

Moreover, as also discussed above, Patent Owner pointed out this
Abbe number discrepancy in its Patent Owner Response.  *See* PO Resp. 31.
This put Petitioner on notice of the discrepancy and shifted the burden of
production to Petitioner to either correct its analysis or explain why the
Abbe number discrepancy did not affect the analysis.  *See Dynamic
Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir.
2015) (explaining the shifting burden of production in an *inter partes* review
may require "producing additional evidence and presenting persuasive
argument based on new evidence or evidence already of record") (internal
citations omitted).  Petitioner neither corrected its reason to combine
analysis nor explained why it would not be affected by the apparent Abbe
number discrepancy.  *See* Pet. Reply 1–26.

Finally, in response to Patent Owner's argument that a person skilled
in the art "would not have used the Ogata lens design scaled down," but
would have instead constructed a miniature camera lens using "a fully

---

[10] We note, as well, that the lens prescription data for example 1 of
Kawamura's lens appears to differ from the lens prescription data Dr. Sasián
used to perform the Zemax analysis for scaling Kawamura's lens.  *Compare*
Ex. 1012, 3, *with* Ex. 1021, 37, 39.

17

IPR2020-00906
Patent 10,225,479 B2

aspheric design with plastic elements" having an aperture stop near the front of the lens (PO Resp. 58–59), Petitioner argues that a person of ordinary skill in the art "could have used lens design software to modify and adjust an older lens design into a miniaturized version" because the "modifications or adjustments [needed] were within the skill" level of a person of ordinary skill in the art (Pet. Reply 15–16 (citing Ex. 1039 ¶¶ 24–31)).[11]  Patent Owner argues that "Dr. Sasián's new Zemax analyses should be disregarded as an untimely obviousness theory presented in reply" because "[t]he Zemax analyses in Dr. Sasián's original declaration simply took the lens prescriptions in the Kawamura and Ogata patents and confirmed that Zemax would scale them."  PO Sur-Reply 13–14.

We agree with Patent Owner.  The Petition contends that a person of ordinary skill in the art would have known that Ogata's lens (using glass lens elements) could have been *scaled* to focus an image onto a 1/2.5" image sensor for use in Parulski's camera.  *See* Pet. 24–30; Ex. 1021, 36. Petitioner's reply evidence and argument is not introduced to support that contention but a different contention—that a person of ordinary skill in the art would have known that Ogata's lens could have been *redesigned* using aspheric plastic lens elements to focus an image onto a 1/3" image sensor. *See* n.11, *supra*.  This is a new contention that does not support Petitioner's

---

[11] We note that Dr. Sasián's analysis discloses how Kawamura's lens can be modified by replacing the spherical glass lens elements with aspherical plastic lens elements, moving the aperture stop to the first lens element, changing the F number to 2.8, and reducing the effective focal length to focus an image onto a 1/3" image sensor rather than a 1/2.5" image sensor. *See* Ex. 1039 ¶¶ 25–30; App'x, 17–18.  Dr. Sasián also opines that although this analysis illustrates how Kawamura's lens could have been modified, a person skilled in the art "would have recognized that Ogata could have been similarly adjusted to yield a miniaturized form-factor." *Id.* ¶ 25.

18

IPR2020-00906
Patent 10,225,479 B2

original contention that Ogata's lens could simply be scaled. Therefore, because it is a new and untimely contention, we do not consider it further. *See* Consolidated Trial Practice Guide (Nov. 2019)[12] ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g., to make out a prima facie case of unpatentability."); *see also Ariosa Diagnostics v. Verinata Heath, Inc.*, 805 F.3d 1359, 1368 (Fed. Cir. 2015) ("The Board must make judgments about . . . when a Reply contention crosses the line from the responsive to the new."); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d at 1359, 1369–70 (Fed. Cir. 2016) (affirming the Board's rejection of a reply argument presenting an "entirely new rationale to explain why one of skill in the art would have been motivated to combine" prior art references); *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330–31 (Fed. Cir. 2019) (affirming the Board's rejection of a reply argument presenting an "entirely new rationale" for why a claim would have been obvious).

For the reasons discussed above, we find Petitioner has failed to muster sufficient evidence to demonstrate by a preponderance of evidence that a person or ordinary skill in the art at the time of the invention would have known that Ogata's lens could have been scaled to work in Parulski's camera with a reasonable expectation of success. Accordingly, we find Petitioner has failed to demonstrate that claims 19 and 20 are unpatentable over Parulski, Ogata, Kawamura, and Soga or that claims 20 and 21 are unpatentable over Parulski, Ogata, Kawamura, Soga, and Morgan-Mar.

---

[12] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated

IPR2020-00906
Patent 10,225,479 B2

### III.    CONCLUSION

We have reviewed the Petition, Patent Owner Response, Petitioner Reply, and Patent Owner Sur-Reply.  We find, on this record, Petitioner has failed to demonstrate by a preponderance of evidence that claims 19–22 of the '479 patent are unpatentable.

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 19, 20 | 103(a) | Parulski, Ogata, Kawamura, Soga | | 19, 20 |
| 21, 22 | 103(a) | Parulski, Ogata, Kawamura, Soga, Morgan-Mar | | 21, 22 |
| **Overall Outcome** | | | | 19–22 |

### IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has failed to show by a preponderance of evidence that claims 19 and 20 are unpatentable under 35 U.S.C. § 103(a) over Parulski, Ogata, Kawamura, and Soga; and

FURTHER ORDERED that Petitioner has failed to show by a preponderance of evidence that claims 21 and 22 are unpatentable under 35 U.S.C. § 103(a) over Parulski, Ogata, Kawamura, Soga, and Morgan-Mar; and

FURTHER ORDERED that this Decision is final, and a party to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00906
Patent 10,225,479 B2

FOR PETITIONER:

Michael Parsons
Andrew Ehmke
Jordan Maucotel
HAYNES & BOONE, LLP
michael.parsons.ipr@haynesboone.com
andy.ehmke.ipr@ haynesboone.com
jordan.maucotel@ haynesboone.com

FOR PATENT OWNER:

Neil C. Rubin
Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

21

### U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**February 22, 2022**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE, INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS LTD.,**
**Patent Owner.**

**Case: IPR2020-00905**
**Patent No. 10,225,479 B2**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



Prosecution History ~ IPR2020-00905

| Date | Document |
|------|----------|
| 5/6/2020 | Petitioner's Notice for Filing Two Petitions |
| 5/6/2020 | Petition for Inter Partes Review |
| 5/6/2020 | Petitioner's Power of Attorney |
| 5/8/2020 | Patent Owner's Power of Attorney |
| 5/8/2020 | Patent Owner's Mandatory Notices |
| 5/13/2020 | Notice of Filing Date Accorded to Petition |
| 8/13/2020 | Patent Owner's Preliminary Response |
| 9/21/2020 | Order - Conduct of the Proceeding |
| 11/12/2020 | Decision - Institution of Inter Partes Review |
| 11/12/2020 | Scheduling Order |
| 1/12/2021 | Notice of Deposition - Durand, Ph.D. |
| 2/2/2021 | Petitioner's Updated Mandatory Notices |
| 2/2/2021 | Joint Stipulation to Modify Due Date 2 |
| 2/4/2021 | Patent Owner's Response (Confidential) |
| 2/5/2021 | Patent Owner's Response (Redacted) |
| 2/5/2021 | Patent Owner's Unopposed Motion to File Under Seal and for Entry of Protective Order |
| 3/2/2021 | Notice of Deposition - Moore, Ph.D. |
| 3/5/2021 | Petitioner's Updated Mandatory Notices |
| 4/2/2021 | Notice of Deposition - Hart, Ph.D. |
| 4/28/2021 | Patent Owner's Updated Mandatory Notices |
| 4/28/2021 | Patent Owner's Updated Power of Attorney |
| 5/7/2021 | Petitioner's Reply (Public Redacted Version) |
| 5/7/2021 | Petitioner's Reply (Confidential) |
| 5/7/2021 | Petitioner's Motion to Seal |
| 6/1/2021 | Notice of Deposition - Durand, Ph.D. |
| 6/2/2021 | Unopposed Motion for Pro Hac Vice Admission - Fenster and Tsuei |
| 6/4/2021 | Joint Stipulation to Modify Due Date 3 |
| 6/10/2021 | Order - Pro Hac Vice Admission - Fenster and Tsuei |
| 6/21/2021 | Order - Patent Owner's Motion to Seal and to Enter a Protective Order |
| 6/21/2021 | Order - Petitioner's Motion to Seal |
| 6/22/2021 | Patent Owner's Sur-Reply |
| 7/1/2021 | Petitioner's Request for Oral Argument |
| 7/1/2021 | Patent Owner's Request for Oral Argument |
| 7/6/2021 | Order - Requests for Oral Argument |
| 7/13/2021 | Patent Owner's Unopposed Revised Motion to File Under Seal |
| 7/13/2021 | Patent Owner's Response to Petition for Inter Partes Review (Confidential) |
| 7/13/2021 | Petitioner's Reply (Confidential) |
| 7/13/2021 | Patent Owner's Response to Petition for Inter Partes Review |
| 7/13/2021 | Petitioner's Reply |
| 7/30/2021 | Patent Owner's Updated Mandatory Notices |
| 8/3/2021 | Joint Stipulation to Alternative Schedule for Exchanging Demonstratives and Request |

**Prosecution History ~ IPR2020-00905**

| Date | Document |
|------|----------|
| | to Modify Schedule |
| 8/9/2021 | Petitioner's Oral Argument Demonstratives (Public) |
| 8/9/2021 | Petitioner's Oral Argument Demonstratives (Confidential) |
| 8/9/2021 | Patent Owner's Oral Argument Demonstratives (Confidential) |
| 8/9/2021 | Patent Owner's Oral Argument Demonstratives (Public) |
| 8/10/2021 | Petitioner's Corrected Oral Argument Demonstratives (Public) |
| 8/10/2021 | Petitioner's Corrected Oral Argument Demonstratives (Confidential) |
| 9/14/2021 | Oral Hearing Transcript |
| 9/29/2021 | Order - Patent Owner's Motions to Seal |
| 11/8/2021 | Final Written Decision |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>**February 22, 2022**</u>
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE, INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS LTD.,**
**Patent Owner.**

**Case:  IPR2020-00906**
**Patent No. 10,225,479 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



Prosecution History ~ IPR2020-00906

| Date | Document |
|------|----------|
| 5/6/2020 | Petitioner's Notice for Filing Two Petitions |
| 5/6/2020 | Petition for Inter Partes Review |
| 5/6/2020 | Petitioner's Power of Attorney |
| 5/8/2020 | Patent Owner's Power of Attorney |
| 5/8/2020 | Patent Owner's Mandatory Notices |
| 5/13/2020 | Notice of Filing Date Accorded to Petition |
| 8/13/2020 | Patent Owner's Preliminary Response |
| 9/21/2020 | Order - Conduct of the Proceeding |
| 11/12/2020 | Decision - Institution of Inter Partes Review |
| 11/12/2020 | Scheduling Order |
| 1/12/2021 | Notice of Deposition - Durand, Ph.D. |
| 2/2/2021 | Petitioner's Updated Mandatory Notices |
| 2/2/2021 | Joint Stipulation to Modify Due Date 2 |
| 2/4/2021 | Patent Owner's Response (Confidential) |
| 2/5/2021 | Patent Owner's Response (Redacted) |
| 2/5/2021 | Patent Owner's Unopposed Motion to File Under Seal and for Entry of Protective Order |
| 3/2/2021 | Notice of Deposition - Moore, Ph.D. |
| 3/5/2021 | Petitioner's Updated Mandatory Notices |
| 4/2/2021 | Notice of Deposition - Hart, Ph.D. |
| 4/29/2021 | Patent Owner's Updated Power of Attorney |
| 4/29/2021 | Patent Owner's Updated Mandatory Notices |
| 5/7/2021 | Petitioner's Reply (Public Redacted Version) |
| 5/7/2021 | Petitioner's Reply (Confidential) |
| 5/7/2021 | Petitioner's Motion to Seal |
| 5/26/2021 | Notice of Deposition - Sasian, Ph.D. |
| 6/1/2021 | Notice of Deposition - Durand, Ph.D. |
| 6/2/2021 | Unopposed Motion for Pro Hac Vice Admission - Fenster and Tsuei |
| 6/4/2021 | Joint Stipulation to Modify Due Date 3 |
| 6/10/2021 | Order - Pro Hac Vice Admission - Fenster and Tsuei |
| 6/21/2021 | Order - Patent Owner's Motion to Seal and to Enter a Protective Order |
| 6/21/2021 | Order - Petitioner's Motion to Seal |
| 6/22/2021 | Patent Owner's Sur-Reply |
| 7/1/2021 | Petitioner's Request for Oral Argument |
| 7/1/2021 | Patent Owner's Request for Oral Argument |
| 7/6/2021 | Order - Requests for Oral Argument |
| 7/13/2021 | Patent Owner's Unopposed Revised Motion to File Under Seal |
| 7/13/2021 | Patent Owner's Response to Petition for Inter Partes Review (Confidential) |
| 7/13/2021 | Petitioner's Reply (Confidential) |
| 7/13/2021 | Patent Owner's Response to Petition for Inter Partes Review |
| 7/13/2021 | Petitioner's Reply |
| 7/30/2021 | Patent Owner's Updated Mandatory Notices |

**Prosecution History ~ IPR2020-00906**

| Date | Document |
|------|----------|
| 8/3/2021 | Joint Stipulation to Alternative Schedule for Exchanging Demonstratives and Request to Modify Schedule |
| 8/9/2021 | Petitioner's Oral Argument Demonstratives (Public) |
| 8/9/2021 | Petitioner's Oral Argument Demonstratives (Confidential) |
| 8/9/2021 | Patent Owner's Oral Argument Demonstratives (Confidential) |
| 8/9/2021 | Patent Owner's Oral Argument Demonstratives (Public) |
| 8/10/2021 | Petitioner's Corrected Oral Argument Demonstratives (Public) |
| 8/10/2021 | Petitioner's Corrected Oral Argument Demonstratives (Confidential) |
| 9/1/2021 | Petitioner's Motion to Submit Supplemental Evidence |
| 9/8/2021 | Patent Owner's Response to Petitioner's Motion to Submit Supplemental Evidence |
| 9/14/2021 | Oral Hearing Transcript |
| 9/29/2021 | Order - Patent Owner's Motions to Seal |
| 11/8/2021 | Final Written Decision |



US010225479B2

(12) **United States Patent**  
Shabtay et al.

(10) Patent No.: **US 10,225,479 B2**  
(45) Date of Patent: **Mar. 5, 2019**

(54) **DUAL APERTURE ZOOM DIGITAL CAMERA**

(71) Applicant: **Corephotonics Ltd.**, Tel Aviv (IL)

(72) Inventors: **Gal Shabtay**, Tel Aviv (IL); **Ephraim Goldenberg**, Ashdod (IL); **Oded Gigushinski**, Herzlia (IL); **Noy Cohen**, Tel Aviv (IL)

(73) Assignee: **Corephotonics Ltd.**, Tel Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/048,242**

(22) Filed: **Jul. 28, 2018**

(65) **Prior Publication Data**

US 2018/0359423 A1    Dec. 13, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/865,869, filed on Jan. 9, 2018, which is a continuation of application (Continued)

(51) **Int. Cl.**  
*H04N 5/232* (2006.01)  
*H04N 5/225* (2006.01)  
(Continued)

(52) **U.S. Cl.**  
CPC ....... *H04N 5/23296* (2013.01); *G02B 13/009* (2013.01); *G02B 13/0015* (2013.01);  
(Continued)

(58) **Field of Classification Search**  
CPC ......................... G02B 13/0015; G02B 27/0075  
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,354,503 A    7/1944    Cox  
2,378,170 A    6/1945    Aklin  
(Continued)

FOREIGN PATENT DOCUMENTS

CN    101276415 A    10/2008  
CN    102739949 A    10/2012  
(Continued)

OTHER PUBLICATIONS

Statistical Modeling and Performance Characterization of a Real-Time Dual Camera Surveillance System, Greienhagen et al., Publisher: IEEE, 2000, 8 pages.

(Continued)

*Primary Examiner* — Cynthia Segura  
(74) *Attorney, Agent, or Firm* — Nathan and Associates; Menachem Nathan

(57) **ABSTRACT**

A dual-aperture zoom digital camera operable in both still and video modes. The camera includes Wide and Tele imaging sections with respective lens/sensor combinations and image signal processors and a camera controller operatively coupled to the Wide and Tele imaging sections. The Wide and Tele imaging sections provide respective image data. The controller is configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image from a particular point of view, and to provide without fusion continuous zoom video mode output images, each output image having a given output resolution, wherein the video mode output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa, and wherein at the lower ZF the output resolution is determined by the Wide sensor while at the higher ZF value the output resolution is determined by the Tele sensor.

**40 Claims, 8 Drawing Sheets**



**US 10,225,479 B2**

Page 2

### Related U.S. Application Data

No. 15/424,853, filed on Feb. 5, 2017, now Pat. No. 10,015,408, which is a continuation of application No. 14/880,251, filed on Oct. 11, 2015, now Pat. No. 9,661,233, which is a continuation of application No. 14/365,711, filed as application No. PCT/IB2014/062180 on Jun. 12, 2014, now Pat. No. 9,185,291.

(60)  Provisional application No. 61/834,486, filed on Jun. 13, 2013.

(51)  **Int. Cl.**
   *G02B 13/00*          (2006.01)
   *G02B 27/00*          (2006.01)

(52)  **U.S. Cl.**
   CPC ......... *G02B 27/0075* (2013.01); *H04N 5/225* (2013.01); *H04N 5/2258* (2013.01); *H04N 5/2259* (2013.01); *H04N 5/23212* (2013.01); *H04N 5/23232* (2013.01); *H04N 5/23245* (2013.01)

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,441,093 | A | 5/1948 | Aklin |
| 3,388,956 | A | 6/1968 | Eggert et al. |
| 3,524,700 | A | 8/1970 | Eggert et al. |
| 3,864,027 | A | 2/1975 | Harada |
| 3,942,876 | A | 3/1976 | Betensky |
| 4,134,645 | A | 1/1979 | Sugiyama et al. |
| 4,199,785 | A | 4/1980 | McCullough et al. |
| 4,338,001 | A | 7/1982 | Matsui |
| 4,465,345 | A | 8/1984 | Yazawa |
| 5,000,551 | A | 3/1991 | Shibayama |
| 5,005,083 | A | 4/1991 | Grage et al. |
| 5,032,917 | A | 7/1991 | Aschwanden |
| 5,051,830 | A | 9/1991 | von Hoessle |
| 5,248,971 | A | 9/1993 | Mandl |
| 5,287,093 | A | 2/1994 | Amano et al. |
| 5,436,660 | A | 7/1995 | Sakamoto |
| 5,444,478 | A | 8/1995 | Lelong et al. |
| 5,459,520 | A | 10/1995 | Sasaki |
| 5,657,402 | A | 8/1997 | Bender et al. |
| 5,682,198 | A | 10/1997 | Katayama et al. |
| 5,768,443 | A | 6/1998 | Michael et al. |
| 5,926,190 | A | 7/1999 | Turkowski et al. |
| 5,940,641 | A | 8/1999 | McIntyre et al. |
| 5,982,951 | A | 11/1999 | Katayama et al. |
| 6,101,334 | A | 8/2000 | Fantone |
| 6,128,416 | A | 10/2000 | Oura |
| 6,148,120 | A | 11/2000 | Sussman |
| 6,208,765 | B1 | 3/2001 | Bergen |
| 6,268,611 | B1 | 7/2001 | Pettersson et al. |
| 6,549,215 | B2 | 4/2003 | Jouppi |
| 6,611,289 | B1 | 8/2003 | Yu et al. |
| 6,643,416 | B1 | 11/2003 | Daniels et al. |
| 6,650,368 | B1 | 11/2003 | Doron |
| 6,654,180 | B2 | 11/2003 | Ori |
| 6,680,748 | B1 | 1/2004 | Monti |
| 6,714,665 | B1 | 3/2004 | Hanna et al. |
| 6,724,421 | B1 | 4/2004 | Glatt |
| 6,738,073 | B2 | 5/2004 | Park et al. |
| 6,741,250 | B1 | 5/2004 | Furlan et al. |
| 6,750,903 | B1 | 6/2004 | Miyatake et al. |
| 6,778,207 | B1 | 8/2004 | Lee et al. |
| 7,002,583 | B2 | 2/2006 | Rabb, III |
| 7,015,954 | B1 | 3/2006 | Foote et al. |
| 7,038,716 | B2 | 5/2006 | Klein et al. |
| 7,187,504 | B2 | 3/2007 | Horiuchi |
| 7,199,348 | B2 | 4/2007 | Olsen et al. |
| 7,206,136 | B2 | 4/2007 | Labaziewicz et al. |
| 7,248,294 | B2 | 7/2007 | Slatter |
| 7,256,944 | B2 | 8/2007 | Labaziewicz et al. |
| 7,305,180 | B2 | 12/2007 | Labaziewicz et al. |

| | | | |
|---|---|---|---|
| 7,339,621 | B2 | 3/2008 | Fortier |
| 7,346,217 | B1 | 3/2008 | Gold, Jr. |
| 7,365,793 | B2 | 4/2008 | Cheatle et al. |
| 7,411,610 | B2 | 8/2008 | Doyle |
| 7,424,218 | B2 | 9/2008 | Baudisch et al. |
| 7,509,041 | B2 | 3/2009 | Hosono |
| 7,515,351 | B2 | 4/2009 | Chen et al. |
| 7,533,819 | B2 | 5/2009 | Barkan et al. |
| 7,564,635 | B1 | 7/2009 | Tang |
| 7,619,683 | B2 | 11/2009 | Davis |
| 7,643,225 | B1 | 1/2010 | Tsai |
| 7,660,049 | B2 | 2/2010 | Tang |
| 7,684,128 | B2 | 3/2010 | Tang |
| 7,688,523 | B2 | 3/2010 | Sano |
| 7,692,877 | B2 | 4/2010 | Tang et al. |
| 7,697,220 | B2 | 4/2010 | Iyama |
| 7,738,016 | B2 | 6/2010 | Toyofuku |
| 7,738,186 | B2 | 6/2010 | Chen et al. |
| 7,773,121 | B1 | 8/2010 | Huntsberger et al. |
| 7,777,972 | B1 | 8/2010 | Chen et al. |
| 7,813,057 | B2 | 10/2010 | Lin |
| 7,821,724 | B2 | 10/2010 | Tang et al. |
| 7,826,149 | B2 | 11/2010 | Tang et al. |
| 7,826,151 | B2 | 11/2010 | Tsai |
| 7,869,142 | B2 | 1/2011 | Chen et al. |
| 7,880,776 | B2 | 2/2011 | LeGall et al. |
| 7,898,747 | B2 | 3/2011 | Tang |
| 7,916,401 | B2 | 3/2011 | Chen et al. |
| 7,918,398 | B2 | 4/2011 | Li et al. |
| 7,957,075 | B2 | 6/2011 | Tang |
| 7,957,076 | B2 | 6/2011 | Tang |
| 7,957,079 | B2 | 6/2011 | Tang |
| 7,961,406 | B2 | 6/2011 | Tang et al. |
| 7,964,835 | B2 | 6/2011 | Olsen et al. |
| 7,978,239 | B2 | 7/2011 | Deever et al. |
| 8,000,031 | B1 | 8/2011 | Tsai |
| 8,004,777 | B2 | 8/2011 | Yoshihito Souma |
| 8,077,400 | B2 | 12/2011 | Tang |
| 8,115,825 | B2 | 2/2012 | Culbert et al. |
| 8,149,327 | B2 | 4/2012 | Lin et al. |
| 8,149,523 | B2 | 4/2012 | Ozaki |
| 8,154,610 | B2 | 4/2012 | Jo et al. |
| 8,218,253 | B2 | 7/2012 | Tang |
| 8,228,622 | B2 | 7/2012 | Tang |
| 8,233,224 | B2 | 7/2012 | Chen |
| 8,238,695 | B1 | 8/2012 | Davey et al. |
| 8,253,843 | B2 | 8/2012 | Lin |
| 8,274,552 | B2 | 9/2012 | Dahi et al. |
| 8,279,537 | B2 | 10/2012 | Sato |
| 8,363,337 | B2 | 1/2013 | Tang et al. |
| 8,390,729 | B2 | 3/2013 | Long et al. |
| 8,391,697 | B2 | 3/2013 | Cho et al. |
| 8,395,851 | B2 | 3/2013 | Tang et al. |
| 8,400,555 | B1 | 3/2013 | Georgiev et al. |
| 8,400,717 | B2 | 3/2013 | Chen et al. |
| 8,439,265 | B2 | 5/2013 | Ferren et al. |
| 8,446,484 | B2 | 5/2013 | Muukki et al. |
| 8,451,549 | B2 | 5/2013 | Yamanaka et al. |
| 8,483,452 | B2 | 7/2013 | Ueda et al. |
| 8,503,107 | B2 | 8/2013 | Chen et al. |
| 8,508,649 | B2 * | 8/2013 | Reshidko .......... G02B 13/0045 348/345 |
| 8,514,491 | B2 | 8/2013 | Duparre |
| 8,514,502 | B2 | 8/2013 | Chen |
| 8,547,389 | B2 | 10/2013 | Hoppe et al. |
| 8,553,106 | B2 | 10/2013 | Scarff |
| 8,587,691 | B2 | 11/2013 | Takane |
| 8,619,148 | B1 | 12/2013 | Watts et al. |
| 8,780,465 | B2 | 7/2014 | Chae |
| 8,803,990 | B2 | 8/2014 | Smith |
| 8,810,923 | B2 | 8/2014 | Shinohara |
| 8,854,745 | B1 | 10/2014 | Chen |
| 8,896,655 | B2 | 11/2014 | Mauchly et al. |
| 8,958,164 | B2 | 2/2015 | Kwon et al. |
| 8,976,255 | B2 | 3/2015 | Matsuoto et al. |
| 9,019,387 | B2 | 4/2015 | Nakano |
| 9,025,073 | B2 | 5/2015 | Attar et al. |
| 9,025,077 | B2 | 5/2015 | Attar et al. |
| 9,041,835 | B2 | 5/2015 | Honda |

APPLE INC. v. COREPHOTONICS LTD.

Appx53

**US 10,225,479 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,137,447 B2 | 9/2015 | Shibuno | |
| 9,185,291 B1 | 11/2015 | Shabtay et al. | |
| 9,215,377 B2 | 12/2015 | Sokeila et al. | |
| 9,215,385 B2 | 12/2015 | Luo | |
| 9,229,194 B2 | 1/2016 | Yoneyama et al. | |
| 9,235,036 B2 | 1/2016 | Kato et al. | |
| 9,270,875 B2 | 2/2016 | Brisedoux et al. | |
| 9,279,957 B2 | 3/2016 | Kanda et al. | |
| 9,286,680 B1 | 3/2016 | Jiang et al. | |
| 9,344,626 B2 | 5/2016 | Silverstein et al. | |
| 9,360,671 B1 | 6/2016 | Zhou | |
| 9,369,621 B2 | 6/2016 | Malone et al. | |
| 9,402,032 B2 * | 7/2016 | Dror | G02B 9/60 |
| 9,413,930 B2 | 8/2016 | Geerds | |
| 9,413,984 B2 | 8/2016 | Attar et al. | |
| 9,420,180 B2 | 8/2016 | Jin | |
| 9,438,792 B2 | 9/2016 | Nakada et al. | |
| 9,485,432 B1 | 11/2016 | Medasani et al. | |
| 9,488,802 B2 | 11/2016 | Chen et al. | |
| 9,568,712 B2 | 2/2017 | Dror et al. | |
| 9,578,257 B2 | 2/2017 | Attar et al. | |
| 9,618,748 B2 | 4/2017 | Munger et al. | |
| 9,678,310 B2 | 6/2017 | Iwasaki et al. | |
| 9,681,057 B2 | 6/2017 | Attar et al. | |
| 9,723,220 B2 | 8/2017 | Sugie | |
| 9,736,365 B2 | 8/2017 | Laroia | |
| 9,736,391 B2 | 8/2017 | Du et al. | |
| 9,762,812 B2 * | 9/2017 | Belote | G02B 5/005 |
| 9,768,310 B2 | 9/2017 | Ahn et al. | |
| 9,800,798 B2 | 10/2017 | Ravirala et al. | |
| 9,817,213 B2 | 11/2017 | Mercado | |
| 9,851,803 B2 | 12/2017 | Fisher et al. | |
| 9,894,287 B2 | 2/2018 | Qian et al. | |
| 9,900,522 B2 | 2/2018 | Lu | |
| 9,927,600 B2 | 3/2018 | Goldenberg et al. | |
| 2002/0005902 A1 | 1/2002 | Yuen | |
| 2002/0063711 A1 | 5/2002 | Park et al. | |
| 2002/0075258 A1 | 6/2002 | Park et al. | |
| 2002/0122113 A1 | 9/2002 | Foote | |
| 2003/0030729 A1 | 2/2003 | Prentice et al. | |
| 2003/0093805 A1 | 5/2003 | Gin | |
| 2003/0160886 A1 | 8/2003 | Misawa et al. | |
| 2003/0202113 A1 | 10/2003 | Yoshikawa | |
| 2004/0008773 A1 | 1/2004 | Itokawa | |
| 2004/0017386 A1 | 1/2004 | Liu et al. | |
| 2004/0027367 A1 | 2/2004 | Pilu | |
| 2004/0061788 A1 | 4/2004 | Bateman | |
| 2004/0240052 A1 | 12/2004 | Minefuji et al. | |
| 2005/0013509 A1 | 1/2005 | Samadani | |
| 2005/0046740 A1 | 3/2005 | Davis | |
| 2005/0141103 A1 | 6/2005 | Nishina | |
| 2005/0157184 A1 | 7/2005 | Nakanishi et al. | |
| 2005/0168840 A1 | 8/2005 | Kobayashi et al. | |
| 2005/0200718 A1 | 9/2005 | Lee | |
| 2006/0054782 A1 | 3/2006 | Olsen et al. | |
| 2006/0056056 A1 | 3/2006 | Ahiska et al. | |
| 2006/0125937 A1 | 6/2006 | LeGall et al. | |
| 2006/0170793 A1 | 8/2006 | Pasquarette et al. | |
| 2006/0175549 A1 | 8/2006 | Miller et al. | |
| 2006/0187310 A1 | 8/2006 | Janson et al. | |
| 2006/0187322 A1 | 8/2006 | Janson et al. | |
| 2006/0187338 A1 | 8/2006 | May et al. | |
| 2007/0024737 A1 | 2/2007 | Nakamura et al. | |
| 2007/0146503 A1 * | 6/2007 | Shiraki | H04N 3/1593 |
| | | | 348/231.3 |
| 2007/0177025 A1 | 8/2007 | Kopet et al. | |
| 2007/0188653 A1 | 8/2007 | Pollock et al. | |
| 2007/0189386 A1 | 8/2007 | Imagawa et al. | |
| 2007/0229983 A1 | 10/2007 | Saori | |
| 2007/0257184 A1 | 11/2007 | Olsen et al. | |
| 2007/0285550 A1 | 12/2007 | Son | |
| 2008/0017557 A1 | 1/2008 | Witdouck | |
| 2008/0024614 A1 | 1/2008 | Li et al. | |
| 2008/0025634 A1 | 1/2008 | Border et al. | |

| | | | |
|---|---|---|---|
| 2008/0030592 A1 * | 2/2008 | Border | H04N 5/232 |
| | | | 348/218.1 |
| 2008/0030611 A1 | 2/2008 | Jenkins | |
| 2008/0084484 A1 | 4/2008 | Ochi et al. | |
| 2008/0117316 A1 | 5/2008 | Orimoto | |
| 2008/0218611 A1 | 9/2008 | Parulski et al. | |
| 2008/0218612 A1 | 9/2008 | Border et al. | |
| 2008/0218613 A1 * | 9/2008 | Janson | G03B 15/00 |
| | | | 348/262 |
| 2008/0219654 A1 * | 9/2008 | Border | H04N 5/23212 |
| | | | 396/89 |
| 2008/0304161 A1 | 12/2008 | Souma | |
| 2009/0086074 A1 | 4/2009 | Li et al. | |
| 2009/0122195 A1 | 5/2009 | Van Baar et al. | |
| 2009/0122406 A1 | 5/2009 | Rouvinen et al. | |
| 2009/0122423 A1 | 5/2009 | Park et al. | |
| 2009/0128644 A1 | 5/2009 | Camp et al. | |
| 2009/0219547 A1 | 9/2009 | Kauhanen et al. | |
| 2009/0252484 A1 | 10/2009 | Hasuda et al. | |
| 2009/0295949 A1 | 12/2009 | Ojala | |
| 2010/0013906 A1 | 1/2010 | Border et al. | |
| 2010/0020221 A1 | 1/2010 | Tupman et al. | |
| 2010/0060746 A9 | 3/2010 | Olsen et al. | |
| 2010/0103194 A1 | 4/2010 | Chen et al. | |
| 2010/0238327 A1 | 9/2010 | Griffith et al. | |
| 2010/0283842 A1 | 11/2010 | Guissin et al. | |
| 2011/0001838 A1 | 1/2011 | Lee | |
| 2011/0064327 A1 * | 3/2011 | Dagher | G06T 5/004 |
| | | | 382/263 |
| 2011/0080487 A1 | 4/2011 | Venkataraman et al. | |
| 2011/0115965 A1 | 5/2011 | Engelhardt et al. | |
| 2011/0128288 A1 | 6/2011 | Petrou et al. | |
| 2011/0164172 A1 | 7/2011 | Shintani et al. | |
| 2011/0229054 A1 | 9/2011 | Weston et al. | |
| 2011/0234853 A1 | 9/2011 | Hayashi et al. | |
| 2011/0234881 A1 | 9/2011 | Wakabayashi et al. | |
| 2011/0242286 A1 | 10/2011 | Pace et al. | |
| 2011/0242355 A1 | 10/2011 | Goma et al. | |
| 2012/0026366 A1 * | 2/2012 | Golan | H04N 5/232 |
| | | | 348/240.2 |
| 2012/0062780 A1 | 3/2012 | Morihisa | |
| 2012/0069235 A1 | 3/2012 | Imai | |
| 2012/0075489 A1 | 3/2012 | Nishihara | |
| 2012/0092777 A1 | 4/2012 | Tochigi et al. | |
| 2012/0105579 A1 | 5/2012 | Jeon et al. | |
| 2012/0105708 A1 | 5/2012 | Hagiwara | |
| 2012/0154929 A1 | 6/2012 | Tsai et al. | |
| 2012/0196648 A1 | 8/2012 | Havens et al. | |
| 2012/0229663 A1 | 9/2012 | Nelson et al. | |
| 2012/0249815 A1 | 10/2012 | Bohn et al. | |
| 2012/0287315 A1 | 11/2012 | Huang et al. | |
| 2012/0320467 A1 | 12/2012 | Baik et al. | |
| 2013/0002928 A1 | 1/2013 | Imai | |
| 2013/0093842 A1 | 4/2013 | Yahata | |
| 2013/0135445 A1 | 5/2013 | Dahi et al. | |
| 2013/0182150 A1 | 7/2013 | Asakura | |
| 2013/0201360 A1 | 8/2013 | Song | |
| 2013/0202273 A1 | 8/2013 | Ouedraogo et al. | |
| 2013/0208178 A1 | 8/2013 | Park | |
| 2013/0235224 A1 | 9/2013 | Park et al. | |
| 2013/0250150 A1 | 9/2013 | Malone et al. | |
| 2013/0258044 A1 | 10/2013 | Betts-LaCroix | |
| 2013/0286488 A1 | 10/2013 | Chae | |
| 2013/0321668 A1 | 12/2013 | Kamath | |
| 2014/0022436 A1 | 1/2014 | Kim et al. | |
| 2014/0049615 A1 | 2/2014 | Uwagawa | |
| 2014/0118584 A1 | 5/2014 | Lee et al. | |
| 2014/0192238 A1 | 7/2014 | Attar et al. | |
| 2014/0192253 A1 | 7/2014 | Laroia | |
| 2014/0204480 A1 | 7/2014 | Jo et al. | |
| 2014/0285907 A1 | 9/2014 | Tang et al. | |
| 2014/0293453 A1 | 10/2014 | Ogino et al. | |
| 2014/0313316 A1 | 10/2014 | Olsson et al. | |
| 2014/0362242 A1 | 12/2014 | Takizawa | |
| 2014/0362274 A1 | 12/2014 | Christie et al. | |
| 2015/0002683 A1 | 1/2015 | Hu et al. | |
| 2015/0042870 A1 | 2/2015 | Chan et al. | |
| 2015/0092066 A1 | 4/2015 | Geiss et al. | |
| 2015/0116569 A1 | 4/2015 | Mercado | |

**US 10,225,479 B2**

Page 4

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0154776 A1 | 6/2015 | Zhang et al. | |
| 2015/0162048 A1 | 6/2015 | Hirata et al. | |
| 2015/0195458 A1 | 7/2015 | Nakayama et al. | |
| 2015/0215516 A1 | 7/2015 | Dolgin | |
| 2015/0237280 A1 | 8/2015 | Choi et al. | |
| 2015/0242994 A1 | 8/2015 | Shen | |
| 2015/0253647 A1 | 9/2015 | Mercado | |
| 2015/0271471 A1 | 9/2015 | Hsieh et al. | |
| 2015/0316744 A1 | 11/2015 | Chen | |
| 2015/0334309 A1 | 11/2015 | Peng et al. | |
| 2016/0044250 A1 | 2/2016 | Shabtay et al. | |
| 2016/0070088 A1 | 3/2016 | Koguchi | |
| 2016/0085089 A1 | 3/2016 | Mercado | |
| 2016/0154202 A1 | 6/2016 | Wippermann et al. | |
| 2016/0154204 A1 | 6/2016 | Lim et al. | |
| 2016/0187631 A1 | 6/2016 | Choi et al. | |
| 2016/0191819 A1 * | 6/2016 | Sakai | H04N 5/23245 348/333.12 |
| 2016/0202453 A1 * | 7/2016 | Iwasawa | G02B 13/18 359/684 |
| 2016/0212358 A1 | 7/2016 | Shikata | |
| 2016/0301840 A1 | 10/2016 | Du et al. | |
| 2016/0313537 A1 | 10/2016 | Mercado | |
| 2016/0353012 A1 | 12/2016 | Kao et al. | |
| 2017/0019616 A1 | 1/2017 | Zhu et al. | |
| 2017/0054911 A1 * | 2/2017 | Lee | H04N 5/23293 |
| 2017/0102522 A1 | 4/2017 | Jo | |
| 2017/0115471 A1 | 4/2017 | Shinohara | |
| 2017/0214846 A1 | 7/2017 | Du et al. | |
| 2017/0214866 A1 | 7/2017 | Zhu et al. | |
| 2017/0289458 A1 | 10/2017 | Song et al. | |
| 2018/0096487 A1 * | 4/2018 | Nash | H04N 5/217 |
| 2018/0120674 A1 | 5/2018 | Avivi et al. | |
| 2018/0150973 A1 | 5/2018 | Tang et al. | |
| 2018/0152640 A1 * | 5/2018 | Shabtay | H04N 5/2258 |
| 2018/0224630 A1 | 8/2018 | Lee et al. | |
| 2018/0241922 A1 | 8/2018 | Baldwin et al. | |
| 2018/0295292 A1 | 10/2018 | Lee et al. | |
| 2018/0359423 A1 * | 12/2018 | Shabtay | H04N 5/2258 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 103024272 A | 4/2013 |
| CN | 104297906 A | 1/2015 |
| EP | 1536633 A1 | 6/2005 |
| EP | 2523450 A1 | 11/2012 |
| JP | S54157620 A | 12/1979 |
| JP | S59121015 A | 7/1984 |
| JP | 04211230 A | 8/1992 |
| JP | H07318864 A | 12/1995 |
| JP | 08271976 A | 10/1996 |
| JP | 2003298920 A | 10/2003 |
| JP | 2004133054 A | 4/2004 |
| JP | 2005099265 A | 4/2005 |
| JP | 2006238325 A | 9/2006 |
| JP | 2007228006 A | 9/2007 |
| JP | 2007306282 A | 11/2007 |
| JP | 2008076485 A | 4/2008 |
| JP | 2012203234 A | 10/2012 |
| JP | 2013106289 A | 5/2013 |
| KR | 20100008936 A | 1/2010 |
| KR | 20140014787 A | 2/2014 |
| KR | 20140023552 A | 2/2014 |
| KR | 101477178 B1 | 12/2014 |
| WO | 2013058111 A1 | 4/2013 |
| WO | 2013063097 A1 | 5/2013 |

OTHER PUBLICATIONS

A 3MPixel Multi-Aperture Image Sensor with 0.7µm Pixels in 0.11µm CMOS, Fife et al., Publisher: Stanford University, 2008, 3 pages.
Dual camera intelligent sensor for high definition 360 degrees surveillance, Scotti et al., Publisher: IET, May 9, 2000, 8 pages.
Dual-sensor foveated imaging system, Hua et al., Publisher: Optical Society of America, Jan. 14, 2008, 11 pages.
Defocus Video Matting, McGuire et al., Publisher: ACM SIG-GRAPH, Jul. 31, 2005, 11 pages.
Compact multi-aperture imaging with high angular resolution, Santacana et al., Publisher: Optical Society of America, 2015, 10 pages.
Multi-Aperture Photography, Green et al., Publisher: Mitsubishi Electric Research Laboratories, Inc., Jul. 2007, 10 pages.
Multispectral Bilateral Video Fusion, Bennett et al., Publisher: IEEE, May 2007, 10 pages.
Super-resolution imaging using a camera array, Santacana et al., Publisher: Optical Society of America, 2014, 6 pages.
Optical Splitting Trees for High-Precision Monocular Imaging, McGuire et al., Publisher: IEEE, 2007, 11 pages.
High Performance Imaging Using Large Camera Arrays, Wilburn et al., Publisher: Association for Computing Machinery, Inc., 2005, 12 pages.
Real-time Edge-Aware Image Processing with the Bilateral Grid, Chen et al., Publisher: ACM SIGGRAPH, 9 pages.
Superimposed multi-resolution imaging, Caries et al., Publisher: Optical Society of America, 2017, 13 pages.
Viewfinder Alignment, Adams et al., Publisher: EUROGRAPHICS, 2008, 10 pages.
Dual-Camera System for Multi-Level Activity Recognition, Bodor et al., Publisher: IEEE, Oct. 2014, 6 pages.
Engineered to the task: Why camera-phone cameras are different, Giles Humpston, Publisher: Solid State Technology, Jun. 2009, 3 pages.
A compact and cost effective design for cell phone zoom lens, Chang et al., Sep. 2007, 8 pages.
Consumer Electronic Optics: How small a lens can be? The case of panomorph lenses, Thibault et al., Sep. 2014, 7 pages.
Optical design of camera optics for mobile phones, Steinich et al., 2012, pp. 51-58 (8 pages).
The Optics of Miniature Digital Camera Modules, Bareau et al., 2006, 11 pages.
Modeling and measuring liquid crystal tunable lenses, Peter P. Clark, 2014, 7 pages.
Mobile Platform Optical Design, Peter P. Clark, 2014, 7 pages.

* cited by examiner

<u>100</u>



FIG. 1A



Tele camera

FIG. 1B

APPL-1001 / Page 5 of 21
APPLE INC. v. COREPHOTONICS LTD.



FIG. 2



FIG. 3



FIG. 4



FIG. 5

APPL-1001 / Page 9 of 21
APPLE INC. v. COREPHOTONICS LTD.



FIG. 6

APPL-1001 / Page 10 of 21
APPLE INC. v. COREPHOTONICS LTD.



FIG. 7

APPL-1001 / Page 11 of 21
APPLE INC. v. COREPHOTONICS LTD.



FIG. 8



FIG. 9

US 10,225,479 B2

**1**

# DUAL APERTURE ZOOM DIGITAL CAMERA

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation application of U.S. patent application Ser. No. 15/865,869, filed Jan. 9, 2018, which was a Continuation application of U.S. patent application Ser. No. 15/424,853 filed Feb. 5, 2017, which was a Continuation application of U.S. patent application Ser. No. 14/880,251 filed Oct. 11, 2015 (issued as U.S. Pat. No. 9,661,233), which was a Continuation application of U.S. patent application Ser. No. 14/365,711 filed Jun. 16, 2014 (issued as U.S. Pat. No. 9,185,291), which was a 371 application from international patent application PCT/IB2014/062180 filed Jun. 12, 2014, and is related to and claims priority from U.S. Provisional Patent Application No. 61/834,486 having the same title and filed Jun. 13, 2013, which is incorporated herein by reference in its entirety.

## FIELD

Embodiments disclosed herein relate in general to digital cameras and in particular to thin zoom digital cameras with both still image and video capabilities

## BACKGROUND

Digital camera modules are currently being incorporated into a variety of host devices. Such host devices include cellular telephones, personal data assistants (PDAs), computers, and so forth. Consumer demand for digital camera modules in host devices continues to grow.

Host device manufacturers prefer digital camera modules to be small, so that they can be incorporated into the host device without increasing its overall size. Further, there is an increasing demand for such cameras to have higher-performance characteristics. One such characteristic possessed by many higher-performance cameras (e.g., standalone digital still cameras) is the ability to vary the focal length of the camera to increase and decrease the magnification of the image. This ability, typically accomplished with a zoom lens, is known as optical zooming. "Zoom" is commonly understood as a capability to provide different magnifications of the same scene and/or object by changing the focal length of an optical system, with a higher level of zoom associated with greater magnification and a lower level of zoom associated with lower magnification. Optical zooming is typically accomplished by mechanically moving lens elements relative to each other. Such zoom lenses are typically more expensive, larger and less reliable than fixed focal length lenses. An alternative approach for approximating the zoom effect is achieved with what is known as digital zooming. With digital zooming, instead of varying the focal length of the lens, a processor in the camera crops the image and interpolates between the pixels of the captured image to create a magnified but lower-resolution image.

Attempts to use multi-aperture imaging systems to approximate the effect of a zoom lens are known. A multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "sub-cameras"). Each sub-camera includes one or more lenses and/or other optical elements which define an aperture such that received electro-magnetic radiation is imaged by the optical sub-system and a resulting image is directed towards a two-dimensional (2D) pixelated

**2**

image sensor region. The image sensor (or simply "sensor") region is configured to receive the image and to generate a set of image data based on the image. The digital camera may be aligned to receive electromagnetic radiation associated with scenery having a given set of one or more objects. The set of image data may be represented as digital image data, as well known in the art. Hereinafter in this description, "image" "image data" and "digital image data" may be used interchangeably. Also, "object" and "scene" may be used interchangeably.

Multi-aperture imaging systems and associated methods are described for example in US Patent Publications No. 2008/0030592, 2010/0277619 and 2011/0064327. In US 2008/0030592, two sensors are operated simultaneously to capture an image imaged through an associated lens. A sensor and its associated lens form a lens/sensor combination. The two lenses have different focal lengths. Thus, even though each lens/sensor combination is aligned to look in the same direction, each captures an image of the same subject but with two different fields of view (FOVs). One sensor is commonly called "Wide" and the other "Tele". Each sensor provides a separate image, referred to respectively as "Wide" (or "W") and "Tele" (or "T") images. A W-image reflects a wider FOV and has lower resolution than the T-image. The images are then stitched (fused) together to form a composite ("fused") image. In the composite image, the central portion is formed by the relatively higher-resolution image taken by the lens/sensor combination with the longer focal length, and the peripheral portion is formed by a peripheral portion of the relatively lower-resolution image taken by the lens/sensor combination with the shorter focal length. The user selects a desired amount of zoom and the composite image is used to interpolate values from the chosen amount of zoom to provide a respective zoom image. The solution offered by US 2008/0030592 requires, in video mode, very large processing resources in addition to high frame rate requirements and high power consumption (since both cameras are fully operational).

US 2010/0277619 teaches a camera with two lens/sensor combinations, the two lenses having different focal lengths, so that the image from one of the combinations has a FOV approximately 2-3 times greater than the image from the other combination. As a user of the camera requests a given amount of zoom, the zoomed image is provided from the lens/sensor combination having a FOV that is next larger than the requested FOV. Thus, if the requested FOV is less than the smaller FOV combination, the zoomed image is created from the image captured by that combination, using cropping and interpolation if necessary. Similarly, if the requested FOV is greater than the smaller FOV combination, the zoomed image is created from the image captured by the other combination, using cropping and interpolation if necessary. The solution offered by US 2010/0277619 leads to parallax artifacts when moving to the Tele camera in video mode.

In both US 2008/0030592 and US 2010/0277619, different focal length systems cause Tele and Wide matching FOVs to be exposed at different times using CMOS sensors. This degrades the overall image quality. Different optical F numbers ("F#") cause image intensity differences. Working with such a dual sensor system requires double matching support, i.e. additional wires from the sensors to the following HW component. Neither US 2008/0030592 nor US 2010/0277619 deal with registration errors. Neither US2008/0030592 nor US 2010/0277619 refer to partial fusion, i.e. fusion of less than all the pixels of both Wide and Tele images in still mode.

APPL-1001 / Page 13 of 21
APPLE INC. v. COREPHOTONICS LTD.

US 10,225,479 B2

**3**

US 2011/0064327 discloses multi-aperture imaging systems and methods for image data fusion that include providing first and second sets of image data corresponding to an imaged first and second scene respectively. The scenes overlap at least partially in an overlap region, defining a first collection of overlap image data as part of the first set of image data, and a second collection of overlap image data as part of the second set of image data. The second collection of overlap image data is represented as a plurality of image data sub-cameras such that each of the sub-cameras is based on at least one characteristic of the second collection, and each sub-camera spans the overlap region. A fused set of image data is produced by an image processor, by modifying the first collection of overlap image data based on at least a selected one of, but less than all of, the image data sub-cameras. The systems and methods disclosed in this application deal solely with fused still images.

None of the known art references provide a thin (e.g. fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses, the camera configured to operate in both still mode and video mode to provide still and video images, wherein the camera configuration uses partial or full fusion to provide a fused image in still mode and does not use any fusion to provide a continuous, smooth zoom in video mode.

Therefore there is a need for, and it would be advantageous to have thin digital cameras with optical zoom operating in both video and still mode that do not suffer from commonly encountered problems and disadvantages, some of which are listed above.

SUMMARY

Embodiments disclosed herein teach the use of dual-aperture (also referred to as dual-lens or two-sensor) optical zoom digital cameras. The cameras include two sub-cameras, a Wide sub-camera and a Tele sub-camera, each sub-camera including a fixed focal length lens, an image sensor and an image signal processor (ISP). The Tele sub-camera is the higher zoom sub-camera and the Wide sub-camera is the lower zoom sub-camera. In some embodiments, the lenses are thin lenses with short optical paths of less than about 9 mm. In some embodiments, the thickness/effective focal length (EFL) ratio of the Tele lens is smaller than about 1. The image sensor may include two separate 2D pixelated sensors or a single pixelated sensor divided into at least two areas. The digital camera can be operated in both still and video modes. In still mode, zoom is achieved "with fusion" (full or partial), by fusing W and T images, with the resulting fused image including always information from both W and T images. Partial fusion may be achieved by not using fusion in image areas where the Tele image is not focused. This advantageously reduces computational requirements (e.g. time).

In video mode, optical zoom is achieved "without fusion", by switching between the W and T images to shorten computational time requirements, thus enabling high video rate. To avoid discontinuities in video mode, the switching includes applying additional processing blocks, which include image scaling and shifting.

In order to reach optical zoom capabilities, a different magnification image of the same scene is captured (grabbed) by each camera sub-camera, resulting in FOV overlap between the two sub-cameras. Processing is applied on the two images to fuse and output one fused image in still mode. The fused image is processed according to a user zoom factor request. As part of the fusion procedure, up-sampling

**4**

may be applied on one or both of the grabbed images to scale it to the image grabbed by the Tele sub-camera or to a scale defined by the user. The fusion or up-sampling may be applied to only some of the pixels of a sensor. Down-sampling can be performed as well if the output resolution is smaller than the sensor resolution.

The cameras and associated methods disclosed herein address and correct many of the problems and disadvantages of known dual-aperture optical zoom digital cameras. They provide an overall zoom solution that refers to all aspects: optics, algorithmic processing and system hardware (HW). The proposed solution distinguishes between video and still mode in the processing flow and specifies the optical requirements and HW requirements. In addition, it provides an innovative optical design that enables a low TTL/EFL ratio using a specific lens curvature order.

Due to the large focal length, objects that are in front or behind the plane of focus appear very blurry, and a nice foreground-to-background contrast is achieved. However, it is difficult to create such a blur using a compact camera with a relatively short focal length and small aperture size, such as a cell-phone camera. In some embodiments, a dual-aperture zoom system disclosed herein can be used to capture a shallow DOF photo (shallow compared with a DOF of a Wide camera alone), by taking advantage of the longer focal length of the Tele lens. The reduced DOF effect provided by the longer Tele focal length can be further enhanced in the final image by fusing data from an image captured simultaneously with the Wide lens. Depending on the distance to the object, with the Tele lens focused on a subject of the photo, the Wide lens can be focused to a closer distance than the subject so that objects behind the subject appear very blurry. Once the two images are captured, information from the out-of-focus blurred background in the Wide image is fused with the original Tele image background information, providing a blurrier background and even shallower DOF.

In an embodiment there is provided a zoom digital camera comprising a Wide imaging section that includes a fixed focal length Wide lens with a Wide FOV, a Wide sensor and a Wide image signal processor (ISP), the Wide imaging section operative to provide Wide image data of an object or scene; a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV, a Tele sensor and a Tele ISP, the Tele imaging section operative to provide Tele image data of the object or scene; and a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view (POV), and to provide without fusion continuous zoom video mode output images of the object or scene, a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view and to provide without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, wherein the video output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa, wherein at the lower ZF value the output resolution is determined by the Wide sensor, and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

APPL-1001 / Page 14 of 21
APPLE INC. v. COREPHOTONICS LTD.

US 10,225,479 B2

5                                                                        6

In an embodiment, the camera controller configuration to provide video output images with a smooth transition when switching between a lower ZF value and a higher ZF value or vice versa includes a configuration that uses at high ZF secondary information from the Wide camera and uses at low ZF secondary information from the Tele camera. As used herein, "secondary information" refers to white balance gain, exposure time, analog gain and color correction matrix.

In a dual-aperture camera image plane, as seen by each sub-camera (and respective image sensor), a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV). The system output image can have the shape and position of either sub-camera image or the shape or position of a combination thereof. If the output image retains the Wide image shape then it has the Wide perspective POV. If it retains the Wide camera position then it has the Wide position POV. The same applies for Tele images position and perspective. As used in this description, the perspective POV may be of the Wide or Tele sub-cameras, while the position POV may shift continuously between the Wide and Tele sub-cameras. In fused images, it is possible to register Tele image pixels to a matching pixel set within the Wide image pixels, in which case the output image will retain the Wide POV ("Wide fusion"). Alternatively, it is possible to register Wide image pixels to a matching pixel set within the Tele image pixels, in which case the output image will retain the Tele POV ("Tele fusion"). It is also possible to perform the registration after either sub-camera image is shifted, in which case the output image will retain the respective Wide or Tele perspective POV.

In an embodiment there is provided a method for obtaining zoom images of an object or scene in both still and video modes using a digital camera, the method comprising the steps of providing in the digital camera a Wide imaging section having a Wide lens with a Wide FOV, a Wide sensor and a Wide image signal processor (ISP), a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV, a Tele sensor and a Tele ISP, and a camera controller operatively coupled to the Wide and Tele imaging sections; and configuring the camera controller to combine in still mode at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view, and to provide without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, wherein the video mode output images are provided with a smooth transition when switching between a lower ZF value and a higher ZF value or vice versa, and wherein at the lower ZF value the output resolution is determined by the Wide sensor while at the higher ZF value the output resolution is determined by the Tele sensor.

BRIEF DESCRIPTION OF THE DRAWINGS

Non-limiting examples of embodiments disclosed herein are described below with reference to figures attached hereto that are listed following this paragraph. The drawings and descriptions are meant to illuminate and clarify embodiments disclosed herein, and should not be considered limiting in any way.

FIG. 1A shows schematically a block diagram illustrating a dual-aperture zoom imaging system disclosed herein;

FIG. 1B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. 1A:

FIG. 2 shows an example of Wide sensor, Tele sensor and their respective FOVs;

FIG. 3 shows a schematically embodiment of CMOS sensor image grabbing vs. time;

FIG. 4 shows schematically a sensor time configuration which enables sharing one sensor interface using dual sensor zoom system;

FIG. 5 shows an embodiment of a method disclosed herein for acquiring a zoom image in capture mode;

FIG. 6 shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode;

FIG. 7 shows a graph illustrating an effective resolution zoom factor;

FIG. 8 shows one embodiment of a lens block in a thin camera disclosed herein;

FIG. 9 shows another embodiment of a lens block in a thin camera disclosed herein.

DETAILED DESCRIPTION

FIG. 1A shows schematically a block diagram illustrating an embodiment of a dual-aperture zoom imaging system (also referred to simply as "digital camera" or "camera") disclosed herein and numbered 100. Camera 100 comprises a Wide imaging section ("sub-camera") that includes a Wide lens block 102, a Wide image sensor 104 and a Wide image processor 106. Camera 100 further comprises a Tele imaging section ("sub-camera") that includes a Tele lens block 108, a Tele image sensor 110 and a Tele image processor 112. The image sensors may be physically separate or may be part of a single larger image sensor. The Wide sensor pixel size can be equal to or different from the Tele sensor pixel size. Camera 100 further comprises a camera fusion processing core (also referred to as "controller") 114 that includes a sensor control module 116, a user control module 118, a video processing module 126 and a capture processing module 128, all operationally coupled to sensor control block 110. User control module 118 comprises an operational mode function 120, a region of interest (ROI) function 122 and a zoom factor (ZF) function 124.

Sensor control module 116 is connected to the two sub-cameras and to the user control module 118 and used to choose, according to the zoom factor, which of the sensors is operational and to control the exposure mechanism and the sensor readout. Mode choice function 120 is used for choosing capture/video modes. ROI function 122 is used to choose a region of interest. As used herein, "ROI" is a user defined as a sub-region of the image that may be exemplarily 4% or less of the image area. The ROI is the region on which both sub-cameras are focused on. Zoom factor function 124 is used to choose a zoom factor. Video processing module 126 is connected to mode choice function 120 and used for video processing. Still processing module 128 is connected to the mode choice function 120 and used for high image quality still mode images. The video processing module is applied when the user desires to shoot in video mode. The capture processing module is applied when the user wishes to shoot still pictures.

FIG. 1B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. 1A. Exemplary dimensions: Wide lens TTL=4.2 mm and EFL=3.5 mm; Tele lens TTL=6 mm and EFL=7 mm; both Wide and Tele sensors ⅓ inch. External dimensions of Wide and Tele cameras: width (w) and length (1)=8.5 mm and height (h)=6.8 mm Distance "d" between camera centers=10 mm.

Following is a detailed description and examples of different methods of use of camera 100.

APPL-1001 / Page 15 of 21
APPLE INC. v. COREPHOTONICS LTD.

US 10,225,479 B2

7

Design for Continuous and Smooth Zoom in Video Mode

In an embodiment, in order to reach high quality continuous and smooth optical zooming in video camera mode while reaching real optical zoom using fixed focal length sub-cameras, the system is designed according to the following rules (Equations 1-3):

$$\mathrm{Tan(FOV}_{Wide})/\mathrm{Tan(FOV}_{Tele})=PL_{Wide}/PL_{video} \qquad (1)$$

where Tan refers to "tangent", while $FOV_{Wide}$ and $FOV_{Tele}$ refer respectively to the Wide and Tele lens fields of view (in degrees). As used herein, the FOV is measured from the center axis to the corner of the sensor (i.e. half the angle of the normal definition). $PL_{Wide}$ and $PL_{video}$ refer respectively to the "in-line" (i.e. in a line) number of Wide sensor pixels and in-line number of output video format pixels. The ratio $PL_{Wide}/PL_{video}$ is called an "oversampling ratio". For example, in order to get full and continuous optical zoom experience with a 12 Mp sensor (sensor dimensions 4000×3000) and a required 1080p (dimension 1920×1080) video format, the FOV ratio should be 4000/1920=2.083. Moreover, if the Wide lens FOV is given as $FOV_{Wide}=37.5°$, the required Tele lens FOV is 20.2°. The zoom switching point is set according to the ratio between sensor pixels in-line and the number of pixels in-line in the video format and defined as:

$$Z_{switch}=PL_{Wide}/PL_{video} \qquad (2)$$

Maximum optical zoom is reached according to the following formula:

$$Z_{max}=\mathrm{Tan(FOV}_{Wide})/\mathrm{Tan(FOV}_{Tele})*PL_{Tele}/PL_{video} \qquad (3)$$

For example: for the configuration defined above and assuming $PL_{Tele}=4000$ and $PL_{video}=1920$, $Z_{max}=4.35$.

In an embodiment, the sensor control module has a setting that depends on the Wide and Tele FOVs and on a sensor oversampling ratio, the setting used in the configuration of each sensor. For example, when using a 4000×3000 sensor and when outputting a 1920×1080 image, the oversampling ratio is 4000/1920=2.0833.

In an embodiment, the Wide and Tele FOVs and the oversampling ratio satisfy the condition

$$0.8*PL_{Wide}/PL_{video}<\mathrm{Tan(FOV}_{Wide})/\mathrm{Tan(FOV}_{Tele})$$
$$<1.2*PL_{Wide}/PL_{video} \qquad (4)$$

Still Mode Operation/Function

In still camera mode, the obtained image is fused from information obtained by both sub-cameras at all zoom levels, see FIG. 2, which shows a Wide sensor 202 and a Tele sensor 204 and their respective FOVs. Exemplarily, as shown, the Tele sensor FOV is half the Wide sensor FOV. The still camera mode processing includes two stages: (1) setting HW settings and configuration, where a first objective is to control the sensors in such a way that matching FOVs in both images (Tele and Wide) are scanned at the same time. A second objective is to control the relative exposures according to the lens properties. A third objective is to minimize the required bandwidth from both sensors for the ISPs; and (2) image processing that fuses the Wide and the Tele images to achieve optical zoom, improves SNR and provides wide dynamic range.

FIG. 3 shows image line numbers vs. time for an image section captured by CMOS sensors. A fused image is obtained by line (row) scans of each image. To prevent matching FOVs in both sensors to be scanned at different times, a particular configuration is applied by the camera controller on both image sensors while keeping the same frame rate. The difference in FOV between the sensors determines the relationship between the rolling shutter time

8

and the vertical blanking time for each sensor. In the particular configuration, the scanning is synchronized such that the same points of the object in each view are obtained simultaneously.

Specifically with reference to FIG. 3 and according to an embodiment of a method disclosed herein, the configuration to synchronize the scanning includes: setting the Tele sensor vertical blanking time $VB_{Tele}$ to equal the Wide sensor vertical blanking time $VB_{Wide}$ plus half the Wide sensor rolling shutter time $RST_{Wide}$; setting the Tele and Wide sensor exposure times $ET_{Tele}$ and $ET_{Wide}$ to be equal or different; setting the Tele sensor rolling shutter time $RST_{Tele}$ to be $0.5*RST_{Wide}$; and setting the frame rates of the two sensors to be equal. This procedure results in identical image pixels in the Tele and Wide sensor images being exposed at the same time

In another embodiment, the camera controller synchronizes the Wide and Tele sensors so that for both sensors the rolling shutter starts at the same time.

The exposure times applied to the two sensors could be different, for example in order to reach same image intensity using different F# and different pixel size for the Tele and Wide systems. In this case, the relative exposure time may be configured according to the formula below:

$$ET_{Tele}=ET_{Wide}\cdot(F\#_{Tele}/F\#_{Wide})^2\cdot(\text{Pixel size}_{Wide}/\text{Pixel size}_{Tele})^2 \qquad (5)$$

Other exposure time ratios may be applied to achieve wide dynamic range and improved SNR. Fusing two images with different intensities will result in wide dynamic range image.

In more detail with reference to FIG. 3, in the first stage, after the user chooses a required zoom factor ZF, the sensor control module configures each sensor as follows:

1) Cropping Index Wide Sensor:

$$Y_{Wide\,start}=\frac{1}{2}\cdot PC_{Wide}(1-1/ZF)$$

$$Y_{Wide\,end}=\frac{1}{2}\cdot PC_{Wide}(1+1/ZF)$$

where PC is the number of pixels in a column, and Y is the row number

2) Cropping Index Tele Sensor:

If ZF>Tan (FOV$_{Wide}$)/Tan (FOV$_{Tele}$), then

$$Y_{Tele\,start}=\frac{1}{2}\cdot PC_{Tele}(1-(1/ZF)\cdot\mathrm{Tan(FOV}_{Tele})/\mathrm{Tan(FOV}_{Wide}))$$

$$Y_{Tele\,end}=\frac{1}{2}\cdot PC_{Tele}(1+(1/ZF)\cdot\mathrm{Tan(FOV}_{Tele})/\mathrm{Tan(FOV}_{Wide}))$$

If ZF<Tan (FOV$_{Wide}$)/Tan (FOV$_{Tele}$), then

$$Y_{Tele\,start}=0$$

$$Y_{Tele\,end}=PC_{Tele}$$

This will result in an exposure start time of the Tele sensor with a delay of (in numbers of lines, relative to the Wide sensor start time):

$$(1-ZF/((\mathrm{Tan(FOV}_{Wide})/\mathrm{Tan(FOV}_{Tele})))\cdot1/(2\cdot\text{FPS}) \qquad (6)$$

where FPS is the sensor's frame per second configuration. In cases where ZF>Tan (FOV$_{Wide}$)/Tan (FOV$_{Tele}$), no delay will be introduced between Tele and Wide exposure starting point. For example, for a case where Tan (FOV$_{Wide}$)/Tan (FOV$_{Tele}$)=2 and ZF=1, the Tele image first pixel is exposed ¼·(1/FPS) second after the Wide image first pixel was exposed.

After applying the cropping according to the required zoom factor, the sensor rolling shutter time and the vertical blank should be configured in order to satisfy the equation to keep the same frame rate:

US 10,225,479 B2

**9**

$$VB_{Wide}+RST_{Wide}=VB_{Tele}+RST_{Tele} \qquad (7)$$

FIG. **3** exemplifies Eq. (7), One way to satisfy Eq. (7) is to increase the $RST_{Wide}$. Controlling the $RST_{Wide}$ may be done by changing the horizontal blanking (HB) of the Wide sensor. This will cause a delay between the data coming out from each row of the Wide sensor.

Generally, working with a dual-sensor system requires multiplying the bandwidth to the following block, for example the ISP. For example, using 12 Mp working at 30 fps, 10 bit per pixel requires working at 3.6 Gbit/sec. In this example, supporting this bandwidth requires 4 lanes from each sensor to the respective following ISP in the processing chain. Therefore, working with two sensors requires double bandwidth (7.2 Gbit/sec) and 8 lanes connected to the respective following blocks. The bandwidth can be reduced by configuring and synchronizing the two sensors. Consequently, the number of lanes can be half that of a conventional configuration (3.6 Gbit/sec).

FIG. **4** shows schematically a sensor time configuration that enables sharing one sensor interface using a dual-sensor zoom system, while fulfilling the conditions in the description of FIG. **3** above. For simplicity, assuming the Tele sensor image is magnified by a factor of 2 compared with the Wide sensor image, the Wide sensor horizontal blanking time $HB_{Wide}$ is set to twice the Wide sensor line readout time. This causes a delay between output Wide lines. This delay time matches exactly the time needed to output two lines from the Tele sensor. After outputting two lines from the Tele sensor, the Tele sensor horizontal blanking time $HB_{Tele}$ is set to be one Wide line readout time, so, while the Wide sensor outputs a row from the sensor, no data is being output from the Tele sensor. For this example, every 3rd line in the Tele sensor is delayed by an additional $HB_{Tele}$. In this delay time, one line from the Wide sensor is output from the dual-sensor system. After the sensor configuration stage, the data is sent in parallel or by using multiplexing into the processing section.

FIG. **5** shows an embodiment of a method disclosed herein for acquiring a zoom image in still mode. In ISP step **502**, the data of each sensor is transferred to the respective ISP component, which performs on the data various processes such as denoising, demosaicing, sharpening, scaling, etc, as known in the art. After the processing in step **502**, all following actions are performed in capture processing core **128**: in rectification step **504**, both Wide and Tele images are aligned to be on the epipolar line; in registration step **506**, mapping between the Wide and the Tele aligned images is performed to produce a registration map; in resampling step **508**, the Tele image is resampled according to the registration map, resulting in a re-sampled Tele image; in decision step **510**, the re-sampled Tele image and the Wide image are processed to detect errors in the registration and to provide a decision output. In more detail, in step **510**, the re-sampled Tele image data is compared with the Wide image data and if the comparison detects significant dissimilarities, an error is indicated. In this case, the Wide pixel values are chosen to be used in the output image. Then, in fusion step **512**, the decision output, re-sampled Tele image and the Wide image are fused into a single zoom image.

To reduce processing time and power, steps **506**, **508**, **510**, **512** could be bypassed by not fusing the images in non-focused areas. In this case, all steps specified above should be applied on focused areas only. Since the Tele optical system will introduce shallower depth of field than the Wide optical system, defocused areas will suffer from lower contrast in the Tele system.

**10**

Zoom-In and Zoom-Out in Still Camera Mode

We define the following: TFOV=tan (camera FOV/2). "Low ZF" refers to all ZF that comply with ZF<Wide TFOV/Tele TFOV. "High ZF" refers to all ZF that comply with ZF>Wide TFOV/Tele TFOV. "ZFT" refers to a ZF that complies with ZF=Wide TFOV/Tele TFOV. In one embodiment, zoom-in and zoom-out in still mode is performed as follows:

Zoom-in: at low ZF up to slightly above ZFT, the output image is a digitally zoomed, Wide fusion output. For the up-transfer ZF, the Tele image is shifted and corrected by global registration (GR) to achieve smooth transition. Then, the output is transformed to a Tele fusion output. For higher (than the up-transfer) ZF, the output is the Tele fusion output digitally zoomed.

Zoom-out: at high ZF down to slightly below ZFT, the output image is a digitally zoomed, Tele fusion output. For the down-transfer ZF, the Wide image is shifted and corrected by GR to achieve smooth transition. Then, the output is transformed to a Wide fusion output. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

In another embodiment, zoom-in and zoom-out in still mode is performed as follows:

Zoom-in: at low ZF up to slightly above ZFT, the output image is a digitally zoomed, Wide fusion output. For the up-transfer ZF and above, the output image is the Tele fusion output.

Zoom-out: at high ZF down to slightly below ZFT, the output image is a digitally zoomed, Tele fusion output. For the down-transfer ZF and below, the output image is the Wide fusion output.

Video Mode Operation/Function

Smooth Transition

When a dual-aperture camera switches the camera output between sub-cameras or points of view, a user will normally see a "jump" (discontinuous) image change. However, a change in the zoom factor for the same camera and POV is viewed as a continuous change. A "smooth transition" is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Zoom-In and Zoom-Out in Video Mode

In video mode, sensor oversampling is used to enable continuous and smooth zoom experience. Processing is applied to eliminate the changes in the image during crossover from one sub-camera to the other. Zoom from 1 to $Z_{switch}$ is performed using the Wide sensor only. From $Z_{switch}$ and on, it is performed mainly by the Tele sensor. To prevent "jumps" (roughness in the image), switching to the Tele image is done using a zoom factor which is a bit higher ($Z_{switch}+\Delta Zoom$) than $Z_{switch}$. $\Delta Zoom$ is determined according to the system's properties and is different for cases where zoom-in is applied and cases where zoom-out is applied ($\Delta Zoom_{in}\neq\Delta Zoom_{out}$). This is done to prevent residual jumps artifacts to be visible at a certain zoom factor. The switching between sensors, for an increasing zoom and for decreasing zoom, is done on a different zoom factor.

APPL-1001 / Page 17 of 21

APPLE INC. v. COREPHOTONICS LTD.

US 10,225,479 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

The zoom video mode operation includes two stages: (1) sensor control and configuration, and (2) image processing. In the range from 1 to $Z_{switch}$, only the Wide sensor is operational, hence, power can be supplied only to this sensor. Similar conditions hold for a Wide AF mechanism. From $Z_{switch}+\Delta$Zoom to $Z_{max}$ only the Tele sensor is operational, hence, power is supplied only to this sensor. Similarly, only the Tele sensor is operational and power is supplied only to it for a Tele AF mechanism. Another option is that the Tele sensor is operational and the Wide sensor is working in low frame rate. From $Z_{switch}$ to $Z_{switch}+\Delta$Zoom, both sensors are operational.

Zoom-in: at low ZF up to slightly above ZFT, the output image is the digitally zoomed, unchanged Wide camera output. For the up-transfer ZF, the output is a transformed Tele sub-camera output, where the transformation is performed by a global registration (GR) algorithm to achieve smooth transition. For higher (than the up-transfer), the output is the transfer ZF output digitally zoomed.

Zoom-out: at high ZF down to slightly below ZFT, the output image is the digitally zoomed transformed Tele camera output. For the down-transfer ZF, the output is a shifted Wide camera output, where the Wide shift correction is performed by the GR algorithm to achieve smooth transition, i.e. with no jump in the ROI region. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

FIG. **6** shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode for 3 different zoom factor (ZF) ranges: (a) ZF range=1: $Z_{switch}$; (b) ZF range=$Z_{switch}$: $Z_{switch}+\Delta$Zoom$_{in}$; and (c) Zoom factor range=$Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$. The description is with reference to a graph of effective resolution vs. zoom value (FIG. **7**). In step **602**, sensor control module **116** chooses (directs) the sensor (Wide, Tele or both) to be operational. Specifically, if the ZF range=1:$Z_{switch}$, module **116** directs the Wide sensor to be operational and the Tele sensor to be non-operational. If the ZF range is $Z_{switch}$: $Z_{switch}+\Delta$Zoom$_{in}$, module **116** directs both sensors to be operational and the zoom image is generated from the Wide sensor. If the ZF range is $Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$, module **116** directs the Wide sensor to be non-operational and the Tele sensor to be operational. After the sensor choice in step **602**, all following actions are performed in video processing core **126**. Optionally, in step **604**, color balance is calculated if two images are provided by the two sensors. Optionally yet, in step **606**, the calculated color balance is applied in one of the images (depending on the zoom factor). Further optionally, in step **608**, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient can be used to set an AF position in step **610**. In step **612**, an output of any of steps 602-608 is applied on one of the images (depending on the zoom factor) for image signal processing that may include denoising, demosaicing, sharpening, scaling, etc. In step **614**, the processed image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p). To avoid a transition point to be executed at the same ZF, $\Delta$Zoom can change while zooming in and while zooming out. This will result in hysteresis in the sensor switching point.

In more detail, for ZF range 1: $Z_{switch}$, for ZF<$Z_{switch}$, the Wide image data is transferred to the ISP in step **612** and resampled in step **614**. For ZF range=$Z_{switch}$: $Z_{switch}+$

$\Delta$Zoom$_{in}$, both sensors are operational and the zoom image is generated from the Wide sensor. The color balance is calculated for both images according to a given ROI. In addition, for a given ROI, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient is used to set an AF position. The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of pixel movements between matching points in the images. This movement can be translated into depth and the depth can be translated into an AF position. This enables to set the AF position by only analyzing two images (Wide & Tele). The result is fast focusing.

Both color balance ratios and transformation coefficient are used in the ISP step. In parallel, the Wide image is processed to provide a processed image, followed by resampling. For ZF range=$Z_{switch}+\Delta$Zoom$_{in}$:$Z_{max}$ and for Zoom factor >$Z_{switch}\Delta$Zoom$_{in}$, the color balance calculated previously is now applied on the Tele image. The Tele image data is transferred to the ISP in step **612** and resampled in step **614**. To eliminate crossover artifacts and to enable smooth transition to the Tele image, the processed Tele image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p).

FIG. **7** shows the effective resolution as a function of the zoom factor for a zoom-in case and for a zoom-out case $\Delta$Zoom$_{up}$ is set when we zoom in, and $\Delta$Zoom$_{down}$ is set when we zoom out. Setting $\Delta$Zoom$_{up}$ to be different from $\Delta$Zoom$_{down}$ will result in transition between the sensors to be performed at different zoom factor ("hysteresis") when zoom-in is used and when zoom-out is used. This hysteresis phenomenon in the video mode results in smooth continuous zoom experience.

Optical Design

Additional optical design considerations were taken into account to enable reaching optical zoom resolution using small total track length (TTL). These considerations refer to the Tele lens. In an embodiment, the camera is "thin" (see also FIG. **1**) in the sense that is has an optical path of less than 9 mm and a thickness/focal length (FP) ratio smaller than about 0.85. Exemplarily, as shown in FIG. **8**, such a thin camera has a lens block that includes (along an optical axis starting from an object) five lenses: a first lens element **802** with positive power and two lenses **804** and **806** and with negative power, a fourth lens **808** with positive power and a fifth lens **810** with negative power. In the embodiment of FIG. **8**, the EFL is 7 mm, the TTL is 4.7 mm, f=6.12 and FOV=20°. Thus the Tele lens TTL/EFL ratio is smaller than 0.9. In other embodiments, the Tele lens TTL/EFL ratio may be smaller than 1.

In another embodiment of a lens block in a thin camera, shown in FIG. **9**, the camera has a lens block that includes (along an optical axis starting from an object) a first lens element **902** with positive power a second lens element **904** with negative power, a third lens element with positive power **906** and a fourth lens element with negative power **908**, and a fifth lens element **910** with positive or negative power. In this embodiment, f=7.14, F#=3.5, TTL=5.8 mm and FOV=22.7°.

In conclusion, dual aperture optical zoom digital cameras and associate methods disclosed herein reduce the amount of processing resources, lower frame rate requirements, reduce power consumption, remove parallax artifacts and provide continuous focus (or provide loss of focus) when changing

APPL-1001 / Page 18 of 21
APPLE INC. v. COREPHOTONICS LTD.

US 10,225,479 B2

**13**

from Wide to Tele in video mode. They provide a dramatic reduction of the disparity range and avoid false registration in capture mode. They reduce image intensity differences and enable work with a single sensor bandwidth instead of two, as in known cameras.

All patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present disclosure.

While this disclosure has been described in terms of certain embodiments and generally associated methods, alterations and permutations of the embodiments and methods will be apparent to those skilled in the art. The disclosure is to be understood as not limited by the specific embodiments described herein, but only by the scope of the appended claims.

What is claimed is:

**1**. A dual-aperture digital camera for imaging an object or scene, comprising:

  a) a Wide camera comprising a Wide lens and a Wide image sensor, the Wide camera having a respective field of view $FOV_W$ and being operative to provide a Wide image of the object or scene;

  b) a Tele camera comprising a Tele lens and a Tele image sensor, the Tele camera having a respective field of view $FOV_T$ narrower than $FOV_W$ and being operative to provide a Tele image of the object or scene, wherein the Tele lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T/TTL_T > 1$;

  c) a first autofocus (AF) mechanism coupled mechanically to, and used to perform an AF action on the Wide lens;

  d) a second AF mechanism coupled mechanically to, and used to perform an AF action on the Tele lens; and

  e) a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms and to process the Wide and Tele images to create a fused image, wherein areas in the Tele image that are not focused are not combined with the Wide image to create the fused image and wherein the camera controller is further operative to output the fused image with a point of view (POV) of the Wide camera by mapping Tele image pixels to matching pixels within the Wide image.

**2**. The dual-aperture digital camera of claim **1**, wherein the camera controller is further configured to perform rectification of the Wide and Tele images by aligning these images to be on an approximately epipolar line to obtain rectified Wide and Tele images.

**3**. The dual-aperture digital camera of claim **2**, wherein the camera controller is further configured to perform mapping between the rectified Wide and Tele images to produce a registration map.

**4**. The dual-aperture digital camera of claim **3**, wherein the camera controller is further configured to perform resampling of the Tele image according to the registration map to provide a re-sampled Tele image.

**5**. The dual-aperture digital camera of claim **4**, wherein the camera controller is further configured to process the re-sampled Tele image and the Wide image to detect an error in the registration and to provide a decision output.

**14**

**6**. The dual-aperture digital camera of claim **5**, wherein, if an error is detected, the camera controller is further configured to choose Wide pixel values to be used in the output image for pixels that caused the error.

**7**. The dual-aperture digital camera of claim **6**, wherein the Wide and Tele image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ wherein Pixel $size_{Wide}$ is equal to Pixel $size_{Tele}$, wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, and wherein the camera controller is further configured to synchronize the Wide and Tele image sensors to start exposure at the same time.

**8**. The dual-aperture digital camera of claim **6**, wherein the Wide and Tele image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$, wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, and wherein the camera controller is further configured to synchronize the Wide and Tele image sensors to start exposure at the same time.

**9**. The dual-aperture digital camera of claim **6**, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ and wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$, wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, and wherein the camera controller is further configured to synchronize the Wide and Tele image sensors to start exposure at the same time.

**10**. The dual-aperture digital camera of claim **1**, wherein the Wide and Tele image sensors have pixels with identical pixel counts.

**11**. The dual-aperture digital camera of claim **10**, wherein the pixel count is 12 MP.

**12**. The dual-aperture digital camera of claim **1**, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ and wherein Pixel $size_{Wide}$ is equal to Pixel $size_{Tele}$.

**13**. The dual-aperture digital camera of claim **1**, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ and wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$.

**14**. The dual-aperture digital camera of claim **1**, wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$.

**15**. The dual-aperture digital camera of claim **14**, wherein the camera controller is further configured to synchronize scanning of the Wide and Tele image sensors such that matching FOVs in the Wide and Tele images are scanned at the same time.

**16**. The dual-aperture digital camera of claim **14**, wherein the camera controller is further configured to synchronize the Wide and Tele image sensors to start exposure at the same time.

**17**. The dual-aperture digital camera of claim **1**, wherein the Wide and Tele lenses have respective F numbers $F\#_{Wide}$ and $F\#_{Tele}$ and wherein the camera controller is further configured to set respective Wide and Tele image sensor exposure times $ET_{Wide}$ and $ET_{Tele}$ to fulfill the condition $ET_{Tele} = ET_{Wide} \times (F\#_{Tele}/F\#_{Wide})^2 \times (\text{Pixel } size_{Wide}/\text{Pixel } size_{Tele})^2$.

**18**. The dual-aperture digital camera of claim **1**, wherein the Wide and Tele lenses have respective F numbers $F\#_{Wide}$ and $F\#_{Tele}$ and wherein the camera controller is further configured to set respective Wide and Tele image sensor exposure times $ET_{Wide}$ and $ET_{Tele}$ to be equal.

**19**. A dual-aperture digital camera for imaging an object or scene, comprising:

APPL-1001 / Page 19 of 21
APPLE INC. v. COREPHOTONICS LTD.

15

a) a Wide camera comprising a Wide lens and a Wide image sensor, the Wide camera having a respective field of view $FOV_W$ and being operative to provide a Wide image of the object or scene;

b) a Tele camera comprising a Tele lens and a Tele image sensor, the Tele camera having a respective field of view $FOV_T$ narrower than $FOV_W$ and being operative to provide a Tele image of the object or scene, wherein the Tele lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T/TTL_T > 1$;

c) a first autofocus (AF) mechanism coupled mechanically to, and used to perform an AF action on the Wide lens;

d) a second AF mechanism coupled mechanically to, and used to perform an AF action on the Tele lens, wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$, and wherein the Tele camera has a Tele camera depth of field ($DOF_T$) shallower than a DOF of the Wide camera ($DOF_W$); and

e) a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms, to process the Wide and Tele images to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos, the fused image having a DOF shallower than $DOF_T$ and having a blurred background.

**20**. The dual-aperture digital camera of claim **19**, wherein the Tele lens includes five lens elements along an optical axis from an object side to an image side, starting from the object side with a first lens element with positive power, a second lens element with negative power, a fourth lens element with negative power and a fifth lens element, wherein the largest distance between consecutive lens elements along the optical axis is a distance between the fourth lens element and the fifth lens element.

**21**. The dual-aperture digital camera of claim **20**, wherein the fused image having a DOF shallower than $DOF_T$ is output as a portrait photo similar to a portrait photo taken with a digital single-lens reflex (DSLR) camera.

**22**. The dual-aperture digital camera of claim **21**, wherein the DSLR has a focal length between 50-80 mm.

**23**. A method comprising:

a) providing a dual-camera comprising a Wide camera and a Tele camera, the Wide and Tele cameras having respective Wide and Tele lenses, Wide and Tele image sensors and Wide and Tele fields of view $FOV_W$ and $FOV_T$, wherein $FOV_T$ is narrower than $FOV_W$, wherein the Tele lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T/TTL_T > 1$;

b) acquiring a Wide image with the Wide sensor and a Tele image with the Tele sensor;

c) processing the Wide and Tele images to create a fused image, wherein areas in the Tele image that are not focused are not combined with the Wide image to create the fused image; and

d) outputting the fused image with a point of view (POV) of the Wide camera by mapping Tele image pixels to matching pixels within the Wide image.

16

**24**. The method of claim **23**, further comprising rectifying the Wide and Tele images by aligning these images to be on an approximately epipolar line to obtain rectified Wide and Tele images.

**25**. The method of claim **24**, further comprising mapping between the rectified Wide and Tele images to produce a registration map.

**26**. The method of claim **25**, further comprising resampling the Tele image according to the registration map to provide a re-sampled Tele image.

**27**. The method of claim **26**, further comprising processing the re-sampled Tele image and the Wide image to detect an error in the registration and to provide a decision output.

**28**. The method of claim **27**, wherein if an error is detected, further comprising choosing Wide pixel values to be used in the output image for those pixels that caused the error.

**29**. The method of claim **28**, wherein the Wide and Tele image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ wherein Pixel $size_{Wide}$ is equal to Pixel $size_{Tele}$ and wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, the method further comprising synchronizing the Wide and Tele image sensors to start exposure at the same time.

**30**. The method of claim **28**, wherein the Wide and Tele image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$ and wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, the method further comprising synchronizing the Wide and Tele image sensors to start exposure at the same time.

**31**. The method of claim **28**, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$ and wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$, the method further comprising synchronizing the Wide and Tele image sensors to start exposure at the same time.

**32**. The method of claim **23**, wherein the Wide and Tele image sensors have pixels with identical pixel counts.

**33**. The method of claim **32**, wherein the pixel count is 12 MP.

**34**. The method of claim **23**, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ and wherein Pixel $size_{Wide}$ is equal to Pixel $size_{Tele}$.

**35**. The method of claim **23**, wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel $size_{Wide}$ and Pixel $size_{Tele}$ and wherein Pixel $size_{Wide}$ is not equal to Pixel $size_{Tele}$.

**36**. The method of claim **23**, wherein the Wide and Tele lenses have different F numbers $F\#_{Wide}$ and $F\#_{Tele}$.

**37**. The method of claim **36**, further comprising synchronizing scanning of the Wide and Tele image sensors such that matching FOVs in the Wide and Tele images are scanned at the same time.

**38**. The method of claim **36**, further comprising synchronizing the Wide and Tele image sensors to start exposure at the same time.

**39**. The method of claim **23**, wherein the Wide and Tele lenses have respective F numbers $F\#_{Wide}$ and $F\#_{Tele}$, the method further comprising setting respective Wide and Tele image sensor exposure times $ET_{Wide}$ and $ET_{Tele}$ to fulfill the condition $ET_{Tele} = ET_{Wide} \times (F\#_{Tele}/F\#_{Wide})^2 \times (Pixel\ size_{Wide}/Pixel\ size_{Tele})^2$.

US 10,225,479 B2

17

18

**40**. The method of claim **23**, wherein the Wide and Tele lenses have respective F numbers $F\#_{Wide}$ and $F\#_{Tele}$, the method further comprising setting respective Wide and Tele image sensor exposure times $ET_{Wide}$ and $ET_{Tele}$ to be equal.

\*    \*    \*    \*    \*

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.,

Patent Owner

———————————

IPR2020-00905
U.S. Patent No. 10,225,479

———————————

## PETITION FOR *INTER PARTES* REVIEW
## UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104

## TABLE OF CONTENTS

PETITIONER'S EXHIBIT LIST .................................................................. IV

I.     INTRODUCTION ....................................................................... 1

II.    MANDATORY NOTICES ........................................................... 1

       A.    Real Party-in-Interest ...................................................... 1

       B.    Related Matters................................................................ 1

       C.    Lead and Back-up Counsel and Service Information ......... 2

III.   GROUNDS FOR STANDING ..................................................... 2

IV.    THE '479 PATENT .................................................................... 2

       A.    Summary of the Patent ..................................................... 2

       B.    Prosecution History and Priority Date ............................... 5

V.     LEVEL OF ORDINARY SKILL IN THE ART.............................. 6

VI.    CLAIM CONSTRUCTION ......................................................... 6

       A.    "fused image with a point of view (POV) of the Wide camera"
             (claims 1 and 23). ........................................................... 7

VII.   REQUESTED RELIEF ................................................................ 8

VIII.  OVERVIEW OF CHALLENGES ................................................ 8

       A.    Challenged Claims ........................................................... 8

       B.    Statutory Grounds for Challenges ..................................... 9

       C.    Page Citations and Emphasis ............................................ 9

IX.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE.. 10

       A.    Ground 1: Claims 1, 10-14, 16, 18, 23, 32-26, 38, and 40 are
             obvious under § 103 over Parulski and Konno. .................. 10

             1.    Summary of Parulski.............................................. 10

             2.    Summary of Konno................................................. 12

             3.    Reasons to Combine Parulski and Konno................. 16

             4.    Claim 1 ................................................................. 19

             5.    Claim 10 ............................................................... 30

6.    Claim 11 .................................................................31

7.    Claim 12 .................................................................33

8.    Claim 13 .................................................................35

9.    Claim 14 .................................................................36

10.   Claim 16 .................................................................37

11.   Claim 18 .................................................................38

12.   Claim 23 .................................................................38

13.   Claim 32 .................................................................40

14.   Claim 33 .................................................................40

15.   Claim 34 .................................................................40

16.   Claim 35 .................................................................40

17.   Claim 36 .................................................................41

18.   Claim 38 .................................................................41

19.   Claim 40 .................................................................41

B.    Ground 2: Claims 2-4 and 24-26 are obvious under § 103 over
      Parulski, Konno, and Szeliski. .............................................42

1.    Summary of Szeliski ...................................................42

2.    Reasons to combine Parulski, Konno, and Soga .....................42

3.    Claim 2 ..................................................................44

4.    Claim 3 ..................................................................47

5.    Claim 4 ..................................................................48

6.    Claim 24 .................................................................50

7.    Claim 25 .................................................................50

8.    Claim 26 .................................................................50

C.    Ground 3: Claims 5-9 and 27-31 are obvious under § 103 over
      Parulski, Konno, Szeliski, and Segall. .....................................51

1.    Summary of Segall .....................................................51

2.    Reasons to combine Parulski, Konno, Szeliski, and Segall ......52

3.    Claim 5 ........................................................54

4.    Claim 6 ........................................................56

5.    Claim 7 ........................................................57

6.    Claim 8 ........................................................57

7.    Claim 9 ........................................................58

8.    Claim 27 ......................................................58

9.    Claim 28 ......................................................59

10.   Claim 29 ......................................................59

11.   Claim 30 ......................................................59

12.   Claim 31 ......................................................60

D.    Ground 4: Claims 15 and 37 are obvious under § 103 over
      Parulski, Konno, and Stein. ................................60

1.    Summary of Stein. .......................................60

2.    Stein is entitled to its February 7, 2013 priority date ..............62

3.    Reasons to combine Parulski, Konno, and Stein. ....................65

4.    Claim 15 ......................................................67

5.    Claim 37 ......................................................70

X.    CONCLUSION ........................................................71

XI.   CERTIFICATE OF WORD COUNT .....................................72

CERTIFICATE OF SERVICE ........................................................73

- iii -

## PETITIONER'S EXHIBIT LIST

May 6, 2020

| APPL-1001 | U.S. Patent No. 10,225,479 to Shabtay et al. (the "'479 Patent") |
| --- | --- |
| APPL-1002 | Prosecution File History of the '479 Patent (the "'242 App") |
| APPL-1003 | Declaration of Dr. Fredo Durand Ph.D. |
| APPL-1004 | CV of Dr. Fredo Durand |
| APPL-1005 | U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski") |
| APPL-1006 | Used in co-filed Petition |
| APPL-1007 | Used in co-filed Petition |
| APPL-1008 | Used in co-filed Petition |
| APPL-1009 | Used in co-filed Petition |
| APPL-1010 | Used in co-filed Petition |
| APPL-1011 | Used in co-filed Petition |
| APPL-1012 | Used in co-filed Petition |
| APPL-1013 | Richard Szeliski, COMPUTER VISION – ALGORITHMS AND APPLICATIONS (2011) ("Szeliski") |
| APPL-1014 | Used in co-filed Petition |
| APPL-1015 | JP Pub. No. 2013-106289 to Konno et al. ("Konno"), Certified English translation and Original |
| APPL-1016 | Used in co-filed Petition |
| APPL-1017 | Used in co-filed Petition |
| APPL-1018 | U.S. Patent No. 7,206,136 to Labaziewicz et al. ("Labaziewicz") |
| APPL-1019 | Used in co-filed Petition |

| APPL-1020 | Warren J. Smith, MODERN LENS DESIGN (1992) ("Smith") |
|---|---|
| APPL-1021 | Declaration of Dr. Jose Sasián, Ph.D. |
| APPL-1022 | ZEMAX Development Corporation, ZEMAX Optical Design Program User's Manual, February 14, 2011 ("ZEMAX User's Manual") |
| APPL-1023 | U.S. Patent No. 8,908,041 to Stein et al. ("Stein") |
| APPL-1024 | U.S. Patent No. 8,406,569 to Segall et al. ("Segall") |
| APPL-1025 | U.S. Patent No. 8,824,833 to Dagher et al. ("Dagher") |
| APPL-1026 | Used in co-filed Petition |
| APPL-1027 | File History for Provisional No. 61/752,515 to Stein ("Stein provisional") |
| APPL-1028 | Used in co-filed Petition |
| APPL-1029 | Used in co-filed Petition |
| APPL-1030 | Used in co-filed Petition |
| APPL-1031 | Product announcement for Sony ICX612 12 MP image sensor |
| APPL-1032 | Product announcement for Sony ICX652 13.5 MP image sensor |
| APPL-1033 | Used in co-filed Petition |
| APPL-1034 | U.S. Patent No. 7,112,774 to Baer |
| APPL-1035 | Robert E. Fischer et al., OPTICAL SYSTEM DESIGN (2008) |
| APPL-1036 | Email from Patent Owner's counsel authorizing electronic service |

## I.    INTRODUCTION

U.S. Patent No. 10,225,479 (the "'479 Patent," APPL-1001) is generally directed to a "dual aperture" digital camera. *See* APPL-1001, Title. The claims challenged in this Petition recite two types of limitations— (1) a camera with wide and telephoto lenses having overlapping fields of view (FOVs) and (2) a camera controller that outputs an image with a broader depth of field by fusing only in-focus portions of the telephoto image with the wide image.

This Petition, along with the cited evidence, demonstrates that claims 1-16, 18, 23-38, and 40 are obvious under 35 U.S.C. § 103. Petitioner Apple Inc. requests that these claims be held unpatentable and cancelled.

## II.    MANDATORY NOTICES

### A.    Real Party-in-Interest

The real party-in-interest is Apple Inc.

### B.    Related Matters

As of the filing date of this Petition and to the best knowledge of Petitioner, the '479 Patent has been asserted in the following matters:

- *Corephotonics Ltd. v. Apple Inc.*, Case No. 5-19-cv-04809 (N.D. Cal. filed August 14, 2019).

- Petitioner is concurrently filing IPR2020-00906 directed to claims 19-22.

### C.    Lead and Back-up Counsel and Service Information

<u>Lead Counsel</u>

| | |
|---|---|
| **Michael S. Parsons** | Phone:    972-739-8611 |
| HAYNES AND BOONE, LLP | Fax:       214-200-0853 |
| 2323 Victory Ave. Suite 700 | michael.parsons.ipr@haynesboone.com |
| Dallas, TX 75219 | USPTO Reg. No. 58,767 |

<u>Back-up Counsel</u>

| | |
|---|---|
| **Andrew S. Ehmke** | Phone:    214-651-5116 |
| HAYNES AND BOONE, LLP | Fax:       214-200-0853 |
| 2323 Victory Ave. Suite 700 | andy.ehmke.ipr@haynesboone.com |
| Dallas, TX 75219 | USPTO Reg. No. 50,271 |

| | |
|---|---|
| **Jordan Maucotel** | Phone:    (972) 739-8621 |
| HAYNES AND BOONE, LLP | Fax:       (214) 200-0853 |
| 2323 Victory Ave. Suite 700 | jordan.maucotel.ipr@haynesboone.com |
| Dallas, TX 75219 | USPTO Reg. No. 69,438 |

Please address all correspondence to lead and back-up counsel. Petitioner consents to electronic service.

## III.    GROUNDS FOR STANDING

Pursuant to 37 C.F.R. §42.104(a), Petitioner certifies that the '479 Patent is available for *inter partes* review and that Petitioner is not barred or estopped from requesting an *inter partes* review challenging the claims on the grounds identified in this Petition.

## IV.    THE '479 PATENT

### A.    Summary of the Patent

The '479 Patent describes a "dual-aperture zoom digital camera operable in both still and video modes." APPL-1001, Abstract. Figure 1A diagrams the

- 2 -

patent's camera as a dual-aperture Zoom imaging system 100 including a first

Wide imaging section and a second Telephoto imaging section, with each section

having respective lenses and image sensors:



APPL-1001, Fig. 1A (annotated).

Figure 2 of the '479 Patent illustrates the respective fields of view (FOVs) of

the Wide and Telephoto image sensors:



APPL-1001, Fig. 2 (annotated). The larger FOV for the Wide image is provided by Wide sensor 202 and the corresponding smaller FOV for the Telephoto image is provided by Telephoto sensor 204. *See id.*, 6:1-2.

With Wide and Telephoto images captured from the respective cameras, the '479 Patent describes several processing methods that can be achieved. In the method that forms the subject of the challenged claims, the image processing first rectifies the Wide and Telephoto images to be aligned on an epipolar line. *See id.*, 9:46-47. Next, the process performs "mapping between the Wide and the Telephoto aligned images" to "produce a registration map." *Id.*, 9:48-49. The Telephoto image is then "resampled according to the registration map" or in other words, resized to correspond to the field of view ("FOV") of the Wide image. *See id.*, 9:50-60. The process finally then fuses or combines portions of the resampled

- 4 -

Telephoto image with corresponding portions of the Wide image to produce an output image. *See id.*, 9:52-67. As part of this fusion step, any errors between the images are detected and if an error exists, "Wide pixel values are chosen to be used in the output image." *Id.*, 9:54-60.

As set forth in this Petition and the accompanying evidence, a dual-aperture camera system having 1) Wide and Telephoto lens systems with overlapping fields of view, and 2) a camera controller that processes images from both systems to outputs an image were known to POSITAs prior to the '479 Patent. *See* APPL-1003, ¶25.

### B.    Prosecution History and Priority Date

U.S. Patent Application No. 16/048,242 ("the '242 App") that issued as the '479 Patent was filed on July 28, 2018 and claims priority through a chain of applications to a provisional filed on June 13, 2013. APPL-1001, 1:5-20. The '242 application was filed with 40 claims that ultimately issued as claims 1-40 in the '479 Patent. *See* APPL-1002, p.334-66. The '479 Patent issued on March 5, 2019. In the Notice of Allowance, the Examiner's reasoning simply copied the limitations that were found to be patentable including "the Telephoto lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T / TTL_T > 1$. This limitation was known in the prior art.

## V.    LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art may be reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Here, a Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including image processing and lens design. APPL-1003, ¶13. Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA. *Id.* However, Petitioner does not imply that a person having an extraordinary level of skill should be regarded as a POSITA.

## VI.    CLAIM CONSTRUCTION

The challenged claims of the '479 Patent are construed herein "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (Nov. 13, 2018). The claim terms construed below are thus construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* For terms not addressed below, Petitioner submits that no specific construction is necessary for this proceeding.

- 6 -

**A.    "fused image with a point of view (POV) of the Wide camera" (claims 1 and 23).**

This term is used in claims 1 and 23 which both recite: "to output the *fused image with a point of view (POV) of the Wide camera* by mapping Telephoto image pixels to matching pixels within the Wide image."

The Summary section of the '479 Patent describes the concept of POV in regard to the Wide and Telephoto cameras in this way: "In a dual-aperture camera image plane, as seen by each sub-camera (and respective image sensor), a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV)." APPL-1001, 5:10-12. Because Wide and Telephoto cameras have different perspectives, the '479 Patent indicates that a fused image (i.e., output image) "can have the shape and position of either sub-camera image or the shape or position of a combination thereof." *Id.*, 5:12-15. "If the output image retains the Wide image shape then it has the Wide perspective POV. If it retains the Wide camera position, then it has the Wide position POV." *Id.*, 5:15-19. The same applies to the images from the Telephoto camera. *Id.*, 5:19-20.

In other words, according to the specification, "*a point of view of the Wide camera*" in the claims can mean one of two things—either "Wide perspective POV" (i.e., wide camera FOV) or "Wide position POV" (i.e., wide camera position). APPL-1003, ¶ 31. When discussing the fusion step, the '479 Patent does not specifically indicate whether position or perspective POV is maintained: "it is

- 7 -

possible to register Telephoto image pixels to a matching pixel set within the Wide image pixels, in which case the output image will retain the Wide POV ("Wide fusion")." *Id.*, 5:23-26. Because the specification describes Wide POV in two ways and does not specify which type is maintained by image fusion, a POSITA would have understood that a fused image that maintains a Wide POV either fuses images to maintain just the Wide field of view or fuses images to maintain both the Wide camera's position. APPL-1003, ¶31.

Based on this description from the '479 Patent, a POSITA therefore would have understood a "fused image with a point of view (POV) of the Wide camera" to mean "*a fused image that maintains the Wide camera's field of view or the Wide camera's position.*" APPL-1003, ¶¶32-33.

## VII.  REQUESTED RELIEF

Petitioner requests that the Board institute *inter partes* review of claims 1-16, 18, 23-38, and 40 of the '479 Patent and cancel each of those claims as unpatentable.

## VIII.  OVERVIEW OF CHALLENGES

### A.    Challenged Claims

Claims 1-16, 18, 23-38, and 40 of the '479 Patent are challenged.

**B.   Statutory Grounds for Challenges**

| Ground | Claims | Basis |
|--------|--------|-------|
| 1 | 1, 10-14, 16, 18, 23, 32-36, 38, 40 | Obvious under § 103 over the combination of Parulski and Konno |
| 2 | 2-4, 24-26 | Obvious under § 103 over the combination of Parulski, Konno, and Szeliski |
| 3 | 5-9, 27-31 | Obvious under § 103 over the combination of Parulski, Konno, Szeliski, and Segall |
| 4 | 15, 37 | Obvious under § 103 over the combination Parulski, Konno, and Stein |

Parulski (APPL-1005) issued on December 28, 2010, Konno (APPL-1015) published on May 30, 2013, Szeliski (APPL-1013) published in 2011, and Segall (APPL-1024) issued on March 26, 2013. Consequently, Parulski, Konno, Szeliski, and Segall are prior art to under at least 35 U.S.C. § 102(a)(1).

Stein issued on December 9, 2014 from an application filed on January 15, 2014. Stein claims priority to two provisional applications filed on January 15, 2013 and February 7, 2013. Since the provisional application filed on February 7, 2013 support both one claim of Stein and the subject matter relied on in this Petition, Stein is prior art to under at least 35 U.S.C. § 102(a)(2).

**C.   Page Citations and Emphasis**

For exhibits that include suitable page, column, or paragraph numbers in their original publication, Petitioner's citations are to those original numbers and

not to the page numbers added for compliance with 37 CFR 42.63(d)(2)(ii). The

Petition may bold or italicize quotations and add color or colored annotations to

figures from exhibits for emphasis.

## IX. IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A. Ground 1: Claims 1, 10-14, 16, 18, 23, 32-26, 38, and 40 are obvious under § 103 over Parulski and Konno.

#### 1. *Summary of Parulski*

Parulski is titled "Method and Apparatus for Operating a Dual Lens Camera to

Augment an Image," and discloses "a digital camera that uses multiple lenses and

image sensors to provide an improved imaging capability." APPL-1005, Title, 1:8-10.

In Parulski, "digital zooming between the wide angle and the telephoto focal lengths"

is used to provide an extended zoom range. APPL-1005, 23:54-58; APPL-1003, ¶34.

Parulski teaches that its dual lens image capture assembly may operate in still and

video modes to produce "still images and motion video images." APPL-1003, ¶35;

APPL-1005, 12:36-41. The images can then be "processed by the image processor 50

to produce a processed digital image file, which may contain a still digital image or a

video image." APPL-1001, 14:5-9.

More specifically, Parulski describes a cell phone camera with a dual image

capture system that "utilize both images to provide an improved output image."

APPL-1005, 7:21-24; APPL-1003, ¶36. The output image is generated via an

augmentation process that "utilizes one of the images from a dual-lens camera as a

secondary image that can be used to modify the other, primary image and thereby

generate an enhanced primary image." APPL-1005, 7:32-35. Parulski describes that

its image augmentation process may be applied to "a still image or a video image."

APPL-1005, 29:8-20. As shown relative to annotated FIG. 16B below, Parulski goes

on to describe its technique using images from fixed focal length wide-angle and

telephoto lenses and image sensors. APPL-1005, 23:28-43; APPL-1003, ¶36.



APPL-1005, Fig. 16B (annotated).

Parulski teaches using its image capture assembly in a method to enhance the

depth of field in Figure 14, which shows "a method for enhancing the depth of field of

an image by using images from both image capture stages … " APPL-1003, ¶37; *id.*,

22:14-16; 23:4-7 (explaining that "the integrated image capture assembly [previously

described], may be adapted for use in a cell phone." This process is also discussed in

relation to Figure 26 where the primary image is sharpened by fusing focused portions of the secondary image with corresponding portions of the primary image to broaden the primary image's depth of field. *Id.*, 28:47-51 ("Then, the two images are combined into a modified image with a broadened depth of field.").

In sum, Parulski teaches a cell phone camera with dual-lens systems for capturing primary and secondary images with overlapping fields of view (FOVs) and then processing the images to enhance the Wide image by fusing it with focused portions of the Tele image. APPL-1003, ¶46.

### 2.     *Summary of Konno*

#### a)     **Konno's disclosure**

Similar to the dual-lens system described in the '479 Patent, Konno also discloses a dual-lens system for use in digital equipment including cell phones. *See* APPL-1015, Abstract, ¶¶ 12, 25 ("digital equipment such as digital cameras, mobile phones, and personal digital assistants."). Konno's dual-lens system is designed to "realize a high-performance slim and small-sized imaging apparatus." APPL-1015, ¶25. One dual-lens embodiment in Konno is Example 2 which has a wide-angle lens LN1 and a telephoto lens LN2 with an EFL / TTL > 1.0. APPL-1015, ¶¶ 7, 14, 40, Table 1. An example of Konno's dual-lens system is provided below:

IPR2020-00905 Petition
*Inter Partes* Review of 10,225,479



Ex.1015, Fig. 21.

In the example above, the wide (LN1) and telephoto (LN2) lens systems have fixed-focal-length lens assemblies that project images on to respective image sensors. *See id.*, ¶¶49, 52-53. Each lens system also includes a focus drive element to provide focusing across a range of options. *See id.*, ¶50 ("the first and second imaging optical systems LN1 and LN2 have different focus movements in the case of whole feeding"). Konno's dual-lens system is therefore configured to achieve stereoscopic vision that uses parallax (i.e., spacing between the two sensors) to provide "three-dimensional vision [that] can be displayed at the focal length fm of the second imaging optical system LN2." *Id.*, ¶52; *see also* APPL-1003, ¶47.

Optical data for Example 2 is provided in Table 1 below:

- 13 -

[Table 1]

|  |  | Example 1 | | Example 2 | |
|---|---|---|---|---|---|
|  |  | LN1 | LN2 | LN1 | LN2 |
| Focal Length of Entire System (mm) | fw or fm | 2.73 | 4.32 | 3.70 | 5.51 |
| Fno | FNOw or FNOm | 4.00 | 4.00 | 3.00 | 4.00 |
| Lens Entire Length (at infinite) (mm) | TLw or TLm | 3.04 | 3.65 | 4.45 | 4.91 |
| Maximum Image Height (mm) | 2Y' | 5.12 | 5.12 | 5.80 | 5.80 |
| Entire Viewing Angle (deg) | 2ωw or 2ωm | 86.32 | 61.28 | 76.18 | 55.52 |
| L1 Focal Length (mm) | f1w or f1m | 2.60 | 2.10 | 2.47 | 2.54 |
| L2 Focal Length (mm) | f2w or f2m | -7.91 | -5.51 | -3.53 | -4.02 |
| L3 Focal Length (mm) | f3w or f3m | 3.14 | -13.70 | 13.47 | 22.96 |
| L4 Focal Length (mm) | f4w or f4m | -1.68 | -3.09 | 2.42 | -5.99 |
| L5 Focal Length (mm) | F5w or f5m | -- | -- | -1.84 | -7.73 |
| Composite Focal lengths of L1 and L2 (mm) | fFw or fFm | 3.48 | 2.91 | 5.48 | 4.84 |
| Focal Length of Lens LX (mm) | fXw or fXm | 3.14 | -13.70 | 2.42 | -5.99 |
| Number of Pixels of Sensor (MegaPixels) | PX | 10.00 | 10.00 | 13.00 | 13.00 |
| Segmented Minimum Number of Pixels (MegaPixels) |  | 4.00 | 4.00 | 5.86 | 5.86 |
| Segmented Maximum Focal Length (mm) |  | 4.32 | 6.83 | 5.51 | 8.21 |
| Electronic Zoom Ratio (Power) | ZR |  | 2.50 |  | 2.22 |
| Focal Length (135 Conversion) (mm) |  | 23.07 | 36.52 | 27.60 | 41.10 |

APPL-1015, Table 1.

As shown in Table 1, the "Focal Length of [the] Entire System (mm)" (*f* or EFL), the "Lens Entire Length (at infinite) (mm)" (TTL), "Entire Viewing Angle" (i.e., field of view or FOV), F number, and 35 mm equivalent focal length is provided for each lens system in Example 2. Specific to Example 2, the field of view of LN1 is wider than LN2, LN1 and LN2 have different F numbers, and the EFL/TTL ratio for LN2 of 5.51/4.91 is greater than one thus making LN2 a telephoto type lens. *See* APPL-1020, p.57; APPL-1003, ¶49.

### b) Correcting Konno's LN2 lens in the Example 2 embodiment

According to Dr. Sasián (APPL-1021), the LN2 lens in Konno's Example 2 has a small overlap between the fourth and fifth lens elements, which would be recognized by a POSITA upon modelling the LN2 lens. *See* APPL-1021, ¶29. A POSITA would have been able to easily correct this overlap by simply adjusting the fifth lens. *Id.*, ¶30. In fact, by adjusting the fifth lens element position by 0.5 microns (to abut the image-side surface of the fourth lens element), a POSITA would have recognized that the overlap could be resolved and still produce a lens with comparable performance using Konno's data. *Id.*

A POSITA would have understood that performing such an adjustment of the fifth lens by 0.5 microns would have been the natural result of manufacturing the fourth and fifth elements as indicated in Konno and placing the fifth lens as close to the fourth lens as possible. This would have been understood by a POSITA to be the natural result of assembling Konno's Example 2 since two lens elements cannot physically overlap. *Id.*, ¶34. Thus, a POSITA would not have been discouraged to manufacture and use Konno's dual-lens system in cell phone camera since the lens overlap could have been readily resolved in a logical way by simply putting the lens assembly together to the extent possible minus the overlapping elements. *Id.*

- 15 -

### 3.    Reasons to Combine Parulski and Konno

A POSITA would have combined Konno's dual-lens system with Parulski's cell phone camera embodiment because such a combination would have merely been incorporating Konno dual-lens system (with single-focus wide and telephoto lenses) into Parulski's cell phone 600 to obtain the same predictable result of a fixed-focal length, dual-lens camera capable of producing stereo images for processing in Parulski's cell phone. *See* APPL-1003, ¶52. A POSITA would have been motivated to incorporate Konno into Parulski's cell phone for several reasons.

First, Parulski does not provide lens prescription data for either the first or second fixed-focus lenses in its cell phone embodiment 600. Instead, Parulski simply refers to image assembly 610 as having a "first lens 612, preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens)" and "the second lens 616, preferably fixed focal length telephoto lens (such as 100 mm equiv. lens) ...." APPL-1005, 23:36-41. Since Parulski provides no specific lens description or design parameters, a POSITA looking to implement the wide and telephoto dual-lens image assembly 610 in a cell phone embodiment would have needed to either find or design a suitable dual-lens system capable of producing stereo images in cell phone embodiment. APPL-1003, ¶57. For this reason alone, a POSITA would have looked to Konno which provides a fixed-focal length, dual-lens system

designed for digital equipment like cell phones, as indicated in Parulski's disclosure. *Id.*

While Parulski suggests 40 mm and 100 mm equivalent 35 mm focal length lenses as an option, a POSITA would have recognized that the preceding language "such as" that sets forth this suggestion would have meant that these 35 mm equivalent focal lengths are examples and not requirements for a dual-lens system that could be incorporated in Parulski's cell phone embodiment. *Id.*, ¶54.

Moreover, a POSITA would have recognized that Konno's dual-lens assembly is compatible with Parulski since Konno's system offers fixed-focal length wide and telephoto lenses in a thin format for incorporation in a mobile device. *See* APPL-1015, ¶46 ("The first and second imaging optical systems … are suitable for digital equipment having an image input function (for example, imaging apparatuses such as mobile phones with camera, and digital cameras), and can be combined with the imaging device ….").

Second, Parulski teaches the importance of keeping the "z" dimension (i.e., thickness) of its cell phone embodiment small, and notes the importance of selecting Wide and Telephoto lenses that reduces thickness. APPL-1005, 24:20-27 ("An important constraint in this embodiment is the "z" dimension 630, which must be held to a very small figure consistent with a cell phone layout and architecture."). Based on this, a POSITA looking to implement Parulski's

- 17 -

teachings would have been motivated to utilize Konno's dual-lens system because a POSITA would have recognized the benefits of Konno's thin profile at a reduced cost. *See* APPL-1015, ¶46 ("a thin and small-sized imaging optical units having high variable power and high performance, and digital equipment equipped with the imaging optical units can be realized at low costs."); *see also* APPL-1003, ¶56.

Thus, a POSITA would have been motivated to incorporate Konno's dual-lens system in Parulski's cell phone embodiment and would have reasonably expected success in doing so since both Parulski and Konno specify fixed-focus wide and telephoto lenses and Konno meets Parulski's need for lenses with reduced thickness suitable for processing to derive 3-dimensional data like a range map. *See* APPL-1003, ¶61; *see also* APPL-1005, Fig. 11, 19:49-20:15. Such a combination would have beneficially met Parulski's stated need for a thin dual-lens assembly appropriate for a cell phone but at a reduced cost, as stated in Konno. *See* APPL-1003, ¶57; APPL-1015, ¶46 ("By disposing the first and second imaging optical systems … a thin and small-sized imaging optical units having high variable power and high performance, and digital equipment equipped with the imaging optical units can be realized at low costs.").

As set forth below, the combination of Parulski and Konno renders obvious claims 1, 10-14, 16, 18, 23, 32-36, and 38, and 40.

- 18 -

IPR2020-00905 Petition
*Inter Partes* Review of 10,225,479

### 4.    Claim 1

**[1.0] "*A dual-aperture digital camera for imaging an object or scene, comprising:*"**

The combination of Parulski and Konno renders [1.0] obvious. APPL-1003, p.36. First, Parulski teaches a digital camera in the form of a cell phone embodiment (*see* Fig. 15) that includes a dual image capture assembly 610 and an image processor 50. *See* APPL-1005, 23:4-12 ("as shown in FIG. 15A, a cell phone 600 includes a phone stage comprising … a cellular image capture assembly 610 connected via the image processor 50 …."). Fig 15A is below:



APPL-1005, Fig. 15A.

Parulski's cell phone is a "dual-aperture digital camera" because the image capture assembly 610 includes "a first fixed focal length lens 612 and a first image sensor 614, and a second fixed focal length lens 616 and a second image sensor 618." *Id.*, 23:33-36. The first lens 612 is "preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens)" and the second lens 616 is "preferably fixed focal length telephoto lens (such as 100 mm equiv. lens)." Both lenses are "oriented in the same direction" and capture images of the same scene but with different fields of view (FOVs). *See id.*, 23:40-43. Image assembly 610 from Figs. 16A and 16B are reproduced below:



FIG. 16A

FIG. 16B

*Id.*, Figs. 16A, 16B (annotated).

IPR2020-00905 Petition
*Inter Partes* Review of 10,225,479

Second, Konno similarly teaches a dual-aperture imaging system that also includes a wide-angle lens (i.e., shorter focal length) and a telephoto lens (i.e., longer focal length) represented in Fig. 21:



APPL-1015, Fig. 21 (annotated). As shown in Fig., 21, the lenses "LN1 and LN2 are single focus lenses that face the same direction." The LN2 lens has a focal length fm that is "longer than the focal length fw" of the LN1 lens. APPL-1015, ¶¶ 48-49. Because LN2 has a longer focal length, a POSITA would have understood Konno's lenses to have different FOVs. APPL-1003, p.40.

Third, as discussed above, a POSITA would have found it obvious to combine Konno's Example 2 with Parulski's cell phone camera. *Id.* Such a combination would have met Parulski's requirement for an image assembly with wide and telephoto fixed-focal-length lenses that produces images suitable for

- 21 -

stereo processing, but in a thin format appropriate for cell phones, as required by Parulski. *Id.* Thus, Parulski's cell phone combined with Konno's dual-lens system renders [1.0] obvious. *Id.*

### [1.1] "a) a Wide camera comprising a Wide lens and a Wide image sensor, the Wide camera having a respective field of view $FOV_W$ and being operative to provide a Wide image of the object or scene;"

The combination of Parulski and Konno renders this limitation obvious. First, as discussed above in [1.0] both Parulski and Konno teach dual-aperture cameras with Wide and Telephoto lenses. Konno further discloses that its "wide camera" includes a "wide lens and a wide image sensor" that provides a "wide image of the object or scene." APPL-1015, ¶49.

Second, a POSITA would have recognized that the LN1 lens in Konno's Example 2 as a "wide" lens. It provides a larger field of view ($FOV_W = 76.18°$) than the telephoto LN2 lens system ($FOV_T = 55.52°$) and a ratio of TTL/EFL (4.45/3.70) of less than one. *See* APPL-1003, p.41; APPL-1015, ¶76. Thus, Parulski combined with Konno's LN1 lens renders [1.1] obvious. *Id.*

### [1.2] "b) a Telephoto camera comprising a Telephoto lens and a Telephoto image sensor, the Telephoto camera having a respective field of view $FOV_T$ narrower than $FOV_W$ and being operative to provide a Telephoto image of the object or scene, wherein the Telephoto lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T / TTL_T > 1$;"

The combination of Parulski and Konno renders [1.2] obvious. First, as discussed above in [1.0] both Parulski and Konno teach a dual-aperture camera

- 22 -

with Wide and Telephoto lenses. Konno further discloses a "telephoto camera" with a "telephoto image sensor" that provides a "telephoto image of the object or scene." APPL-1015, ¶49 ("The first and second imaging optical systems LN1 and LN2 are single focus lenses that face the same direction as described above and form the optical images IM1 and IM2 on the imaging faces SS1 and SS2 of the imaging devices SR1 and SR2, respectively.").

Second, a POSITA would have recognized Konno's LN2 lens system in Example 2 as a "telephoto" lens when compared to the LN1 lens system because LN2 provides a narrower field of view ($FOV_W$ = 76.18° vs $FOV_T$ = 55.52°) and has ratio of EFL/TTL (5.51/4.91) greater than one. APPL-1003, p.44-45; *see also* APPL-1015, ¶76. Thus, Parulski's cell phone combined with Konno's LN2 lens renders [1.2] obvious. APPL-1003, pp.42-44.

### [1.3] "c) a first autofocus (AF) mechanism coupled mechanically to, and used to perform an AF action on the Wide lens;"

### [1.4] "d) a second AF mechanism coupled mechanically to, and used to perform an AF action on the Telephoto lens; and"

The combination of Parulski and Konno renders [1.3]-[1.4] obvious because both references teach providing respective autofocus mechanisms for the Wide and Telephoto lens systems. *See id.*, p.43-46.

First, Parulski teaches that lens assembly 610 in its cell phone embodiment includes an autofocus mechanism for both the wide lens 612 and the telephoto lens

616. *Id.*, p.44. Specifically, Parulski states that "**both lenses 612 and 616 are adjustable focus lenses**" such that "**the sensor output from the telephoto lens 616 … generate[s] a focus detection signal for the wide angle lens 612**" and "**the sensor output from the wide angle lens 612 … generate[s] the focus detection signal for the telephoto lens 616**." *Id.*, 23:62-24:4. The focus detection is then applied to the autofocus subsystem 628 to adjust the focus of the respective lenses. *See id.*, 23:62-24:7. Because Parulski teaches generating a focus detection signal from either the Wide or Telephoto images that is then applied to an "autofocus subsystem" to adjust the focus, a POSITA would have understood that each lens system includes a mechanically coupled autofocus mechanism automatically controlled by the autofocus subsystem using a respective focus detection signal. *See* APPL-1003, p.44-45.

Second, Konno similarly teaches that it's dual-lens system includes an autofocus-drive mechanism for the LN1 and LN2 lenses. *See* APPL-1015, ¶50 ("[T]he first and second imaging optical systems **LN1 and LN2 have different focus movements** in the case of whole feeding."); APPL-1003, p.45. A POSITA would have understood "whole feeding" in this context to mean through a full range of focus distances. *Id.* Like Parulski's description above, Konno's autofocus mechanism is similarly adjusted by a controller. APPL-1015, ¶54 ("**The control**

**unit 2 is formed of a microcomputer, and controls various functions including**

… **a lens moving mechanism for focusing**.”).

Because Konno teaches that the controller automatically adjusts the focus of
each lens and that each lens has different focusing movements, a POSITA would
have understood that each lens system's focusing movement is mechanically
coupled to its respective lens system to be automatically controlled. APPL-1003,
p.46. A POSITA also would have understood that since both Parulski's and
Konno's lenses include autofocus mechanisms, the combination of Parulski and
Konno would likewise include autofocus mechanisms for each lens that would be
automatically controlled by Parulski's image processor 50 as discussed above. *Id.*
Thus, Parulski's cell phone with autofocuses lenses combined with Konno's dual
lens system also with autofocus lenses renders [1.3]-[1.4] obvious. *Id.*

**[1.5] “e) a camera controller operatively coupled to the first and second AF
mechanisms and to the Wide and Telephoto image sensors and configured to
control the AF mechanisms”**

Parulski discloses [1.5] because it teaches that processor 50 (e.g., a camera
controller) included in the cell phone controls the autofocus mechanism on each
lens. *Id.*, p.46-47. More specifically, as discussed above in [1.3] and [1.4], Parulski
teaches that “both lenses 612 and 616 are adjustable focus lenses” such that “the
image processor 50 … uses the sensor output from the telephoto lens 616 to
generate a focus detection signal for the wide angle lens 612 or … uses the sensor

- 25 -

output from the wide angle lens 612 to generate the focus detection signal for the telephoto lens 616." APPL-1005, 23:62-24:4. The focus detection signal is then applied to the autofocus subsystem 628 to adjust the focus of the respective lens. *Id.*; *see* APPL-1005, 23:62-24:7.

A POSITA would have understood that Parulski's teaching of image processor 50 (i.e., a camera controller) using sensor output from one lens to generate a focus detection signal for the other lens that is then applied to an autofocus subsystem means that the processor is operatively coupled to each autofocus mechanism to control the autofocus based on the focus detection signal. APPL-1003, p.47. Thus, Parulski's image processor 50 that controls an autofocus mechanism renders this limitation obvious. *Id.*

### [1.5.1] *"and to process the Wide and Telephoto images to create a fused image, wherein areas in the Telephoto image that are not focused are not combined with the Wide image to create the fused image"*

Parulski renders [1.5.1] obvious because, in reference to Fig. 14, it teaches an image enhancement method where, via image processor 50, "an image is captured from the primary capture unit at one focus position" (e.g., the wide lens, *see* Fig. 14, block 510) and "another image is captured from the scene analysis capture unit (the secondary image capture unit) at another focus position" (e.g., the telephoto lens, *see* Fig. 14, block 512). APPL-1005, 28:45-57. "**Then, the two images are combined into a modified image with a broadened depth of field**."

- 26 -

*Id.; see also id.*, 22:14-42. This process is annotated in Fig. 14 below:



APPL-1003, p.48; APPL=1005, Fig. 14, in part, (annotated).

Because Parulski teaches that the enhanced image has a "broadened depth of field," a POSITA would have understood this to mean that when the primary image is from the wide lens (*see* Fig. 14, block 510) and the secondary image is from the telephoto lens (*see* Fig. 14, block 512), the focused portions of the telephoto image are identified and combined with the wide image to broaden the wide image's depth of field (*see* Fig. 14, block 514). APPL-1003, p.48-49.

Parulski offers an example of this where a wide image is focused on a

mountain range, a telephoto image is focused on a dog, and the images are combined so that both the mountains and the dog are in focus (i.e., creating a broader depth of field). APPL-1005, 21:34-44 ("For example, **the dog and mountains, albeit they are at opposite range extremes, could be brought in focus because they are the regions of interest** ...."). For this example, Parulski teaches using a range map "to improve object identification within the image by identifying the continuous boundaries of the object so the shape of the object can be define" and "**to enable object extraction from an image by identifying the continuous boundaries of the object so it can be segmented within the image**." APPL-1005, 20:50-59.

Based on Fig. 14 and the example that Parulski provides of having an image of mountains captured at one extreme focus distance (i.e., the wide image focused on the mountains) and the image of a dog captured at the other extreme focus distance (i.e., the telephoto image focused on the dog), a POSITA would have understood that creating an enhanced image with both the mountains and the dog in focus would have meant that the pixel corresponding to the dog from the telephoto image would have been identified by the range mapping process and then fused with the corresponding pixels in the wide image so that the dog would be sharpened in the wide image while maintaining the mountains in focus, thus broadening the wide image's depth of field. APPL-1003, p.50. Because the dog

from the telephoto image is fused with the wide image, a POSITA would have understood this to mean than only the portions that are in-focus (i.e., the dog) are fused with the wide image. *Id.* Otherwise, the wide image's depth of field would not be broadened if out-of-focus portions of the telephoto image are also fused. *Id.*

Thus, Parulski's cell phone camera that combines in-focus portions of a telephoto image with a wide image to broaden the depth of field of the wide image teaches [1.5.1].

### [1.5.2] *"and wherein the camera controller is further operative to output the fused image with a point of view (POV) of the Wide camera by mapping Telephoto image pixels to matching pixels within the Wide image."*

Parulski renders [1.5.2] obvious. First, as discussed above in [1.5.1], Parulski teaches an image enhancement process where in-focus portions of the telephoto image are combined with the wide image to broaden the wide image's depth of field. *Id.*; *see* APPL-1005, 22:14-42, 28:45-57, Fig. 14. A POSITA would have understood that fusing portions of the telephoto image with the wide image (as annotated in Fig. 14 above) would have otherwise maintained the wide image, therefore outputting a fused image with the wide image's field of view. APPL-1003, pp.50-51.

Second, as discussed above in [1.5.1], Parulski teaches that its fusion process is performed, in part, by using a range map "to improve object identification within the image by identifying the continuous boundaries of the object so the shape of

the object can be defined" and "**to enable object extraction from an image by identifying the continuous boundaries of the object so it can be segmented within the image**." APPL-1005, 20:50-59.

Parulski's range map is generated by matching pixels from the telephoto image to matching pixels in the wide image. APPL-1005, 20:1-15 ("**Then, in block 480, the second autofocus image is correlated with the cropped 10 and upsampled image to determine the pixel offset between the images for different portions of the images**"). Parulski thus teaches outputting a fused image by mapping pixels from the telephoto image to matching pixels in the wide image. APPL-1003, p.51-52. Thus, Parulski's cell phone that matches pixels from the telephoto image to pixels in the wide image which is then used to enhance the wide image's depth of field teaches [1.5.2].

### 5.    Claim 10

**[10.0] "*The dual-aperture digital camera of claim 1, wherein the Wide and Telephoto image sensors have pixels with identical pixel counts.*"**

The combination of Parulski and Konno renders [10.0] obvious because as shown in Table 1, the LN1 and LN2 lenses in Konno's Example 2 both utilize image sensors with identical 13-megapixel pixel counts:

|  |  | Example 1 | | Example 2 | |
|---|---|---|---|---|---|
|  |  | LN1 | LN2 | LN1 | LN2 |
| Focal Length of Entire System (mm) | fw or fm | 2.73 | 4.32 | 3.70 | 5.51 |
| Fno | FNOw or FNOm | 4.00 | 4.00 | 3.00 | 4.00 |
| Lens Entire Length (at infinite) (mm) | TLw or TLm | 3.04 | 3.65 | 4.45 | 4.91 |
| Maximum Image Height (mm) | 2Y' | 5.12 | 5.12 | 5.80 | 5.80 |
| Entire Viewing Angle (deg) | 2ωw or 2ωm | 86.32 | 61.28 | 76.18 | 55.52 |
| L1 Focal Length (mm) | f1w or f1m | 2.60 | 2.10 | 2.47 | 2.54 |
| L2 Focal Length (mm) | f2w or f2m | -7.91 | -5.51 | -3.53 | -4.02 |
| L3 Focal Length (mm) | f3w or f3m | 3.14 | -13.70 | 13.47 | 22.96 |
| L4 Focal Length (mm) | f4w or f4m | -1.68 | -3.09 | 2.42 | -5.99 |
| L5 Focal Length (mm) | F5w or f5m | -- | -- | -1.84 | -7.73 |
| Composite Focal lengths of L1 and L2 (mm) | fFw or fFm | 3.48 | 2.91 | 5.48 | 4.84 |
| Focal Length of Lens LX (mm) | fXw or fXm | 3.14 | -13.70 | 2.42 | -5.99 |
| Number of Pixels od Sensor (MagaPixels) | PX | 10.00 | 10.00 | 13.00 | 13.00 |
| Cropped Minimum Number of Pixels (MagaPixels) |  | 4.00 | 4.00 | 5.86 | 5.86 |
| Cropped Maximum Focal Length (mm) |  | 4.32 | 6.83 | 5.61 | 8.21 |
| Electronic Zoom Ratio (Power) | ZR |  | 2.50 |  | 2.22 |
| Focal Length (135 Conversion) (mm) |  | 23.07 | 36.52 | 27.60 | 41.10 |

**Image Sensors with Identical Number of Pixels**

APPL-1003, p.53; APPL-1015, ¶76 (annotated).

Thus, Parulski's cell phone embodiment combined with Konno's dual-lens assembly that uses a 13-megapixel image sensor in each lens system renders [10.0] obvious.

### 6.    *Claim 11*

### [11.0] *"The dual-aperture digital camera of claim 10, wherein the pixel count is 12 MP."*

The combination of Parulski and Konno renders [11.0] obvious. First, Parulski teaches that various types and sizes of sensors may be used in its cell phone embodiment. APPL-1005, 13:27-36 ("image sensors 12 and 14 may have a

- 31 -

variety of aspect ratios, for example, a 4:3 image aspect ratio and a variety of resolutions …. It should also be understood that the image sensors 12 and 14 do not have to have the same specifications.").

Second, Konno teaches using at least a 10 MP image sensor to obtain high-quality images. APPL-1015 ¶21 ("To acquire an excellent image, also when the electronic zoom is performed, a sufficient number of pixels are required…. [T]o acquire the above-mentioned number of pixels, an imaging device (that is, a large-sized sensor) having **a large number of pixels such as 10 megapixels is required**."). As discussed above in [10.0], Konno teaches also using a 13 MP image sensor in the Example 2 embodiment. *See id.*, Table 1.

Based on Parulski's teaching of its embodiments using image sensors of various types and sizes and Konno's teaching of needing an image sensor of at least 10 MP for high quality imaging (and providing an embodiment using 13 MP sensors), a POSITA would have found it obvious that a 12 MP (4000x3000) sensor could likewise be used for capturing high-quality images in Konno's dual-lens system. APPL-1003, p.55. One such sensor that was available and could have been used with Konno's Example 2 system due to have a similar image diagonal is the Sony ICX612 image sensor for digital imaging having a pixel count of 12 MP. *Id.*; *see* APPL-1031, p.1

A POSITA thus would have found it obvious to use an image sensor in Konno that outputs a high resolution like the ICX612 sensor simply based on Konno's teaching of using a sensor larger than 10 MP to maintain high image quality. APPL-1003, p.55. Thus, Parulski's cell phone embodiment combined with Konno's requirement for an image sensor lager than 10 MP renders [11.0] obvious.

### 7.    *Claim 12*

### [12.0] *"The dual-aperture digital camera of claim 1, wherein the Wide and Telephoto image sensors have pixels with respective pixel sizes Pixel size$_{Wide}$ and Pixel size$_{Tele}$ and wherein Pixel size$_{Wide}$ is equal to Pixel size$_{Tele}$."*

The combination of Parulski and Konno renders this [12.0]. First, as discussed above in [10.0] Konno teaches that the image sensors in its Example 2 embodiment have identical pixel counts of 13.0 megapixels. Second, Konno further teaches that each image sensor is 5.8 mm high:

- 33 -

**Image Sensor Height**

| | | Example 1 | | Example 2 | |
|---|---|---|---|---|---|
| | | LN1 | LN2 | LN1 | LN2 |
| Focal Length of Entire System (mm) | fw or fm | 2.73 | 4.32 | 3.70 | 5.51 |
| Fno | FNOw or FNOm | 4.00 | 4.00 | 3.00 | 4.00 |
| Lens Entire Length (at infinite) (mm) | TLw or TLm | 3.04 | 3.65 | 4.43 | 4.91 |
| Maximum Image Height (mm) | 2Y' | 5.12 | 5.12 | 5.80 | 5.80 |
| Entire Viewing Angle (deg) | 2ωw or 2ωm | 86.32 | 61.28 | 76.18 | 55.52 |
| L1 Focal Length (mm) | f1w or f1m | 2.60 | 2.10 | 2.47 | 2.54 |
| L2 Focal Length (mm) | f2w or f2m | -7.91 | -5.51 | -3.53 | -4.02 |
| L3 Focal Length (mm) | f3w or f3m | 3.14 | -13.70 | 13.47 | 22.96 |
| L4 Focal Length (mm) | f4w or f4m | -1.68 | -3.09 | 2.42 | -5.99 |
| L5 Focal Length (mm) | F5w or f5m | -- | -- | -1.84 | -7.73 |
| Composite Focal lengths of L1 and L2 (mm) | fFw or fFm | 3.48 | 2.91 | 5.48 | 4.84 |
| Focal Length of Lens LX (mm) | fXw or fXm | 3.14 | -13.70 | 2.42 | -5.99 |
| Number of Pixels od Sensor (MagaPixels) | PX | 10.00 | 10.00 | 13.00 | 13.00 |
| Cropped Minimum Number of Pixels (MagaPixels) | | 4.00 | 4.00 | 5.86 | 5.86 |
| Cropped Maximum Focal Length (mm) | | 4.32 | 6.83 | 5.51 | 8.21 |
| Electronic Zoom Ratio (Power) | ZR | | 2.50 | | 2.22 |
| Focal Length (135 Conversion) (mm) | | 23.07 | 36.52 | 27.60 | 41.10 |

**Image Sensor # of Pixels**

APPL-1003, p.56; APPL-1015, ¶76 (annotated).

Since each sensor in Example 2 is 13-megapixel and 5.8 mm high, a

POSITA would have recognized that the sensors have not only the same number of

pixels but also the same physical dimensions and therefore identical pixel widths

(since pixels are square, pixel heights would also be the identical). APPL-1003,

p.56. Thus, Parulski's cell phone combined with Konno's dual-lens assembly with

image sensors having the same dimensions and pixel counts renders [12.0]

obvious.

8.     *Claim 13*

**[13.0] "*The dual-aperture digital camera of claim 1, wherein the Wide and Telephoto image sensors have pixels with respective pixel sizes Pixel size_{Wide} and Pixel size_{Tele} and wherein Pixel size_{Wide} is not equal to Pixel size_{Tele}.*"**

The combination of Parulski and Konno renders [13.0] obvious. First, Parulski teaches that sensors used in the Wide and Telephoto lens systems "**may have a variety of aspect ratios, for example, a 4:3 image aspect ratio and a variety of resolutions**." APPL-1005, 13:27-36. Parulski also explains that "**the image sensors 12 and 14 do not have to have the same specifications**." *Id.* Second, Konno teaches using a sensor having "**a sufficient number of pixels**" and that "**to acquire the above-mentioned number of pixels, an imaging device (that is, a large-sized sensor) having a large number of pixels such as 10 megapixels is required**" for high performance. APPL-1015 ¶21.

Based on these teachings, a POSITA could have selected compatible sensors with different sizes or resolution. APPL-1003, p.58. Two commonly available prior art sensors of which a POSITA would have been aware and sought to use in devices like Parulski and Konno (due to having a high pixel count and similar diagonal) were the Sony ICX612 with about 12 MP and the ICX652 with about 13.5 MP. *Id.*; *see* APPL-1031; APPL-1032. Both sensors are the same size but by having different resolutions, the ICX 612 has a pixel width of 1.85 μm and the ICX652 has a pixel width of 1.75 μm. *See* APPL-1031; APPL-1032. Using these

- 35 -

sensors with Konno's lens design would have thus yielded a dual-lens imaging system having with image sensors having different pixel widths. APPL-1003, p.58.

Thus, based on Parulski's teachings that the image sensors in its embodiments can have different resolutions, Konno's teaching of using image sensors of 10 MP or greater, and the availability of compatible sensors of similar size but different pixel widths renders [13.0] obvious.

### 9.    *Claim 14*

### [14.0] "The dual-aperture digital camera of claim 1, wherein the Wide and Telephoto lenses have different F numbers F#*Wide* and F#*Telephoto*."

The combination of Parulski and Konno renders [14.0] obvious because as shown in Table 1, the LN1 and LN2 lenses in Konno's Example 2 have different F numbers (LN1: F#*Wide* = 3.0) and (LN2: F#*Telephoto* = 4.0):

|  |  | Example 1 | | Example 2 | |
|---|---|---|---|---|---|
|  |  | LN1 | LN2 | LN1 | LN2 |
| Focal Length of Entire System (mm) | fw or fm | 2.73 | 4.32 | 3.70 | 5.51 |
| Fno | FNOw or FNOm | 4.00 | 4.00 | 3.00 | 4.00 |
| Lens Entire Length (at infinite) (mm) | TLw or TLm | 3.04 | 3.65 | 4.45 | 4.91 |
| Maximum Image Height (mm) | 2Y' | 5.12 | 5.12 | 5.80 | 5.80 |
| Entire Viewing Angle (deg) | 2ωw or 2ωm | 86.32 | 61.28 | 76.18 | 55.52 |
| L1 Focal Length (mm) | f1w or f1m | 2.60 | 2.10 | 2.47 | 2.54 |
| L2 Focal Length (mm) | f2w or f2m | -7.91 | -5.51 | -3.53 | -4.02 |
| L3 Focal Length (mm) | f3w or f3m | 3.14 | -13.70 | 13.47 | 22.96 |
| L4 Focal Length (mm) | f4w or f4m | -1.68 | -3.09 | 2.42 | -5.99 |
| L5 Focal Length (mm) | F5w or f5m | -- | -- | -1.84 | -7.73 |
| Composite Focal lengths of L1 and L2 (mm) | fFw or fFm | 3.48 | 2.91 | 5.48 | 4.84 |
| Focal Length of Lens LX (mm) | fXw or fXm | 3.14 | -13.70 | 2.42 | -5.99 |
| Number of Pixels od Sensor (MagaPixels) | PX | 10.00 | 10.00 | 13.00 | 13.00 |
| Cropped Minimum Number of Pixels (MagaPixels) |  | 4.00 | 4.00 | 5.86 | 5.86 |
| Cropped Maximum Focal Length (mm) |  | 4.32 | 6.83 | 5.51 | 8.21 |
| Electronic Zoom Ratio (Power) | ZR |  | 2.50 |  | 2.22 |
| Focal Length (135 Conversion) (mm) |  | 23.07 | 36.52 | 27.60 | 41.10 |

**Tele F#**

**Wide F#**

APPL-1015, ¶76 (annotated).

Thus, Parulski's cell phone combined with Konno's dual-lens system renders [14.0] obvious.

### 10.    Claim 16

**[16.0] "The dual-aperture digital camera of claim 14, wherein the camera controller is further configured to synchronize the Wide and Telephoto image sensors to start exposure at the same time."**

Parulski renders [16.0] obvious because it teaches both cameras capturing images (i.e., starting exposure) simultaneously. *See* APPL-1005, 12:9-20. ("a second image sensor, is used to **simultaneously capture** a second (i.e., secondary) still image at a second (i.e., secondary) focus distance."); *Id.*, 30:1-11 ("Simultaneously, the secondary capture stage is set for a relatively fast exposure…"). A POSITA would have understood that "simultaneous capture" means that exposure of each image sensor surface starts at the same time. *See* APPL-1034, 1:21-23 ("two independent offset cameras with coordinated shutters are used to **simultaneously expose two frames of film**."). APPL-1003, p.60.

When applied to Parulski's cell phone camera, a POSITA would have understood that both the Wide and Telephoto lenses would have been synchronized by the image processor 50 (i.e., a camera controller) to expose each image sensor surface at the same time to facilitate simultaneous capture. *Id.* p.61. Thus, Parulski's renders [16.0] obvious.

- 37 -

### 11.    Claim 18

**[18.0] "The dual-aperture digital camera of claim 1, wherein the Wide and Telephoto lenses have respective F numbers F#_{Wide} and F#_{Telephoto} and"**

Konno discloses [18.0] because it teaches, as discussed above in [14.0], the

Example 2 LN1 lens (i.e., Wide) has an F# of 3.0 and the LN2 lens (i.e.,

Telephoto) has an F# of 4.0. *See* APPL-1005, Table 1.

**[18.1] "wherein the camera controller is further configured to set respective Wide and Telephoto image sensor exposure times ET_{Wide} and ET_{Tele} to be equal."**

Parulski renders [18.0] obvious because it teaches an "alternate"

embodiment that uses different exposure times for each camera to achieve different

noise levels or motion blur. *Id.*, 30:1-4 ("In a further embodiment of the invention,

the **primary capture stage and secondary capture stage are set for different**

**exposure times so that different levels of noise and motion blur are present in**

**the respective images**."). Since Parulski teaches using different exposure times in

an alternate embodiment, a POSITA would have understood that the main

embodiment includes setting the same exposure time for each camera so that both

images maintain the similar levels of noise and motion blur. APPL-1003, p.62.

Thus, the combination of Parulski and Konno renders [18.0] obvious.

### 12.    Claim 23

**[23.0] "A method comprising:"**

Parulski discloses a method of enhancing an image based on a wide and

telephoto image as discussed above in [1.0-1.5.2]. *Id.*

- 38 -

***[23.1] "a) providing a dual-camera comprising a Wide camera and a Telephoto camera, the Wide and Telephoto cameras having respective Wide and Telephoto lenses, Wide and Telephoto image sensors and Wide and Telephoto fields of view $FOV_W$ and $FOV_T$, wherein $FOV_T$ is narrower than $FOV_W$, wherein the Telephoto lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T / TTL_T > 1$"***

This limitation is substantially similar to [1.0-1.2] that provides a dual-aperture camera with Wide and Telephoto cameras. *Id.* As discussed above in [1.2], the Wide and Telephoto cameras have respective fields of view (FOV) where the FOV of the telephoto camera is narrower than the FOV of the wide camera. *Id.* Thus, this limitation is rendered obvious as discussed above.

***[23.2] "b) acquiring a Wide image with the Wide sensor and a Telephoto image with the Telephoto sensor;"***

This limitation is substantially similar to [1.1] and [1.2] that each recite providing an image with the Wide and Telephoto cameras. *Id.*, p.63. A POSITA would have recognized that "acquiring" an image with the Wide and Telephoto cameras is indistinguishable from the Wide and Telephoto cameras "providing" images. *Id.* This limitation is thus rendered obvious as discussed above.

***[23.3] "c) processing the Wide and Telephoto images to create a fused image, wherein areas in the Telephoto image that are not focused are not combined with the Wide image to create the fused image; and"***

This limitation is substantially similar to [1.5.1] and is rendered obvious as discussed above. *Id.*

***[23.4] "d) outputting the fused image with a point of view (POV) of the Wide camera by mapping Telephoto image pixels to matching pixels within the Wide***

*image."*

This limitation is substantially similar to [1.5.2] and is rendered obvious as discussed above. *Id.*

### 13.    Claim 32

**[32.0] "The method of claim 23, wherein the Wide and Telephoto image sensors have pixels with identical pixel counts."**

This limitation is substantially similar to [10.0] and is rendered obvious as discussed above. *Id.*, p.64.

### 14.    Claim 33

**[33.0] "The method of claim 32, wherein the pixel count is 12 MP."**

This limitation is substantially similar to [11.0] and is rendered obvious as discussed above. *Id.*

### 15.    Claim 34

**[34.0] "The method of claim 23, wherein the Wide and Telephoto image sensors have pixels with respective pixel sizes Pixel size$_{Wide}$ and Pixel size$_{Tele}$ and wherein Pixel size$_{Wide}$ is equal to Pixel size$_{Tele}$."**

This limitation is substantially similar to [12.0] and is rendered obvious as discussed above. *Id.*

### 16.    Claim 35

**[35.0] "The method of claim 23, wherein the Wide and Telephoto image sensors have pixels with respective pixel sizes Pixel size$_{Wide}$ and Pixel size$_{Tele}$ and wherein**

- 40 -

***Pixel size*<sub>Wide</sub> is not equal to Pixel size<sub>Tele</sub>.”***

Pixel size$_{Wide}$ is not equal to Pixel size$_{Tele}$.”

This limitation is substantially similar to [13.0] and is rendered obvious as discussed above. *Id.*

### 17.    Claim 36

**[36.0] “The method of claim 23, wherein the Wide and Telephoto lenses have different F numbers F#$_{Wide}$ and F#$_{Telephoto}$.”**

This limitation is substantially similar to [14.0] and is rendered obvious as discussed above. *Id.*, p.65.

### 18.    Claim 38

**[38.0] “The method of claim 36, further comprising synchronizing the Wide and Telephoto image sensors to start exposure at the same time.”**

This limitation is substantially similar to [16.0] and is rendered obvious as discussed above. *Id.*

### 19.    Claim 40

**[40.0] “The method of claim 23, wherein the Wide and Telephoto lenses have respective F numbers F#$_{Wide}$ and F#$_{Telephoto}$, the method further comprising setting respective Wide and Telephoto image sensor exposure times ET$_{Wide}$ and ET$_{Tele}$ to be equal.”**

This limitation is the same as [18.0]-[18.1] and is rendered obvious as discussed above. *Id.*

- 41 -

**B.    Ground 2: Claims 2-4 and 24-26 are obvious under § 103 over Parulski, Konno, and Szeliski.**

**1.    Summary of Szeliski**

Szeviski is a textbook "suitable for teaching a senior-level undergraduate course in computer vision to students in both computer science and electrical engineering." APPL-1013, Preface. Chapter 11 discusses "Stereo Correspondence" which teaches a method for deriving a range or depth map to "estimat[e] a 3D model of the scene by finding matching pixels in the images and converting their 2D positions into 3D depths." *Id.*, p.535. As part of Szeliski's method, epipolar geometry is used to compute a pixel's correspondence in another image. *See id.*, p.537. This allows for rectification of the images along an epipolar line which, when performed prior to image registration, provides for a more efficient algorithm for registration and distance calculations. *See id.*, p.538-39.

**2.    Reasons to combine Parulski, Konno, and Soga**

A POSITA would have found it obvious to combine Parulski, Konno, and Szeliski because such a combination would have been nothing more than using Szeliski's step of first rectifying images along epipolar lines (*id.*, p.538) to improve Parulski's range mapping process in the same way. APPL-1003, ¶60

Specifically, as discussed above, Parulski teaches using wide and telephoto lenses in a dual aperture camera to generate images suitable for calculating a range map. *See* APPL-1005, 19:49-20:24 ("FIG. 11 depicts a flow diagram showing a

- 42 -

method for processing images captured using the image capture assemblies of FIG. 3 or 8, wherein a range map is produced."). Parulski's process determines pixel offsets for a disparity map (i.e., registration map) which then allows for the determination of distances within the scene (i.e., a range/depth map). *See id.*, 19:49-20:6.

Szeliski improves upon Parulski's image processing technique by showing that first rectifying the images based on epipolar geometry makes the registration and depth mapping process more efficient. *See* APPL-1013, p.538 ("A more efficient algorithm can be obtained by first rectifying (i.e., warping) the input images so that corresponding horizontal scanlines are epipolar lines …."). Because both Parulski and Szeviski teach calculating distance information between stereo images and Szeliski teaches that the process can be made more efficient by first rectifying the images along an epipolar line, a POSITA would have sought to add an epipolar rectification process (e.g., such as Szeliski's) to Paruskli's range mapping algorithm. APPL-1003, ¶62.

Such a combination would have been understood to provide Parulski with the same result of a more efficient image range mapping algorithm. *See id.*, ¶63; APPL-1013, p.538. Since efficiency is always better in computer processing, POSITAs would have sought to add Szeliski's suggested rectification step to Parulski's method and would have had reasonable success in doing so since both

describe implementing image processing in software. *See* APPL-1005, 9:65-10:10;

APPL-1013, p.538-40.

The following analysis show how the combination of Parulski, Konno, and

Szeliski renders obvious claims 2-4 and 24-26.

### 3.    Claim 2

**[2.0] *"The dual-aperture digital camera of claim 1, wherein the camera controller is further configured to perform rectification of the Wide and Telephoto images by aligning these images to be on an approximately epipolar line to obtain rectified Wide and Telephoto images."***

The combination of Parulski and Szeliski renders [2.0] obvious. First, as

discussed above in [1.5.1] and [1.5.2], Parulski teaches performing an image

enhancement technique where portions of the Telephoto image are identified and

combined with the Wide image to broaden the wide image's field of view.

APPL1003, p.68; *see* APPL-1005, 20:50-21:6, 28:32-40, Fig. 14.

The process of identifying the portions of the Telephoto image to fuse with

the Wide image uses a range map to match pixels from the Telephoto image to

corresponding pixels in the Wide image. APPL-1003, p.68; *see* APPL-1005, 20:1-

15, Fig. 11(set forth in Fig. 11). This matching process includes up-sampling and

cropping the Wide image (i.e., shorter focal length) before correlating it with the

Telephoto image (i.e., longer focal length) to determine pixel offsets. APPL-1005,

20:1-15 ("the second autofocus image is correlated with the cropped and

upsampled image to **determine the pixel offset between the images for different**

**portions of the images**. The pixel offsets are then converted in block 482 to distances from the image capture device using the autofocus rangefinder calibration curve."). A POSITA would have recognized that Parulski's process of correlating the Wide and Telephoto images to determine pixel offsets that are converted to distances creates a registration map. APPL-1003, pp.68-69.

Second, Szeliski teaches that Parulski's range mapping technique can be made more efficient by first rectifying the two images along an epipolar line. APPL-1003, p.69. Specifically, Szeliski teaches that "epipolar geometry for a pair of cameras is implicit in the relative pose and calibrations of the cameras…." APPL-1013, p.538. Szeliski teaches that once this geometry is computed, "**we can use the epipolar line corresponding to a pixel in one image to constrain the search for corresponding pixels in the other image**." *Id.* Thus, "[a]** more efficient algorithm can be obtained by first *rectifying* (i.e., warping) the input images so that corresponding horizontal scanlines are epipolar lines** …." *Id.*

Szeliski's Figure 11.4 offers a visual example of rectifying two images along epipolar lines:



**Figure 11.4**  The multi-stage stereo rectification algorithm of Loop and Zhang (1999) ©
1999 IEEE. (a) Original image pair overlaid with several epipolar lines; (b) images trans-
formed so that epipolar lines are parallel; (c) images rectified so that epipolar lines are hori-
zontal and in vertial correspondence; (d) final rectification that minimizes horizontal distor-
tions.

APPL-1013, p.539 (Fig. 11.4).

A POSITA would have recognized that applying Szeliski's rectification step

to Parulski's image processing on the cell phone camera would yield rectified

Wide and Telephoto images. APPL-1003, p.71. A POSITA also would have

understood that these rectified images would then be used in Parulski's method for

performing more efficient pixel matching in deriving the range map. *Id.* Further, as

discussed above, a POSITA would have found it obvious to improve Parulski's

image processing method by first rectifying the images along an epipolar line, as

described in Szeliski. *Id.* Adding Szeliski's rectification step in Parulski's range

mapping method would have provided the same benefit as described in Szeliski of

- 46 -

achieving a more efficient method for determining corresponding pixel between

the Wide and Telephoto images. *Id.*, pp.71-72.

Thus, the Parulski's range mapping method combined with Szeliski's step

for first rectifying images renders [2.0] obvious.

### 4.    Claim 3

**[3.0] "The dual-aperture digital camera of claim 2, wherein the camera controller is further configured to perform mapping between the rectified Wide and Telephoto images to produce a registration map."**

The combination of Parulski and Szeliski renders [3.0] obvious. First, as

shown above in [2.0], the combination of Parulski and Szeliski renders obvious

first rectifying Wide and Telephoto images as part of Parulski's range mapping

method. *Id.*, p.72. Second, as also discussed above in [2.0], a POSITA would have

understood Parulski range mapping method to include deriving a registration map

by determining pixel offsets between the images. *Id.*; APPL-1005, 20:8-15 ("Then,

in block 480, the second autofocus image is correlated with the cropped and

upsampled image **to determine the pixel offset between the images for different**

**portions of the images**."). This is consistent with the '479 Patent that similarly

derives a registration map by determining pixel offsets. *See* APPL-1001, 12:4-9

("registration is performed between the Wide and Telephoto images to output a

transformation coefficient.… The transformation coefficient includes the

- 47 -

translation between matching points in the two images. This translation can be

measured in a number of pixels.").

Thus, Parulski's range mapping method that determines pixel offsets

combined with Szeliski's technique of rectifying images before determining pixel

offsets renders [3.0] obvious. APPL-1003, p.73.

### 5.    *Claim 4*

**[4.0] "The dual-aperture digital camera of claim 3, wherein the camera controller is further configured to perform resampling of the Telephoto image according to the registration map to provide a re-sampled Telephoto image."**

The combination of Parulski and Szeliski renders [4.0] obvious. First, as

discussed above in [3.0], a POSITA would have recognized that Parulski's range

mapping method that determines pixel offsets between corresponding portions of

the images creates a "registration map." *Id.* Second, Parulski renders obvious

resampling the Telephoto image according to the registration map because, for

example, as discussed above in [1.5.1-1.5.2], Parulski teaches an image

enhancement process that combines portions of the Telephoto image with the Wide

image in order to output an enhanced image with the wide image's field of view

having a broadened depth of field. *Id.*; *see* APPL-1005, 20:14-42, Fig. 14, 28:45-

53 ("Then, the two images are combined into a modified image with a broadened

depth of field.").

When applied to Parulski's cell phone embodiment as discussed above in [1.0] (i.e., two cameras with different focal lengths), a POSITA would have understood this "combination" of the two images to require a down-sampling of the Telephoto image so that portions of the Telephoto image are of similar size to corresponding portions of the Wide image for combination. APPL-1003, p.74. Otherwise, the fused portions of the Telephoto image (with a longer focal length and narrower FOV) would not be correctly size for combination with the Wide image (with a shorter focal length and wider FOV). *Id.*

A POSITA also would have recognized that this down-sampling would have been performed according to a registration map (i.e., determined pixel offsets) discussed above in [3.0] because Parulski teaches performing this type of image enhancement using the range map derived from determined pixel offsets. *Id.*; *see* APPL-1005, 20:50-21:6 ("The range map is then used to modify … the output image for a variety of purposes, such as … : a) to improve object identification … ; b) to enable object extraction … ; g) to improve scene balance … by enabling objects in the foreground to be emphasized.").

In other words, a POSITA would have understood that Parulski's image enhancement method—that combines portions of the Telephoto image with the Wide image—would have (1) used a range map to determining down-sampling size for the Telephoto image based on object identification, (2) used the range map

- 49 -

to extract the foreground object from the Telephoto image for combination with the Wide image, and (3) emphasized the foreground object in the Wide image by fusing with corresponding pixels in the down-sampled Telephoto image. *Id.*, pp.75-76. Accordingly, a POSITA would have understood that Parulski's method of combining Telephoto portions with the Wide image would have included down-sampling the Telephoto image according to a registration map. *Id.*

Thus, Parulski's image processing technique of combining portions of the Telephoto image with the Wide image renders [4.0] obvious.

### 6.    Claim 24

**[24.0] "The method of claim 23, further comprising rectifying the Wide and Telephoto images by aligning these images to be on an approximately epipolar line to obtain rectified Wide and Telephoto images."**

This limitation is substantially similar to [2.0] and is rendered obvious as discussed above. *Id.*

### 7.    Claim 25

**[25.0] "The method of claim 24, further comprising mapping between the rectified Wide and Telephoto images to produce a registration map."**

This limitation is substantially similar to [3.0] and is rendered obvious as discussed above. *Id.*

### 8.    Claim 26

**[26.0] "The method of claim 25, further comprising resampling the Telephoto image according to the registration map to provide a re-sampled Telephoto**

- 50 -

*image."*

This limitation is substantially similar to [4.0] and is rendered obvious as discussed above. *Id.*, p.77.

### C.     Ground 3: Claims 5-9 and 27-31 are obvious under § 103 over Parulski, Konno, Szeliski, and Segall.

#### 1.     Summary of Segall

Segall describes an image processing method with two phases—a registration phased for building a registration map and a fusion phase for fusing an enhancement image with a reference image based on the registration map. *Id.*, ¶65; *See* APPL-1024, 3:15-16 ("These systems and methods typically comprise two basic phases: registration and fusion."). The registration phase transforms a sequence of images "to a sequence of registered frame-sets, where each frame-set corresponds to a specific point in time and may comprise an auto-exposure frame and one or more aligned enhancement frames." APPL-1024, 3:18-23. Segall's registration phase can include "global motion estimation, image warping and interpolation as well as other methods." APPL-1024, 3:17-18.

The fusion phase "performs the fusion process, which may result in outputting an EDR sequence." APPL-1024, 3:23-25. Fusion is performed "at each time point individually, and may comprise a mismatch detector which may restrict or exclude areas containing local motion and other registration errors from the fusion process." APPL-1024, 3:25-28. "The goal of the mis-registration detector is to map the regions

- 51 -

in the enhancement frames which are not accurately enough aligned with the reference, and selectively exclude them from the fusion." APPL-1024, 6:44-47.

## 2.    *Reasons to combine Parulski, Konno, Szeliski, and Segall.*

A POSITA would have combined Parulski and Segall because Parulski teaches image processing, including registration and fusion, and Segall teaches an improvement of Parulski by showing how to handle registration errors during the fusion process. APPL-1003, ¶67. Combining Parulski and Segall would have simply required adding software functionality of Segall's error handing process to Parulski's image processing. *Id.* Thus, combining Parulski and Segall would have been as simple as using Segall's known registration and fusion methods, including error handling, to improve Parulski's registration and fusion processes in the same way. *Id.*

Specifically, a POSITA looking to find a fusion method suitable for Parulski would have recognized that both Parulski and Segall teach similar methods for both registering and then fusing two images together based on pixel correlation (i.e., registration). APPL-1003, ¶68; APPL-1005, 22:14-23:3, 28:45-57; APPL-1024, 3:9-28. Segall expands on Parulski by showing specific methods for fusing together pixels of two images based on registration, the exact issue that a POSITA would look to Segall for implementing Parulski's fusion process. APPL-1003, ¶68; *see* APPL-1024, 3:9-28; 6:44-47. It would have therefore been obvious to combine Segall's fusion process with Parulski because Parulski teaches both pixel correlation and fusion but

- 52 -

does not disclose any specific fusion method. APPL-1003, ¶68. Because Parulski does not disclose a fusion method, a POSITA would have been motivated to seek similar teachings to implement this functionality and would have implemented a process similar to Segall's since Segall and Parulski both base their fusion techniques on first performing image registration. *Id.*

Moreover, POSITAs would have combined Segall with Parulski because processes similar to Segall's for handling errors in a registration map were already known and used by POSITA's for handling registration errors during image fusion. *Id.*, ¶69; *see* APPL-1025, 23:30-41. For example, Dagher teaches an image fusion process that looks to an error map generated at image registration for determining "whether or not to 'color' a certain wavelet block." APPL-1025, 23:42-56. According to Dagher, its algorithm is "particularly useful in the presence of occluded regions, where there are objects visible in the grayscale image data that are not visible in the color image data due to parallax effects, which results in that object having no corresponding color information." APPL-1025, 23:48-52.

Accordingly, a POSITA looking to implement a fusion process compatible with Parulski's image processing method would have looked to methods similar to Segall and Dagher because both teach using image registration to perform image fusion but also include steps for handling registration errors. APPL-1003, ¶70. A POSITA would have expected to succeed in implementing Segall's teachings in

- 53 -

Parulski's cell phone since both teach performing image registration and fusion in software. *Id.*

The following analysis describes how the combination of Parulski, Konno, Szeliski, and Segall renders obvious claims 5-9 and 27-31.

### 3. Claim 5

**[5.0] "The dual-aperture digital camera of claim 4, wherein the camera controller is further configured to process the re-sampled Telephoto image and the Wide image to detect an error in the registration and to provide a decision output."**

The combination of Parulski and Segall renders [5.0] obvious because Parulski teaches an image enhancement process that combines a down-sampled Telephoto image with a Wide image and Segall teaches an image registration and fusion process that detects registration errors. APPL-1003, p.80.

As shown in the analysis above, Parulski teaches a dual-aperture camera with Wide and Telephoto lenses that processes images for stereo matching and image enhancement (*see* [1.0]-[1.5.2]). One possible enhancement includes combining portions of the Telephoto image with the Wide image (*see* [1.5.1]). *Id.* This process includes down-sampling the Telephoto image based on a registration map (*see* [4.0]) and combining the down-sampled Telephoto portions with the Wide image to broaden the depth of field in the output image. *Id.* Parulski, however, does not specifically describe how the pixels of the two images are combined. *Id.*, p.80-81. Thus, a POSITA looking to implement this feature would

- 54 -

have selected one of many existing fusion methods like that taught in Segall
(APPL-1024). *Id.*

Segall similarly teaches a process for registering and fusing portions of two
images. *See* APPL-1024, 3:9-16 ("These systems and methods typically comprise
two basic phases: registration and fusion."). The fusion step includes error
detection that excludes from fusion areas containing registration errors. APPL-
1024, 3:23-28 ("The fusion … **may comprise a mismatch detector which may
restrict or exclude areas containing local motion and other registration errors
from the fusion process**."); APPL-1024, 6:43-47 ("The goal of the mis-
registration detector is to map the regions in the enhancement frames which are not
accurately enough aligned with the reference, and **selectively exclude them from
the fusion**."). A POSITA would have understood that excluding an area of the
enhancement from fusion due to a registration error is "detect[ing] an error in the
registration and provid[ing] a decision output." APPL-1003, p.81.

As discussed above, a POSITA would have found it obvious to implement a
fusion technique like Segall's in Parulski's image processing method. *Id.*, p.82.
Segall's error detection method when applied to Parulski would have similarly
excluded areas of the Telephoto image (i.e., enhancement) for any registration
errors, thereby providing a decision output based on the registration errors. *Id.*,

- 55 -

p.88. Thus, Parulski's image processing method combined with Segall's method for processing registration errors during fusion renders [5.0] obvious.

### 4.    Claim 6

**[6.0] The dual-aperture digital camera of claim 5, wherein, if an error is detected, the camera controller is further configured to choose Wide pixel values to be used in the output image for pixels that caused the error.**

The combination of Parulski and Segall renders [6.0] obvious. As discussed above in [5.0], Parulski combined with Segall renders obvious an image registration and fusion process where, based on Segall's teachings, areas of the Telephoto image that correspond to registration errors are excluded from the fusion process. *Id.* Segall describes this process in terms of a mis-registration detector that "map[s] the regions in the enhancement frames which are not accurately enough aligned with the reference, and **selectively exclude them from the fusion**." APPL-1024, 6:43-47.

Since Parulski's fusion process uses the Wide image as the reference image and the Telephoto image for enhancement (*see* [1.5.1]-[1.5.2]), a POSITA applying this error handling technique to Parulski would have likewise excluded portions of the Telephoto image for areas having registration errors. APPL-1003, p.82. This would have left only Wide pixels to be used in the output image. *Id.* A POSITA would have thus understood that the combination of Parulski and Segall renders [6.0] obvious.

### 5.    *Claim 7*

**[7.0] *"The dual-aperture digital camera of claim 6, wherein the Wide and Telephoto image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel size<sub>Wide</sub> and Pixel size<sub>Tele</sub> wherein Pixel size<sub>Wide</sub> is equal to Pixel size<sub>Tele</sub>,"***

This limitation is substantially similar to [10.0] and [12.0] and is rendered

obvious as discussed above. *Id.*, p.83.

**[7.1] *"wherein the Wide and Telephoto lenses have different F numbers F#<sub>Wide</sub> and F#<sub>Telephoto</sub>, and"***

This limitation is substantially similar to [14.0] and is rendered obvious as

discussed above. *Id.*

**[7.2] *"wherein the camera controller is further configured to synchronize the Wide and Telephoto image sensors to start exposure at the same time."***

This limitation is substantially similar to [16.0] and is rendered obvious as

discussed above. *Id.*

### 6.    *Claim 8*

**[8.0] *"The dual-aperture digital camera of claim 6, wherein the Wide and Telephoto image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel size<sub>Wide</sub> and Pixel size<sub>Tele</sub> wherein Pixel size<sub>Wide</sub> is not equal to Pixel size<sub>Tele</sub>,"***

This limitation is substantially similar to [10.0] and [13.0] and is rendered

obvious as discussed above. *Id.*, p.84.

**[8.1] *"wherein the Wide and Telephoto lenses have different F numbers F#<sub>Wide</sub>***

*and F#<sub>Telephoto</sub>, and"*

This limitation is the same as [7.1] and is rendered obvious as discussed

above. *Id.*

**[8.2] "wherein the camera controller is further configured to synchronize the Wide and Telephoto image sensors to start exposure at the same time."**

This limitation is the same as [7.2] and is rendered obvious as discussed

above. *Id.*

**7.    Claim 9**

**[9.0] "The dual-aperture digital camera of claim 6, wherein the Wide and Telephoto image sensors have pixels with respective pixel sizes Pixel size<sub>Wide</sub> and Pixel size<sub>Tele</sub> and wherein Pixel size<sub>Wide</sub> is not equal to Pixel size<sub>Tele</sub>,"**

This limitation is substantially similar to [13.0] and is rendered obvious as

discussed above. *Id.*

**[9.1] "wherein the Wide and Telephoto lenses have different F numbers F#<sub>Wide</sub> and F#<sub>Telephoto</sub>, and"**

This limitation is the same as [7.1] and is rendered obvious as discussed

above. *Id.*

**[9.2] "wherein the camera controller is further configured to synchronize the Wide and Telephoto image sensors to start exposure at the same time."**

This limitation is the same as [7.2] and is rendered obvious as discussed

above. *Id.*

**8.    Claim 27**

**[27.0] "The method of claim 26, further comprising processing the re-sampled Telephoto image and the Wide image to detect an error in the registration and to**

- 58 -

*provide a decision output."*

This limitation is substantially similar to [5.0] and is rendered obvious as

discussed above. *Id.*, p.85.

### 9.    Claim 28

**[28.0] *"The method of claim 27, wherein if an error is detected, further comprising choosing Wide pixel values to be used in the output image for those pixels that caused the error."***

This limitation is substantially similar to [6.0] and is rendered obvious as

discussed above. *Id.*

### 10.    Claim 29

**[29.0] *"The method of claim 28, wherein the Wide and Telephoto image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel size_{Wide} and Pixel size_{Tele} wherein Pixel size_{Wide} is equal to Pixel size_{Tele} and"***

**[29.1] *"wherein the Wide and Telephoto lenses have different F numbers F#_{Wide} and F#_{Telephoto},"***

**[29.2] *"the method further comprising synchronizing the Wide and Telephoto image sensors to start exposure at the same time."***

These limitations are substantially similar to [7.0]–[7.2] and are rendered

obvious as discussed above. *Id.*, p.86.

### 11.    Claim 30

**[30.0] *"The method of claim 28, wherein the Wide and Telephoto image sensors have pixels with identical pixel counts and with respective pixel sizes Pixel size_{Wide} and Pixel size_{Tele} wherein Pixel size_{Wide} is not equal to Pixel size_{Tele} and"***

**[30.1] *"wherein the Wide and Telephoto lenses have different F numbers***

**F#Wide and F#Telephoto,"**

**[30.2] "the method further comprising synchronizing the Wide and Telephoto image sensors to start exposure at the same time."**

These limitations are substantially similar to [8.0]–[8.2] and are rendered

obvious as discussed above. *Id.*, pp.86-87.

### 12.    Claim 31

**[31.0] "The method of claim 28, wherein the Wide and Telephoto image sensors have pixels with respective pixel sizes Pixel size$_{Wide}$ and Pixel size$_{Tele}$ wherein Pixel size$_{Wide}$ is not equal to Pixel size$_{Tele}$ and"**

**[31.1] "wherein the Wide and Telephoto lenses have different F numbers F#$_{Wide}$ and F#$_{Telephoto}$,"**

**[31.2] "the method further comprising synchronizing the Wide and Telephoto image sensors to start exposure at the same time."**

These limitations are substantially similar to [9.0]–[9.2] and are rendered

obvious as discussed above. *Id.*, p.87.

### D.    Ground 4: Claims 15 and 37 are obvious under § 103 over Parulski, Konno, and Stein.

#### 1.    Summary of Stein

Stein is directed to a vehicle camera system with "a first image capture

device having a first field of view" and "a second image capture device having a

second field of view different from the first" that at least partially overlaps. APPL-

1023, Abstract; APPL-1021, p.13. An example of the fields of view (FOVs) of

Stein's wide and narrow cameras and how they overlap is provided in Fig. 2a:

- 60 -



APPL-1003, ¶72; APPL-1023, Fig. 2a (annotated).

According to Stein, imaging systems with dual cameras used for stereo imaging can use CMOS sensors with rolling shutters. *See* APPL-1023, 5:36-42 ("a CMOS image sensor may be employed along with a rolling shutter"); APPL-1027, p.13. The problem with rolling shutters for stereo image processing is that for cameras having different FOVs "if both cameras acquire images as a similar number of image scan lines acquired at a similar line scan rate, then the acquired

image scan lines in the area of the overlap in the fields of view of the two cameras will lack synchronization." APPL-1023, 2:5-10; APPL-1027, p.13. According to Stein, a lack of synchronization between the overlapping FOVs "may introduce difficulties in determining a correspondence of image points in a first image from the wide FOV camera with image points in a second image from the narrow FOV camera, which can lead to significant inaccuracies object distance measurements." APPL-1023, 2:10-15; APPL-1027, p.13.

To solve this problem, Stein teaches that "by adjusting the image acquisition timing control parameters of each image capture device, however, it may be possible to ensure that the portions of the image frames of each image capture device corresponding to overlap region 270 are acquired during the same period of time." APPL-1023, 10:27-31; *see* APPL-1027, p.13-14. In other words, Stein teaches that for CMOS sensors with rolling shutters, synchronized images (which provide better stereo imaging analysis) can be obtained by setting the timing of each of the rolling shutters such that the portions of the overlapping FOVs on the sensors are scanned at the same time. *Id.*, ¶74. Stein thus provides an improvement to Parulski's cell phone embodiment when implemented with CMOS sensors. *Id.*

## 2.    *Stein is entitled to its February 7, 2013 priority date*

According to the Federal Circuit, "[a] reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of

the provisional application provides support for the claims in the reference patent

in compliance with § 112, ¶ 1." *Dynamic Drinkware, LLC v. National Graphics,*

*Inc.*, 800 F. 3d 1375, 1381 (Fed. Cir. 2015). Stein's claim 1 is entitled to the

February 7, 2013 priority date as shown below.

| Stein Claim 1 | Provisional App. 61/761,724 filed Feb. 7, 2013 |
|---|---|
| [1.0] An imaging system for a vehicle, the system comprising: | *See* APPL-1027, p.13: "The more recent generation of automotive sensors use a rolling shutter which introduces complications for assymetric [sic] stereo. This paper describes the issues and solutions for working with rolling shutter." |
| [1.1] a first image capture device having a first field of view and configured to acquire a first image relative to a scene associated with the vehicle, the first image being acquired as a first series of image scan lines captured using a rolling shutter, | *See* APPL-1027, p.13: "The more recent generation of automotive sensors use a rolling shutter which introduces complications for assymetric [sic] stereo. Ideally stereo cameras are synchronized to sub row accuracy in timing. Now consider two cameras such as the Aptina M024 (1280x960 images) one with a 6mm lens and horizontal FOV of 46 degrees and the second with a 12mm lens and horizontal FOV of 23 degrees. The cameras have their optical axis aligned and the central 640x480 part of the wide angle camera matches the full 23 degree FOV of the second camera." |
| [1.2] a second image capture device having a second field of view different from the first field of view and that at least partially overlaps the first field of view, the second image capture device being configured to acquire a second image relative to the scene associated with the | *See* APPL-1027, p.13: "However the cameras have a rolling shutter. Assuming the same camera timing in both cameras, the central part of the wide angle camera is scanned in 480 lines while the full 23 degree image takes 960 lines to scan. Thus it is impossible to have all the imager lines synchronized accurately. If the first lines of the original two images are synchronized then only the center line of both images would be both synchronized and spatially aligned." |

| Stein Claim 1 | Provisional App. 61/761,724 filed Feb. 7, 2013 |
|---|---|
| vehicle, the second image being acquired as a second series of image scan lines captured using a rolling shutter, | |
| [1.3] wherein, as a result of overlap between the first field of view and the second field of view, a first overlap portion of the first image corresponds with a second overlap portion of the second image; and | *See* APPL-1027, p.13: "Now consider two cameras such as the Aptina M024 (1280x960 images) one with a 6mm lens and horizontal FOV of 46 degrees and the second with a 12mm lens and horizontal FOV of 23 degrees. The cameras have their optical axis aligned and the central 640x480 part of the wide angle camera matches the full 23 degree FOV of the second camera." |
| [1.4] wherein the first image capture device has a first scan rate associated with acquisition of the first series of image scanlines that is different from a second scan rate associated with acquisition of the second series of image scan lines, such that the first image capture device acquires the first overlap portion of the first image over a period of time during which the second overlap portion of the second image is acquired, wherein the period of time is associated with a ratio | *See* APPL-1027, p.13-14: "One solution would be to run the narrow FOV camera at twice the frame rate of the wide FOV camera and have the first line of the narrow camera synchronized with line 240 of the wide camera. The two cameras will then scan the central region at the same time, the narrow FOV camera outputting two lines for every one line of the wide FOV camera and line sychronization [sic] will be maintained. The second narrow FOV frame which is out of synch can be used or discarded. In practice the narrow FOV camera could simply output the lines in a quick burst and then have a long vertical blanking period."<br><br>*See* APPL-1027, p.14: "If the line time of the secondary camera can be made faster then one can also reduce the target ratio between focal lengths so that these match the ratio between line timing. For example if the primary sensor has a FOV of 46° and is running at a line timing of 45KHz (22.2usec) but the sensor can support line timing of 60KHz (15.2usec) then a FOV of 32° of the secondary camera can be supported and synchronized precisely: |

| Stein Claim 1 | Provisional App. 61/761,724 filed Feb. 7, 2013 |
|---|---|
| between the first scan rate and the second scan rate. | $$\frac{15.2\ \mu sec\ \times 46°}{22.2\ \mu sec} = 31.7°\ .$$ |

### 3.    *Reasons to combine Parulski, Konno, and Stein.*

A POSITA would have found it obvious to combine Parulski and Stein because such a combination would have merely been applying Stein's method of setting the rolling shutter timing in stereo CMOS image sensors to the CMOS sensors in Parulski's cell phone camera. *Id.*, ¶76. Applying Stein to Parulski in this way would have yielded the same predictable result of allowing Parulski's dual cameras with different fields of view ("FOVs") to scan the overlapping portions of the respective image sensors at the same time. *Id.*

A POSITA would have looked to Stein to enhance Parulski's image sensors because both Parulski and Stein teach using CMOS image sensors for their respective cameras. *See* APPL-1005, 13:20-25 ("other sensors, **such as CMOS sensors**, … may be used equally well without limitation according to the invention."); APPL-1023, 5:34-42 (the image capture device "may contain any suit able type of image sensor, including CCD sensors or CMOS sensors."), 6:12-17. Parulski and Stein are also both directed to processing stereo images with different fields of view to derive depth data for the scene captured in the images. *See* APPL-1005, 19:49-20:36, Fig. 11; APPL-1023, 2:5-15.

- 65 -

According to Stein, the issue with CMOS sensors in dual-lens cameras with different FOVs (e.g., by having different focal lengths) is that they utilize rolling shutters that "may introduce complications in stereo image processing, especially in asymmetric stereo applications that use cameras having different fields of view." APPL-1023, 1:66-2:1. Stein further explains that "[i]f both cameras acquire images as a similar number of image scan lines acquired at a similar line scan rate, then the acquired image scan lines in the area of the overlap in the fields of view of the two cameras will lack synchronization." APPL-1023, 2:2-5. A lack of synchronization introduces "difficulties in determining a correspondence of image points in a first image from the wide FOV camera with image points in a second image from the narrow FOV camera, which can lead to significant inaccuracies object distance measurements." APPL-1023, 2:5-15.

To solve this problem, Stein teaches a method of setting the rolling shutter timings for each sensor so that the overlapping FOVs between the image sensors is captured at the same time. APPL-1003, ¶78, *See* APPL-1023, 10:27-11:30 ("By adjusting the image acquisition timing control parameters of each image capture device, however, it may be possible to ensure that the portions of the image frames of each image capture device corresponding to overlap region 270 are acquired during the same period of time.").

Since Parulski is similarly concerned with processing stereo images with

- 66 -

different fields of view to derive a range map, a POSITA looking to implement Parulski's cell phone embodiment using CMOS sensors would have, based on Stein, known of the problem that rolling shutters present in stereo image processing of generating unsynchronized images. *Id.*, ¶79. A POSITA therefore would have looked to apply Stein's method of setting rolling shutter timings to synchronize scanning of the overlapping FOVs to the Wide and Telephoto lens systems in Parulski's cell phone camera. *Id.* A POSITA would have recognized that applying Stein's method to Parulski's CMOS sensors would have yielded the same benefit of synchronizing the image capture of the overlapping FOVs in Parulski's camera which would likewise provide more accurate stereo image processing and distance calculations. *Id.* Thus, it would have been obvious to apply Stein's method to control the roller shutter timings to Parulski's CMOS image sensors to overcome the known issues that CMOS sensors with rolling shutters present in stereo image processing. *Id.*

The following analysis describes how the combination of Parulski, Konno, and Stein renders obvious claims 15 and 37.

### 4.    *Claim 15*

**[15.0] *"The dual-aperture digital camera of claim 14, wherein the camera controller is further configured to synchronize scanning of the Wide and Telephoto image sensors such that matching FOVs in the Wide and Telephoto images are scanned at the same time."***

The combination of Parulski, Konno, and Stein renders [15.0] obvious because Stein teaches synchronizing the scanning of two image sensors so that the

overlapping field of view between the image sensors is scanned at the same time.

*Id.*, p.94 Specifically, Stein first teaches using cameras with different focal lengths

to capture images with overlapping fields of view (FOVs). APPL-1023, 8:37-43

("**In some embodiments, system 100 may be configured such that the field of**

**view of image capture device 120, for example, falls within (e.g., is narrower**

**than) and shares a common center with the field of view of image capture**

**device 110.**"); *Id.*, 7:62-67; *see* APPL-1027, p.13. This overlapping field of view is

shown in Fig. 2a:



APPL-1003, p.95; APPL-1023, Fig. 2a (annotated).

Second, each of Segall's cameras use rolling shutter times such that the overlapping fields of view are scanned at the same time. APPL-1023, 10:27-31 ("By adjusting the image acquisition timing control parameters of each image capture device, however, it may be possible to ensure that the portions of the image frames of each image capture device corresponding to overlap region 270 are acquired during the same period of time."); *Id.*, 10:41-46 ("Generally, the narrower field of view image capture device 120 should have a scan rate at least high enough such that **the portions of the image frames from both image capture devices 110 and 120 that correspond to overlap region 270 may be acquired during the same time period**."). A POSITA would have understood that images with overlapping FOVs that are captured "during the same time period" is "synchroniz[ing] scanning of the … image sensors such that matching FOVs in the … images are scanned at the same time." *Id.*, p.96.

As discussed above, a POSITA would have found it obvious to combine Parulski and Stein because both references teach using CMOS image sensors for their respective cameras and Stein teaches the benefit of adjusting roller shutter timing to scan overlapping fields of view at the same time. *Id.* Combining Parulski and Stein would have therefore been nothing more than applying Stein's method of adjusting the rolling shutters timings to the CMOS image sensors in Parulski's

- 69 -

camera. *Id.*, pp.96-97. Applying Stein in this way would have yielded the same benefit to Parulski's cell phone camera of providing synchronized stereo images for more accurate stereo image processing. *Id.*

Thus, the combination of Parulski's cell phone implementing Stein's rolling shutter timing method renders [15.0] obvious.

### 5.    *Claim 37*

**[37.0] "The method of claim 36, further comprising synchronizing scanning of the Wide and Telephoto image sensors such that matching FOVs in the Wide and Telephoto images are scanned at the same time."**

This limitation is substantially similar to [15.0] and is rendered obvious as discussed above. *Id.*, p.97

## X.    CONCLUSION

For the reasons set forth above, Petitioner has established a reasonable likelihood that claims 1-16, 18, 23-38, and 40 of the '479 Patent are unpatentable. Petitioner requests institution of *inter partes* review and cancelation of these claims.

Respectfully submitted,

Dated: May 6, 2020                    /Michael S. Parsons/
                                      Michael S. Parsons
                                      Lead Counsel for Petitioner
                                      Registration No. 58,767

- 71 -

## XI.    CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for Petitioner

declares that the argument section of this Petition (Sections I and III–X) has 13,907

words, according to the word count tool in Microsoft Word™.

/Michael S. Parsons/
Michael S. Parsons
Lead Counsel for Petitioner
Registration No. 58,767

- 72 -

## CERTIFICATE OF SERVICE

The undersigned certifies that, in accordance with 37 C.F.R. § 42.6(e) and

37 C.F.R. § 42.105, service was made on Patent Owner as detailed below. Patent

Owner has authorized electronic service due to the United States Post Office

suspending deliver to the address listed in accordance with 37 CFR § 42.105(a).

*See* APPL-1036.

| | |
|---|---|
| *Date of service* | May 6, 2020 |
| *Manner of service* | Electronically: mafenster@raklaw.com, bwang@raklaw.com, jtsuei@raklaw.com, nrubin@raklaw.com |
| *Documents served* | Petition for *Inter Partes* Review of U.S. Patent No. 10,225,479; Petitioner's Exhibit List; Exhibits 1001–1036 |
| *Persons served* | Marc A. Fenster, Benjamin T. Wang James S. Tsuei, Neil A. Rubin Russ August & Kabat 12424 Wilshire Blvd., 12th Floor Los Angeles, CA 90025 |

/Michael S. Parsons/
Michael S. Parsons
Lead Counsel for Petitioner
Registration No. 58,767

- 73 -

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.
_____

Case No. IPR2020-00906
U.S. Patent No. 10,225,479
_____

PATENT OWNER'S PRELIMINARY RESPONSE

Case No. IPR2020-00906
U.S. Patent No. 10,225,479

would operate or read on" the claims. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327–28 (Fed. Cir. 2012).

Moreover, a petitioner may not rely on the Board to substitute its own reasoning to remedy the deficiencies in a petition. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (rejecting the Board's reliance on obviousness arguments that "could have been included" in the petition but were not, and holding that the Board may not "raise, address, and decide unpatentability theories never presented by the petitioner and not supported by the record evidence"); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367 (Fed. Cir. 2015) (holding that "a challenge can fail even if different evidence and arguments might have led to success"). Nor may the petitioner remedy the deficiencies in a reply brief. *Wasica Finance GMBH v. Continental Auto. Systems*, 853 F.3d 1272, 1286 (Fed. Cir. 2017) ("Rather than explaining how its original petition was correct, Continental's subsequent arguments amount to an entirely new theory of prima facie obviousness absent from the petition. Shifting arguments in this fashion is foreclosed by statute, our precedent, and Board guidelines.") (internal citations omitted).

Case No. IPR2020-00906
U.S. Patent No. 10,225,479

## IV.  THE PETITION FAILS TO ESTABLISH THE REASONABLE LIKELIHOOD OF A *PRIMA FACIE* CASE OF OBVIOUSNESS

### A.  The Petition Fails To Demonstrate A Motivation To Combine The Cited References

Ground 1 of the Petition asserts obviousness over a combination of Parulski, Ogata, Kawamura, and Soga. *E.g.*, Paper 3 at i, 12, 62. Petitioner, however, has failed to disclose a motivation to combine ***all*** of these references, let alone in the specific manner to achieve the claimed inventions. Instead, Petitioner has identified purported motivations for creating two-reference combinations of Parulski/Ogata, Parulski/Kawamura and Parulski/Soga. Paper 2 at 21-24, 28-30, 33-39. Because Petitioner does not argue that any of these two-reference combinations invalidate the claims, the Petition must fail on its face. It is Petitioner's burden to show a motivation to combine ***all*** of the references it combines to invalidate claims 19 and 20. *E.g.*, *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) ("There must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." (internal quotations omitted) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006))); *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) ("[t]here must be a reason or suggestion in the art for selecting the pro-

7

Case No. IPR2020-00906
U.S. Patent No. 10,225,479

cedure used, other than the knowledge learned from the applicant's disclo-sure"); *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371, 1376 (Fed. Cir. 2004) ("the suggestion to combine references must not be de-rived by hindsight from knowledge of the invention itself."). Having failed to provide a motivation to combine, Ground 1 must not be instituted.

Ground 2 should not be instituted for similar reasons. Ground 2 is a five-reference combination of Parulski, Ogata, Kawamura, Soga and Morgan-Mar. Paper 3 at ii, 67-74. Petitioner, however, has only provided a purported motivation to combine for three of the five references: Parulski, Soga and Morgan-Mar. Paper 3 at 67-69. Petitioner **does not** provide a motivation to combine Parulski, Soga and Morgan-Mar with Ogata **and** Kawamura. Ground 2 must therefore not be instituted. *E.g.*, *In re Dow Chem. Co.*, 837 F.2d at 473; *Cardiac Pacemakers*, 381 F.3d at 1376.

**B.    The Petition Fails To Demonstrate [19.5.1] And [19.5.2] Be-cause It Fails To Show That A Camera Controller Configured For Those Limitations**

Petitioner has failed to show that its proposed combination discloses the claim limitations styled [19.5.1] and [19.5.2]. [19.5.1] and [19.5.2] are ex-cerpts from claim 19e of the '479 patent:

> *a camera controller* operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and

Case No. IPR2020-00906
U.S. Patent No. 10,225,479

> ***configured*** to control the AF mechanisms***, to process the Wide
> and Tele images to find translations between matching points
> in the images to calculate depth information and to create a
> fused image suited for portrait photos***, the fused image having
> a DOF shallower than $DOF_T$ and having a blurred background.

Ex. 1001 at 15:25-32 (emphasis added). For the purposes of this argument,
the relevant portions have been highlighted. The claim limitations require that
the ***camera controller*** be configured to ***both*** "process the Wide and Tele im-
ages to find translations" and "create a fused image suited for portrait photos."
*Id.* Petitioner identifies Parulski's image processor 50 as being the camera
controller. Paper 3 at 52. Petitioner fails to demonstrate that ***image processor
50 is configured as required in both [19.5.1] and [19.5.2]***.

For [19.5.1], Petitioner argues that it identifies a "process for calculat-
ing depth information based on wide and tele images" in Parulski that pur-
portedly discloses the "to process the Wide and Tele images to find
translations between matching points in the images to calculate depth in-for-
mation" limitation. Paper 3 at 53-54. Petitioner has failed, however, to show
that image processor 50 is involved in Parulski's "process for calculating
depth information based on wide and tele images," let alone that the image
processor 50 is "configured . . . to process the Wide and Tele images to find

9

Trials@uspto.gov                                        Paper 10
571-272-7822                                  Date: November 12, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE, INC.,
Petitioner,

v.

COREPHOTONICS LTD.,
Patent Owner.

———————————

IPR2020-00905
Patent 10,255,479 B2

———————————

Before BRYAN F. MOORE, JOHN F. HORVATH, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

HORVATH, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2020-00905
Patent 10,255,479 B2

proceeding, we find Petitioner's assessment of the level of skill in the art to be reasonable, and commensurate with the problems and solutions disclosed in the prior art. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). Accordingly, for purposes of this Decision, we adopt Petitioner's description as our own. *Id.*

    *C. Claim Construction*

    In *inter partes* reviews, we interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, a claim is construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Only claim terms which are in controversy need to be construed and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

    Petitioner contends the only term requiring construction is the term "fused image with a point of view (POV) of the Wide camera," and argues that term should be construed to mean "a fused image that maintains the Wide camera's field of view or the Wide camera's position." Pet. 7–8. Patent Owner does not dispute this proposed construction or provide an alternative, and does not argue that any other term requires express construction. Prelim. Resp. 1–14.

    At this stage of the proceeding, the parties do not disagree on the meaning of any claim term and no claim term requires express construction to determine the merits of the Petition. *See* Pet. 6–8; Prelim. Resp. 1–14. Accordingly, at this stage of the proceeding, we decline to expressly construe any claim term. *See Nidec Motor*, 868 F.3d at 1017.

12

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

———————

PATENT OWNER'S RESPONSE TO
PETITION FOR *INTER PARTES* REVIEW

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

The '479 patent refers to "combination" possibilities where an output image reflects only some aspects of a given POV, such as "Wide perspective POV" or "Wide position POV." (Ex. 1001, '479 patent at 5:15–19.) But, when it refers to "Wide POV," without qualification, it is referring to the complete Wide POV, both perspective and position. (Ex. 1001, '479 patent at 5:10–14; 5:23–26.) *See* Hart Decl., ¶ 45.

In summary, a POSITA would not agree that the term POV in the phrase "fused image with a point of view (POV) of the Wide camera" can be replaced with the distinct term FOV. Further, a POSITA would understand that POV of the Wide camera in this phrase refers to the full Wide camera POV and not to "combination" outputs that have a Wide "perspective POV" and Tele "position POV" or vice versa. (Ex. 1001, '479 patent at 5:13–23.) Therefore, a POSITA would understand this term to mean "fused image in which the positions and shapes of objects reflect the POV of the Wide camera." *See* Hart Decl., ¶ 46.

13

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

positioned near the secondary focus distance" (Ex. 1005 at 12:18-20), or "to sharpen portions of the primary still image that are positioned near the secondary focus distance" (Id. at 22:40-42, 64-65 and 23:2-3). *See* Hart Decl., ¶ 69. The enhancement signal is "generated by the camera" or is "generated by the eternal processor" (Id. at 22:63-23:3) but without any disclosure of what is generated or how it is generated. *See* Hart Decl., ¶ 69.

The term "range map" never appears in Parulski's disclosure of enhancing the depth of field at 22:14-23:3. Furthermore, this disclosure of enhancing the depth of field describes a different flow diagram (Fig. 14) than the ones capable of producing a range map (Figs. 3 and 8). It would not be obvious to a POSITA how to modify the method shown in Fig. 14 to generate both a range map and to autofocus the images captured by both stages. *See* Hart Decl., ¶ 70.

Assuming the "enhancement signal" were a range map (which is never suggested by Parulski), however, the discussion of Figure 14 in column 22 of Parulski does not describe a "fused image," because sharpening using a range map would involve sharpening the edges present in specific portions of the primary still image, rather than transferring image data from the secondary

25

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

still image into the output image. (Ex. 1005 at 22:37–42.) *See* Hart Decl., ¶ 71.

## VIII. OBVIOUSNESS

### A.    Claims 1, 10–14, 16, 18, 23, 32–26, 38, and 40 Are Not Obvious Over the Combination of Parulski and Konno (Ground 1)

Petitioner relies on hindsight and to combine cherry-picked portions of embodiments of Parulski to create a Frankenstein embodiment that Parulski neither disclosed nor preferred. In his analysis for limitations [1.5.1] and [1.5.2] (Ex. 1003, Durand Decl. at 47–53), and thus in his analysis for limitations [23.3] and [23.4], which simply refers back to these limitations (id. at 63), he relies on three portions of Parulski: (1) 20:1–15, 20:50–59, and 21:34–44 discussing Figure 11; (2) 22:14–42 discussing Figure 14; and (3) 28:45–57 discussing Figure 26. Hart Decl., ¶ 72.

Figure 11 describes a method "wherein a range map is produced." (Ex. 1005, Parulski at 19:49–51.) The Figure 11 discussion is the only portion of Parulski that Dr. Durand cites as satisfying the "by mapping Tele image pixels to matching pixels within the Wide image" portion of limitation [1.5.2]. (Ex. 1003, Durand Decl. at 52–53.) However, as explained above, nothing in the discussion of Figure 11 describes using the range map as part of a system that outputs a "fused image." Hart Decl., ¶ 73. Identifying objects within an image,

26

tracking motion, blurring portions of an image, or adjusting gain would all be understood as operations that could utilize a range map, but would not need to fuse image data from two different images. *Id.* Likewise, the image capture assemblies of Figures 3 and 8, which Parulski says Figure 11's method uses, do not fuse data from two different images. (Ex. 1005, Parulski at 19:49–51.)

Nowhere else does Parulski describe using the Figure 11 method together with image fusion. Hart Decl., ¶ 74. Indeed, the only reference to using the Figure 11 method (or any "range map") at all in the rest of Parulski describes using the range map, together with GPS location and direction information to determine the geographic locations of portions of the scene. (*Id.*; Ex. 1005, at 24:52–25:15.)

Dr. Durand cites the motivation of focusing on both a foreground dog and a background mountain of Parulski at 21:7-44. However, nothing in the passage describes combining portions of the wide and tele images. The paragraph describes a series of modifications to a wide image that can be made without directly incorporating image data from the tele image, or using the tele image for any reason other than generating range data. It describes "applying gain adjustments to . . . portions *of the image*" (id. at 21:17–24), which can readily be done directly to the wide image data. *See* Hart Decl., ¶ 75.

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

Likewise, "blurring" and "sharpening" can be done directly on the wide image data (using for example the Fourier transform techniques discussed above), without importing image data from elsewhere. Indeed, the blurring and sharpening described would, in general, need to work without importing tele image data. *Id.* This is because background objects in the wide image, such as the mountains in Parulski's example will generally extend beyond the area visible in the tele image, and limiting the blurring or sharpening to the regions visible in the tele image would not achieve the results described in Parulski. *Id.*

The description of an image that has both the dog and the mountains in focus, with the intermediate parts of the scene blurred, (id. at 21:40–44) would be achieved using image data from the wide image, without any need for importing image data from the tele image. The dog is described as being "5 feet away" (id. at 21:12–13), and Parulski teaches that a single wide angle lens, set to its hyperfocal distance, will have objects from 4 feet to infinity in focus (id. at 21:59–61). *See* Hart Decl., ¶ 76.

As for the discussion of Figure 14 and Figure 26, neither mentions using a range map, and neither provide any detail on how the two images are fused, if at all. The Figure 14 discussion refers to use of an "enhancement signal that can be used to sharpen portions of the primary still image." (Id. at

28

22:39–42.) Parulski does not specify that the enhancement signal actually contains image data from the secondary image, and it does not specify how the enhancement signal is used. As explained above, sharpening can be performed to enhance edges based solely on the data from a single image. Thus, the enhancement signal could be something as basic as a signal telling the system to sharpen a particular portion of the primary image, without containing any information about depth or any image data from the secondary image. *See* Hart Decl., ¶ 77

The Figure 26 discussion states that "the two images are combined into a modified image with a broadened depth of field." (Id. at 28:52–53.) However, it says nothing at all about how the images are "combined" or what the characteristics of that image are beyond the "broadened" depth of field.

Even assuming that a POSITA would cobble the cherry-picked quotes from Dr. Durand's analysis into a new system, as Dr. Durand suggests, Dr. Durand has not shown that this new system would satisfy the "fused image with a point of view (POV) of the Wide camera" limitation, under its proper construction. Dr. Durand's sole argument that Parulski meets this limitation is based on the output im-age having the "wide image's field of view." (Ex. 1003, Durand Decl. at 51.) He does not even address the optional portion of

29

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

his proposed claim construction, "the Wide camera's . . . position." Dr. Durand confirmed that his sole theory for satisfying the POV limitation was based on the output FOV during his deposition, when he testified that his only theory for in-fringement was when the zoom position equals 1 (no zoom) and the output field of view equals the wide image view of view. (Ex. 2036, Durand Depo. at 64:20–65:3, 65:18–67:5.)[4] *See* Hart Decl., ¶ 79

As explained above, the '479 patent's discussion of POV defines it with respect to shapes (perspectives) and positions of the objects within images. (Ex. 1001, '479 patent at 5:11–33.) Nothing in this discussion even suggests that FOV is relevant to the question of POV, let alone that it is the same thing. Nothing in Parulski suggests that whatever image data from the tele image that might be "fused" into the output would be modified to have the shapes and positions from the wide image POV. And nothing in Dr. Durand's declaration even attempts to establish this would be true. As a result, Dr. Durand has failed to show that any combination of Parulski with the other references

---

[4] The questions asked of Dr. Durand here appear to conflate "X" with the zoom position, rather than being a threshold value of the "X" position where the primary and secondary image capture modules switch roles. This reflects a misreading of Parulski's figures at that time by the questioning attorney. However, Dr. Durand's answers are clear that he believes Parulski only meets this limitation when no zoom is applied to the wide image and the output image has the same field of view as the wide image.

30

satisfies the limitations of the independent claims. Since Dr. Durand has not

offered any other theory for how Parulski or any other prior art reference sat-

isfies the "fused image with a point of view (POV) of the Wide camera" lim-

itation in any of the claims challenged in this IPR, he has also failed to

demonstrate that any obvious combination of references satisfies any of these

challenged claims under any ground. *See* Hart Decl., ¶ 80.

### B.    Claims 2–4 and 24–26 Are Not Obvious Over the Combination of Parulski, Konno and Szeliski (Ground 2)

Dr. Durand opines regarding Claim 2 at pp. 71-71 that "[a] POSITA

would have recognized that applying Szeliski's rectification process to Parul-

ski's cell phone camera would yield rectified Wide and Tele images" and that

"[a] POSITA also would have understood that these rectified images would

then be used in Parulski's method for performing more efficient pixel match-

ing in deriving the range map." However, Parulski was filed Mar. 9, 2007, and

image rectification was already well known to a POSITA at that time. For

example, image rectification was covered in the popular textbook "Computer

Vision: A Modern Approach" by Forsyth and Ponce (First Edition) (2003) at

325–26 (Ex. 2037). If rectification was an obvious improvement to Puralski

to a POSITA on June 13, 2013, then it would have been an obvious

31

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

improvement to Puralski to a POSITA (including Puralski) on Mar. 9, 2007.
*See* Hart Decl., ¶ 81.

Dr. Durand cherry-picked rectification from Szeliski in a hindsight attempt to modify Parulski toward the '479, and provides no reason why a POSITA would use rectification over other alternatives. Szeliski §11.1.1 "Rectification" is immediately followed by §11.1.2 "Plane sweep" which is "[a]n alternative to pre-rectifying the images before matching… ." (Ex. 1013, Szeliski at 474.)  "The choice of virtual camera and parameterization is application dependent and is what gives this framework a lot of its flexibility. In many applications, one of the input cameras (the reference camera) is used, thus computing a depth map that is registered with one of the input images." *Id.* at 475. Hence the plane sweep would be useful for constructing a range map, especially for the '479, because its depths would be registered specifically with respect to the Wide image point of view. *See* Hart Decl., ¶ 82.

### C.   Claims 5–9 and 27–31 Are Not Obvious Over the Combination of Parulski, Konno, Szeliski and Segall (Ground 3)

Parulski is directed at a camera consisting of multiple image capture stages, whereas Segall, in particular the portions cited by Dr. Durand, is directed at devices consisting of a single image capture stage. Parulski's registration relies on "Stereo-Based Image Processing" (Parulski at 19:53-20:49)

32

whereas Segall's registration relies on "motion estimation" (Segall at 4:33-5:23). A POSITA would have understood that the registration produced by the simple global "epipolar" disparity of stereo images from multiple simultaneous photographs would have fewer errors than would the registration obtained through motion estimation of a sequence of frames with a single moving camera as well as an articulated scene with multiple surfaces moving in different directions. *See* Hart Decl., ¶ 83.

Furthermore. Segall's "Mis-Registration Detection" cited by Dr. Durand's four line excerpt of Segall was actually the introduction of an entire section of Segall 6:43-9:61 including portions on temporal consistency and other issues of motion compensation registration that a POSITA would have realized would have added significant wasted effort when applied to a simpler and less error-prone stereo registration. *See* Hart Decl., ¶ 84.

### D.   Claims 15 and 37 Are Not Obvious Over the Combination of Parulski, Konno and Stein (Ground 4)

The '479 includes a clever scheme for synchronizing the rolling shutter signals of its Wide and Tele CMOS sensors. One of the objectives of this design was to "minimize the required bandwidth from both sensors for the ISPs" ('479 at 7:56-57). Another objective is that "matching FOV's in both images (Tele and Wide) are scanned at the same time" but this would have little

33

impact in anything other than trick photography that reveals the limits of a CMOS sensor by setting the exposure time too fast. *See* Hart Decl., ¶ 85.

Dr. Durand opines that it would have been obvious for a POSITA to combine Parulski and Konno with Stein to incorporate the latter's synchronization of a CMOS shutter to produce a similar result to '479. That is incorrect, for several reasons. *See* Hart Decl., ¶ 86.

First, the POSITA would have needed to be motivated to seek this synchronization. Parulski's examples, including landscapes with mountains, flowers and a sitting dog, provide little high-speed motion to motivate the need for careful synchronization of the image signals. Parulski's design also provides little motivation for the need of increased bandwidth between sensors and processors, as Parulski design includes an interface to an external PC that can be used in the computation of a range map. *See* Hart Decl., ¶ 87.

Second, even if a POSITA was motivated to reduce the bandwidth needed between the sensors and the processor, the POSITA would not have looked to the automotive industry for a solution. The synchronization of CMOS sensors is important to Stein not because of any reduction in bandwidth, but because multiple vehicle cameras have to register fast moving scenes, so it is important that the rolling shutters are synchronized. Cameras

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

used for driver assistance systems do not provide images intended for human viewing, and are less concerned with rolling shutter image artifacts than the images produced by the cameras of the '479. The fact that two very different problems (fast scene registration for Stein v. bandwidth reduction for '479) were solved by a similar synchronization approach is coincidental. The combination of Stein with Parulski is due not to obviousness, but to hindsight. *See* Hart Decl., ¶ 88.

## IX.  SECONDARY CONSIDERATIONS / OBJECTIVE INDICIA OF NON-OBVIOUSNESS

The challenged claims of the '479 patent are not proven to be obvious for the additional reason that there is objective evidence of secondary considerations supporting their non-obviousness. "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).  Evidence of such secondary considerations assists the fact finder to "turn back the clock and place the claims in the context that led to their invention." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378-79 (Fed. Cir. 2012).

35

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

There are several secondary considerations of non-obviousness indicat-
ing that Petitioner has not sufficiently demonstrated the challenged claims are
obvious in view of the prior art references identified by Petitioner. These sec-
ondary considerations include at least industry praise, licensing, commercial
success, and failure of others / copying. *See* Hart Decl., ¶¶ 114-16.

First, the Petition, Dr. Durand's declaration (Ex. 1003), and Dr.
Saisian's (Ex. 1021) declaration are silent as to whether there is evidence of
secondary considerations of non-obviousness as to the challenged claims. *See*
Hart Decl., ¶ 118.

Second, the critical aspects of the '479 patent can be divided into two
categories: first, (1) a dual aperture camera design with Corephotonics' in-
ventive telephoto lens; and second, the (2) use of image fusion techniques to
output a fused image using images from both Wide and Tele cameras. For
example, the '479 patent provides an embodiment of a "dual-aperture zoom
imaging system" which includes a "Wide imaging section" and a "Tele imag-
ing section." *See* Ex. 1001, at 4:29-52. For example, the Tele lens "has a re-
spective effective focal length EFLT and total track length $TTL_T$ fulfilling the
condition $EFL_T/TTL_T>1$." *Id.*, at cl. 1. The '479 patent also describes the use
of "a camera fusion processing core" which, performs an algorithm which

36

results in a "fusion step" where "re-sampled Tele image and the Wide image are fused into a single zoom image." *See id.*, at 9:39-60. As shown below, Patent Owner is entitled to a presumption of nexus between these aspect of the invention and the secondary considerations. *See* Hart Decl., ¶¶ 119-20.

## A.    Industry Praise / Licensing

Industry praise and licensing support non-obviousness. Petitioner and Patent Owner had extensive and detailed discussions regarding Petitioner's use of Patent Owner's technology. Patent Owner's public complaint, in *Corephotonics, Ltd. v. Apple Inc.*, Case No. 6:19-cv-04809-LHK (Dkt. No. 1) (Ex. 2004) ("Complaint"), provides a great amount of detail regarding those discussions, which lasted from 2012 to 2017. *See* Ex. 2004, at ¶¶ 28-44. Petitioner's "Answer" to Patent Owner's public complaint in relevant part "admits" that "Apple personnel attended meetings with Corephotonics personnel to discuss a potential business arrangement." *See, e.g.*, Ex. 2005 at ¶¶ 28-44; Hart Decl., ¶ 121.

The operative questions include whether the allegations in Patent Owner's public complaint concerning Petitioner's attempt to license Patent Owner's technology are supported by evidence and whether there is a nexus

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

between those licensing discussions with the invention of the '479 patent. The answer is "yes" to both questions. Hart Decl., ¶ 122.

Patent Owner has provided documentary evidence and declaration testimony detailing Corephotonics's business, its licensing history, the relevant facts as to the technology licensing discussions between Patent Owner and Petitioner, and several documents that corroborate Patent Owner's Complaint. *See, e.g.*, Declaration of Eran Kali, at ¶¶ 17-26 ("Kali Decl." or "Kali Declaration") (Ex. 2013); Hart Decl., ¶ 123. Several communications and documents are provided and described below for exemplary purposes.

- Exs. 2011 and 2012 is a pair of emails from an Apple engineer to Corephotonics on May 23, 2013, in which he expresses an interest in learning more about Corephotonics's technologies and intellectual property, including "software that fuses wide angle and telephoto video together," "sensor synchronization," "MIPI signaling and image processing requirements," and "image registration in GPU followed by color reproduction in hardware ISP." These emails appears to be referenced in paragraph 29 of the Complaint.

- Ex. 2018 is an email chain between Apple and Corephotonics following a visit by Corephotonics to an Apple facility. An Apple engineer wrote, on June 28, 2013: "***As we discussed during your visit, we are interested in evaluating your image fusion algorithms in more depth.***" In response, Corephotonics said it would "***be happy to make our algorithm available for your evaluation.***" Moreover, at this visit, Corephotonics presented its telephoto lens design to Apple, including key characteristics such as ███████

38

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479



Kali Decl. ¶ 25.

- Ex. 2019 is an email chain between Apple and Corephoton-ics engineers from July 2013. On July 3, 2013, Corephoton-ics provided samples of fused images generated using Corephotonics' image fusion algorithms. In response, an Apple engineer stated: "***Thank you for the images.  We don't see any parallax issues, and the Corephotonics im-ages blend the wide and tele camera image data very smoothly***."

- Ex. 2021 is a copy of a Technology Evaluation Agreement dated September 9, 2013,



Ex. 2022.

- Ex. 2020 is an email chain between Apple and Corephoton-ics engineers discussing, among other things, samples of im-ages generated by Corephotonics's fusion algorithms. An Apple engineer noted, on October 15, 2013: "We'll analyze the images further on our side but the first glance shows that ***the images look quite good***." After further evaluation, Apple followed up: "***My initial impression of the images CP pro-vided has been quite positive***."

- Ex. 2023 is an email from an Apple engineer to Corephoton-ics dated May 21, 2014. In that email, Apple informs Core-photonics: "We had a very positive meeting with company executives on Monday. We showed our results and your module to people in charge of software, hardware, product

39

design and industrial design and there was a very clear message that this is something we want to continue to investigate."

- Ex. 2006 is a presentation dated June 22, 2014 addressed to "Apple strategic deals team" and which was provided to Apple executives on or around June 22, 2014. This presentation appears to be part of the information which Corephotonics alleges it provided to Apple in paragraph 35 of its Complaint. The presentation is titled "Dual Aperture Image Fusion Technology -  Proposed Engagement Framework."

- Ex. 2007 is an email chain between Apple and Corephotonics executives and engineers (including Gal Shabtay, one of the named inventors). The top-level email, dated August 5, 2014, is an email from an Apple executive to Corephotonics, requesting that Corephotonics provide a number of eleven "top level deliverables," including: "2. ***Still image fusion code which does not suffer from artifacts from high speed local motion***." This  email appears to support Corephotonics's allegation regarding Apple's intention to evaluate Corephotonics's technology as alleged in paragraph 36 of the Complaint. The Complaint states in paragraph 33 that the relevant software was provided by Corephotonics to Apple on a confidential and NDA basis, including as part of a "black box" set of algorithms and simulations.

- Ex. 2009 is an email from a Corephotonics executive, David Mendlovic, to Apple executives, stating "[O]ur IP portfolio is the widest and in our opinion has the best defensive value for such applications." This email is quoted in paragraph 39 of the Complaint.

- Ex. 2010 is 

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

As the evidence shows, the licensing discussions between Petitioner and Patent Owner lasted over many years. Hart Decl., ¶ 124. Petitioner specifically asked Patent Owner for an "███████████████████████ █ in August 2016. Apple specifically asked for, and received, technological samples of Corephotonics' lens designs and Corephotonics' image fusion algorithms. *See* Exs. 2007, 2011, 2012, 2018, 2019, 2020, 2021, 2022, Kali Decl., at ¶¶ 17-30.  The licensing discussions specifically would have encompassed the lens design and image fusion technology that Patent Owner had provided, on a confidential and NDA basis, to Apple years earlier. It specifically would have also encompassed a license to Corephotonics's U.S. Patent No. 9,185,291 (the "'291 patent"), to which the '479 patent claims priority. This is evidence that there is a "nexus" between the licensing negotiations between Patent Owner and Petitioner as the claims of the '479 patent challenged by Petitioner in this proceeding. Petitioner's years-long effort in studying Patent Owner's patented technology (and specifically the technology at issue in the '479 patent), combined ██████████████████████ ████████████████████████████████, demonstrates Petitioner's respect for Patent Owner's technology and the non-obviousness of the challenged claims. *See* Hart Decl., ¶ 124.

41

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

Like Apple, numerous other technology companies have recognized the value in Patent Owner's camera and image processing technology and taken licenses to Patent Owner's patented technology. These companies include, OPPO Mobile Telecommunications[5], one of the top 5 global smartphone vendors, and Samsung Electro-Mechanics[6]. Other companies who have taken licenses to Corephotonics's technology include ██████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

*See* Kali Declaration, ¶¶ 11-16.  The fact that several companies have taken licenses to Corephotonics' technology is evidence of industry-wide respect for the patented technology. *See* Hart Decl., ¶ 125.

---

[5] https://corephotonics.com/press-releases/oppo-signs-strategic-license-with-corephotonics-for-next-generation-mobile-handset-cameras/

[6] https://corephotonics.com/press-releases/corephotonics-collaborates-samsung-electro-mechanics-bring-new-era-imaging-smartphones/

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

Corephotonics has been described as a "leader in multi-camera technology,"[7] "a world-renowned leader in the mobile imaging space,"[8] "a leading supplie[r],"[9] and a "key player" in the computational photography market[10]. As early as 2015, Corephotonics had already been recognized as the industry leader in developing dual-camera designs and software technologies to power them, with industry observers speculating: "All this raises the question of whether Apple will use a Corephotonics module."[11] Widespread praise of Corephotonics's technologies is yet further evidence of non-obviousness. *See* Hart Decl., ¶ 126.

Another fact that demonstrates Petitioner's respect for the technology in the '479 patent is Petitioner's repeated and numerous citations to the '291 patent. The '291 patent, which establishes the priority date for the '479 patent,

---

[7] https://twitter.com/UniverseIce/status/1169611027266203648. "Ice Universe" is recognized as one of the leading industry observers in the Android space (and, more specifically, Samsung phones) and is known for publishing confidential industry information. *See, e.g., http://www.businesskorea.co.kr/news/articleView.html?idxno=59259* ("Ice Universe, a famous twitterian in the global IT industry").

[8] https://optics.org/news/8/1/21.

[9] https://www.photonics.com/Articles/OPPO_to_Collaborate_with_Corephotonics/a63427.

[10] https://reportedtimes.com/computational-photography-market-to-develop-new-growth-story-emerging-segments-is-the-key/.

[11] https://www.forbes.com/sites/gordonkelly/2015/01/14/iphone-6s-dual-lens-camera-optical-zoom/?sh=4936af1216c6.

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

is cited on the face of numerous patents assigned to Petitioner, such as U.S. Patent Nos. 9,769,389; 9,774,787; 9,781,345; 10,063,783; 10,122,931; 10,136,048; and 10,264,188. *See* Hart Decl., ¶ 127.

## B.    Commercial Success

Patent Owner's commercial success attributable to the invention of the '479 patent supports non-obviousness of the challenged claims. In 2019, Patent Owner was acquired by Samsung Electronics Benelux BV for a reported $155m. *See* Kali Decl. ¶ 16. Samsung's acquisition of Patent Owner was widely reported in industry news, e.g.:

- Paul Monckton, "Samsung Buys Significant New Camera Advantage Over Apple," Forbes.com (Jan. 29, 2019), https://www.forbes.com/sites/paulmonckton/2019/01/29/samsung-corephotonics/?sh=2c6c144b2de7 (accessed Jan. 25, 2021)

- Omri Zerachovitz, "Samsung buys Israeli co Corephotonics for $155m," Globes.com (Jan. 28, 2019), https://en.globes.co.il/en/article-samsung-buys-israeli-co-corephotonics-for-155m-1001270699 (accessed Jan. 25, 2021)

- Jon Fingas, "Samsung reportedly bought a company to improve its phone cameras," Engadget (Jan. 29, 2019), https://www.engadget.com/2019-01-29-samsung-reportedly-buys-corephotonics.html (accessed Jan. 25, 2021)

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

Patent Owner's acquisition by Samsung, one of the world's leading smartphone manufacturers, is evidence of Patent Owner's commercial access and is attributable to Patent Owner's innovative technology, including its smooth transition algorithms. It is thus evidence tending to support the non-obviousness of the challenged claims. *See* Hart Decl., ¶ 128.

## C.    Failure of Others / Copying

The failure of others, including Petitioner, to successfully address the problems stated in the '479 patent using position matching and image registration to reduce the image jump effect is evidence of the non-obviousness of the challenged claims. The evidence of Apple's copying of the '479 patent's technologies from Patent Owner also supports that conclusion. *See* Hart Decl., ¶ 130.

The failure of others, including the Petitioner, to solve the problems addressed in the '479 patent in the manner claimed by the '479 patent is evidence that suggests that the '942 patent's claims are non-obviousness. *See Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994) (the "argument that an innovation is really quite ordinary carries diminished weight when offered by those who had

45

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

tried and failed to solve the same problem, and then promptly adopted the solution that they are now denigrating.").

Petitioner's own long-standing failure to successfully write image fusion algorithms or design an effective long focal length telephoto lens design (such as the one Corephotonics provided to Apple) for its own iPhone projects using the technologies claimed in the '479 patent until 2016, by which point Petitioner had had years of analysis, access, and experience with Patent Owner's patented lens designs and image processing techniques, is further evidence of non-obviousness. Petitioner's copying of Patent Owner's technologies, including image fusion techniques that Patent Owner demonstrated to Petitioner and the telephoto lens designs it provided to Petitioner, is evidence of non-obviousness. *See* Hart Decl., ¶¶ 131-33. That Petitioner copied the invention of the '479 patent (among other Corephotonics technologies, which Petitioner also appears to have copied) is strongly implied by the course of conduct between the parties and the timing of Petitioner's announcement of their dual-aperture camera in their iPhone 7 series in Fall of 2016. In that generation, Apple introduced its still-image fusion feature for the first time. *See, e.g.*, "What's new in Camera Capture on iPhone 7 and iPhone 7 Plus," https://forums.developer.apple.com/thread/63347 (Authored by "Apple

Case Nos. IPR2020-00905
U.S. Patent No. 10,225,479

Staff"): "When zoomed, the Dual camera intelligently fuses images from the wide-angle and telephoto cameras to improve image quality. This process is transparent to the user and happens automatically when you take pictures using AVCapturePhotoOutput or AVCaptureStillImageOutput."

Numerous of Petitioner's own camera and image processing patents cite the '291 patent (to which the '479 patent claims priority), as previously explained. This suggests Apple has built its own camera and image processing technology based on the technology at issue in the '479 patent. All of these facts support a conclusion that the challenged claims are not obvious. *See* Hart Decl., ¶ 134.

## X.    CONCLUSION

For the reasons set forth above, Corephotonics respectfully requests that the Board affirm the validity of claims 1–16, 18, 23–36–38, and 40 of the '479 patent.

Dated: February 4, 2021         /Neil A. Rubin/
                                Neil A. Rubin (Reg. No. 67,030)
                                RUSS AUGUST & KABAT
                                12424 Wilshire Boulevard, 12th Floor
                                Los Angeles, CA  90025
                                Telephone: 310-826-7474

                                Attorney for Patent Owner,
                                COREPHOTONICS, LTD.

47

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner

v.

COREPHOTONICS, LTD.,
Patent Owner

————————————

IPR2020-00905
U.S. Patent 10,225,479

————————————

**PETITIONER'S REPLY**

As previously explained, the parties' constructions reflect the same concepts in capturing a scene but merely use different terminology. APPL-1038, ¶2. The only significant difference between the parties' constructions is whether the claim language encompasses maintaining Wide position POV *or* Wide perspective POV (as Petitioner contends) or requires maintaining both Wide position POV and Wide perspective POV (as Patent Owner incorrectly contends). *Id.*, ¶8. To narrow the disputes for resolution by the Board, Petitioner's construction can be rephrased using Patent Owner's terminology, consistent with the specification, as "*fused image in which the positions or shapes of objects reflect those of the Wide camera.*" *Id.* As shown in the Petition and explained further below, Parulski satisfies the meaning required by the claim language, including under this alternative construction.

## III.    Obviousness

### A.    Patent Owner's expert, Dr. Hart, applies the wrong standard for a POSITA in his obviousness analysis.

Patent Owner's flawed arguments against combining the prior art relies on Dr. Hart's unsupported conclusions minimizing a POSITA's knowledge, skill, and understanding. *See* APPL-1037, 61:22-10, 62:14-63:17, 100:25-101:13, 111:17-112:5, 114:3-13, 114:14-116:15, 129:7-14, 138:24-139:12, 140:23-141:9.

- 6 -

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

———————

PATENT OWNER'S SUR-REPLY

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

combination thereof." *Id.* at 5:14-16. That is, both shape (perspective) and position are necessary. This is consistent with Patent Owner's construction.[2]

With its misunderstanding of the teachings of the '479 patent, Petitioner further argues that the '479 patent's description of position POV is actually the POV. Reply at 3-4. This is incorrect, as it ignores that the registering pixels to matching pixels will necessarily address both position (shift) and perspective (shape).

To support this argument, Petitioner relies heavily on the teaching in the '479 patent that registration can be performed "after either sub-camera image is shifted, ***in which case the output image will retain the respective Wide or Tele perspective POV***." *Id.*, 5:30-33 (emphasis added). Petitioner asserts that because "perspective POV" is explicitly recited here, the previous recitation of registration does not address perspective POV. Reply at 3-4. But this interpretation ignores the logical construction of this sentence. The '479 patent, in the sentence identified by Petitioner above, certainly describes shifting and

---

[2] Petitioner's argument that this construction is improper because it excludes a preferred embodiment is wrong. Patent Owner's construction is consistent with the specification and the embodiments described therein. Further, Petitioner has not demonstrated that any particular embodiment is a "preferred embodiment." Rather, the '479 patent contemplates numerous embodiments, of which some or all may be covered by a particular claim.

3

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

then registering as addressing perspective. Ex. 1001, 5:30-33. But that cannot mean, as Petitioner argues, that registering *without* shifting only addresses position and not perspective. At best, Petitioner's argument logically would mean that shifting, without registering, would not address perspective. But Petitioner fails to identify any portion of the '479 patent that even describes such a scenario. And this conclusion, even if accurate, does not support Petitioner's claim construction.

Petitioner's arguments ignore the correct way to interpret these portions of the '479 patent – that the examples in the '479 patent at col. 5:26-33 are just a parallel to the examples at col. 5:20-23. More specifically, col. 5:26-30 describes a scenario where the the unmodified position of either the wide or the tele is used, thereby matching both position and perspective POV of that camera. This is no different than the description in the '479 patent that "the perspective POV may be of the Wide or Tele sub-cameras" as described at col. 5:21-22.

Further to that, col. 5:30-33 describes the scenario where images are shifted to create a position POV that is intermediate between the two cameras. Again, this is the same as the teaching of the '479 patent that "the position POV may shift continuously between the Wide and Tele sub-cameras" as

4

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

In addition, as noted above, Petitioner is now offering up a new construction, arguing that a "fused image with a point of view (POV) of the Wide camera" should be construed to mean a "fused image in which the positions or shapes of objects reflect those of the Wide camera." Reply at 6; Ex. 1038 at ¶8. Petitioner and Dr. Durand did not offer this construction in the Petition and supporting declaration. Petitioner and Dr. Durand did not previously apply this construction to the claims. Therefore, as previously noted, this new construction and analysis is improper and should not be permitted in its Reply.

## B.    Claims 1, 10–14, 16, 18, 23, 32–36, 38, and 40 Are Not Obvious Over the Combination of Parulski and Konno (Ground 1)

Petitioner further admits that its Petitioner relies on hindsight and to combine cherry-picked portions of embodiments of Parulski to create an embodiment that Parulski neither disclosed nor preferred. Reply at 7-8. Instead, Petitioner doubles-down by arguing that a POSITA would have had the "common sense, common wisdom and common knowledge" to yield the claim invention. *Id.* at 8. However, this argument ignores that a POSITA would need motivation to do so. This motivation is missing from the Petition, and Petitioner's improper attempts to provide that motivation now should be ignored.

Petitioner argues that a range map "is the only method taught by Parulski" for identifying portions of an image positioned near a focal distance.

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

Reply at 8-9. However, that fact does not mean a POSITA would necessarily use that method in different embodiments. Rather, a POSITA would need to be motived to use that specific methodology depending on the characteristics of a particular embodiment. Petitioner ignores this.

The Petition argued that an image that has both the dog and the mountains in focus, with the intermediate parts of the scene blurred, (Ex. 1005 at 21:40–44) would provide such a motivation to use the range map in other embodiments of Parulski. However, as noted in Patent Owner's Response, this could be achieved using image data from the wide image, without any need for importing image data from the tele image. The dog in Parulski is described as being "5 feet away." *Id*. at 21:12–13. Parulski further teaches that a single wide angle lens, set to its hyperfocal distance, will have objects from 4 feet to infinity in focus. *Id*. at 21:59–61; *see also* Ex. 2001, Hart Decl., ¶ 76.

Petitioner asserts that this argument fails because "it does not consider the combination with Konno's wide lens (which Patent Owner does not dispute) which, when similarly focused at 8 feet, has a smaller depth of field of about 6 feet to infinity." Reply at 11. But this would mean a POSITA would alter the teachings in Parulski to create an embodiment with a smaller depth of field, and more nearby objects would be out of focus. Thus, Petitioner's

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

modification would create a system with lesser performance results than it originally had because fewer objects would be in focus up close.

Further, because the dog in the example would be out of focus, additional steps of sharpening using the range-map and the tele image to bring the dog into focus would now be required. Reply at 11. Even in its Reply, Petitioner does not explain why a POSITA would do this. That is because there is no reason why a POSITA would alter Parulski to change its functions such that it has a smaller depth of field, thereby degrading performance, and then requiring additional steps to achieve what it does as taught. A POSITA having "common sense, common wisdom and common knowledge" would not do this, and Petitioner knows it.

For these reasons, Petitioner's arguments should be rejected and claims 1, 10–14, 16, 18, 23, 32–26, 38, and 40 should not be found unpatentable.

### C.    Grounds 2, 3 and 4 Also Do Not Establish Unpatentability

Ground 2 (claims 2-4 and 24-26), Ground 3 (5-9 and 27-31), and Ground 4 (claims 15 and 37) are all based on the combination of Parulski, Konno and one or more additional prior art references added to address limitations in these dependent claims. None of these additional prior art references cure the

Trials@uspto.gov                                              Paper 49
571-272-7822                                    Entered: September 14, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

————————

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

————————

Record of Oral Hearing
Held:  August 12, 2021

————————

Before BRYAN F. MOORE, JOHN F. HORVATH, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)


APPEARANCES:

ON BEHALF OF THE PETITIONER:

>        MICHAEL PARSONS, ESQUIRE
>        Haynes & Boone, LLP
>        6000 Headquarters Drive
>        Suite 200
>        Plano, TX  75024


ON BEHALF OF PATENT OWNER:

>        MARC FENSTER, ESQUIRE
>        Russ, August & Kabat
>        12424 Wilshire Blvd.
>        12th Floor
>        Los Angeles, CA  90025




The above-entitled matter came on for hearing on Thursday, August 12, 2021, commencing at 12:59 p.m., EDT, at the U.S. Patent and Trademark Office, by video/by telephone, before Chris Hofer, Notary Public.

2

1   portion because they have different fields of view but they're

2   overlapping.  Objects in the tele image are going to appear larger

3   than they are in the wide image and so by resampling the tele

4   image it means you're actually going to scale it to the same -- so

5   the objects are the same size as what they are in the wide image.

6   And therefore when you pull those portions out, that they can go

7   into the wide image at the same, you know, at the same size so

8   you're not obscuring other portions of the image.

9        JUDGE HORVATH:  Okay.  So let me ask you this.  There

10   are other steps then in figure 5 and what is intriguing to me is

11   this last step which is in 510, this decision step where they

12   compare the pixels in the tele image to the pixels in the wide

13   image and determine if there's an error in that registration map.

14   And then if there is an error, they pick the wide image pixel.

15   Now, the way I look at that, and I'm taking that and I'm

16   considering that in combination with what they said about the

17   point of view shifting -- and I sort of had an image in my mind

18   that, you know, I could have a camera that's looking let's say

19   straight on at an I-beam so that all I really see is the "I" of the I-

20   beam; right?  And let's say that's painted red.  I don't see any of

21   the sides.  But then I have another camera which is to the right

22   of that camera and so it has a different point of view.  So now

23   that camera is seeing two things.  It sees the red of the I-beam,

24   the face of the I-beam, but it also sees the side of the I-beam

25   which let's say is colored blue; right?  So if I try to register

14

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1  pixels and map pixels, I'm going to map some of the red from the

2  tele camera, from the camera on the right, and it sees both the

3  front of the I-beam and the side of the I-beam and so it's going to

4  have those red pixels from the front face of the I-beam and

5  they're going to map to the pixels that I see from the wide

6  camera. But there's going to be pixels from the camera to the

7  right, the tele camera that sees the side of the I-beam that's blue.

8  Those aren't going to match anything that I see from the wide

9  camera. So isn't that what they mean by registration error? And

10  in that case they say choose the information from the wide

11  camera, so I'm throwing away the tele-perspective.

12      MR. PARSONS: Well, Your Honor, that concept is

13  actually claimed in claim 5 which also -- based on claim

14  differentiation -- does not determine whether or not you're

15  maintaining wide POV because that error process is actually

16  happening in a different claim. So that's not what's doing the

17  maintaining of the wide POV. Also that's happening again after

18  the registration process and the specification specifically says

19  that you have to shift before registration because otherwise you

20  end up with exactly this error that you described where you will

21  have errors between the two of them because you didn't shift the

22  tele pixels in to have the perspective of the wide camera before

23  you did the registration mapping process.

24      JUDGE HORVATH: Uh-huh. Okay.

25      MR. PARSONS: Well, thank you, Your Honor. In light of

15

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1    them with the wide image to create a combined image.  And what

2    this does is it enables the in-focus portions of the telephoto

3    image to then enhance the wide image and increase the number

4    of -- the portions of the wide image that are in focus, which is

5    what broadening the depth of field means.

6        JUDGE HORVATH:  So, Mr. Parsons, if I can ask you a

7    question.  So when you do this, you know, extracting an image

8    from the telephoto lens for example, or from the telephoto image,

9    extracting an object and then copying that and placing it in the

10   position of that object from the wide image, would you agree

11   that in doing that you are only preserving the position, the wide

12   position point of view and not both the wide position and the

13   wide perspective point of view?

14       MR. PARSONS:  Well, Your Honor, our position in the

15   petition was exactly that. That if you just perform the

16   registration process to match the tele pixels with the wide pixels

17   to identify where the objects are and then you just extract the

18   objects from the tele and use it with the wide, that that does in

19   fact maintain the wide position POV because the wide image is

20   the one that's maintained.  And all of the objects that have been

21   moved over are in the same position and then the objects that are

22   moved over from the tele image would be in the same position

23   because you used the registration mapping process.  But Parulski

24   isn't clear on whether or not there's a shifting process that

25   happens before registration.  So that was our position in the

19

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1   petition.

2        But let me supplement that a little bit.  On page 3 of the

3   Patent Owner's surreply, in the second paragraph, the last

4   sentence, they specifically say that our position of just

5   maintaining position POV is incorrect because, and this is what

6   they say, they say this is incorrect as it ignores that the

7   registering pixels to matching pixels will necessarily address

8   both position and perspective.  So in the surreply Patent Owner

9   has taken the position it doesn't matter if you use the registration

10  map, it does both position and perspective and there's no dispute

11  at the end that Parulski's registration mapping process satisfies

12  the limitation in the claim.  So even based on Patent Owner's

13  position in the surreply it seems to be that if you just do the

14  registration process, based on their argument, that it would

15  maintain both.

16       JUDGE HORVATH:  I'm sorry.  What page number was

17  that from the surreply?

18       MR. PARSONS:  Page 3 of the surreply.  It's in the second

19  paragraph.

20       JUDGE HORVATH:  Page 3.

21       MR. PARSONS:  It's the last sentence of the first full

22  paragraph.

23       JUDGE HORVATH:  Okay.  Okay.  Thank you.

24       MR. PARSONS:  Right.  Thank you.  So I'll continue on.

25  In slide 14 Parulski provides a specific example for using the

20

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1    So now let's go to slide 33 which is that Petitioner has no

2    arguments under the correct construction.  It is up until today

3    when they made this one argument about our surreply which I'll

4    address, they have no argument under the proper construction.

5    They basically have admitted through their reply that Parulski

6    only does a shift in position but does not maintain the

7    perspective of the point of view of the wide angle; okay?  So if

8    you adopt the proper construction that point of view requires

9    both shape and position then the petition just does not show that

10   Parulski meets shape and position.

11       Now, they made a new argument today for the first time

12   that, based on something in our surreply which obviously is not

13   in their petition which is based on a misreading of our surreply,

14   if there is -- if you use registration where you map tele pixels to

15   matching wide pixels in the wide image, that does preserve both

16   shape and position.  But that is not what Parulski does.  Parulski

17   -- they use two different embodiments.  One, the broadened

18   depth of field, which does not have pixel matching.  There's no

19   pixel matching.  That's what they rely on for the fused image.

20   The pixel matching is for creating a range map which is

21   something different and the range map is not  a fused image.  So

22   there is no teaching in Parulski, no evidence in the record that

23   shows that Parulski creates a fused image by mapping tele pixels

24   into the wide.

25       So slide 34.  This is their expert admitting that he did not

36

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1  provide a construction -- any evidence under the proper

2  construction of both shape and position.  That's Dr. Hart's

3  construction.  At slides 35 and 36 we talked about how new

4  arguments on reply can't be used to supplement the prima facie

5  case.

6      So now let's go to slide 40.  Okay.  So this is why Parulski

7  doesn't meet the claimed limitation.  So the claimed element

8  requires creating a fused image where the fused image has a

9  point of view of the wide camera that's both shape and position.

10  That's undisputedly not there, and you have to do so by mapping

11  tele pixels to matching pixels.  Parulski does not create a fused

12  image by mapping pixels at all.  The only pixel mapping that's

13  shown in Parulski is to create a range map.

14      So let's go to slide 48.  So on slide 42, remember that

15  Petitioner uses the range map of figure 11 for pixel matching and

16  they use the broadened depth of field embodiment in figures 14

17  and 26 from Parulski for the fusion.  There is no pixel matching

18  in the broadened depth of field and at slide 43 you see that they

19  rely on the range map for pixel matching.  That's the only

20  mention in the petition of pixel matching.  It's for this range map

21  but the range map is not a fused image.

22      JUDGE MOORE:  All right, counsel.  I'm going to give sort

23  of my high level of understanding and have you react to that.  So

24  the range map is relevant to object extraction and the extracted

25  object is part of the fused image.  So maybe tell me if you think

37

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1    that is correct?  And then No. 2, tell me why that doesn't mean

2    that range map is a part of the fused image, unlike what you've

3    been saying.

4        MR. FENSTER:  Yes.  Okay.  So, you're exactly right.  So

5    Parulski teaches creating this range map which is basically just a

6    map of depths by pixel; right?  So that's what the depth map is --

7    the range map in Parulski.  Parulski then teaches you can do that

8    to extract an object like a person in the foreground and then take

9    that to those -- take that and just paste it into the wide

10   perspective.  And so what it's teaching would give you shifting

11   but not perspective because you're pasting the tele images, the

12   tele images with the tele shape.  There isn't any teaching in

13   there.

14       So let me back up to your question.  Your question was

15   range map.  The range map is only a depth map, it is not the

16   fused image; okay?  So the only pixel matching that is shown in

17   Parulski that the Petitioner relies on is to create the range map.

18   There's no showing that pixel matching is used to create the

19   broadened depth of field fused image.  So that's the answer to

20   your question.  It's a separate step.  Pixel matching gives you a

21   range map but the range map is not a fused image.  And there's

22   no showing, there's nothing in Parulski that uses pixel matching

23   to create the fused image.  And so there's nothing in Parulski that

24   gets you to a fused image that has the point of view of the wide

25   camera by mapping or matching tele pixels into the wide.  The

38

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1    me reset my clock here.  So, Mr. Fenster, you had reserved 15

2    minutes.  You graciously allowed us to take three minutes of

3    your rebuttal time to answer my question.  I appreciate that.  So

4    that leaves you with 12 minutes left for rebuttal.  Let me just set

5    the time here and would you like to go back to your presentation

6    slides?

7         MR. FENSTER:  Yes, Your Honor.  I would appreciate that.

8         JUDGE HORVATH:  Okay.  Okay.  We can see your

9    presentation slides now.  Any particular slide number?

10        MR. FENSTER:  I'll just leave it here.  I'm going to speak

11   to you first and then we'll go to the slides.  So let me go ahead

12   and start with Judge Moore and Judge Horvath's questions to Mr.

13   Parsons.  So, Judge Moore, your question does the petition meet

14   Patent Owner's construction?  The answer is clearly

15   unmistakably no.  The petition does not show that Parulski meets

16   the position of maintaining the point of view, meaning both

17   shape and position, in the fused image.

18        Now, Judge Horvath, I want to go back to your question

19   because this helps answer it and your excellent example of the I-

20   beam with the red front and the blue side; right?  And your

21   question referring back to figure 5 of the '479 patent, so your

22   question referring back to figure 5 was don't you need something

23   more to preserve the point of view, meaning the shape, of the

24   wide angle and the answer is yes.  The answer is the extra step is

25   you have to reject the pixels from the tele image that don't

52

IPR2020-00905 (Patent 10,225,479 B2)
IPR2020-00906 (Patent 10,225,479 B2)

1    match.  There is a step in figure 5 that is rejecting the side image

2    that don't match and by rejecting the side image and only using

3    those pixels from the tele image that match the wide, you thereby

4    preserve both the shape and position of the red I-beam meeting

5    the wide camera; okay?  And what is wholly missing from

6    Parulski is that teaching of rejecting those pixels that don't

7    match.

8        Remember, the only pixel matching that Parulski shows that

9    they point to in their petition or their reply is to create this range

10   map.  There is no pixel matching that is then used in the fused

11   image, so there's no rejection of pixels that don't match and

12   that's why then in the fused image there is no pixel matching.

13   Instead it results in a combination of a wide position and a tele

14   perspective and that is not what the claim requires.  The claim --

15   the specification clearly says that you can have either a wide

16   point of view, a tele point of view or a combination of both.  But

17   the claim requires the wide point of view and Parulski only

18   teaches in the fused image a combination where it has the wide

19   shifted image, the wide position, but the tele perspective or

20   combination and that is not what meets the claim limitation.  And

21   so, Your Honors, that is the essence of this  -- of the failure in

22   Apple's petition regarding Parulski under the proper

23   construction.

24       The proper construction requires both shape and position.

25   And Parulski does not teach that, no matter how generous you

53

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————————

IPR2020-00905
U.S. Patent No. 10,225,479 B2

———————————

**PETITIONER APPLE INC.'S NOTICE OF APPEAL**

via E2E
Patent Trial and Appeal Board

via Hand Delivery
Director of the United States Patent and Trademark Office
c/o Office of the General Counsel, 10B20
Madison Building East
600 Dulany Street
Alexandria, VA 22314

via CM/ECF
United States Court of Appeals for the Federal Circuit

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, and 37 C.F.R. §§ 90.2(a), 90.3, and Federal Circuit Rule 15(a)(1), Petitioner Apple Inc. ("Petitioner") provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered November 8, 2021 (Paper 51), and from all underlying and related orders, decisions, rulings, and opinions regarding U.S. Patent No. 10,225,479 B2 ("the '479 patent") in *Inter Partes* Review IPR2020-00905.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), the expected issues on appeal include, but are not limited to: the Board's error(s) in determining that challenged claims 1–16, 18, 23–38, and 40 of the '479 patent are not unpatentable, the Board's construction of the term "fused image with a point of view (POV) of the Wide camera," and all other issues decided adversely to Petitioner in any orders, decisions, rulings, or opinions.

Pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2(a), a copy of this Notice is being filed with the Director of the United States Patent and Trademark Office and with the Patent Trial and Appeal Board. In addition, a copy of this Notice and the required docketing fees are being filed with the Clerk's Office for the United States Court of Appeals for the Federal Circuit via CM/ECF.

1

Petitioner Apple Inc.'s Notice of Appeal                              IPR2020-00905
Attorney Docket No. 52959.54R479                    U.S. Patent No. 10,225,479 B2

Respectfully submitted,

Dated: January 10, 2022                    /Michael S. Parsons/
                                           Michael S. Parsons
                                           Reg. No. 58,767

HAYNES AND BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX  75219
Telephone: (972) 739-8611
Facsimile: (214) 200-0853
michael.parsons.ipr@haynesboone.com

2

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically filed through PTAB E2E, a true and correct copy of the above-captioned PETITIONER APPLE INC.'S NOTICE OF APPEAL is being filed by hand with the Director on January 10, 2022, at the following address:

> Director of the United States Patent and Trademark Office
> c/o Office of the General Counsel, 10B20
> Madison Building East
> 600 Dulany Street
> Alexandria, VA 22314

The undersigned also hereby certifies that a true and correct copy of the above-captioned PETITIONER APPLE INC.'S NOTICE OF APPEAL and the filing fee is being filed via CM/ECF with the Clerk's Office of the United States Court of Appeals for the Federal Circuit on January 10, 2022.

Respectfully submitted,

Dated: January 10, 2022                    /Michael S. Parsons/
                                           Michael S. Parsons
                                           Reg. No. 58,767
                                           Attorney for Petitioner Apple Inc.

3

Petitioner Apple Inc.'s Notice of Appeal                                IPR2020-00905
Attorney Docket No. 52959.54R479                     U.S. Patent No. 10,225,479 B2

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, this is to certify that a true and correct copy of

the foregoing "Petitioner Apple Inc.'s Notice of Appeal" was served on the Patent

Owner Corephotonics, Ltd. as detailed below:

| | |
|---|---|
| *Date of service* | January 10, 2022 |
| *Manner of service* | Electronic Service by E-mail:<br>– nrubin@raklaw.com<br>– jchung@raklaw.com<br>– mfenster@raklaw.com<br>– jtsuei@raklaw.com<br>– jlink@raklaw.com |
| *Documents served* | **Petitioner Apple Inc.'s Notice of Appeal** |
| *Persons served* | Neil A. Rubin (nrubin@raklaw.com)<br>C. Jay Chung (jchung@raklaw.com)<br>Marc A. Fenster (mfenster@raklaw.com)<br>James S. Tsuei (jtsuei@raklaw.com)<br>Russ August & Kabat<br>12424 Wilshire Blvd., 12th Floor<br>Los Angeles, CA 90025<br><br>Jonathan Link (jlink@raklaw.com)<br>Russ August & Kabat<br>800 Maine Ave SW, Suite 200<br>Washington, DC 20024 |

4

Respectfully submitted,

/Michael S. Parsons/
Michael S. Parsons
Reg. No. 58,767
Attorney for Petitioner Apple Inc.

5

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.,

Patent Owner

———————————

IPR2020-00906

U.S. Patent No. 10,225,479

———————————

# PETITION FOR *INTER PARTES* REVIEW
# UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104

# TABLE OF CONTENTS

PETITIONER'S EXHIBIT LIST ................................................................III

I.    INTRODUCTION ...................................................................1

II.   MANDATORY NOTICES ......................................................1

      A.   Real Party-in-Interest .................................................1

      B.   Related Matters ..........................................................1

      C.   Lead and Back-up Counsel and Service Information ..........................2

III.  GROUNDS FOR STANDING ................................................2

IV.   THE '479 PATENT ...............................................................2

      A.   Summary of the Patent ...............................................2

      B.   Prosecution History and Priority Date .................................6

V.    LEVEL OF ORDINARY SKILL IN THE ART.......................7

VI.   CLAIM CONSTRUCTION ....................................................7

      A.   "to find translations between matching points in the images to
           calculate depth information and to create a fused image suited for
           portrait photos" (claim 19). ...........................................8

VII.  REQUESTED RELIEF ........................................................10

VIII. OVERVIEW OF CHALLENGES ........................................10

      A.   Challenged Claims .....................................................10

      B.   Statutory Grounds for Challenges ..................................10

      C.   Discretionary Denial is Not Warranted .............................11

      D.   Page Citations and Emphasis ........................................12

IX.   IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE..12

      A.   Ground 1: Claims 19 and 20 are obvious over the combination of
           Parulski, Ogata, Kawamura, and Soga...............................12

           1.   Summary of Parulski.............................................12

           2.   Summary of Kawamura .........................................17

           3.   Reasons to combine Parulski and Kawamura.........................21

           4.   Summary of Ogata ..............................................24

5.      Reasons to combine Parulski and Ogata ....................................28

6.      Summary of Soga .........................................................................30

7.      Reasons to Combine Parulski and Soga ....................................33

8.      Claim 19 ........................................................................................39

9.      Claim 20 ........................................................................................62

B.      Ground 2: Claims 21 and 22 obvious over the combination of
        Parulski, Ogata, Kawamura, Soga, and Morgan-Mar. .......................64

1.      Summary of Morgan-Mar ............................................................64

2.      Reasons to Combine Parulski, Soga, and Morgan-Mar............67

3.      Claim 21 ........................................................................................69

4.      Claim 22 ........................................................................................71

X.    CONCLUSION.......................................................................................75

XI.   CERTIFICATE OF WORD COUNT ....................................................76

CERTIFICATE OF SERVICE ........................................................................77

## PETITIONER'S EXHIBIT LIST

May 6, 2020

| APPL-1001 | U.S. Patent No. 10,225,479 to Shabtay et al. (the "'479 Patent") |
|---|---|
| APPL-1002 | Prosecution history of the '479 Patent (the "'242 App") |
| APPL-1003 | Declaration of Dr. Fredo Durand Ph.D. |
| APPL-1004 | CV of Dr. Fredo Durand |
| APPL-1005 | U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski") |
| APPL-1006 | JP Patent Application Publication No. 2007-259108 to Soga ("Soga"), English Translation, Declaration, and Original |
| APPL-1007 | Jacobs et al., "Focal Stack Compositing for Depth of Field Control," Stanford Computer Graphics Laboratory Technical Report 2012-1 |
| APPL-1008 | Prosecution history Morgan-Mar |
| APPL-1009 | U.S. Patent No. 8,989,517 to Morgan-Mar et al. ("Morgan-Mar") |
| APPL-1010 | PCT Publication No. WO2013140359 to Shalon et al. ("Shalon") |
| APPL-1011 | U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border") |
| APPL-1012 | JPS5862609A to Kawamura ("Kawamura") |
| APPL-1013 | Used in co-filed Petition |
| APPL-1014 | U.S. Patent No. 6,259,863 to Maruyama ("Maruyama") |
| APPL-1015 | Used in co-filed Petition |
| APPL-1016 | Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson") |
| APPL-1017 | U.S. Patent App. Pub. No. 2010/0321511 to Koskinen et al. ("Koskinen") |

| APPL-1018 | U.S. Patent No. 7,206,136 to Labaziewicz et al. ("Labaziewicz") |
| APPL-1019 | Milton Katz, INTRODUCTION TO GEOMETRICAL OPTICS (2002) ("Katz") |
| APPL-1020 | Warren J. Smith, MODERN LENS DESIGN (1992) ("Smith") |
| APPL-1021 | Declaration of Dr. Jose Sasián, Ph.D. |
| APPL-1022 | ZEMAX Development Corporation, ZEMAX Optical Design Program User's Manual, February 14, 2011 ("ZEMAX User's Manual") |
| APPL-1023 | Used in co-filed Petition |
| APPL-1024 | Used in co-filed Petition |
| APPL-1025 | Used in co-filed Petition |
| APPL-1026 | U.S. Patent No. 5,546,236 to Ogata et al. ("Ogata") |
| APPL-1027 | Used in co-filed Petition |
| APPL-1028 | Bae et al., "Defocus Magnification," EUROGRAPHICS 2007, ("Bae") |
| APPL-1029 | Specification sheet for Sony ICX629 image sensor ("ICX629") |
| APPL-1030 | Specification sheet for Sony ICX624 image sensor ("ICX624") |
| APPL-1031 | Used in co-filed Petition |
| APPL-1032 | Used in co-filed Petition |
| APPL-1033 | Product manual for Kodak Easyshare V610 |
| APPL-1034 | Used in co-filed Petition |
| APPL-1035 | Robert E. Fischer et al., OPTICAL SYSTEM DESIGN (2008) |
| APPL-1036 | Email from Patent Owner's counsel authorizing electronic service |

- iv -

# I.  INTRODUCTION

U.S. Patent No. 10,225,479 (the "'479 Patent," APPL-1001) is generally directed to a "dual aperture" digital camera. APPL-1001, Title. The claims challenged in this Petition recite two sets of limitations— (1) wide and tele cameras with overlapping fields of view (FOVs) and (2) a camera controller that provides two functions: (1) "to find translations between matching points in the images to calculate depth information" and (2) "to create a fused image suited for portrait photos." *Id.*, 15:28-31. As shown in this Petition, these concepts were known in the art prior to the '479 Patent.

This Petition, along with the cited evidence, demonstrates that claims 19-22 of the '479 Patent ("the challenged claims") are obvious under 35 U.S.C. § 103. Petitioner Apple Inc. requests that these claims be held unpatentable and cancelled.

# II.  MANDATORY NOTICES

## A.  Real Party-in-Interest

The real party-in-interest is Apple Inc.

## B.  Related Matters

As of the filing date of this Petition and to the best knowledge of Petitioner, the '479 Patent has been asserted in the following matters:

- *Corephotonics Ltd. v. Apple Inc.*, Case No. 5-19-cv-04809 (N.D. Cal. filed August 14, 2019).

- Petitioner is concurrently filing IPR2020-00905 directed to claims 1-16, 18, 23-38, and 40.

### C.    Lead and Back-up Counsel and Service Information

**Lead Counsel**

| | |
|---|---|
| **Michael S. Parsons** | Phone:        972-739-8611 |
| HAYNES AND BOONE, LLP | Fax:           214-200-0853 |
| 2323 Victory Ave. Suite 700 | michael.parsons.ipr@haynesboone.com |
| Dallas, TX 75219 | USPTO Reg. No. 58,767 |

**Back-up Counsel**

| | |
|---|---|
| **Andrew S. Ehmke** | Phone:        214-651-5116 |
| HAYNES AND BOONE, LLP | Fax:           214-200-0853 |
| 2323 Victory Ave. Suite 700 | andy.ehmke.ipr@haynesboone.com |
| Dallas, TX 75219 | USPTO Reg. No. 50,271 |
| **Jordan Maucotel** | Phone:        (972) 739-8621 |
| HAYNES AND BOONE, LLP | Fax:           (214) 200-0853 |
| 2323 Victory Ave. Suite 700 | jordan.maucotel.ipr@haynesboone.com |
| Dallas, TX 75219 | USPTO Reg. No. 69,438 |

Please address all correspondence to lead and back-up counsel. Petitioner consents to electronic service.

## III.    GROUNDS FOR STANDING

Pursuant to 37 C.F.R. §42.104(a), Petitioner certifies that the '479 Patent is available for *inter partes* review and that Petitioner is not barred or estopped from requesting an *inter partes* review challenging the claims on the grounds identified in this Petition.

## IV.    THE '479 PATENT

### A.    Summary of the Patent

The '479 Patent describes a "dual-aperture zoom digital camera operable in both still and video modes." APPL-1001, Abstract. Figure 1A diagrams the

- 2 -

patent's camera as a dual-aperture Zoom imaging system 100 including a first

Wide imaging section and a second Tele imaging section, with each section having

respective lenses and image sensors:



APPL-1001, Fig. 1A (annotated).

Figure 2 of the '479 Patent illustrates the respective fields of view (FOVs) of

the Wide and Tele image sensors:



APPL-1001, Fig. 2 (annotated). The larger FOV for the Wide image is provided by Wide sensor 202 and the corresponding smaller FOV for the Tele image is provided by Tele sensor 204. *See id.*, 6:1-2.

With Wide and Tele images captured from the respective cameras, the '479 Patent describes performing several image processing methods. In the method that forms the subject of the challenged claims, the image processing performs two separate functions— "find[ing] translations between matching points in the images to calculate depth information" and "creat[ing] a fused image suited for portrait photos" with a depth of field shallower than the depth of field of the Tele image. *Id.*, 15:25-32.

Regarding the process for calculating depth information, the '479 Patent only describes this for the purposes of fast focusing of an autofocus mechanism.

- 4 -

*Id.*, 12:12-15 ("The result is fast focusing."). This process first performs

registration "between the Wide and Tele images to output a transformation

coefficient…. The transformation coefficient includes the translation between

matching points in the two images" that is "measured in a number of pixels. *Id.*,

12:7-11. The different translations between the images "result in a different

number of pixel movements between matching points in the images." *Id.*, 12:11-

12. The pixel movements are "translated into depth" and then "translated into an

AF position." *Id.*, 12:12-15.

Regarding the process for creating a fused image with a shallower depth of

field, the '479 Patent describes that:

> In some embodiments, a dual-aperture zoom system
> disclosed herein can be used to capture a shallow DOF
> photo (shallow compared with a DOF of a Wide camera
> alone), by taking advantage of the longer focal length of
> the Tele lens. The reduced DOF effect provided by the
> longer Tele focal length can be further enhanced in the
> final image by fusing data from an image captured
> simultaneously with the Wide lens. Depending on the
> distance to the object, with the Tele lens focused on a
> subject of the photo, the Wide lens can be focused to a
> closer distance than the subject so that objects behind the
> subject appear very blurry. Once the two images are
> captured, information from the out-of-focus blurred

> background in the Wide image is fused with the original
> Tele image background information, providing a blurrier
> background and even shallower DOF.

*Id.*, 4:23-38.

The system and method presented in the '479 Patent, namely, a dual-aperture camera system having 1) Wide and Tele lens systems with overlapping fields of view, and 2) a camera controller that performs image processing to calculate depth information and to fuse Wide and Tele images to emphasize the foreground and blur the background, were well known in the prior art prior to the '479 Patent. APPL-1003, ¶27.

### B.    Prosecution History and Priority Date

U.S. Patent Application No. 16/048,242 ("the '242 App") that issued as the '479 Patent was filed on July 28, 2018 and claims priority through a chain of applications to a provisional filed on June 13, 2013. APPL-1001, 1:5-20. The '242 application was filed with 40 claims that ultimately issued as claims 1-40 in the '479 Patent. *See* APPL-1002, p.334-66. The '479 Patent issued on March 5, 2019. In the Notice of Allowance, the Examiner's reasoning simply copied the limitations that were found to be patentable including "the Tele lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T / TTL_T > 1$. This limitation was known in the prior art.

- 6 -

## V.     LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art may be reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Here, a Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including optics and image processing. APPL-1003, ¶13. A POSITA also would have had experience in lens system design including analyzing, tolerancing, adjusting, and optimizing multi-lens systems with lens design software, and would have been familiar with the specifications of lens systems including image sensors. *Id.* Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA. *Id.* However, Petitioner does not imply that a person having an extraordinary level of skill should be regarded as a POSITA.

## VI.    CLAIM CONSTRUCTION

The challenged claims of the '479 Patent are construed herein "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (Nov. 13, 2018). The claim terms construed below are thus construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the

art and the prosecution history pertaining to the patent." *Id.* For terms not

addressed below, Petitioner submits that no specific construction is necessary for

this proceeding.

### A. "to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos" (claim 19).

This term is recited in claim 19, where it appears as follows:

> e) a camera controller operatively coupled to the first and
> second AF mechanisms and to the Wide and Tele image
> sensors and configured to control the AF mechanisms, to
> process the Wide and Tele images to find translations
> between matching points in the images to calculate depth
> information and to create a fused image suited for portrait
> photos, the fused image having a DOF shallower than
> $DOF_T$ and having a blurred background.

APPL-1001, 15:25-32.

This limitation should be construed as requiring the "camera controller" to

perform two separate functions: (1) "to find translations between matching point in

the images to calculate depth information" and (2) "to create a fused image suited

for portrait photos."

Regarding the operation "to find translations between matching point in the

images to calculate depth information," the specification references Fig. 6 which is

"a method disclosed herein for acquiring a zoom image in video/preview mode for

- 8 -

3 different zoom factor (ZF) ranges." *Id.*, 11:30-32. As discussed above, the

specification describes obtaining two images where, for a given ROI ("Region of

Interest") depth information is obtained for faster focusing:

> [R]egistration is performed between the Wide and Tele
> images to output a transformation coefficient. The
> transformation coefficient is used to set an AF position.
> The transformation coefficient includes the translation
> between matching points in the two images. This
> translation can be measured in a number of pixels.
> Different translations will result in a different number of
> pixel movements between matching points in the images.
> This movement can be translated into depth and the depth
> can be translated into an AF position. This enables to set
> the AF position by only analyzing two images (Wide &
> Tele). The result is fast focusing.

*Id.*, 12:7-15. Nowhere does the specification describe using the "translations

between matching point" to "create a fused image suited for portrait photos."

APPL-1003, ¶33.

Rather, the specification describes image fusion in relation to a different

"Still Mode Operation" (shown in Fig. 2). *See id.*, 7:44. In this separate

embodiment, "the obtained image is fused from information obtained by both sub-

cameras at all zoom levels (see FIG. 2), which shows a Wide sensor 202 and a Tele

sensor 204 and their respective FOVs." *Id.*, 7:45-48. Fusing the Wide and Tele

- 9 -

images is stated to "achieve optical zoom, improves SNR and provides wide dynamic range." *Id.*, 7:57-59. Nowhere does the specification describe fusing two images using "translations between matching points." APPL-1003, ¶34.

Based on these teachings and descriptions, a POSITA would have understood "to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos" as requiring the claimed camera controller to perform two separate and independent operations: (1) "finding translations between matching points in the images to calculate depth information" and (2) "creating a fused image suited for portrait photos." APPL-1003, ¶35.

## VII.    REQUESTED RELIEF

Petitioner requests that the Board institute *inter partes* review of claims 19-22 of the '479 Patent and cancel each of those claims as unpatentable.

## VIII.   OVERVIEW OF CHALLENGES

### A.    Challenged Claims

Claims 19-22 of the '479 Patent are challenged.

### B.    Statutory Grounds for Challenges

| Ground | Claims | Basis |
|--------|--------|-------|
| 1 | 19-20 | Obvious under § 103 over Parulski, Ogata, Kawamura, and Soga |
| 2 | 21-22 | Obvious under § 103 over Parulski, Ogata, |

| | | Kawamura, Soga, and Morgan-Mar |
|---|---|---|

Parulski (APPL-1005) issued on December 28, 2010, Ogata (APPL-1026) issued on August 13, 1996, Kawamura (APPL-1012) published on April 14, 1983, and Soga (APPL-1006) published on October 4, 2007, and are all prior art under 35 U.S.C. § 102(a)(1).

Morgan-Mar (APPL-1009) was filed on November 13, 2013 and claims priority to AU Patent Application No. 2012258467 filed December 3, 2012. According to Morgan-Mar's file history (APPL-1008), the application was filed in English (*see id.*, pp.173-234) and a certified copy of the foreign application was received by the Patent Office (*see id.*, pp.48-108). Morgan-Mar is therefore prior art under 35 U.S.C. § 102(a)(2) as of its AU filing date.

### C.    Discretionary Denial is Not Warranted

The Board should not exercise its discretion under 35 U.S.C. §§ 314(a) or 325(d) to deny this Petition. Among other factors, none of the asserted prior art was cited during examination, and as the Examiner raised no arguments during prosecution, there is no "overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art." Becton, Dickinson and Company v. B. Braun Melsungen AG, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential). Further, the '479 Patent has not been challenged in any prior IPR petition. None of discretionary institution factors 1–5 in General

- 11 -

Plastic apply to this Petition. See General Plastic Indus. Co., Ltd. v. Canon

Kabushiki Kaisha, IPR2016-01357, Paper 19 at 16 (PTAB Sept. 6, 2016) (Section

II.B.4.i. precedential).

### D.    Page Citations and Emphasis

For exhibits that include suitable page, column, or paragraph numbers in

their original publication, Petitioner's citations are to those original numbers and

not to the page numbers added for compliance with 37 CFR 42.63(d)(2)(ii). The

Petition may bold or italicize quotations and add color or colored annotations to

figures from exhibits for emphasis.

## IX.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A.    Ground 1: Claims 19 and 20 are obvious over the combination of Parulski, Ogata, Kawamura, and Soga.

#### 1.    *Summary of Parulski*

U.S. Patent No. 7,859,588 to Parulski, et al. ("Parulski") was filed on March

9, 2007 and issued on December 28, 2010. *See* APPL-1005. Parulski is titled

"Method and Apparatus for Operating a Dual Lens Camera to Augment an Image,"

and discloses "a digital camera that uses multiple lenses and image sensors to

provide an improved imaging capability." *Id.*, 1:8-10.

Parulski describes several embodiments that can utilize its dual-capture

enhancement methods. *Id.*, 12:55-13:20. An example of the camera embodiment is

below:

- 12 -



*Id.*, Figs. 2A-2B. Parulski describes this embodiment as an "image capture assembly l0A" that includes "first zoom lens 3" and a "second zoom lens 4." *Id.*, 12:55-59. The camera also includes "a color LCD image display 70 and a number of user controls 42, including a shutter button 42a for enabling an image capture sequence …." *Id.*, 12:60-62.

In this camera embodiment, "[t]he optical axes of the zoom lenses 3 and 4 and the sensors 12 and 14 are generally aligned with respect to each other so as to be viewing substantially the same scene, albeit typically with different fields of view." *Id.*, 13:6-9. An extended zoom range is provided by "digital zooming between the wide angle and the telephoto focal lengths." *Id.*, 23:54-58. As an alternative, Parulski states that "**one (or both) of the zoom lenses 3 and 4 could be replaced with a fixed focal length lens**." *Id.*, 13:4-6. Reference herein to "Parulski's camera" is to the embodiment that includes fixed-focal-length wide and telephoto lenses.

Parulski teaches that its camera embodiment may operate in still and video

- 13 -

modes to produce "still images and motion video images." *Id.*, 12:36-41; *see also id.*, 14:5-9 ("The digital data ... is ... processed by the image processor 50 to produce a processed digital image file, which may contain a still digital image or a video image."); *Id.*, 29:8-11 ("the images captured by the primary and secondary capture units could be a still image or a video image, and in the case of a video image could be a series of images.").

Parulski also describes several digital zoom features for its camera based on a requested zoom position from a user that determines the primary image and secondary image from two capture units of the digital camera based on the user requested zoom position. *Id.*, FIG. 23, 27:8-24, 29:51-64. If the requested zoom position is less than a zoom switch value X, the first image station with a wide lens is set as primary capture unit for providing a primary image, and the second image station with a tele lens is set as a secondary capture unit for providing a secondary image. *Id.*, Figs. 3, 14, 23, 22:18-21 ("In block 502, the zoom position setting is compared to a value X at which the image capture function switches" between first/second image capture units), 15:54-61 ("In block 102, the zoom position setting is compared to a value X at which the image capture function switches from the first image capture stage to the second image capture stage. In block 104, if the zoom position setting is less than X (a negative response to block 102), then the first image capture stage 1 is used [as the primary image capture stage]"), 27:8-15

- 14 -

(if the requested zoom position is not within the zoom range of the current primary capture unit for providing a primary image, "the functions of the capture units are reversed," where the current scene analysis unit for providing a secondary image and the current primary capture unit for providing the primary image are "reset to be the primary capture unit and scene analysis capture unit, respectively.").

Parulski also teaches several image enhancement processes performed using the primary and secondary images. First, as shown in Fig. 11, Parulski teaches that a range map (i.e., depth map) can be created using the two images by correlating the secondary image with a "cropped and upsampled [primary] image to **determine the pixel offset between the images for different portions of the images**." *Id.*, 20:9-11. The pixel offset information produces a "disparity map" (i.e., a registration map) of pixel offset information, that is in turn used to produce a range map or depth map. *See id.*, 19:55-58 ("a method for producing a rangemap or depth map from a disparity map produced from the pixel offset information for a set of images captured by multiple cameras with similar fields of view"). The pixel offsets are "**converted in block 482 to distances from the image capture device** using the autofocus rangefinder calibration curve. **A map is then produced in block 484 showing the distances to different portions of the images**." *Id.*, 20:11-15. Parulski's Fig. 11 showing its depth map creation process is below:



**FIG. 11**

*Id.*, Fig. 11.

Second, Parulski teaches image enhancement techniques by using an image from one of the lens systems to enhance the image from the other lens system. This is discussed in regard to Figure 14:

> [I]n block 514, the secondary still image is used to enhance the depth of field of the primary image, for instance, where the secondary still image is used to provide an enhancement signal **that can be used to sharpen portions of the primary still image that are positioned near the secondary focus distance**.

*Id.*, 22:37-45. This process is further discussed later in Parulski where one way of sharpening portions of the primary image positioned near the secondary focus distance is to fuse those focused portions of the secondary image with the

- 16 -

corresponding portions of the primary image. *Id.*, 28:47-53 ("Then, the two images are combined into a modified image with a broadened depth of field.").

In sum, Parulski teaches a dual-lens camera system for capturing primary and secondary images at different focal lengths with overlapping fields of view (FOVs) and then processing the images (1) to create a depth map and (2) to create an enhanced image using portion of images from both lens systems. APPL-1003, ¶43.

### 2. *Summary of Kawamura*

Kawamura is titled "Telephoto Lens" and describes a "telephoto lens of a four-group, five-lens configuration." APPL-1012, p.1. Kawamura's telephoto lens system is designed to "provide a lens that keeps a compactness of an overall length to a conventional level of a telephoto ratio of about 0.96 to 0.88" and "has an excellent image-formation performance due to favorably correcting spherical aberration of both a reference wavelength and color" while "decreasing chromatic aberration in magnification." *Id.*

Kawamura provides several embodiments (Examples 1-4) that each include five lens elements. *See id.*, p.1, Figs. 1, 3, 6, 8. In each embodiment, the telephoto lens system includes a four-group, five-lens configuration including:

> in order from an object side, a first lens, which is a positive meniscus lens that is convex toward the object side; a second lens and a third lens, which are a laminated positive

- 17 -

meniscus lens of a negative meniscus lens and positive meniscus lens having a lamination surface that is convex toward the object side; a fourth lens, which is a negative lens having a rear surface with a large curvature that is concave toward an image-surface side; and a fifth lens, which is a positive lens.

*Id.*

For Examples 1-4, Kawamura provides figures and a prescription table including numerical values for the design. As an example, FIG. 1 and corresponding table of example 1 are reproduced below:



APPL-1003, ¶46; APPL-1012, Fig. 1 (annotated).

Example 1

1 : 4.1   F = 200.079   ω = 12.3°

| NO. | r | d | N | ν |
|---|---|---|---|---|
| 1 | 57.091 | 9.00 | 1.60311 | 60.7 |
| 2 | 330.000 | 0.20 | | |
| 3 | 45.039 | 4.00 | 1.67270 | 32.1 |
| 4 | 33.450 | 9.60 | 1.48749 | 70.1 |
| 5 | 81.000 | 3.50 | | |
| 6 | 387.380 | 3.00 | 1.57501 | 41.5 |
| 7 | 34.361 | 41.80 | | |
| 8 | 146.228 | 4.34 | 1.74950 | 35.3 |
| 9 | 552.040 | | | |

d7
a largest distance between consecutive lens elements along the optical axis

$F_{1 \cdot 2 \cdot 3}$ = 74.912

$F_{1 \cdot 2 \cdot 3 \cdot 4}$ = 356.466

$d_1 + d_2 + d_3 + d_4 + d_5 + d_6$ = 29.3

APPL-1003, ¶46; APPL-1012, p.3 (Table for Example 1) (annotated).

While Kawamura was originally described as a 150-200 mm focal length (*see* APPL-1012, p.1), a POSITA would have recognized that, given the prescription data above, the design could have been scaled to work in a smaller format such as to support digital image sensors that were more modern than when Kawamura published in 1983. *See* APPL-1021, ¶43; APPL-1020, p.57. According to Smith: "A lens prescription can be scaled to any desired focal length simply by multiplying all of its dimensions by the same constant." APPL-1026, p.57.

Based on Smith and as shown in Dr. Sasián's declaration, a POSITA would have recognized that Kawamura could be successfully scaled for a 1/2.5" image

- 19 -

sensor, as would have been compatible with image sensors that Parulski would

have considered for use in its camera embodiments. APPL-1021, ¶44; *see* APPL-

1005, 5:21-35 (indicating that the Kodak Easyshare V610 is a similar prior art

camera); APPL-1033, p.62 (indicating a 1/2.5" CCD image sensor in the V610

camera), APPL-1030 (specification sheet for a prior art 1/2.5" CCD sensor);

APPL-1029 (specification sheet for a prior art 1/2.5" CCD sensor).

Kawamura scaled in this way would have maintained the same field of view

($FOV_W$) of 24.3 degrees and f-number of 4.0 but would have had a lower focal

length (EFL) of 16.33 mm and total track length (TTL) of 15.343 mm as a result of

the scaling. APPL-1021, ¶45. A POSITA would have recognized that this could

have been done in lens design software such as Zemax, as indicated in the model

of Kawamura Example 1 scaled to support a 1/2.5" mm sensor, shown below:



*Id.*; *see* APPL-1022, pp.254-55.

### 3. Reasons to combine Parulski and Kawamura

A POSITA would have combined Kawamura's telephoto lens assembly with Parulski's fixed-focal-length camera embodiments since such a combination would have been nothing more than using known methods to incorporate Kawamura's lens assembly as the telephoto portion of Parulski's fixed-focal-length dual-lens camera. APPL-1003, ¶50. Such a combination would have been understood to achieve the same predictable result, as described in Parulski, of a fixed-focal-

length telephoto lens assembly included in a dual-lens camera device. A POSITA

would have been motivated to incorporate Kawamura's telephoto lens assembly in

Parulski's cameras for several reasons. *Id.*

First, Parulski does not indicate lens prescription data for either the wide or

telephoto fixed-focal-length lens systems in its camera embodiments. *Id.* Instead,

in a different fixed-focal-length embodiment, Parulski provides that "[t]he first lens

612, preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens)"

and "the second lens 616, preferably fixed focal length telephoto lens (such as 100

mm equiv. lens) …." APPL-1005, 23:36-41.

Since Parulski offers nothing more, a POSITA looking to implement the

fixed-focal-length camera embodiment would have sought a suitable telephoto lens

assembly to incorporate in its camera. APPL-1003, ¶52. For this reason alone, a

POSITA would have looked to telephoto lens assemblies like Kawamura's, which

provides not only a fixed-focal-length telephoto lens as indicated by Parulski, but

also provides lens data that specifies the properties and configuration that teaches a

POSITA how to construct a telephoto lens unit. *Id.* While Parulski offers 40 mm

and 100 mm as optional equivalent focal lengths, a POSITA would have

recognized that the preceding language as indicating that the two have differing

fields of view and the "such as" means that these are examples of this difference

and not requirements. *Id.*

- 22 -

Moreover, a POSITA would have recognized that Kawamura's telephoto lens assembly is just one possible option to implement the telephoto-side of Parulski's fixed-focal-length embodiments since Kawamura's Example 1 is a telephoto lens assembly design for obtaining photographic images. APPL-1003, ¶53; *see* APPL-1012, p.1.

Second, a POSITA would have understood that Parulski's discussion on 40 mm and 100 mm focal lengths is in the context of lenses for 35 mm photography, where a telephoto lens with 100 mm focal length would have a HFOV of about 12 degrees. APPL-1003, ¶54. This value can be calculated by first determining the diagonal measurement for the 35 mm format, which has a standard dimension of 24 mm × 36 mm, as evidenced by Smith. APPL-1020, p.26. The diagonal of a 35 mm camera can be calculated as:

$$diagonal = \sqrt{(24 * 24) + (36 * 36)} = 43.27 \, mm$$

APPL-1003, ¶54. This value can then be used to find the HFOV with the following equation derived from Katz. *See* APPL-1019, p.107:

$$HVOF = \, arctan\left(\frac{diagonal}{2}/(focal \; length)\right)$$

APPL-1003, ¶54. A diagonal of 43.27 mm and a focal length of 100 mm, results in a **HFOV of 12.21 degrees** for a 35 mm lens. *Id.* A POSITA would have thus recognized that Kawamura's telephoto lens scaled for a 1/2.5" sensor with a

similar HFOV of about 12 degrees satisfies Parulski's example for a telephoto lens. *Id.*; *see* APPL-1021, ¶45.

Thus, a POSITA would have been motivated to incorporate Kawamura's telephoto lens assembly in Parulski's fixed-focal-length camera embodiments and would have reasonably expected success in doing so since Parulski describes using fixed-focal-length telephoto lens assemblies and Kawamura teaches a fixed-focal-length telephoto lens that meets Parulski's field of view examples for a telephoto lens. *Id.*, ¶55. Such a combination would have beneficially met Parulski's stated need for a telephoto lens assembly in its dual-lens camera and such incorporate would have been within the knowledge and skill of a person of ordinary skill. *Id.*

### 4.    *Summary of Ogata*

Ogata describes [a] wide-angle photographic lens system comprising a front lens unit having a positive refractive power, an aperture stop and a rear lens unit having a positive refractive power or a negative refractive power …." APPL-1026, Abstract. Ogata's photographic lens system "has a short total length (a length as measured from first surface to an image side surface of the lens system and … is suited for use with collapsible mount type cameras." *Id.* An example of Ogata's lens assembly is provided below:



*Id.*, Fig. 1.

In addition to providing a short total length, Ogata asserts that the benefit of this lens design is that it "a high aperture ratio and excellent optical performance …." *Id.*, 3:4-5. A table showing the prescription data for Ogata's Embodiment 1 is provided below:

Embodiment I

$f = 35.0$, $f_B = 26.1$, F/2.9, $2\omega \approx 63.4°$
$r_1 = 14.1000$

|  |  |  |  |
|---|---|---|---|
|  | $d_1 = 3.700$ | $n_1 = 1.79952$ | $v_1 = 42.24$ |
| $r_2 = 47.5750$ |  |  |  |
|  | $d_2 = 1.800$ |  |  |
| $r_3 \approx -81.2140$ |  |  |  |
|  | $d_3 = 1.000$ | $n_2 = 1.76182$ | $v_2 = 26.52$ |
| $r_4 = 12.0220$ (aspherical surface) |  |  |  |
|  | $d_4 = 1.000$ |  |  |
| $r_5 = 55.8920$ |  |  |  |
|  | $d_5 = 3.000$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = -11.3420$ |  |  |  |
|  | $d_6 = 1.000$ | $n_4 = 1.53172$ | $v_4 = 48.90$ |
| $r_7 = -106.9860$ |  |  |  |
|  | $d_7 = 1.000$ |  |  |
| $r_8 = \infty$ (stop) |  |  |  |
|  | $d_8 = 2.000$ |  |  |
| $r_9 = -10.4990$ |  |  |  |
|  | $d_9 = 1.500$ | $n_5 = 1.51633$ | $v_5 = 64.15$ |
| $r_{10} = -9.0360$ (aspherical surface) |  |  |  |

aspherical surface coefficients

(4th surface)    $P = 1.0396$, $A_4 = 0.66373 \times 10^{-4}$
        $A_6 = 0.13983 \times 10^{-5}$, $A_8 = -0.97157 \times 10^{-8}$
        $A_{10} = 0.42114 \times 10^{-9}$
(10th surface)    $P = 1.3037$, $A_4 = 0.44302 \times 10^{-4}$
        $A_6 = -0.17498 \times 10^{-5}$, $A_8 = 0.10177 \times 10^{-6}$
        $A_{10} = -0.17446 \times 10^{-8}$
$D_R/f = 0.043$.; $f_R/f = 2.660$, $(R_{2a} - r_{3b})/(r_{2a} + r_{2b}) = 1.347$,
$N_p = 1.717$, $r_{1a}/r_{2b} = 1.173$, $(r_{1b} - r_{2a})/r_{1b} + r_{2a}) = -3.829$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -3.188$

*Id.*, 7:35-61.

While Ogata was originally described in reference to a "collapsible mount type camera" with a 35 mm focal length, a POSITA would have recognized that, given the prescription data above, the design could be scaled to work in a smaller format such as to support digital image sensors that were more modern than when Ogata issued in 1996. See APPL-1021, ¶37; APPL-1020, p.57. As discussed above, Smith states that "A lens prescription can be scaled to any desired focal length simply by multiplying all of its dimensions by the same constant." APPL-1026, p.57.

Based on Smith and as shown in Dr. Sasián's declaration, a POSITA would

- 26 -

have recognized that Ogata could have been successfully scaled for a 1/2.5" image sensor, as would have been compatible with image sensors that Parulski would have considered for use in its camera embodiments. APPL-1021, ¶38; *see* APPL-1005, 5:21-35 (indicating that the Kodak Easyshare V610 is a similar prior art camera); APPL-1033, p.62 (indicating a 1/2.5" CCD image sensor in the V610 camera), APPL-1030 (specification sheet for a prior art 1/2.5" CCD sensor); APPL-1029 (specification sheet for a prior art 1/2.5" CCD sensor).

Ogata scaled in this way would have maintained the same field of view (FOV$_W$) of 63.4 degrees and f-number of 2.9 but would have had a lower focal length (EFL) of 5.72 mm and total track length (TTL) of 6.892 mm as a result of the scaling. APPL-1021, ¶39. A POSITA would have recognized that this could have been done in lens design software such as Zemax, as indicated in the model of Ogata Embodiment 1 scaled to support a 1/2.5" mm sensor, shown below:



*Id.*; *see* APPL-1022, pp.254-55.

### 5.    *Reasons to combine Parulski and Ogata*

A POSITA would have incorporated a lens design like Ogata's as the wide-angle lens assembly in Parulski's fixed-focal-length camera embodiments. APPL-1003, ¶61. Such a combination would have been nothing more than using known methods to incorporate Ogata's and Parulski's teaching to yield the predictable result of Ogata's fixed-focal-length wide-angle lens assembly in Parulski's fixed-focal-length camera device. *Id.* A POSITA would have been motivated to make

- 28 -

this combination for several reasons. *Id.*

First, Parulski does not indicate lens prescription data for either the wide or telephoto fixed-focal-length lens systems in its camera embodiments. *Id.*, ¶62. Instead, in a different fixed-focal-length embodiment, Parulski provides that "[t]he first lens 612, preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens)" and "the second lens 616, preferably fixed focal length telephoto lens (such as 100 mm equiv. lens) …." APPL-1005, 23:36-41.

Since Parulski offers nothing more, a POSITA looking to implement the fixed-focal-length camera embodiment would have sought a suitable wide-angle lens assembly to incorporate in the camera. *Id.*, ¶63. For this reason alone, a POSITA would have looked to telephoto lens assemblies like Ogata's, which provides not only a fixed-focal-length wide-angle lens as indicated by Parulski, but also provides lens data that specifies the properties and configuration that teaches a POSITA how to construct a wide-angle lens unit. *Id.*

Second, a POSITA would have understood that Parulski's discussion on focal length is in the context of lenses for 35 mm photography, where a wide-angle lens with 40 mm focal length would have a HFOV of about 28 degrees. APPL-1003, ¶68. As discussed above, this value can be calculated using the formula:

$$HVOF = \ arctan\left(\frac{diagonal}{2}/(focal\ length)\right)$$

*Id.* With a diagonal of 43.27 mm and a focal length of 40 mm, **<u>HFOV = 28.40</u>**

**degrees** for a 35 mm lens. *Id.*; *see* APPL-1019, p.107. A POSITA would have understood Ogata's wide-angle lens scaled for a 1/2.5" image sensor having a similar HFOV of 31.7 degrees to be compatible with Parulski's example of a wide-angle lens, based on the similarity between the fields of view of the lenses. APPL-1021, ¶39; *see also* APPL-1005, 23:23-43; APPL-1026, 7:35-38.

Thus, a POSITA would have been motivated to incorporate Ogata's fixed-focal-length wide-angle lens assembly in Parulski's fixed-focal-length embodiments and would have reasonably expected success in doing so since Parulski and Ogata address fixed-focal-length wide-angle lenses requiring similar fields of view and Ogata meets Parulski's need for wide-angle lenses with reduced thickness suitable for incorporation in a portable camera. APPL-1003, ¶65. Such a combination would have beneficially met Parulski's stated need for a wide-angle lens assembly in its dual-lens camera and such incorporation would have been within the knowledge and skill of a person of ordinary skill. *Id.*

### 6.    *Summary of Soga*

Soga is directed to a "Photographic Device" that "obtain[s] an image having similar bokeh to an image photographed by a silver halide camera." APPL-1006, Title, Abstract. A silver halide camera takes "an image of a subject into **a silver halide film**," where a digital camera is "an electronic camera having electronic

- 30 -

image pickup devices for transforming an image of subject into electrical signals."

APPL-1014, 1:12-15.

According to Soga, "when the same subject is photographed by a digital camera, in contrast to the conventional photographic image from the silver halide camera, an image is obtained [] where the background and a principal subject all in focus, **without a blurred background**." APPL-1006, ¶5. This is because of "a size of a photosensitive surface of an imaging element" in a digital camera "is considerably smaller than a size of a photosensitive surface of film (for example, 24 mm × 36 mm in 35 mm film)" in a silver halide camera. *Id.*

To address this issue, Soga teaches obtaining "a first photographic image, which is focused on the principal subject, and a second photographic image, which is more on a wide-angle side than the first photographic image and is focused at a shorter distance than a distance to the principal subject," and generating a composite image "by cutting out the principal subject in the first image and replacing a region of the second image identical to the principal subject cut out from the first image with this principal subject cut out from the first image." *Id.*, claims 1, 2; *see also id.*, ¶31.

This process is illustrated in annotated Figure 4(a) of Soga (below), where Soga describes that in a first round, "a first image is obtained that is **focused on a principal subject**," for example, a flower, and "in a second round, **a second image**

- 31 -

**is obtained that is focused at a shorter distance than the principal subject**."

*Id.*, ¶¶ 65-66. Soga also provides that the second image "is **more wide-angle than the first image**," and "has the **principal subject and a background blurred**." *Id.*, ¶65. In other words, Soga teaches that the first image has a narrower FOV than the second image, which is more wide-angle.



APPL-1003, ¶68; APPL-1006, Fig. 4(a) (annotated).

As shown in annotated Figure 4(b) of Soga (below), Soga describes compositing the first and second images to obtain "an image having similar bokeh to an image photographed by a silver halide camera." APPL-1006, ¶66. In the composite image, "a focused image is obtained as the principal subject" from the first image, and "a blurred image (indicated by the diagonal lines) is obtained as the background" from the second image. *Id.* As a result, the composite image that

- 32 -

"has a focused principal subject but a blurred background becomes an image that is close to an image photographed by a silver halide camera." *Id.*, ¶¶ 67-68.



APPL-1003, ¶69; *Id.*, Fig. 4(b) (annotated).

### 7.    *Reasons to Combine Parulski and Soga*

A POSITA would have been motivated to apply Soga's teachings of generating an output image with a shallow DOF to Parulski's cell phone camera to achieve the same benefit taught in Soga of generating an "aesthetic [] bokeh" image in "a photographic device equipped with an imaging element of a small area." APPL-1003, ¶71; *see also* APPL-1006, ¶¶ 2,7. A POSITA would have understood that applying Soga's teaching of compositing (1) an image having a narrower FOV that is focused on a principle subject with (2) a more wide-angle image that is focused at a shorter distance than the distance to the principle subject

- 33 -

would likewise produce an "aesthetic [] bokeh" image when applied to Parulski's device. *Id.*

First, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating an improved output image using two images of the same scene. *Id.*, ¶72. Parulski discusses using the "secondary output image for modifying the primary output image, thereby generating an enhanced primary image signal." APPL-1005, 12:14-16. Similarly, Soga discusses generating "an image having similar bokeh to an image photographed by a silver halide camera" using two images "of the same subject." APPL-1006, ¶¶ 7-8.

Second, a POSITA would have been motivated to incorporate the teachings of Soga in Parulski's digital camera system, because Parulski provides the benefit of capturing images having different focus distances from two image sensors simultaneously. APPL-1003, ¶73. For example, Parulski teaches capturing "a first (i.e., primary) still image [captured] **at a first (i.e., primary) focus distance**" and "**simultaneously capture** a second (i.e., secondary) still image **at a second (i.e., secondary) focus distance**," and using the "secondary output image for modifying the primary output image, thereby generating an enhanced primary image signal." APPL-1005, 12:6-13. A POSITA would have recognized that by applying the teachings of Soga (which is implemented using a zoom lens to capture the two

images at different focus positions) to Parulski where the two images are captured by two image sensors simultaneously, "complexities in the image processing are reduced since differences between the two images due to motion of the camera or motion within the scene are avoided," and "slow response that is typical of an optical zoom system when traversing a large zoom range" is avoided. APPL-1003, ¶73; *see also* APPL-1011, ¶15 ("By capturing images from **the two image sensors substantially simultaneously, complexities in the image processing are reduced** since differences between the two images due to motion of the camera or motion within the scene are avoided. It is an additional advantage, that the present invention can **avoid the slow response that is typical of an optical zoom system** when traversing a large zoom range.").

Third, a POSITA would have been motivated to incorporate the teachings of Parulski and Soga because they share a need for controlling depth of field. APPL-1003, ¶74. For example, in reference to FIG. 14, Parulski teaches "**enhancing the depth of field** of an image by using images from both image capture stages" setting to "a primary focus position" and a "secondary focus position" respectively, where "the secondary still image is used to provide **an enhancement signal that can be used to sharpen portions of the primary still image** that are **positioned near the secondary focus distance**." APPL-1005, 22:14-42. Similarly, Soga teaches generating an image "that has a focused principal subject but a blurred

background [which] becomes an image that is close to an image photographed by a silver halide camera," which has a shallow depth of field. APPL-1006, ¶67; *see also* APPL-1009, 1:19-33 (explaining that a narrow depth of field provides "aesthetic quality of background blur … known as bokeh."). As such, a need for, or goal of controlling depth of field is shared by Parulski and Soga, and provides at least one reason to combine the respective teachings. APPL-1003, ¶74.

Importantly, a POSITA would have understood that enhancing a depth of field may provide shallower depth of field (e.g., for portrait photo) or extended depth of field (e.g., for landscape photo). *Id.*, ¶75; *see, e.g.*, APPL-1005, 21:12-31 (describing shallower depth of field to "emphasize the dog" sitting in the foreground where "the mountains and the flowers [] can be blurred [and the dog] is sharpened, and describing extended depth of field where "the dog is in focus, the mountains are in focus and so are those great flowers"); APPL-1009, pp.1,7 (explaining that control over depth of field "is one of the principal artistic tools available to photographers," and providing techniques for "reduced depth of field" to "create an SLR-like depth of field … that would accentuate out-of-focus blur" or "extended depth of field"); APPL-1029 (Bae), p.1 (explaining that "shallow depth of field is often desired for photographs such as portraits" and "larger depth field [] can be desirable, for example in landscape or macro photography").

Fourth, a POSITA would have been motivated to apply Soga's teachings of generating a shallow DOF output image by compositing a narrower-FOV image and a more wide-angle image having different focuses, without the necessity of an accurate range map/depth map, in the digital camera of Parulski to achieve the benefit of an "aesthetic [] bokeh" image in a compact digital camera without the necessity of an accurate depth map as taught by Soga. APPL-1003, ¶76; *see also* APPL-1006, ¶¶ 2, 5; APPL-1005, 20:50-65 (explaining that "range map is then used to modify the captured image signal … to enable dynamic depth of field images by blurring of portions of the image that correspond to areas of the scene that lie outside of the desired depth of field"); APPL-1009, p.2 (explaining that photographic blur that is achieved by compositing two images with different focus distances without the necessity of an accurate depth map, as taught by Soga, "guarantees a consistent defocus blur **regardless of depth map accuracy**," while "synthetic blur" using a single image based on range map, as described in Parulski, can "fail[] to capture subtle details that are naturally present in photographic (physically produced) blur" and relies on depth map accuracy).

Fifth, combining Soga's teachings with the system of Parulski would have produced operable results that are predictable. APPL-1003, ¶77. Specifically, combining Soga's teachings in Parulski's cell phone camera would have been no more than the combination of known elements according to known methods. *Id.*

For example, implementing Soga's method would have merely meant configuring Parulski's controller so that the primary (wide) and secondary (tele) image sections focus at particular distances and then generating a composite image by replacing portions of the primary image (wide image) with corresponding focused principle subject of secondary image (tele image). *Id.* This would have been obvious to a POSITA at the time of the '479 Patent to enhance Parulski's device to achieve the same benefit as taught in Soga of an "aesthetic [] bokeh image" in a compact camera by combining two images, without the necessity of an accurate depth map as required by Parulski. *Id.*; *see* APPL-1006, ¶2. As discussed above, with reference to FIG. 14, Parulski teaches a similarly controlling zooming of the wide and telephoto lenses for combining images at different focal positions to broaden the depth of field. *See* APPL-1005, 28:47-57. A POSITA thus would have known how to control zooming in Parulski to also implement Soga's fusion method to combine portions of the primary and secondary images to narrow the depth of field. APPL-1003, ¶78; *See* APPL-1005, Fig. 14, 22:14-42; APPL-1006, Fig. 3, ¶¶ 57-63.

As set forth below, the combination of Parulski, Ogata, Kawamura, and Soga renders claims 19-20 obvious. A claim chart corresponding to the analysis below is contained in Dr. Durand's expert declaration. *See* APPL-1003, pp.48-75.

### 8.    *Claim 19*

**[19.0] "A dual-aperture digital camera for imaging an object or scene, comprising:"**

Parulski discloses [1.0] because it teaches a camera embodiment that includes an "image capture assembly l0A" having a "first zoom lens 3" and a "second zoom lens 4." APPL-1005, 12:56-58. The camera is shown in Figs. 2A-2B, below:



*Id.*, Figs. 2A-2B.

In Parulski's camera "[t]he optical axes of the zoom lenses 3 and 4 and the sensors 12 and 14 are generally aligned with respect to each other so as to be viewing substantially the same scene, albeit typically **with different fields of view**." *Id.*, 13:6-9. An extended zoom range is provided by "digital zooming between the wide angle and the telephoto focal lengths." *Id.*, 23:54-58. As an

alternative, Parulski states that "**one (or both) of the zoom lenses 3 and 4 could be replaced with a fixed focal length lens**." *Id.*, 13:4-6.

Reference herein to "Parulski's camera" is to the embodiment that includes fixed-focal-length wide and telephoto lenses.

### [19.1] "a) a Wide camera comprising a Wide lens and a Wide image sensor, the Wide camera having a respective field of view FOV_W and being operative to provide a Wide image of the object or scene;"

The combination of Parulski and Ogata renders [19.1] obvious. APPL-1003, p.50. First, as discussed above in [19.0] Parulski teaches using fixed-focal-length Wide and Telephoto lens assemblies in a dual-aperture camera format. *Id.* Second, Ogata teaches a fixed-focal-length lens assembly used for capturing a photographic image since it "relates to a photographic lens system suited for use with lens shutter cameras" and "a wide-angle photographic lens system which has an F number on the order of 2.8 or a high aperture ratio and high optical performance." APPL-1026, 1:14-16.

As discussed in the "Reasons to combine Parulski and Ogata," a POSITA would have recognized that Ogata could be scaled to work with smaller image sensor formats like the image sensors that would have been used by Parulski's camera. APPL-1021, ¶38; *see* APPL-1005, 5:21-35 (indicating that the Kodak Easyshare V610 is a similar prior art camera); APPL-1033, p.62 (indicating a 1/2.5" CCD image sensor in the V610 camera), APPL-1030 (specification sheet for

a prior art 1/2.5" CCD sensor); APPL-1029 (specification sheet for a prior art 1/2.5" CCD sensor).

Scaling Ogata in this way maintains the same f-number, field of view, and performance. APPL-1021, ¶39. Ogata scaled has a TTL of 6.892 mm and a focal length (EFL) of 5.72 mm while maintaining the same field of view of 63.4 degrees and f-number of 2.9. *Id.* Ogata scaled to support a 1/2.5" image sensor is provided below:



*Id.*

A POSITA would have understood that Ogata scaled in this way is a "Wide" lens assembly because it has a $FOV_W$ of 64 degrees, and a focal length (EFL) of 5.72 mm and a total track length (TTL) of 6.892 mm, thus yielding an EFL/TTL ratio of 0.830, which, consistent with the '479 Patent, is less than one for a Wide lens. APPL-1003, p.52; APPL-1021, ¶39.

Thus, Parulski's camera combined with Ogata's wide-angle lens renders [19.1] obvious.

### [19.2] "b) a Tele camera comprising a Tele lens and a Tele image sensor, the Tele camera having a respective field of view $FOV_T$ narrower than $FOV_W$ and being operative to provide a Tele image of the object or scene, wherein the Tele lens has a respective effective focal length $EFL_T$ and total track length $TTL_T$ fulfilling the condition $EFL_T / TTL_T > 1$;"

The combination of Parulski and Kawamura renders [19.2] obvious. *Id.* First, as discussed above in [19.0] Parulski teaches using fixed-focal-length Wide and Telephoto lens assemblies in a dual-aperture camera format. *Id.* Second, Kawamura teaches telephoto lens "that keeps a compactness of **an overall length to a conventional level of a telephoto ratio of about 0.96 to 0.88** but has an excellent image-formation performance due to favorably correcting spherical aberrations of both a reference wavelength and color and also decreasing chromatic aberration in magnification." APPL-1012, p.1.

As discussed in the "Reasons to combine Parulski and Kawamura," a POSITA would have recognized that Kawamura could be scaled to work with

- 42 -

smaller image sensor formats like the image sensors that would have been used by Parulski's camera. APPL-1021, ¶44; *see* APPL-1005, 5:21-35 (indicating that the Kodak Easyshare V610 is a similar prior art camera); APPL-1033, p.62 (indicating a 1/2.5" CCD image sensor in the V610 camera), APPL-1030 (specification sheet for a prior art 1/2.5" CCD sensor); APPL-1029 (specification sheet for a prior art 1/2.5" CCD sensor).

Scaling Kawamura in this way maintains the same f-number, field of view, and performance. APPL-1021, ¶45. Kawamura scaled has a TTL of 15.343 mm and a focal length (EFL) of 16.33 mm while maintaining the same f-number of 4.0 and field of view ($FOV_T$) of 24.6 degrees. *Id.* **Kawamura's field of view ($FOV_T$) of 24.6 degrees is narrower than the $FOV_W$ of 63.4 degrees provided by Ogata's wide-angle lens**. APPL-1003, p.54-55. Kawamura scaled to support a 1/2.5" image sensor is provided below:

- 43 -



*Id.*

A POSITA would have understood that Kawamura scaled in this way is a "Tele" lens assembly because it has a narrower field of view than Ogata's wide lens, and a focal length (EFL) of 16.33 mm and a total track length (TTL) of 15.343 mm, yielding an EFL/TTL ratio of 1.064, which, consistent with the '479 Patent, is greater than one for a Tele lens. APPL-1003, pp.54-55.

Thus, Parulski's camera combined with Kawamura's telephoto lens renders [19.2] obvious.

- 44 -

**[19.3] "c) a first autofocus (AF) mechanism coupled mechanically to, and used to perform an AF action on the Wide lens;"**

**[19.4] "d) a second AF mechanism coupled mechanically to, and used to perform an AF action on the Tele lens; and"**

Parulski discloses [19.3]-[19.4] because it teaches providing respective autofocus mechanisms for the Wide and Tele lens systems in its camera embodiments. *Id.*, p.55.

First, in reference to a similar fixed-focal-length cell phone embodiment, Parulski teaches including an autofocus mechanism for both wide and telephoto lens assemblies and using a focus detection signal generated by one lens system to adjust focus on the other:

> In an embodiment according to the present invention, **where both lenses 612 and 616 are adjustable focus lenses**, the image processor 50 either (a) selects the sensor output from the wide angle lens 612 as the captured image signal and **uses the sensor output from the telephoto lens 616 to generate a focus detection signal for the wide angle lens 612** or (b) selects the sensor output from the telephoto lens 616 as the captured image signal and **uses the sensor output from the wide angle lens 612 to generate the focus detection signal for the telephoto lens 616**. **The focus detection signal is then applied to the autofocus subsystem 628** of the telephoto lens 616 in

- 45 -

order to adjust the focus of the image providing the sensor

output for the captured image signal.

APPL-1005, 23:62-24:7.

Based on this description, a POSITA would have understood that each lens system has a respective autofocus mechanism that is mechanically coupled to the lens so that a "focus detection signal" can adjust the focus of the lens automatically. APPL-1003, p.56. While the example above is specific to adjusting the focus of the telephoto lens using a focus detection signal from the wide sensor, a POSITA would have understood that the same would be true for adjusting the autofocus of the wide lens since, as disclosed above, a focus detection signal is likewise generated for the wide lens. *Id.*

Second, with reference to Figure 14, Parulski teaches an image enhancement method that includes automatically adjusting focus for each lens. *Id.* Specifically, Parulski states that:

> Should the zoom button not be pressed (negative response to block 508), and when the shutter button 42a is pressed, a primary still image is captured in block 510 using **the first image capture stage set to a primary focus position**. Then, in block 512, a secondary still image is captured using **the second image capture stage set to a secondary focus position**.

APPL-1005, 22:31-42.

Based on Parulski's teachings for both providing an autofocus subsystem for a similar fixed-focal-length embodiment and performing image processing by obtaining autofocused images from both lens assemblies, a POSITA would have recognized that Parulski's other fixed-focal-length embodiments would likewise have had an autofocus mechanism for both lenses in order to perform this and other enhancement processes taught by Parulski. APPL-1003, pp.56-57.

Third, a POSITA would have understood that the lens assemblies in both Ogata and Kawamura would have been controlled by Parulski's autofocus system when incorporated in Parulski's camera embodiment since Parulski teaches using its autofocus system for both Wide and Tele fixed-focal-length lens assemblies like the lenses described in Ogata and Kawamura. APPL-1003, p.57. A POSITA also would have understood that these fixed-focal-length lens assemblies would have been mechanically coupled to an autofocus mechanism so that the focus settings for each lens assembly could be automatically controlled by Parulski's processor 50 as discussed above. *Id.* Thus, Parulski's renders [19.3]-[19.4] obvious. *Id.*

### [19.4.1] *"wherein the Wide and Tele lenses have different F numbers F#$_{Wide}$ and F#$_{Tele}$"*

The combination of Parulski, Ogata, and Kawamura renders [19.4.1] obvious because Ogata has an F#$_{Wide}$ of 2.9 (*see* APPL-1026, 7:35-40) and Kawamura an F#$_{Tele}$ of 4.0 (*see* APPL-1012, p.3). These f-numbers remain the same when both lenses are scaled for an image sensor that a POSITA would have

considered for Parulski's camera. *See* APPL-1003, p.57; APPL-1021, ¶¶39,45.

Thus, Parulski's camera combined with Ogata and Kawamura renders [19.4.1]

obvious. APPL-1003, p.57.

### [19.4.2] *"wherein the Wide and Tele image sensors have pixels with respective pixel sizes Pixel size$_{Wide}$ and Pixel size$_{Tele}$ wherein Pixel size$_{Wide}$ is not equal to Pixel size$_{Tele}$"*

Parulski renders [19.4.2] obvious because it teaches that "**image sensors 12**

**and 14 may have a variety of aspect ratios, for example, a 4:3 image aspect**

**ratio and a variety of resolutions** ...." APPL-1005, 13:27-29. In other words,

"**the image sensors 12 and 14 do not have to have the same specifications**"

including not having the same "**size, resolution**, color filter array, spectral

sensitivity and aspect ratio." APPL-1005, 13:31-37. Parulski also explains using

sensors different resolutions may be preferred: "Furthermore, the wide angle image

sensor 614 may have high resolution, e.g., higher than that of the telephoto image

sensor 618, in order to provide a higher quality source image for the digital

zooming." APPL-1005, 23:58-61; *see also* APPL-1018, 24:33-37.

Examples of two commonly available prior art sensors of which a POSITA

would have been aware and used in mobile devices like Parulski's embodiments

are the Sony ICX624 with about 6 MP and the ICX629 with about 7 MP. APPL-

1003, p.58. Both sensors are the same size at 1/2.5" but have different resolutions

thereby yielding different pixel widths. *Id.*; *see* APPL-1030 (pixel width of 2.03

µm); APPL-1029 (pixel width of 1.86 µm). Given Parulski's teaching that its wide and telephoto image sensors can have different resolutions, a POSITA would have recognized that using sensors of the same size but different resolutions would have necessarily yielded different pixel widths. APPL-1003, p.58.

Thus, Parulski's teaching of using image sensors with different resolutions and the availability of compatible sensors of the same size having different pixel width renders [19.4.2] obvious. *Id.*

### [19.4.3] *"wherein the Tele camera has a Tele camera depth of field (DOFT) shallower than a DOF of the Wide camera (DOFW); and"*

The combination of Parulski, Ogata, and Kawamura renders [19.4.3] obvious because Kawamura's telephoto lens would have been understood to have a shallower depth of field than Ogata's wide-angle lens. *Id.*

First, depth of field ("DOF") of a combination lens and image sensor can be determined using the following equations provided in Jacobson (APPL-1016):

> Considering the general photographic case, for distant subjects where m is less than unity, the object plane is near infinity, so we may put $L'$ approximately equal to $f$ Likewise, $N'$, the effective aperture, may be replaced by $N$, the relative aperture. For simple and symmetrical lenses, the pupils are located in the principal planes, so we may take $L = u$. Hence
>
> $$S = \frac{uf^2}{f^2 - NCu} \qquad (15)$$

- 49 -

$$R = \frac{uf^2}{f^2 + NCu} \qquad (16)$$

The values of $S$ and $R$ define the far and near limits respectively of the depth of field, when the lens is focused on distance $u$. The values may be tabulated in various ways, displayed in graphical form or provided as depth of field scales on the focusing mounts of lenses (Figure 4.20),

If depth of field ($T$) is defined as $T = S - R$ then

$$T = \frac{2f^2u^2NC}{f^4 - N^2C^2u^2} \qquad (17)$$

APPL-1016, p.54. The variables in the above equations are:

$f$ is the focal length of the lens,

$u$ is the distance from the focus to the lens,

$N$ is the F number of the lens,

$C$ is the circle of confusion of the image sensor,

*See id.*, pp.53-55.

According to Jacobson, the circle of confusion ($C$) "is taken as a constant for a given format, for the whole range of lenses." APPL-1016, p.53. One way that $C$ can be determined, according to Koskinen (APPL-1017), is by using the Zeiss formula ($C=d/1730$) where $d$ is the diagonal of the image sensor. APPL-1017, ¶29 ("There are different ways to find the CoC diameter limit, for example the Zeiss formula d/1730."). Using sensors such as the ICX624 (*see* APPL-1030) or ICX629

- 50 -

(*see* APPL-1029) as discussed above in [19.4.2], circle of confusion (*C*) using the

Zeiss formula would approximately be 0.004 (i.e., 7.2 mm/1730). APPL-1003,

p.61. The equation from Jacobson with a circle of confusion *C*=0.004, yields the

following approximate DOF$_W$ for Ogata and DOF$_T$ for Kawamura. Because DOF is

relative to a specific distance of focus from the lens, the below equation uses 6 ft.

for the focus distance (*u*) which converts to 1828.8 mm. *Id.*, p.62.

As discussed above in [19.1], Ogata scaled to support a 1/2.5" image sensor

has a focal length of 5.72 mm and an f-number of 2.9. APPL-1021, ¶39; APPL-

1026, 7:35-40. As discussed in [19.2], Kawamura similarly scaled has a focal

length of 16.33 mm and an f-number of 4.0. APPL-1021, ¶45; APPL-1012, p.3.

Using these values in the DOF calculation for each lens yields the following:

$$DOF_W = \frac{(2)(5.72)^2(1828.8)^2(3)(0.004)}{(5.72)^4 - ((3)^2(0.004)^2(1828.8)^2)} = 4.460\ m$$

$$DOF_T = \frac{(2)(16.33)^2(1828.8)^2(4)(0.004)}{(16.33)^4 - ((4)^2(0.004)^2(1828.8)^2)} = 406\ mm$$

APPL-1003, pp.61-62. Since the approximate **DOF$_W$ is about 4.460 meters** and

the **DOF$_T$ is approximately 406 millimeters**, the DOF$_T$ is shallower than the

DOF$_W$. *Id.*, p.62. A POSITA would have understood this to hold true for other

focus distances. *Id.*

Thus, Parulski's camera combined with Ogata's and Kawamura's lens

assemblies renders [19.4.3] obvious.

**[19.5] "e) a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms"**

As discussed above in [19.3]-[19.4] a POSITA would have understood Parulski to teach including autofocus mechanisms for each of its wide and telephoto fixed-focal-length lens assemblies in order to perform its various focus and image enhancement techniques. *Id.* Parulski discloses [19.4.1] because it teaches that:

> the image processor 50 either (a) **selects the sensor output from the wide angle lens 612 as the captured image signal and uses the sensor output from the telephoto lens 616 to generate a focus detection signal for the wide angle lens 612** or (b) **selects the sensor output from the telephoto lens 616 as the captured image signal and uses the sensor output from the wide angle lens 612 to generate the focus detection signal for the telephoto lens 616**."

APPL-1005, 23:62-24:7. While this embodiment is described in terms of an integrated image assembly, a POSITA would have understood that the same teaching would apply to Parulski's other embodiments that similarly use fixed-focal-length lens assemblies. APPL-1003, p.63.

A POSITA also would have understood that this necessitates that the image processor 50 is operatively coupled to each autofocus mechanism because it has to

- 52 -

control the autofocus based on the focus detection signal. *Id.* Applied to Ogata and Kawamura, a POSITA would have recognized that Parulski's autofocus mechanisms would similarly control focus for these lens assemblies in the same way. *Id.*

Thus, Parulski's processor 50 that controls auto focus on each lens disclosed [19.5].

**[19.5.1] *"to process the Wide and Tele images to find translations between matching points in the images to calculate depth information"***

Parulski discloses [19.6] because it teaches "a flow diagram showing a method for processing images captured using the image capture assemblies of FIG. 3 or 8, wherein a range map is produced." APPL-1005, 19:49-51. According to Parulski:

> **Methods to produce a rangemap are well known to those skilled in the art**; for example, **a description of a method for producing a rangemap or depth map from a disparity map produced from the pixel offset information for a set of images captured by multiple cameras with similar fields of view** is described in United States Patent Application Publication Number 2006/0193509 (published Aug. 31, 2006 in the names of Antonio Criminisi et al., and entitled "Stereo-based Image Processing"), which is incorporated herein by reference.

*Id.*, 19:53-62. Once Parulski determines the pixel offsets between images, as

discussed above, they are "converted in block 482 to distances from the image capture device using the autofocus rangefinder calibration curve. A map is then produced in block 484 showing the distances to different portions of the images." APPL-1005, 19:49-20:15; Fig. 11. A POSITA would have understood this process to be the same as "find[ing] translations between matching points in the images to calculate depth information." APPL-1003, p.65.

Thus, Parulski's process for calculating depth information based on wide and tele images renders [19.6] obvious.

### [19.5.2] *and to create a fused image suited for portrait photos,*

The combination of Parulski and Soga renders [19.5.2] obvious. *Id.*, p.66. First, Parulski teaches capturing an image from "the primary capture unit at one focus position and another image is captured from the scene analysis capture unit (the secondary image capture unit) at another focus position. **Then, the two images are combined into a modified image with a broadened depth of field**." APPL-1005, 22:14-42.

Second, Soga enhances the teachings of Parulski by also disclosing an image fusion process that affect the depth of field of the output image. APPL-1003, p.66. Specifically, in reference to Fig. 4(a), Soga first teaches capturing two images of the same subject (a flower in the example below) at different focus distances, the second image being more "wide-angle" with a blurred background:

- 54 -

> (a) in FIG. 4 illustrates focal positions of when the first photographic image and the second photographic image are obtained by photographing the same subject. Whereas **the first photographic image is focused on the principal subject, the second photographic image is more on the wide-angle side than the first photographic image and is focused at a shorter distance than the distance to the principal subject**….
>
> As illustrated in (a) in FIG. 4, when an image focused on the subject—for example, a flower—is obtained in the first round of photography, the first photographic image illustrated in (b) in FIG. 4 is obtained. **When an image is obtained that is focused at a shorter distance** than the flower in **the second round** of photography, as illustrated in (b) in FIG. 4, **a blurred photographic image is obtained**.

APPL-1006, ¶¶ 65-66.

Soga clarifies this process in reference to Fig. 4(b) by explaining that "a focused image is obtained as the principal subject, as illustrated on the left in (b) in FIG. 4, and a blurred image (indicated by the diagonal lines) is obtained as the background, as illustrated on the right in (b) in FIG. 4." APPL-1006, ¶ 66. Fig. 4(b) is annotated below showing the first image with a subject in focus, the second, wide-angle image with a blurred background, and a resulting output image with the subject from the first image "fused" at its corresponding position with the blurred

- 55 -

background of the second image:



APPL-1003, p.68; APPL-1006, Fig. 4(b) (annotated).

A POSITA would have understood that the images output from Soga's fusion method would have been "suited for a portrait photo" because Soga specifically teaches using this method for taking a portrait photo of a person to obtain an adjustable bokeh effect in the background:

> FIG. 8 is a diagram for describing an example **wherein the principal subject is a person** and the frame guide is displayed on the liquid-crystal monitor to prompt the **photographer to shoot a head and shoulder shot.**
>
> …

As described above, this realizes a photographic device that, while being a photographic device equipped with an imaging element of a small area, **can obtain an image having similar bokeh to an image photographed by a silver halide camera**.

Note that in reference to the art of patent literature 2, it is favorable to further display a setting screen for setting an extent of the blurring when the background blurring mode is selected by, for example, an operation of the menu/OK button. Doing so enables the photographer to view the setting screen on the liquid-20 crystal monitor and **set the extent of the bokeh in advance on the photographic device such that a bokeh image of the photographer's preference is obtained**.

APPL-1006, ¶¶ 83, 86-87. Thus, Soga specifically teaches using its fusion method for capturing portrait photos with a background bokeh effect. APPL-1003, p.69.

Thus, Parulski's dual-lens camera system implementing Soga's image capture and enhancement method renders [19.5.2] obvious.

### *[19.5.3] the fused image having a DOF shallower than DOFT and having a blurred background.*

The combination of Parulski, Ogata, Kawamura, and Soga renders [19.5.3] obvious. First, a POSITA would have understood that Soga's composite image with adjustable bokeh in the background is a shallow depth of field effect. *Id.*, p.69. This is evidenced by Jacobs (Figures 1(a) and (b) annotated below) where

FIG. 1(b) shows a "reduced depth of field composite" with a blurred background: "To simulate the additional blur, objects closer to the camera are rendered from a slice focused afar, and objects far from the camera are rendered from a slice focused near." APPL-1007, p.1; *see also id.*, p.4, Fig. 11(d) (section 5.1 explaining application of reduced depth of field by compositing images with different focuses).



*additional background blur achieved where "objects far from the camera are rendered from a slice focused near"*

*focused subject*

(a) Single focal stack slice    (b) Reduced depth of field composite

*output image exhibits a shallow depth of focus (DOF) effect*

APPL-1003, pp.69-70; APPL-1007, Figs. 1(a) and (b) (annotated).

A POSITA also would have understood that enhancing a depth of field may provide a shallower depth of field (e.g., for portrait photo) or an extended depth of

field (e.g., for landscape photo). *Id.*, p.70; *see, e.g.*, APPL-1005, 21:12-31 (describing shallower depth of field to "emphasize the dog" sitting in the foreground where "the mountains and the flowers [] can be blurred [and the dog] is sharpened, and describing extended depth of field where "the dog is in focus, the mountains are in focus and so are those great flowers"); APPL-1007, pp.1,7 (explaining that control over depth of field "is one of the principal artistic tools available to photographers," and providing techniques for "reduced depth of field" to "create an SLR-like depth of field … that would accentuate out-of-focus blur" or "extended depth of field."); APPL-1028, p.1 (explaining that "shallow depth of field is often desired for photographs such as portraits" and "larger depth field [] can be desirable, for example in landscape or macro photography").

Because both Parulski and Soga teach enhancing an image's depth of field by fusing two images, a POSITA would have been motivated to implement Soga's teachings of compositing two images captured at different focus distances to output a "fused" image with a shallow DOF (also referred to as photographic blur) in the operations performed by Parulski's image processor. *Id.*, p.71.

Such a combination would have been understood to provide Parulski's camera with the benefit of producing output images with Soga's adjustable and more aesthetic bokeh effect at a lower computational cost than Parulski's disclosed method. *Id.*; *see* APPL-1007, p.2 (explaining that photographic blur (e.g., like

- 59 -

Soga's method), "guarantees a consistent defocus blur regardless of depth map accuracy," while "synthetic blur" (e.g., Parulski's method) using a single image "fails to capture subtle details that are naturally present in photographic (physically produced) blur" and relied on depth map accuracy); *id.*, p.9 ("synthetically blurred image … fails to accurately portray the defocused specular highlights").

Second, a POSITA would have recognized that Soga's image enhancement method could have been accomplished by the combination of Parulski's image processing system and the wide and telephoto lenses provided by Ogata and Kawamura. APPL-1003, p.71. A POSITA would have understood that an enhanced image could have been generated by each of the wide and telephoto lens systems and by applying Soga's focus, capture, and enhancement methods, the depth of field of the fused image would have been shallower than the depth of field (DOFT) of the image captured by Kawamura's telephoto lens assembly. *Id.*

For example, as discussed above in [19.4.3], focusing on a principle subject at 6 ft., an appropriate distance to obtain a headshot of a person, Kawamura's lens design would have captured a Tele image with the principle subject in focus at a depth of field ($DOF_T$) of about 406 mm (16 in.) around subject. *Id.*, p.72. A POSITA would have understood this to be the first image in Soga's method. *Id.* Ogata focused at a shorter distance of 6 inches (152.4 mm), according to Soga's method, would have yielded a depth of field of about 15.84 mm (0.62 in.) as shown

below using the depth of field equation discussed in [19.4.3]:

$$DOF_W = \frac{(2)(5.75)^2(152.4)^2(3)(0.004)}{(5.75)^4 - ((3)^2(0.004)^2(152.4)^2)} = 16.91 \; mm$$

*Id.*

A POSITA would have recognized that the resulting Wide image having a depth of field of about 16.91 mm (about ½ inch) would have had a blurred background, which, according to Soga is suitable for a bokeh effect. APPL-1003, p.72; *see* APPL-1007, Fig. 8. A POSITA would have understood this Wide image to be the second image in Soga's method. APPL-1003, p.72.

Applying Soga's fusion method to these wide and telephoto images would have been understood by a POSITA to result in a fused image with a blurred background and a depth of field limited to the depth of the principle subject, thereby utilizing a depth of field shallower than the $DOF_T$ of 406 mm (16 in.). *Id.* *See* APPL-1009, 1:41-50 (teaching a depth of field for a photo of a person is desirably between 200 mm to 500 mm). In other words, fusing just the principle subject from the first image and blurring the rest would have utilized only a few inches of the telephoto image's depth of field to capture the subject and, when combined with the blurred background from the wide image, would have resulted in a fused image "having a DOF shallower than $DOF_T$ and having a blurred background" as claimed. *Id.*

Thus, Parulski's camera with lens systems from Ogata and Kawamura

implementing Soga's portrait photo method renders [19.5.3] obvious.

### 9. *Claim 20*

**[20.0] "The dual-aperture digital camera of claim 19, wherein the Tele lens includes five lens elements along an optical axis from an object side to an image side, starting from the object side with a first lens element with positive power, a second lens element with negative power, a fourth lens element with negative power and a fifth lens element,"**

The combination of Parulski and Kawamura renders [20.0] obvious. *Id.*,

p.73. First, Kawamura teaches a five-lens assembly as indicated in Fig. 1:



*Id.*; APPL-1012, p.6, Fig. 1 (annotated).

Second, Kawamura's five lenses include: "in order from an object side, **a**

**first lens, which is a positive** meniscus …; **a second lens** … **of a negative**

**meniscus lens** …; **a fourth lens, which is a negative lens** …; and **a fifth lens** ….”

APPL-1012, p.1.

Thus, Parulski's dual-lens camera implementing a design like Kawamura's

telephoto lens assembly renders [20.0] obvious. APPL-1003, p.74.

**[20.1] wherein the largest distance between consecutive lens elements along the optical axis is a distance between the fourth lens element and the fifth lens element.**

The combination of Parulski and Kawamura renders [20.1] obvious because

as shown in Fig. 1, Kawamura's lens assembly as the largest gap between lens

elements between the fourth and fifth lens elements:



APPL-1003, p.74; APPL-1012, p.6 (annotated). This is confirmed in the table for

Example 1:

Example 1

1 : 4.1    F = 200.079    $\omega$ = 12.3 °.

| NO. | $r$ | $d$ | $N$ | $\nu$ |
|-----|-----|-----|-----|-----|
| 1 | 57.091 | 9.00 | 1.60311 | 60.7 |
| 2 | 330.000 | 0.20 | | |
| 3 | 45.039 | 4.00 | 1.67270 | 32.1 |
| 4 | 33.450 | 9.60 | 1.48749 | 70.1 |
| 5 | 81.000 | 3.50 | | |
| 6 | 387.380 | 3.00 | 1.57501 | 41.5 |
| 7 | 34.361 | 41.80 | | |
| 8 | 146.228 | 4.34 | 1.74950 | 35.3 |
| 9 | 552.040 | | | |

*d7*
*a largest distance between consecutive lens elements along the optical axis*

$F_{1\cdot2\cdot3}$ = 74.912

$F_{1\cdot2\cdot3\cdot4}$ = 356.466

$d_1 + d_2 + d_3 + d_4 + d_5 + d_6$ = 29.3

APPL-1003, p.75; APPL-1012, p.3 (Table for Example 1) (annotated).

Thus, Parulski's camera implementing a design like Kawamura's telephoto lens assembly renders [20.1] obvious. APPL-1003, p.75.

## B.    Ground 2: Claims 21 and 22 obvious over the combination of Parulski, Ogata, Kawamura, Soga, and Morgan-Mar.

### 1.    Summary of Morgan-Mar

Morgan-Mar is titled "Bokeh Amplification," and on its face is assigned to "Canon Kabushiki Kaisha, Tokyo (JP)." APPL-1009, Title. Morgan-Mar is directed at "digital image processing and, in particular, to rendering a photographic

image with modified blur characteristics." APPL-1009, 1:14-15.

Morgan-Mar explains that "[s]ingle-lens reflex (SLR) and digital single-lens reflex (DSLR) cameras have large aperture optics which can produce a narrow depth of field," where depth of field "measures the distance from the nearest object to the camera which is in focus, to the farthest object from the camera which is in focus." APPL-1009, 1:19-23. "This allows the foreground subject of a photo to be rendered in sharp focus, while the background is blurred by defocus," and "[t]he result is visually pleasing as it provides a separation between the subject and any distracting elements in the background." APPL-1009, 1:26-30.

Morgan-Mar explains that the "aesthetic quality of background blur (encompassing both the quality and "look" of the blur) is known as bokeh," and "[b]okeh is especially important for photos of people, or portraits." APPL-1009, 1:30-33. Morgan-Mar provides that an example "for taking a photo of a person about 3 meters from the camera" is "the depth of field for a full frame SLR camera at 50 mm focal length and aperture f/2.8 is about 0.5 meters," and for "a portrait scenario, a photographer would typically want to use a depth of field this size, or ever smaller, maybe 0.2 meters or even 0.1 meters." APPL-1009, 1:44-48.

Morgan-Mar explains that because "depth of field is largely dictated by the size of the camera sensor," a method of "producing artificial bokeh with a compact camera, mimicking the amount and quality of background blur produced by an

- 65 -

SLR camera would provide a major improvement in image quality for compact camera users." APPL-1009, 2:5-8.

In reference to "generation of SLR-like bokeh from compact camera images," Morgan-Mar describes that it may "capture two images with different camera parameters, the varying parameters being one or more of: focus, zoom, aperture, or any other camera setting that influences the amount of blur in the captured image." APPL-1009, 2:13-14, 19:3-6. Morgan-Mar explains that "[i]n the case of some parameters, such as zoom in particular but also focus and potentially other parameters, the magnification of the captured images may be different. In this case one or more of the images may be scaled to bring the images substantially into registration before applying the artificial bokeh algorithm to render an artificial bokeh image." APPL-1009, 19:6-12.

Morgan-Mar describes using corresponding selected image patches in the two images to "produce an output image patch with blur modified with respect to the initial amount of blur" by "calculating a set of frequency domain pixel values from a combined function of Fourier transforms of two of the selected image patches," "raising each of the pixel values in the set of frequency domain pixel values to a predetermined power, thereby forming an amplified set of frequency domain pixel values," and "combining the amplified set of frequency domain pixel values with the pixels of the selected image patch in one of the captured images to

produce an output image patch with blur modified with respect to the initial

amount of blur in the image patch." APPL-1009, 28:27-49.

According to Morgan-Mar, the "result is that a single pair of input patches f1

and f2, covering objects at different distances will produce an output image patch

f(N) containing an additional amount of blur that varies across the patch, the

variation in additional blur being appropriate for the differing distances of the

various objects within the patch." APPL-1009, 12:4-10. The "amount of additional

blurring of background regions can be controlled by adjusting the amplification

factor N," and when "N > 1, the blurring of the background is increased." APPL-

1009, 11:4-35.

### 2.    *Reasons to Combine Parulski, Soga, and Morgan-Mar*

A POSITA would have been motivated to apply Morgan-Mar's teachings of

using SLR-like bokeh images for portrait photo and performing bokeh amplification

in the digital camera of Parulski and Soga to produce the obvious, beneficial, and

predictable results of a visually pleasing aesthetic quality of background blur for a

portrait photo in a compact camera as taught by Morgan-Mar. *Id.*, ¶87.

First, the references are analogous prior art and are in the same field of

endeavor pertaining to imaging systems for producing an enhanced output image

using two images. *Id.*, ¶88. Similar to Parulski and Soga, Morgan-Mar discusses

"modifying blur in at least a part of an image of a scene" using "two images of the

- 67 -

scene with different camera parameters," including for example, "focus" and "zoom."

APPL-1009, 28:27-33; 19:3-6.

Second, a POSITA would have been motivated to incorporate the teachings of Morgan-Mar in the digital camera of Parulski and Soga because they share a need to provide a bokeh image in a compact system. APPL-1003, ¶89. Similar to the teachings of Parulski and Soga discussed above, Morgan-Mar describes "producing artificial bokeh with a compact camera, mimicking the amount and quality of background blur produced by an SLR camera," which "would provide a major improvement in image quality for compact camera users." APPL-1009, 2:5-8. Here, to provide a high-quality output bokeh image in a compact camera is a need shared by Morgan-Mar and the Parulski and Soga combination, which provides at least one reason to combine the respective teachings. APPL-1003, ¶89.

Third, combining the teachings of Morgan-Mar with Parulski and Soga would have produced operable results that are predictable. *Id.*, ¶90. Specifically, combining Morgan-Mar's teachings of using SLR-like bokeh images for portrait photo and performing bokeh amplification in the digital camera of Parulski and Soga would have simply included the combination of known elements according to known methods (such as providing portrait photo with SLR-like bokeh effect, performing bokeh amplification using two images with different focus distances as taught by Morgan-Mar by the camera controller of the digital camera of Parulski and Soga), and

- 68 -

would have been obvious to a POSITA at the time of the '479 Patent to achieve the

benefits of a visually pleasing aesthetic quality of background blur for a portrait photo

in a compact camera described by Morgan-Mar. *Id.* To the extent that any

modification would have been needed in order to accommodate the teachings of

Morgan-Mar in with Parulski's and Soga's teachings, such modifications would have

been within the level of ordinary skill in the art. *Id.*

As set forth below, the combination of Parulski, Ogata, Kawamura, Soga, and

Morgan-Mar renders claims 21-22 obvious. A claim chart corresponding to the

analysis below is contained in Dr. Durand's expert declaration. *See* APPL-1003,

pp.80-84.

### 3. *Claim 21*

### [21.0] *"The dual-aperture digital camera of claim 20, wherein the fused image having a DOF shallower than DOFT is output as a portrait photo similar to a portrait photo taken with a digital single-lens reflex (DSLR) camera."*

The combination of Parulski, Soga and Morgan-Mar renders [21.0]. APPL-

1003, p.80. First, as shown in [19.5.2]-[19.5.3], the combination of Parulski and

Soga teaches that the output image is a bokeh image exhibiting a DOF effect

shallower than the depth of field of the Tele image ($DOF_T$). *Id.* Further, Soga

teaches generating a portrait photo. *Id.* In reference to FIG. 8a annotated below,

Soga teaches an example "of the frame guide for a head and shoulder shot." APPL-

1006, ¶83. Soga's portrait photo having the bokeh effect which "has a focused

- 69 -

principal subject but a blurred background becomes an image that is close to an

image photographed by a silver halide camera," APPL-1006, ¶67.

**_portrait photo_**



APPL-1003, p.81; APPL-1006, Fig. 8 (annotated)

Second, Morgan-Mar teaches that for a portrait photo, the output bokeh

image exhibiting a shallow DOF effect is similar to a portrait photo taken with a

digital single-lens reflex (DSLR) camera. *Id.*, p.81 Specifically, Morgan-Mar

explains that "[s]ingle-lens reflex (SLR) and digital single-lens reflex (DSLR)

cameras have large aperture optics which can produce a narrow depth of field,"

where depth of field "measures the distance from the nearest object to the camera

which is in focus, to the farthest object from the camera which is in focus." APPL-

1009, 1:19-23. "This allows the foreground subject of a photo to be rendered in

sharp focus, while the background is blurred by defocus," and "[t]he result is

visually pleasing as it provides a separation between the subject and any distracting

- 70 -

elements in the background." APPL-1009, 1:26-30. Morgan-Mar explains that the "aesthetic quality of background blur (encompassing both the quality and "look" of the blur) is known as bokeh," and "[b]okeh is especially important for photos of people, or portraits." APPL-1009, 1:30-33.

A POSITA would have been motivated to apply Morgan-Mar's teaching that for a portrait photo, the output bokeh image exhibiting a shallow DOF effect is similar to a portrait photo taken with a DSLR camera in the digital Parulski's camera modified with Soga's teaching to achieve the benefit of a visually pleasing aesthetic quality of background blur for a portrait photo as taught by Morgan-Mar. APPL-1003, pp.81-82; *see also* Ground 3: Reasons to Combine Parulski, Soga, and Morgan-Mar.

Accordingly, Parulski's camera system combined with the teachings of Soga and Morgan-Mar yield a camera controller that is configured to provide, that for a portrait photo, the output image exhibits a shallow DOF effect similar to a portrait photo taken with a digital single-lens reflex (DSLR). *Id.*, p.82. These teachings thus render [21.0] obvious.

### 4.    *Claim 22*

**[22.0] "*The dual-aperture digital camera of claim 21, wherein the DSLR has a focal length between 50-80 mm.*"**

The combination of Parulski, Soga, and Morgan-Mar renders [22.0] obvious. *Id.*, p.82. First, as discussed at [21.0], the combination of Parulski, Soga, and

Morgan-Mar teaches that for a portrait photo, the output image exhibiting a shallow DOF effect is similar to a portrait photo taken with a digital single-lens reflex (DSLR) camera. *Id.*

Second, Morgan-Mar teaches that a portrait photo having a depth of field similar to a DSLR equivalent focal length between 50-80 mm captured at 3 meters is between 200 mm and 500 mm:

> Depth of field varies significantly depending on the geometry of the photographic scene. The following examples are for taking a photo of a person about 3 meters from the camera:
>
> (i) the depth of field for a full frame SLR camera at 50 mm focal length and aperture f/2.8 is about 0.5 meters. For a portrait scenario, a photographer would typically want to use a depth of field this size, or even smaller, maybe 0.2 meters or even 0.1 meters. An SLR camera can also be configured with a smaller aperture to achieve very large depth of field, though this is not usually done for portraits.

APPL-1009, 1:44-48.

While this example does not specify the end range of 80 mm, a POSITA would have found a depth of field of 0.2 meters (i.e., 200 mm) to correspond to an equivalent focal length of 80 mm as calculated below using the equation set forth in [19.4.3]. APPL-1003, p.83. Because this example from Morgan-Mar discusses standard 50 mm SLR lenses, a POSITA would have understood it to use a 35 mm

image sensor format. *Id.* Such sensors have a Circle of Confusion (C) of about .025

(C = 43 / 1730) because a 35 mm image sensor has a diagonal of about 43 mm.

$$DOF_{50} = \frac{(2)(50)^2(3000)^2(2.8)(0.025)}{(50)^4 - ((2.8)^2(0.025)^2(3000)^2)} = 508 \; mm$$

$$DOF_{80} = \frac{(2)(80)^2(3000)^2(2.8)(0.025)}{(80)^4 - ((2.8)^2(0.025)^2(3000)^2)} = 197 \; mm$$

*Id.* Thus, a POSITA would have understood that Morgan-Mar's example of SLR is

the same for DSLR, and as such, desiring a depth of field between 200 mm and

500 mm teaches "the DSLR has a focal length between 50-80 mm" as recited in

the claim. *Id.*

Consequently, Morgan-Mar teaches that for a portrait photo, a photographer

would desire a depth of field between about 500 mm, corresponding to 50 mm

focal length, and 200 mm, corresponding to about 80 mm focal length. *Id.* This is

consistent with the focal length range of a DSLR that a POSITA would have

understood as appropriate for portrait photos as indicated by, for example, Shalon:

> [I]n accordance with one or more embodiments that
> effectuate a solution to the inventor's discovery, the
> camera lens has a 50-80 mm focal length. As a result, and
> in accordance with one or more such embodiments, the
> camera optics are suited for close range portrait
> photography. For example, in accordance with one or
> more such embodiments, the camera optics has a low F
> number lens such as, for example and without limitation,

- 73 -

> an F number in a range from about 2 to about 3 to provide
> a shallow depth of focus that blurs the background and a
> flattering 50-70 mm DSLR equivalent lens angle of
> approximately 40 degrees field of view.

APPL-1010, p.9.

Accordingly, Parulski's camera combined with the teachings of Soga and Morgan-Mar provide a controller that could have been configured to provide an output image similar to a portrait phot that exhibits a shallow DOF effect of 200 mm to 500 mm similar to a portrait photo taken with a digital single-lens reflex (DSLR) camera having a focal length between 50-80 mm. APPL-1003, p.84. Thus, the combination of Parulski, Soga, and Morgan-Mar renders [22.0] obvious.

## X.    CONCLUSION

For the reasons set forth above, Petitioner has established a reasonable

likelihood that claims 19-22 of the '479 Patent are unpatentable. Petitioner requests

institution of *inter partes* review and cancelation of these claims.

Respectfully submitted,

Dated: <u>May 6, 2020</u>              /Michael S. Parsons/
                                      Michael S. Parsons
                                      Lead Counsel for Petitioner
                                      Registration No. 58,767s

## XI.    CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for Petitioner

declares that the argument section of this Petition (Sections I and III–X) has 13,712

words, according to the word count tool in Microsoft Word™.

/Michael S. Parsons/
Michael S. Parsons
Lead Counsel for Petitioner
Registration No. 58,767

- 76 -

## CERTIFICATE OF SERVICE

The undersigned certifies that, in accordance with 37 C.F.R. § 42.6(e) and

37 C.F.R. § 42.105, service was made on Patent Owner as detailed below. Patent

Owner has authorized electronic service due to the United States Post Office

suspending deliver to the address listed in accordance with 37 CFR § 42.105(a).

*See* APPL-1036.

| | |
|---|---|
| *Date of service* | May 6, 2020 |
| *Manner of service* | Electronically: mafenster@raklaw.com, bwang@raklaw.com, jtsuei@raklaw.com, nrubin@raklaw.com |
| *Documents served* | Petition for *Inter Partes* Review of U.S. Patent No. 10,225,479; Petitioner's Exhibit List; Exhibits 1001–1036 |
| *Persons served* | Marc A. Fenster, Benjamin T. Wang James S. Tsuei, Neil A. Rubin Russ August & Kabat 12424 Wilshire Blvd., 12th Floor Los Angeles, CA 90025 |

/Michael S.  Parsons/
Michael S. Parsons
Lead Counsel for Petitioner
Registration No. 58,767

Trials@uspto.gov                                                      Paper 10
571-272-7822                                          Date: November 12, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE, INC.,
Petitioner,

v.

COREPHOTONICS LTD.,
Patent Owner.

———————————

IPR2020-00906
Patent 10,255,479 B2

———————————

Before BRYAN F. MOORE, JOHN F. HORVATH, and
MONICA S. ULLAGADDI, *Administrative Patent Judges.*

HORVATH, *Administrative Patent Judge.*


DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

_____

Case No. IPR2020-00906
U.S. Patent No. 10,225,479

_____

PATENT OWNER'S RESPONSE TO
PETITION FOR *INTER PARTES* REVIEW

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

        4.    Apple Has Not Shown that the Limitation "to find translations
              between matching points in the images to calculate depth
              information and to create a fused image suited for portrait
              photos" Is Satisfied Under Its Proper Construction ................. 59

    B.    Claims 21 and 22 Are Not Obvious Over the Combination of
          Parulski, Ogata, Kawamura, Soga, and Morgan-Mar (Ground 2)  66

IX.    SECONDARY CONSIDERATIONS / OBJECTIVE INDICIA
       OF NON-OBVIOUSNESS ..................................................... 68

    A.    Industry Praise / Licensing ........................................... 70

    B.    Commercial Success ................................................... 77

    C.    Failure of Others / Copying .......................................... 78

X.    CONCLUSION ................................................... 80

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

# VII.  OVERVIEW OF SELECTED PRIOR ART

## A.  Parulski[2]

The Parulski patent was published as U.S. Patent No. 7,859,588 and issued on December 28, 2010. (Ex. 1005.) It was filed on March 9, 2007. (Ex. 1005, Parulski, at 1.)

Parulski at the Summary of the Invention includes an overview of the preferred embodiments and their motivations at 7:54 – 8:19. These embodiments include the use of the secondary image from the additional lens "to sharpen portions of the primary image … where the secondary output image is captured … at a different focus position … ; to modify the dynamic range of the primary image … ; to provide scene analysis data for setting the capture parameters for the primary image; or to replace portions of the primary image … with corresponding portions of [a longer exposure] secondary image." Id. at 7:56-8:5. As this list suggests, these various preferred embodiments are designed to achieve different results, and they take different approaches to doing so. A POSITA would not understand all of Parulski's specification (or all of the portions cited by Apple and Dr. Durand) to be part of the same embodiment or even to be compatible with one another. *See* Hart Decl., ¶ 52.

---

[2] *See* Hart Decl., ¶¶ 51-71.

placing the aperture stop near the center of the lens assembly (Ex. 2030, Sasián Introduction to Aberrations at 73–74). *See* Moore Decl., ¶ 58.

### C.    Ogata[17]

Ogata was published as U.S. Patent No. 5,546,236 and issued on August 13, 1996. Ex. 1026. It was assigned to Olympus Optical Co., Ltd. and claims priority to Japanese patent applications filed in 1993. Ex. 1026 at 1. *See* Moore Decl., ¶ 59.

The Ogata lens was not quite as large as the Kawamura lens. Rather than being designed for a medium format film camera, it was designed for a 35 mm format film camera. We can see this from looking at, for example, the focal length, 35 mm, and the angle of view $2\omega = 63.4°$ of Ogata Embodiment 1:

---

[17] *See* Moore Decl., ¶¶ 59-67.

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

---

Embodiment 1

$f = 35.0$, $f_B = 26.1$, F/2.9, $2\omega \approx 63.4°$
$r_1 = 14.1000$

| | | | |
|---|---|---|---|
| | $d_1 = 3.700$ | $n_1 = 1.79952$ | $\nu_1 = 42.24$ |
| $r_2 = 47.5750$ | | | |
| | $d_2 = 1.800$ | | |
| $r_3 = -81.2140$ | | | |
| | $d_3 = 1.000$ | $n_2 = 1.76182$ | $\nu_2 = 26.52$ |
| $r_4 = 12.0220$ (aspherical surface) | | | |
| | $d_4 = 1.000$ | | |
| $r_5 = 55.8920$ | | | |
| | $d_5 = 3.000$ | $n_3 = 1.83481$ | $\nu_3 = 42.72$ |
| $r_6 = -11.3420$ | | | |
| | $d_6 = 1.000$ | $n_4 = 1.53172$ | $\nu_4 = 48.90$ |
| $r_7 = -106.9860$ | | | |
| | $d_7 = 1.000$ | | |
| $r_8 = \infty$ (stop) | | | |
| | $d_8 = 2.000$ | | |
| $r_9 = -10.4990$ | | | |
| | $d_9 = 1.500$ | $n_5 = 1.51633$ | $\nu_5 = 64.15$ |
| $r_{10} = -9.0360$ (aspherical surface) | | | |

aspherical surface coefficients

---

(4th surface)    $P = 1.0396$, $A_4 = 0.66373 \times 10^{-4}$
                 $A_6 = 0.13983 \times 10^{-5}$, $A_8 = -0.97157 \times 10^{-8}$
                 $A_{10} = 0.42114 \times 10^{-9}$
(10th surface)   $P = 1.3037$, $A_4 = 0.44302 \times 10^{-4}$
                 $A_6 = -0.17498 \times 10^{-5}$, $A_8 = 0.10177 \times 10^{-6}$
                 $A_{10} = -0.17446 \times 10^{-8}$
$D_R/f = 0.043.$; $f_R/f = 2.660$, $(R_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 1.347$,
$N_p = 1.717$, $r_{1a}/r_{2b} = 1.173$, $(r_{1b} - r_{2a})/r_{1b} + r_{2a}) = -3.829$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -3.188$

Ex. 1026 at 7:35–62. 63.4° is exactly the angle of view of a 35 mm focal-

length lens with a 35 mm film frame.[18] This can be confirmed using the for-

mula used by Dr. Durand in his declaration[19]:

---

[18] https://en.wikipedia.org/wiki/Angle_of_view#Calculating_a_camera's_angle_of_view

[19] The formula appears to contain a typographical error, and "HVOF" should read "HFOV." It is also an approximation that is only strictly true for a single-element lens with the stop at the lens.

30

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

$$HVOF = arctan\left(\frac{diagonal}{2}/(focal\ length)\right)$$

(Ex. 1003, ¶ 64.) *See* Moore Decl., ¶ 60.

As Dr. Durand notes, the diagonal size of 35 mm camera film is 43.27 mm. For a 35 mm focal length, this formula gives a HFOV = arctan(43.27 mm / 2 / 35 mm) = arctan(0.618) = 31.7°, i.e. a full angle of view equal to the 63.4° value given in Ogata. *See* Moore Decl., ¶ 61.

We can confirm this with Dr. Sasián's Zemax analysis. As an initial matter, Dr. Sasián appears to have made at least one error in entering the parameters from the Ogata Embodiment 1 lens. For the third lens element he mistakenly used an Abbe number of 26.5 (the Abbe number of the second lens element), rather than the value 42.72 given in Ogata. Ex. 1021 at 36; Ex. 1026 at 7:45. Because of this error, Dr. Sasián's field curvature, distortion and OPD fan plots on page 35 of his declaration do not accurately reflect the performance of a scaled version of Ogata's Embodiment 1 lens. *See* Moore Decl., ¶ 62.

31

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

To work with a 1/2.5″ sensor Dr. Sasián scaled Ogata embodiment 1 from a focal length of 35 mm to a focal length of 5.724 mm, reducing the size by a factor of 35 mm / 5.724 mm = 6.114. *See* Moore Decl., ¶ 63.

While all of Kawamura's lens surfaces are spherical, Ogata does make limited use of aspherical surfaces. In Embodiment 1, two of the ten lens surfaces (the image-side surfaces of the second and fifth lens elements) are

32

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

# VIII. OBVIOUSNESS

## A. Claims 19 and 20 Are Not Obvious Over the Combination of Parulski, Ogata, Kawamura, and Soga (Ground 1)

### 1. A POSITA Would Not Have Been Motivated to Use the Ogata and Kawamura Lens Designs with Parulski

In this ground, Apple and Dr. Durand propose combining Parulski with Soga and with two patents describing lens designs, Ogata and Kawamura. Dr. Duncan Moore has provided an extensive discussion of the Kawamura and Ogata lens designs and a response to Dr. Sasián's opinions concerning scaling these lens designs. *See* Hart Decl., ¶ 89; Ex. 2015, Moore Decl.

Dr. Moore describes the Kawamura lens design at length. (Ex. 2015, Moore Decl., ¶¶ 40–58.) As he explains, Kawamura's lens was designed in the early 1980s for a larger than 35 mm film camera. The lens examples provided in Kawamura were over 7 inches long, and a POSITA would recognize that a camera utilizing them would have weighed many pounds. *Id*.; *see* Hart Decl., ¶ 90.

Dr. Moore also describes the Ogata lens design at length (Ex. 2015, Moore Decl., ¶¶ 59–67.) This lens was designed in the early 1990s and designed for use in a 35 mm film camera. *Id*.; *see* Hart Decl., ¶ 91.

36

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

A POSITA in 2007 (when Parulski was filed) or in 2013 would not have been motivated to combine multiple large and heavy lenses designed for film cameras to create an even larger, heavier, and more unwieldy dual-lens camera. Hart Decl., ¶ 92. Rather, Parulski describes its invention in terms of compact digital point-and-shot cameras and mobile phones:



**FIG. 2A**          **FIG. 2B**

37

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479



**FIG. 15A**                **FIG. 15B**

(Ex. 1005, Parulski, Figs. 2, 15.)

As a result, the combination that Apple and its expert propose requires

scaling the Kawamura and Ogata lens designs down to a size appropriate for

a 1/2.5-inch image sensor. (Petition at 19–20, 26–27; Ex. 1003, Durand Decl.,

¶¶ 47–49, 58–60; Ex. 1021, Sasián Decl. at 18, 22.) *See also* Hart Decl., ¶ 93.

As explained by Dr. Moore, the lenses in Kawamura and Ogata must

be scaled down by a significant factor to reach the size proposed by Apple: a

38

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

factor of 12.25 for the Kawamura lens (Ex. 2015, Moore Decl, ¶ 50) and a factor of 6.114 for the Ogata lens (id., ¶ 63.). Hart Decl., ¶ 94.

Dr. Moore explains at length the reasons that one skilled in the art in 2007 or later, looking for 1/2.5-inch sensors for a digital system like Parulski would have looked to lenses designed for miniature digital camera modules, not to 15- and 25-year-old lenses, many times larger than desired, designed and built using old technology, intended for use in film cameras. (Ex. 2015, Moore Decl., ¶¶ 68–107.) Dr. Moore further explains reasons that a POSITA would not have expected scaling Kawamura and Ogata to yield successful results. (*Id.*) *See also* Hart Decl., ¶ 95.

Since a POSITA would not have been motivated to use Kawamura and Ogata unmodified with Parulski (and Apple does not even propose doing so), and a POSITA would not have been motivated to scale Kawamura and Ogata as proposed by Apple, a POSITA would not have been motivated to combine Kawamura and Ogata with Parulski (and Soga), and the claims challenged under this ground are not obvious. *See* Hart Decl., ¶ 96.

### 2.    A POSITA Would Not Have Scaled Kawamura to Use in Parulski

A POSITA would not have been motivated to scale Kawamura for use in Parulski. At the time that Parulski was written, Kawamura's design was 26

39

years old. Substantial improvements in computation power, design tech-
niques, materials, and manufacturing techniques meant that lenses made in
2007 or in 2013 were substantially improved in performance and other char-
acteristics over even high-quality lenses designed in 1981. Moore Decl., ¶ 68.

Kawamura's lenses were also designed for a different purpose, with
different design constraints, than a lens for the Parulski system. As explained
above, the Kawamura lens would need to be scaled down by a factor of around
12 (or more than 12 for Parulski's mobile phone examples) in order provide
the same field of view on a sensor of the kind contemplated in Parulski. Moore
Decl., ¶ 69.

### a.     Scaling Lens Designs by a Large Factor Is Not Done in Practice

Dr. Sasián's brief discussion of lens scaling suggests that scaling by
large factors is routine and would be expected to result in a well-performing
lens. (Ex. 1021, Sasián Declaration, ¶¶ 37, 43.) Not so. While it is true that
from the standpoint of the geometric optics of an ideal lens design, scaling
that design will also scale the aberrations of the design and leave many di-
mensionless properties of the lens design unchanged, that does not does not
mean that the resulting design will be practical or useful. There is more to a
good lens design than the geometric optics of a lens perfectly fabricated to the

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

design. Scaling a design can dramatically alter the practicality of manufacturing the design and its sensitivity to variations in manufacturing. In addition, the most important performance characteristics for judging a lens design (including parameters such as f-number, field of view, and manufacturing tolerances) will change with the scale of a lens, meaning that scaling a good conventional lens design to a smaller size will often produce a design that is substantially inferior for its intended purpose to designs that were specifically created to be used as small lenses. Moore Decl., ¶ 70.

Dr. Sasián and his Ph.D. students have acknowledged the impracticality of scaling conventional lens designs to miniature size in their academic writings, as have others in the field, both prior to Parulski's filing date and after. Moore Decl., ¶ 71.

For example, Dr. Sasián and his Ph.D. student Dmitry Reshidko wrote in 2015:

> A traditional objective lens ***can not be simply scaled down*** as a lens solution due to fabrication constraints, materials properties, manufacturing process, light diffraction and geometrical aberrations.

(Ex. 2029, Reshidko and Sasián at E216.) *See* Moore Decl., ¶ 72.

In the same paper, Dr. Sasián wrote that "[t]he practically achievable ratio of the total length to the focal length in lenses for mobile cameras is

41

between 1.15 and 1.3 [12]." (Ex. 2028, Reshidko and Sasián at E217.) This further illustrates the difficulties of scaling conventional lenses to miniature size. Otherwise, Dr. Sasián's statement would make no sense. Telephoto lenses with a ratio of the total length to the focal length less than 1.0 were first achieved in the 1800s and were widely used in film cameras and other applications in the twentieth century.[20] If simple scaling of these conventional lenses would produce practical lenses, then Dr. Sasián would not have written in 2015 that 1.15 was the lowest ratio of the total length to the focal length that was "practically achievable." *See* Moore Decl., ¶ 73.

Dr. Sasián's student Yufeng Yan[21] explained in his Ph.D. dissertation that "that the design approaches and lens constructions are significantly different between a miniature camera lens and a conventional camera lens" and that "if the conventional camera lens was simply scaled down to the same focal length of the miniature lens, it would encounter many issues." (Ex. 2034, Yan at 79.) Yan further explained: "Scaling down a conventional camera lens requires spatial tolerances to scale down with the same ratio, which is about

---

[20] Many histories credit Thomas Dallmeyer with inventing the telephoto lens in 1891. (https://en.wikipedia.org/wiki/Telephoto_lens)

[21] Dr. Yan currently works as an optical engineer at Apple. https://www.linkedin.com/in/yufengyan/

the factor of 7. This creates a huge problem on the tolerance budget of element and surface decenter." (Ex. 2034, Yan at 83.) *See* Moore Decl., ¶ 74.

The fact that scaling of conventional lens designs to miniature size is impractical was known prior to 2007, as explained a paper by Bareau and Clark that Dr. Sasián cites in his textbook (Ex. 2027, Sasián at 195) and that Apple has relied upon as a prior art reference in another IPR challenging a Corephotonics patent (IPR2018-01146, Ex. 1012). Bareau and Clark state:

> When designing a camera module lens, it is not always helpful to begin with a traditional larger-scale imaging lens. ***Scaling down such a lens will result in a system that is unmanufacturable***. . . . For glass elements, the edge thicknesses will become too thin to be fabricated without chipping. To achieve a successful design we have to modify our lens forms and adjust the proportions of the elements.

(Ex. 2033, Bareau at 1.) Bareau and Clark describe a number of issues that arise when scaling a 35 mm lens to a lens for a 1/4-inch sensor: "smaller entrance pupil" leading to greater depth of field and more sensitivity to diffraction, tighter "surface figure tolerances," tighter "geometric tolerances," tighter "angular tolerances," "stray light considerations," and "scratch/dig and contamination." (Ex. 2033, Bareau at 3.) *See* Moore Decl., ¶ 75.

Dr. Sasián further explains the manufacturing problems encountered when lens designs become smaller in his textbook on lens design. He explains

43

that for miniature lenses, "lens tolerances for lens thickness and decenter become tighter." (Ex. 2027, Sasián at 187.) Dr. Sasián elaborates:

> "As mentioned before, one problem with the small scale of miniature lenses is that lens element thickness and decenter errors can have a large impact by decreasing performance. For example, a thickness error of 0.1 mm can be tolerable in a 50 mm focal length lens, but not at all in a miniature lens with a focal length of 5 mm. Therefore, an important part of the lens design is to desensitize as much as possible a given design."

(Ex. 2027, Sasián at 192.) *See* Moore Decl., ¶ 76.

Bareau and Clark also describe the importance of desensitizing a miniature lens design: "One of the most challenging aspects of designing lenses for camera modules is desensitizing the system. If sensitivity to manufacturing tolerances is not built into the merit function, ***then the lens will not be manufacturable***." (Ex. 2033, Bareau at 9.) *See* Moore Decl., ¶ 77.

A POSITA would recognize that a conventional lens designed for medium-format film, such as that in Kawamura, may not be desensitized as required if it were scaled down by a factor of 12 or more. This is especially true of a lens designed in 1981, when the computer simulation abilities to study and reduce lens sensitivity were limited. For this reason, a POSITA in 2007 or in 2013 would not expect the Kawamura lens to be successful if scaled

down for use in Parulski. Dr. Sasián's declaration is silent on this important issue. *See* Moore Decl., ¶ 78.

A POSITA in or around 2013 simply would not have looked to a 200-mm lens designed in 1981 in selecting a design for Parulski's narrow lens. Rather, the POSITA would look to designs that were purpose-made for miniature cameras and that took advantage of three decades of technological improvement. As Dr. Sasián explains in his textbook, evolutionary development from existing miniature lens designs is the standard approach in the field: "[m]obile phone lenses have been evolutionary, in that every generation increased complexity from the previous one." (Ex. 2027, Sasián at 190.) There was also no shortage of miniature lens designs for a POSITA to use or to improve on: "[t]he patent literature has hundreds of lens design examples for mobile phone lenses and their forerunners, personal digital assistants." (Ex. 2006, Sasián at 190.) A POSITA would not have been motivated to go beyond rich literature of miniature lens designs and try scaling old lenses, designed for different purposes, with little reason to expect the result would be manufacturable. *See* Moore Decl., ¶ 79.

### b.    A POSITA Selecting a Lens for Parulski Would Have Used an Aspheric Design with Plastic Elements

A critical feature that was available in miniature lenses in 2007 or 2013, but not easily achieved in 1981, is the use of aspheric surfaces, made possible through the use of molded plastic and glass materials and improved computation resources. Aspheric surfaces have numerous degrees of freedom to their shape (compared to a single radius of curvature for a spherical surface), and adjusting these parameters allows the lens designer to reduce aberrations and improve the performance of a lens. Because of the superior performance they provide, aspheric lenses have become ubiquitous, particularly in the design of miniature lenses. Moore Decl., ¶ 80.

Dr. Sasián and his Ph.D. students have acknowledged that aspheric surfaces are a necessary feature of miniature lenses: "Mobile lenses are notorious by the extensive use of aspheric surfaces. The interaction of multiple aspherics within the design allows for effectively controlling aberrations." (Ex. 2028, Reshidko and Sasián at E217.) "To achieve good optical performance for the miniature cameras, aspherical surfaces are extensively used during the lens design." (Ex. 2031, Yan and Sasián at 1.) "In order to efficiently correct aberrations, aspherical surfaces are used extensively with injection molding of plastic." (Ex. 2031, Yan and Sasián at 1.) "The rear group of miniature camera

46

lenses usually contains one or two elements that are strongly aspheric to cor-

rect field curvature, astigmatism and distortion." (Ex. 2031, Yan and Sasián

at 1.) Moore Decl., ¶ 81.

Dr. Sasián's student Yufeng Yan elaborated on these issues in his Ph.D.

dissertation, explaining that "to achieve good optical performance, aspherical

surfaces are extensively used during the miniature lens design, usually em-

ploying up to 16th order terms." (Ex. 2034, Yan at 77–78.) "For miniature

lenses, injection molding is typically used to manufacture the small-scale lens

elements with high order aspherical surfaces." (Ex. 2034, Yan at 83.) Moore

Decl., ¶ 82.

Dr. Sasián's textbook explains that "[a]spheric surfaces provide effec-

tive degrees of freedom to correct all orders of spherical aberration" (Ex.

2027, Sasián at 27) and that in miniature lenses, "[t]o aid in the correction of

aberration, highly aspheric surfaces are used" (Ex. 2027, Sasián at 187). He

further explains that plastic lens elements make possible the use of aspheric

elements and provide other advantages: "Some advantages of plastic lens

molding are the freedom to specify aspheric surfaces, and the choice to specify

a lens flange to help precisely position a lens element with respect to other

47

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

lens elements, thereby simplifying the lens system assembly." (Ex. 2027, Sas-

ián at 194.) Moore Decl., ¶ 83.

The importance of aspheric surfaces and plastic lens elements in miniature

lens designs was recognized prior to Parulski's 2007 priority date:

> "The majority of these lenses are all-plastic although some in-
> corporate one glass element (usually the front element) for the
> advantages of high-index refraction and color correction. Plastic
> elements are almost always bi-aspheric, and frequently the as-
> pheres are not subtle!"

(Ex. 2033, Bareau at 8.) *See* Moore Decl., ¶ 84.

Simply scaling traditional glass designs leads to manufacturing diffi-

culties:

> "Traditional glass lenses have similar types of requirements but
> with different values, based on their own manufacturing pro-
> cesses. The inability of lens manufacturers to accurately center
> the outer dimension of these elements on the optical axis,
> makes precise mounting very difficult. The benefits of tradi-
> tional glass is reduced as the TTL requirements become
> shorter."

(Ex. 2033, Bareau at 8.) *See* Moore Decl., ¶ 85.

Clark's 2014 paper confirms that aspheric surface and plastic materials

remained "necessary" in the design of miniature camera modules: "The de-

signs of these MCM lenses are very different than those we are used to seeing

for larger cameras. Why? . . . Plastic materials. For cost, and to allow the

48

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

aspheric surfaces necessary for performance." (Ex. 2032, Clark at 4.) *See* Moore Decl., ¶ 86.

Based on a review of patented miniature digital camera lens designs, Clark observed that there are "several characteristics that separate" miniature digital camera lenses from traditional lens designs, including "[e]xtensive use of aspherics, including a large final surface, which is concave in the center and turning back before the edge of the surface." (Ex. 2032, Clark at 4.) He further found that in patented designs, "materials shift[ed] completely to the newer types" of plastics and that use of "high-order aspherics" had become "uninhibited." (Ex. 2032, Clark at 5.) Clark further observes that "[t]he asphere-dominated design form that has developed for these products appears to have been known for less than twenty years," i.e., since some time after 1994. (Ex. 2032, Clark at 8.) *See* Moore Decl., ¶ 87.

Both in 2009 and in 2013, a POSITA would have recognized that the best materials for making miniature lens elements were plastics. This is another reason that the POSITA would not have looked to scale Kawamura's lens designs. The optical performance of the lens depends on the index of refraction of each lens element, and the aberrations of the lens depend on the Abbe numbers of each lens element. A significant change in the index of

49

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

refraction or the Abbe number can change a highly performing lens design

into an unacceptable design. *See* Moore Decl., ¶ 88.

The indices of refraction and Abbe numbers required by the Kawamura

designs are not available in plastic materials. This can be seen by the follow-

ing "glass map," a plot index of refraction on the vertical axis and Abbe num-

ber on the horizontal axis, taken from Figure 4 of Clark:



Figure 4. Glass map indicating plastic optical materials.

(Ex. 2032, Clark at 4 (red dots added).) *See* Moore Decl., ¶ 89.

On this plot, the small black dots correspond to available optical

glasses, and the large gray and black dots correspond to available optical

50

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

plastics. The added red dots correspond to the properties of the Kawamura lens elements. As this shows, the available optical plastics have significantly different index of refraction and/or Abbe number from the optical glasses used in the Kawamura designs. This is a further reason that a POSITA would have looked to a high-performing, manufacturable miniature lens design, rather than trying to scale a decades-old design that requires the use of glass lens elements. *See* Moore Decl., ¶ 90.

### c.    A POSITA Selecting a Lens for Parulski Would Have Used a Design with an Aperture Stop Near the First Lens Element

Another feature that a POSITA in 2009 or in 2013 would have recognized is essential in a miniature camera lens design is that the aperture stop be at or near the front of the lens assembly. As Dr. Sasián's Ph.D. student Yufeng Yan stated in his Ph.D. dissertation, placing the stop position at the front of the lens was the "first required design change" between conventional lens designs and miniature lens designs. (Ex. 2034, Yan at 80.) He explained this is necessary to "minimize image space CRA" or chief ray angle and to reduce the telephoto ratio. (Ex. 2034, Yan at 80.) A higher than necessary CRA "causes rapid drop of relative illumination towards the edge of image that

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

requires digital compensation to the final image." (Ex. 2034, Yan at 81.) *See*

Moore Decl., ¶ 91.

Dr. Sasián and another Ph.D. student explained that for miniature

lenses:

> "The chief ray incidence angle (CRA) depends on the stop posi-
> tion and on the amount of pupil spherical aberration. The CRA
> impacts the relative illumination, which often is set to 50% at
> the sensor corners. . . . For better CRA control, the aperture stop
> is placed close to the front of the lens, away from the image
> plane. The aperture stop position and the strong aspheric next to
> the image plane generate exit pupil spherical aberration, which
> reduces the CRA."

(Ex. 2028, Reshidko and Sasián at E217.) *See* Moore Decl., ¶ 92.

To understand the issue Dr. Sasián is describing here, it is helpful to

look at a ray trace, such as the following one that Dr. Sasián performed of

Kawamura's first example:

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479



(Ex. 1003, Sasián Decl. at 62.) Rays in this figure travel from left to right, reaching the film, shown as a vertical red line on the right of the figure. The blue rays that strike the center of the film are incident on the film at close to the perpendicular this confusing. The red rays at the edge of the field that strike the edge of the film do so at a larger angle to the perpendicular to the sensor. This can be quantified by measuring the angle from the perpendicular of the "chief ray," which is the ray that passes through the center of the aperture stop and is incident at the edge of the film (or sensor). In this figure, the chief ray is approximately the middle one of the three red rays. *See* Moore Decl., ¶ 93.

53

The brightness of the image is affected by the angle that the light is incident on the film or sensor. Parts of the sensor that receive light at a perpendicular are typically brightest, while parts of the sensor that receive light at an angle are typically dimmer as the angle from the perpendicular increases. The ratio of the brightness between the center of the sensor and the edge is called the relative illumination, and it is desirable to reduce this ratio to provide a more uniform image. To achieve this, the chief ray angle should be kept as small as possible. As Dr. Sasián and his Ph.D. students explained in the statements quoted above, the chief ray angle in a system with aspheric lenses is reduced by placing the aperture stop close to the front of the lens. (Ex. 2034, Yan at 80; Ex. 2028, Reshidko and Sasián at E217.) *See* Moore Decl., ¶ 94.

The need to place the aperture stop close to the front of the lens in a miniature lens system was recognized before 2009. For example, Bareau and Clark explained that "[t]he aperture stop is usually towards the front of the lens, often before the first element, which helps CRA and TTL." (Ex. 2033, Bareau at 8.) *See* Moore Decl., ¶ 95.

Based on a review of patented miniature digital camera lens designs, Clark observed that there are "several characteristics that separate" miniature digital camera lenses from traditional lens designs, including that the

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

"[a]perture stop is close to the front of the lens." (Ex. 2032, Clark at 4.) *See* Moore Decl., ¶ 96.

As explained above, Dr. Sasián's simulations of the Kawamura lenses show that these lenses were designed to have the aperture stop in the middle of the lens assembly, between the fourth and five lens elements. (Ex. 1003, Sasián Decl. at 62–65.) As also explained above, a POSITA would recognize that this stop location was needed to reduce aberrations in this design lacking aspheric surfaces and made without the benefit of modern computation. This is a further reason that a POSITA would not expect scaling of the Kawamura lens designs to successfully provide a lens with performance suitable for use in Parulski's system. *See* Moore Decl., ¶ 97.

### d. A POSITA Selecting a Lens for Parulski Would Not Have Used a Lens with F-Number of 4

As explained above, the f-number of the lens determines how bright the image produced on the sensor is for a given scene, i.e., how much light reaches each unit of area of the sensor per unit of time. This relationship is independent of other lens characteristics such as field of view or telephoto ratio. Moore Decl., ¶ 98.

The brightness varies as one over the square of the f-number, so that a lens with f-number of 4.0 produces an image roughly one half as bright as a

55

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

lens with f-number 2.8. The small size of the pixels in miniature camera sensors means that they require more light per unit area to produce an accurate image. In order to maintain acceptable exposure times, it is important to make the f-number as small as practical. Moore Decl., ¶ 99.

Dr. Sasián recognized the importance of low f-number in miniature cameras: "Due to the demand of low-light performance of the miniature cameras, larger aperture lenses with lower F/# are desired." (Ex. 2031, Yan and Sasián at 1.) In this paper, Dr. Sasián uses as a "benchmark lens" a lens with f-number equal to 2.2. Moore Decl., ¶ 100.

The need for small f-numbers was recognized prior to 2009. For example, Bareau and Clark state that "typical lens specifications" for a 1/4-inch sensor format include a f-number of 2.8. (Ex. 2033, Bareau at 3.) They further explain:

> Although most camera module customers specify f/2.8, it is not uncommon to see lenses at f/3.0 and f/3.3 when the increased fno has a significant effect on performance or manufacturability. However, smaller pixel sensors have less light gathering capability and will suffer at slower f/numbers.

(Ex. 2033, Bareau at 4.) *See* Moore Decl., ¶ 101.

Based on a review of patented miniature digital camera lens designs, Clark observed that there are "several characteristics that separate" miniature

56

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

digital camera lenses from traditional lens designs, including that the "f/number is between f/3 and f/2," i.e. that the f-number is between 2 and 3. (Ex. 2032, Clark at 4.) Moore Decl., ¶ 102.

The f-number of the Kawamura lenses is 4.1. (Ex. 1012 at 3–5.) This is substantially less bright than the f-numbers described as typical for miniature lenses by Dr. Sasián and by Bareau and Clark, e.g., less than half as bright as a lens with f-number 2.8. A POSITA would have recognized the importance of a small f-number lens in the miniature camera of Parulski. This is another reason that a POSITA would have looked to existing miniature lens designs, rather than the old Kawamura design, directed to an entirely different purpose. Moore Decl., ¶ 103.

### 3.    A POSITA Would Not Have Scaled Ogata to Use in Parulski

A POSITA also would not have scaled Ogata to use in Parulski's system, for most of the same reasons discussed for Kawamura. The issues are not quite as extreme for Ogata as for Kawamura. It was merely 14 years old when Parulski was filed, rather than 26 years old. It "only" requires scaling by a factor of 6 or more, rather than by a factor of 12 or more. It does make very limited use of aspheric surfaces. But, it still is not the kind of a lens that a POSITA would have turned to in 2007 (or in 2013), when numerous lens

57

designs intended for miniature camera modules were available. Moore Decl., ¶ 104.

A POSITA would have recognized that it was not practical to scale Ogata down by a factor of 6 or more, for the same reasons discussed in connection with Kawamura above. The teachings of Dr. Sasián, Dr. Yan, and of Bareau and Clark that conventional camera lenses "can not simply be scaled down" and that scaling such lenses "with result in a system that is unmanufacturable" apply equally to Ogata as they do to Kawamura. (Ex. 2029, Reshidko and Sasián at E216; Ex. 2034, Yan at 83; Ex. 2033, Bareau at 1, 9.) Moore Decl., ¶ 105.

Likewise, a POSITA would not have used the Ogata lens design scaled down because they would have instead used a fully aspheric design with plastic elements, for the same reasons discussed in connection with Kawamura above. As discussed in that section, a POSITA at the time of Parulski's patent would have known that to make an acceptable miniature camera lens, it was necessary to make "extensive use of aspheric surface" and plastic lens elements. (Ex. 2028, Reshidko and Sasián at E217; Ex. 2031, Yan and Sasián at 1; Ex. 2034, Yan at 77–78, 83; Ex. 2027, Sasián at 194; Ex. 2033, Bareau at 8; Ex. 2032, Clark at 4, 5, 8.) And as discussed above, the design of Ogata

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

Embodiment 1 could not be made with available plastic materials, whether at original size or scaled down. (Ex. 2032, Clark at 4.) Moore Decl., ¶ 106.

In addition, a POSITA would not have used the Ogata lens design scaled down because they would have understood that placing the stop near the back of the lens assembly as in Ogata's conventional lens design would have led to higher than necessary chief ray angle and poor relative illumination, as discussed in connection with Kawamura above. As Dr. Sasián, Dr. Yan and other emphasize, placing the aperture stop at the front of the lens assembly is necessary (the "first required design change") for a miniature lens. (Ex. 2034, Yan at 80; Ex. 2007, Reshidko and Sasián at E217; Ex. 2033, Bareau at 8; Ex. 2032, Clark at 4.) Moore Decl., ¶ 107.

### 4. Apple Has Not Shown that the Limitation "to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos" Is Satisfied Under Its Proper Construction

As discussed above, Apple's proposed construction of "to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos" improperly splits the phrase into two, unrelated steps. Hart Decl., ¶ 97. Petitioner's obviousness

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

combination likewise improperly splits related claim limitations into unre-

lated steps. *Id.*

Dr. Durand calls the phrase "to process the Wide and Tele images to

find translations between matching points in the images to calculate depth in-

formation" limitation [19.5.1], and calls the phrase "and to create a fused im-

age suited for portrait photos" limitation [19.5.2]. (Ex. 1003, Durand Decl. at

63, 66.) *See* Hart Decl., ¶ 98.

For limitation [19.5.1], Dr. Durand points solely to Figure 11 of Parul-

ski and to Parulski's discussion of that figure. (Ex. 1003, Durand Decl. at 63–

66; Ex. 1005, Parulski at 19:49–20:15. Fig. 11). *See* Hart Decl., ¶ 99.

For limitation [19.5.2], Dr. Durand points to a portion of Parulski's dis-

cussion of Figure 14. (Ex. 1003, Durand Decl. at 66; Ex. 1005, Parulski at

22:14–42.) However, he concedes Parulski does not disclose limitation

[19.5.2] (or limitation [19.5.3]), because creating "a fused image suited for

portrait photos" (and with a shallower DOF) in the context of Parulski requir-

ing narrowing the depth of field of the original images, but the teachings in

Parulski that Dr. Durand points to only discuss *broadening* (i.e., "enhancing")

the depth of field. (Ex. 1003, Durand Decl. at 66; Ex. 1005, Parulski at 22:14–

42.) *See* Hart Decl., ¶ 100.

60

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

Because Parulski does not disclose narrowing the DOF, Dr. Durand points to Soga to satisfy the limitation "and to create a fused image suited for portrait photos." (Ex. 1003, Durand Decl. at 66–69.) However, Soga does not satisfy the broader term "to process the Wide and Tele images to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos," under the correct interpretation of that term. *See* Hart Decl., ¶ 101.

Soga does not utilize depth information or matching of points in the image at all. Indeed, it performs image segmentation solely based upon the first image. Hart Decl., ¶ 102.

Soga captures two images with a same camera, as shown in Figure 4:

61

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

[FIG. 4]





(Ex. 1006, Soga, Fig. 4.) *See* Hart Decl., ¶ 103.

As shown in this figure, the first photograph is focused at the position of the principal subject, so that the details of that subject (e.g., the flower) will be sharp. (*Id.*, ¶¶ 65–66.) The second photograph is focused at a much shorter distance, such that both the principal subject and the background are out of

62

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

focus (illustrated by the wavy outline of the flower in the second image). (*Id.*)
*See* Hart Decl., ¶ 104.

The images are combined by "cutting" the principal subject out of the first image and inserting it into the second image. (Ex. 1006, Soga, ¶¶ 54, 56.) But, this cutting step is performed before the second image has even been captured. Specifically, the first image is captured and stored in memory (id., ¶ 52), then the camera is adjusted to take the second image (id., ¶ 53), then while the second image is being captured, the circuitry performs "edge detection" on the first image and "cuts out the principal subject" (id., ¶ 54), and after that is complete, the second image capture is completed (id., ¶ 55). *See* Hart Decl., ¶ 105.

There is a good reason that Soga only uses the first image in order to identify what region to cut out for the principal subject. *See* Hart Decl., ¶ 106. Soga utilizes an edge detection technique illustrated in Figure 3:

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

[FIG. 3]



(Ex. 1006, Soga, Fig. 3.)

Successful edge detection depends on a sharp change in the image at

the edge of the object—what Soga refers to as a "high frequency component"

in the signal. (Ex. 1006, Soga, ¶¶ 59–61.) In the second (out of focus) image,

the high frequency components are substantially reduced, and the sharp edge

is gone. (Id., ¶ 61.) The blurry second image does not have useful information

for determining where to cut the first image. Hart Decl., ¶ 107. It also could not be used to produce depth information, because it was captured using the same camera at the same location as the first image, and no parallax between the cameras is present. *Id.*

Because Soga relies solely on the information in the first image to identify the principal subject, and because it simply pastes the cutout principal subject into the second image without modification, it does not utilize "translations between matching points in the images" as part of creating the fused image. Indeed, Dr. Durand points to Soga's not needing "an accurate depth map" as a benefit of Soga that he believes would have motivated a POSITA to combine it with Parulski. (Ex. 1003, Durand Decl., ¶ 76.) Based on Dr. Durand's arguments for combination in ¶ 76, the art (including Soga and Jacobs) teach away from modifying Soga to make use of "translations between matching points in the images" or "depth information." (*Id.*, ¶ 76; Ex. 1007, Jacobs at 2.) *See* Hart Decl., ¶ 108.

As a result, the combination of Parulski and Soga only satisfy the limitations of claim 1(e) under an interpretation that improperly treats "to create a fused image" as a completely separate step that does not in any way relate to

65

or depend on the "to find translations between matching points" limitation.

Hart Decl., ¶ 109.

### B. Claims 21 and 22 Are Not Obvious Over the Combination of Parulski, Ogata, Kawamura, Soga, and Morgan-Mar (Ground 2)

Claim 21 depends from 20, and claim 22 depends from 21. (Ex. 1001, '479 patent at 15:43–49.) For both claims, Apple relies on the Ground 1 combination to satisfy the elements that these claims inherit from claims 19 and 20. As a result, the same analysis provided above for claims 19 and 20 applies to this ground, and Apple has not shown claims 21 and 22 to be obvious, either. *See* Hart Decl., ¶ 110.

One skilled in the art would not have been motivated to combine Morgan-Mar with the other four references making up this ground. Morgan-Mar, titled "Bokeh Amplification" discloses methods designed for an ordinary single-lens image capture device. Morgan-Mar teaches a preference for determining depth from multiple images taken from the same POV (allowing only for slight camera movement) at different times, by examining the degree of blur of pixels corresponding to out-of-focus points in the scene. *See* Hart Decl., ¶ 111.

Case Nos. IPR2020-00906
U.S. Patent No. 10,225,479

Morgan-Mar at Fig. 5 illustrates an example where multiple images are used. These images are intended to be captured from a single POV (camera position and orientation) using different camera parameters (e.g. focus settings). Mogan-Mar does not rely on any shift in the POV of the captured images, but can accommodate "slight camera movement between capture of the two images" (Ex. 1009, Morgan-Mar at 19:33-34). Fig. 6 further illustrates that Morgan-Mar depends on an alignment between pixels in patches in the first image and corresponding pixels in patches in a second image, as explained by Morgan-Mar at 19:55-20-21:39. "Many such alignment processes are known to those skilled in the art" (id. at 10:10-11) but would need to be robust enough to "address issues such as motion of the object such as motion of objects within the scene between the two exposures, motion of the camera 427 between the two exposures, and changes in the magnification or distortion or both between the two exposures" (id. 20:4-8). *See* Hart Decl., ¶ 112.

Dr. Durand opines at ¶ 87 that a POSITA would have been motivated to combine Morgan-Mar with Parulski and Soga. (Ex. 1003, Durand Decl., ¶ 87.) Not so. While Morgan-Mar and Parulski are both directed at manipulating depth-of-field effects in photographs, they approach the problem from incompatible directions. Parulski relies on multiple images but captured

67

simultaneously from separate imaging sections with separate POV's, whereas Morgan-Mar expects multiple images from the same imaging section and a single POV (or with "slight movement") but taken at different times. Parulski's determination of depth depends critically on the reliance that the multiple images have a different POV enabling stereo correspondence. Parulski's stereo correspondence is a simpler and more robust global process for determining pixel offsets than Morgan-Mar's more general patch-based process needed to handle the registration of multiple temporally distinct images that could include articulated motion in different directions in the scene between images in the collection of multiple images used. A POSITA would not have looked to the significant additional processing burden needed for constructing a range map when a more robust dual lens stereo correspondence was already available in Parulski. *See* Hart Decl., ¶ 113.

## IX.  SECONDARY CONSIDERATIONS / OBJECTIVE INDICIA OF NON-OBVIOUSNESS

The challenged claims of the '479 patent are not proven to be obvious for the additional reason that there is objective evidence of secondary considerations supporting their non-obviousness. "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,

Petitioner

v.

COREPHOTONICS, LTD.,
Patent Owner

_____

IPR2020-00906
U.S. Patent 10,225,479

_____

**PETITIONER'S REPLY**

1981 and opinion testimony unsupported by any underlying lens design software

analysis also sink Patent Owner's arguments.

**A.    Patent Owner does not dispute that "a camera controller configured to … *to find translations between matching point in the images to calculate depth information and to create a fused image suited for portrait photos*" is satisfied under Petitioner's construction.**

Patent Owner concedes that this limitation is satisfied as discussed in

Ground 1 under Petitioner's construction of this limitation. *See* Response at 65;

APPL-1038, ¶42. Because Patent Owner's construction of this term is unsupported

by the specification as discussed above, this limitation is disclosed by the

combination of Parulski and Soga as set forth in the Petition. *See* Petition at 54-57;

APPL-1003, pp.63-69; APPL-1038, ¶42.

**B.    Patent Owner relies on an incorrect premise that Ground 1 in the Petition requires Kawamura and Ogata to be used in a miniature camera module.**

The Petition explains that Parulski can use a 1/2.5" sensor in its digital still

camera, and a POSITA would have looked to Kawamura's and Ogata's lens

designs scaled to appropriate sizes for these sensors. Petition at 19-20, 29-30.

Patent Owner first argues that "one skilled in the art in 2007 or later, looking for

1/2.5-inch sensors for a digital system like Parulski would have looked to lenses

- 5 -

designed for **miniature digital camera modules**." Response at 39; Ex. 2015, ¶¶

38-39. This is not supported by the evidence. APPL-1039, ¶2.

Patent Owner cites the chart from Galstain to support its position (Ex. 2015,

¶39) but a 1/2.5" sensor is not even listed:

TABLE 1.1   Comparison of Camera Formats

(a) Miniature Camera Modules, Digital Cameras, and Film Cameras[a]

| Inch-Format | Horizontal (mm) | Vertical (mm) | Diagonal (mm) | Area (mm²) | Megapixels | Minimum Pixel (mm) | Maximum Pixel (mm) | Linear Scale (35 mm ref) (%) | Area Scale (35 mm ref) (%) | Typical Minimum f/number | EFL | Entrance Pupil Diameter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Miniature Camera Modules* | | | | | | | | | | | | |
| 1/6 | 2.32 | 1.74 | 2.90 | 4.04 | 1.3–2 | 0.0014 | 0.0017 | 7 | 0.4 | 2 | 2.28 | 1.14 |
| 1/5 | 2.80 | 2.10 | 3.50 | 5.88 | 2–3 | 0.0014 | 0.0017 | 8 | 0.7 | 2 | 2.75 | 1.37 |
| 1/4 | 3.60 | 2.70 | 4.50 | 9.72 | 3–5 | 0.0014 | 0.0017 | 10 | 1.1 | 2.4 | 3.53 | 1.47 |
| 1/3 | 4.80 | 3.60 | 6.00 | 17.28 | 5–8 | 0.0014 | 0.0017 | 14 | 1.9 | 2.8 | 4.71 | 1.68 |
| *Digital Still Cameras* | | | | | | | | | | | | |
| 1/2.3 | 6.08 | 4.56 | 7.60 | 27.72 | 12–16.6 | 0.0015 | 0.0022 | 18 | 3.1 | 2.8 | 6.0 | 2.1 |
| 1/2 | 6.40 | 4.80 | 8.00 | 30.72 | 16 | 0.0014 | 0.0014 | 18 | 3.4 | 2.4 | 6.3 | 2.6 |
| 1/1.7 | 7.44 | 5.58 | 9.30 | 41.52 | 10–12 | 0.0019 | 0.002 | 21 | 4.6 | 2 | 7.3 | 3.6 |
| 1 | 13.20 | 8.80 | 15.86 | 116.16 | 14.2 | 0.0029 | 0.0029 | 37 | 13 | 2 | 12.5 | 6.2 |
| APS-C | 23.60 | 15.80 | 28.40 | 372.88 | 12.2–24.7 | 0.0039 | 0.0055 | 66 | 43 | 2 | 22.3 | 11.1 |
| FULL | 36.00 | 24.00 | 43.27 | 864.00 | 18.1–24.7 | 0.0059 | 0.0069 | 100 | 100 | 1.4 | 34.0 | 24.3 |
| *Film Cameras* | | | | | | | | | | | | |
| Disc | 11.0 | 8.0 | 13.6 | 88 | | | | 31 | 10 | 2 | 10.7 | 5.3 |
| APS-H | 30.2 | 16.7 | 34.5 | 504 | | | | 80 | 64 | 2 | 27.1 | 13.5 |
| 35 mm | 36.0 | 24.0 | 43.3 | 864 | | | | 100 | 100 | 1.4 | 34.0 | 24.3 |
| 6 × 6 cm | 60.0 | 60.0 | 84.9 | 3600 | | | | 196 | 385 | 2.8 | 66.6 | 23.8 |
| 4 × 5 in. | 127.0 | 101.6 | 162.6 | 12903 | | | | 376 | 1413 | 4.5 | 127.6 | 28.4 |

Ex. 2028, p.4; Response at 39; Ex. 2015, ¶¶ 38-39. Dr. Moore's belief is therefore

an unsupported assumption that a 1/2.5" sensor would fall into the "Miniature

Camera Module" category, which it does not. APPL-1039, ¶3. To the contrary,

Konno's Example 2 lens system is a miniature camera module using a sensor with

an image height of 5.8 mm, which translates closely to a 1/1.7" sensor which is

also not listed in the miniature camera module group. *Id.*; s*ee* APPL-1015, Table 1.

- 6 -

A 1/2.5" sensor has a diagonal dimension of about 7.2 mm. *See* APPL-1029; APPL-1030. The Petition cites two 1/2.5" image sensors available to POSITAs at the time with pixel sizes of 0.00186 mm (*see* APPL-1029) and 0.00203 mm (*see* APPL-1030). Petition at 20, 27. Based on the above chart from Galstain, a 1/2.5" sensor is closer in both dimension and pixel size to a 1/2.3" sensor and supports a POSITA's understanding that a 1/2.5" sensor was better suited for "Digital Still Cameras." not "Miniature Camera Modules" in 2013. APPL-1039, ¶4. Further, Parulski refers to a 100 mm equivalent focal length lens which for a 1/2.5" sensor would correspond to a focal length of about 100 mm x 7 mm / 43 mm = 16.27 mm; this focal length does not correspond to a miniature camera in the Galstein chart. *Id.*

Based on this this incorrect premise, Patent Owner argues that Kawamura and Ogata must be scaled to fit in miniature camera module to be combinable with Parulski. *See* Response at 39-59; Ex. 2015, ¶¶ 68-107. Because there is no evidence supporting Dr. Moore's assumption that a 1/2.5" sensor is only suited for a miniature camera module (e.g., Parulski Fig. 16), Patent Owner fails to rebut the Petition's showing that a POSITA would have looked to scale Kawamura and Ogata for use in a digital still camera (e.g., Parulski Fig. 2; Labaziewicz, Fig. 10D). APPL-1039, ¶5. For this reason alone, Dr. Moore's opinion should be disregarded as being based on an inaccurate assumption. *Id.*

- 7 -

### C.  A POSITA would have considered the Kawamura and Ogata designs in selecting lenses for Parulski's digital camera.

Patent Owner provides several reasons why a POSITA "would not have been motivated to scale Kawamura for use in Parulski," none of which are relevant to a proper obviousness analysis. First, Patent Owner cites the 26-year gap and "substantial improvements" in that time, but neither are relevant to the first *Graham* factor, determining "the scope and content of the prior art." *See Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The only relevant question here is "if the reference is within the field of the inventor's endeavor." *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986). Patent Owner does not dispute that Parulski, Ogata, or Kawamura are all within the same field of endeavor as the '479 patent. APPL-1039, ¶6. And, Patent Owner's assertions about the age of the references or improvements in the art are not relevant to an obviousness inquiry.

### 1.  A POSITA would have scaled Kawamura and Ogata for a digital camera, not a miniature camera module.

Patent Owner argues that a POSITA would not have been motivated to scale Kawamura as presented in the Petition because "[s]caling lens designs by a large factor is not done in practice." Response at 40. This argument fails because it

- 8 -

impermissibly limits the implementation of Parulski to miniature camera modules.
APPL-1039, ¶7.

First, Patent Owner cites the premise that "scaling a good conventional lens
design to a smaller size will often produce a design that is substantially inferior for
its intended purpose to designs that were specifically created to be used as small
lenses." Response at 41; Ex. 2015, ¶70. This statement cites to nothing, and is
based on Dr. Moore's assumption that Parulski is limited to miniature camera
modules. APPL-1039, ¶8; *see Rohm and Haas Co. v. Brotech Corp.*, 127 F. 3d
1089, 1092 (Fed. Cir. 1997) ("Nothing in the rules or in our jurisprudence requires
the fact finder to credit the unsupported assertions of an expert witness.").

Second, Patent Owner cites several academic references that each describe
lens scaling issues for miniature camera modules, not larger digital cameras.
APPL-1039, ¶9. Patent Owner relies on Ex. 2029 for the proposition that "[a]
traditional objective lens can not be simply scaled down …." Response at 41; Ex.
2029, p.1. But the immediately preceding sentence limits this statement to "a
miniature camera lens module" (*see* Ex. 2029), which is irrelevant to whether a
POSITA would have scaled Kawamura for a larger device like a digital camera.
APPL-1039, ¶9. Additionally, lens designers as a standard practice scale lenses,
adjust, and optimize lenses. *Id.*

- 9 -

Patent Owner relies on Ex. 2028 to support its assumption that a POSITA would implement Parulski using a 1/2.5" image sensor in a miniature camera module. Again, this assumption is unsupported because the chart Dr. Moore cites does not list a 1/2.5" sensor in the "Miniature Camera Module" category. APPL-1039, ¶¶ 3-4.

Patent Owner relies on Ex. 2034 for the proposition that "if the conventional camera lens was simply scaled down to the same focal length of the miniature lens, it would encounter many issues." Response at 42; Ex. 2034, p.79. The miniature lenses discussed in this reference, though, are specific to "mobile platform electronics applications, such as cell phones and tablets," not to larger devices like a digital camera. APPL-1039, ¶10.

Patent Owner relies on Ex. 2033 for the proposition that "Scaling down such a lens will result in a system that is unmanufacturable." Response at 43; Ex. 2033, p.1. But again, this reference is directed to "lenses for cell phone cameras" having "typical lens specifications" of a 1/4" sensor and a total track length of about 5 mm. *See* Ex. 2033, p.3. The combination in the Petition, however, is a digital camera with a 1/2.5" sensor and both Kawamura and Ogata being scaled to larger than 5 mm. *See* Petition at 41, 44 (scaling the lenses to 15 mm and 7 mm respectively); APPL-1039, ¶11.

- 10 -

Patent owner finally relies on Ex. 2027 for the proposition that "one problem with the small scale of miniature lenses is that lens element thickness and decenter errors can have a large impact by decreasing performance." Response at 44; Ex. 2027, p.192. But yet again, this is in reference to a "miniature lens with a focal length of 5 mm," (Ex. 2027, p.192) not a digital camera with larger lenses as presented in the Petition. *See* Petition at 41, 44; APPL-1039, ¶12.

Thus, Patent Owner's evidence fails to address the combination of Parulski, Ogata, and Kawamura implemented in a digital camera, as in Parulski Fig. 2 where Kawamura is scaled to have a total track length of about 15 mm and Ogata is scaled to about 7 mm. *See* Petition at 39, 41, 44. Additionally, Exs. 2027, 2029, 2034, do not reflect the knowledge of a POSITA as of the '479 patent's priority date in 2013 because they were published in 2015 and 2019, and address miniature camera modules in these time periods. APPL-1021, ¶13.

### 2. *Patent Owner's list of miniature lens requirements should be rejected because they are based on improperly limiting Parulski to miniature camera modules using miniature lenses.*

Patent Owner alleges that a miniature lens used with Parulski must satisfy requirements including (1) an aspheric design with plastic elements, (2) an aperture stop near the first lens element, and (3) a small F-Number between 2 and 3. Response at 46-57. Each "requirement," however, is premised on Patent Owner's

- 11 -

assumption, that Parulski is limited to miniature camera modules. *See* Ex. 2015, ¶39. These requirements are irrelevant and improperly imposed. APPL-1039, ¶14.

Moreover, Patent Owner's assertion that a POSITA would have not have considered Kawamura due to its F-number (Response at 55-57) also fails because miniature cameras modules with f-numbers similar to Kawamura and Ogata were known in the art, for example, in the Konno reference. APPL-1039, ¶15; *compare* APPL-1015, p.21 (wide F#=3 and tele F#=4) *with* APPL-1026, 7:34-40 (wide F#=2.9) *and* APPL-1012, p.3 (tele F#=4.1).

### 3. *A POSITA would have looked to Kawamura among other lens designs when considering how to implement Parulski's camera.*

Patent Owner argues that "a POSITA would have looked to one of the **hundreds** of known **miniature** lens designs when looking for a lens to use in Parulski," and therefore a POSITA would not have looked to Kawamura's non-miniature design. Response, 2-3, 45. This argument fails because it is again incorrectly premised on Parulski requiring a miniature lens. APPL-1039, ¶17.

The argument that a POSITA would have considered "hundreds of lens design examples for mobile phone lenses" for use in Parulski (Response at 45) is also unsupported because Patent Owner fail to provide even a single example of a miniature telephoto lens design that a POSITA would have looked to. APPL-1039,

- 12 -

¶17; *see* APPL-1041, 128:5-22 (Dr. Moore admitting that he does not know any reference providing a miniature telephoto lens design on or before 2013).

### D. Patent Owner's analysis is incorrect because it is based on a POSITA's understanding of technology in 1981 and incorrect understanding of ongoing relevance of older lens designs.

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person of ordinary skill in the art **at the time the invention was made**. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Patent Owner's argument that a POSITA would not have been motivated to combine Kawamura and Ogata with Parulski is incorrectly based on alleged technology in 1981, instead of evaluation and routine modification by a POSITA at the time the invention was made as required by *KSR*.

For example, Patent Owner argues that "a POSITA in 2007 or in 2013 would not expect the Kawamura lens to be successful if scaled down for use in Parulski," because "in 1981 [] the computer simulation abilities to study and reduce lens sensitivity were limited." Response, 44; *see also* Response, 24-25 (discussing lower computer ability to optimize a lens design and more limited lens fabrication technology in 1981); Response, 46 (discussing that the use of aspheric surfaces was not easily achieved in 1981). Dr. Moore reaffirmed during deposition

- 13 -

his reliance on limitations of computer-assisted lens design optimization and lens fabrication technology in 1981 as reasons why POSITA would not have been motivated to use Kawamura's design in Parulski. APPL-1041, 70:18-71:12.

Additionally, Patent Owner argues that in 2013, a POSITA "simply would not have looked" to Kawamura's 1981 design. Response at 45. First, Patent Owner argues that there were many developments in miniature lens design during those thirty years. *Id.* But as explained above, Parulski is not limited to miniature lenses. Second, Patent Owner implies that designs from 1981 would be wholly outdated by 2013. *Id.* However, lens designs remain relevant to a POSITA for many decades. APPL-1039, ¶20; APPL-1020, pp.359-366 (Textbook titled "Modern Lens Design" from 2005 including example telephoto lens designs from 1950, 1977, and 1982). Indeed, Patent Owner's U.S. Patent 9,568,712 included claims for a lens design it believed was novel and non-obvious that were invalidated as anticipated by a 1968 patent. IPR2018-01146, Paper 37, 29-37.

Patent Owner's reliance on an POSITA's knowledge of the technology in 1981 fails to consider the ongoing relevance of older lens designs with modern lens design optimization, and therefore fails to evaluate prior art as a POSITA would have done at the time the invention was made. APPL-1039, ¶21. This argument

that a POSITA would not have been motivated to combine Kawamura and Parulski

should be rejected. *Id.*

### E. Lens design software analysis supports combining Parulski with Ogata and Kawamura.

#### 1. *Patent Owner fails to provide any optical design software analysis to support his opinion, which a POSITA at the time of the invention would have performed to evaluate prior art.*

A POSITA in 2013 would have performed lens design software analysis and

formed its opinion based on the lens design software. APPL-1039, ¶22. Petitioner

and Dr. Sasián have provided detailed lens design software analysis, which

confirms the viability of Kawamura's and Ogata's lens designs in Parulski and

reinforces the Petition's motivation to use same. Petition at 21-24, 28-30; APPL-

1021, ¶¶ 50-55, 61-65, Appendix; APPL-1039, ¶22, Appendix.

#### 2. *To the extent that Parulski is limited to miniature camera modules, modifications or adjustments would have been within the level of a POSITA to accommodate the teachings of Kawamura and Ogata in Parulski's camera.*

As discussed in III.C.3, Patent Owner's list of miniature lens requirements

for incorporating lenses in Parulski should be rejected. However, to the extent that

miniaturized lenses would have been required for combining Kawamura and Ogata

with Parulski, Dr. Sasián's detailed analysis (APPL-1039, ¶ 25-31) shows how a

POSITA could have used lens design software to modify and adjust an older lens

IPR2020-00906

*Apple Inc. v. Corephotonics, Ltd.*

U.S. Patent No. 10,225,479

core|photonics

IPR2020-00906 | SLIDE 1

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

_____

IPR2020-00906
U.S. Patent No. 10,225,479 B2

_____

**PETITIONER APPLE INC.'S NOTICE OF APPEAL**

via E2E
Patent Trial and Appeal Board

via Hand Delivery
Director of the United States Patent and Trademark Office
c/o Office of the General Counsel, 10B20
Madison Building East
600 Dulany Street
Alexandria, VA 22314

via CM/ECF
United States Court of Appeals for the Federal Circuit

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, and 37 C.F.R. §§ 90.2(a), 90.3, and Federal Circuit Rule 15(a)(1), Petitioner Apple Inc. ("Petitioner") provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered November 8, 2021 (Paper 54), and from all underlying and related orders, decisions, rulings, and opinions regarding U.S. Patent No. 10,225,479 B2 ("the '479 patent") in *Inter Partes* Review IPR2020-00906.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), the expected issues on appeal include, but are not limited to: the Board's error(s) in determining that challenged claims 19-22 of the '479 patent are not unpatentable, the Board's findings and conclusions regarding combining the prior art references presented, and all other issues decided adversely to Petitioner in any orders, decisions, rulings, or opinions.

Pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2(a), a copy of this Notice is being filed with the Director of the United States Patent and Trademark Office and with the Patent Trial and Appeal Board. In addition, a copy of this Notice and the required docketing fees are being filed with the Clerk's Office for the United States Court of Appeals for the Federal Circuit via CM/ECF.

1

Respectfully submitted,

Dated: January 10, 2022              /Michael S. Parsons/
                                     Michael S. Parsons
                                     Reg. No. 58,767

HAYNES AND BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX  75219
Telephone: (972) 739-8611
Facsimile: (214) 200-0853
michael.parsons.ipr@haynesboone.com

2

Petitioner Apple Inc.'s Notice of Appeal                                    IPR2020-00906
Attorney Docket No. 52959.54R479                          U.S. Patent No. 10,225,479 B2

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically filed through PTAB E2E, a true and correct copy of the above-captioned PETITIONER APPLE INC.'S NOTICE OF APPEAL is being filed by hand with the Director on January 10, 2022, at the following address:

> Director of the United States Patent and Trademark Office
> c/o Office of the General Counsel, 10B20
> Madison Building East
> 600 Dulany Street
> Alexandria, VA 22314

The undersigned also hereby certifies that a true and correct copy of the above-captioned PETITIONER APPLE INC.'S NOTICE OF APPEAL and the filing fee is being filed via CM/ECF with the Clerk's Office of the United States Court of Appeals for the Federal Circuit on January 10, 2022.

Respectfully submitted,

Dated: January 10, 2022                    /Michael S. Parsons/
                                           Michael S. Parsons
                                           Reg. No. 58,767
                                           Attorney for Petitioner Apple Inc.

3

# CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, this is to certify that a true and correct copy of

the foregoing "Petitioner Apple Inc.'s Notice of Appeal" was served on the Patent

Owner Corephotonics, Ltd. as detailed below:

| | |
|---|---|
| *Date of service* | January 10, 2022 |
| *Manner of service* | Electronic Service by E-mail:<br>– nrubin@raklaw.com<br>– jchung@raklaw.com<br>– mfenster@raklaw.com<br>– jtsuei@raklaw.com<br>– jlink@raklaw.com |
| *Documents served* | **Petitioner Apple Inc.'s Notice of Appeal** |
| *Persons served* | Neil A. Rubin (nrubin@raklaw.com)<br>C. Jay Chung (jchung@raklaw.com)<br>Marc A. Fenster (mfenster@raklaw.com)<br>James S. Tsuei (jtsuei@raklaw.com)<br>Russ August & Kabat<br>12424 Wilshire Blvd., 12th Floor<br>Los Angeles, CA 90025<br><br>Jonathan Link (jlink@raklaw.com)<br>Russ August & Kabat<br>800 Maine Ave SW, Suite 200<br>Washington, DC 20024 |

4

Respectfully submitted,

/Michael S. Parsons/
Michael S. Parsons
Reg. No. 58,767
Attorney for Petitioner Apple Inc.

5

Declaration of Fredo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 10,225,479

# UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS, LTD.

Patent Owner

————————————

IPR2020-00905

U.S. Patent No. 10,225,479

————————————

# DECLARATION OF FREDO DURAND, PH.D.
# UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITION
# FOR INTER PARTES REVIEW

| Patent No. 10,225,479 | Parulski and Konno |
|---|---|
| matching pixels within the Wide image. | As shown below in Fig. 14, Parulski teaches that portions of the telephoto image are combined with the wide image, thus maintain the wide image's field of view:<br><br><br><br>APPL-1005, Fig. 14, in part, (annotated).<br><br>A POSITA would have understood that fusing portions of the telephoto image with the wide image (as annotated in Fig. 14 above) would have otherwise maintained the wide image, therefore outputting a fused image with the wide image's field of view. |

# UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS, LTD.

Patent Owner

————————————

IPR2020-00906
U.S. Patent No. 10,225,479

————————————

# DECLARATION OF FREDO DURAND, PH.D.
# UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITION
# FOR INTER PARTES REVIEW

process the Wide and Tele images *to find translations between matching points in the images to calculate depth information and to create a fused image suited for portrait photos*, the fused image having a DOF shallower than DOFT and having a blurred background.

APPL-1001, 15:25-32.

32.    This claim term should be construed as requiring the "camera controller" to perform two separate functions: (1) "to find translations between matching point in the images to calculate depth information" <u>and</u> (2) "to create a fused image suited for portrait photos."

33.    Regarding the operation "to find translations between matching point in the images to calculate depth information," the specification references Fig. 6 which is "a method disclosed herein for acquiring a zoom image in video/preview mode for 3 different zoom factor (ZF) ranges." *Id.*, 11:30-32. As discussed above, the specification describes obtaining two images where, for a given ROI ("Region of Interest") depth information is obtained for faster focusing:

> [R]egistration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient is used to set an AF position. The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of



US007859588B2

(12) **United States Patent**
Parulski et al.

(10) Patent No.: **US 7,859,588 B2**
(45) Date of Patent: **\*Dec. 28, 2010**

(54) **METHOD AND APPARATUS FOR OPERATING A DUAL LENS CAMERA TO AUGMENT AN IMAGE**

(75) Inventors: **Kenneth A. Parulski**, Rochester, NY (US); **Wilbert F. Janson, Jr.**, Shortsville, NY (US); **John N. Border**, Walworth, NY (US); **John R. Fredlund**, Rochester, NY (US); **Joseph A. Manico**, Rochester, NY (US); **Robert J. Parada, Jr.**, Rochester, NY (US)

(73) Assignee: **Eastman Kodak Company**, Rochester, NY (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 882 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/684,025**

(22) Filed: **Mar. 9, 2007**

(65) **Prior Publication Data**

US 2008/0218611 A1    Sep. 11, 2008

(51) **Int. Cl.**
   *H04N 5/232* (2006.01)
   *G03B 13/00* (2006.01)
   *G03B 17/00* (2006.01)
(52) **U.S. Cl.** ........................................ **348/349**; 396/79
(58) **Field of Classification Search** ................. 348/349; 396/72, 79, 100
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,606,630 | A | 8/1986 | Haruki et al. |
| 5,668,597 | A | 9/1997 | Parulski et al. |
| 5,874,994 | A | 2/1999 | Xie et al. |
| 6,441,855 | B1 | 8/2002 | Omata et al. |
| 6,611,289 | B1 | 8/2003 | Yu et al. |
| 6,864,474 | B2 | 3/2005 | Misawa |
| 7,676,146 | B2 * | 3/2010 | Border et al. ................. 396/80 |
| 2003/0020814 | A1 | 1/2003 | Ono |
| 2003/0160886 | A1 | 8/2003 | Misawa et al. |
| 2005/0046738 | A1 | 3/2005 | Sato |
| 2005/0275747 | A1 | 12/2005 | Nayar et al. |
| 2006/0187312 | A1 | 8/2006 | Labaziewicz et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0 858 208 | 8/1998 |
|---|---|---|

(Continued)

*Primary Examiner*—Kelly L Jerabek
(74) *Attorney, Agent, or Firm*—Thomas J. Strouse; Peyton C. Watkins

(57) **ABSTRACT**

An electronic camera for producing an output image of a scene from a captured image signal includes a first imaging stage comprising a first image sensor for generating a first sensor output and a first lens for forming a first image of the scene on the first image sensor, and a second imaging stage comprising a second image sensor for generating a second sensor output and a second lens for forming a second image of the scene on the second image sensor. The sensor output from the first imaging stage is used as a primary output image for forming the captured image signal and the sensor output from the second imaging stage is used as a secondary output image for modifying the primary output image, thereby generating an enhanced, captured image signal.

**22 Claims, 29 Drawing Sheets**



**US 7,859,588 B2**

Page 2

| U.S. PATENT DOCUMENTS | | | |
|---|---|---|---|
| 2006/0193509 A1 | 8/2006 | Criminisi et al. | |
| 2008/0013941 A1* | 1/2008 | Daley ......................... | 396/121 |
| 2008/0218612 A1* | 9/2008 | Border et al. ............... | 348/262 |
| 2008/0218613 A1* | 9/2008 | Janson et al. ............... | 348/262 |

| FOREIGN PATENT DOCUMENTS | | |
|---|---|---|
| JP | 2005045511 | 2/2005 |
| WO | 01/06449 | 1/2001 |
| WO | 2005/057278 | 6/2005 |

\* cited by examiner



*FIG. 1*

Case: 22-1350    Document: 24    Page: 363    Filed: 12/30/2022



*FIG. 2B*



*FIG. 2A*



**FIG. 3**

Case: 22-1350     Document: 24     Page: 366     Filed: 12/30/2022



250 — USER SELECTS ZOOM POSITION

252 — ZOOM POSITION DETERMINES WHICH IMAGE STAGE IS USED FOR CAPTURE

254 — THE IMAGE STAGE NOT USED FOR CAPTURE IS ZOOMED TO THE POINT CLOSEST TO THE USER SELECTED ZOOM POSITION

256 — FOCUS LENSES IN BOTH IMAGE STAGES ARE SET TO THEIR HYPERFOCAL POSITIONS

258 — USER PUSHES CAPTURE BUTTON FROM S0 TO S1 TO INITIATE AUTOFOCUS SEQUENCE

260 — AUTOFOCUS IMAGES ARE CAPTURED WITH BOTH IMAGE STAGES

262 — THE AUTOFOCUS IMAGE FROM THE IMAGE STAGE IN THE LOWER ZOOM POSITION IS CROPPED AND UPSAMPLED SO THAT CORRESPONDING FEATURES IN THE TWO AUTOFOCUS IMAGES SPAN THE SAME NUMBER OF PIXELS

264 — THE CROPPED AND UPSAMPLED AUTOFOCUS IMAGE IS CORRELATED TO THE AUTOFOCUS IMAGE FROM THE OTHER IMAGE STAGE TO IDENTIFY THE PIXEL OFFSET BETWEEN THE TWO AUTOFOCUS IMAGES FOR CORRESPONDING PORTIONS OF THE IMAGES

266 — USE THE AUTOFOCUS RANGEFINDER CALIBRATION CURVE AND THE IDENTIFIED PIXEL OFFSET TO DETERMINE THE MOVEMENT OF THE FOCUS LENS NEEDED TO BEST FOCUS THE IMAGE CAPTURE STAGE

268 — THE FOCUS LENS IS MOVED TO THE DETERMINED POSITION FOR BEST FOCUS

270 — WHEN THE USER PUSHES THE CAPTURE BUTTON FROM S1 TO S2, THE FINAL IMAGE IS CAPTURED

*FIG. 4*

APPL-1005 / Page 6 of 49
APPLE INC. v. COREPHOTONICS LTD.
Appx1958

Case: 22-1350 Document: 24 Page: 367 Filed: 12/30/2022





276 — CONTINUOUSLY CAPTURE VIDEO WITH THE CAPTURE STAGE

278 — CONTINUOUSLY CHECK FOCUS WITH THE IMAGE CAPTURE STAGE BEING USED FOR CAPTURE USING THE "HILL CLIMB METHOD"

280 — IS THE FOCUS GOOD ? — YES

282 — IDENTIFY THE FOCUS LENS ADJUSTMENT NEEDED TO PRODUCE BEST FOCUS ON THE IMAGE CAPTURE STAGE NOT BEING USED FOR CAPTURE — NO

284 — USE THE AUTOFOCUS "HILL CLIMB METHOD" CALIBRATION CURVE AND THE IDENTIFIED FOCUS LENS ADJUSTMENT TO DETERMINE THE MOVEMENT OF THE FOCUS LENS NEEDED IN THE CAPTURE STAGE TO PRODUCE BEST FOCUS

286 — MOVE THE FOCUS LENS IN THE CAPTURE STAGE TO THE NEW BEST FOCUS POSITION

250 — USER SELECTS ZOOM POSITION

252 — ZOOM POSITION DETERMINES WHICH IMAGE CAPTURE STAGE IS THE CAPTURE STAGE

254 — THE IMAGE STAGE NOT USED FOR CAPTURE IS ZOOMED TO THE POINT CLOSEST TO THE USER SELECTED ZOOM POSITION

258 — USER PUSHES CAPTURE BUTTON FROM S0 TO S1 TO INITIATE AUTOFOCUS SEQUENCE

272 — AUTOFOCUS BOTH IMAGE CAPTURE STAGES BY THE "HILL CLIMB METHOD"

274 — USER PUSHES THE CAPTURE BUTTON FROM S1 TO S2

*FIG. 5*

CAPTURE A SERIES OF IMAGE SETS WITH OBJECTS AT KNOWN DISTANCES WITH THE SHORTER FOCAL LENGTH FIRST IMAGE CAPTURE STAGE AND THE LONGER FOCAL LENGTH SECOND IMAGE CAPTURE STAGE AND A SERIES OF FOCUS LENS POSITIONS ⌐300

THE AUTOFOCUS IMAGE FROM THE LOWER FOCAL LENGTH FIRST IMAGE STAGE IS CROPPED AND UPSAMPLED SO THAT CORRESPONDING FEATURES IN THE TWO AUTOFOCUS IMAGES SPAN THE SAME NUMBER OF PIXELS ⌐302

CORRELATE THE IMAGES FROM THE SECOND IMAGE CAPTURE STAGE TO CORRESPONDING PORTIONS OF THE IMAGES FROM THE CROPPED AND UPSAMPLED IMAGE FROM THE FIRST IMAGE CAPTURE STAGE TO DETERMINE THE PIXEL OFFSET BETWEEN THE IMAGES IN EACH IMAGE SET ⌐304

STORE THE DATA OF PIXEL OFFSET BETWEEN IMAGES IN EACH IMAGE SET VERSUS KNOWN DISTANCE TO OBJECTS AS AN AUTOFOCUS RANGEFINDER CALIBRATION CURVE ⌐306

*FIG. 6*

```
┌─────────────────────────────────────────────┐
│ CAPTURE A SERIES OF IMAGE SETS WITH OBJECTS  │ ─ 400
│  AT KNOWN DISTANCES WITH THE FIRST IMAGE     │
│ CAPTURE STAGE AND THE SECOND IMAGE CAPTURE   │
│   STAGE WHEREIN AUTOFOCUS IS DONE BY THE     │
│    "HILL CLIMB METHOD" FOR EACH IMAGE        │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│ COMPARE THE FOCUS LENS POSITIONS FOR THE TWO │ ─ 402
│ IMAGE CAPTURE STAGES VERSUS THE DISTANCE TO  │
│  THE FOCUSED OBJECTS IN THE IMAGE SETS       │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│   STORE THE DATA OF FOCUS LENS POSITIONS OF  │ ─ 404
│ THE FIRST IMAGE CAPTURE STAGE VERSUS THE FOCUS│
│ LENS POSITIONS OF THE SECOND IMAGE CAPTURE   │
│   STAGE FOR THE SAME DISTANCE TO FOCUSED     │
│    OBJECTS IN THE IMAGES AS AN AUTOFOCUS     │
│     "HILL CLIMB METHOD" CALIBRATION CURVE    │
└─────────────────────────────────────────────┘
```

*FIG. 7*



**FIG. 8**



CAPTURE A FIRST AUTOFOCUS IMAGE WITH THE LOWER FOCAL LENGTH IMAGE CAPTURE STAGE — 440

THE AUTOFOCUS IMAGE FROM THE IMAGE STAGE IN THE LOWER FOCAL LENGTH IS CROPPED AND UPSAMPLED SO THAT CORRESPONDING FEATURES IN THE TWO AUTOFOCUS IMAGES SPAN THE SAME NUMBER OF PIXELS — 442

CAPTURE A SECOND AUTOFOCUS IMAGE WITH THE LONGER FOCAL LENGTH IMAGE CAPTURE STAGE — 448

CORRELATE THE SECOND AUTOFOCUS IMAGE WITH THE CROPPED AND UPSAMPLED IMAGE TO DETERMINE THE PIXEL OFFSET BETWEEN THE IMAGES FOR DIFFERENT PORTIONS OF THE IMAGES — 444

DETERMINE THE FOCUS CORRECTION NEEDED FROM THE OFFSET AND THE AUTOFOCUS RANGEFINDER CALIBRATION CURVE — 446

*FIG. 9*

Case: 22-1350    Document: 24    Page: 371    Filed: 12/30/2022

Case: 22-1350    Document: 24    Page: 372    Filed: 12/30/2022



CAPTURE A FIRST IMAGE WITH THE FIRST IMAGE CAPTURE STAGE WHEREIN THE AUTOFOCUS IS DONE BY THE "HILL CLIMB METHOD" ⌐460

PROVIDE THE IMAGE FROM THE FIRST IMAGE CAPTURE STAGE AS A PREVIEW IMAGE ON THE DISPLAY ⌐462

CHANGE THE FOCUS CONDITIONS FOR THE FIRST IMAGE CAPTURE STAGE BASED ON THE CHANGE OF THE FOCUS CONDITIONS FOR THE SECOND IMAGE CAPTURE STAGE AND THE AUTOFOCUS "HILL CLIMB METHOD" CALIBRATION CURVE ⌐464

CAPTURE A SECOND IMAGE WITH THE SECOND IMAGE CAPTURE STAGE WHEREIN THE AUTOFOCUS IS DONE BY THE "HILL CLIMB METHOD" ⌐466

CAPTURE ANOTHER IMAGE WITH THE SECOND IMAGE CAPTURE STAGE WHEREIN THE AUTOFOCUS IS DONE BY THE "HILL CLIMB METHOD" ⌐468

COMPARE THE FOCUS CONDITIONS FOR THE SECOND IMAGE TO THOSE OF THE ANOTHER IMAGE ⌐470

FOCUS CONDITIONS CHANGED ? ⌐472   YES   NO

*FIG. 10*

APPL-1005 / Page 12 of 49
APPLE INC. v. COREPHOTONICS LTD.
Appx1964

Case: 22-1350        Document: 24        Page: 373        Filed: 12/30/2022



CAPTURE A SECOND AUTOFOCUS IMAGE WITH THE HIGHER FOCAL LENGTH IMAGE CAPTURE STAGE — 448

CAPTURE A FIRST AUTOFOCUS IMAGE WITH THE LOWER FOCAL LENGTH IMAGE CAPTURE STAGE — 440

THE AUTOFOCUS IMAGE FROM THE IMAGE STAGE IN THE LOWER ZOOM POSITION IS CROPPED AND UPSAMPLED SO THAT CORRESPONDING FEATURES IN THE TWO AUTOFOCUS IMAGES SPAN THE SAME NUMBER OF PIXELS — 442

CORRELATE THE SECOND AUTOFOCUS IMAGE WITH THE CROPPED AND UPSAMPLED IMAGE TO DETERMINE THE PIXEL OFFSET BETWEEN THE IMAGES FOR DIFFERENT PORTIONS OF THE IMAGES — 480

CONVERT THE PIXEL OFFSETS TO DISTANCES FROM THE IMAGE CAPTURE DEVICE USING THE AUTOFOCUS RANGEFINDER CALIBRATION CURVE — 482

PRODUCE A MAP SHOWING THE DISTANCES TO DIFFERENT PORTIONS OF THE IMAGES — 484

*FIG. 11*

Case: 22-1350    Document: 24    Page: 374    Filed: 12/30/2022



*FIG. 12*

APPL-1005 / Page 14 of 49
APPLE INC. v. COREPHOTONICS LTD.
Appx1966

Case: 22-1350  Document: 24  Page: 375  Filed: 12/30/2022



*FIG. 13*



**FIG. 14**



*FIG. 15B*



*FIG. 15A*



*FIG. 16A*

*FIG. 16B*



—350

*FIG. 17A*



—352

*FIG. 17B*

APPL-1005 / Page 19 of 49
APPLE INC. v. COREPHOTONICS LTD.



GPS LOCATION OF THE CAMERA PROVIDED BY THE GPS IN THE CAMERA — 750

CAMERA POINTING DIRECTION PROVIDED BY THE ELECTRONIC COMPASS IN THE CAMERA — 752

DISTANCE OFFSETS FROM THE CAMERA TO PORTIONS OF THE SCENE PROVIDED BY THE RANGEMAP — 754

ANGULAR OFFSET FROM THE CAMERA PROVIDED FROM THE LOCATION IN THE FIELD OF VIEW — 756

GPS LOCATIONS FOR PORTIONS OF THE SCENE ARE DETERMINED BY ADDING DISTANCE OFFSETS AND THE ANGULAR OFFSETS TO THE GPS LOCATION AND POINTING DIRECTION OF THE CAMERA — 758

A GPS LOCATIONS FOR THE OBJECTS IN THE SCENE ARE STORED IN METADATA OR DISPLAYED AS LABELS IN A GPS LOCATION MAP — 760

**FIG. 18**

APPL-1005 / Page 20 of 49
APPLE INC. v. COREPHOTONICS LTD.



*FIG. 19*

APPL-1005 / Page 21 of 49
APPLE INC. v. COREPHOTONICS LTD.



**FIG. 20**

APPL-1005 / Page 22 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1974



**FIG. 21**

APPL-1005 / Page 23 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1975



**FIG. 22**

APPL-1005 / Page 24 of 49
APPLE INC. v. COREPHOTONICS LTD.



**FIG. 23**

APPL-1005 / Page 25 of 49
APPLE INC. v. COREPHOTONICS LTD.



*FIG. 24*



**FIG. 25**

APPL-1005 / Page 27 of 49
APPLE INC. v. COREPHOTONICS LTD.





**FIG. 26**



**FIG. 27**
**(PRIOR ART)**

APPL-1005 / Page 29 of 49
APPLE INC. v. COREPHOTONICS LTD.



**FIG. 28**
**(PRIOR ART)**

APPL-1005 / Page 30 of 49
APPLE INC. v. COREPHOTONICS LTD.



FOCUS
ADJUSTMENT
STEPS



# FIG. 29
## (PRIOR ART)

APPL-1005 / Page 31 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1983

US 7,859,588 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD AND APPARATUS FOR OPERATING A DUAL LENS CAMERA TO AUGMENT AN IMAGE

## FIELD OF THE INVENTION

The present invention relates to a digital camera that produces digital image files and, more particularly, to a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability.

## BACKGROUND OF THE INVENTION

Currently, most digital cameras use a zoom taking lens and a single color image sensor to capture still and motion images. The captured images are then processed to produce digital image files, which are stored in a digital memory in the camera. The digital image files can then be transferred to a computer, displayed, printed, and shared via the Internet.

In order to capture sharp images of moving subjects, a digital camera needs to provide a precise automatic lens focusing system (i.e., an autofocus system). The autofocus system must be capable of quickly obtaining the correct focus in order to minimize the "shutter delay" between the time the shutter button is pressed and the still image is captured. The autofocus system must also work in a continuous image capture mode wherein video images are captured. For instance, in a video mode the focus should be adjusted in real-time while video images are being continuously captured.

Many digital cameras and scanners capture images using an image sensor and a taking lens system with an adjustable focus. Typically, the focus distance of such an adjustable focus taking lens system can automatically be set to one of a plurality of different settings by sensing, control, and drive systems, which are adapted to provide optimal focus of what is determined to be a subject area in a scene. Lens systems that provide automatically adjustable focus settings based on a focus measurement and an adjustable focus lens are referred to herein as autofocus systems. Digital cameras typically use one of two types of autofocus systems: a rangefinder system and a "through-the-lens" focus system.

A rangefinder system uses rangefinding sensors such as a sonic rangefinder or a dual lens rangefinder to determine the distance from a camera to one or more portions of a scene within a field of view of the rangefinder system. A sonic rangefinder measures the phase offset between a projected sonic signal and a reflected sonic signal to infer the distance to objects in the scene. Dual lens rangefinders contain two lenses that are separated by a distance along with two matching sensor areas that capture matched pairs of images. Dual lens rangefinders are commonly used on digital cameras in the form of dual lens rangefinder modules which contain two lenses separated by a distance along with two matching sensor areas that capture matched pairs of low resolution images.

Common dual lens rangefinder-based autofocus systems include active and passive systems. Active systems actively project light onto the scene, while passive systems work with the available light from the scene. Dual lens rangefinder modules can be purchased from Fuji Electric in several models such as the FM6260W. A dual lens rangefinder module for optical apparatus such as a camera is described in U.S. Pat. No. 4,606,630, which was issued to Haruki et al. on Aug. 19, 1986 (and assigned to Fuji Electric). According to the description of the prior art in this patent, matched pairs of low resolution images are analyzed for correlation between the two images to determine the offset between the two images caused by the separation between the two lenses.

A diagram illustrative of the principle of the operation of a conventional rangefinder is shown herein in FIG. 27. In that diagram, light from an object **151** is incident on two small lenses **152** and **153** which have a sufficiently short focal length f that light rays received from the object through different spaced paths **154** and **155** produce corresponding spaced images **157** and **158** in a focal plane **156** which is common to the lenses **152** and **153**. When the object **151** is at an infinite distance, the centers of the images **157** and **158** are located at reference positions **170** and **180** in FIG. 27, but when the object **151** is located at a closer distance, the centers of the images are shifted apart to positions **171** and **181**. If the distance by which the images **157** and **158** are shifted from the reference positions **170** and **180** are designated $x_1$ and $x_2$, respectively, then the total shift x may be expressed as follows:

$$x = x_1 + x_2 = b \cdot f/d$$

Thus, the distance d to the object **151** can be measured by d=b·f/x. In this case, b is the distance between the optical axes of the small lenses, that is, the base length. To obtain the shifted amounts $x_1$ and $x_2$, or the sum x of both, two optical sensor arrays **190** and **191** are provided in the focal plane **156** as shown in FIG. **27**. These optical sensor arrays each comprise a plurality of optical sensors, for instance CCD devices, and an analog photoelectric signal is generated by each optical sensor corresponding to the light intensity at the portion of the image which is incident on the sensor. Haruki et al. shows a conventional circuit, as well as a higher speed rangefinding circuit according to the patent, for obtaining the sum x of the shifted distances by comparing two image signal trains comprising the digital image signals from the left and right optical sensor arrays.

Basically, the offset information x is used along with the lens separation distance b and the focal length f to calculate the distanced to the scene by triangulation. The calculated distance d to the scene is used to guide the positioning of an adjustable focus lens to produce the best image quality. As known in the prior art, this adjustment may be based on a calibration curve established between the distance to the scene as measured by the dual lens rangefinder module and a series of best focused images as produced by a "through the lens" autofocus system. The calibration curve is stored as an equation or a look-up table in a microprocessor in the camera.

Rangefinder-based autofocus systems have the advantage of being very fast, some having a response time that can be in the range of 0.01-0.05 second. However, the focus quality produced by some rangefinder-based autofocus systems can vary when they are used in different operating conditions. For example, sonic autofocus systems cannot focus through a glass window as the glass stops the projected sonic signal, thereby causing the autofocus system to focus onto the glass. In the case of a dual lens rangefinder autofocus system, the accuracy of dual lens rangefinders are typically influenced by changes in environmental conditions such as temperature and/or humidity. The problem with dual lens rangefinder modules is that the calibration between the dual lens rangefinder module and the adjustable focus lens position is not stable within the normal operating environment for digital cameras. Environmental conditions such as changes in temperature and humidity can cause the distance to the portion of the scene as measured by the dual lens rangefinder module to change by over 10%. In addition, the measured position of the adjustable focus taking lens in the adjustable focus taking lens system is prone to environmentally induced changes as well so that inaccuracies are produced in the control system

APPL-1005 / Page 32 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1984

US 7,859,588 B2

**3**

for the adjustable focus lens. Consequently, dual lens rangefinder modules are not typically used independently for autofocus in digital cameras but instead are used as a rough focus adjustment that is supplemented by a "through the lens" autofocus system.

Alternatively, the "through-the-lens" autofocus system determines a focus state through an analysis of a series of autofocus images captured with the adjustable focus lens system positioned at a plurality of different focus distances. For example, in a typical "through-the-lens" autofocus system a plurality of autofocus images (e.g., 5-20) are captured with the adjustable focus lens in a series of different positions in a so-called "hill climb" method. This type of autofocus is known as "hill climbing" autofocus because it generates a sequence of values that increase in level until they pass over a peak, i.e., a "hill". In other words, the lens focus position is adjusted automatically until the contrast of the edge detail in the image, or a particular area of the image, is maximized. For instance, the contrast present in each of the autofocus images is compared and the autofocus image with the greatest contrast is deemed to have been captured with the best focus conditions (often the best focus lens position is further refined by interpolating the contrast values between images).

In order to decrease focusing response time without sacrificing focusing precision, it is common to use filters to separate not only the higher frequency component of the video signal, but also the lower frequency component. For example, a lens may be quickly driven in coarse adjustment steps in a low frequency range furthest from the maximum focus, and then driven in finer adjustment steps in a high frequency range nearer to the maximum focus. A flow diagram of a conventional "hill climbing" contrast autofocus algorithm is shown in FIG. **28**. This algorithm uses the "hill climbing" contrast autofocus method discussed above and shown in the diagram of FIG. **29**, which illustrates the relationship between the focus value obtained from the filters and the lens position. In FIG. **29**, the abscissa indicates the focusing position of a lens along a distance axis, the ordinate indicates the focusing evaluation value, and the curves A and B indicate the focusing evaluation values for high and low frequency components, respectively, for a particular in-focus position P.

Referring to the flow diagram of FIG. **28**, the best starting point for the algorithm depends on the hyperfocal distance of the current lens setting, which is a function of the focal length setting and the f-number. A distance of about 2 meters is typically a good starting point. Then a low frequency bandpass filter is loaded (stage **197**) and the focus values are read out. The algorithm employs a comparison stage **198** to set the direction of lens adjustment toward increasing focus values, and to determine when the lens is stepped over the "hill". The depth of field, which depends on the present focal length and f-number, sets the number of steps, i.e., the next near focus position, which should be taken before capturing the next frame when using the low frequency bandpass filter. Once the peak of the hill is passed (curve B in FIG. **29**), a high frequency bandpass filter is loaded (stage **199**), and the lens is moved in the opposite direction until the peak of the higher "hill" is found (curve A in FIG. **29**). The peak focus value may use either the weighted average or peak value from numerous pixels.

"Through-the-lens" autofocus systems are very accurate since they measure focus quality directly from autofocus images captured with the high quality taking lens. Unfortunately, "through-the-lens" autofocus systems can be relatively slow in determining a focus setting due to the large number of autofocus images that must be captured and com-

**4**

pared. For example, "through-the-lens" autofocus systems can take as long as 0.5-2.0 seconds to determine focus conditions.

Accordingly, in some digital cameras, the two types of autofocus systems are used together in a hybrid system in which the rangefinder based autofocus system is used to provide a fast estimation of the adjustable focus lens location that is then followed by the use of the "through-the-lens" autofocus system to refine the focus setting. For example, U.S. Pat. No. 6,864,474, entitled "Focusing Apparatus for Adjusting Focus of an Optical Instrument" and which issued Mar. 8, 2005 in the name of Misawa, describes the coordinated use of a rangefinder-based autofocus system with a "through-the-lens" autofocus system. In Misawa, the focus position of the adjustable focus taking lens is determined by both the rangefinder-based autofocus system and the "through-the-lens" autofocus system. The difference between the adjustable focus taking lens position determined by the rangefinder-based autofocus system and the adjustable focus taking lens position determined by the "through-the-lens" autofocus system is stored for future reference. In subsequent image capture episodes, the stored difference information is used to refine the number of autofocus images captured and analyzed by the "through-the-lens" autofocus system in the "hill climb" method to determine the adjustable focus lens position for best focus, thereby reducing the number of autofocus images captured and processed in cases where the rangefinder system is accurate and increasing the number of autofocus images captured and processed in cases where the rangefinder is inaccurate. However, the method described by Misawa assumes that the performance of the rangefinder, adjustable focus taking lens system and control system are consistent over time, do not fluctuate with variations in environmental conditions, and do not otherwise change or drift over time.

Once an image is in focus, the "hill climb" method typically operates over incremental distances near the subject presently focused upon. Then, in refocusing an image, the "hill climb" method typically determines whether any lens movement is stepping "up or down the hill" and resets the lens for a new maximum. In practice, this means that, if the lens movement is stepping "down the hill", the lens motion is immediately reversed so as to seek the new maximum for the existing subject. This is a particular problem in video focusing, where a new subject at some distance away from the present subject may come into the image and never be detected by the "hill climb" method—even where the new subject may present a greater "hill" in terms of contrast values. One way of responding to this problem is referred to as "whole way" autofocusing, where the auto focus module looks over all the distances discernible by the taking lens before deciding upon a focus position.

Commonly assigned U.S. Pat. No. 6,441,855 describes a "whole-way" autofocusing method, where a focusing device includes a movable focusing lens adapted to be moved to different positions across the entire focusing range, a conversion element for converting light incident on and transmitted through the focusing lens into a signal, and a lens driving mechanism for moving the focusing lens. The focusing device further includes a focus evaluation value calculation unit for calculating a focus evaluation value for each position of the focusing lens based on the signal from the conversion element. The focus evaluation value calculation unit extracts only the signals corresponding to the pixels in a face area defined, e.g., at the center of an image, which is further divided into nine "tiles", that is, blocks that are obtained by

APPL-1005 / Page 33 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

5

dividing the focus area into a small number of rows and columns used as observation areas.

In calculating the focus evaluation values, a determination is first made as to whether or not the calculation of the focus evaluation values has been repeated a certain number of times, e.g., ten times, for different distance settings. When the determination is negative, the focusing lens is moved by a preset step width, and the calculation is repeated. Thus, the focusing lens is always moved stepwise from an infinite far position to a nearest position, and for each step of movement, a focus evaluation value is calculated for each tile. These calculations are performed for the respective tiles, to thereby obtain the focus evaluation values for ten lens positions for each of the nine tiles, including all of the peaks that are found across the total distance. Using the ten total sums obtained for the respective lens positions as the focus evaluation values, the focusing lens position producing the maximum peak is determined as the in-focus lens position. A lens driving output is then applied to the lens driving mechanism so that the lens moves to the determined in-focus position.

In order to provide a small size digital camera with a large "optical zoom range", a digital camera can use multiple image sensors with different focal length lenses, as described in commonly assigned U.S. patent application Ser. No. 11/062,174, entitled "Digital Camera Using Multiple Lenses and Image Sensors to Provide an Improved Zoom Range", which was filed Feb. 18, 2005 in the names of Labaziewicz et al., the disclosure of which is incorporated herein by reference. For example, the Kodak Easyshare V610 dual lens digital camera includes a 38-114 mm (35 mm equiv.) f/3.9-f/ 4.4 lens and a 130-380 mm (35 mm equiv.) f/4.8 lens, in order to provide a 10× optical zoom range. However, in both this patent application and product, only one of the two image sensors is used at a time. The two image sensors do not simultaneously capture images.

U.S. Patent Application Publication No. US 2003/ 0020814, which was published Jan. 30, 2003, discloses an image capturing apparatus having a plurality of capturing optical systems, each coupled to a CCD image sensor, including a first system having a shorter focal length and a second system having a longer focal length. In the various embodiments described in this disclosure, the two lenses can provide different focal lengths ranges, including one system with a fixed-focus lens and the other system with a zoom lens, or they can both be fixed focus lenses set to two different focus distance settings. In each case, rather than obtaining user input, a selection unit automatically selects the capture signals from one of the capturing optical systems based on capture conditions, such as measured distance or luminance, determined by a capture condition acquiring unit. The autofocus for these systems is provided using a separate distance sensor. Neither of the two CCD image sensors are used for the autofocusing operation.

U.S. Patent Application Publication No. US 2003/ 0160886, which was published Aug. 23, 2003, discloses a digital camera having two photographing systems that are independent of each other. One embodiment shows one system including a monofocal "ordinary mode" lens and the other system including a zoom "telescopic mode" lens, each generating an image. An operator-actuated change over switch determines which image is to be recorded. Autofocus is also disclosed in connection with the separate photographing systems, where a "hill-climb" contrast comparison technique used in one system complements a "hill-climb" contrast comparison technique used in the other system. When it is desired to capture an image from the telescopic mode optical system, a rough autofocus search (where a stepping

6

motor may be driven at intervals of several steps) is made by the ordinary mode optical system (where the focal depth is relatively large). This rough search results in a reduced focal distance range that includes the focusing position. Using the focal distance range information provided by the ordinary mode optical system, the telescopic mode optical system is driven to an autofocus search start position at one end of the reduced focal distance range. Then, a fine autofocus search is performed by the telescopic mode optical system (where the focal depth is relatively shorter), but only in the reduced focal distance range determined by the ordinary mode autofocus search. (When it is desired to capture an image from the ordinary mode optical system, the autofocus search is made solely by the ordinary mode optical system, with the telescopic mode optical system playing no part in the autofocus search.)

In another embodiment in U.S. Patent Application Publication No. US 2003/0160886, which does not depend on the rough vs. fine search mentioned above, a "hill climb" contrast comparison search is performed while the focusing lens of a first optical system is driven stepwise so as to move from an infinite distance setting toward a closest distance position, and a second "hill climb" contrast comparison search is performed while the focusing lens of a second optical system is driven stepwise from the closest position toward the infinite setting. This procedure continues until a maximum contrast position is located, although neither system ordinarily needs to move through its entire range. This tends to reduce the time period for detecting a focusing position. In this embodiment, each of the optical systems could be used for capturing an image and for focus adjustment, or one optical system could be employed for capturing an image and focus adjustment and the other optical system could be devoted only to focus adjustment of the image-capturing optical system. In another embodiment, in the case where the non-capturing optical system determines the focusing position first, the capturing optical system is driven to that position and a fine adjustment is then made by the capturing optical system.

A problem with these prior art systems is that either a separate autofocus sensor must be used (thus increasing the cost) or else there is typically a significant "shutter delay" as the autofocus is performed using the same sensor that is used to capture the image. Moreover, the separate autofocus sensor is usually a rangefinder and, as mentioned above, the calibration between the dual lens rangefinder module and the adjustable focus lens position is not stable within the normal operating environment for digital cameras. Where the autofocus is performed with the "through-the-lens" taking system, the process can be relatively slow in determining a focus setting due to the large number of autofocus images that must be captured and compared. The problem can be somewhat alleviated according to the aforementioned U.S. Patent Application Publication No. US 2003/0160886, but difficulties remain in rapidly achieving focus as the subject changes or moves, or in rapidly interchanging the focusing requirements of the optical systems when the operator elects to change the capture function from one photographing system to the other.

A special problem arises during video capture, where the autofocus images are derived from the same series of still images or frames that compose the video images. Consequently, the process of autofocusing may cause 5-20 or more out of focus video images to be produced in the video each time the scene changes. As a result, during video capture with pan movements of the camera where the scene changes continuously, large portions of the video are actually out of focus as the autofocus system hunts for proper focus. A further

APPL-1005 / Page 34 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1986

US 7,859,588 B2

**7**

problem is that during video capture, many of the frames are out of focus due to the use of an autofocus system that uses the "hill climb method" to focus.

In copending, commonly-assigned U.S. patent application Ser. No. 11/684,025, entitled "Camera Using Multiple Lenses and Image Sensors to Provide Improved Focusing Capability" and filed on even date herewith in the names of John Border et al., the aforementioned problems are addressed in a multi-lens digital camera in which two (or more) image capture stages are used to separately capture images of the same scene so that one image capture stage can be used for autofocus while the other(s) is used for capturing a still image or a video. This provides precise, rapid autofocus in both still and video modes without unduly increasing the size or cost of the digital camera.

Besides the autofocus advantages, such a camera provides two separate image capture stages yielding separate high resolution images of basically the same scene, or the same portion(s) of the same scene. This offers a number of possibilities for using one of the images to modify or otherwise augment the other image. What is therefore needed is a digital camera with dual capture systems that provides an improved imaging capability by utilizing both images to provide an improved output image.

## SUMMARY OF THE INVENTION

The object of this invention is to provide an improved imaging capability in a multi-lens digital camera utilizing both (or more) images to provide an improved output image. without unduly increasing the size or cost of the camera.

A further object of the invention is to utilize one of the images from a dual-lens camera as a secondary image that can be used to modify the other, primary image and thereby generate an enhanced primary image.

The present invention, which is directed to overcoming one or more of the problems set forth above, pertains to an electronic camera for producing an output image of a scene from a captured image signal. Briefly summarized, the invention comprises, according to a first embodiment of the invention:

a first imaging stage comprising a first image sensor for generating a first sensor output and a first lens for forming a first image of the scene on the first image sensor;

a second imaging stage comprising a second image sensor for generating a second sensor output and a second lens for forming a second image of the scene on the second image sensor; and

a processing stage for using the sensor output from the first imaging stage as a primary output image for forming the captured image signal and using the sensor output from the second imaging stage as a secondary output image for modifying the primary output image, thereby generating an enhanced, captured image signal.

The secondary output image may be used by the processing stage for a number of purposes, including without limitation: to sharpen portions of the primary image (e.g., to extend the depth of field of the primary still image or to selectively sharpen portions of the primary still image and defocus other portions of the image, particularly where the secondary output image is captured by the second imaging stage at a different focus position than used by the first imaging stage to capture the primary output image); to modify the dynamic range of the primary image (e.g., where the secondary output image is captured by the second imaging stage at a different exposure level than used by the first imaging stage to capture the primary output image); to provide scene analysis data for setting the capture parameters for the primary image; or to

**8**

replace portions of the primary image (areas of lower noise but with some motion blur) with corresponding portions of the secondary image (areas of higher noise but little or no motion blur) to obtain a modified image with relatively low noise and good sharpness.

Briefly summarized, the invention generally comprises the use of two (or more) image capture stages, wherein an image capture stage is composed of a sensor, a lens and a lens focus adjuster, in a multi-lens digital camera in which the two (or more) image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes while the other(s) is used for capturing an image. In thus utilizing the invention, a digital camera advantageously provides an improved imaging capability without unduly increasing the size or cost of the digital camera. More specifically, the non-capturing image stage may advantageously be used to provide a secondary image that can be used to modify or otherwise augment, e.g., the focus or dynamic range of the primary image.

These and other aspects, objects, features and advantages of the present invention will be more clearly understood and appreciated from a review of the following detailed description of the preferred embodiments and appended claims, and by reference to the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts a block diagram of a first embodiment of a digital camera using a first zoom lens with a first image sensor, and a second zoom lens with a second image sensor according to the invention.

FIGS. **2**A and **2**B are two perspective views of the digital camera shown in FIG. **1**.

FIG. **3** depicts a flow diagram showing a method for performing autofocus and for capturing digital still images according to a first embodiment of the digital camera shown in FIG. **1**.

FIG. **4** depicts a flow diagram showing a method for performing autofocus using a rangefinder method with two image capture stages.

FIG. **5** depicts a flow diagram showing a method for performing autofocus using a "hill climb method" with two image capture stages.

FIG. **6** depicts a flow diagram showing a method for producing an autofocus rangefinder calibration curve.

FIG. **7** depicts a flow diagram showing a method for producing an autofocus "hill climb method" calibration curve.

FIG. **8** depicts a flow diagram showing a method for performing autofocus and for capturing digital video images according to a second embodiment of the digital camera shown in FIG. **1**.

FIG. **9** depicts a flow diagram showing a method for performing autofocus with a rangefinder method with two image capture stages.

FIG. **10** depicts a flow diagram showing a method for performing autofocus with a "hill climb method" with two image capture stages.

FIG. **11** depicts a method for producing a range map with two image capture stages.

FIG. **12** depicts a block diagram of another embodiment of a digital camera using a first fixed focal length lens with a first image sensor, and a second (zoom) lens with a second image sensor.

FIG. **13** depicts a block diagram of another embodiment of a digital camera using a first fixed focal length lens with a first image sensor, a second (zoom) lens with a second image sensor, and a third (zoom) lens with a third image sensor.

APPL-1005 / Page 35 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

9 | 10

FIG. **14** depicts a flow diagram showing a method for enhancing the depth of field of an image by using images from both image capture stages according to an embodiment of the invention.

FIG. **15**A and FIG. **15**B depict a diagram of a mobile phone camera with two image capture stages according to another embodiment of the digital camera.

FIG. **16**A and FIG. **16**B depict a diagram of a stage containing two image capture stages in a single stage for a mobile phone camera.

FIG. **17**A and FIG. **17**B are representations of images captured with two image capture stages showing the offset between the two images that is used to determine the distance to portions of the scene.

FIG. **18** depicts a flow diagram of a method for determining GPS locations of portions of the scene.

FIG. **19** depicts a flow diagram for selecting one of the imaging stages in a dual lens camera system as the primary capture unit, while relegating the other imaging stage to other functions, such as scene analysis, according to another embodiment of the invention.

FIG. **20** depicts a flow diagram illustrating the usage of the non-primary capture unit for scene analysis, according to another embodiment of the invention.

FIG. **21** depicts a flow diagram illustrating the usage of the non-primary capture unit for scene analysis whenever the change in scene conditions exceeds a threshold, according to another embodiment of the invention.

FIG. **22** depicts a flow diagram illustrating the usage of both the primary capture unit and the non-primary capture unit for scene analysis, according to another embodiment of the invention.

FIG. **23** depicts a flow diagram illustrating the reversal of the functions of the capture units, that is, the current scene analysis and primary capture units are reset to be the primary capture unit and scene analysis capture unit, respectively, according to another embodiment of the invention.

FIG. **24** depicts a flow diagram illustrating the usage of a preview image taken by the primary capture stage to set the capture unit parameters for the primary capture stage, specifically during the capture process, according to another embodiment of the invention.

FIG. **25** depicts a flow diagram illustrating the usage of a preview image taken by the primary capture stage and a scene analysis image taken by the non-capture stage to set the capture unit parameters for the primary capture stage, specifically during the capture process, according to another embodiment of the invention.

FIG. **26** depicts a flow diagram illustrating the usage of a primary image taken by the primary capture stage and an augmentation image taken by the non-capture stage to produce an enhanced image, according to another embodiment of the invention.

FIG. **27** depicts a diagram illustrative of the operation of a conventional dual lens rangefinder.

FIG. **28** depicts a flow diagram of a conventional "hill climbing" contrast autofocus algorithm.

FIG. **29** illustrates the relationship between the focus value obtained from the filters used to isolate components of the image and the lens position for a "hill climbing" autofocus method.

DETAILED DESCRIPTION OF THE INVENTION

Because digital cameras employing imaging devices and related circuitry for signal processing are well known, the present description will be directed in particular to elements forming part of, or cooperating more directly with, apparatus in accordance with the present invention. Elements not specifically shown or described herein may be selected from those known in the art. Certain aspects of the embodiments to be described may be provided in software. Given the system as shown and described according to the invention in the following materials, software not specifically shown, described or suggested herein that is useful for implementation of the invention is conventional and within the ordinary skill in such arts.

Each of the several embodiments described herein include an image capture assembly, such as a digital camera—still or video—or a digital scanner, having multiple image capture stages, each composed of a lens and an image sensor, wherein the lenses of the multiple image capture stages have different focal lengths to provide an extended optical zoom range for the image capture assembly. The present invention contemplates the use of the multiple image capture stages to provide an enhanced imaging capability, in addition to an enhanced autofocus capability. By using the image capture stages for image capture and autofocus, dedicated autofocus modules can be eliminated thereby reducing the cost and size of the image capture assembly while improving the sharpness of the captured still and video images, as well as increasing the speed of response of the autofocus system.

There are several embodiments by which one image capture stage may be used to capture digital still images or video images while another image capture stage is simultaneously being used for another purpose, such as enhanced autofocus, generation of a secondary image, production of a range map, and the like. In a first embodiment described herein, when a user has set a zoom position to be within a first optical zoom range, a first imaging stage containing a first (e.g., zoom) lens is used to capture a still image or a series of images as in a video sequence, while a second imaging stage simultaneously provides the images for the purpose of autofocus of the first imaging stage. Since the second imaging stage is not used to capture the images, the focus conditions of the lens in the second imaging stage can be adjusted over a wider range, e.g., around a peak contrast position (e.g., "hill climb" autofocus) or from the near focus position to the infinity focus position (e.g., "whole way" autofocus) to determine the new best focus setting for the lens in the first imaging stage without detrimentally affecting the focus quality of the images captured by the first imaging stage. When the new best focus condition has been determined using the second imaging stage, the focus condition of the first imaging stage is changed from the previous best focus condition to the new best focus condition.

When the user adjusts the zoom position on the image capture assembly to a second optical zoom range, the camera automatically switches to use the second imaging stage (containing, e.g., a second zoom lens) to capture the images, and begins using the first imaging stage for autofocus of the second imaging stage. Because the two lenses have different focal lengths, they have different magnifications. Therefore, the digital filters used to determine the autofocus may be adjusted, as a function of this difference in magnification, in order to compensate for the differences in magnification.

In a variation of this embodiment, two image capture stages are used together to form a high resolution rangefinder similar to a dual lens rangefinder but with higher resolution, which is provided by the two high resolution image capture stages and a larger separation distance between the two lenses in the two image capture stages. In this variation, the first image capture stage may be used to provide an initial accurate autofocus using a "hill climb" contrast comparison method; subsequently, the first image capture stage is used in conjunction

APPL-1005 / Page 36 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

**11**                                                          **12**

with the second image capture stage as a high resolution rangefinder operating in a differential mode to detect any changes in the distance to the scene that require refocusing prior to capture of a digital still image or prior to or during a video capture. By using the rangefinder in a differential mode, that is, to discern a change in distance from an already focused position to a nearby changed focus position, the impact of environmental changes on the accuracy of the rangefinder is diminished.

In another embodiment described herein, the two image capture stages are both autofocused at the same time using a "hill climb" contrast comparison method prior to capture of a digital still image or capture of a video image by the first image capture stage. The second image capture stage then continues to check the focus by measuring the contrast in the image; when a change in contrast is detected, a second autofocus operation using the "hill climb" contrast comparison method is performed using the second image capture stage to determine the change in focus condition. The focus of the first image capture stage is then changed by an amount proportional to the change in focus determined by using the second image capture stage. Again, a differential focus change measurement is performed from a position established by a "hill climb" autofocus to improve the accuracy of the autofocusing process.

As mentioned in the background of the invention section, a special problem arises during video capture, where the autofocus images are derived from the same series of still images or frames that compose the video images. For instance, during video capture with pan movements of the camera where the scene changes continuously, large portions of the video are actually out of focus as the autofocus system hunts for proper focus. Moreover, many of the frames may be out of focus due to the use of an autofocus system that uses the "hill climb method" to focus, which as mentioned earlier may be unable to discern changing focus under certain conditions where the subject of interest has suddenly shifted in the scene.

Accordingly. in a variation of the foregoing embodiment, when the user has set the zoom position to be within the first optical zoom range, the first imaging stage, including the first zoom lens and its associated image sensor, is used to set the initial focus for taking an image, such as a video image, while the second imaging stage, including the second zoom lens and its associated image sensor, simultaneously provides a continuous "whole-way" autofocus input image to determine if the focus of the first zoom lens should be adjusted as a result of subject motion. Since the second zoom lens and its associated image sensor are not used to capture the motion images, the focus distance can be adjusted from the near focus to the infinity position, in order to determine the best focus setting without affecting the captured motion images. When the user adjusts the zoom position to be outside the first zoom range, the camera automatically switches to the second imaging stage, using the second zoom lens and its associated sensor to capture the motion sequence, and begins using the first imaging stage, with its first lens and associated image sensor, to simultaneously determine if the focus of the second zoom lens should be adjusted as a result of subject motion.

In another embodiment described herein, the two image capture stages are configured as a high resolution rangefinder in order to determine the distances to different portions of the scene in the form of a range map. The range map is then used to modify the captured image signal or the output image for a variety of purposes, such as (without limitation): to improve image processing and enable improved image quality; to improve object identification within the image; to enable object extraction from an image; to enable motion tracking of objects within multiple images; to enable reduced depth of field images by blurring of objects outside of the desired depth of field; to improve the dynamic range within images; to reduce exposure issues introduced by use of a flash; and to improve scene balance within the image.

In another embodiment described herein, and in accordance with the present invention, a first imaging stage, including a first zoom lens and a first image sensor, is used to capture a first (i.e., primary) still image at a first (i.e., primary) focus distance, while a second imaging stage, including a second zoom lens and a second image sensor, is used to simultaneously capture a second (i.e., secondary) still image at a second (i.e., secondary) focus distance. The sensor output from the second imaging stage is used as a secondary output image for modifying the primary output image, thereby generating an enhanced primary image signal. For instance, the secondary still image is used to provide an enhancement signal that may, e.g., sharpen portions of the primary still image that are positioned near the secondary focus distance or may modify the dynamic range of the primary still image.

As mentioned above, the images from both imaging stages may be used to generate a range map identifying the distances to the different portions of the scene. In another embodiment described herein, the camera further includes a GPS unit for providing GPS coordinates for the location of the camera and an electronic compass for providing the pointing direction of the camera. Thereupon, the GPS coordinates for the location of the camera, the pointing direction of the camera, and distance offsets from the range map may be used in order to generate GPS coordinates for portions of the scene.

FIG. 1 depicts a block diagram of an image capture assembly 10A according to the first embodiment of the present invention. Though not an essential aspect of the invention, the image capture assembly 10A is preferably a portable battery operated device, small enough to be easily handheld by a user when capturing and reviewing images. In the preferred embodiment, the image capture assembly 10A is a digital camera that produces both still images and motion video images that are stored on a removable memory card 54. Alternatively, the digital camera may produce and store only motion images or only still images.

The image capture assembly 10A includes two imaging stages 1 and 2, both with zoom lenses 3 and 4. (These stages will hereinafter be referred to in the specification as image capture stages, although in most cases only one stage—at a time—is capturing an image that is stored on the removable memory card 54.) The first zoom lens 3 is controlled by a first lens focus adjuster, e.g., zoom and focus motors 5a, and provides an image to a first image sensor 12. The second zoom lens 4 is controlled by a second lens focus adjuster, e.g., zoom and focus motors 5b, and provides an image to a second image sensor 14. An adjustable aperture and shutter assembly in each zoom lens (not shown) is used to control the exposure to image sensors 12 and 14.

FIGS. 2A and 2B show perspective views of the image capture assembly 10A described in relation to FIG. 1. FIG. 2A is a frontal view of the image capture assembly 10A, showing the first zoom lens 3, the second zoom lens 4 and a flash 48. FIG. 2B is a rear view of the camera 10A, showing a color LCD image display 70 and a number of user controls 42, including a shutter button 42a for enabling an image capture sequence, a zoom button 42c for enabling a selection of a zoom setting, and a multi-position selector 42d for navigating through images, menu choices and the like that are displayed on the color LCD image display 70.

The image capture stages 1 and 2 comprise the zoom lenses 3 and 4 and the image sensors 12 and 14, as shown in FIG. 1.

APPL-1005 / Page 37 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

13

While zoom lenses **3** and **4** are offset vertically, as shown in FIG. **2**a, the zoom lenses **3** and **4** could be offset in other directions, such as horizontally. In addition, according to another embodiment of the invention, one (or both) of the zoom lenses **3** and **4** could be replaced with a fixed focal length lens. In all cases, the optical axes of the zoom lenses **3** and **4** and the sensors **12** and **14** are generally aligned with respect to each other so as to be viewing substantially the same scene, albeit typically with different fields of view. The configuration of the optical components are further described in the aforementioned, commonly assigned U.S. patent application Ser. No. 11/062,174, the disclosure of which is incorporated herein by reference, which includes several embodiments in which more than two image capture stages are used. The configuration of the zoom lenses **3** and **4** in the image capture stages **1** and **2** can include folded optical paths to change the overall dimensions of the image capture stages **1** and **2**; however, folded optical paths are not necessary for practice of the present invention.

In a preferred embodiment, the image sensors **12** and **14** are single-chip color megapixel CCD sensors, using the well-known Bayer color filter pattern in order to capture color images, although other sensors, such as CMOS sensors, and other color filter arrays, such as stripe filters, may be used equally well without limitation according to the invention. The image sensors **12** and **14** may have a variety of aspect ratios, for example, a 4:3 image aspect ratio and a variety of resolutions, for example, a total of 6.1 MP effective megapixels (million pixels), with, in this particular case, 2848 active columns of pixels×2144 active rows of pixels. It should also be understood that the image sensors **12** and **14** do not have to have the same specifications. For instance, in some embodiments disclosed in the aforementioned, commonly assigned U.S. patent application Ser. No. 11/062,174, the size, resolution, color filter array, spectral sensitivity and aspect ratio of the image sensors **12** and **14** can be different.

A control processor and timing generator **40** controls the first image sensor **12** by supplying signals to clock drivers **13**, and controls the second image sensor **14** by supplying signals to clock drivers **15**. The control processor and timing generator **40** also controls the zoom and focus motors **5**a and **5**b, an auto exposure detector **46**, user controls **42**, first and second digital multiplexer control elements **34** and **36**, and the flash **48** for emitting light to illuminate the scene. The user controls **42** are used to control the operation of the digital camera **10**A, as also described earlier in reference to FIG. **2**B.

An analog output signal **12**e from the first image sensor **12** is amplified and converted to a first digital image signal by a first analog signal processor **22**. The digitized first digital image signal is provided to a first input of the first digital multiplexer control element **34** and to a first input of the second digital multiplexer control element **36**. An analog output signal **14**e from the second image sensor **14** is amplified and converted to a second digital image signal by a second analog signal processor **24**. The digitized second digital image signal is provided to a second input of the first digital multiplexer control element **34** and a second input of a second digital multiplexer control element **36**. The function of the first multiplexer **34** is to select either the first sensor output **12**e from the first image sensor **12**, or the second sensor output **14**e from the second image sensor **14** as the image capture signal. The function of the second multiplexer **36** is to select either the second sensor output **14**e from the second image sensor **14** or the first sensor output **12**e from the first image sensor **12** as the autofocus image signal, which is provided to an image processor **50**.

14

The control processor and timing generator **40** controls the digital multiplexers **34** and **36** in order to select one of the sensor outputs (**12**e or **14**e) as the captured image signal, and to select the other sensor output (**14**e or **12**e) as the autofocus image signal. The digital data provided by the first digital multiplexer control element **34** is temporarily stored in a DRAM buffer memory **38** and subsequently processed by the image processor **50** to produce a processed digital image file, which may contain a still digital image or a video image. The digital data provided by the second digital multiplexer control element **36** is provided to the image processor **50**, which performs autofocus calculations as will be described later in reference to FIGS. **4**, **5**, **6** and **7**.

Briefly summarized, the image processor **50** produces the focus detection signals that drive the first and second focus adjusters, that is, the zoom and focus motors **5**a and **5**b. The control processor and timing generator **40**, in combination with the image processor **50**, either (a) selects the sensor output **12**e from the first imaging stage **1** as the captured image signal and uses the sensor output **14**e from the second imaging stage **2** to generate the focus detection signal for the selected imaging stage **1** or (b) selects the sensor output **14**e from the second imaging stage **2** as the captured image signal and uses the sensor output **12**e from the first imaging stage **1** to generate the focus detection signal for the selected imaging stage **2**. In such a manner, the focus detection signal is applied to the zoom and focus motors **5**a and **5**b of the selected imaging stage in order to adjust the focus of the image providing the sensor output for the captured image signal.

The processing performed by the image processor **50** is controlled by firmware stored in a firmware memory **58**, which may be flash EPROM memory or any other form of appropriate memory. The processor **50** processes the digital input image from the DRAM buffer memory **38**, using a RAM memory **56** to store intermediate results during the processing stage. The processed digital image file is provided to a memory card interface **52**, which stores the digital image file on the removable memory card **54**. Removable memory cards **54** are one type of removable digital image storage medium, and are available in several different physical formats. For example, the removable memory card **54** can include (without limitation) memory cards adapted to well-known formats, such as the Compact Flash, SmartMedia, MemoryStick, MMC, SD, or XD memory card formats. Other types of removable digital image storage media, such as magnetic hard drives, magnetic tape, or optical disks, can alternatively be used to store the still and motion digital images. Alternatively, the digital camera **10**A can use internal non-volatile memory (not shown), such as internal Flash EPROM memory to store the processed digital image files. In such an embodiment, the memory card interface **52** and the removable memory card **54** are not needed.

The image processor **50** also receives input from a global positioning system (GPS) unit **57**, which enables the image processor **50** to determine the GPS coordinates (i.e., location) of the camera at any appropriate time, e.g., when an image is captured. The image processor also receives directional input from an electronic compass **59**, which enables the image processor **50** to determine which direction the camera is pointed, e.g., when an image is captured. The image processor **50** performs various other image processing functions, including color interpolation followed by color and tone correction, in order to produce rendered sRGB image data. The rendered sRGB image data is then JPEG compressed and stored as a JPEG image file on the removable memory card **54**. The rendered sRGB image data may also be provided to a host PC **66** via a host interface **62** communicating over a

APPL-1005 / Page 38 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

15                                                                    16

suitable interconnection **64**, such as a SCSI connection, a USB connection or a Firewire connection. The JPEG file preferably uses the so-called "Exif" image format defined in "Digital Still Camera Image File Format (Exif)" version 2.2 by the Japan Electronics and Information Technology Industries Association (JEITA), Tokyo, Japan. This format includes an Exif application segment that stores particular image metadata, including the date/time the image was captured, as well as the lens f/number, GPS location and pointing direction when the image was captured and other camera settings.

It should be noted that the image processor **50**, while typically a programmable image processor, can alternatively be, for example, a hard-wired custom integrated circuit (IC) processor, a general purpose microprocessor, or a combination of hard-wired custom IC and programmable processors. Furthermore, one or more of the functions shown as separate blocks in FIG. **1**, such as the digital multiplexer control elements **34** and **36**, the DRAM buffer memory **38**, and the RAM memory **58**, can be incorporated in an IC containing the image processor **50**. It should also be noted that the functions of at least certain portions of the control processor **40** and the image processor **50** may be merged as needed for purposes of certain applications and discussions, such as in the reference to a processing stage in this description and in certain of the claims, where, e.g., selection of a sensor output (as by the control processor **40**) and generation of a focus signal (as by the image processor **50**) are referred to. In other words, the recitation of a processing stage is intended to encompass the recited functions, whether they are to be found in one or more actual processing elements, circuits, or the like.

In a further embodiment of the present invention, the digital camera **10**A is included as part of a camera phone. In such an embodiment, the image processor **50** also interfaces to a cellular processor **90**, which uses a cellular modem **92** to transmit digital images to a cellular network (not shown) using radio frequency transmissions via an antenna **94**. In some embodiments of the present invention, the two image capture stages **1** and **2**, and the zoom and focus motors **5a** and **5b** may be part of an integrated assembly. In addition, the clock drivers **13** and **15**, as well as the analog signal processors **22** and **24** and the analog/digital converters included therewith, may be part of the integrated assembly.

FIG. **3** depicts a flow diagram showing a method for capturing digital images using the image capture assembly of FIG. **1**. In block **100**, when the camera **10**A is turned ON using a power switch (not shown), the zoom lenses **3** and **4** are set to their default positions, which is preferably a wide angle position where the output of the first image sensor **12** is used to capture images in a preview mode for display on the color LCD image display **70** to enable the user to compose the images to be captured. As part of composing the images, in block **102** the user typically presses the zoom button **42c** in order to set a desired field of view for the digital camera **10**A.

In block **102**, the zoom position setting is compared to a value X at which the image capture function switches from the first image capture stage to the second image capture stage. In block **104**, if the zoom position setting is less than X (a negative response to block **102**), then the first image capture stage **1** is used to capture images in the preview mode, while the second image capture stage **2** is used to capture autofocus images. The first image capture stage **1** continues to capture images for preview on the display **70** (block **110**) while, in block **106**, the second image capture stage **2** is used to capture autofocus images for autofocus of the first image capture stage **1**, which are processed by the image processor **50** and used in block **108** to focus the first image capture stage **1**.

In block **112**, if the zoom button **42c** is not pressed, and in block **114** if the capture button is pressed, a digital image is captured in block **116** with the first image capture stage **1**. Alternatively, if the zoom button is pressed in block **112**, control is returned to block **102**, and if the capture button is not pressed in block **114**, control is returned to block **106**.

In block **124**, if the zoom position setting is greater than X (a positive response to block **102**), then the second image capture stage **2** is used to capture images in the preview mode, while the first image capture stage **1** is used to capture autofocus images. The second image capture stage **2** continues to capture images for preview on the display **70** (block **130**) while, in block **126**, the first image capture stage **1** is used to capture autofocus images for autofocus of the second image capture stage **2**, which are processed by the image processor **50** to generate a focus detection signal that is used in block **128** to focus the second image capture stage **2**.

In block **132**, if the zoom button **42c** is not pressed, and in block **134** if the capture button is pressed, a digital image is captured in block **136** with the second image capture stage **2**. Alternatively, if the zoom button is pressed in block **132**, control is returned to block **102**, and if the capture button is not pressed in block **134**, control is returned to block **126**.

A flow chart of an autofocus process using the two image capture stages shown in FIG. **3** in a rangefinder configuration is shown in FIG. **4**, where the rangefinder method is used in blocks **108** and **128** of FIG. **3** to autofocus the images from the first and second image capture stages. In block **250**, the user determines the zoom position by adjusting the zoom control **42c** on the camera, which in turn dictates, as described above, which image capture stage will be used to capture the final image and which image capture stage will be used only for autofocus images (block **252**). The image capture stage that will not be used for capture of the final image is zoomed to a position closest to the transition zoom position between the two zoom lens systems in the two image capture stages (block **254**). The focus lenses of the two image stages are moved to their respective hyperfocal positions, wherein the greatest focus range is produced (block **256**). In block **258**, the user presses the capture button **42** a from a position S0 to a position S1 to initiate the autofocus sequence (and the autoexposure sequence). (The capture button has **3** positions: S0 is the neutral position that the button maintains prior to the operator touching the capture button; S1 is the intermediate position in which the camera performs autofocus and autoexposure; S2 is the final position in which the camera performs a final autoexposure and captures the final image.)

Autofocus images are then captured by both image stages (block **260**) with their zoom lenses at their respective zoom positions. The autofocus image from the image stage in the lower zoom position, i.e., where the zoom position is less than X (see block **102** in FIG. **3**), is then cropped and upsampled so that corresponding features in the two autofocus images span the same number of pixels (block **262**). The cropped and upsampled autofocus image is then correlated with the other autofocus image to identify the pixel shift between the two autofocus images (block **264**) and thereby produce the focus detection signal. FIG. **17**A shows a representation of the autofocus image **350** as captured from the higher zoom position image stage. FIG. **17**B shows a representation of a cropped and upsampled autofocus image **352** from the image stage in the lower zoom position. These representations show the offset between the two images that is used to determine the distance to portions of the scene. In block **266**, a calibration factor is then applied to the focus detection signal to determine the distance that the focus lens must be moved to produce a best focus condition for the image capture. In block

APPL-1005 / Page 39 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

17

268, the focus detection signal is applied to the zoom and focus motor 5a and the focus lens is then moved the determined distance in the image capture stage that will be used for the final image capture to produce the condition for best focus 268. When the user pushes the capture button from S1 to S2, the image capture stage capture the final image.

A flow chart of an autofocus process using the two image capture stages shown in FIG. 3 in a well known "hill climb" contrast comparison method is shown in FIG. 5, where the "hill climb" contrast comparison method is used in blocks 108 and 128 of FIG. 3 to autofocus the images from the first and second image capture stages. In block 250, the user selects a zoom position. The zoom position determines which imaging stage will be used as the capture stage (block 252). Then, in block 254, the image capture stage not used for capture is zoomed to the point closest to the user selected zoom position from block 250. In block 258, the user pushes the capture button 42a from the S0 position to the S1 position to initiate an autofocus sequence. In block 272, both image capture stages are autofocused by the "hill climb" method. When the user pushes the capture button from the S1 position to the S2 position (block 274), video images are continuously captured by the capture stage (block 276).

In order to maintain focus with a minimal amount of hunting, focus is continually checked in block 278 with the image capture stage not being used for capture using the "hill climb" contrast comparison method. Then, in the decision block 280, if the focus is good, control is returned to block 276 and video images are continuously captured by the capture stage. If, in the decision block 280, if the focus is not good, then the focus lens adjustment is identified (block 282) that is needed to produce best focus on the image capture stage not being used for capture. In block 284, the autofocus "hill climb" method calibration curve and the identified focus lens adjustment is used to determine the movement of the focus lens needed in the capture stage to produce best focus, thereby producing a focus change detection signal. Finally, in block 286, the focus change detection signal is applied to the zoom and focus motor 5a or 5b and the focus lens in the capture stage is moved to the new best focus position, and control is returned to block 276 and video images are continuously captured by the capture stage.

Alternatively, and also in order to maintain focus with a minimal amount of hunting, focus is continually checked in block 278 with the image capture stage not being used for capture using the "whole way" autofocus method. Accordingly, in block 284, an autofocus "whole way" method calibration curve and the identified focus lens adjustment is used to determine the movement of the focus lens needed in the capture stage to produce best focus, thereby producing a focus change detection signal. Finally, in block 286, the focus change detection signal is applied to the zoom and focus motor 5a or 5b and the focus lens in the capture stage is moved to the new best focus position, and control is returned to block 276 and video images are continuously captured by the capture stage.

Calibration curves are used in both FIGS. 4 and 5 to determine the movement of the focus lens needed in the capture stage to produce best focus. FIGS. 6 and 7 depict flow diagrams for calculating these curves. More specifically, FIG. 6 depicts calculation of the autofocus rangefinder calibration curve used in block 266 of FIG. 4. In block 300 of FIG. 6, a series of image sets are captured with objects at known distances, using the shorter focal length first image capture stage and the longer focal length second image capture stage at a series of focus lens positions. Then, in block 302, the autofocus image from the lower focal length first image stage is

18

cropped and upsampled so that corresponding features in the two autofocus images span the same number of pixels as shown in FIGS. 17A and 17B. In block 304, the images from the second image capture stage are correlated to corresponding portions of the images from the cropped and upsampled image from the first image capture stage to determine the pixel offset between the images in each image set. Thereupon, in block 306, the data of pixel offset between images in each image set versus known distance to objects is stored as the autofocus rangefinder calibration curve for use in block 266 of FIG. 4.

FIG. 7 depicts calculation of the "hill climb" calibration curve used in block 284 of FIG. 5. In block 400 of FIG. 7, a series of image sets are captured with objects at known distances, using the first image capture stage and the second image capture stage—wherein autofocus is done by the "hill climb" method for each image. Then, in block 402, the focus lens positions is compared for the two image capture stages versus the distance to the focused objects in the image sets. Then, the data of focus lens positions of the first image capture stage versus the focus lens positions of the second image capture stage for the same distance to focused objects in the images is stored as an autofocus "hill climb" method calibration curve for use in block 284 of FIG. 5.

FIG. 8 depicts a flow diagram showing a method for capturing video images using the image capture assembly of FIG. 1. Much of the flow diagram duplicates the functional elements shown in FIG. 3, and will not be repeated here where the same functions and reference characters are indicated. If the zoom position setting is less than X (a negative response to block 102), then the first image capture stage 1 is used to capture video images, while the second image capture stage 2 is used to capture autofocus images. The focus of the first image capture stage is performed as described in FIG. 3, except it is now for a video image. Subsequently, in block 112 in FIG. 8, if the zoom button 42c is not pressed, and in block 114 if the capture button is pressed, a video image is captured in block 118 by the first image capture stage 1. The video image is checked for focus quality in block 119, and if there is a need to refocus, control is returned to block 106 and the focus change detection signal is generated, which is used in block 108 to drive the focus motor 5a for the first image capture stage 1. If there is no need to refocus, then control is returned to block 112.

If the zoom position setting is greater than X (a positive response to block 102), then the second image capture stage 2 is used to capture video images, while the first image capture stage 1 is used to capture autofocus images. The focus of the second image capture stage is performed as described in FIG. 3, except it is now for a video image. Subsequently, in block 132, if the zoom button 42c is not pressed, and if in block 134 if the capture button is pressed, a video image is captured in block 138 with the second image capture stage 2. The video image is checked for focus quality in block 139, and if there is a need to refocus, control is returned to block 126 and the focus change detection signal is generated, which is used in block 128 to drive the focus motor 5b for the second image capture stage 2. If there is no need to refocus, then control is returned to block 132.

A flow chart of an autofocus process using the two image capture stages shown in FIG. 8 in a rangefinder configuration is shown in FIG. 9, where the rangefinder method is used in blocks 108 and 128 of FIG. 8 to autofocus the images from the first and second image capture stages. In block 440 of FIG. 9, a first autofocus image is captured with the lower focal length image capture stage. Then, in block 442, the autofocus image from the image stage in the lower focal length is cropped and

APPL-1005 / Page 40 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1992

US 7,859,588 B2

**19**                                                                              **20**

upsampled so that corresponding features in the two autofocus images span the same number of pixels. Meanwhile, in block **448**, a second autofocus image is captured with the longer focal length image capture stage. The second autofocus image is correlated in block **444** with the cropped and upsampled image to determine the pixel offset between the images for different portions of the images. Then, in block **446**, the focus correction needed is determined from the offset and the autofocus rangefinder calibration curve (which was calculated in FIG. **6**).

A flow chart of an autofocus process using the two image capture stages shown in FIG. **8** in a "hill climb" contrast comparison method is shown in FIG. **10**, where the "hill climb" contrast comparison method is used in blocks **108** and **128** of FIG. **8** to autofocus the images from the first and second image capture stages. In block **460** of FIG. **10**, a first image is captured with the first image capture stage, wherein the autofocus is done by the "hill climb" method. Then, in block **462**, the image from the first image capture stage is provided as a preview image on the display. Meanwhile, in block **466**, a second image is captured with the second image capture stage, wherein the autofocus is done by the "hill climb" method. Then, in block **468**, another, subsequent image is captured with the second image capture stage, wherein the autofocus is also done by the "hill climb" method. In block **470**, the focus conditions for the second image are compared to those of the subsequent image. Then, if the focus conditions have changed (positive response to block **472**), the focus conditions are changed for the first image capture stage based on the change of the focus conditions for the second image capture stage and the autofocus "hill climb" method calibration curve (which was calculated in FIG. **7**). If the focus conditions have not changed (negative response to block **472**), control is returned to block **468** and another image is captured with the second image capture stage.

Alternatively, and in order to maintain focus with a minimal amount of hunting, focus is continually checked in block **470** with the second image capture stage using the "whole way" autofocus method. Accordingly, if the focus conditions have changed (positive response to block **472**), the focus conditions are changed for the first image capture stage based on the change of the focus conditions for the second image capture stage and an autofocus "whole way" method calibration curve. If the focus conditions have not changed (negative response to block **472**), control is returned to block **468** and another image is captured with the second image capture stage.

FIG. **11** depicts a flow diagram showing a method for processing images captured using the image capture assemblies of FIG. **3** or **8**, wherein a range map is produced. (Certain parts of the diagram bear the same functions and reference characters as used in FIG. **9**.) Methods to produce a rangemap are well known to those skilled in the art; for example, a description of a method for producing a rangemap or depth map from a disparity map produced from the pixel offset information for a set of images captured by multiple cameras with similar fields of view is described in United States Patent Application Publication Number 2006/0193509 (published Aug. 31, 2006 in the names of Antonio Criminisi et al., and entitled "Stereo-based Image Processing"), which is incorporated herein by reference. In the case described in the present patent application, two or more image capture devices are included in a single electronic camera. Since the two or more image capture devices have different focal lengths, at least one of the images must be modified to make the two or more images comparable to enable the pixel offsets to be deter-

mined. Referring now to FIG. **11**, in block **440** a first autofocus image is captured with the lower focal length image capture stage and, in block **442**, the autofocus image from the image capture stage in the lower zoom position is cropped and upsampled so that corresponding features in the two autofocus images span the same numbers of pixels. Meanwhile, in block **448**, a second autofocus image is captured with the higher focal length image capture stage. Then, in block **480**, the second autofocus image is correlated with the cropped and upsampled image to determine the pixel offset between the images for different portions of the images. The pixel offsets are then converted in block **482** to distances from the image capture device using the autofocus rangefinder calibration curve. A map is then produced in block **484** showing the distances to different portions of the images.

The distance from the image capture device to portions of the scene can be calculated from the measured pixel offsets between corresponding portions of the first and second autofocus images, that is, between corresponding portions of the cropped and upsampled image obtained in block **442** from the first autofocus image and the second autofocus image obtained from block **448**. The relationship between the pixel offset as experienced on the image sensors p, the pixel size m, the spacing between lenses s, the effective focal length of the lens f and the distance d to the portion of the scene is given as

$$d = s \cdot f/(p \cdot m)$$

Table 1 shows typical pixel offsets for an image capture device as described. In a preferred embodiment, the relationship between pixel offset and distance to portions of the scene is calibrated against objects in a scene with known distances to compensate for any unexpected variations in dimensions and any angular tilt between the two lens assemblies.

TABLE 1

| Pixel size (mm) | | 0.002 |
| Separation between lenses (mm) | | 20 |
| Focal Length (mm) | | 6 |
|---|---|---|
| Distance (ft) | Distance (mm) | Offset (pixels) |
| 0.5 | 152.4 | 393.7 |
| 1 | 304.8 | 196.9 |
| 2 | 609.6 | 98.4 |
| 4 | 1219.2 | 49.2 |
| 8 | 2438.4 | 24.6 |
| 16 | 4876.8 | 12.3 |
| 32 | 9753.6 | 6.2 |
| 64 | 19507.2 | 3.1 |
| 128 | 39014.4 | 1.5 |

As mentioned earlier, The range map is then used to modify the captured image signal or the output image for a variety of purposes, such as (without limitation):

a) to improve object identification within the image by identifying the continuous boundaries of the object so the shape of the object can be defined;

b) to enable object extraction from an image by identifying the continuous boundaries of the object so it can be segmented within the image;

c) to enable motion tracking of objects within multiple images by identifying objects so they can be tracked as the same object between images;

d) to enable dynamic depth of field images by blurring of portions of the image that correspond to areas of the scene that lie outside of the desired depth of field;

e) to improve the dynamic range within images by applying gain adjustments to objects as a whole;

APPL-1005 / Page 41 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

21 22

f) to reduce exposure issues introduced by use of a flash by reducing the gain on the portions of the image that correspond to objects in the foreground and increasing the gain on objects in the background;

g) to improve scene balance within the image by enabling objects in the foreground to be emphasized.

In order to understand the use of a range map for purposes such as noted above, it is helpful to consider an example. Assume that a user/photographer has a great picture of the Alaskan mountains—beautiful clouded sky and white-capped mountains in the most distant ranges, flowers carpeting the fields in the mid range, and a black dog sitting in the foreground about 5 feet away. However, the clouds are blown out (over-exposed), as are the white-capped mountains. The black dog is too dark (underexposed) and out of focus (be-cause, e.g., the camera was set on landscape mode). Using the range data, several features of the image can be modified. The exposure for various locations can be improved by applying gain adjustments to selected object portions of the image: in particular, e.g., to the cloud detail, the snow detail, and the fur on the black dog. More generally, the range map can be used to improve dynamic range within the output image by applying gain adjustments to objects as a whole within the output image, and independently of their position in the range map. Moreover, the depth of field can be adjusted so that, e.g., the dog is in focus, the mountains are in focus and so are those great flowers. Or, if the user really wants to emphasize the dog more than the beautiful scenery, the range data can be used to isolate the mountains and the flowers, which can then be blurred, and further to isolate the dog, which is sharpened to obtain a nice sharp image. As can be understood, given the availability of a range map according to the invention, there are numerous other uses that would be available for artistically optimizing the image. For instance, the user can make a dynamic depth of field, that is, with mixed regions of the ranges in focus. More generally, the range map can be used to enable dynamic depth of field images by blurring portions of the output image, independently of their position in the range map, that correspond to areas of the scene that lie outside of a desired depth of field for a featured portion of the image. For example, the dog and mountains, albeit they are at opposite range extremes, could be brought in focus because they are the regions of interest and the flowers in the mid range can be blurred smoothly.

FIGS. 12 and 13 show block diagrams of digital cameras using different variations of the optical image capture stages. Most components subsequent to the image capture stages are the same as those described in connection with FIG. 1, and will not be further described here. FIG. 12 depicts a block diagram of a digital camera having a first image capture stage 71 and a second image capture stage 2. The first stage 71 includes a first fixed focal length lens 73 and the first image sensor 12, and the second stage 2 includes the second (zoom) lens 4 and second image sensor 14. The focusing is carried out between the focus adjustments of the first and second image capture stages 71 and 2.

Because the focal length of the fixed focal length lens typically generates an ultra-wide angle field of view, e.g., 22 mm equiv., it may have a fixed focus set to a distance near the lens hyperfocal distance of, e.g., 8 feet, so that objects from 4 feet to infinity are in focus. Therefore, the fixed focal length lens does not need to include a focus adjustment. The fixed focal length lens includes an adjustable aperture and shutter assembly (not shown) to control the exposure of the image sensor.

FIG. 13 depicts a block diagram of a digital camera having a first image capture stage 71, a second image capture stage 2,

and a third image capture stage 74. The first stage 71 includes a first fixed focal length lens 73 with a first image sensor 12, the second stage 2 includes a second (zoom) lens 4 with a second image sensor 14, and the third image capture stage 74 includes a third (zoom) lens 75 with a third image sensor 16. According to this configuration, the first lens 73 is typically a ultra-wide angle lens, the second (zoom) lens 4 is typically a wide angle zoom lens, and the third (zoom) lens 75 is typically a telephoto zoom lens. Since, as mentioned in the pre-ceding paragraph, the first fixed focal length lens 73, being an ultra-wide angle lens, is typically not focused, the focusing is carried out between the second and third image capture stages 2 and 74.

FIG. 14 depicts a flow diagram showing a method for enhancing the depth of field of an image by using images from both image capture stages from FIG. 1, in accordance with the present invention. In block 500 of FIG. 14, the zoom position is set to a default position when the camera is powered on. In block 502, the zoom position setting is compared to a value X at which the image capture function switches from the first image capture stage to the second image capture stage. In block 504, if the zoom position setting is less than X (a negative response to block 502), then the first image capture stage 1 is used to capture images in the preview mode, while the second image capture stage 2 is used to capture autofocus images. The first image capture stage 1 continues to capture images for preview on the display 70 (block 506) while the second image capture stage 2 is used to capture autofocus images for autofocus of the first image capture stage 1, which are processed by the image processor 50 and used to focus the first image capture stage 1. Should the zoom button not be pressed (negative response to block 508), and when the shut-ter button 42a is pressed, a primary still image is captured in block 510 using the first image capture stage set to a primary focus position. Then, in block 512, a secondary still image is captured using the second image capture stage set to a sec-ondary focus position. Then, in block 514, the secondary still image is used to enhance the depth of field of the primary image, for instance, where the secondary still image is used to provide an enhancement signal that can be used to sharpen portions of the primary still image that are positioned near the secondary focus distance.

In block 524, if the zoom position setting is greater than X (a positive response to block 502), then the second image capture stage 2 is used to capture images in the preview mode, while the first image capture stage 1 is used to capture auto-focus images. The second image capture stage 2 continues to capture images for preview on the display 70 (block 526) while the first image capture stage 1 is used to capture auto-focus images for autofocus of the second image capture stage 2, which are processed by the image processor 50 and used to focus the second image capture stage 2. Should the zoom button be pressed (positive response to block 528), and when the shutter button 42a is pressed, a primary still image is captured in block 530 using the second image capture stage set to a primary focus position. Then, in block 532, a second-ary still image is captured using the first image capture stage set to a secondary focus position. Then, in block 534, the secondary still image is used to enhance the depth of field of the primary image, for instance, where the secondary still image is used to sharpen portions of the primary still image that are positioned near the secondary focus distance.

As shown above, the enhancement signal is generated by the camera to sharpen portions of the primary still image that are positioned near the secondary focus distance. However, the primary and secondary still images may submitted to an external processor, such as the host PC 66 illustrated in FIG.

APPL-1005 / Page 42 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

23

24

**1**, and the enhancement signal is generated by the external processor to sharpen portions of the primary still image that are positioned near the secondary focus distance.

The concept of multiple lenses and multiple sensors, and the use of an integrated image capture assembly, may be adapted for use in a cell phone of the type having a picture taking capability. Accordingly, and as shown in FIG. **15**A, a cell phone **600** includes a phone stage comprising a microphone **602** for capturing the voice of a caller, related electronics (not shown) for processing the voice signals of the caller and the person called, and a speaker **604** for reproducing the voice of the one called. A keypad **606** is provided for entering phone numbers and image capture commands, and a (LCD) display **608** for showing phone-related data and for reproducing images captured by the phone or received over the cellular network. The rear view of the cell phone **600** shown in FIG. **15**B identifies some of the internal components, including a cellular image capture assembly **610** connected via the image processor **50** (as shown in FIG. 1) to a cellular processing stage comprising the cellular processor **90** and the modem **92**. The cellular processor **90** receives and processes the image data from the image processor **50** and the voice data captured by the microphone **602**, and transfers the image and voice data to the cellular modem **92**. The cellular modem **92** converts the digital image and voice data into the appropriate format for transmission by the antenna **94** to a cellular network.

As the cellular image capture assembly **610** is shown in FIGS. **16**A and **16**B, where FIG. **16**A is a top view of the assembly **610** taken along the lines **24**B-**24**B in FIG. **16**B, the assembly **610** comprises an integrated packaging of the optical and imaging components on a common substrate **620**. More specifically, the assembly **610** includes a first fixed focal length lens **612** and a first image sensor **614**, and a second fixed focal length lens **616** and a second image sensor **618**. The first lens **612**, preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens), forms an image on the first image sensor **614**, and the second lens **616**, preferably a fixed focal length telephoto lens (such as 100 mm equiv. lens), forms an image on the second image sensor **618**. Both of the lenses are oriented in the same direction in order to form images of the same portion of the overall scene in front of them, albeit with different fields of view.

Each lens **612** and **616** and each associated image sensor **614** and **618** are mounted to the substrate **620** with an IR cut filter **622** in between to reduce the incidence of IR radiation on the image pixels. Electronic components **624**, such as resistors, capacitors and power management components, are also mounted on the substrate **620**. The image signals are taken from the substrate **620** via a flex connector **626**. The data taken from the assembly **610** may be raw image data, or if suitable processors (not shown) are on board the substrate **620**, the data could be YUV image data or JPEG image data. Moreover, the image processor **50** may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface displayed on the (LCD) display **608** and by keying appropriate buttons on the keypad **606**. Furthermore, the wide angle image sensor **614** may have high resolution, e.g., higher than that of the telephoto image sensor **618**, in order to provide a higher quality source image for the digital zooming.

In an embodiment according to the present invention, where both lenses **612** and **616** are adjustable focus lenses, the image processor **50** either (a) selects the sensor output from the wide angle lens **612** as the captured image signal and uses the sensor output from the telephoto lens **616** to generate a focus detection signal for the wide angle lens **612** or (b)

selects the sensor output from the telephoto lens **616** as the captured image signal and uses the sensor output from the wide angle lens **612** to generate the focus detection signal for the telephoto lens **616**. The focus detection signal is then applied to the autofocus subsystem **628** of the telephoto lens **616** in order to adjust the focus of the image providing the sensor output for the captured image signal. In this embodiment, the wide angle lens **612** could instead be a zoom lens, such as a wide angle to normal angle zoom lens.

In another embodiment, the wide angle lens **612** is set to its hyperfocal distance, which means it is in focus from a few feet to infinity without need for any focus adjustment by the user. The telephoto lens **616** is automatically focused by an auto focus subsystem **628**. This is required because the hyperfocal distance increases as the focal length increases, and so the focus needs to be adjusted in order to obtain proper focus for objects at typical (e.g. 4' to 12') distances. By using only one focusing subsystem **628** for the telephoto lens **616**, the cost and size can be reduced.

An important constraint in this embodiment is the "z" dimension **630**, which must be held to a very small figure consistent with a cell phone layout and architecture. This may be obtained by careful choice of the telephoto focal length and the size of the sensor. For example, the size of the sensor **616**, and consequently the size of the image that must be produced to fill the sensor, may be made small enough to reduce the focal length to an acceptable z dimension **630**.

In a further embodiment, the two lenses may have approximately identical focal lengths, with the imaging arrays being of different sizes. With the differently sized imaging arrays, each lens is designed to fill the area of the imaging array and each lens-array combination will have substantially the same actual focal length, i.e., the same lens to array distance. However, the 35 mm equiv. of each lens will be different; consequently, each lens will have a different field of view.

While not shown in detail in FIGS. **16**A and **16**B, but similarly as was explained in connection with FIG. **1**, an analog output signal from the first image sensor **614** is amplified by a first analog signal processor and provided to a first input of a control element, e.g., an analog multiplexer control element provided as one of the electronic components **624** on the substrate **620**. The analog output signal from the second image sensor **618** is amplified by a second analog signal processor and provided to a second input of the control element. The function of the control element is to select either the first sensor output from the first image sensor **614** or the second sensor output from the second image sensor **618**, depending on user input from the keypad **606** as to zoom selection, thereby providing a selected sensor output from the cellular image capture assembly **600** to the image processor **50**.

In a further embodiment using the range map (generated according to FIG. **11**), the GPS location and the pointing direction of the camera, which is provided by the GPS unit **57** and the electronic compass **59** in the camera, are combined with distances and directions from the camera to portions of the scene to determine the GPS locations for portions of the scene. FIG. **18** depicts a flow chart for a method to determine GPS locations for portions of the scene. In block **750**, the GPS location of the camera is determined by the GPS unit **57** in the camera. The pointing direction of the camera is determined in block **752** by the electronic compass **59** in the camera. Distance offsets from the camera to portions of the scene are provided by the range map, which is obtained in block **754** from a procedure such as depicted in FIG. **11**. Angular offsets from the pointing direction of the camera (provided by the electronic compass **59**) are determined in block **756** from the

APPL-1005 / Page 43 of 49
APPLE INC. v. COREPHOTONICS LTD.

Appx1995

US 7,859,588 B2

25

location of a portion of the scene in the field of view in the image. GPS locations for portions of the scene are determined in block **758** by adding the distance offsets and the angular offsets to the GPS location and pointing direction of the camera. The GPS locations for portions of the scene are then stored in block **760** in the metadata for the image or displayed as labels on the image in the form of a GPS location map. Alternately, the GPS location for a portion of the image can be displayed on the electronic camera.

Those skilled in the art will recognize that GPS locations of portions of the scene can be used for a variety of purposes, including without limitation: determining the identity of an object; providing navigational directions to a location in a scene; identifying the field of view of a camera relative to a map or other geographical database, etc.

FIG. **19** depicts a flow diagram illustrating a process for selecting one of the imaging stages in a dual lens camera system as the primary capture unit, while relegating the other imaging stage to certain other functions, such as scene analysis, according to the present invention. More specifically, the power to the camera is turned on and the initialization process begins (block **1100**). After the initialization process is completed, the first and second imaging stages **1** and **2** are set to their default zoom positions (block **1102**), which are predetermined initial zoom positions that determine the images that are initially captured and displayed. Thereupon, the first and second imaging stages capture and display first and second preview images (block **1104**) on the image display **70**. These images could be displayed in several ways, for instance, side by side on the display as thumbnails or the like, one within the other, sequentially, etc. Next, the camera operator is asked to decide whether the first or second preview image should be the primary image (block **1106**), where the primary image will be the one that is captured and stored. The operator is given a display time interval x in which to make this decision (block **1110**). If the shutter button is pressed during this interval (block **1108**), or if the operator fails to make a decision during this interval (yes to block **1110**), a predetermined one of the imaging stages (the default imaging stage) is automatically set to be the primary capture unit (block **1112**). (The default imaging stage could be pre-selected for a variety of reasons, one being to provide a comprehensive, wider angle view of the scene as the initial image.) Otherwise, if the operator picks one of the stages (yes to block **1106**), the selected imaging stage is set to be the primary capture unit (block **1124**). For either situation, the other (non-selected) imaging stage is designated as the scene analysis capture unit (block **1114**). Thereupon, the primary capture unit is operated in the preview mode, as subsequently explained in connection with FIGS. **20-22**.

FIGS. **20-22** and **24-26** depict flow diagrams illustrating the usage or analysis of the image from one imaging stage in a dual (or more) lens camera system to modify the image produced by another imaging stage according to the present invention, that is, to influence, analyze, augment or otherwise change the image produced by the other imaging stage. For instance, in FIG. **20**, once the primary capture unit is put in the preview mode (as shown in FIG. **19**), the scene analysis capture unit analyzes the scene (block **1200**) and the image processor **50** sets the primary capture unit parameters utilizing the scene analysis data obtained by the scene analysis capture unit (block **1202**). Such scene analysis data could include without limitation exposure data, dynamic range data, depth of field data, color balance, identification of different aspects of the scene including faces, grass, sunset, snow, etc, and the capture unit parameters could include without limitation aperture value, exposure time, focus position,

26

white balance, ISO setting, etc. The preview image is then captured by the primary capture unit and displayed on the display **70** (block **1204**). The scene analysis capture unit then continues to analyze the scene (block **1206**), and if the scene conditions have not changed (no to block **1208**) the process loops back to block **1204** and a preview image is again captured by the primary capture unit and displayed on the display **70** (without changing the capture parameters). If the scene conditions have changed (yes to block **1208**), the process loops back to block **1202** and the image processor **50** resets the primary capture unit parameters utilizing the scene analysis data obtained by the scene analysis capture unit, and the subsequent process is repeated as before.

In FIG. **21**, the primary capture unit parameters are only changed if the change in scene conditions exceed a threshold value x. Thus, in utilizing the preview mode with a threshold, the scene analysis capture unit captures an image and analyzes the scene (block **1300**). Then, the image processor **50** sets the primary capture unit parameters utilizing the scene analysis data obtained by the scene analysis capture unit (block **1302**). A preview image is then captured by the primary capture unit and displayed on the display **70** (block **1304**). Then, another image is captured from the scene analysis capture unit (block **1306**). If the scene conditions of this later image fail to change by a threshold equal to x (no to block **1308**), that is, the scene conditions are considered to be stable from image to image, the process loops back to block **1304** and another preview image is captured by the primary capture unit and displayed on the display **70** (without changing the capture parameters). Then, another image is captured from the scene analysis capture unit (block **1306**). Otherwise, when the scene condition change is greater than the threshold x and the situation is considered to be unstable (yes to block **1308**), the process loops back to block **1302** and the image processor **50** resets the primary capture unit parameters utilizing the scene analysis data obtained by the scene analysis capture unit. Then, the process is repeated as before.

In FIG. **22**, the consideration of the threshold scene conditions is enhanced by considering the relative zoom positions of the capture units and utilizing scene information from the images captured by both of the capture units. In utilizing this enhanced preview mode, the zoom position of the scene analysis capture unit is set relative to the zoom position of the primary capture unit (block **1400**). Then, the scene analysis capture unit captures an image (block **1402**) and the image processor **50** sets the primary capture unit parameters utilizing the scene analysis data obtained by the scene analysis capture unit (block **1404**). A preview image is then captured by the primary capture unit (block **1406**) and the scene is analyzed utilizing the captured preview image and the scene analysis data (block **1408**). Then, the image processor **50** sets the primary capture unit parameters utilizing the results of the preceding scene analysis (block **1410**), that is, results obtained by analyzing images from both capture units. Next, the preview image is captured by the primary capture unit and displayed on the display **70** (block **1412**) and another image is captured from the scene analysis capture unit (block **1414**). The scene is then analyzed by utilizing the captured preview image data and the scene analysis data (block **1416**). If the scene conditions fail to change by a threshold equal to x (no to block **1418**), that is, the scene conditions are considered to be stable, the process loops back to block **1412** and another preview image and scene analysis image are captured by the primary capture unit and the scene analysis capture unit, respectively (blocks **1412** and **1414**) and the aforementioned process continues. Otherwise, where the scene condition change is greater than the threshold (yes to block **1400**) and

APPL-1005 / Page 44 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

27 28

the situation is considered to be unstable, the process loops back to block **1410** and the image processor **50** resets the primary capture unit parameters utilizing the results of new scene analysis data (obtained by the scene analysis capture unit in block **1416**), and the process is repeated.

During the operations shown in the preceding FIGS. **19-22**, the preview process is continued as shown unless either the shutter button **42a** or the zoom button **42c** is pressed. As shown in FIG. **23**, if the zoom button **42c** is pressed (block **1500**), and if the requested zoom position is not within the zoom range of the primary capture unit (yes to block **1502**), the functions of the capture units are reversed, that is, the current scene analysis and primary capture units are reset to be the primary capture unit and scene analysis capture unit, respectively. Then, the zoom position of the primary capture unit is set to the selected zoom position (block **1506**) and the process returns to the preview mode, as illustrated by FIGS. **20-23**. However, if the zoom button **42c** is pressed (yes to block **1500**), and if the requested zoom position is within the zoom range of the primary capture unit (no to block **1502**), the functions of the respective capture units are maintained the same as before and the zoom position of the primary capture unit is set to the selected zoom position (block **1506**), and the process returns to the preview mode.

FIGS. **24-26** depict flow diagrams illustrating the usage or analysis of the image from one imaging stage in a dual (or more) lens camera system to modify the image produced by another imaging stage according to the present invention, that is, to influence, analyze, augment or otherwise change the image produced by the other imaging stage, specifically during the capture process. Referring to FIG. **24**, to enter the capture mode (block **1600**) according to a first capture embodiment, the shutter button **42a** is pressed half-way (S1)—otherwise, the process returns to the preview mode. In the capture mode, a preview image is captured from the primary capture unit (block **1602**). The scene is next analyzed utilizing the captured preview image (block **1604**). When the analysis is complete (yes to block **1606**), the image processor **50** sets the primary capture unit parameters utilizing the results of the scene analysis (block **1608**). Then, using the set parameters, a preview image is captured and displayed from the primary capture unit (block **1610**). When the shutter button **42a** is fully pressed (S2) so as to initiate image capture (yes to block **1612**), a primary image is captured from the primary capture unit using the set parameters (block **1614**), and the process returns to the preview mode. If the shutter button **42a** was not fully depressed (no to block **1612**), the camera checks to see if the focus or exposure lock is set (block **1616**). If it is (yes to block **1616**), the process loops back to block **1610** and another preview image is captured and displayed from the primary capture unit, the condition of the shutter button **42a** is again checked (block **1612**), and the process continues as before. If the focus or exposure lock is not set (no to block **1616**), the process loops back to the block **1602** and a preview image is captured from the primary capture unit and the scene is analyzed utilizing the captured preview image (block **1604**). Then, the process continues as before.

Referring to FIG. **25**, to enter the capture mode (block **1700**) according to a second capture embodiment, the shutter button **42a** is pressed (S1) half-way. Then, a preview image is captured from the primary capture unit (block **1702**). Next, an image is captured by the scene analysis capture unit (block **1704**), and the scene is analyzed utilizing both the captured preview image and the captured scene analysis image (block **1706**). The image processor **50** next sets the primary capture unit parameters utilizing the results of the combined scene

analysis (block **1708**). Then, using the set parameters, a preview image is captured and displayed from the primary capture unit (block **1710**). Next, and as shown before in FIG. **24**, when the shutter button **42a** is fully (S2) pressed (yes to block **1712**), a primary image is captured from the primary capture unit using the set parameters (block **1714**), and the process returns to the preview mode. If the shutter button **42a** was not fully depressed, the camera checks to see if the focus or exposure lock is set (block **1716**). If it is, the process loops back to block **1710** and another preview image is captured and displayed from the primary capture unit (block **1710**), the condition of the shutter button **42a** is checked (block **1712**), and the process continues as before. If the focus or exposure lock is not set (no to block **1716**), the process loops back to block **1702**, and a preview image is captured from the primary capture unit (block **1702**) and the scene is analyzed utilizing the captured preview image (block **1704**). Then, the process continues as before.

Referring to FIG. **26**, to enter the capture mode according to a third capture embodiment, the shutter button **42a** is pressed (S1) half-way (block **1800**). Then, a preview image is captured from the primary capture unit (block **1802**) and an image is captured from the scene analysis capture unit (block **1804**). The scene is next analyzed utilizing both the captured preview image and the captured scene analysis image (block **1806**), and the image processor **50** sets the primary capture unit parameters utilizing the results of the combined scene analysis (block **1808**). The scene analysis capture unit is next designated as a secondary capture unit (block **1810**), and the image processor **50** sets the secondary capture unit parameters utilizing the results of the combined scene analysis (block **1812**). Next, when the shutter button **42a** is fully (S2) pressed (yes to block **1814**), a primary image is captured from the primary capture unit using the set parameters (block **1816**) and an augmentation image is captured from the scene analysis capture unit (block **1818**), which is now designated the secondary capture unit. Then an enhanced image is produced by the image processor **50** from the primary and augmentation images (block **1820**), and the process returns to the preview mode. If the shutter button **42a** was not fully pressed (block **1814**), the process loops back to block **1802** and the process is resumed by again capturing images from the primary capture unit and the scene analysis capture unit (blocks **1802** and **1804**).

In accordance with the invention, different types of augmentation or modification are contemplated in relation to FIG. **26**. In a first type of augmentation or modification, and as was depicted in connection with FIG. **14**, an image is captured from the primary capture unit at one focus position and another image is captured from the scene analysis capture unit (the secondary image capture unit) at another focus position. Then, the two images are combined into a modified image with a broadened depth of field. The advantage is that this can be done without having to stop down the aperture of the primary lens to obtain the greater depth of field, which is particularly useful for low light capture where a large aperture is preferred.

In another type of augmentation or modification according to the present invention, the image could be examined by the image processor **50** for its dynamic range. When the dynamic range exceeds a predetermined threshold, the scene analysis capture unit is used to produce a secondary image with different dynamic range than the primary image. For example, the primary image could be captured at a normal exposure, while the secondary image could be captured at more of an extreme exposure, i.e., either under- or over-exposed. Then, if for example, highlights are blown out in the primary expo-

APPL-1005 / Page 45 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

29 30

sure, the secondary exposure could be underexposed to capture detail in the highlights. Alternatively, if shadows are darkened in the primary exposure, the secondary exposure could be overexposed to capture detail in the shadows. Then, a modified image is created with a broadened dynamic range by replacing portions of the primary image with portions of the secondary image.

It should be understood that the images captured by the primary and secondary capture units could be a still image or a video image, and in the case of a video image could be a series of images. In either case, the still image or the series of images constituting the video signal may be modified in accordance with the particular form of augmentation described, according to the present invention. For instance, an electronic camera incorporating the capture units may produce a video image signal and the secondary output image is used to modify at least, e.g., the depth of field and/or the dynamic range of the series of images constituting the video image signal.

The flow diagram shown in FIG. **14** can be modified to obtain a primary image that is enhanced specifically for dynamic range according to the present invention. For instance, referring to FIG. **14**, when the shutter button **42**a is pressed, a primary still image is captured (similar to blocks **510** or **530**) using the first (or second) image capture stage set to a primary exposure level. Then, (similar to blocks **512** or **532**) a secondary still image is captured using the second (or first image) capture stage set to a secondary exposure level. Then, (similar to blocks **514** or **534**) the secondary still image is used to enhance the dynamic range of the primary image, for instance, where the secondary exposure, which is underexposed to capture detail in the highlights, is combined with the primary image to obtain an extended dynamic range primary image.

In a preferred method for producing the modified image, a sliding scale is used to create the modified image in which the pixel values are determined by considering the pixel values of both the primary and secondary images, as described in commonly-assigned, copending U.S. patent application Ser. No. 11/460,364 (which was filed Jul. 27, 2006 in the names of John Border and Efrain Morales, and entitled "Producing an Extended Dynamic Range Digital Image"), which is incorporated herein by reference. It should be noted that having two exposure levels is to enable a correction for dynamic range is particularly important when using a flash, wherein overexposure conditions are often produced. Consequently, the exposure time of one of the capture stages will be set to a very short exposure or the timing of the exposure will be shifted to be either just before the flash or just after the flash.

The augmentation process can also be applied in connection with image pairs having different resolutions. For instance, in commonly-assigned, copending U.S. patent application Ser. No. 11/461,574 (which was filed Aug. 1, 2006 in the names of John Border, Scott Cahall and John Griffith, and entitled "Producing Digital Image with Different Resolution Portions"), which is incorporated herein by reference, a first wide angle digital image of a scene and a second telephoto digital image of a portion of substantially the same scene are captured by two capture stages. A composite image is then formed by combining a portion of the first wide angle digital image and a portion of the telephoto digital image, to produce a digital image with improved resolution during digital zooming. More specifically, digital zooming of the composite image produces a zoomed image with high resolution throughout the zoom range with improved image quality.

In a further embodiment of the invention, the primary capture stage and secondary capture stage are set for different exposure times so that different levels of noise and motion blur are present in the respective images. For example: the primary capture stage is set for a relatively long exposure so that the digital noise in the image is low, but any motion present either from movement of the camera or from movement of objects in the scene results in motion blur. Simultaneously, the secondary capture stage is set for a relatively fast exposure so that digital noise in the image is higher, but the motion blur is less. The primary image and the secondary image are then compared to one another to identify motion blur. The gain of the secondary image is increased so the average pixel values in the secondary image match those of the primary image. A modified image is then created by replacing portions of the primary image with portions of the secondary image. In effect, portions of the primary image (areas of lower noise but with some motion blur) are replaced with corresponding portions of the secondary image (areas of higher noise but little or no motion blur) to obtain a modified image with relatively low noise and good sharpness.

The invention has been described in detail with particular reference to certain preferred embodiments thereof, but it will be understood that variations and modifications can be effected within the spirit and scope of the invention.

PARTS LIST

**1** first imaging stage
**2** second imaging stage
**3** first zoom lens
**4** second zoom lens
**5**a zoom and focus motors
**5**b zoom and focus motors
**10**A digital camera
**12** first image sensor
**12**e first sensor output
**13** clock drivers
**14** second image sensor
**14**e second image output
**15** clock drivers
**16** third image sensor
**17** clock drivers
**22** first analog signal processor (ASP**1**) & A/D converter
**24** second analog signal processor (ASP**2**) & A/D converter
**25** third analog signal processor (ASP**2**) & A/D converter
**34** first digital multiplexer control element
**36** second digital multiplexer control element
**37** third digital multiplexer control element
**38** DRAM buffer memory
**40** control processor and timing generator
**42** user controls
**42**a shutter button
**42**c zoom button
**42**d multi-position selector
**46** automatic exposure detector
**48** electronic flash
**50** image processor
**52** memory card interface
**54** removable memory card
**56** RAM memory
**57** GPS unit
**58** firmware memory
**59** electronic compass
**62** host interface
**64** interconnection
**66** host PC

APPL-1005 / Page 46 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

| 31 | 32 |
|---|---|

**70** color LCD image display
**71** first image capture stage
**73** first fixed focal length lens
**74** third image capture stage
**75** third (zoom) lens
**90** cellular processor
**92** cellular modem
**94** antenna
**100** zoom lens setting block
**101** input zoom position block
**102** zoom position check block
**104** capture stage setting block
**106** second stage autofocus image capture block
**108** first stage focus block
**110** first stage preview capture and display block
**112** zoom button check block
**114** capture button check block
**116** first stage capture block
**118** first stage video capture block
**119** focus quality check block
**120** refocus check block
**124** capture stage setting block
**126** first stage autofocus image capture block
**128** second stage focus block
**130** second stage preview capture and display block
**132** zoom button check block
**134** capture button check block
**136** second stage capture block
**138** second stage video capture block
**139** focus quality check block
**140** refocus check block
**151** object
**152** first lens
**153** second lens
**154** first path
**155** second path
**156** focal plane
**157** first image
**158** second image
**170** first reference position
**171** first shifted position
**180** second reference position
**181** second shifted position
**190** first sensor array
**191** second sensor array
**197** low frequency bandpass filter loading stage
**198** comparison stage
**199** high frequency bandpass filter loading stage
**250** zoom position selection block
**252** image capture stage determination block
**254** non-capture stage zoom block
**256** hyperfocal setting block
**258** initiate autofocus sequence block
**260** capture autofocus images block
**262** crop and upsample block
**264** image correlation block
**266** best focus determination block
**268** focus lens movement block
**270** capture image block
**272** "hill climb" autofocus block
**274** capture button actuation block
**276** capture video block
**278** continuous "hill climb" focus check block
**280** focus check block
**282** best focus determination block
**284** focus lens movement block
**286** capture stage refocus block

**300** image sets capture block
**302** crop and upsample block
**304** correlate images block
**306** autofocus rangefinder calibration curve generation block
**350** representation of an autofocus image
**352** representation of a zoomed and cropped autofocus image
**400** image sets capture block
**402** position vs. distance comparison block
**404** autofocus "hill climb" calibration curve generation block
**440** lower focal length capture block
**442** crop and upsample lower focal length image block
**444** correlate images block
**446** determine focus correction block
**448** longer focal length capture block
**460** first stage "hill climb" first image capture block
**462** first stage preview image block
**464** refocus first stage block
**466** second stage "hill climb" second image capture block
**468** second stage another image capture block
**470** second stage focus conditions comparison block
**472** focus change check block
**480** correlate images block, determining pixel offsets
**482** pixel offset conversion block, using rangefinder calibration curve
**484** range map production block
**500** default zoom position block
**502** zoom position check block
**504** capture stage setting block
**506** second stage preview capture, display and autofocus block
**508** zoom button check block
**510** first stage primary image capture at primary focus block
**512** second stage secondary image capture at secondary focus block
**514** primary image enhancement block, using secondary image
**524** capture stage setting block
**526** first stage preview capture, display and autofocus block
**528** zoom button check block
**530** second stage primary image capture at primary focus block
**532** first stage secondary image capture at secondary focus block
**534** primary image enhancement block, using secondary image
**600** cell phone
**602** microphone
**604** speaker
**606** keypad
**608** (LCD) display
**610** cellular image capture assembly
**612** first fixed focal length lens
**614** first image sensor
**616** second fixed focal length lens
**618** second image sensor
**620** substrate
**622** IR cut filter
**624** electronic components
**626** flex connector
**628** auto focus subsystem
**630** z dimension
**750** camera GPS location block
**752** camera pointing direction block
**754** distance offsets block
**756** angular offsets block
**758** scene GPS locations block
**760** GPS location storage block

US 7,859,588 B2

**33**

1100 power on block
1102 default setting block
1104 capture and display block
1106 preview selection block
1108 shutter check block
1110 display time check block
1112 set default capture unit block
1114 set scene analysis capture unit block
1124 set selected primary capture unit block
1200 scene analysis block
1202 set capture parameters block
1204 capture and display preview image block
1206 scene analysis block
1208 scene condition check block
1300 capture scene analysis image block
1302 set capture parameters block
1304 capture and display preview image block
1306 scene analysis block
1308 scene condition threshold check block
1400 zoom position setting block
1402 capture scene analysis image block
1404 set capture parameters block
1406 capture preview image block
1408 scene analysis block, using preview and scene analysis data
1410 set primary capture parameters block
1412 capture and display preview image block
1414 capture scene analysis image block
1416 scene analysis block, using preview and scene analysis data
1418 scene condition threshold check block
1500 zoom button check block
1502 zoom position check block
1504 reverse capture unit assignment block
1506 set primary capture unit zoom position block
1600 shutter button check block
1602 capture preview image block
1604 scene analysis using preview image block
1606 analysis complete check block
1608 set primary capture parameters block
1610 capture and display preview image block
1612 shutter button check block
1614 capture primary image block
1616 focus/exposure lock check block
1700 shutter button check block
1702 capture preview image block
1704 capture scene analysis image block
1706 scene analysis using preview and scene image block
1708 set primary capture parameters block
1710 capture and display preview image block
1712 shutter button check block
1714 capture primary image block7
1716 focus/exposure lock check block
1800 shutter button check block
1802 capture preview image block
1804 capture scene analysis image block
1806 scene analysis using preview and scene image block
1808 set primary capture parameters block
1810 set scene analysis capture unit as secondary capture unit block
1812 set secondary capture parameters block
1814 shutter button check block
1816 capture primary image block
1818 capture augmentation image block
1820 produce enhanced image block

**34**

What is claimed is:

1. An electronic camera for producing an output image of a scene from a captured image signal, said electronic camera comprising:

    a first imaging stage comprising a first lens for capturing a first image of the scene on a first image sensor;

    a second imaging stage comprising a second lens for capturing second image of the scene on a second image sensor;

    a processing stage for analyzing the first and second images to determine one or more capture parameters; and

    wherein the first imaging stage utilizes a first setting of at least one of the capture parameters to capture a third image and the second imaging stage utilizes a second, different setting of said at least one of the capture parameters to capture a fourth image substantially simultaneously with the third image, and wherein the processor produces an augmented image from at least a portion of both the third and fourth images.

2. The electronic camera as claimed in claim 1 wherein at least a portion of the augmented image is sharpened.

3. The electronic camera as claimed in claim 2 wherein at least a portion of the augmented image has an extended depth of field.

4. The electronic camera as claimed in claim 2 wherein the augmented image includes sharpened and blurred portions.

5. The electronic camera as claimed in claim 1 wherein the third image is captured with a different focus setting than the fourth image.

6. The electronic camera as claimed in claim 1 wherein the secondary output image is used by the processing stage to modify the dynamic range of the primary image.

7. The electronic camera as claimed in claim 1 wherein the secondary output image is captured by the second imaging stage at a different exposure level than used by the first imaging stage to capture the primary output image.

8. The electronic camera as claimed in claim 1 wherein the captured image signal is a still image signal and the secondary output image modifies at least one of the depth of field and the dynamic range of the still image signal.

9. The electronic camera as claimed in claim 1 wherein the captured image signal is a video image signal and the secondary output image modifies at least one of the depth of field and the dynamic range of the video image signal.

10. The electronic camera as claimed in claim 1 wherein the imaging stages are set for different exposure times so that different levels of noise and motion blur are present in the respective primary and secondary output images, whereby a modified primary image is then formed by replacing portions of the primary image with portions of the secondary image such that the level of motion blur is reduced while minimizing an increase in the noise level.

11. The electronic camera as claimed in claim 1 wherein the third image is captured with a different exposure level than the fourth image.

12. A method for operating a digital camera having first and second imaging stages for forming separate images of a scene, said method comprising the steps of:

    using the first imaging stage for capturing a first image;

    using the second imaging stage for capturing a second image;

    analyzing the first and second images to determine data indicative of capture conditions;

    capturing third and fourth images substantially simultaneously with the first and second imaging stages, respectively, by processing the data to determine capture

APPL-1005 / Page 48 of 49
APPLE INC. v. COREPHOTONICS LTD.

US 7,859,588 B2

35

parameters, wherein one of the stages uses a setting of at least one of the capture parameters that is different from the setting used by the other stage; and

producing an augmented image from at least a portion of both the third and fourth images.

**13**. The method as claimed in claim **12** wherein at least a portion of the augmented image is sharpened.

**14**. The method as claimed in claim **13** wherein at least a portion of the augmented image has an extended depth of field.

**15**. The method as claimed in claim **13** wherein the augmented image includes sharpened and blurred portions.

**16**. The method as claimed in claim **12** wherein the third image, is captured with a different focus setting than the fourth image.

**17**. The method as claimed in claim **12** wherein the secondary output image is used to modify the dynamic range of the primary image.

**18**. The method as claimed in claim **12** wherein the secondary output image is captured by the second imaging stage at a different exposure level than used by the first imaging stage to capture the primary output image.

36

**19**. The method as claimed in claim **12** wherein the captured image signal is a still image signal and the secondary output image modifies at least one of the depth of field and the dynamic range of the still image signal.

**20**. The method as claimed in claim **12** wherein the captured image signal is a video image signal and the secondary output image modifies at least one of the depth of field and the dynamic range of the video image signal.

**21**. The electronic camera as claimed in claim **12** wherein the imaging stages are set for different exposure times so that different levels of noise and motion blur are present in the respective primary and secondary output images, whereby a modified primary image is then formed by replacing portions of the primary image with portions of the secondary image such that the level of motion blur is reduced while minimizing an increase in the noise level.

**22**. The method as claimed in claim **12** wherein the third image is captured with a different exposure level than the fourth image.

\* \* \* \* \*

APPL-1005 / Page 49 of 49
APPLE INC. v. COREPHOTONICS LTD.
Appx2001

JP 2007-259108 A 2007.10.4

(12) **Unexamined Patent Application Publication (A)**

(19) **Japan Patent Office (JP)**

(11) Patent Application Publication No.

**JP 2007-259108**
**(P2007-259108A)**
(43) Publication Date: **Oct. 4, Heisei 19 (2007.10.4)**

| (51) Int. Cl. | | | FI | | | Theme Code (Reference) |
|---|---|---|---|---|---|---|
| *H04N* | *5/225* | *(2006.01)* | H04N | 5/225 | F | 5C122 |
| *H04N* | *5/232* | *(2006.01)* | H04N | 5/232 | Z | |

Examination Request: Not Made    No. of Claims: 7    OL    (13 Pages Total)

| | | |
|---|---|---|
| (21) Filing No. | JP 2006-81229 (P2006-81229) | (71) Applicant    306037311 |
| (22) Filing Date | Mar. 23, Heisei 18 (2006.3.23) | Fujifilm Corp. |
| | | 2-26-30 Nishi Azabu, Minato-ku, Tokyo |
| | | (74) Agent    100094330 |
| | | Masaki Yamada, Patent Attorney |
| | | (74) Agent    100079175 |
| | | Yoshio Kosugi, Patent Attorney |
| | | (74) Agent    100109689 |
| | | Musubu Mikami, Patent Attorney |
| | | (72) Inventor    Takashi Soga |
| | | c/o Fuji Photo Film Co. Ltd. |
| | | 3-11-46 Senzui, Asaka-shi, Saitama-ken |
| | | F Terms (Ref.)    5C122    DA04 EA61 FD14 FH19 FH22 |
| | | FK12 GG16 GG28 HB05 |

(54) [Title] Photographic Device

(57) [Abstract]

[Problem] To provide a photographic device that, while being a photographic device equipped with an imaging element of a small area, can obtain an image having similar *bokeh* to an image photographed by a silver halide camera.
[Solution] First, in a first round of photography, a first image is obtained that is focused on a principal subject. In a second round of photography, a second image is obtained that is focused at a shorter distance than the principal subject, is more wide-angle than the first image, and has the principal subject and a background blurred. Compositing is performed by cutting out the principal subject in the first image and replacing a region of the second image identical to the principal subject cut out from the first image with this principal subject cut out from the first image. This generates an image having similar *bokeh* to an image photographed by a silver halide camera.
[Selected FIG.] FIG. 4





[Claims]
[Claim 1]

A photographic device that forms an image of a subject on an imaging element by a photographic optical system and generates an image representing the subject, comprising:

an image generation means for generating a first image, which is focused on a principal subject, and a second image, which has the principal subject and a background blurred and is more wide-angle than the first image, the first image and the second image being of the same subject; and

an image compositing means for generating a composite image by cutting out the principal subject in the first image and replacing a region of the second image identical to the principal subject cut out from the first image with the principal subject cut out from the first image.

[Claim 2]

The photographic device of claim 1, wherein the photographic optical system is a photographic optical system having a focal-length adjustment function and a focus adjustment function, and

the image generation means obtains, by photographing the same subject, a first photographic image, which is focused on the principal subject, and a second photographic image, which is more on a wide-angle side than the first photographic image and is focused at a shorter distance than a distance to the principal subject, and defines the first photographic image as the first image and the second photographic image as the second image.

[Claim 3]

The photographic device of claim 1, wherein the photographic optical system has a focal-length adjustment function and a focus adjustment function, and

the image generation means obtains, by photographing the same subject, a first photographic image, which is focused on the principal subject, and a second photographic image, which is focused on the principal subject but is more on a wide-angle side than the first photographic image, and defines the first photographic image as the first image and, upon generating a blurred image by subjecting the second photographic image to a blurring process, the blurred image as the second image.

[Claim 4]

The photographic device of claim 2 or 3, further comprising: an emission means for emitting a photography auxiliary light; and an emission control means for emitting the photography auxiliary light in photographing the first photographic image and not emitting the photography auxiliary light in photographing the second photographic image.

[Claim 5]

The photographic device of claim 1, wherein the photographic optical system has a focus adjustment function, and

the image generation means obtains, by photography, a first photographic image focused on the principal subject; subjects the first photographic image to an enlarging process corresponding to a photographic image more on a telephoto side than the first photographic image to obtain an enlarged image; and defines the enlarged image as the first image and, upon subjecting the photographic image prior to the enlarging process to a blurring process to generate a blurred image, the blurred image as the second image.

[Claim 6]

The photographic device of claim 1, further comprising: a through-the-lens–image display means for displaying a moving image of the subject prior to a photography instruction; wherein the through-the-lens–image display means displays a frame guide for a head and shoulder shot of the principal subject together with the moving image of the subject.

[Claim 7]

The photographic device of claim 1, further comprising: a blurring-level setting means for setting an extent of blurring in the second image; wherein

the image generation means generates a second image having blurring of a level set by the blurring-level setting means.

[Description]
[Field]
[0001]

The present invention relates to a photographic device that forms an image of a subject on an imaging element by a photographic optical system and generates image data representing the subject.

[Background]

APPL-1006 / Page 2 of 30
APPLE INC. v. COREPHOTONICS LTD.

(3)                    JP 2007-259108 A 2007.10.4

[0002]

Conventional art is proposed for obtaining an aesthetic image ("*bokeh*" hereinbelow) on film that is intentionally blurred by performing multiple exposure while moving a focus lens in silver halide camera photography (for example, see patent literature 1).

[0003]

Furthermore, recent art also includes art that, by taking advantage of digital cameras being equipped with an image signal processing circuit, performs continuous photography (continuous shooting) while shifting a focal position and composites images obtained by the continuous shooting by this image signal processing unit in an attempt to obtain a *bokeh* image (for example, see patent literature 2).

[0004]

Furthermore, recent art also includes art that, by making use of labs being equipped with a printing device that performs digital exposure, subjects an image to a blurring process or the like by this printing device when printing an image from a negative on photographic paper in an attempt to obtain a *bokeh* image (for example, see patent literature 3).

[0005]

Now, a size of a photosensitive surface of an imaging element is considerably smaller than a size of a photosensitive surface of film (for example, 24 mm × 36 mm in 35 mm film). Because of this, when a subject is photographed by a silver halide camera using a lens with a bright f value, an image with a *bokeh* background is obtained, but when the same subject is photographed by a digital camera, in contrast to the conventional photographic image from the silver halide camera, an image is obtained that, due to the difference in the size of the photosensitive surface, has the background and a principal subject all in focus, without a blurred background.

[0006]

Using an imaging element having a photosensitive surface of the same size as the photosensitive surface of the above film in the digital camera prevents the above situation, but this makes the digital camera large in size.

[Patent Literature 1] JP H5-313060 A

[Patent Literature 2] JP 2003-209727 A

[Patent Literature 3] JP H10-233919 A

[Summary]

[Technical Problem]

[0007]

In view of these circumstances, the present invention has as an object to provide a photographic device that, while being a photographic device equipped with an imaging element of a small area, can obtain an image having similar *bokeh* to an image photographed by a silver halide camera.

[Solution to Problem]

[0008]

A photographic device of the present invention that achieves the above object is a photographic device that forms an image of a subject on an imaging element by a photographic optical system and generates image data representing this subject, provided with:

an image generation means of generating a first image, which is focused on a principal subject, and a second image, which has the principal subject and a background blurred and is more wide-angle than the first image, the first image and the second image being of the same subject; and

an image compositing means of generating a composite image by cutting out the principal subject in the first image and replacing a region of the second image identical to the principal subject cut out from the first image with this principal subject cut out from the first image.

[0009]

According to the photographic device of the present invention, the image generation means generates the first image and the second image, and the image compositing means cuts out the principal subject in the first image and replaces the region of the second image identical to the principal subject cut out from the first image with the principal subject cut out from the first image.

[0010]

Here, by making the second image an image that is more wide-angle than the first image, a size of the principal subject in the second image is made smaller than the principal subject in the first image. Then, the background of the principal subject in the second image is blurred, and the region of this second image with

APPL-1006 / Page 3 of 30

APPLE INC. v. COREPHOTONICS LTD.

the blurred background identical to the principal subject cut out from the first image is replaced with the principal subject cut out from the first image.

[0011]

That is, when the background of the principal subject in the second image is blurred, a contour periphery of the principal subject also undergoes *bokeh*, widening the contour periphery. As such, the principal subject in the second image is made smaller and replaced with the first principal subject, and afterward, the *bokeh* of the contour periphery of the principal subject in the second image is made to not appear in a periphery of the principal subject so the *bokeh* effect only appears in a portion other than the principal subject. By doing so, the *bokeh* effect only appears in the portion other than the principal subject, which is at a focal position, such that a *bokeh* image substantially similar to an image photographed by a silver halide camera is obtained.

[0012]

As described above, this realizes a photographic device that, while being a photographic device equipped with an imaging element of a small area, can obtain an image having similar *bokeh* to an image photographed by a silver halide camera.

[0013]

Here, the photographic optical system may be a photographic optical system having a focal-length adjustment function and a focus adjustment function, and

the image generation means may obtain, by photography, a first photographic image, which is focused on the principal subject, and define this as the first image and define a second photographic image, which is more on a wide-angle side than this first photographic image and is focused at a shorter distance than a distance to the principal subject, as the second image.

Alternatively, the photographic optical system may have a focal-length adjustment function and a focus adjustment function, and

the image generation means may obtain, by photographing the same subject, a first photographic image, which is focused on the principal subject, and a second photographic image, which is focused on this principal subject but is more on a wide-angle side than this first photographic image, and define this first photographic image as the first image and, upon generating a blurred image by subjecting the second photographic image to a blurring process, this blurred image as the second image.

[0014]

Here, preferably, further provided are: an emission means of emitting a photography auxiliary light; and an emission control means of emitting the photography auxiliary light in photographing the first photographic image and not emitting the photography auxiliary light in photographing the second photographic image.

[0015]

This emphasizes the contour of the principal subject in the first photographic image and facilitates the image compositing means cutting out the principal subject.

[0016]

Alternatively, the photographic optical system may have a focus adjustment function, and

the image generation means may obtain, by photography, a first photographic image focused on the principal subject; subject this first photographic image to an enlarging process corresponding to a photographic image more on a telephoto side than this first photographic image to obtain an enlarged image; and define this enlarged image as the first image and, upon subjecting the photographic image prior to the enlarging process to a blurring process to generate a blurred image, this blurred image as the second image.

[0017]

Furthermore, preferably, further provided is: a through-the-lens–image display means of displaying a moving image of the subject prior to a photography instruction; wherein the through-the-lens–image display means displays a frame guide for a head and shoulder shot of the principal subject together with the moving image of the subject.

[0018]

When the subject is a person, a full shot often causes the person and the background to not match, producing an image where the person seems to be floating. Therefore, during photography, it is favorable to display the frame guide to a photographer to instruct the photographer to shoot a head and shoulder shot to prevent failed photography in advance.

[0019]

Furthermore, more preferably, further provided is: a blurring-level setting means of setting an extent of blurring in the second image; wherein

the image generation means generates a second image having blurring of a level set by the blurring-level setting means.

[0020]

This enables the photographer to photograph upon setting the extent of blurring by the blurring-level setting means so a *bokeh* image of the photographer's preference is obtained.

[Advantageous Effects of Invention]

[0021]

As described above, this realizes a photographic device that, while being a photographic device equipped with an imaging element of a small area, can obtain an image having similar *bokeh* to an image photographed by a silver halide camera.

[Description of Embodiments]

[0022]

A digital camera that is one embodiment of a photographic device of the present invention is described below.

[0023]

FIG. 1 is an external perspective view of a digital camera 10 that is one embodiment of the photographic device of the present invention as viewed from the front and diagonally above. (a) in FIG. 1 illustrates a view of a front surface of the digital camera 10 as viewed from diagonally above, and (b) in FIG. 1 illustrates a view of a back surface of the digital camera 10 as viewed from diagonally above.

[0024]

This digital camera 10 illustrated in (a) and (b) in FIG. 1 is a photographic device that forms a subject image on an imaging element by a photographic optical system and generates an image signal for recording in response to a release button being pressed.

[0025]

A zoom lens barrel 10_1 internally provided with a photographic lens 10_1a that is an optical zoom lens is provided in a central portion of the front surface of the digital camera 10 illustrated in (a) in FIG. 1. Provided above this zoom lens barrel is a flash emission window 10_2 for irradiating a flash light to a subject when a field brightness is low and a flash dimming sensor 10_3 for adjusting a light amount of the flash light emitted toward the subject through the flash emission window 10_2.

[0026]

This flash dimming sensor 10_3 receives a flash light that, when the flash light is irradiated toward the subject through the flash emission window 10_2, strikes the subject, is reflected by the subject, and returns. A control unit inside the digital camera controls automatically stopping irradiation of the flash light when the light amount received by this flash dimming sensor 10_3 increases over time and reaches a predetermined value. Moreover, an optical-finder objective window 10_4 paired with an optical-finder eyepiece window (described below) on a back-surface side is provided next to this dimming sensor 10_3.

[0027]

Furthermore, a release button 10_11 is disposed on an upper surface of the digital camera.

[0028]

Furthermore, as illustrated in (b) in FIG. 1, an optical-finder eyepiece window 10_12; a finder lamp 10_13 that turns on when, for example, photography preparation is completed and blinks during photography; a mode switch 10_14 that switches between a photography mode and a playback mode; a zoom button 10_15 that zooms up toward a wide-angle side (wide side) by being pressed or zooms up toward a telephoto side (tele side) by being pressed; and the like are disposed in a back-surface upper portion of the digital camera 10.

[0029]

Furthermore, a menu/OK button 10_16, a DISP button 10_17, and a BACK button 10_18 are provided below the zoom button 10_15. This menu/OK button 10_16 is a button for displaying various menus during photography or playback and determining a selected menu. When this menu/OK button 10_16 is pressed and the photography mode is selected when a plurality of selection items including the photography mode is displayed on a liquid-crystal panel 10_30a, a mode referred to as a background blurring mode, indicating a type of the photography mode, is displayed as one of the selection items.

[0030]

APPL-1006 / Page 5 of 30
APPLE INC. v. COREPHOTONICS LTD.

This background blurring mode is for solving the problem above; photographing in this mode enables an image having the *bokeh* of silver halide–camera photography to be obtained.

[0031]

Details are described below, but when this background blurring mode is selected, the digital camera of the present embodiment performs continuous photography in two rounds. First, the first round of photography acquires a first photographic image that is focused on a principal subject, and the second round of photography acquires a second photographic image that is more on a wide-angle side than this first photographic image and is focused at a shorter distance than a distance to the principal subject. Afterward, an image signal processing circuit that is described below composites the first photographic image and the second photographic image, thereby processing these images into an image having identical *bokeh* to an image photographed by a silver halide camera. This first photographic image corresponds to "first image" as referred to in the present invention, and this second photographic image corresponds to "second image" as referred to in the present invention.

[0032]

Furthermore, the DISP button 10_17 is a button for switching a state of a screen displayed on the liquid-crystal monitor 10_30a, which is to the side of this button. For example, it turns display of the liquid-crystal monitor 10_30a on and off during photography and turns character display on and off during playback. Moreover, the BACK button 10_18 serves as a button for returning an operation state effected by the MENU/OK button 10_16 or the like to an operation state one before or cancelling an operation state.

[0033]

FIG. 2 is a block diagram illustrating a circuit configuration of the digital camera 10 illustrated in FIG. 1.

[0034]

The circuit configuration is described along a flow of the image signal. FIG. 2 illustrates as an example a digital camera 10 that, when the mode switch 10_14 is switched to a photography-mode side when power is turned on, displays a through-the-lens image on the liquid-crystal monitor 10_30a and performs photography by the release button 10_11 being pressed at a photo opportunity.

[0035]

First, a circuit configuration involved in the flow of the image signal as pertaining to display of the through-the-lens image is described.

[0036]

FIG. 2 illustrates a zoom lens 10_1a1 and a focus lens 10_1a2 in the photographic lens. The photographic lens 10_1a that includes these lenses forms an image of subject light on the imaging element (because a CCD solid-state imaging element is used here, this is referred to as a "CCD" hereinbelow) at a subsequent stage, and this CCD 10_41 generates the image signal, which represents the subject light.

[0037]

Described below is how the CCD 10_41 generates the image signal and how the generated image signal is transmitted to subsequent circuits.

[0038]

First, the flow of the image signal, which represents the through-the-lens image displayed on the liquid-crystal panel when power is turned on and the mode switch is on the photography-mode side, is described.

[0039]

In the CCD 10_41 generating the image signal for the through-the-lens image, as controlled by a CPU 10_47 that is described below, a timing generator that is not illustrated repeatedly supplies an exposure start signal and an exposure end signal to the CCD 10_41 in a predetermined period so the CCD 10_41 generates the image signal representing the through-the-lens image every predetermined period. After exposure at the CCD 10_41 is ended according to the exposure end signal from this timing generator (not illustrated), the image signal representing the through-the-lens image ("RGB signal" hereinbelow) for which exposure is ended is output from the CCD 10_41 substantially at the same time.

[0040]

When the RGB signal for the through-the-lens image is output to an A/D conversion circuit 10_42 in this manner, the A/D conversion circuit 10_42 converts the analog RGB signal into a digital RGB signal, and an image input controller 10_43 at a subsequent stage guides the digital RGB signal to a bus line 10_100.

[0041]

APPL-1006 / Page 6 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2007

This digital RGB signal for the through-the-lens image guided to the bus line 10_100 by the image input controller 10_43 is supplied to an image signal processing circuit 10_44, and this image signal processing circuit 10_44 converts the digital RGB signal into a digital YC signal. This YC signal converted by the image signal processing circuit 10_44 is supplied to an LCD control unit 10_46, and the LCD control unit 10_46 displays an image based on the YC signal on the liquid-crystal monitor 10_30a, which is provided by an LCD 10_30. Because the CCD 10_41 generates this YC signal every predetermined period, the image based on the YC signal is displayed on the liquid-crystal monitor 10_30a by being switched every predetermined period. This causes a subject in a direction where the photographic lens 10_1a faces to be displayed on the liquid-crystal monitor 10_30a as-is as a through-the-lens image.

[0042]

That is, photography can be performed by pressing the release button 10_11 at a photo opportunity while viewing the liquid-crystal monitor 10_30a instead of and without looking through the optical finder.

[0043]

Next, the flow of the image signal as pertaining to photographic processing in response to an operation of pressing the release button 10_11 is described.

[0044]

The release button 10_11 provided by the digital camera of the present embodiment has two operation aspects, a half-press operation and a full-press operation, and two contacts 10_11A, 10_11B respectively corresponding to these operation aspects. Each of these contacts is connected to an input port of the CPU 10_47. When operation of this release button 10_11 starts, the CPU 10_47 senses a half-pressed state due to one of the switches, the switch 10_11B, separating, and the CPU 10_47 senses a full press due to the other switch, the switch 10_11A, connecting.

[0045]

In the digital camera 10 of this embodiment, upon sensing the first contact 10_11B entering an open state when the pressing operation of the release button 10_11 starts, the CPU 10_47 instructs an AE detection circuit 10_50 to perform exposure adjustment and instructs an AF detection circuit 10_51 to perform focus adjustment. This is so exposure setting and focus setting are performed quickly in preparation for a full press.

[0046]

The AE detection circuit 10_50 detects a brightness necessary for exposure setting. According to a detection result of this AE detection circuit 10_50, a flash emission device 10_60 emits the flash light, and an opening diameter of an aperture that is not illustrated is adjusted. Moreover, the AF detection circuit 10_51 performs a process of detecting a subject contrast at each of a plurality of positions when, as controlled by the CPU 10_47, a motor driver 10_49 is being instructed to move the focus lens 10_1a2 from a closest point to a farthest point in order to define as a focal point a peak of the subject contrasts detected at each position.

[0047]

After exposure setting and focus adjustment end upon the half-press of the release button 10_11 in this manner, when the release button 10_11 is fully pressed, an image of the subject light is formed on the CCD 10_41 at the exposure and focus from the half-press, and an exposure start signal and an exposure end signal according to a shutter speed are sequentially supplied from the timing generator that is not illustrated. After the CCD 10_41 outputs the RGB signal to the A/D conversion circuit 10_42 in response to this exposure end signal, the image input controller 10_43 guides the RGB signal converted into a digital signal by this A/D conversion circuit 10_42 to the bus line 10_100.

[0048]

An entirety of this RGB signal guided to the bus line 10_100 is temporarily stored in a memory (SDRAM) 10_52 and afterward read from the memory 10_52 and supplied to the image signal processing circuit 10_44. The RGB signal is converted into the YC signal by this image signal processing circuit 10_44, and the converted YC signal is then supplied to a compression processing circuit 10_45 and subjected to JPEG compression by the compression processing circuit 10_45. This JPEG-compressed YC signal is recorded in a recording medium 10_54 via a media controller 10_53.

[0049]

In the digital camera of the present embodiment, image data obtained by photography is recorded in a recording medium in this manner.

[0050]

Here, photographic processing when the background blurring mode is selected is described.

[0051]

When the background blurring mode is selected, the CPU 10_47 disposes the focus lens 10_1a2 in the focal position and instructs a clock generator (not illustrated) to supply the exposure start signal to the CCD 10_41. Afterward, when a predetermined shutter time is elapsed, the exposure end signal is supplied to the CCD 10_41 so the image signal is output. This image signal output from the CCD 10_41 is converted into a digital signal by the A/D conversion circuit 10_42. The image signal input controller 10_43 in a subsequent stage guides the image signal converted into a digital signal to the bus 10_100, and the image signal guided to the bus 10_100 is temporarily stored in the memory 10_52. The photographic image represented by this image signal obtained by disposing the focus lens 10_1a2 in the focal position is the "first image" as referred to in the present invention.

[0052]

When the image signal representing this first image is entirely stored in the memory 10_52, next, the CPU 10_47 reads this image signal and supplies this image signal representing the first image to the image signal processing circuit 10_44 via the bus 10_100.

[0053]

At this time, the CPU 10_47 instructs the motor driver 10_49 to move the focus lens 10_1a2 to a macro position (closest end) and instructs a motor driver 10_48 to move the zoom lens 10_1a1 to the wide-angle side. Afterward, the clock generator (not illustrated) supplies the exposure start signal so the CCD 10_41 starts a second round of exposure.

[0054]

Meanwhile, the image signal processing circuit 10_44 performs edge detection of the first image read from the memory 10_52 and cuts out the principal subject. This cutout principal subject is temporarily stored in a storage unit (not illustrated) in the image signal processing circuit 10_44.

[0055]

Here, upon confirming that a predetermined shutter time is elapsed from the clock generator (not illustrated) supplying to the CCD 10_47 the exposure start signal for starting exposure in the second round of photography, the CPU 10_47 next causes the exposure end signal for ending the second round of exposure to be supplied to the CCD 10_41 so the image signal is output to the A/D conversion circuit 10_42. The image input controller 10_43 in a subsequent stage guides the image signal converted into a digital signal by the A/D conversion circuit 10_42 to the bus 10_100 so this signal is stored in the memory 10_52. This photographic image obtained by the second round of photography is the "second image" as referred to in the present invention. Moreover, the CPU 10_47, the motor driver 10_48, the motor driver 10_49, the clock generator (not illustrated), and the CCD 10_41 correspond to "image generation means" as referred to in the present invention.

[0056]

Furthermore, the CPU 10_47 reads the image signal representing the second image in the memory 10_52 and supplies this to the image signal processing circuit 10_44. In this image signal processing circuit 10_44, a region of the second image identical to a region of the principal subject is replaced by the principal subject cut out earlier from the first image. After the region of the second image identical to the principal subject is replaced by the principal subject cut out from the first image in this manner, the replaced image signal is recorded in the recording medium. This image signal processing circuit 10_44 corresponds to "image compositing means" as referred to in the present invention.

[0057]

FIG. 3 is a diagram for describing a relationship between the "first image" as referred to in the present invention and the "second image" as referred to in the present invention.

[0058]

(a) in FIG. 3 illustrates an example where a cylinder that is a principal subject is photographed.

[0059]

Furthermore, (b) to (d) in FIG. 3 illustrate as waveforms detection states of detecting a high-frequency component along each position on a horizontal line a–a', in order from an a side, in the photographic image illustrated in (a) in FIG. 3. In (b) to (d) in FIG. 3, the horizontal axis is horizontal position.

[0060]

(b) in FIG. 3 illustrates a waveform of when an edge of an image from when the focus lens is disposed in the focal position and the first round of photography is performed (the "first image" as referred to in the present invention) is detected in order from the a side along the horizontal line. Moreover, like (b) in FIG. 3, (c) in FIG. 3 illustrates a waveform of when an edge of an image from when the focus lens is moved to a macro

side and photography is performed is detected. Moreover, like (b) in FIG. 3, (d) in FIG. 3 illustrates a waveform of when an edge of an image from when the focus lens is moved to the macro side, the zoom lens is moved to the wide-angle side, and the second round of photography is performed is detected.
[0061]

As illustrated in (b) in FIG. 3, in the first round of photography, a pulse-like waveform that rises instantaneously at one edge of the cylinder and falls at operation at another edge thereof (a portion of the pulse from rise to fall corresponds to the principal subject) is obtained. In contrast, in the second round of photography, as illustrated in (c) in FIG. 3, photography is performed upon defocusing the focus lens. As such, both edge portions of the cylinder are blurred, and the waveform comes to have an incline. If the pulse portion illustrated in (a) in FIG. 3 (the principal subject) is cut out and this portion is made to replace the region of the principal subject in the image obtained in the second round of photography, a bottom side of the incline of the signal illustrated in (b) in FIG. 3 comes to stick out.
[0062]

Therefore, by moving the zoom lens 10_1a1 to the wide-angle side, an image of the cylinder that is the principal subject is reduced as illustrated in (d) in FIG. 3 so when this image is replaced by the pulse-like waveform in (b) in FIG. 3, the incline does not stick out from a periphery of this pulse-like waveform.
[0063]

Describing an edge detection state of the portion that is the horizontal line a–a′ as a waveform is somewhat difficult to understand. As such, here, a description is given in terms of an entirety of the subject including the principal subject.
[0064]

FIG. 4 is a diagram for describing a relationship between the first photographic image obtained by the first round of photography and the second photographic image obtained by the second round of photography.
[0065]

(a) in FIG. 4 illustrates focal positions of when the first photographic image and the second photographic image are obtained by photographing the same subject. Whereas the first photographic image is focused on the principal subject, the second photographic image is more on the wide-angle side than the first photographic image and is focused at a shorter distance than the distance to the principal subject. Moreover, (b) in FIG. 4 illustrates the first photographic image, the second photographic image, and a composite image that composites the first photographic image and the second photographic image.
[0066]

As illustrated in (a) in FIG. 4, when an image focused on the subject—for example, a flower—is obtained in the first round of photography, the first photographic image illustrated in (b) in FIG. 4 is obtained. When an image is obtained that is focused at a shorter distance than the flower in the second round of photography, as illustrated in (b) in FIG. 4, a blurred photographic image is obtained. The diagonal lines in (b) in FIG. 4 indicate a *bokeh* background. Moreover, the wavy lines indicate that a contour of the flower that is the principal subject is blurred. Compositing these, a focused image is obtained as the principal subject, as illustrated on the left in (b) in FIG. 4, and a blurred image (indicated by the diagonal lines) is obtained as the background, as illustrated on the right in (b) in FIG. 4.
[0067]

This image that has a focused principal subject but a blurred background becomes an image that is close to an image photographed by a silver halide camera.
[0068]

As described above, this realizes a photographic device that, while being a photographic device equipped with an imaging element of a small area, can obtain an image having similar *bokeh* to an image photographed by a silver halide camera.
[0069]

Furthermore, FIG. 5 is a diagram for describing an effectiveness of using a photography auxiliary light in the first round of photography when performing two rounds of continuous shooting.
[0070]

Increasing a contrast between the principal subject and the background by emitting the photography auxiliary light in obtaining the first photographic image in the first round of photography facilitates the cutting-out process in the image signal processing circuit 10_44 (see FIG. 2).
[0071]

Furthermore, instead of going through the trouble of photographing a blurred image by focusing at a shorter distance in the second round of photography as compared to the first round of photography as in the first embodiment, a focused photographic image may be obtained in the second round of photography as well, this photographic image may be defined as the second image, and this second image may be subjected to a blurring process in the image signal processing circuit 10_44.

[0072]

FIG. 6 is a diagram for describing a second embodiment that performs the blurring process in the image signal processing circuit 10_44.

[0073]

Note that an appearance and internal circuit configuration of the photographic device of the second embodiment are identical to an appearance and circuit configuration of the first embodiment above (see FIG. 1, FIG. 2). As such, diagrams illustrating such and description of such are omitted for the second embodiment.

[0074]

In the first embodiment, two rounds of continuous shooting are performed, a focused image being obtained in the first round and a blurred image being obtained in the second round, the latter being obtained by focusing at a position at a shorter distance than the first round of photography. However, in the second embodiment, the image signal processing circuit 10_44 can perform the blurring process; in light of this, an improvement is made so a focused image is also obtained in the second round of photography.

[0075]

As illustrated in FIG. 6, in the first round of photography, a first photographic image is obtained that is focused on the principal subject. Moreover, in the second round of photography, a second photographic image is obtained that is focused on this principal subject but is more on the wide-angle side than the first photographic image. Afterward, the second photographic image is subjected to the blurring process in the image signal processing circuit 10_44 so a blurred-background image is generated. Both images are then composited in the image signal processing circuit 10_44. This is one option.

[0076]

Furthermore, if the image signal processing circuit 10_44 (see FIG. 2) has an electronic zoom function, an enlarging process by electronic zooming can be performed without disposing the zoom lens 10_1a1 (see FIG. 2) on the wide-angle side.

[0077]

FIG. 7 is a diagram for describing processing of a photographic device of a third embodiment whereby a similar effect is obtained using electronic zooming.

[0078]

Note that an appearance and internal circuit configuration of the photographic device of the third embodiment are identical to the appearance and circuit configuration of the first embodiment above (see FIG. 1, FIG. 2). As such, diagrams illustrating such and description of such are omitted for the third embodiment.

[0079]

FIG. 7 illustrates an example of generating an enlarged image using the electronic zoom function had by the image signal processing circuit 10_44.

[0080]

In the photographic device illustrated in FIG. 7, a first photographic image focused on the principal subject is obtained by photography. Afterward, without performing a second round of photography, this first photographic image is subjected to an electronic zoom process in the image signal processing circuit 10_44 to obtain an enlarged image, this enlarged image being defined as the first image. Moreover, the photographic image prior to the enlarging process is defined as the second image, and this second image is subjected to the blurring process to obtain a blurred-background image. By this, an effect similar to the first and second embodiments is obtained. This is one option.

[0081]

Furthermore, although not a problem when the principal subject is a flower or the like, when the principal subject is a person and a full shot of this person is photographed, if a blurring process is not performed that continuously changes a *bokeh* state as a distance from the principal subject moves farther away, the background becomes a uniformly distant background such that the person does not blend in with the background and appears to be floating. Although this occurs when photographing a full shot, this hardly occurs when photographing a head and shoulder shot instead of a full shot.

[0082]

APPL-1006 / Page 10 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2011

(11)                    JP 2007-259108 A 2007.10.4

Therefore, a moving image of the subject and a frame guide for a head and shoulder shot of the principal subject may be displayed in order to present a photographer with recommended framing.

[0083]

FIG. 8 is a diagram for describing an example wherein the principal subject is a person and the frame guide is displayed on the liquid-crystal monitor to prompt the photographer to shoot a head and shoulder shot.

[0084]

(a) in FIG. 8 illustrates a display example of the frame guide for a head and shoulder shot, and (b) in FIG. 8 illustrates, together with explanatory text, why a full shot is not preferable.

[0085]

By displaying the frame guide for a head and shoulder shot as illustrated in (a) in FIG. 8, a person not matching the background and appearing to float due to a full shot as illustrated in (b) in FIG. 8 is prevented.

[0086]

As described above, this realizes a photographic device that, while being a photographic device equipped with an imaging element of a small area, can obtain an image having similar *bokeh* to an image photographed by a silver halide camera.

[0087]

Note that in reference to the art of patent literature 2, it is favorable to further display a setting screen for setting an extent of the blurring when the background blurring mode is selected by, for example, an operation of the menu/OK button. Doing so enables the photographer to view the setting screen on the liquid-crystal monitor and set the extent of the *bokeh* in advance on the photographic device such that a *bokeh* image of the photographer's preference is obtained.

[Brief Description of Drawings]

[0088]

[FIG. 1] A perspective view illustrating an appearance of a digital camera 10 that is one embodiment of a photographic device of the present invention.

[FIG. 2] A block diagram illustrating a circuit configuration of the digital camera 100 illustrated in FIG. 1.

[FIG. 3] A diagram for describing a relationship between a first image and a second image.

[FIG. 4] A diagram for describing a first photographic image obtained by a first round of photography, a second photographic image obtained by a second round of photography, and a composite image compositing the first photographic image and the second photographic image.

[FIG. 5] A diagram for describing an effectiveness of using a photography auxiliary light when performing two rounds of continuous shooting.

[FIG. 6] A diagram for describing a second embodiment wherein an image signal processing circuit 10_44 performs a blurring process.

[FIG. 7] A diagram for describing processing of a photographic device of a third embodiment whereby a similar effect is obtained using an electronic zoom.

[FIG. 8] A diagram for describing an example wherein a principal subject is a person and a frame guide is displayed on a liquid-crystal monitor to prompt a photographer to shoot a head and shoulder shot.

[Reference Signs List]

[0089]

| | |
|---|---|
| 10 | Digital camera |
| 10_11 | Release button |
| 10_30 | LCD |
| 10_30a | Liquid-crystal panel |
| 10_31 | OSD |
| 10_44 | Image signal processing circuit |
| 10_47 | CPU |

APPL-1006 / Page 11 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2012

(12)          JP 2007-259108 A 2007.10.4

[FIG. 1]



(a)



(b)

APPL-1006 / Page 12 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2013

[FIG. 2]



(14)          JP 2007-259108 A 2007.10.4

[FIG. 3]



APPL-1006 / Page 14 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2015

(15)          JP 2007-259108 A 2007.10.4

[FIG. 4]



(a)



(b)

First round          Second round

First photographic       Second photographic
image                image

Composite image

(16)          JP 2007-259108 A 2007.10.4

[FIG. 5]



First round

Photography
auxiliary light ON

Sharp principal subject

Second round

Photography
auxiliary light off



[FIG. 6]



Blurring process in image signal
processing circuit 10_44

APPL-1006 / Page 16 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2017

(17)        JP 2007-259108 A 2007.10.4

[FIG. 7]

Blurring process in image signal
processing circuit 10_44



Electronic zoom

[FIG. 8]



(a)



(b)

In a full shot, a person appears to be
floating if a degree of *bokeh* is not
changed in accordance with the
depth of the subject.

JP 2007-259108 A 2007.10.4

(19)【日本国特許庁(JP)    (12)公 開 特 許 公 報(A)    (11)特許出願公開番号

特開2007-259108
(P2007-259108A)

(43)公開日 平成19年10月4日(2007.10.4)

| (51)Int.Cl. | | F I | | | テーマコード (参考) |
|---|---|---|---|---|---|
| H O 4 N | 5/225 (2006.01) | H O 4 N | 5/225 | F | 5 C 1 2 2 |
| H O 4 N | 5/232 (2006.01) | H O 4 N | 5/232 | Z | |

審査請求 未請求 請求項の数 7 O L (全 13 頁)

| | | | |
|---|---|---|---|
| (21)出願番号 | 特願2006-81229 (P2006-81229) | (71)出願人 | 306037311 |
| (22)出願日 | 平成18年3月23日 (2006.3.23) | | 富士フイルム株式会社 |
| | | | 東京都港区西麻布2丁目26番30号 |
| | | (74)代理人 | 100094330 |
| | | | 弁理士 山田 正紀 |
| | | (74)代理人 | 100079175 |
| | | | 弁理士 小杉 佳男 |
| | | (74)代理人 | 100109689 |
| | | | 弁理士 三上 結 |
| | | (72)発明者 | 曽我 孝 |
| | | | 埼玉県朝霞市泉水3丁目11番46号 富士写真フイルム株式会社内 |
| | | Fターム (参考) | 5C122 DA04 EA61 FD14 FH19 FH22 FK12 GG16 GG28 HB05 |

(54)【発明の名称】撮影装置

(57)





APPL-1006 / Page 18 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2019

10

20

30

40

50

APPL-1006 / Page 19 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2020

10

×

20

30

40

50

( 4 )    JＰ 2007-259108 Ａ 2007.10.4

10

20

30

40

50

APPL-1006 / Page 21 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2022

10

20

30

40

50

APPL-1006 / Page 22 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2023

10

20

30

40

50

APPL-1006 / Page 23 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2024

10

20

＇

30

40

50

10

20

30

40

50

APPL-1006 / Page 25 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2026

10

20

30

40

50

10

20

(          )

30

40

(       )

50

APPL-1006 / Page 27 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2028

(                    )

10

20

30

40

50

APPL-1006 / Page 28 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2029

( 12 )　　　　　JP 2007-259108 A 2007. 10. 4

10





APPL-1006 / Page 29 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx2030



















(19) Japan Patent Office (JP)

(12) Unexamined Patent Application Publication (A)

(11) Patent Application Publication No.
S58-62609

| (51) Int. Cl.³ | | Ident. Code | Internal Ref. No. | (43) Pub. Date: Apr. 14, Showa 58 (1983) |
|---|---|---|---|---|
| | G 02 B | 13/02 | 7529-2H | |
| // | G 02 B | 9/34 | 6952-2H | |

No. of Inventions: 1
Examination Request: Not Made

(5 Pages Total)

(54) Telephoto Lens

| (21) Filing No. | S56-160716 |
|---|---|
| (22) Filing Date | Oct. 8, Showa 56 (1981) |
| (72) Inventor | Noriaki Kawamura |
| | c/o Asahi Optical Co. Ltd. |
| | 2-36-9 Maeno-chō, Itabashi-ku, Tokyo |
| (71) Applicant | Asahi Optical Co. Ltd. |
| | 2-36-9 Maeno-chō, Itabashi-ku, Tokyo |

Specification

1. Title    Telephoto Lens

2. Scope of Patent Claim

A telephoto lens of a four-group, five-lens configuration of, in order from an object side, a first lens, which is a positive meniscus lens that is convex toward the object side; a second lens and a third lens, which are a laminated positive meniscus lens of a negative meniscus lens and positive meniscus lens having a lamination surface that is convex toward the object side; a fourth lens, which is a negative lens having a rear surface with a large curvature that is concave toward an image-surface side; and a fifth lens, which is a positive lens, wherein the telephoto lens has a favorable aberration situation that satisfies all of the following conditions (1) to (8):

(1) $0.3F < F_{1 \cdot 2 \cdot 3} < 0.5F$

(2) $1.0F < F_{1 \cdot 2 \cdot 3 \cdot 4} < 2.5F$

(3) $0.1F < d_1 + d_2 + d_3 + d_4 + d_5 + d_6 < 0.2F$

(4) $0.1F < d_7 < 0.3F$

(5) $30 < \nu_4 < 50$

(6) $0.1F < r_4 < 0.25F$

(7) $0.05 < n_2 - n_3 < 0.3$

(8) $5 < \nu_3 - \nu_2 < 50$

F being a focal length of an overall system, $F_{1, 2 \ldots i}$ being a composite focal length to an ith lens, $n_i$ being a refractive index of a d-line of the ith lens, $\nu_i$ being an Abbe number of the ith lens, $r_j$ being a jth curvature radius, and $d_j$ being a jth surface interval.

3. Detailed Description of Invention

The present invention relates to a medium telephoto lens of a brightness of about 1:4 and is applied as, for example, a lens of a focal length of about 200 mm for a screen size of 6×7 or a focal length of about 150 mm for a screen size of 4.5×6. A lens type is a so-called Ernostar type, and conventionally, this type tends to overcorrect spherical aberration of color—in particular, spherical aberration of a peripheral luminous flux of short-wavelength light near a g-line—even when other aberration is corrected favorably. Moreover, chromatic aberration in magnification is also comparatively large.

An object of the present invention is to provide a lens that keeps a compactness of an overall length to a conventional level of a telephoto ratio of about 0.96 to 0.88 but has an excellent image-formation performance due to favorably correcting spherical aberration of both a reference wavelength and color and also decreasing chromatic aberration in magnification.

First, a lens configuration of the present invention is described. The present invention is a telephoto lens of a four-group, five-lens configuration of a first lens, which is a positive meniscus lens that is convex toward an object side; a

second lens and a third lens, which are a laminated positive meniscus lens of a negative meniscus lens and positive meniscus lens having a lamination surface that is convex toward the object side; a fourth lens, which is a negative lens having a rear surface with a large curvature that is concave toward an image-surface side; and a fifth lens, which is a positive lens, wherein the telephoto lens satisfies all of the following conditions:

(1)  $0.3F < F_{1 \cdot 2 \cdot 3} < 0.5F$

(2)  $1.0F < F_{1 \cdot 2 \cdot 3 \cdot 4} < 2.5F$

(3)  $0.1F < d_1 + d_2 + d_3 + d_4 + d_5 + d_6 < 0.2F$

(4)  $0.1F < d_7 < 0.3F$

(5)  $30 < \nu_4 < 50$

(6)  $0.1F < r_4 < 0.25F$

(7)  $0.05 < n_2 - n_3 < 0.3$

(8)  $5 < \nu_3 - \nu_2 < 50$

The reference signs are defined as follows:
F: Focal length of overall system
$F_{1, 2 \ldots i}$: Composite focal length to ith lens
$n_i$: Refractive index of d-line of ith lens
$\nu_i$: Abbe number of ith lens
$r_j$: jth curvature radius
$d_j$: jth surface interval
$\omega$: Half angle of view

Each of the above conditions is described below.

Condition (1) is a condition that, in connection with conditions (2) and (3), indicates an allocation of a focal length necessary to set a telephoto ratio to about 0.96 to 0.88 and form a framework of the telephoto lens that favorably corrects aberration. If the upper limit is exceeded, a surface interval $d_5$ between the third lens and the fourth lens must be increased considerably to maintain compactness, making chromatic aberration and other aberration difficult to correct. Moreover, if the lower limit is exceeded, a greater proportion of the power burden falls to the first lens to the third lens thus necessitating the use of a positive lens with a large refractive index as the first lens and the third lens. This also creates difficulties in terms of a Petzval sum, glass formulation, and the like and causes reduced performance.

Condition (2) is a condition that establishes a power of the fourth lens under condition (1). If $F_{1, 2, 3, 4}$ are longer than the upper limit, telephoto ratios at these points increase. As such, for compactness, the fifth lens must be disposed as close as possible, resulting in unbalanced correction of chromatic aberration and loss of aberration balance. Moreover, if these are shorter than the lower limit, a power of the fifth lens becomes too small such that all aberration arising in the first to fourth lenses cannot be corrected in a balanced manner.

Condition (3) is a condition mainly for maintaining a normal Petzval sum but is also for maintaining the telephoto ratio in the intended range. Exceeding the upper limit is advantageous for the telephoto ratio but disadvantageous for the Petzval sum, and exceeding the lower limit is the inverse of this. As such, in either situation, aberration is unsatisfactory at an intended angle of view.

Condition (4) is a condition relating to a position of the fifth lens. If $d_7$ is greater than the upper limit, a diameter of the fifth lens is too large to maintain an appropriate peripheral light amount, which is not preferable in terms of frame configuration. Moreover, if $d_7$ is smaller than the lower limit, coma aberration arises, which is not preferable due to correction thereof being difficult.

Condition (5) relates to the fourth lens. It also relates to conditions (6), (7), and (8) and has great significance in the present invention. Whereas a general Ernostar-type lens performs color correction using one negative lens, the lens of the present invention adds another negative lens (the second lens) to distribute color correction. This has an effect of being able to suppress overcorrection of chromatic aberration in a peripheral luminous flux that conventionally arises in a negative lens and being able to obtain a comparatively large value for $\nu_4$ due to the assignment of color correction. This is effective in decreasing chromatic aberration and magnification chromatic aberration in a secondary spectrum. Moreover, in terms of a distribution of glass materials, those with a low refractive index can also be used. This also has an effect on the allotment of other glass materials. If the lower limit is exceeded, as above, correcting chromatic aberration of a peripheral luminous flux is difficult. Moreover, if the upper limit is exceeded, an effect of color correction by the fourth lens becomes small, necessitating a considerable power increase in the fourth lens. This causes considerable difficulties in other aberration correction.

Conditions (6), (7), and (8) are conditions relating to the laminated lens of the second and third lenses. They are mainly conditions for distributing chromatic aberration correction together with the fourth lens and maintaining other aberration to be appropriate. Conditions (6), (7), and (8) fulfill these roles in connection with each other.

Condition (6) establishes a range of a curvature radius of the lamination surface. If the upper limit is exceeded, in terms of aberration correction, the upper limit of condition (7) or condition (8) needs to be exceeded; when selecting

APPL-1012 / Page 2 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2379

within a scope of commercially available glass materials, this requires the use of a special glass material, which is inappropriate for a lens of a comparatively large diameter. Moreover, if the lower limit is exceeded, the curvature radius of the lamination surface is too small, which increases manufacturing difficulty and makes correction of chromatic aberration of a peripheral luminous flux difficult.

With condition (7), if the upper limit is exceeded, in the range of condition (6), a refractive power of a fourth surface $r_4$ is too strong. This is inappropriate for the correction of chromatic aberration of a peripheral luminous flux intended by the present invention. Moreover, if the lower limit is exceeded, an effect of the second lens decreases, and to raise the effect of the second lens, the lower limit of condition (6) or the upper limit of condition (8) must be exceeded. This makes it difficult to correct chromatic aberration and other aberration in a balanced manner.

Condition (8) is a condition of achromatization. When this is smaller than the lower limit, an achromatizing distribution of the second lens is too small and inappropriate such that the effects of the present invention are not exhibited. Moreover, when the upper limit is exceeded, chromatic aberration of a peripheral luminous flux arises, which is not preferable.

Next, numerical values of examples of the present invention are listed.

Example 1

1 : 4.1   F = 200.079   $\omega$ = 12.3°.

| NO. | $r$ | $d$ | $N$ | $\nu$ |
|-----|-----|-----|-----|-----|
| 1 | 57.091 | 9.00 | 1.60311 | 60.7 |
| 2 | 330.000 | 0.20 | | |
| 3 | 45.039 | 4.00 | 1.67270 | 32.1 |
| 4 | 33.450 | 9.60 | 1.48749 | 70.1 |
| 5 | 81.000 | 3.50 | | |
| 6 | 387.380 | 3.00 | 1.57501 | 41.5 |
| 7 | 34.361 | 41.80 | | |
| 8 | 146.228 | 4.34 | 1.74950 | 35.3 |
| 9 | 552.040 | | | |

$$F_{1 \cdot 2 \cdot 3} = 74.912$$
$$F_{1 \cdot 2 \cdot 3 \cdot 4} = 356.466$$
$$d_1 + d_2 + d_3 + d_4 + d_5 + d_6 = 29.3$$

APPL-1012 / Page 3 of 16
APPLE INC. v. COREPHOTONICS LTD.

JP S58-62609 (4)

Example 2

$1 : 4.1$    $F = 199.419$    $\omega = 12.4°$

| NO. | $r$ | $d$ | $n$ | $\nu$ |
|-----|-----|-----|-----|-------|
| 1 | 56.700 | 8.50 | 1.60311 | 60.7 |
| 2 | 263.618 | 0.2 | | |
| 3 | 45.570 | 5.6 | 1.66755 | 41.9 |
| 4 | 30.259 | 9.0 | 1.49700 | 81.6 |
| 5 | 85.200 | 3.13 | | |
| 6 | 353.617 | 4.28 | 1.57501 | 41.5 |
| 7 | 34.500 | 38.24 | | |
| 8 | 129.576 | 4.34 | 1.74950 | 35.3 |
| 9 | 400.000 | | | |

$F_{1 \cdot 2 \cdot 3}$ $= 77.277$

$F_{1 \cdot 2 \cdot 3 \cdot 4}$ $= 367.730$

$d_1 + d_2 + d_3 + d_4 + d_5 + d_6 = 30.71$

Example 3

$1 : 4.1$    $F = 199.692$    $\omega = 12.4°$

| NO. | $r$ | $d$ | $n$ | $\nu$ |
|-----|-----|-----|-----|-------|
| 1 | 53.134 | 8.50 | 1.58913 | 61.0 |
| 2 | 216.482 | 0.20 | | |
| 3 | 42.882 | 4.00 | 1.80610 | 40.9 |
| 4 | 27.695 | 10.00 | 1.61800 | 63.4 |
| 5 | 101.862 | 3.00 | | |
| 6 | 215.992 | 4.81 | 1.72000 | 42.0 |
| 7 | 31.982 | 42.70 | | |
| 8 | 103.244 | 4.34 | 1.64769 | 33.8 |
| 9 | 231.664 | | | |

$F_{1 \cdot 2 \cdot 3}$

$F_{1 \cdot 2 \cdot 3 \cdot 4}$ $= 64.069$

$= 319.118$

$d_1 + d_2 + d_3 + d_4 + d_5 + d_6 = 30.51$

APPL-1012 / Page 4 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2381

Example 4

$1 : 4.1$    $F = 199.767$    $\omega = 12.4°$

| NO. | $r$ | $d$ | $n$ | $\nu$ |
|---|---|---|---|---|
| 1 | 50.041 | 8.50 | 1.60311 | 60.7 |
| 2 | 218.067 | 0.20 | | |
| 3 | 39.842 | 3.72 | 1.69680 | 55.5 |
| 4 | 25.661 | 9.50 | 1.51633 | 64.1 |
| 5 | 102.728 | 2.95 | | |
| 6 | 275.049 | 2.79 | 1.63980 | 34.5 |
| 7 | 31.011 | 49.89 | | |
| 8 | 107.040 | 4.34 | 1.78472 | 26.6 |
| 9 | 175.118 | | | |

$$F_{1 \cdot 2 \cdot 3} = 63.147$$

$$F_{1 \cdot 2 \cdot 3 \cdot 4} = 286.461$$

$$d_1 + d_2 + d_3 + d_4 + d_5 + d_6 = 27.66$$

4. Brief Description of Drawings

FIGS. 1, 3, 5, and 7 are lens-system configuration views respectively corresponding to examples 1, 2, 3, and 4 of the present invention, and FIGS. 2, 4, 6, and 8 are aberration curve diagrams respectively corresponding to examples 1, 2, 3, and 4.

Applicant:    Asahi Optical Co. Ltd.

[Illegible]

Representative: Tōru Matsumoto

APPL-1012 / Page 5 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2382

FIG. 1



FIG. 2

Spherical aberration
Sine conditions

Chromatic aberration

Astigmatism

Distortion aberration

APPL-1012 / Page 6 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2383

JP S58-62609 (7)



FIG. 3

FIG. 4

Spherical aberration
Sine conditions

Chromatic aberration

Astigmatism

Distortion aberration

FIG. 5

APPL-1012 / Page 7 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2384



FIG. 6

FIG. 7

Spherical aberration
Sine conditions

Chromatic aberration

Astigmatism

Distortion aberration

APPL-1012 / Page 8 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2385



FIG. 8

Spherical aberration
Sine conditions

Chromatic aberration

Astigmatism

Distortion aberration

APPL-1012 / Page 9 of 16
APPLE INC. v. COREPHOTONICS LTD.
Appx2386

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,

Petitioner,

v.

COREPHOTONICS LTD.,

Patent Owner

————————

**DECLARATION OF DAVID BALDWIN**

# DECLARATION OF DAVID BALDWIN

I, David Baldwin, do hereby make the following declaration:

1. I am fluent in both English and Japanese languages. I hereby certify under penalty of perjury that I have translated the document which is attached to this Declaration, and that the attached translation is, to the best of my knowledge and belief, a true, accurate, and faithful translation.

2. I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Date: 2/3/20

_____

David Baldwin

⑲ 日本国特許庁（JP）　　　　　　　　⑪ 特 許 出 願 公 開

⑫ 公 開 特 許 公 報（A）　　　　昭58—62609

| �51Int. Cl.³ | 識別記号 | 庁内整理番号 | ㊸公開　昭和58年(1983) 4 月14日 |
|---|---|---|---|
| G 02 B　13/02 | | 7529—2H | |
| ∥G 02 B　　9/34 | | 6952—2H | 発明の数　1 |
| | | | 審査請求　未請求 |

（全 5 頁）

㊴望遠レンズ

㉑特　　願　昭56—160716

㉒出　　願　昭56(1981)10月 8 日

㉒発 明 者　河村憲明

東京都板橋区前野町 2 丁目36番
9 号旭光学工業株式会社内

㉗出 願 人　旭光学工業株式会社
東京都板橋区前野町 2 丁目36番
9 号

明　　細　　書

**1. 発明の名称**　望遠レンズ

**2. 特許請求の範囲**

　物体側より順に、第 1 レンズは物体側に凸の正メニスカスレンズ、第 2 レンズと第 3 レンズは物体側に凸の貼り合わせ面を有する負メニスカスレンズと正メニスカスレンズとの貼り合せ正メニスカスレンズ、第 4 レンズは像面側に凹の曲率大なる後面を有する負レンズ、第 5 レンズは正レンズである 4 群 5 枚構成レンズにおいて、次の(1)〜(8)の諸条件を満足する収差状況良好な望遠レンズ。

(1)　$0.3F < F_{1 \cdot 2 \cdot 3} < 0.5F$

(2)　$1.0F < F_{1 \cdot 2 \cdot 3 \cdot 4} < 2.5F$

(3)　$0.1F < d_1 + d_2 + d_3 + d_4 + d_5 + d_6 < 0.2F$

(4)　$0.1F < d_7 < 0.3F$

(5)　$30 < \nu_4 < 50$

(6)　$0.1F < r_4 < 0.25F$

(7)　$0.05 < n_2 - n_3 < 0.3$

(8)　$5 < \nu_3 - \nu_2 < 50$

但し、F は全系の焦点距離、$F_{1 \cdot 2 \cdots i}$ は第 i レ

ンズ迄の合成焦点距離、$n_i$ は第 i 番目レンズの d-line の屈折率、$\nu_i$ は第 i 番目レンズのアッベ数、$r_j$ は第 j 番目の曲率半径、$d_j$ は第 j 番目の面間隔である。

**3. 発明の詳細な説明**

　本発明は明るさ 1：4 程度の中望遠レンズに関するものであり、例えば画面サイズ 6 × 7 用の焦点距離 200 ㎜、同 4.5 × 6 用の焦点距離 150 ㎜ 前後のレンズに適用されるものである。レンズタイプは、いわゆるエルノスタータイプで、このタイプは従来、他の収差が良好に補正されたとしても

　色の球面収差、特に g 線付近の短波長光に対する軸線光束の球面収差が、補正過剰となる傾向があった。また倍率の色収差も比収の大きかった。

　本発明の目的は、全長のコンパクト性は望遠比 0.96 〜 0.88 程度の従来並みに止どめるが、基準波長、色の球面収差を共に良好に補正し、また倍率の色収差も小さくすることにより、結像性能において優秀なレンズを提供することである。

APPL-1012 / Page 12 of 16
APPLE INC. v. COREPHOTONICS LTD.

Appx2389

先ず本発明のレンズ構成を説明すると、第1レンズは物体側に凸の正メニスカスレンズ、第2レンズと第3レンズは物体側に凸の貼り合わせ面を有する負メニスカスレンズと正メニスカスレンズとの貼り合わせ正メニスカスレンズ、第4レンズは像面側に凹の曲率大なる像面を有する負レンズ、第5レンズは正レンズである4群5枚構成レンズにおいて、次の諸条件を満足する望遠レンズである。

(1) $0.3F < F_{1 \cdot 2 \cdot 3} < 0.5F$

(2) $1.0F < F_{1 \cdot 2 \cdot 3 \cdot 4} < 2.5F$

(3) $0.1F < d_1 + d_2 + d_3 + d_4 + d_5 + d_6 < 0.2F$

(4) $0.1F < d_7 < 0.3F$

(5) $30 < \nu_4 < 50$

(6) $0.1F < r_4 < 0.25F$

(7) $0.05 < n_2 - n_3 < 0.3$

(8) $5 < \nu_3 - \nu_2 < 50$

符号は次のように定める。

$F$ : 全系の焦点距離

$F_{1 \cdot 2 \cdots i}$ : 第iレンズ迄の合成焦点距離

$n_i$ : 第i番目レンズの d-line の屈折率

$\nu_i$ : 第i番目レンズのアッベ数

$r_j$ : 第j番目の曲率半径

$d_j$ : 第j番目の面間隔

$\omega$ : 半画角

以下、上記各条件について説明する。

(1)の条件は、(2)、(3)の条件と関連して、望遠比を $0.96 \sim 0.88$ 程度とし、収差を良好に補正した望遠レンズの骨格をなすに必要な焦点距離の配分を示す条件である。上限を超える時には、コンパクト性を保つために第3レンズと第4レンズとの面間隔 $d_6$ をかなり大きくしなければならず、色収差をはじめ、他の収差を補正するのが容易ではなくなる。また下限を超える時には、第1レンズから第3レンズまでの間に負担がかかるので第1レンズ及び第3レンズの正レンズに屈折率の大きいものを用いなければならず、ペッツバールの和及び硝子の配合等にも困難を生じ、性能を低下させる原因となるものである。

(2)の条件は、(1)の条件下で第4レンズの間を定

める条件である。上限を超えて長い $F_{1 \cdot 2 \cdot 3 \cdot 4}$ の時には、ここまでの望遠比が増大するので、コンパクトにするためには第5レンズを出来るだけ接近して配置しなければならず、色収差の補正及び収差バランスを崩してしまう結果となる。また下限を超えて短い時には、第5レンズの間が小さくなりすぎて、第1～第4レンズで発生した諸収差をバランス良く補正出来ない。

(3)の条件は、主にペッツバールの和を正常に保ち、しかも望遠比を目的の範囲に維持するための条件である。上限より大きい時には、望遠比に有利であるが、ペッツバール和には不利となり、また下限より小さい時には、この逆になる。従って、どちらも収差上、目的の画角では満足できないものとなる。

(4)の条件は、第5レンズの位置に関する条件である。上限を超えて $d_7$ が大きくなると、周辺光量を適度に保つためには第5レンズの径が大きくなり過ぎ、枠構成上好ましくない。また下限を超えて $d_7$ が小さくなると、コマ収差が発生し、その

補正が容易でなくなるので好ましくない。

(5)の条件は、第2レンズに関するものである。これは(6)、(7)、(8)の条件とも関連して本発明において大きな意味を持つ。一般のエルノスタータイプレンズは、負レンズ1枚にて色補正を担当しているが、本発明のレンズにおいてはさらに1枚負レンズ(第2レンズ)を追加して色補正を分担している。その効果は、従来負レンズで発生していた周縁光束における色収差補正過剰を抑えることが出来たこと、および色補正を分担させたことにより、より比較的小さい像を取り得ることである。これは2次スペクトルの色収差、倍率色収差を小さくする意味で有効であり、また硝材の分布から見て屈折率の低いものも使用可能となった。この事は他の硝材配分にも効果をもたらした。下限を超えると、上述のように周縁光束の色収差の補正が困難となり、また上限を超えると、第4レンズによる色補正の効果が小さくなり、第4レンズのパワーを相当減じなくてはならないが、これは他の収差補正に相当の困難を伴う。

-46-

APPL-1012 / Page 13 of 16
APPLE INC. v. COREPHOTONICS LTD.

特開昭58- 62609(3)

(6)，(7)，(8)の条件は、第2，第3レンズの貼り合わせレンズに関する条件であり、主として第4レンズと共に色収差補正を分担し、且つ、他の収差を適正に保つための条件である。(6)，(7)，(8)の条件は互いに関連を持ちながらこの役割を果す。

(6)の条件は貼り合せ面の曲率半径の範囲を定めたものであるが、上限を超える時には、収差補正上、条件(7)あるいは条件(8)の上限を超す必要を生じ、市販の硝材の範囲で選択すると特殊な硝材を使用する事になり、径の比較的大きいレンズに於ては不適当である。また下限を超えると、貼り合せ面の曲率半径が小さくなりすぎて、製作上の困難さを増すと共に、周縁光束の色収差の補正が困難となる。

(7)の条件は、上限を超えると、条件(6)の範囲では第4面 $r_4$ の屈折力が強くなり過ぎて、本発明の目的とする周縁光束の色収差の補正に不適当であり、また下限を超えると、第2レンズの効果が小さくなり、第2レンズの効果を上げるためには条件(6)の下限あるいは条件(8)の上限を超さなければ

ならず、色収差と他の諸収差をバランスよく補正する事が困難となる。

(8)の条件は、色消し分担の条件で、下限より小さいと、第2レンズの色消分担が少なすぎ、本発明による効果が現われず不適である。また上限を超える時には、周縁光束の色収差が発生するので好ましくない。

次に本発明の実施例の数値を示す。

実施例1

1 : 4.1     F = 200.079     ω = 12.3°

| NO. | r | d | N | ν |
|---|---|---|---|---|
| 1 | 57.091 | 9.00 | 1.60311 | 60.7 |
| 2 | 330.000 | 0.20 | | |
| 3 | 45.039 | 4.00 | 1.67270 | 32.1 |
| 4 | 33.450 | 9.60 | 1.48749 | 70.1 |
| 5 | 81.000 | 3.50 | | |
| 6 | 387.380 | 3.00 | 1.57501 | 41.5 |
| 7 | 34.361 | 41.80 | | |
| 8 | 146.228 | 4.34 | 1.74950 | 35.3 |
| 9 | 552.040 | | | |

$F_{1\cdot2\cdot3}$ = 74.912

$F_{1\cdot2\cdot3\cdot4}$ = 356.466

$d_1 + d_2 + d_3 + d_4 + d_5 + d_6$ = 29.3

実施例2

1 : 4.1     F = 199.419     ω = 12.4°

| NO. | r | d | n | ν |
|---|---|---|---|---|
| 1 | 56.700 | 8.50 | 1.60311 | 60.7 |
| 2 | 263.618 | 0.2 | | |
| 3 | 45.570 | 5.6 | 1.66755 | 41.9 |
| 4 | 30.259 | 9.0 | 1.49700 | 81.6 |
| 5 | 85.200 | 3.13 | | |
| 6 | 353.617 | 4.28 | 1.57501 | 41.5 |
| 7 | 34.500 | 38.24 | | |
| 8 | 129.576 | 4.34 | 1.74950 | 35.3 |
| 9 | 400.000 | | | |

$F_{1\cdot2\cdot3}$ = 77.277

$F_{1\cdot2\cdot3\cdot4}$ = 367.730

$d_1 + d_2 + d_3 + d_4 + d_5 + d_6$ = 30.71

—47—

APPL-1012 / Page 14 of 16
APPLE INC. v. COREPHOTONICS LTD.

特開昭58- 62609**(4)**

実施例 5

1 ： 4.1    F = 199.692    ω = 12.4°

| NO. | $r$ | $d$ | $n$ | $\nu$ |
|---|---|---|---|---|
| 1 | 53.134 | 8.50 | 1.58913 | 61.0 |
| 2 | 216.482 | 0.20 | | |
| 3 | 42.882 | 4.00 | 1.80610 | 40.9 |
| 4 | 27.695 | 10.00 | 1.61800 | 63.4 |
| 5 | 101.862 | 3.00 | | |
| 6 | 215.992 | 4.81 | 1.72000 | 42.0 |
| 7 | 31.982 | 42.70 | | |
| 8 | 103.244 | 4.34 | 1.64769 | 33.8 |
| 9 | 231.664 | | | |

$$F_{1 \cdot 2 \cdot 3} = 64.069$$
$$F_{1 \cdot 2 \cdot 3 \cdot 4} = 319.118$$
$$d_1 + d_2 + d_3 + d_4 + d_5 + d_6 = 30.51$$

実施例 4

1 ： 4.1    F = 199.767    ω = 12.4°

| NO. | $r$ | $d$ | $n$ | $\nu$ |
|---|---|---|---|---|
| 1 | 50.041 | 8.50 | 1.60311 | 60.7 |
| 2 | 218.067 | 0.20 | | |
| 3 | 39.842 | 3.72 | 1.69680 | 55.5 |
| 4 | 25.661 | 9.50 | 1.51633 | 64.1 |
| 5 | 102.728 | 2.95 | | |
| 6 | 275.049 | 2.79 | 1.63980 | 34.5 |
| 7 | 31.011 | 49.89 | | |
| 8 | 107.040 | 4.34 | 1.78472 | 26.6 |
| 9 | 175.118 | | | |

$$F_{1 \cdot 2 \cdot 3} = 63.147$$
$$F_{1 \cdot 2 \cdot 3 \cdot 4} = 286.461$$
$$d_1 + d_2 + d_3 + d_4 + d_5 + d_6 = 27.66$$

4. 図面の簡単な説明

第 1 , 3 , 5 , 7 図はそれぞれ本発明の実施例 1 , 2 , 3 , 4 に対応するレンズ系構成図、第 2 , 4 , 6 , 8 図はそれぞれ実施例 1 , 2 , 3 , 4 に対応する収差曲線図である。

特許出願人　　旭光学工業株式会社

代表者　　松本　徹

第 1 図



第 2 図





—48—

APPL-1012 / Page 15 of 16
APPLE INC. v. COREPHOTONICS LTD.

Appx2392

特開昭58- 62609(5)

第3図



第 5 図



第4図



第 6 図



第 7 図



第 8 図



—49—

APPL-1012 / Page 16 of 16
APPLE INC. v. COREPHOTONICS LTD.

Appx2393

Case: 22-1350    Document: 24    Page: 456    Filed: 12/30/2022

TEXTS IN COMPUTER SCIENCE

# Computer Vision

## Algorithms and Applications



### Richard Szeliski


Springer



**Figure 11.1**   Stereo reconstruction techniques can convert (a–b) a pair of images into (c) a depth map (http://vision.middlebury.edu/stereo/data/scenes2003/) or (d–e) a sequence of images into (f) a 3D model (http://vision.middlebury.edu/mview/data/).  (g) An analytical stereo plotter, courtesy of Kenney Aerial Mapping, Inc., can generate (h) contour plots.

Case: 22-1350    Document: 24    Page: 457    Filed: 12/30/2022

Stereo matching is the process of taking two or more images and estimating a 3D model of the scene by finding matching pixels in the images and converting their 2D positions into 3D depths. In Chapters 6–7, we described techniques for recovering camera positions and building sparse 3D models of scenes or objects. In this chapter, we address the question of how to build a more complete 3D model, e.g., a sparse or dense *depth map* that assigns relative depths to pixels in the input images. We also look at the topic of *multi-view stereo* algorithms that produce complete 3D volumetric or surface-based object models.

Why are people interested in stereo matching? From the earliest inquiries into visual perception, it was known that we perceive depth based on the differences in appearance between the left and right eye.[1] As a simple experiment, hold your finger vertically in front of your eyes and close each eye alternately. You will notice that the finger jumps left and right relative to the background of the scene. The same phenomenon is visible in the image pair shown in Figure 11.1a–b, in which the foreground objects shift left and right relative to the background.

As we will shortly see, under simple imaging configurations (both eyes or cameras looking straight ahead), the amount of horizontal motion or *disparity* is inversely proportional to the distance from the observer. While the basic physics and geometry relating visual disparity to scene structure are well understood (Section 11.1), automatically measuring this disparity by establishing dense and accurate inter-image *correspondences* is a challenging task.

The earliest stereo matching algorithms were developed in the field of *photogrammetry* for automatically constructing topographic elevation maps from overlapping aerial images. Prior to this, operators would use photogrammetric stereo plotters, which displayed shifted versions of such images to each eye and allowed the operator to float a dot cursor around constant elevation contours (Figure 11.1g). The development of fully automated stereo matching algorithms was a major advance in this field, enabling much more rapid and less expensive processing of aerial imagery (Hannah 1974; Hsieh, McKeown, and Perlant 1992).

In computer vision, the topic of stereo matching has been one of the most widely studied and fundamental problems (Marr and Poggio 1976; Barnard and Fischler 1982; Dhond and Aggarwal 1989; Scharstein and Szeliski 2002; Brown, Burschka, and Hager 2003; Seitz, Curless, Diebel *et al.* 2006), and continues to be one of the most active research areas. While photogrammetric matching concentrated mainly on aerial imagery, computer vision applications include modeling the human visual system (Marr 1982), robotic navigation and manipulation (Moravec 1983; Konolige 1997; Thrun, Montemerlo, Dahlkamp *et al.* 2006), as well as view interpolation and image-based rendering (Figure 11.2a–d), 3D model building (Figure 11.2e–f and h–j), and mixing live action with computer-generated imagery (Figure 11.2g).

In this chapter, we describe the fundamental principles behind stereo matching, following the general taxonomy proposed by Scharstein and Szeliski (2002). We begin in Section 11.1 with a review of the *geometry* of stereo image matching, i.e., how to compute for a given pixel in one image the range of possible locations the pixel might appear at in the other image, i.e., its *epipolar line*. We describe how to pre-warp images so that corresponding epipolar lines are coincident (*rectification*). We also describe a general resampling algorithm called *plane sweep* that can be used to perform multi-image stereo matching with arbitrary camera configurations.

---

[1] The word *stereo* comes from the Greek for *solid*; stereo vision is how we perceive solid shape (Koenderink 1990).

Case: 22-1350    Document: 24    Page: 458    Filed: 12/30/2022



MULTILING CORPORATION

180 NORTH UNIVERSITY AVE.
Suite 600
PROVO, UT 84601-4474

VOICE (801) 377-2000
FAX (801) 377-7085

### TRANSLATOR'S CERTIFICATE OF TRANSLATION

Translation from Japanese (Japan) to English (United States)
MultiLing Project Number: RENOO1820005HQ
Client: Apple

MultiLing Corporation, a Delaware corporation, which has its principal office at 180 North University Avenue, Suite 600, Provo, UT 84601-4474, USA, certifies that

(a) it is a professional translation company of multiple languages including Japanese (Japan) and English (United States);
(b) it has translated from the original document to the translated document identified below, and to the best of its knowledge, information, and belief the translation of that document is accurate as a publication quality translation; and further,
(c) these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Original Document Identifier: JP2013106289A.pdf.
Translated Document Identifier: JP2013106289A_en-US.docx.

Signed this 11th day of May 2018.

Jeremy Coombs, VP Global Operations

### ACKNOWLEDGMENT BEFORE NOTARY

State of Utah
                    }ss.
County of Utah

On this 11th day of May, 2018before me, the undersigned Notary Public, personally appeared Jeremy Coombs, who proved on the basis of satisfactory evidence to be the person whose name is subscribed to this Translator's Certificate of Translation and who acknowledged that he or she executed the same for the purposes stated therein.
                    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

DIXIE CALKINS
NOTARY PUBLIC · STATE OF UTAH
COMMISSION# 696823
COMM. EXP. 10-09-2021

Notary Public, residing at Lehi, UT

Certificate of Translation (004).docx

*182099*

APPL-1015 / Page 1 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2455

(19) Japanese Patent Office (JP)

(12) Publication of Unexamined Patent Application (A)

(11) Patent Application Laid-Open Disclosure Number

Japanese laid-Open Patent Publication Number: 2013-106289 (P2013-106289A)

(43) Publication Date: 2013, 5, 30

| (51)Int. Cl.[6] | | | F1 | | | Theme Code (Reference) |
|---|---|---|---|---|---|---|
| *HHO4N* | *5/228* | *(2006.01)* | HHO4N | 5/228 | Z | 2HO54 |
| *HHO4N* | *5/225* | *(2006.01)* | HHO4N | 5/225 | Z | 2HO87 |
| *GO2B* | *13/00* | *(2006.01)* | GO2B | 13/00 | | 5C122 |
| *GO2B* | *15/00* | *(2006.01)* | GO2B | 15/00 | | |
| *GO2B* | *13/18* | *(2006.01)* | GO2B | 13/18 | | |

Request for Examination Unrequested The number of Claims    (26 Pages)    Continuing to last page

| (21) Application Number | Patent Application No. 2011-250322 | (71) Applicant: | 593034699 |
|---|---|---|---|
| | | | KONICA MINOLTA ADVANCED LAYERS INC. |
| | | | Ishikawa-cho 2970, Hachioji-shi, Tokyo |
| (22) Filing Date | 2011, 11, 16 | (74) Representative: | 100085501 |
| | | | Patent Attorney Shizuo SANO |
| | | (74) Representative: | 100128842 |
| | | | Patent Attorney Yutaka INOUE |
| | | (72) Inventor: | Kenji KONNO |
| | | | Ishikawa-cho 2970, Hachioji-shi, Tokyo |
| | | | KONICA MINOLTA OPTO INC. |
| | | (72) Inventor: | Keiji MATSUZAKA |
| | | | Ishikawa-cho 2970, Hachioji-shi, Tokyo |
| | | | KONICA MINOLTA OPTO INC. |
| | | | Continuing to last page |

(54) [Title of the Invention] Imaging Apparatus

(57) [Abstract]                    (Corrected)

[Object] To provide an image having high image quality and high resolution over an entire wide variable power region.

[Solving Means] An imaging apparatus includes single-focus first and second imaging optical systems LN1 and LN2 that face the same direction. A focal length of the second imaging optical system LN2 is longer than a focal length of the first imaging optical system LN1. Zooming is performed from a wide angle end to an intermediate focal length state with an electronic zoom by segmentation of an image acquired in the first imaging optical system LN1, and zooming is performed from the intermediate focal length state to a telescopic end with an electronic zoom by segmentation of an image acquired in the second imaging optical system. Thus, zooming from the wide angle end to the telescopic end is performed as a whole. Both of the first and second imaging optical systems LN1 and LN2 includes four or more lenses of first lenses of positive power and second lenses of negative power in order from an object side, the lenses nearest to the image side are negative lenses, and composite focal lengths of the first lenses and the second lenses are positive, and satisfy a conditional expression: $1.0 < fFw/fFm < 1.5$.

[Selected Drawing] FIG. 21

APPL-1015 / Page 2 of 59

APPLE INC. v. COREPHOTONICS LTD.

Appx2456

Specification
Title of the Invention: IMAGING APPARATUS

DETAILED DESCRIPTION OF THE INVENTION

TECHNICAL FIELD
[0001]
  The present invention relates to an imaging apparatus. In particular, the present invention relates to a small-sized imaging apparatus having an electronic zoom function that can capture an image of a subject by an imaging device (for example, a solid imaging device such as a CCD (Charge Coupled Device)-type image sensor or a CMOS (Complementary Metal-Oxide Semiconductor)), and scale the image.

BACKGROUND ART
[0002]
  In recent years, with improved performance and miniaturization of imaging apparatuses using a solid imaging device such as a CCD-type image sensor and a CMOS-type image sensor, mobile phones and personal digital assistants that are equipped with the imaging apparatus have been widespread. In addition, further initialization and higher performance for the imaging optical system installed in the imaging apparatus are in increasing demand. Although conventional imaging apparatuses are single focus, a zoom function has grown in demand. However, when the imaging optical system having the optical zoon function is used, the optical system itself becomes excessively large, and requires an actuator for zoom driving. As a result, the imaging apparatus becomes extremely large. Therefore, it has been difficult to install such imaging apparatus in mobile phones or personal digital assistants.

[0003]
  Thus, a single-focus imaging optical system having a small entire length can be provided with an electronic zoom function (that is, pseudo zoom function by segmentation of an image). However, in the case of an electronic zoom having a large zoom ratio, disadvantageously, the number of pixels of a segmented image becomes excessively small at a telescopic end. To solve the problem, Patent Document 1 to 3 propose that a decrease in the number of pixels is prevented by installing a single-focus imaging optical system having two or more different focal lengths, and switching the electronic zoom function for each focal length. Patent Document 1 proposes a digital camera that includes a single focus lens and a zoom lens to gap the focal length with the electronic zoom. Patent Document 2 and Patent Document 3 propose an imaging apparatus that uses two or three single focus lenses to perform the electronic zoom.

CONVENTIONAL TECHNICAL DOCUMENTS
Patent Documents
[0004]
  Patent Document 1: Japanese National Publication of International Patent Application No. 2008-530954
  Patent Document 2: Japanese Laid-open Publication No. 2005-99265
  Patent Document 3: Japanese Laid-open Publication No. 2007-306282

SUMMARY OF THE INVENTION
Problems to be Solved by the Invention

APPL-1015 / Page 3 of 59
APPLE INC. v. COREPHOTONICS LTD.

[0005]

 As described in Patent Documents 1 to 3, the high variable power imaging apparatus having the large number of pixels can be realized by using a plurality of imaging optical systems to perform the electronic zoom. However, Patent Documents 1 to 3 fail to describe any specific configuration of the imaging optical system for achieving slimming-down and high image quality. The documents merely describe its concepts, and do not sufficiently demonstrate the feasibility of slimming-down.

[0006]

 The present invention is devised in consideration of such problem, and its object is to provide a high-performance thin and small-sized imaging apparatus capable of acquiring an image of high quality and high resolution over an entire wide variable power region.

MEANS FOR SOLVING THE PROBLEMS

[0007]

 To attain the above-mentioned object, an imaging apparatus from a first aspect of the invention includes single-focus first and second imaging optical systems that face the same direction, a focal length of the second imaging optical system is longer than a focal length of the first imaging optical system, zooming is performed from a wide angle end to an intermediate focal length state with an electronic zoom by segmentation of an image acquired in the first imaging optical system, zooming is performed from the intermediate focal length state to a telescopic end with an electronic zoom by segmentation of an image acquired in the second imaging optical system, and zooming from the wide angle end to the telescopic end is performed as a whole. Both of the first and second imaging optical systems includes four or more lenses of first lenses of positive power and second lenses of negative power in order from the object side, the lenses nearest to the image side are negative lenses, and composite focal lengths of the first lenses and the second lenses are positive, and satisfy a conditional expression (1).

$$1.0 < fFw/fFm < 1.5... (1)$$

wherein,

fFw: Composite focal lengths of the first lenses and the second lenses in the first imaging optical system, and

fFm: Composite focal lengths of the first lenses and the second lenses in the second imaging optical system.

[0008]

 The imaging apparatus from a second aspect of the invention is characterized by that, in the first aspect of the invention, following conditional expression (2A) and (2B) are satisfied.

$$fFw/fw > 1... (2A)$$
$$fFm/fm < 1... (2B)$$

wherein,

fw: Focal length of the entire first imaging optical system, and

fm: Focal length of the entire second imaging optical system.

[0009]

APPL-1015 / Page 4 of 59
APPLE INC. v. COREPHOTONICS LTD.

The imaging apparatus from a third aspect of the invention is characterized by that, in the first or second aspect of the invention, a following conditional expression (3) is satisfied.

$$-0.6 < fXw/fXm < 0.5... (3)$$

wherein,
fXw: Focal length of the second lens from the image side in the first imaging optical system, and
fXm: Focal length of the second lens from the image side in the second imaging optical system.
[0010]
The imaging apparatus from a fourth aspect of the invention is characterized by that, in any one of the first to third aspect of the invention, a following conditional expression (4) is satisfied.

$$94 > 2\omega w > 72... (4)$$

wherein,
$2\omega w$: Entire viewing angle [deg] of the first imaging optical system.
[0011]
The imaging apparatus from a fifth aspect of the invention is characterized by that, in any one of the first to fourth aspect of the invention, the first imaging optical system includes four lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, and a four lens of negative power in order from the object side, and the second imaging optical system includes four lenses of a first lens of positive power, a second lens of negative power, a third lens of negative power, and a four lens of negative power in order from the object side.
[0012]
The imaging apparatus from a sixth aspect of the invention is characterized by that, in any one of the first to fourth aspect of the invention, the first imaging optical system includes five lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, a fourth lens of positive power, and a fifth lens of negative power in order from the object side, and the second imaging optical system includes five lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, a four lens of negative power, and a fifth lens of negative power in order from the object side.
[0013]
The imaging apparatus from a seventh aspect of the invention is characterized by that, in any one of the first to sixth aspect of the invention, a following conditional expression (5) is satisfied.

$$0.6 < FNOw/FNOm < 1.3... (5)$$

wherein,
FNOw: F-number of the first imaging optical system, and
FNOm: F-number of the second imaging optical system.
[0014]

The imaging apparatus from an eighth aspect of the invention is characterized by that, in any one of the first to seventh aspect of the invention, a following conditional expression (6) is satisfied.

$$0.7 < TLm/fm < 1.0... (6)$$

wherein,

TLm: Entire lens length (distance from the face nearest to the object side to the image face) of the second imaging optical system, and fm: Focal length of the entire second imaging optical system.

[0015]

The imaging apparatus from a ninth aspect of the invention is characterized by that, in any one of the first to eighth aspect of the invention, a following conditional expression (7) is satisfied.

$$1.0 < TLw/fw < 1.4... (7)$$

wherein,

TLw: Entire lens length (distance from the face nearest to object side to the image face) of the first imaging optical system, and

fw: Focal length of the entire first imaging optical system.

[0016]

The imaging apparatus from a tenth aspect of the invention is characterized by that, in any one of the first to ninth aspect of the invention, further including an imaging device that converts an optical image formed in the first and second imaging optical systems into an electrical signal, and the electronic zoom is performed using the signal acquired by the imaging device, wherein a following conditional expression (8) is satisfied.

$$3 < PX/ZR < 6... (8)$$

wherein,

PX: The number of pixels (megapixel) of the imaging device, and

ZR: Entire electronic zoom ratio (power) from the wide angle end to the telescopic end.

EFFECT OF THE INVENTION

[0017]

The configuration of the present invention can achieve a high-performance thin and small imaging apparatus capable of acquiring an image of high quality and high resolution over a wide variable power region.

BRIEF DESCRIPTION OF THE DRAWINGS

[0018]

FIG. 1 a sectional view illustrating optical configuration of a first imaging optical system in accordance with a first embodiment (Example 1).

FIG. 2 a vertical aberration view illustrating the first imaging optical system in Example 1 at an infinite object distance.

FIG. 3 a vertical aberration view illustrating the first imaging optical system in Example 1 at an object distance of 10 cm.

FIG. 4 a horizontal aberration view illustrating the first imaging optical system in Example 1 at the infinite object distance.

FIG. 5 a horizontal aberration view illustrating the first imaging optical system in Example 1 at an object distance of 10 cm.

FIG. 6 a sectional view illustrating optical configuration of a second imaging optical system in the first embodiment (Example 1).

FIG. 7 a vertical aberration view illustrating the second imaging optical system in Example 1 at the infinite object distance.

FIG. 8 a vertical aberration view illustrating the second imaging optical system in Example 1 at an object distance of 10 cm.

FIG. 9 a horizontal aberration view illustrating the second imaging optical system in Example 1 at the infinite object distance.

FIG. 10 a horizontal aberration view illustrating the second imaging optical system in Example 1 at an object distance of 10 cm.

FIG. 11 a sectional view illustrating optical configuration of a first imaging optical system in a second embodiment (Example 2).

FIG. 12 a vertical aberration view illustrating the first imaging optical system in Example 2 at the infinite object distance.

FIG. 13 a vertical aberration view illustrating the first imaging optical system in Example 2 at an object distance of 10 cm.

FIG. 14 a horizontal aberration view illustrating the first imaging optical system in Example 2 at an infinite object distance.

FIG. 15 a horizontal aberration view illustrating the first imaging optical system in Example 2 at an object distance of 10 cm.

FIG. 16 a sectional view illustrating optical configuration of a second imaging optical system in the second embodiment (Example 2).

FIG. 17 a vertical aberration view illustrating the second imaging optical system in Example 2 at the infinite object distance.

FIG. 18 a vertical aberration view illustrating the second imaging optical system in Example 2 at an object distance of 10 cm.

FIG. 19 a horizontal aberration view illustrating the second imaging optical system in Example 2 at the infinite object distance.

FIG. 20 a horizontal aberration view illustrating the second imaging optical system in Example 2 at an object distance of 10 cm.

FIG. 21 a schematic view illustrating exemplified configuration of digital equipment including first and second imaging optical units.

FIG. 22 an outline view illustrating exemplified configuration of the first and second imaging optical units including the first and second imaging optical systems.

FIG. 23 an outline view illustrating exemplified configuration of digital equipment including the first and second imaging optical units.

EXAMPLES FOR CARRYING OUT THE INVENTION

[0019]

An imaging apparatus according to the present invention will be described below. The imaging apparatus according to the present invention includes single-focus first and second imaging optical systems that face the same direction, a focal length fm of the second imaging optical system is longer than a focal length fw of the first imaging optical system, zooming (fw to fm) is performed from a wide angle end to an intermediate focal length state with an electronic zoom by segmentation of an image acquired in the first imaging optical system, zooming (fm to ft) is performed from the

intermediate focal length state to a telescopic end with an electronic zoom by segmentation of an image acquired in the second imaging optical system, and zooming (fw to ft) from the wide angle end to the telescopic end is performed as a whole. Both of the first and second imaging optical systems includes four or more lenses of first lenses of positive power (power: quantity defined as a reciprocal of the focal length) and second lenses of negative power in order from the object side, the lenses nearest to the image side are negative lenses, and composite focal lengths of the first lenses and the second lenses are positive, and satisfy a conditional expression (1). In the intermediate focal length state as the switch point between the first and second imaging optical systems, the image acquired in the second imaging optical system is preferably used. However, as necessary, the image acquired in the first imaging optical system may be used.

$$1.0 < fFw/fFm < 1.5... (1)$$

wherein,

fFw: Composite focal lengths of the first lenses and the second lenses in the first imaging optical system, and

fFm: Composite focal lengths of the first lenses and the second lenses in the second imaging optical system.

[0020]

The imaging optical system having the optical zoom function includes a large mechanism, which is unsuitable for portable equipment. Thus, the electronic zoom can be adopted. However, when the electronic zoom is performed in one imaging optical system, to acquire a large variable power ratio, the number of pixels at the telescopic end is too small, such that an excellent image cannot be acquired. Therefore, in order to achieve a large variable power ratio and acquire an excellent image, as well as to omit any large part such as a zoom drive mechanism to facilitate incorporation into small-sized portable equipment, a twin-lens electronic zoom function is preferably adopted.

[0021]

To acquire an excellent image, also when the electronic zoom is performed, a sufficient number of pixels are required. Therefore, the number of pixels before the electronic zoom must be sufficiently large. For example, the number of pixels is preferably three million pixels (3 megapixel) or more. Even when the electronic zoom is performed, to acquire the above-mentioned number of pixels, an imaging device (that is, a large-sized sensor) having a large number of pixels such as 10 megapixels is required. Therefore, even the device having a large number of pixels needs to have a high performance. For this reason, at least four lenses are needed.

[0022]

To form the imaging apparatus as a thin module, the first imaging optical system and the second imaging optical system also must be small. Therefore, the relationship between the optical systems, rather than each of them, is important. For achieving miniaturization and high performance, in both of the optical systems, it is preferred that the lens nearest to the object side is a positive lens, a negative lens is disposed at the image side, the composite focal lengths fFw, fFm of the first lenses and the second lenses are positive, and the lens nearest to the image side is a negative lens.

[0023]

As a whole, a telephoto type (the object side is positive power and the image side is negative power) is suitable for miniaturization. At this time, the first lens and the second lens that constitute a front group are the positive lens and the negative lens,

APPL-1015 / Page 8 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2462

respectively, which is suitable in terms of the chromatic aberration and the compensation of Petzval sum. Further, one of conditions for constituting the telephoto type is that the lens nearest to the image side in the negative lens. At this time, preferably, the ratio of the focal lengths of the front group including the first and second lenses satisfies the conditional expression (1).

[0024]

That the ratio falls below a lower limit of the conditional expression (1) means that the focal length of the front group in the second imaging optical system is shorter than the focal length of the front group in the first imaging optical system (that is, power is larger). That is, since the entire focal length of the second imaging optical system is relatively long, positive power becomes weak as a whole. On the contrary, the condition for making the power larger than the power of the front group in the first imaging optical system having a small entire focal length is defined as the lower limit. By satisfying the conditional expression (1), the telephoto tendency of the second imaging optical system can be increased to advantageously reduce the entire length of the apparatus. Conversely, when the ratio exceeds un upper limit of the conditional expression (1), the front group in the second imaging optical system becomes too strong to deteriorate performance and error accuracy, failing to acquire excellent image quality.

[0025]

The above-mentioned characteristic configuration can realize a high-performance slim and small-sized imaging apparatus (for example, digital equipment such as digital cameras, mobile phones, and personal digital assistants) capable of acquiring an image of high resolution and high image quality over the entire wide variable power region. Conditions for acquiring such effect with a good balance, and achieving much higher optical performance, slimming-down, and miniaturization will be described below.

[0026]

Desirably, following conditional expressions (2A) and (2B) are satisfied.

$$fFw/fw > 1... (2A)$$
$$fFm/fm < 1... (2B)$$

wherein,
fw: Focal length of the entire first imaging optical system, and
fm: Focal length of the entire second imaging optical system.

[0027]

The ratio of the focal length of the front group to the focal length of the entire system is an important factor indicating the telephoto property. That the conditional expressions (2A) and (2B) are satisfied means that the power of the front group of the first imaging optical system is smaller than the power of the entire systems, while the power of the second imaging optical system is larger than the power of the entire system. By satisfying the conditional expressions (2A) and (2B), the condition for reducing the entire length of the intermediate focal length state while ensuring the performance of the wide angle end can be satisfied.

[0028]

Desirably, a following conditional expression (3) is satisfied.

$$-0.6 < fXw/fXm < 0.5... (3)$$

wherein,

fXw: Focal length of the second lens from the image side in the first imaging optical system, and

fXm: Focal length of the second lens from the image side in the second imaging optical system.

The second lens from the image side is a lens on the object side from the lens nearest to the image side. It is the third lens in the four-lens configuration, and the third lens in the five-lens configuration.

[0029]

In the second imaging optical system, despite that the focal length of the entire system is long, the entire length needs to be reduced. In terms of the telephoto property, it is effective to satisfy the conditional expressions (1), (2A), and (2B). However, it is also important to identify the power of a rear group. Since the lens nearest to the image side is located near the image, the lens does not affect a back change due to the focal length and the entire length so much. However, the focal length of the lens located at the object side has an important role on the entire length and performance.

[0030]

A lower limit of the conditional expression (3) means that the lens power of the second imaging optical system is small (or negative) than the lens power of the first imaging optical system, and indicates its extent. By satisfying the conditional expression (3), the entire length of the second imaging optical system can be reduced while ensuring the performance of the first imaging optical system. If the ratio falls below the lower limit of the conditional expression (3), when the rear group has large negative power to respond to the performance request of the second imaging optical system, the entire lens configuration can largely change, failing to satisfy requirements for high-performance and slimming-down.

[0031]

Desirably, a following conditional expression (3a) is satisfied.

$$-0.6 < fXw/fXm < 0 ... (3a)$$

The conditional expression (3a) defines a more preferable condition range based on the above-mentioned terms than the range defined by the conditional expression (3), and is characterized by sign change. That is, the first imaging optical system is a positive lens, and the second imaging optical system is a negative lens. Although it obviously exhibits the telephoto property, this numerical range can achieve further miniaturization and higher performance. Therefore, preferably, by satisfying the conditional expression (3a), the above-mentioned effect can be further increased.

[0032]

Desirably, a following conditional expression (4) is satisfied.

$$94 > 2\omega w > 72 ... (4)$$

wherein,

$2\omega w$: Entire viewing angle [deg] of the first imaging optical system.

[0033]

When the viewing angle exceeds an upper limit of the conditional expression (4), the wide angle of the zoom lens becomes too large, and when the viewing angle falls below a lower limit of the conditional expression (4), the entire focal length is located at the telescopic side, leading to scaling-up. In addition, when the viewing angel

at the wide angle end is small, the focal length at the intermediate position and the entire lens length can increase.

[0034]

More desirably, a following conditional expression (4a) is satisfied.

$$90 > 2\omega w > 75... (4a)$$

The conditional expression (4a) defines a more preferable condition range based on the above-mentioned terms than the range defined by the conditional expression (4). Therefore, preferably, by satisfying the conditional expression (4a), the above-mentioned effect can be further increased.

[0035]

Desirably, the first imaging optical system includes four lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, and fourth lens of negative power in order from the object side, and the second imaging optical system includes four lenses of a first lens of positive power, a second lens of negative power, a third lens of negative power, and a fourth lens of negative power in order from the object side. Desirably, the first imaging optical system includes five lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, a fourth lens of positive power, and a fifth lens of negative power in order from the object side, and the second imaging optical system includes five lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, a fourth lens of negative power, and a fifth lens of negative power in order from the object side.

[0036]

As described above, when the first imaging optical system includes four lenses of positive, negative, positive, and negative, when the second imaging optical system includes four lenses of positive, negative, negative, and negative, when the first imaging optical system includes five lenses of positive, negative, positive, positive, and negative, or when the second imaging optical system includes five lenses of positive, negative, positive, negative, and negative, the first imaging optical system is advantageous for compensating field curvature and chromatic aberration, and the second imaging optical system has a high telephoto property and is advantageous for reducing the entire length.

[0037]

Desirably, a following conditional expression (5) is satisfied.

$$0.6 < FNOw/FNOm < 1.3... (5)$$

wherein,
FNOw: F-number of the first imaging optical system, and
NOm: F-number of the second imaging optical system.

[0038]

When F-numbers are different from each other at switching, the impression of blurring greatly changes, giving an unnatural feeling to the user. Thus, it is preferred that the F-numbers of the first and second imaging optical systems are close to each other so as to satisfy the conditional expression (5). To slim down the entire apparatus, it is advantageous to make the second imaging optical system darker than the first imaging optical system.

[0039]

More desirably, a following conditional expression (5a) is satisfied.

$$0.7 < FNOw/FNOm < 1.1... (5a)$$

The conditional expression (5a) defines a more preferable condition range based on the above-mentioned terms than the range defined by the conditional expression (5). Therefore, preferably, by satisfying the conditional expression (5a), the above-mentioned effect can be further increased.

[0040]

Desirably, a following conditional expression (6) is satisfied.

$$0.7 < TLm/fm < 1.0... (6)$$

wherein,

TLm: Entire lens length (distance from the face nearest to the object side (first face) to the image face) of the second imaging optical system, and

fm: Focal length of the entire second imaging optical system.

[0041]

To slim down the second imaging optical system, the telescopic ratio needs to be reduced. However, in keeping a good balance with performance, the conditional expression (6) is preferably satisfied. When the ratio falls below a lower limit of the conditional expression (6), power can increase, leading to aberration deterioration. Further, the difference between the first and second imaging optical systems in performance can become large, causing image deterioration at switching.

[0042]

Desirably, a following conditional expression (7) is satisfied.

$$1.0 < TLw/fw < 1.4... (7)$$

wherein,

TLw: Entire lens length (distance from the face nearest to object side to the image face) of the first imaging optical system, and

fw: Focal length of the entire first imaging optical system.

[0043]

The first imaging optical system can be made slim. However, a too slim system has poor performance. To keep a good balance with the thickness of the second imaging optical system while keeping the performance, it is preferred that the conditional expression (7) is satisfied.

[0044]

Desirably, an imaging device that converts an optical image formed in each of the first and second imaging optical systems into an electrical signal is provided, the electronic zoom is performed using the signals acquired by the imaging device, and a following conditional expression (8) is satisfied.

$$3 < PX/ZR < 6... (8)$$

wherein,

PX: The number of pixels (megapixel) of the imaging device, and

ZR: Entire electronic zoom ratio (power) from the wide angle end to the telescopic end.

[0045]

The conditional expression (8) defines a suitable balance between the entire zoom ratio and the number of pixels. Generally, the image quality of about three million to four million pixels is demanded. To acquire an excellent image quality with the electronic zoom, the conditional expression (8) is desirably satisfied. When the ratio exceeds an upper limit of the conditional expression (8), it is difficult to ensure a sufficient variable power ratio with respect to the number of pixels of the sensor, failing to acquire a wide variable power range. When the ratio falls below a lower limit of the conditional expression (8), the minimum number of pixels becomes too small, failing to acquire a sufficiently high image quality. Here, it is assumed that the zoom ratio of the electronic zoom of the first imaging optical system is the same as the zoom ratio of the electronic zoom of the second imaging optical system, and one common imaging device or two imaging devices having the same number of pixels are used.

[0046]

The first and second imaging optical systems according to the present invention are suitable for digital equipment having an image input function (for example, imaging apparatuses such as mobile phones with camera, and digital cameras), and can be combined with the imaging device to constitute imaging optical units capable of optically capturing an image of a subject and outputting the captured image as an electrical signal. The imaging optical units are optical apparatuses that constitute main components of a camera used to take static images and moving images of a subject, and for example, include first and second imaging optical systems that form an optical image of an object (that is, subject) and an imaging device that converts the optical image formed by the first and second imaging optical systems into an electrical signal, in order from the object. By disposing the first and second imaging optical systems having the above-mentioned characteristic configuration so as to form the optical image of the subject on a light reception face (that is, imaging face) of the imaging device, a thin and small-sized imaging optical units having high variable power and high performance, and digital equipment equipped with the imaging optical units can be realized at low costs.

[0047]

Examples of the digital equipment having the image input function include cameras such as digital cameras, video camera, monitor cameras, vehicle-borne cameras, and videophone cameras, as well as cameras internal and external to personal computers, portable terminals (for example, small portable information equipment terminals such as mobile phones and mobile computers), peripheral equipment (scanner, printer, and so on), and other digital equipment. As apparent from these examples, the imaging optical units can constitute the camera, and the imaging optical units can be built in various equipment to add the camera function. For example, it is possible to constitute digital equipment having the image input function, such as mobile phones with camera.

[0048]

FIG. 21 is a schematic sectional view illustrating exemplified configuration of a digital equipment DU as the digital equipment having the image input function, and FIG. 22 is an outline view illustrating schematic configuration of first and second imaging optical units LU1 and LU2 including first and second imaging optical systems LN1 and LN2, respectively. As illustrated in FIG. 21, the imaging optical units LU1 and LU2 installed in the digital equipment DU include, in order from an object (that is, subject), the single-focus first and second imaging optical systems LN1 and LN2 (AX1, AX2: optical axes) for forming optical images (image faces) IM1 and IM2 of the object,

parallel plates PT1 and PT2 (corresponding to cover glasses of imaging devices SR1 and SR2; optical filter disposed as necessary, such as optical low filter and infrared cut filter), and the first and second imaging devices SR1 and SR2 for converting the optical images IM1 and IM2, which are formed on rectangular light reception faces (imaging face) SS1 and SS2 by the first and second imaging optical systems LN1 and LN2, into electrical signals. When the imaging optical units LU1 and LU2 constitute the digital equipment DU having the image input function, the imaging optical units LU1 and LU2 are generally arranged in the body. However, any other shape can be adopted as necessary to realize the camera function. For example, the imaging optical units LU1 and LU2 can be detachably or rotatably attached to the body of the digital equipment DU.

[0049]

The first and second imaging optical systems LN1 and LN2 are single focus lenses that face the same direction as described above and form the optical images IM1 and IM2 on the imaging faces SS1 and SS2 of the imaging devices SR1 and SR2, respectively. The focal length fm of the second imaging optical system LN2 is longer than the focal length fw of the first imaging optical system LN1, zooming (fw or more, and less than fm) is performed from the wide angle end to the intermediate focal length state with the electronic zoom by segmentation of the image (optical image IM1) acquired in the first imaging optical system LN1, and zooming (fm or more, and ft or less) is performed from the intermediate focal length state to the telescopic end with the electronic zoom by segmentation of the image (optical image IM2) acquired in the second imaging optical system LN2. Thus, zooming (fw to ft) from the wide angle end and the telescopic end is performed as a whole. As necessary, at least one of the imaging optical systems may have the optical zoom function.

[0050]

As illustrated in FIG. 22, the first imaging optical system LN1 and the second imaging optical system LN2 are arranged adjacent to each other. Such arrangement can reduce a parallax as much as possible. When the first and second imaging optical systems LN1 and LN2 are arranged adjacent to each other, the focus drive element is preferably shared. At this time, the first and second imaging optical systems LN1 and LN2 have different focus movements in the case of whole feeding. Thus, more preferably, in the second imaging optical system LN2, focusing is made by driving some lenses or a lens group such that the focus movement of the first imaging optical system LN1 matches the focus movement of the second imaging optical system LN2.

[0051]

Since the first and second imaging optical systems LN1 and LN2 face the same direction, the optical axes AX1 and AX2 are parallel to each other. However, a parallax between the first and second imaging optical systems LN1 and LN2, which is generated depending on the shooting distance by slightly inclining one of the first and second imaging optical systems LN1 and LN2, may be compensated. This means that the first and second imaging optical systems LN1 and LN2 face in the same direction in consideration of the parallax compensation. Thus, the optical axes AX1 and AX2 need not be strictly parallel to each other. In addition, the optical camera shake compensation function may compensate the parallax by inclining the whole inclination of the lens modules, or moving at least some lenses, in one of the first and second imaging optical systems LN1 and LN2. Since a common actuator is used for camera shake compensation and parallax compensation, the imaging apparatus can be effectively slimmed and miniaturized.

[0052]

APPL-1015 / Page 14 of 59
APPLE INC. v. COREPHOTONICS LTD.

FIG. 23 is an outline view illustrating schematic configuration of the digital equipment DU including the first and second imaging optical units LU1 and LU2. The digital equipment DU is a portable equipment having an image input/output function (for example, digital cameras, mobile phones, and portable information equipment terminals) that generates a parallax in the screen lateral direction to achieve stereoscopic vision. The display unit 5 that enables stereoscopic vision with naked eye is provided on the back side (A) of the digital equipment DU, and the first and second imaging optical units LU1 and LU2 are disposed on the front side (B) such that the first imaging optical system LN1 and the second imaging optical system LN2 are separated from each other with a predetermined gap therebetween in the screen lateral direction (the operation unit 4 is provided on the upper side of the digital equipment DU). Since the parallax can be generated by separating the first and second imaging optical systems LN1 and LN2 from each other, using the image acquired in the first imaging optical system LN1 and the image acquired in the second imaging optical system LN2, a three-dimensional vision can be displayed at the focal length fm of the second imaging optical system LN2.

[0053]

A solid imaging device, such as a CCD-type image sensor or a CMOS-type image sensor, which has a plurality of pixels, is used as the imaging devices SR1 and SR2. In the first and second imaging optical systems LN1 and LN2, since the optical images IM1 and IM2 of the subject are formed on the imaging faces SS1 and SS2 that are photoelectric conversion units of the imaging devices SR1 and SR2, the optical images IM1 and IM2 formed by the first and second imaging optical systems LN1 and LN2 each are converted into an electrical signal by the imaging devices SR1 and SR2. Here, although the two imaging devices SR1 and SR2 are used, one imaging device may be commonly used for the first and second imaging optical systems LN1 and LN2.

[0054]

The digital equipment DU (FIG. 21) includes, in addition to the first and second imaging optical units LU1 and LU2, a signal processing unit 1, a control unit 2, a memory 3, an operation unit 4, and a display unit 5. The signals generated by the imaging devices SR1 and SR2 are subjected to predetermined digital image processing, image compression processing, and so on as necessary, in the signal processing unit 1, and are recorded as digital image signals in the memory 3 (semiconductor memory, optical disc, and the like), or, in some cases, are transmitted to other equipment as infrared signals or via a cable (for example, communication function of the mobile phone). The control unit 2 is formed of a microcomputer, and controls various functions including the electronic zoom, an imaging function (a static-image taking function, a moving-image taking function, etc.), and an image reproduction function; a lens moving mechanism for focusing and camera shake compensation. For example, the control unit 2 controls the first and second imaging optical units LU1 and LU2 to take at least either a static image or a moving image of the subject. The display unit 5 includes a display such as a liquid crystal monitor, and displays an image using image signals converted by the imaging devices SR1 and SR2 or image information recorded in the memory 3. The operation unit 4 includes operation members such as an operation button (for example, release button) and an operation dial (for example, imaging mode dial), and transmits information inputted by the operator to the control unit 2.

[0055]

Next, using the first and second embodiments, specific optical configuration of the first and second imaging optical systems LN1 and LN2 will be described below. FIG. 1 is an optical sectional view illustrating lens configuration, optical paths, and so

on of the first imaging optical system LN1 (EX1-w) constituting the first embodiment, and FIG. 6 is an optical sectional view illustrating lens configuration, optical paths, and so on of the second imaging optical system LN2 (EX1-m) constituting the first embodiment. FIG. 11 is an optical sectional view illustrating lens configuration, optical paths, and so on of the first imaging optical system LN1 (EX2-w) constituting the second embodiment, and FIG. 16 is an optical sectional view illustrating lens configuration, optical paths, and so on of the second imaging optical system LN2 (EX2-m) constituting the second embodiment.

[0056]

In the first embodiment, the first imaging optical system LN1 (FIG. 1) includes four lenses of positive, negative, positive, and negative, and the second imaging optical system LN2 (FIG. 6) includes four lenses of positive, negative, negative, and negative. In the second embodiment, the first imaging optical system LN1 (FIG. 11) includes five lenses of positive, negative, positive, positive, and negative, and the second imaging optical system LN2 (FIG. 16) includes positive, negative, positive, negative, and negative. The parallel plates PT disposed on the image side of the first and second imaging optical systems LN1 and LN2 so as to be adjacent to the imaging faces SS1 and SS2 are assumed to be optical low pass filters, IR cut filters, or seal glasses of the solid imaging devices.

EXAMPLES

[0057]

Using construction data in Examples, optical configuration of the imaging apparatus that implements the present invention will be described below more specifically. Here, Examples 1 and 2 (EX1, 2) are numerical examples corresponding to the first and second embodiments, respectively, and optical configuration views illustrating the first and second embodiments (FIG. 1, FIG. 6; FIG. 11, and FIG. 16) illustrate lens configuration of the first and second imaging optical systems LN1 and LN2 in Examples 1 and 2.

[0058]

The construction data in each example shows, face data, face number, radius of curvature r (mm), axial face distance d (mm), refractive index nd with respect to a d line (wavelength of 587.56 nm), and Abbe number vd with respect to the d line, in order from a left column. Faces with face number including * are aspherical, and their shape is defined according to a following equation (AS) using a local Cartesian coordinate system (x, y, z) having the face apex as an origin. Aspherical data includes an aspherical coefficient. It should be noted that the coefficient in undesignated terms in the aspherical data in each example is 0, and in all data, $E - n = \times 10^{-n}$.

$$z = (c \cdot h^2)/[1 + \sqrt{\{1 - (1 + K) \cdot c^2 \cdot h^2\}}] + \Sigma \, (Aj \cdot h^j) \ldots \text{(AS)}$$

wherein,

h: Height ($h^2 = x^2 + y^2$) vertical to a z axis (optical axes AX1 and AX2),

z: Sag amount (with respect to the face apex) in the direction of the optical axes AX1 and AX2 at the height h,

c: Curvature (reciprocal of radius of curvature r) at the face apex,

K: Cone constant,

Aj: j-order aspherical coefficient.

[0059]

Table 1 shows, as various data, the focal length of entire system (fw or fm, unit: mm), the F-number (FNOw or FNOm), the entire lens length at infinite object distance (TLw or TLm, unit: mm), the diagonal length 2Y' of the light reception faces SS1 and SS2 of the imaging devices SR1 and SR2 (Y': maximum image height in the image faces IM1 and IM2), the entire viewing angle (2ωw or 2ωm, °), the focal length (fiw or fim, unit: mm) of i$^{th}$ lens Li (i = 1, 2, 3,...), the composite focal lengths (fFw or fFm, unit: mm) of the first and second lenses L1, L2, the focal length (fXw or fXm, unit: mm) of the second lens LX from the image side, the number of pixels (PX, megapixel) of the imaging devices SR1 and SR2, the minimum number of pixels (megapixel) by segmentation with the electronic zoom, the maximum focal length (mm) by segmentation with the electronic zoom, the electronic zoom ratio (ZR), and the focal length (mm) by 135 conversion. The entire lens length TLw or TLm is a distance from the foremost face (face number: 1) to the image faces IM1 and IM2. Table 2 shows values in the conditional expressions in each Example.
[0060]

FIG. 2 and FIG. 3 are vertical aberration views of the first imaging optical system LN1 in Example 1 (EX1) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. FIG. 7 and FIG. 8 are vertical aberration views of the second imaging optical system LN2 in Example 1 (EX1) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. FIG. 12 and FIG. 13 are vertical aberration views of the first imaging optical system LN1 in Example 2 (EX2) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. FIG. 17 and FIG. 18 are vertical aberration views of the second imaging optical system LN2 in Example 2 (EX2) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. Whole feeding is assumed as a focus mode in performance estimation at the finite object distance (object distance: 10 cm).
[0061]

In each of FIG. 2, FIG. 3; FIG. 7, FIG. 8; FIG. 12, FIG. 13; FIG. 17, FIG. 18, (A) is a spherical aberration view, (B) is an astigmatism view, and (C) is a distortion aberration view. In the spherical aberration view, a spherical aberration amount with respect to the d line expressed as a solid line (wavelength of 587.56 nm), a spherical aberration amount with respect to the C line expressed as a chain line (wavelength of 656.28 nm), and a spherical aberration amount with respect to the g line expressed as a broken line (wavelength of 435.84 nm) each are represented as deviation amount (unit: mm) from a paraxial image face in the direction of optical axes AX1 and AX2, and a vertical axis represents a value acquired by normalizing an incident height to the pupil by the maximum height (that is, relative pupil height). In the astigmatism view, a broken line T represents a tangential image face with respect to the d line and a solid line S represents a sagittal image face with respect to the d line in terms of the deviation amount from the paraxial image face in the direction of the optical axes AX1 and AX2 (unit: mm), and a vertical axis represents the image height (IMG HT, unit: mm). In the distortion aberration view, a horizontal axis represents distortion with respect to the d line (unit: %), and a vertical axis represents the image height (IMG HT, unit: mm). The maximum value of the image height IMG HT corresponds to the maximum image height Y' in the image faces IM1 and IM2 (a half of the diagonal length of the light reception faces SS1 and SS2 of the imaging devices SR1 and SR2).
[0062]

APPL-1015 / Page 17 of 59
APPLE INC. v. COREPHOTONICS LTD.

FIG. 4 and FIG. 5 are horizontal aberration views of the first imaging optical system LN1 in Example 1 (EX1) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. FIG. 9 and FIG. 10 are horizontal aberration views of the second imaging optical system LN2 in Example 1 (EX1) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. FIG. 14 and FIG. 15 are horizontal aberration views of the first imaging optical system LN1 in Example 2 (EX2) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively. FIG. 19 and FIG. 20 are horizontal aberration views of the second imaging optical system LN2 in Example 2 (EX2) at the infinite object distance (object distance: ∞) and the finite object distance (object distance: 10 cm), respectively.

[0063]

In each of FIG. 4, FIG. 5; FIG. 9, FIG. 10; FIG. 14, FIG. 15; FIG. 19, FIG. 20, (A) to (E) are horizontal aberration views at a tangential light flux, and (F) to (J) are horizontal aberration views at a sagittal light flux. Each horizontal aberration view illustrates lateral aberration (mm) at an image height ratio (half viewing angle ω°) represented as RELATIVE FIELD HEIGHT by the solid line: d line (wavelength of 587.56 nm), the chain line: C line (wavelength of 656.28 nm), and the broken line: g line (wavelength of 435.84 nm). The image height ratio is a relative image height acquired by normalizing the image height by the maximum image height Y'.

[0064]

The first imaging optical system LN1 (FIG. 1, EX1-w) in Example 1 includes, in order from the object side, an aperture diaphragm ST, a positive first lens L1, a negative second lens L2, a positive third lens L3, and a negative fourth lens L4, and all of the lens faces are aspherical. When viewed from the paraxial face, the first lens L1 is a positive meniscus lens toward the object side, the second lens L2 is a biconcave negative lens, third lens L3 is a convex positive meniscus lens toward the image, the fourth lens L4 is a biconcave negative lens. All of the lenses are plastic lenses and however, may be glass lenses. Entire feeding focusing is assumed.

[0065]

The second imaging optical system LN2 (FIG. 6, EX1-m) in Example 1 includes, in order from the object side, an aperture diaphragm ST, positive first lens L1, a negative second lens L2, a negative third lens L3, and a negative fourth lens L4, and all of the lens faces are aspherical. When viewed from the paraxial face, the first lens L1 is a convex positive meniscus lens toward the object side, the second lens L2 is a biconcave negative lens, the third lens L3 is a concave negative meniscus lens toward the object side, the fourth lens L4 is a biconcave negative lens. All of the lenses are plastic lenses and however, may be glass lenses. Entire feeding focusing is assumed.

[0066]

The first imaging optical system LN1 (FIG. 11, EX2-w) in Example 2 includes, in order from the object side, an aperture diaphragm ST, a positive first lens L1, a negative second lens L2, a positive third lens L3, positive fourth lens L4, and a negative fifth lens L5, and all of lens faces are aspherical. When viewed from the paraxial face, the first lens L1 is a biconvex positive lens, the second lens L2 is a concave negative meniscus lens toward the image side, the third lens L3 is a convex positive meniscus lens toward the object side, fourth lens L4 is a convex positive meniscus lens toward the image side, the fifth lens L5 is a biconcave negative lens. All of the lenses are plastic lenses and however, may be glass lenses. Entire feeding focusing is assumed.

[0067]

The first imaging optical system LN2 (FIG. 16, EX2-m) in Example 2 includes, in order from the object side, an aperture diaphragm ST, a positive first lens L1, a negative second lens L2, a positive third lens L3, a negative fourth lens L4, and a negative fifth lens L5, and all lens faces are aspherical. When viewed from the paraxial face, the first lens L1 is a convex positive meniscus lens toward the object side, a second lens L2 is a concave negative meniscus lens toward the image side, a third lens L3 is a convex positive meniscus lens toward the object side, a fourth lens L4 is a concave negative meniscus lens toward the object side, and a fifth lens L5 is a biconcave negative lens. All of the lenses are plastic lenses and however, may be glass lenses. Entire feeding focusing is assumed.

[0068]

First imaging optical system LN1 in Example 1
Unit: mm
Face data

| Face number | r | d | nd | vd |
|---|---|---|---|---|
| Object face | ∞ | ∞ | | |
| 1 (Diaphragm) | ∞ | 0.000 | | |
| 2* | 1.135 | 0.455 | 1.54470 | 56.15 |
| 3* | 4.929 | 0.106 | | |
| 4* | -13.457 | 0.300 | 1.63469 | 23.87 |
| 5* | 8.084 | 0.242 | | |
| 6* | -21893.628 | 0.397 | 1.54470 | 56.15 |
| 7* | -1.708 | 0.725 | | |
| 8* | -2.118 | 0.400 | 1.54470 | 56.15 |
| 9* | 1.712 | 0.106 | | |
| 10 | ∞ | 0.110 | 1.51633 | 64.14 |
| 11 | ∞ | 0.200 | | |
| Image face | ∞ | | | |

[0069]

Aspherical data

| Face number | K | A4 | A6 | A8 | A10 | A12 | A14 |
|---|---|---|---|---|---|---|---|
| 2 | 1.132 | -1.01E-01 | -4.36E-01 | 1.01E+00 | -3.63E+00 | 0.00E+00 | 0.00E+00 |
| 3 | -50 | -3.04E-01 | -3.41E-01 | -5.62E-01 | -1.59E+00 | 0.00E+00 | 0.00E+00 |
| 4 | 46.321 | -4.39E-01 | -3.45E-01 | 1.49E+00 | -2.08E+00 | -2.01E-01 | 0.00E+00 |
| 5 | -50 | -1.06E-01 | 1.38E-01 | 3.63E-01 | 1.34E+00 | -1.19E+00 | 0.00E+00 |
| 6 | 50 | 7.51E-02 | -1.73E-01 | 4.42E-02 | 1.16E-01 | -1.70E-01 | 0.00E+00 |
| 7 | -12.577 | -1.36E-01 | 3.68E-01 | -3.45E-01 | 2.00E-01 | -6.20E-02 | 0.00E+00 |
| 8 | 0 | -3.14E-01 | 1.22E-01 | 1.41E-02 | 2.68E-03 | -9.50E-04 | -1.27E-03 |
| 9 | -27.755 | -9.32E-02 | 3.04E-02 | -2.11E-02 | 4.91E-03 | 4.96E-04 | -2.50E-04 |

[0070]

Second imaging optical system LN2 in Example 1
Unit: mm
Face data

| Face number | r | d | nd | vd |
|---|---|---|---|---|
| Object face | ∞ | ∞ | | |
| 1 (Diaphragm) | ∞ | 0.000 | | |
| 2* | 1.001 | 0.548 | 1.54470 | 56.15 |
| 3* | 6.361 | 0.050 | | |
| 4* | -10.735 | 0.300 | 1.63469 | 23.87 |
| 5* | 5.243 | 0.457 | | |
| 6* | -1.751 | 0.300 | 1.54470 | 56.15 |
| 7* | -2.426 | 1.021 | | |
| 8* | -3.987 | 0.400 | 1.54470 | 56.15 |
| 9* | 3.008 | 0.262 | | |

| | | | | |
|---|---|---|---|---|
| 10 | ∞ | 0.110 | 1.51633 | 64.14 |
| 11 | ∞ | 0.200 | | |
| Image face | ∞ | | | |

[0071]

Aspherical data

| Face number | K | A4 | A6 | A8 | A10 | A12 | A14 |
|---|---|---|---|---|---|---|---|
| 2 | 0.222 | -7.13E-03 | 2.33E-01 | 5.01E-01 | -9.32E-01 | 0.00E+00 | 0.00E+00 |
| 3 | -1.95E+01 | -1.81E-01 | -2.57E-01 | 2.18E-01 | -6.66E-02 | 0.00E+00 | 0.00E+00 |
| 4 | -8.218 | -5.94E-02 | -2.10E-01 | 1.26E+00 | -1.65E+00 | 7.66E-01 | 0.00E+00 |
| 5 | 18.999 | 1.58E-01 | 6.91E-01 | -1.08E+00 | 3.38E+00 | 8.27E-01 | 0.00E+00 |
| 6 | -50 | -7.63E-01 | 1.63E+00 | -2.67E+00 | 2.02E+00 | -3.48E-01 | 0.00E+00 |
| 7 | -50 | -2.13E-01 | 4.09E-01 | -2.19E-01 | 7.14E-02 | -4.63E-02 | 0.00E+00 |
| 8 | 0 | -2.33E-01 | 1.27E-01 | -1.65E-02 | -2.95E-03 | 1.02E-03 | -8.08E-05 |
| 9 | -50 | -1.56E-01 | 2.81E-02 | 5.81E-03 | -2.63E-03 | -2.09E-04 | 1.08E-04 |

[0072]

First imaging optical system LN1 in Example 2
Unit: mm
Face data

| Face number | r | d | nd | vd |
|---|---|---|---|---|
| Object face | ∞ | ∞ | | |
| 1 (Diaphragm) | ∞ | 0.100 | | |
| 2* | 1.583 | 0.535 | 1.54470 | 56.15 |
| 3* | -7.954 | 0.050 | | |
| 4* | 86.727 | 0.300 | 1.63469 | 23.87 |
| 5* | 2.182 | 0.334 | | |
| 6* | 7.448 | 0.300 | 1.63469 | 23.87 |
| 7* | 57.053 | 0.539 | | |
| 8* | -5.230 | 0.556 | 1.54470 | 56.15 |
| 9* | -1.093 | 0.280 | | |
| 10 | -6.245 | 0.400 | 1.53048 | 55.72 |
| 11 | 1.182 | 0.516 | | |
| 12 | ∞ | 0.300 | 1.51633 | 64.14 |
| 13 | ∞ | 0.250 | | |
| Image face | ∞ | | | |

[0073]

Aspherical data

| Face number | K | A4 | A6 | A8 | A10 | A12 | A14 |
|---|---|---|---|---|---|---|---|
| 2 | -0.044 | -3.30E-04 | -6.93E-03 | -1.27E-02 | -1.13E-02 | 0.00E+00 | 0.00E+00 |
| 3 | 41.478 | 2.10E-02 | 4.82E-02 | -1.22E-01 | 3.74E-02 | 0.00E+00 | 0.00E+00 |
| 4 | -50 | -6.95E-02 | 1.87E-01 | -2.49E-01 | 1.63E-01 | -3.57E-02 | 0.00E+00 |
| 5 | -9.645 | 9.23E-03 | 1.01E-01 | -9.27E-02 | 5.26E-02 | 0.00E+00 | 0.00E+00 |
| 6 | -10 | -1.14E-01 | 9.59E-03 | 5.60E-02 | 1.32E-02 | -3.15E-02 | 2.39E-03 |
| 7 | -10 | -9.96E-02 | 3.49E-02 | 1.17E-02 | 3.44E-02 | -1.00E-02 | -1.64E-03 |
| 8 | 6.135 | -1.59E-02 | 2.85E-02 | -3.90E-03 | -2.50E-04 | 4.73E-05 | 0.00E+00 |
| 9 | -4.282 | -3.60E-02 | 5.02E-02 | -1.18E-02 | 4.81E-04 | 9.17E-05 | 0.00E+00 |
| 10 | 6.752 | -6.15E-02 | 7.9236E-03 | 1.6618E-03 | -1.87E-04 | 9.66E-07 | 3.77E-06 |
| 11 | -8.272 | -6.71E-02 | 1.5803E-02 | -3.38E-03 | 4.65E-04 | -2.76E-05 | -1.31E-06 |

[0074]

Second imaging optical system LN2 in Example 2
Unit: mm
Face data

| Face number | r | d | nd | vd |
|---|---|---|---|---|
| Object face | ∞ | ∞ | | |
| 1 (Diaphragm) | ∞ | 0.050 | | |
| 2* | 1.364 | 0.530 | 1.54470 | 56.15 |

| | | | | |
|---|---|---|---|---|
| 3* | 88.751 | 0.071 | | |
| 4* | 21.096 | 0.300 | 1.63469 | 23.87 |
| 5* | 2.261 | 0.181 | | |
| 6* | 4.669 | 0.500 | 1.63469 | 23.87 |
| 7* | 6.586 | 1.592 | | |
| 8* | -2.380 | 0.800 | 1.54470 | 56.15 |
| 9* | -9.846 | 0.050 | | |
| 10* | -5.628 | 0.300 | 1.53048 | 55.72 |
| 11* | 15.370 | 0.111 | | |
| 12 | ∞ | 0.300 | 1.51633 | 64.14 |
| 13 | ∞ | 0.121 | | |
| Image face | ∞ | | | |

[0075]

Aspherical data

| Face number | K | A4 | A6 | A8 | A10 | A12 | A14 |
|---|---|---|---|---|---|---|---|
| 2 | 0.153 | 1.38E-02 | -7.55E-03 | 2.15E-02 | -1.49E-02 | 0.00E+00 | 0.00E+00 |
| 3 | -50 | 3.82E-02 | 5.46E-02 | -1.31E-01 | 4.19E-02 | 0.00E+00 | 0.00E+00 |
| 4 | 40.974 | -8.78E-02 | 1.97E-01 | -2.37E-01 | 1.50E-01 | -5.70E-02 | 0.00E+00 |
| 5 | -20.224 | 5.40E-02 | 1.33E-01 | 1.46E-02 | 1.40E-01 | 0.00E+00 | 0.00E+00 |
| 6 | -10 | 2.21E-02 | 1.16E-01 | 3.89E-02 | -1.37E-02 | -3.27E-02 | 8.28E-03 |
| 7 | -10 | 1.05E-01 | 9.54E-02 | -4.58E-02 | 4.26E-02 | 5.53E-03 | -1.91E-02 |
| 8 | -0.226 | -4.11E-02 | -5.66E-02 | 5.73E-02 | -2.77E-02 | 1.12E-03 | 0.00E+00 |
| 9 | 30.588 | -1.09E-01 | 8.44E-03 | -6.32E-03 | 3.35E-03 | -8.67E-04 | 0.00E+00 |
| 10 | 6.752 | -1.54E-01 | 3.00E-02 | -8.96E-04 | -4.30E-04 | 1.43E-04 | -3.32E-06 |
| 11 | -8.272 | -1.29E-01 | 3.68E-02 | -4.67E-03 | 2.52E-04 | -3.73E-05 | 3.70E-06 |

[0076]

[Table 1]

| | | Example 1 | | Example 2 | |
|---|---|---|---|---|---|
| | | LN1 | LN2 | LN1 | LN2 |
| Focal Length of Entire System (mm) | fw or fm | 2.73 | 4.32 | 3.70 | 5.51 |
| Fno | FNOw or FNOm | 4.00 | 4.00 | 3.00 | 4.00 |
| Lens Entire Length (at infinite) (mm) | TLw or TLm | 3.04 | 3.65 | 4.45 | 4.91 |
| Maximum Image Height (mm) | 2Y' | 5.12 | 5.12 | 5.80 | 5.80 |
| Entire Viewing Angle (deg) | 2ωw or 2ωm | 86.32 | 61.28 | 76.18 | 55.52 |
| L1 Focal Length (mm) | f1w or f1m | 2.60 | 2.10 | 2.47 | 2.54 |
| L2 Focal Length (mm) | f2w or f2m | -7.91 | -5.51 | -3.53 | -4.02 |
| L3 Focal Length (mm) | f3w or f3m | 3.14 | -13.70 | 13.47 | 22.96 |
| L4 Focal Length (mm) | f4w or f4m | -1.68 | -3.09 | 2.42 | -5.99 |
| L5 Focal Length (mm) | F5w or f5m | -- | -- | -1.84 | -7.73 |
| Composite Focal lengths of L1 and L2 (mm) | fFw or fFm | 3.48 | 2.91 | 5.48 | 4.84 |
| Focal Length of Lens LX (mm) | fXw or fXm | 3.14 | -13.70 | 2.42 | -5.99 |
| Number of Pixels od Sensor (MagaPixels) | PX | 10.00 | 10.00 | 13.00 | 13.00 |
| Segmented Minimum Number of Pixels (MagaPixels) | | 4.00 | 4.00 | 5.86 | 5.86 |
| Segmented Maximum Focal Length (mm) | | 4.32 | 6.83 | 5.51 | 8.21 |
| Electronic Zoom Ratio (Power) | ZR | | 2.50 | | 2.22 |
| Focal Length (135 Conversion) (mm) | | 23.07 | 36.52 | 27.60 | 41.10 |

[0077]

[Table 2]

| | Conditional Expression | Example 1 | Example 2 |
|---|---|---|---|
| (1) | fFw/fFm | 1.20 | 1.13 |
| (2A) | fFw/fw | 1.27 | 1.48 |
| (2B) | fFm/fm | 0.67 | 0.88 |
| (3) | fXw/fXm | -0.23 | -0.40 |
| (4) | 2ωw | 86.32 | 76.18 |

| (5) | FNOw/FNOm | 1.0 | 0.8 |
|-----|-----------|-----|-----|
| (6) | TLm/fm | 0.84 | 0.89 |
| (7) | TLw/fw | 1.11 | 1.20 |
| (8) | PX/ZR | 3.99 | 5.86 |

[Description of Reference Numerals]

[0078]

| | |
|---|---|
| DU | Digital equipment (imaging apparatus) |
| LU1, LU2 | First and second imaging optical units |
| LN1, LN2 | First and second imaging optical systems |
| L1 to L5 | First to fifth lenses |
| ST | Aperture diaphragm (diaphragm) |
| SR1, SR2 | Imaging device |
| SS1, SS2 | Light reception face (imaging face) |
| IM1, IM2 | Image face (optical image) |
| AX1, AX2 | Optical axis |
| 1 | Signal processing unit |
| 2 | Control unit |
| 3 | Memory |
| 4 | Operation unit |
| 5 | Display unit |

CLAIMS

1.      An imaging apparatus comprising single-focus first and second imaging optical systems that face the same direction, a focal length of the second imaging optical system is longer than a focal length of the first imaging optical system, zooming is performed from a wide angle end to an intermediate focal length state with an electronic zoom by segmentation of an image acquired in the first imaging optical system, zooming is performed from the intermediate focal length state to a telescopic end with an electronic zoom by segmentation of an image acquired in the second imaging optical system, resulting in that zooming from the wide angle end to the telescopic end is performed as a whole, wherein

both of the first and second imaging optical systems LN1 and LN2 includes four or more lenses of first lenses of positive power and second lenses of negative power in order from an object side, the lenses nearest to the image side are negative lenses, and

composite focal lengths of the first lenses and the second lenses are positive, and satisfy a following conditional expression (1):

$$1.0 < fFw/fFm < 1.5... (1)$$

wherein,

fFw: Composite focal lengths of the first lenses and the second lenses in the first imaging optical system, and

fFm: Composite focal lengths of the first lenses and the second lenses in the second imaging optical system.

2.      The imaging apparatus according to claim 1, wherein following conditional expressions (2A) and (2B) are satisfied

$$fFw/fw > 1... (2A)$$
$$fFm/fm < 1... (2B)$$

wherein,

fw: Focal length of the entire first imaging optical system, and

fm: Focal length of the entire second imaging optical system.

3.      The imaging apparatus according to claim 1 or 2, wherein a following conditional expression (3) is satisfied

$$-0.6 < fXw/fXm < 0.5... (3)$$

wherein,

fXw: Focal length of the second lens from the image side in the first imaging optical system, and

fXm: Focal length of the second lens from the image side in the second imaging optical system.

4.      The imaging apparatus according to any one of claims 1 to 3, wherein a following conditional expression (4) is satisfied

$$94 > 2\omega w > 72... (4)$$

wherein, 2ωw: Entire viewing angle [deg] of the first imaging optical system.

5.    The imaging apparatus according to any one of claims 1 to 4, wherein the first imaging optical system includes four lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, and a fourth lens of negative power in order from the object side, and the second imaging optical system includes four lenses of a first lens of positive power, a second lens of negative power, a third lens of negative power, and a fourth lens of negative power in order from the object side.

6.    The imaging apparatus according to any one of claims 1 to 4, wherein the first imaging optical system includes five lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, a fourth lens of positive power, and a fifth lens of negative power in order from the object side, and the second imaging optical system includes five lenses of a first lens of positive power, a second lens of negative power, a third lens of positive power, a fourth lens of negative power, and a fifth lens of negative power in order from the object side.

7.    The imaging apparatus according to any one of claims 1 to 6, wherein a following conditional expression (5) is satisfied

$$0.6 < FNOw/FNOm < 1.3... (5)$$

wherein,
    FNOw: F-number of the first imaging optical system, and
    FNOm: F-number of the second imaging optical system.

8.    The imaging apparatus according to any one of claims 1 to 7, wherein a following conditional expression (6) is satisfied

$$0.7 < TLm/fm < 1.0... (6)$$

wherein,
    TLm: Entire lens length (distance from the face nearest to the object side to the image face) of the second imaging optical system, and
    fm: Focal length of the entire second imaging optical system.

9.    The imaging apparatus according to any one of claims 1 to 8, wherein a following conditional expression (7) is satisfied

$$1.0 < TLw/fw < 1.4... (7)$$

wherein,
    TLw: Entire lens length (distance from the face nearest to object side to the image face) of the first imaging optical system, and
    fw: Focal length of the entire first imaging optical system.

10.    The imaging apparatus according to any one of claims 1 to 9, further comprising an imaging device that converts an optical image formed in each of the first and second imaging optical systems into an electrical signal, wherein the

electronic zoom is performed using the signals acquired by the imaging device, and a following conditional expression (8) is satisfied

$$3 < PX/ZR < 6... (8)$$

wherein,

PX: The number of pixels (megapixel) of the imaging device, and

ZR: Entire electronic zoom ratio (power) from the wide angle end to the telescopic end.

Document Name: Abstract
ABSTRACT

Continuing from front page

| (51)Int. Cl.[6] | | | F1 | | | Theme Code (Reference) |
|---|---|---|---|---|---|---|
| *GO3B* | *19/07* | *(2066.01)* | GO3B | 19/07 | | |
| *HO4N* | *5/232* | *(2006.01)* | HO4N | 5/232 | Z | |

(72) Inventor: Keiko YAMADA

Ishikawa-cho 2970, Hachioji-shi, Tokyo KONICA MINOLTA OPTO INC.

F Term (Reference)

| 2H054 | AA01 | BB05 | BB07 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2H087 | KA01 | LA01 | MA01 | MA05 | PA04 | PA05 | PA17 | PB04 | PB05 | QA02 |
| | QA06 | QA12 | QA14 | QA22 | QA25 | QA26 | QA39 | QA41 | QA42 | QA45 |
| | QA46 | RA05 | RA12 | RA13 | RA34 | RA42 | SA81 | UA01 | | |
| 5C122 | DA03 | DA04 | EA12 | EA37 | FA18 | FB02 | FB03 | FC01 | FC02 | FE02 |
| | FE02 | FE06 | | | | | | | | |

APPL-1015 / Page 26 of 59
APPLE INC. v. COREPHOTONICS LTD.

Document Title: Drawings

[FIG. 1]

[FIG. 2]

EX1-w





(A) EX1-w,∞

(B) EX1-w,∞

(C) EX1-w,∞

Spherical aberration (mm)

Astigmatism (mm)

Distortion aberration (%)

APPL-1015 / Page 27 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2481

[FIG. 3]



[FIG. 4]



[FIG. 5]



[FIG. 6]



[FIG. 7]                                    [FIG. 8]



[FIG. 9]                                    [FIG. 10]

[FIG. 11]                              [FIG. 12]

[FIG. 13]                              [FIG. 14]



[FIG. 15]

[FIG. 16]



[FIG. 17]

[FIG. 18]

[FIG. 19]                                    [FIG. 20]



[FIG. 21]                                    [FIG. 22]

APPL-1015 / Page 32 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2486

[FIG. 23]



APPL-1015 / Page 33 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2487

(19) 日本国特許庁(JP)　　　　(12) 公 開 特 許 公 報(A)　　　　(11)特許出願公開番号

特開2013-106289
(P2013-106289A)

(43) 公開日　平成25年5月30日(2013.5.30)

| (51) Int.Cl. | | | F I | | | テーマコード（参考） |
|---|---|---|---|---|---|---|
| HO4N | 5/228 | (2006.01) | HO4N | 5/228 | Z | 2HO54 |
| HO4N | 5/225 | (2006.01) | HO4N | 5/225 | Z | 2HO87 |
| GO2B | 13/00 | (2006.01) | GO2B | 13/00 | | 5C122 |
| GO2B | 15/00 | (2006.01) | GO2B | 15/00 | | |
| GO2B | 13/18 | (2006.01) | GO2B | 13/18 | | |

審査請求　未請求　請求項の数 10　OL　（全 26 頁）　最終頁に続く

(21) 出願番号　　特願2011-250322 (P2011-250322)
(22) 出願日　　　平成23年11月16日 (2011.11.16)

(71) 出願人　303000408
　　　コニカミノルタアドバンストレイヤー株式
　　　会社
　　　東京都八王子市石川町２９７０番地
(74) 代理人　100085501
　　　弁理士　佐野　静夫
(74) 代理人　100128842
　　　弁理士　井上　温
(72) 発明者　金野　賢治
　　　東京都八王子市石川町２９７０番地　コニ
　　　カミノルタオプト株式会社内
(72) 発明者　松坂　慶二
　　　東京都八王子市石川町２９７０番地　コニ
　　　カミノルタオプト株式会社内

最終頁に続く

(54) 【発明の名称】撮像装置

(57)



APPL-1015 / Page 34 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2488

10

...

20

...
...

...                                                                    30

...                                                                    40

50

APPL-1015 / Page 35 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2489

…

10

…

20

…

30

…

40

(Charge Coupled Device)                    (Complementary Meta
l-Oxide Semiconductor)

50

APPL-1015 / Page 36 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2490

10

20

30

40

...

50

...
...

10

...

APPL-1015 / Page 33 of 59
APPLE INC. v. COREPHOTONICS LTD.

...                                                                              20

30

...                                                                              40

...

50

APPL-1015 / Page 38 of 59
APPLE INC. v. COREPHOTONICS LTD.

...

10

...

20

30

40

50

APPL-1015 / Page 39 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2493

10

...

20

30

40

50

10

...
...

20

30

...

40

50

APPLE INC. v. COREPHOTONICS LTD.

...

10

...

20

...

30

40

...

50

...

10

...

20

...

30

...

40

50

APPL-1015 / Page 43 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2497

10

20

30

40

50

APPL-1015 / Page 44 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2498

10

APPL-1015 / Page 33 of 59
APPLE INC. v. COREPHOTONICS LTD.

20

30

40

50

APPL-1015 / Page 45 of 59
APPLE INC. v. COREPHOTONICS LTD.

10

APPL-1015 / Page 33 of 59
APPLE INC. v. COREPHOTONICS LTD.

20

30

$$\times \qquad {}^{-n}$$

$$2 \qquad\qquad 2 \qquad 2 \qquad\qquad j \qquad \dots$$

40

$$2 \qquad 2 \qquad 2$$

50

…

10

20

30

,

40

。

,　　50

mm

| | r | d | nd | vd |
|---|---|---|---|---|
| 1（    ） | | 0. 000 | | |
| 2* | 1. 135 | 0. 455 | 1. 54470 | 56. 15 |
| 3* | 4. 929 | 0. 106 | | |
| 4* | - 13. 457 | 0. 300 | 1. 63469 | 23. 87 |
| 5* | 8. 084 | 0. 242 | | |
| 6* | - 21893. 628 | 0. 397 | 1. 54470 | 56. 15 |
| 7* | - 1. 708 | 0. 725 | | |
| 8* | - 2. 118 | 0. 400 | 1. 54470 | 56. 15 |

APPL-1015 / Page 48 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2502

| | r | d | nd | vd |
|---|---|---|---|---|
| 9* | 1.712 | 0.106 | | |
| 10 | | 0.110 | 1.51633 | 64.14 |
| 11 | | 0.200 | | |

| | K | A4 | A6 | A8 | A10 | A12 | A14 |
|---|---|---|---|---|---|---|---|
| 2 | 1.132 | -1.01E-01 | -4.36E-01 | 1.01E+00 | -3.63E+00 | 0.00E+00 | 0.00E+00 |
| 3 | -50 | -3.04E-01 | -3.41E-01 | -5.62E-01 | -1.59E+00 | 0.00E+00 | 0.00E+00 |
| 4 | 46.321 | -4.39E-01 | -3.45E-01 | 1.49E+00 | -2.08E+00 | -2.01E-01 | 0.00E+00 |
| 5 | -50 | -1.06E-01 | 1.38E-01 | 3.63E-01 | 1.34E+00 | -1.19E+00 | 0.00E+00 |
| 6 | 50 | 7.51E-02 | -1.73E-01 | 4.42E-02 | 1.16E-01 | -1.70E-01 | 0.00E+00 |
| 7 | -12.577 | -1.36E-01 | 3.68E-01 | -3.45E-01 | 2.00E-01 | -6.20E-02 | 0.00E+00 |
| 8 | 0 | -3.14E-01 | 1.22E-01 | 1.41E-02 | 2.68E-03 | -9.50E-04 | -1.27E-03 |
| 9 | -27.755 | -9.32E-02 | 3.04E-02 | -2.11E-02 | 4.91E-03 | 4.96E-04 | -2.50E-04 |

mm

| | r | d | nd | vd |
|---|---|---|---|---|
| 1( ) | | 0.000 | | |
| 2* | 1.001 | 0.548 | 1.54470 | 56.15 |
| 3* | 6.361 | 0.050 | | |
| 4* | -10.735 | 0.300 | 1.63469 | 23.87 |
| 5* | 5.243 | 0.457 | | |
| 6* | -1.751 | 0.300 | 1.54470 | 56.15 |
| 7* | -2.426 | 1.021 | | |
| 8* | -3.987 | 0.400 | 1.54470 | 56.15 |
| 9* | 3.008 | 0.262 | | |
| 10 | | 0.110 | 1.51633 | 64.14 |
| 11 | | 0.200 | | |

| | K | A4 | A6 | A8 | A10 | A12 | A14 |
|---|---|---|---|---|---|---|---|
| 2 | 0.222 | -7.13E-03 | -2.33E-01 | 5.01E-01 | -9.32E-01 | 0.00E+00 | 0.00E+00 |
| 3 | -1.95E+01 | -1.81E-01 | -2.57E-01 | 2.18E-01 | -6.66E-02 | 0.00E+00 | 0.00E+00 |
| 4 | -8.218 | -5.94E-02 | -2.10E-01 | 1.26E+00 | -1.65E+00 | 7.66E-01 | 0.00E+00 |
| 5 | 18.999 | 1.58E-01 | 6.91E-01 | -1.08E+00 | 3.38E+00 | 8.27E-01 | 0.00E+00 |
| 6 | -50 | -7.63E-01 | 1.63E+00 | -2.67E+00 | 2.02E+00 | -3.48E-01 | 0.00E+00 |
| 7 | -50 | -2.13E-01 | 4.09E-01 | -2.19E-01 | 7.14E-02 | -4.63E-02 | 0.00E+00 |
| 8 | 0 | -2.33E-01 | 1.27E-01 | -1.65E-02 | -2.95E-03 | 1.02E-03 | -8.08E-05 |
| 9 | -50 | -1.56E-01 | 2.81E-02 | 5.81E-03 | -2.63E-03 | -2.09E-03 | 1.08E-04 |

mm

| | r | d | nd | vd |
|---|---|---|---|---|

APPL-1015 / Page 49 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2503

| | r | d | nd | vd | |
|---|---|---|---|---|---|
| 1( ) | | 0.100 | | | |
| 2* | 1.583 | 0.535 | 1.54470 | 56.15 | |
| 3* | -7.954 | 0.050 | | | |
| 4* | 86.727 | 0.300 | 1.63469 | 23.87 | |
| 5* | 2.182 | 0.334 | | | |
| 6* | 7.448 | 0.300 | 1.63469 | 23.87 | |
| 7* | 57.053 | 0.539 | | | |
| 8* | -5.230 | 0.556 | 1.54470 | 56.15 | |
| 9* | -1.093 | 0.280 | | | |
| 10* | -6.245 | 0.400 | 1.53048 | 55.72 | 10 |
| 11* | 1.182 | 0.516 | | | |
| 12 | | 0.300 | 1.51633 | 64.14 | |
| 13 | | 0.250 | | | |

| | K | A4 | A6 | A8 | A10 | A12 | A14 | |
|---|---|---|---|---|---|---|---|---|
| 2 | -0.044 | -3.30E-04 | -6.93E-03 | -1.27E-02 | -1.13E-02 | 0.00E+00 | 0.00E+00 | |
| 3 | 41.478 | 2.10E-02 | 4.82E-02 | -1.22E-01 | 3.74E-02 | 0.00E+00 | 0.00E+00 | |
| 4 | -50 | -6.95E-02 | 1.87E-01 | -2.49E-01 | 1.63E-01 | -3.57E-02 | 0.00E+00 | 20 |
| 5 | -9.645 | 9.23E-03 | 1.01E-01 | -9.27E-02 | 5.26E-02 | 0.00E+00 | 0.00E+00 | |
| 6 | -10 | -1.14E-01 | 9.59E-03 | 5.60E-02 | 1.32E-02 | -3.15E-02 | 2.39E-03 | |
| 7 | -10 | -9.96E-02 | 3.49E-02 | 1.17E-02 | 3.44E-02 | -1.00E-02 | -1.64E-03 | |
| 8 | 6.135 | -1.59E-02 | 2.85E-02 | -3.90E-03 | -2.50E-04 | 4.73E-05 | 0.00E+00 | |
| 9 | -4.282 | -3.60E-02 | 5.02E-02 | -1.18E-02 | 4.81E-04 | 9.17E-05 | 0.00E+00 | |
| 10 | 6.752 | -6.15E-02 | 7.9236E-03 | 1.6618E-03 | -1.87E-04 | 9.66E-07 | 3.77E-06 | |
| 11 | -8.272 | -6.71E-02 | 1.5803E-02 | -3.38E-03 | 4.65E-04 | -2.76E-05 | -1.31E-06 | |

mm    30

| | r | d | nd | vd | |
|---|---|---|---|---|---|
| 1( ) | | 0.050 | | | |
| 2* | 1.364 | 0.530 | 1.54470 | 56.15 | |
| 3* | 88.751 | 0.071 | | | |
| 4* | 21.096 | 0.300 | 1.63469 | 23.87 | |
| 5* | 2.261 | 0.181 | | | |
| 6* | 4.669 | 0.500 | 1.63469 | 23.87 | |
| 7* | 6.586 | 1.592 | | | 40 |
| 8* | -2.380 | 0.800 | 1.54470 | 56.15 | |
| 9* | -9.846 | 0.050 | | | |
| 10* | -5.628 | 0.300 | 1.53048 | 55.72 | |
| 11* | 15.370 | 0.111 | | | |
| 12 | | 0.300 | 1.51633 | 64.14 | |
| 13 | | 0.121 | | | |

| K | A4 | A6 | A8 | A10 | A12 | A14 | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 50 |

APPL-1015 / Page 50 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2504

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | 0.153 | 1.38E-02 | -7.55E-03 | 2.15E-02 | -1.49E-02 | 0.00E+00 | 0.00E+00 |
| 3 | -50 | 3.82E-02 | 5.46E-02 | -1.31E-01 | 4.19E-02 | 0.00E+00 | 0.00E+00 |
| 4 | 40.974 | -8.78E-02 | 1.97E-01 | -2.34E-01 | 1.50E-01 | -5.70E-02 | 0.00E+00 |
| 5 | -20.224 | 5.40E-02 | 1.33E-01 | 1.46E-02 | 1.40E-01 | 0.00E+00 | 0.00E+00 |
| 6 | -10 | 2.21E-02 | 1.16E-01 | 3.89E-02 | -1.37E-02 | -3.27E-02 | 8.28E-03 |
| 7 | -10 | 1.05E-01 | 9.54E-02 | -4.58E-02 | 4.26E-02 | 5.53E-03 | -1.91E-02 |
| 8 | -0.226 | -4.11E-02 | -5.66E-02 | 5.73E-02 | -2.77E-02 | 1.12E-03 | 0.00E+00 |
| 9 | 30.588 | -1.09E-01 | 8.44E-03 | -6.32E-03 | 3.35E-03 | -8.67E-04 | 0.00E+00 |
| 10 | 6.752 | -1.54E-01 | 3.00E-02 | -8.96E-04 | -4.30E-04 | 1.43E-04 | -3.32E-06 |
| 11 | -8.272 | -1.29E-01 | 3.68E-02 | -4.67E-03 | 2.52E-04 | -3.73E-05 | 3.70E-06 |

10

| | | 実施例1 | | 実施例2 | |
|---|---|---|---|---|---|
| | | LN1 | LN2 | LN1 | LN2 |
| 全系の焦点距離[mm] | fw又はfm | 2.73 | 4.32 | 3.70 | 5.51 |
| Fno | FNOw又はFNOm | 4.00 | 4.00 | 3.00 | 4.00 |
| レンズ全長（無限時）[mm] | TLw又はTLm | 3.04 | 3.65 | 4.45 | 4.91 |
| 最大像高[mm] | 2Y' | 5.12 | 5.12 | 5.80 | 5.80 |
| 全画角[deg] | 2ωw又は2ωm | 86.32 | 61.28 | 76.18 | 55.52 |
| L1焦点距離[mm] | f1w又はf1m | 2.60 | 2.10 | 2.47 | 2.54 |
| L2焦点距離[mm] | f2w又はf2m | −7.91 | −5.51 | −3.53 | −4.02 |
| L3焦点距離[mm] | f3w又はf3m | 3.14 | −13.70 | 13.47 | 22.96 |
| L4焦点距離[mm] | f4w又はf4m | −1.68 | −3.09 | 2.42 | −5.99 |
| L5焦点距離[mm] | f5w又はf5m | —— | —— | −1.84 | −7.73 |
| L1－L2合成焦点距離[mm] | fFw又はfFm | 3.48 | 2.91 | 5.48 | 4.84 |
| レンズLXの焦点距離[mm] | fXw又はfXm | 3.14 | −13.70 | 2.42 | −5.99 |
| センサー画素数[MegaPixels] | PX | 10.00 | 10.00 | 13.00 | 13.00 |
| 切出し最小画素数[MegaPixels] | | 4.00 | 4.00 | 5.86 | 5.86 |
| 切出し最大焦点距離[mm] | | 4.32 | 6.83 | 5.51 | 8.21 |
| 電子ズーム比[倍] | ZR | | 2.50 | | 2.22 |
| 焦点距離（135換算）[mm] | | 23.07 | 36.52 | 27.60 | 41.10 |

20

30

| | 条件式 | 実施例1 | 実施例2 |
|---|---|---|---|
| (1) | fFw／fFm | 1.20 | 1.13 |
| (2A) | fFw／fw | 1.27 | 1.48 |
| (2B) | fFm／fm | 0.67 | 0.88 |
| (3) | fXw／fXm | −0.23 | −0.40 |
| (4) | 2ωw | 86.32 | 76.18 |
| (5) | FNOw／FNOm | 1.0 | 0.8 |
| (6) | TLm／fm | 0.84 | 0.89 |
| (7) | TLw／fw | 1.11 | 1.20 |
| (8) | PX／ZR | 3.99 | 5.86 |

40

50

APPL-1015 / Page 51 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2505

10



EX1-w



(A) EX1-w,∞

球面収差 (mm)

(B) EX1-w,∞

非点収差 (mm)

(C) EX1-w,∞

歪曲収差 (%)

APPL-1015 / Page 52 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2506



APPL-1015 / Page 33 of 59
APPLE INC. v. COREPHOTONICS LTD.







APPL-1015 / Page 54 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2508









APPL-1015 / Page 55 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2509







APPL-1015 / Page 56 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2510







APPL-1015 / Page 58 of 59
APPLE INC. v. COREPHOTONICS LTD.
Appx2512

(51)Int.Cl.

| | | |
|---|---|---|
| *19/07* | *(2006.01)* | 19/07 |
| *5/232* | *(2006.01)* | 5/232 |

(72)

( ) 2H054 AA01 BB05 BB07
    2H087 KA01 LA01 NA01 NA05 PA04 PA05 PA17 PB04 PB05 QA02
          QA06 QA12 QA14 QA22 QA25 QA26 QA39 QA41 QA42 QA45
          QA46 RA05 RA12 RA13 RA34 RA42 SA81 UA01
    5C122 DA03 DA04 EA12 EA37 FA18 FB02 FB03 FC01 FC02 FE02
          FE03 FE06

APPL-1015 / Page 59 of 59
APPLE INC. v. COREPHOTONICS LTD.

Appx2513

## OPTICAL AND ELECTRO-OPTICAL ENGINEERING SERIES

# MODERN LENS DESIGN
## A Resource Manual

### WARREN J. SMITH
### GENESEE OPTICS SOFTWARE, INC.

**ROBERT E. FISCHER & WARREN J. SMITH, Series Editors**

APPL-1020 / Page 1 of 88
APPLE INC. v. COREPHOTONICS LTD.
Appx2610

**Chapter**

# 4

# Evaluation:
# How Good Is This Design?

## 4.1 The Uses of a Preliminary Evaluation

At some point in the process of designing an optical system, the designer must decide whether the design is good enough for the application at hand. With modern computing power, it is not a difficult matter to calculate the MTF or the point spread function (PSF), and to accurately include the effects of diffraction in the calculations. The process does consume a finite amount of time, however (which, on a slow computer, may be a significant amount), and it is useful to be able to make a reasonable estimate of the system performance from a more limited amount of data. A good estimate can avoid wasting time and computer paper in evaluating a clearly deficient design, or it can signal an appropriate point at which to conduct a full-dress evaluation.

## 4.2 OPD versus Measures of Performance

The distribution of illumination in the point spread function, particularly in the diffraction pattern of a reasonably well-corrected lens, is often used as a measure of image quality. The *Strehl ratio* (or *Strehl definition*) is the ratio of the illumination at the center of an (aberrated) point image to the illumination at the center of the point image formed by an aberration-free system. Figure 4.1 illustrates the concept. Another measure of image quality uses the percentage of the total energy in the point image which is contained within the diameter of the Airy disk. This diameter remains relatively constant in size for small amounts of aberrations. The table of Fig. 4.2 gives the relationships between the wavefront deformation (or OPD), the Strehl ratio, and the energy distribution.

43

APPL-1020 / Page 55 of 88
APPLE INC. v. COREPHOTONICS LTD.
Appx2664



**Figure 4.1** The Strehl ratio is the illumination at the center of the diffraction pattern of an aberrated image, relative to that of an aberration-free image.

| Relation of Image Quality Measures to OPD | | | | |
|---|---|---|---|---|
| | | | % energy in | |
| P-V OPD | RMS OPD | Strehl Ratio | Airy Disk | Rings |
| 0.0 | 0.0 | 1.00 | 84 | 16 |
| $0.25RL = \lambda/16$ | $0.018\lambda$ | 0.99 | 83 | 17 |
| $0.5RL = \lambda/8$ | $0.036\lambda$ | 0.95 | 80 | 20 |
| $1.0RL = \lambda/4$ | $0.07\lambda$ | 0.80 | 68 | 32 |
| $2.0RL = \lambda/2$ | $0.14\lambda$ | 0.4* | 40 | 60 |
| $3.0RL = 0.75\lambda$ | $0.21\lambda$ | 0.1* | 20 | 80 |
| $4.0RL = \lambda$ | $0.29\lambda$ | 0.0* | 10 | 90 |

*The smaller values of the Strehl ratio do not correlate well with image quality.

**Figure 4.2** Tabulation of the Strehl ratio and the energy distribution as a function of the wavefront deformation. RL means the Rayleigh limit of one-quarter-wavelength peak-to-valley OPD.

Another commonly utilized measure of performance is the modulation transfer function, which describes the image modulation or contrast as a function of the spatial frequency of the object or image. The MTF of a perfect, aberration-free system is given by

$$MTF(v) = \frac{2}{\pi}(\phi - \cos\phi\sin\phi) \qquad (4.1)$$

where

$$\phi = \arccos\left(\frac{\lambda v}{2NA}\right) \qquad (4.2)$$

This is plotted as curve $A$ in Figs. 4.3 and 4.4. Figure 4.3 shows the effect on the MTF of defocusing an otherwise aberration-free lens. The spatial frequency in these plots is normalized to the cutoff frequency

$$v_0 = \frac{2NA}{\lambda} = \frac{1}{\lambda(f\,number)} \qquad (4.3)$$

Figure 4.4 shows the effect of simple third-order spherical aberration on the MTF. Note that, although the curves of Figs. 4.3 and 4.4 are not identical, they *are* quite similar. This similarity of effect is the basis for the common rule of thumb that a given amount of OPD will de-



**Figure 4.3**  The effect of defocusing on the modulation transfer function of an aberration-free system.

| | |
|---|---|
| $(A)$ In focus | OPD = zero |
| $(B)$ Defocus = $\lambda/2n\sin^2 U$ | OPD = $\lambda/4$ |
| $(C)$ Defocus = $\lambda/n\sin^2 U$ | OPD = $\lambda/2$ |
| $(D)$ Defocus = $3\lambda/2n\sin^2 U$ | OPD = $3\lambda/4$ |
| $(E)$ Defocus = $2\lambda/n\sin^2 U$ | OPD = $\lambda$ |
| $(F)$ Defocus = $4\lambda/n\sin^2 U$ | OPD = $2\lambda$ |

(Curves are based on diffraction effects—not on a geometric calculation.)

APPL-1020 / Page 57 of 88
APPLE INC. v. COREPHOTONICS LTD.

Appx2666



**Figure 4.4**  The effect of third-order spherical aberration on the modulation transfer function.
(A) $LA_M$ = zero          OPD = 0
(B) $LA_M = 4\lambda/n \sin^2 U$      OPD = $\lambda/4$
(C) $LA_M = 8\lambda/n \sin^2 U$      OPD = $\lambda/2$
(D) $LA_M = 16\lambda/n \sin^2 U$     OPD = $\lambda$

grade the image by the same amount regardless of what type of aberration produced the OPD.

When the OPD is large (say more than one or two waves), the following geometrical approximation (derived from the geometric defocusing expression) can be used to calculate the MTF with reasonable accuracy:

$$\text{MTF}(v) = \frac{J_1[8\pi n\text{OPD}(v/v_0)]}{4\pi n\text{OPD}(v/v_0)} \quad (4.4)$$

where $v_0$ is the cutoff frequency (Eq. 4.3), $n$ is the index of the image medium, OPD is the peak-to-valley wavefront deformation in waves, and

$$J_1[x] = \frac{x}{2} - \frac{(x/2)^3}{1^2 2} + \frac{(x/2)^5}{1^2 2^2 3} - \cdots$$

The relationships between the basic aberrations and the OPD are given in Sec. F.12, as are the relationships between rms OPD and peak-to-valley OPD and between rms OPD and the Strehl ratio.

A convenient relationship to remember is that a quarter-wave of OPD corresponds to a transverse spherical aberration (either marginal or zonal) of about

$$\text{TA} = \frac{4\lambda}{\text{NA}} \quad (4.5)$$

This is a useful way to make a quick and dirty evaluation from just the ray intercept plots.

APPL-1020 / Page 58 of 88
APPLE INC. v. COREPHOTONICS LTD.

Appx2667

## 4.3 Blur Spot Size versus Certain Aberrations

Many times, the system characteristic of interest is the size of the blur produced as the image of a point source. There are a few simple relationships which are useful in this regard:

Third-order spherical at best focus (three/fourths of the way from paraxial to marginal focus):

$$B = 0.5 \, LA_m \tan U_m = 0.5 TA_m \tag{4.6}$$

Third- and fifth-order spherical (with the marginal spherical corrected, focused at $0.42 \, LA_z$ from the paraxial focus):

$$B = 0.84 \, LA_z \tan U_m = 0.59 \, TA_z \tag{4.7}$$

Third- and fifth-order spherical (corrected so that $LA_z = 1.5 \, LA_m$, or $TA_m = 1.06 \, TA_z$, and focused at $0.83 \, LA_z$ from the paraxial focus; this correction yields the smallest-diameter blur spot for a given amount of fifth-order spherical):

$$B = 0.5 \, LA_m \tan U_m = 0.5 TA_m$$
$$= 0.33 \, LA_z \tan U_m = 0.47 TA_z \tag{4.8}$$

Note that the above are based on the idea of the smallest spot containing 100 percent of the energy in the image of a point. For many applications this concept is valid and useful, but for best image quality there is usually another focus or correction at which the image has a smaller, brighter core and a larger flare; this is usually judged to be better for definition and pictorial purposes.

The effect of a large amount of defocusing on a well-corrected image is to produce a uniformly illuminated blur disk with a diameter of

$$B = 2(\text{defocus}) \tan U_m \approx \frac{\text{defocus}}{f \, \text{number}} \tag{4.9}$$

Astigmatism and field curvature can be evaluated by applying Eq. 4.9 separately in the sagittal and tangential meridians.

Although ordinary axial chromatic is also defocusing, the blur it produces is not uniformly illuminated, but has the energy centrally concentrated. At the midway focus point, the diameter of the blur containing 100 percent of the energy is

$$B = LA_{ch} \tan U_m = TA_{ch} \tag{4.10}$$

However, the central concentration leads to a situation where 75 to 90 percent of the energy is in a spot only half this size, and 40 to 60 percent is in a spot one-quarter as large. (The smaller percentages apply

APPL-1020 / Page 59 of 88
APPLE INC. v. COREPHOTONICS LTD.

Appx2668

for a uniform spectral response distribution and the larger for a triangular spectral distribution.)

For third-order coma, the blur is the typical comet shape, and has a height equal to the tangential coma and a width (in the sagittal direction) two-thirds this size. Note, however, that some 50 to 60 percent of the energy in the coma patch is in the point of the figure, whose size equals one-third the tangential coma.

### 4.4 MTF—The Modulation Transfer Function

The interpretation of an MTF plot is often problematical; it is not the easiest thing in the world to decide how good an image is on the basis of an examination of its MTF plot.

The limiting resolution is easily determined if the system sensor can be characterized by an aerial image modulation (AIM) curve. This is a plot of the threshold, or minimum, modulation required in the image for the sensor to produce a response. When plotted against spatial frequency, the intersection of the AIM curve and the MTF plot clearly indicates the limiting resolution, as shown in Fig. 4.5.



**Figure 4.5** The intersection of the AIM curve and the MTF curve indicates the limiting resolution of the system.

A criterion for *excellent* performance (one which is often used as a design goal for top-of-the-line professional motion picture camera lenses) is to look for a 50 percent MTF at 50 lpm. Another criterion which has been presented for commercial 35-mm camera lenses is 20 percent MTF at 30 lpm over 90 percent of the field. Both criteria are applied at full aperture. These will give some idea of the range of the MTF values which are more or less standard for this type of work.

APPL-1020 / Page 60 of 88
APPLE INC. v. COREPHOTONICS LTD.

Thus one can look at the aberration plots for a given design and, by applying the techniques outlined above, easily visualize what they will look like after an adjustment has been made to fit the design to the application at hand.

### 5.4 Scaling a Design, Its Aberrations, and Its MTF

A lens prescription can be scaled to any desired focal length simply by multiplying all of its dimensions by the same constant. All of the *linear* aberration measures will then be scaled by the same factor. Note however, that percent distortion, chromatic difference of magnification (CDM), the numerical aperture or $f$ number, aberrations expressed as angular aberrations, and any other *angular* characteristics remain completely unchanged by scaling.

The exact *diffraction* MTF cannot be scaled with the lens data. The diffraction MTF, since it includes diffraction effects which depend on wavelength, will not scale because the wavelength is not (ordinarily) scaled with the lens. A *geometric* MTF can be scaled by dividing the spatial frequency ordinate of the MTF plot by the scaling factor. Of course, because it neglects diffraction, the geometric MTF is quite inaccurate unless the aberrations are very large (and the MTF is correspondingly poor).

A diffraction MTF can be scaled *very* approximately as follows: Determine the OPD which corresponds to the MTF value of the lens for several spatial frequencies. This can be done by comparing the MTF plot for the lens to Figs. 4.3 and 4.4, which relate the MTF to OPD. Then multiply the OPD by the scaling factor and, again using Figs 4.3 and 4.4, determine the MTF corresponding to these scaled OPD values. Obviously the accuracy of this procedure depends on how well the simple relationships of Figs. 4.3 and 4.4 represent the usually complex mix of aberrations in a real lens.

In the event that a proposed change of aperture or field is expected to produce a change in the amount of the aberrations, one can attempt to scale the MTF as affected by aberration. This is done by determining the type of aberration which most severely limits the MTF, then scaling the OPD according to the way that this aberration scales with aperture or field, in a manner analogous to that described in Sec. 5.3. In general, OPD as a function of aperture varies as one higher exponent of the aperture than does the corresponding transverse aberration. For example, the OPD for third-order transverse spherical (which varies as $Y^3$) varies as the fourth power of the ray height. In a form analogous to Eqs. 5.3 and 5.4, which indicate a power series expansion of the transverse aberrations as a function of aperture and

APPL-1020 / Page 69 of 88
APPLE INC. v. COREPHOTONICS LTD.

Appx2678

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner

————————————

*Inter partes* review of
U.S. Patent No. 10,225,479

————————————

**DECLARATION OF JOSÉ SASIÁN, PH.D.,
UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITION
FOR INTER PARTES REVIEW**

Embodiment I

$f = 35.0, f_B = 26.1, F/2.9, 2\omega = 63.4°$
$r_1 = 14.1000$

| | | | |
|---|---|---|---|
| | $d_1 = 3.700$ | $n_1 = 1.79952$ | $v_1 = 42.24$ |
| $r_2 = 47.5750$ | | | |
| | $d_2 = 1.800$ | | |
| $r_3 = -81.2140$ | | | |
| | $d_3 = 1.000$ | $n_2 = 1.76182$ | $v_2 = 26.52$ |
| $r_4 = 12.0220$ (aspherical surface) | | | |
| | $d_4 = 1.000$ | | |
| $r_5 = 55.8920$ | | | |
| | $d_5 = 3.000$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = -11.3420$ | | | |
| | $d_6 = 1.000$ | $n_4 = 1.53172$ | $v_4 = 48.90$ |
| $r_7 = -106.9860$ | | | |
| | $d_7 = 1.000$ | | |
| $r_8 = \infty$ (stop) | | | |
| | $d_8 = 2.000$ | | |
| $r_9 = -10.4990$ | | | |
| | $d_9 = 1.500$ | $n_5 = 1.51633$ | $v_5 = 64.15$ |
| $r_{10} = -9.0360$ (aspherical surface) | | | |

aspherical surface coefficients

(4th surface)    $P = 1.0396, A_4 = 0.66373 \times 10^{-4}$
        $A_6 = 0.13983 \times 10^{-5}, A_8 = -0.97157 \times 10^{-8}$
        $A_{10} = 0.42114 \times 10^{-9}$
(10th surface)    $P = 1.3037, A_4 = 0.44302 \times 10^{-4}$
        $A_6 = -0.17498 \times 10^{-5}, A_8 = 0.10177 \times 10^{-6}$
        $A_{10} = -0.17446 \times 10^{-8}$
$D_R/f = 0.043.; f_R/f = 2.660, (R_{2a} - r_{3b})/(r_{2a} + r_{3b}) = 1.347,$
$N_p = 1.717, r_{1a}/r_{2b} = 1.173, (r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -3.829,$
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -3.188$

*Id.*, 7:35-61.

## 2.    *Scaling Ogata would have been obvious*

**37.**    While Ogata was originally described in reference to a "collapsible mount type camera" with a 35 mm focal length, a POSITA would have recognized that, given the prescription data above, the design could be scaled to work in a smaller format such as to support digital image sensors that were more modern than when Ogata issued in 1996. *See* APPL-1020, p.57; APPL-1029; APPL-1030. According to Smith:

A lens prescription can be scaled to any desired focal length simply by multiplying all of its dimensions by the

same constant. All of the linear aberration measures will then be scaled by the same factor. Note however, that percent distortion, chromatic difference of magnification (CDM), the numerical aperture or f number, aberrations expressed as angular aberrations, and any other angular characteristics remain completely unchanged by scaling.

APPL-1026, p.57.

**38.** For example, a POSITA would have recognized that Ogata could have been successfully scaled for a 1/2.5" image sensor, as would have been compatible with image sensors that Parulski would have considered for use in its camera embodiments. *See* APPL-1005, 5:21-35 (indicating that the Kodak Easyshare V610 is a similar prior art camera); APPL-1033, p.62 (indicating a 1/2.5" CCD image sensor in the V610 camera), APPL-1030 (specification sheet for a prior art 1/2.5" CCD sensor); APPL-1029(specification sheet for a prior art 1/2.5" CCD sensor).

**39.** Ogata scaled in this way would have maintained the same field of view ($FOV_W$) of 63.4 degrees and f-number of 2.9 but would have had a lower focal length (EFL) of 5.72 mm and total track length (TTL) of 6.892 mm as a result of the scaling. *See infra* Appendix, Figs. 3A-3C. A POSITA would have recognized that this could have been done in lens design software such as Zemax, as indicated in the model of Ogata Embodiment 1 scaled to support a 1/2.5" mm sensor, shown below:



*See* APPL-1022, pp.254-55 (describing the scaling function in Zemax).

## VI.   A POSITA WOULD HAVE FOUND IT OBVIOUS TO SCALE KAWAMURA FOR A 1/2.5" IMAGE SENSOR

### *1.    Summary of Kawamura*

**40.**    Kawamura is titled "Telephoto Lens" and describes a "telephoto lens of a four-group, five-lens configuration." APPL-1012, p.1. Kawamura's telephoto lens system is designed to "provide a lens that keeps a compactness of an overall length to a conventional level of a telephoto ratio of about 0.96 to 0.88" and "has an

### 2.    *Scaling Kawamura would have been obvious*

**43.**    While Kawamura was originally described in reference to a 150-200 mm focal length (*see* APPL-1012, p.1), a POSITA would have recognized that, given the prescription data above, the design could have been scaled to work in a smaller format such as to support digital image sensors that were more modern than when Kawamura published in 1983. *See* APPL-1020, p.57; APPL-1029; APPL-1030. According to Smith:

> A lens prescription can be scaled to any desired focal length simply by multiplying all of its dimensions by the same constant. All of the linear aberration measures will then be scaled by the same factor. Note however, that percent distortion, chromatic difference of magnification (CDM), the numerical aperture or f number, aberrations expressed as angular aberrations, and any other angular characteristics remain completely unchanged by scaling.

APPL-1026, p.57.

**44.**    For example, a POSITA would have recognized that Kawamura could be successfully scaled for a 1/2.5" image sensor, as would have been compatible with image sensors that Parulski would have considered for use in its camera embodiments. *See* APPL-1005, 5:21-35 (indicating that the Kodak Easyshare V610 is a similar prior art camera); APPL-1033, p.62 (indicating a 1/2.5" CCD image

sensor in the V610 camera), APPL-1030 (specification sheet for a prior art 1/2.5"

CCD sensor); APPL-1029(specification sheet for a prior art 1/2.5" CCD sensor).

**45.**　　Kawamura scaled in this way would have maintained the same field

of view (FOV$_W$) of 24.3 degrees and f-number of 4.0 but would have had a lower

focal length (EFL) of 16.33 mm and total track length (TTL) of 15.343 mm as a

result of the scaling. A POSITA would have recognized that this could have been

done in lens design software such as Zemax, as indicated in the model of

Kawamura Example 1 scaled to support a 1/2.5" mm sensor, shown below:



*See* APPL-1022, pp.254-55 (describing the scaling function in Zemax).

Declaration of José Sasián, Ph.D.
*Inter Partes* Review of U.S. Patent 10,225,479

**C.    Fig. 3 - Ogata scaled to fill a 1/2.5" image sensor using Zemax (v.02/14/2011)**

*1.    Fig. 3A – Ray Trace Diagram*



Declaration of José Sasián, Ph.D.
*Inter Partes* Review of U.S. Patent 10,225,479

**2.     Fig. 3B - Analysis**





Declaration of José Sasián, Ph.D.
*Inter Partes* Review of U.S. Patent 10,225,479

### 3.    *Fig. 3C – Prescription Data*





**A.    Fig. 4 - Kawamura scaled to fill a 1/2.5" image sensor using Zemax (v.02/14/2011)**

     *1.    Fig. 4A – Ray Trace Diagram*



### 2.    *Fig. 4B - Analysis*





Declaration of José Sasián, Ph.D.
*Inter Partes* Review of U.S. Patent 10,225,479

### 3.    *Fig. 4C – Prescription Data*



| | Surf:Type | Comment | Radius | Thickness | Glass | Semi-Diameter | Conic | Par 0(unu |
|---|---|---|---|---|---|---|---|---|
| OBJ | Standard | | Infinity | Infinity | | Infinity | 0.000000000 | |
| 1 | Standard | | 7.102970854 | 0.422095076 | 1.62,60.3 | 3.655374766 | 0.000000000 | |
| 2 | Standard | | 4.013660748 | 4.561006589 | | 3.110214447 | 0.000000000 | |
| 3 | Standard | | 4.748882735 | 0.506639342 | 1.67,32.1 | 1.945399231 | 0.000000000 | |
| 4 | Standard | | Infinity | 0.337550810 | | 1.911325462 | 0.000000000 | |
| 5 | Standard | | 1.908821651 | 0.608092462 | 1.66,51.0 | 1.286852439 | 0.000000000 | |
| 6 | Standard | | 10.46407512 | 0.202906238 | 1.66,35.9 | 1.147388050 | 0.000000000 | |
| 7 | Standard | | 1.372122125 | 0.472821636 | | 0.817830826 | 0.000000000 | |
| STO | Standard | | Infinity | 0.506639342 | | 0.646324235 | 0.000000000 | |
| 9 | Standard | | -1.59068471 | 0.202906238 | 1.76,26.0 | 0.847367996 | 0.000000000 | |
| 10 | Standard | | -2.34281555 | 0.016908853 | | 1.003474956 | 0.000000000 | |
| 11 | Standard | | -14.8760333 | 0.583042309 | 1.62,60.3 | 1.185622539 | 0.000000000 | |



| | Surf:Type | Comment | Radius | Thickness | Glass | Semi-Diameter | Conic | Par 0(unu |
|---|---|---|---|---|---|---|---|---|
| OBJ | Standard | | Infinity | Infinity | | Infinity | 0.000000000 | |
| 1 | Standard | | 7.102970854 | 0.422095076 | 1.62,60.3 | 3.655374766 | 0.000000000 | |
| 2 | Standard | | 4.013660748 | 4.561006589 | | 3.110214447 | 0.000000000 | |
| 3 | Standard | | 4.748882735 | 0.506639342 | 1.67,32.1 | 1.945399231 | 0.000000000 | |
| 4 | Standard | | Infinity | 0.337550810 | | 1.911325462 | 0.000000000 | |
| 5 | Standard | | 1.908821651 | 0.608092462 | 1.66,51.0 | 1.286852439 | 0.000000000 | |
| 6 | Standard | | 10.46407512 | 0.202906238 | 1.66,35.9 | 1.147388050 | 0.000000000 | |
| 7 | Standard | | 1.372122125 | 0.472821636 | | 0.817830826 | 0.000000000 | |
| STO | Standard | | Infinity | 0.506639342 | | 0.646324235 | 0.000000000 | |
| 9 | Standard | | -1.59068471 | 0.202906238 | 1.76,26.0 | 0.847367996 | 0.000000000 | |
| 10 | Standard | | -2.34281555 | 0.016908853 | | 1.003474956 | 0.000000000 | |
| 11 | Standard | | -14.8760333 | 0.583042309 | 1.62,60.3 | 1.185622539 | 0.000000000 | |

# ZEMAX®

## Optical Design Program

## User's Manual

## February 14, 2011



ZEMAX Development Corporation
support@zemax.com
**www.zemax.com**

The dispersion data will be extracted from the glass catalog and placed in the black box file. The exception is for gradient index surfaces as described below.

-Index data for gradient index surfaces is generally defined in parameter data that is encrypted within the black box. Gradient 5 surfaces, when converted to a black box, store the gradient polynomial parameters in encrypted form, but the dispersion data remains as defined in the unencrypted SGRIN.DAT file normally installed with ZEMAX. See "Gradient 5" on page 299 for more information. Gradient 6 surfaces, which use dispersion data defined in the GLC.DAT file, also use the unencrypted data in that file normally installed with ZEMAX.

The encryption is based upon a 256-bit algorithm that provides good, but not unbreakable security. This feature is provided as is and the user should determine if the encryption implemented provides adequate security for the intended application before distributing sensitive data in the encrypted format. ZEMAX Development Corporation provides no warranty and assumes no liability for the use of this feature.

# *Miscellaneous*

## *Reverse Elements*

*Purpose:*

Reverses a lens element or group.

*Settings:*

| Item | Description |
|------|-------------|
| First Surface | This is the first surface of the lens group to be reversed. |
| Last Surface | The last surface of the lens group to be reversed. |

*Discussion:*

The feature may not work correctly in all cases if mirrors, coordinate breaks, multi-configuration controlled data, surface tilts and decenters, or non-standard surfaces are included in the range of surfaces. Solves on data affected by the reversal are removed by this feature. Check the reversed system results carefully to verify that the desired result was achieved.

## *Scale Lens*

*Purpose:*

Scale will scale the entire lens by the specified factor. This is useful for scaling an existing design to a new focal length, for example. Wavelengths are not scaled. The scale lens feature may also be used to change the units from mm to inches, or other combinations of unit types.

*Settings:*

| Item | Description |
|------|-------------|
| Scale by factor | If selected, then a scale factor may be entered directly. |
| Scale by units | If selected, then the lens will be converted by the selected units. |

*Discussion:*

Scaling of data is performed based upon the units of measure for the data. If the scale factor is X, then data measured in lens units of length will be scaled by the factor X. Data measured in units of lens units squared (such as millimeters squared) will be scaled by X squared. Some polynomial coefficients, such as those on the Even Aspheric surface, have units that change from term to term, and ZEMAX accounts for this when scaling the data. Other parameters, such as the conic constant, are dimensionless, and are therefore not scaled.

APPL-1022 / Page 254 of 789
APPLE INC. v. COREPHOTONICS LTD.
Appx3014

US005546236A

# United States Patent [19]

## Ogata et al.

[11] **Patent Number:** **5,546,236**

[45] **Date of Patent:** **Aug. 13, 1996**

[54] **WIDE-ANGLE PHOTOGRAPHIC LENS SYSTEM**

[75] Inventors: **Yasuji Ogata; Toshiro Baba**, both of Hachioji, Japan

[73] Assignee: **Olympus Optical Co., Ltd.**, Tokyo, Japan

[21] Appl. No.: **208,836**

[22] Filed: **Mar. 11, 1994**

[30] **Foreign Application Priority Data**

Mar. 12, 1993 [JP] Japan ...................... 5-077420
Mar. 12, 1993 [JP] Japan ...................... 5-077456
Jul. 16, 1993 [JP] Japan ...................... 5-197704

[51] **Int. Cl.**[6] ...................................... **G02B 15/02**
[52] **U.S. Cl.** ................. **359/794**; 359/795; 359/784; 359/785; 359/793
[58] **Field of Search** ...................... 359/794, 690, 359/795, 793, 691, 692, 689, 784, 785

[56] **References Cited**

U.S. PATENT DOCUMENTS

4,666,257  5/1987  Tanaka et al. ..................... 359/690

FOREIGN PATENT DOCUMENTS

55-105216  8/1980  Japan .

| | | |
|---|---|---|
| 56-91206 | 7/1981 | Japan . |
| 57-116313 | 7/1982 | Japan . |
| 59-147312 | 8/1984 | Japan . |
| 60-176011 | 9/1985 | Japan . |
| 64-90409 | 4/1989 | Japan . |
| 2208616 | 8/1990 | Japan . |

*Primary Examiner*—David C. Nelms
*Assistant Examiner*—Vu A. Le
*Attorney, Agent, or Firm*—Cushman, Darby & Cushman

[57] **ABSTRACT**

A wide-angle photographic lens system comprising a front lens unit having a positive refractive power, an aperture stop and a rear lens unit having a positive refractive power or a negative refractive power; the front lens unit comprising at least one positive lens component and at least one negative lens component, whereas said rear lens unit consisting of a positive lens component having a convex surface on the image side. This photographic lens system has a short total length (a length as measured from a first surface to an image side surface of the lens system and a small value of Σd (a distance as measured from the first surface to a final surface thereof), and is suited for use with collapsible mount type cameras.

**28 Claims, 11 Drawing Sheets**



## FIG. 1



## FIG. 2



APPL-1026 / Page 2 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3646

## FIG. 3



## FIG. 4



APPL-1026 / Page 3 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3647

## FIG. 5



## FIG. 6



APPL-1026 / Page 4 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3648

## FIG. 7



## FIG. 8



# FIG. 9



# FIG. 10



# FIG. 11



## FIG. I2A
SPHERICAL
ABERRATION

## FIG. I2B
ASTIGMATISM

## FIG. I2C
DISTORTION

## FIG. I2D
LATERAL
CHROMATIC
ABERRATION



APPL-1026 / Page 7 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3651



FIG.13A
SPHERICAL
ABERRATION

FIG.13B
ASTIGMATISM

FIG.13C
DISTORTION

FIG.13D
LATERAL
CHROMATIC
ABERRATION



FIG.14A
SPHERICAL
ABERRATION

FIG.14B
ASTIGMATISM

FIG.14C
DISTORTION

FIG.14D
LATERAL
CHROMATIC
ABERRATION

APPL-1026 / Page 8 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3652



FIG. 15A — SPHERICAL ABERRATION

FIG. 15B — ASTIGMATISM

FIG. 15C — DISTORTION

FIG. 15D — LATERAL CHROMATIC ABERRATION



FIG. 16A — SPHERICAL ABERRATION

FIG. 16B — ASTIGMATISM

FIG. 16C — DISTORTION

FIG. 16D — LATERAL CHROMATIC ABERRATION



FIG.17A
SPHERICAL ABERRATION

FIG.17B
ASTIGMATISM

FIG.17C
DISTORTION

FIG.17D
LATERAL CHROMATIC ABERRATION



FIG.18A
SPHERICAL ABERRATION

FIG.18B
ASTIGMATISM

FIG.18C
DISTORTION

FIG.18D
LATERAL CHROMATIC ABERRATION



### FIG.19A
SPHERICAL ABERRATION

### FIG.19B
ASTIGMATISM

### FIG.19C
DISTORTION

### FIG.19D
LATERAL CHROMATIC ABERRATION



### FIG.20A
SPHERICAL ABERRATION

### FIG.20B
ASTIGMATISM

### FIG.20C
DISTORTION

### FIG.20D
LATERAL CHROMATIC ABERRATION

APPL-1026 / Page 11 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3655

Case: 22-1350     Document: 24     Page: 551     Filed: 12/30/2022

### FIG. 21A
SPHERICAL
ABERRATION

### FIG. 21B
ASTIGMATISM

### FIG. 21C
DISTORTION

### FIG. 21D
LATERAL
CHROMATIC
ABERRATION



### FIG.22A
SPHERICAL
ABERRATION

### FIG.22B
ASTIGMATISM

### FIG.22C
DISTORTION

### FIG.22D
LATERAL
CHROMATIC
ABERRATION



5,546,236

# 1

# WIDE-ANGLE PHOTOGRAPHIC LENS SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a photographic lens system suited for use with lens shutter cameras and so on, and more specifically a wide-angle photographic lens system which has an F number on the order of 2.8 or a high aperture ratio and high optical performance.

### 2. Description of the Prior Art

The conventional photographic lens system each of which has a single focal point and is configured for use with the lens shutter cameras, etc. generally have field angles on the order of 60° to 64°. Though the triplet type is known well out of the three types of the conventional photographic lens systems, the triplet type photographic lens systems have F numbers which find a limit around 3.5. For this reason, those skilled in the art often select, for photographic lens system for use with the lens shutter cameras, the telephoto type and Tessar type which can have aperture ratios on the order of F/2.8. Known as conventional examples of the telephoto type photographic lens systems are lens systems which are disclosed by Japanese Patents Kokai Publication No. Sho 56-91,206, Kokai Publication No. Sho 57-116,313 and Kokai Publication No. Sho 59-147,312. Further, there are known a large number of conventional examples of telephoto type photographic lens systems other than those disclosed by the Japanese patents mentioned above. Each of these conventional photographic lens systems consists of a front lens unit having a positive refractive power and a rear lens unit having a negative refractive power. This photographic lens system was originally developed as a telephoto lens system, but is currently applied as a wide-angle photographic lens system since this lens system has a merit that it permits locating a principal point thereof at a position close to an object point therefor, whereby this lens system can be configured so as to have a short total length and a telephoto ratio around 1. However, the telephoto type photographic lens system produces astigmatism, curvature of field and distortion in amounts too large for correction in practice. Therefore, the conventional photographic lens systems disclosed by the Japanese patents mentioned above adopt aspherical surfaces on the lens components disposed on the image side for correcting these aberrations. Further, the other conventional photographic lens systems use aspherical surfaces in the front lens units and/or rear lens units for correcting aberrations.

Known as the conventional Tessar type photographic lens systems are lens systems which are disclosed by Japanese Patents Kokai Publication No. Sho 60-176,011 and Kokai Publication No. Hei 2-208,616. Each of these conventional Tessar type photographic lens systems selects a composition in which an aperture stop is disposed on the image side of the lens system for simplifying a mechanism to move the lens units for focusing the photographic lens system. Since the Tessar type photographic lens system has a principal point located therein, this type of photographic lens system has a total length larger than that of the telephoto type photographic lens system and is disadvantageous for configuring a compact camera which is to use this photographic lens system.

Furthermore, a lens system which was disclosed by Japanese Patent Kokai Publication No. Sho 64-90,409 is known as a lens system configured as a modified version of the

# 2

triplet type photographic lens system. The photographic lens system disclosed by this Japanese patent is a lens system composed of four lens components of four lens elements which are obtained by dividing a third lens component of the triplet type photographic lens system, and has an aperture ratio of F/2.8. Stops are disposed in certain photographic lens systems which are preferred as embodiments of the lens system disclosed by the Japanese patent mentioned above.

On the other hand, known as a conventional example of photographic lens system for use with single-lens reflex cameras is a lens system which was disclosed by Japanese Patent Kokai Publication No. Sho 55-105,216. This photographic lens system consists of the following: (i) a front lens unit which is composed of, in order from the object side, a positive lens component, a positive lens component and a negative lens component; and, (ii) a rear lens unit composed of a positive lens component. That is to say, this photographic lens system consists of four lens components of four lens elements or four lens components of five lens elements, and has a focal length of 40 mm and an aperture ratio of F/3.5.

For configuring a lens shutter camera such that it is compact, it is necessary to shorten a total length of a photographic lens system (a length as measured from a first surface of the lens system to a film surface) which is to be used with the lens shutter camera. A shorter total length of the photographic lens system makes it possible to configure the camera so that it has smaller thickness as a whole and higher optical performance. For this reason, most of the conventional photographic lens systems described above are configured so as to have total lengths as short as possible.

In recent years where lens barrels can be manufactured with high precisions and so as to have sophisticated functions, but cameras are made compacter not only by shortening the lens barrels but also by configuring photographic lens systems so that they can be accommodated into camera bodies. Thickness of a camera, in a condition where it is collapsed, is determined dependently on a total length of a photographic lens system built therein and a distance (Σd) as measured from a first surface to a final surface of the photographic lens system. For configuring a camera compacter, it is therefore necessary to shorten both the total length and Σd of a photographic lens system which is to be used with the camera.

For the reason described above, the telephoto type photographic lens systems which have large values of Σd are unsuited for use with the collapsible mount type cameras.

Further, the Tessar type photographic lens systems which have small values of Σd are suited for use with the collapsible mount type cameras, but insufficient in optical performance thereof since these photographic lens systems produce astigmatism and curvature of field in amounts too large for correction even by using aspherical surfaces.

The photographic lens system which was disclosed by Japanese Patent Kokai Publication No. Sho 64-90,409 has a small value of Σd and is advantageous, like the Tessar type photographic lens systems, for use with the collapsible mount type cameras, but produces astigmatism and curvature of field in large amounts and is insufficient in optical performance thereof.

Though the photographic lens system disclosed by Japanese Patent Kokai Publication No. Sho 55-105,216 is configured for use with the lens shutter cameras, this lens system is unsuited for use with the collapsible mount type cameras since the lens system has a large F-number and a large value of Σd.

APPL-1026 / Page 13 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3657

5,546,236

**3**

### SUMMARY OF THE INVENTION

A primary object of the present invention is to provide a wide-angle photographic lens system which has a short total length, a small value of Σd, a high aperture ratio and excellent optical performance, and is suited for use with the collapsible mount type cameras.

The Tessar type photographic lens system which uses an aperture stop disposed on the image side of the lens system is apt to produce pin cushion type distortion since it comprises the front lens unit having the positive refractive power a rear lens unit having a positive refractive power and an aperture stop, and has a composition asymmetrical with regard to the aperture stop. Since this distortion is corrected by a third surface (an object side surface of a second negative lens component) disposed in the conventional Tessar type photographic lens system, the third surface produces coma and astigmatism, thereby, making it difficult to enhance optical performance of the Tessar type photographic lens system. In a case where the Tessar type photographic lens system has a larger aperture, in particular, it is more difficult to correct these aberrations favorably.

In a fundamental composition of the photographic lens system according to the present invention, both a front lens unit and a rear lens unit have positive refractive powers, and are disposed symmetrically with regard to an aperture stop. In this composition of the photographic lens system, off-axial aberrations are corrected favorably by cancelling the off-axial aberrations produced by the front lens unit with those produced by the rear lens unit. It is further necessary for correcting spherical aberration to compose the front lens unit so as to comprise at least one positive lens component and at least one negative lens component. When the photographic lens system according to the present invention is composed as described above, spherical aberration is corrected by the front lens unit, whereas coma, astigmatism and distortion are corrected by cancelling these aberrations produced by the front lens unit with those produced by the rear lens unit.

On the other hand, it is desirable for reducing a value of Σd of the photographic lens system to compose the rear lens unit of a single lens component and configure this lens component as a cemented lens component for correcting chromatic aberration.

Now, the composition of the rear lens unit will be described below in more detailed.

The wide-angle photographic lens system according to the present invention can be of three types which are different from one another in the composition of the rear lens unit. In case of a first type of the wide-angle photographic lens system, the rear lens unit is composed only of a single meniscus lens component which has a positive refractive power and a convex surface on the object side. In this case, aberrations which are produced by the front lens unit are to be corrected with the rear lens unit and this lens unit must be configured so as to produce aberrations in excessive amounts though these aberrations produce adverse influences on the photographic lens system. In the case of the first type wide-angle photographic lens system, the aberrations can be corrected adequately by selecting the above-described shape of the meniscus lens component for the rear lens unit.

In case of a second type of the wide-angle photographic lens system according to the present invention, the rear lens component is composed of a lens component which is thick on an optical axis and satisfies the following condition (1):

$$0.1 < D_R/f < 0.3 \qquad (1)$$

**4**

wherein the reference symbol $D_R$ represents thickness of the rear lens unit and the reference symbol f designates a focal length of the photographic lens system as a whole.

The condition (1) defines thickness of the rear lens unit or a total thickness of two lens elements used for composing the rear lens unit when it is configured as a cemented doublet. The condition (1) is required for correcting astigmatism. If the lower limit of the condition (1) is exceeded, astigmatism will be produced in a large amount. If the upper limit of the condition (1) is exceeded, the photographic lens system will have a large value of Σd and cannot be configured compactly though an effect advantageous for correcting astigmatism will be obtained.

A third type of the wide-angle photographic lens system according to the present invention adopts a rear lens unit which has a weak negative refractive power. Though the rear lens unit has the positive refractive power in the fundamental composition of the wide-angle photographic lens system according to the present invention, it is possible to correct the aberrations as favorably as in the cases of the first and second types of the wide-angle photographic lens system even when the rear lens unit has the weak negative refractive power. The third type wide-angle photographic lens system according to the present invention satisfies the following condition (2):

$$f_R/f < -5 \qquad (2)$$

wherein the reference symbol $f_R$ represents a focal length of the rear lens unit and the reference symbol f designates a focal length of the photographic lens system as a whole.

If the negative refractive power of the rear lens unit is strong enough to exceed the range defined by the condition (2), the photographic lens system will be of the telephoto type described with reference to the prior art and cannot accomplish the object of the present invention.

For the wide-angle photographic lens system according to the present invention comprising the front lens unit which comprises at least one positive lens component and at least one negative lens component, it is desirable that the front lens unit is composed, in order from the object side, of a first positive lens component, a second negative lens component and a third positive lens component. When the front lens unit is composed as described above, each of the first through third lens components may be composed of a single lens element or configured as a cemented doublet. In this case, aberrations can be corrected more favorably in the wide-angle photographic lens system according to the present invention.

When the front lens unit is of the triplet type of Tessar type, for example, aberrations are produced in large amounts by each lens surface but aberrations produced by different lens surfaces are cancelled with one another, whereby the aberrations are corrected in the front lens unit as a whole. When each of the lens surfaces produces aberrations in large amounts, however, aberrations will remain in rather large amounts. These residual aberrations can be corrected favorably so as to obtain favorably corrected aberrations in the wide-angle photographic lens system as a whole by composing the rear lens unit of a positive meniscus lens component which has a convex surface on the object side.

Further, by composing the front lens unit of three lens components each of which is configured as a meniscus lens component having a convex surface on the object side, it is possible to reduce angles of incidence of off-axial rays and amounts of aberrations to be produced by the lens surfaces. It is therefore possible to correct aberrations much more favorably by reducing the aberrations to be produced by the

APPL-1026 / Page 14 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3658

5,546,236

<table>
<tr><td>5</td><td>6</td></tr>
</table>

lens surfaces and composing the rear lens unit of a thick lens component as in the case of the above-described second type of wide-angle photographic lens system according to the present invention.

Furthermore, it is desirable to configure the front lens unit so as to be of the triplet type or Tessar type even in the case of the third type of the wide-angle photographic lens system according to the present invention, that is to say, in the case that the rear lens unit of the lens system has a weak negative refractive power.

Moreover, it is desirable for each of the first type, second type and third type of the wide-angle photographic lens systems according to the present invention that the front lens unit satisfies the following condition (3):

$$0.1 < (r_{2a} - r_{2b})/(r_{2a} + r_{2b}) < 5 \qquad (3)$$

wherein the reference symbols $r_{2a}$ and $r_{2b}$ represent radii of curvature on the most object side surface and the most image side surface respectively of the second lens component having the negative refractive power; these surfaces being air-contact surfaces when the second lens component is configured as a cemented component.

The condition (3) defines a shape for the second negative lens component, which must have an image side surface having high curvature, of the front lens unit. If the lower limit of the condition (3) is exceeded, both the surfaces of the negative lens component will have radii of curvature which progressively become equal to each other and have small values, whereby these surfaces will produce aberrations in amounts too large to be corrected by the other lens surfaces. These aberrations cannot be corrected by the other surfaces. If the upper limit of the condition (3) is exceeded, spherical aberration cannot be corrected by the image side surface of the negative lens component and the object side surface of this lens component will produce off-axial aberrations in large amounts, thereby making it difficult to correct aberrations in the wide-angle photographic lens system as a whole.

In addition, it is desirable for the wide-angle photographic lens system according to the present invention to satisfy the following condition (4):

$$1.6 < N_p \qquad (4)$$

wherein the reference symbol $N_p$ represents a mean value of refractive indices of all the positive lens elements disposed in the photographic lens system.

The condition (4) is required for adequately correcting curvature of field.

Since Petzval's image surface is tilted underside in the composition selected for the wide-angle photographic lens system according to the present invention, it is necessary to select refractive indices which are high to certain degrees for the positive lens elements so as to satisfy the condition (4).

By selecting the composition which has been described above, the present invention has succeeded in providing the wide-angle photographic lens system having favorably corrected aberrations. In the wide-angle photographic lens system according to the present invention, the pin cushion distortion and negative astigmatism which are produced by the front lens unit are reasonably cancelled with barrel form distortion produced with the rear lens unit. Owing to this correction mode, the wide-angle photographic lens system according to the present invention can assure high and uniform image quality over the entire range of an image surface thereof. Further, by configuring the first lens component of the front lens unit as a meniscus lens component

having the convex surface on the object side, it is possible to shift the principal point of the photographic lens system toward the object side so as to permit shortening a total length of the photographic lens system.

Further, for reserving a sufficient amount of marginal rays on the image side of a photographic lens system, it is necessary to enlarge a diameter of a light bundle passing through the lens system. In the case of the triplet type or Tessar type photographic lens system, it is necessary to increase an amount of lower rays which pass through the lens system, but such increase of the lower rays will result in production of coma in a larger amount. It is remarkably effective for correcting this coma to use an aspherical surface or a plurality of aspherical surfaces in the front lens unit. For the correction of coma, it is desirable to select for the aspherical surface or surfaces such a shape or shapes as to strengthen negative refractive power or weaken positive refractive power as portions of the aspherical surface or surfaces are farther from the optical axis.

Further, it is desirable that the first lens component of the front lens unit satisfies the following condition (5):

$$0.8 < r_{1a}/r_{2b} < 2 \qquad (5)$$

wherein the reference symbol $r_{1a}$ represents a radius of curvature on the object side surface of the first lens component of the front lens unit; the surface being an air-contact surface when the first lens component is configured as a cemented lens component.

The condition (5) is required for correcting spherical aberration. In the wide-angle photographic lens system according to the present invention, spherical aberration is remarkably undercorrected due to a strong converging function which is imparted to the object side surface of the first lens component of the front lens unit. For correcting this spherical aberration, it is necessary that a strong diverging function is imparted to the image side surface of the second lens component and that the ratio $r_{1a}/r_{2b}$ between radii of curvature on both the surfaces satisfies the condition (5). If the lower limit of the condition (5) is exceeded, spherical aberration will be undercorrected. If the upper limit of the condition (5) is exceeded, in contrast, spherical aberration will be overcorrected.

When the wide-angle photographic lens system according to the present invention adopts the front lens unit composed of three lens components each of which is configured as a meniscus lens component, it is desirable that the front lens unit satisfies the following conditions (6) and (7):

$$-1 < (r_{1b} - r_{2a})/(r_{1b} + r_{2a}) < -0.1 \qquad (6)$$

$$-0.6 < (r_{3a} - r_{3b})/(r_{3a} + r_{3b}) < 0 \qquad (7)$$

wherein the reference symbol $r_{1b}$ represents a radius of curvature on an image side surface of the first lens component, and the reference symbols $r_{3a}$ and $r_{3b}$ designate radii of curvature on an object side surface and an image side surface respectively of the third lens component; these surfaces being air-contact surfaces when the third lens component is configured as a cemented lens component.

The condition (6) defines a shape of an air lens disposed between the first lens component and the second lens component, and is required for correcting coma, astigmatism and distortion. If the air lens has a refractive power strong enough to exceed the lower limit of the condition (6), an object side surface of the second lens component will produce aberrations in remarkable amounts, thereby making it difficult to correct aberrations favorably in the photographic lens system as a whole. If the air lens has a refractive

APPL-1026 / Page 15 of 20
APPLE INC. v. COREPHOTONICS LTD.

5,546,236

**7**

power weak enough to exceed the upper limit of the condition (6), the aberration correcting function of the front lens unit will be lowered, thereby making it difficult to correct aberrations favorably in the photographic lens system as a whole.

The condition (7) defines a shape of the third lens component. This condition is required for adequately suppressing production of coma in a remarkable amount by the object side surface of the third lens component and production of distortion in a remarkable amount by the image side surface of the third lens unit, thereby correcting aberrations favorably in the photographic lens system as a whole. If the upper limit or the lower limit of the condition (7) is exceeded, the coma or distortion which is produced by the third lens component will be unbalanced.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 through FIG. 11 show sectional views illustrating compositions of a first embodiment through an eleventh embodiment respectively of the wide-angle photographic lens system according to the present invention;

FIG. 12 through FIG. 22 show graphs illustrating aberration characteristics of the first through eleventh embodiments of the present invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Now, the wide-angle photographic lens system according to the present invention will be described in more detail below with reference to the preferred embodiments illustrated in the accompanying drawings and given in the form of the following numerical data:

---

Embodiment 1

$f = 35.0$, $f_B = 26.1$, F/2.9, $2\omega = 63.4°$
$r_1 = 14.1000$
    $d_1 = 3.700$   $n_1 = 1.79952$   $v_1 = 42.24$
$r_2 = 47.5750$
    $d_2 = 1.800$
$r_3 = -81.2140$
    $d_3 = 1.000$   $n_2 = 1.76182$   $v_2 = 26.52$
$r_4 = 12.0220$ (aspherical surface)
    $d_4 = 1.000$
$r_5 = 55.8920$
    $d_5 = 3.000$   $n_3 = 1.83481$   $v_3 = 42.72$
$r_6 = -11.3420$
    $d_6 = 1.000$   $n_4 = 1.53172$   $v_4 = 48.90$
$r_7 = -106.9860$
    $d_7 = 1.000$
$r_8 = \infty$ (stop)
    $d_8 = 2.000$
$r_9 = -10.4990$
    $d_9 = 1.500$   $n_5 = 1.51633$   $v_5 = 64.15$
$r_{10} = -9.0360$ (aspherical surface)
aspherical surface coefficients

(4th surface)   $P = 1.0396$, $A_4 = 0.66373 \times 10^{-4}$
        $A_6 = 0.13983 \times 10^{-5}$, $A_8 = -0.97157 \times 10^{-8}$
        $A_{10} = 0.42114 \times 10^{-9}$
(10th surface)   $P = 1.3037$, $A_4 = 0.44302 \times 10^{-4}$
        $A_6 = -0.17498 \times 10^{-5}$, $A_8 = 0.10177 \times 10^{-6}$
        $A_{10} = -0.17446 \times 10^{-8}$
$D_B/f = 0.043.$; $f_R/f = 2.660$, $(R_{3a} - r_{2b})/(r_{2a} + r_{2b}) = 1.347$,
$N_p = 1.717$, $r_{1a}/r_{2b} = 1.173$, $(r_{1b} - r_{2a})/r_{1b} + r_{2a}) = -3.829$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -3.188$

Embodiment 2

$f = 35.0$, $f_B = 24.2$, F/2.9, $2\omega = 63.4°$
$r_1 = 13.3210$
    $d_1 = 4.000$   $n_1 = 1.78590$   $v_1 = 44.18$
$r_2 = 44.8040$ (aspherical surface)

---

**8**

-continued

    $d_2 = 1.900$
$r_3 = -47.1350$
    $d_3 = 1.000$   $n_2 = 1.76182$   $v_2 = 26.52$
$r_4 = 12.3260$
    $d_4 = 1.200$
$r_5 = 33.2200$
    $d_5 = 3.000$   $n_3 = 1.79952$   $v_3 = 42.24$
$r_6 = -14.4170$
    $d_6 = 1.000$   $n_4 = 1.51742$   $v_4 = 52.41$
$r_7 = -39.5590$
    $d_7 = 1.000$
$r_8 = \infty$ (stop)
    $d_8 = 2.000$
$r_9 = -10.4140$
    $d_9 = 1.500$   $n_5 = 1.51633$   $v_5 = 64.15$
$r_{10} = -10.3300$
aspherical surface coefficients

(2th surface)   $P = 1.0000$, $A_4 = 0.97649 \times 10^{-6}$
        $A_6\ -0.63052 \times 10^{-7}$,
        $A_8\ -0.66268 \times 10^{-9}$, $A_{10} = 0.0000$
$D_B/f = 0.043$, $f_R/f\ 10.009$, $(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 1.708$
$N_p = 1.701$, $r_{1a}/r_{2b} = 1.081$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -39.442$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -11.481$
Embodiment 3

$f = 35.0$, $f_B = 23.9$, F/2.9, $2\omega = 63.4°$
$r_1 = 12.2960$
    $d_1 = 3.500$   $n_1 = 1.80400$   $v_1 = 46.57$
$r_2 = 31.1960$
    $d_2 = 2.200$
$r_3 = -42.7320$
    $d_3 = 1.000$   $n_2 = 1.76182$   $v_2 = 26.52$
$r_4 = 10.9260$
    $d_4 = 0.750$
$r_5 = 22.7090$ (aspherical surface)
    $d_5 = 4.000$   $n_3 = 1.83400$   $v_3 = 37.16$
$r_6 = -24.2240$
    $d_6 = 1.000$
$r_7 = \infty$ (stop)
    $d_7 = 2.000$
$r_8 = -9.4810$
    $d_8 = 1.500$   $n_4 = 1.49241$   $v_4 = 57.66$
$r_9 = -10.2580$
aspherical surface coefficients

        $P = 1.0000$, $A_4 = 0.25892 \times 10^{-4}$,
        $A_6 = 0.26583 \times 10^{-5}$, $A_8 = -0.12446 \times 10^{-6}$,
        $A_{10} = 0.25845 \times 10^{-8}$
$D_B/f = 0.043$, $f_R/f = -20.005$, $(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 1.687$,
$N_p = 1.819$, $r_{1a}/r_{2b} = 1.125$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -6.408$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -30.979$
Embodiment 4

$f = 28.0$, $f_B = 18.8$, F/2.9, $2\omega = 75.3°$
$r_1 = 13.3690$ (aspherical surface)
    $d_1 = 5.000$   $n_1 = 1.79952$   $v_1 = 42.24$
$r_2 = 43.1940$
    $d_2 = 1.600$
$r_3 = 590.2440$
    $d_3 = 1.000$   $n_2 = 1.76182$   $v_2 = 26.52$
$r_4 = 8.4700$ (aspherical surface)
    $d_4 = 1.100$
$r_5 = 18.4000$
    $d_5 = 3.500$   $n_3 = 1.88300$   $v_3 = 40.78$
$r_6 = -19.7190$
    $d_6 = 1.000$   $n_4 = 1.53172$   $v_4 = 48.90$
$r_7 = 39.6850$
    $d_7 = 1.000$
$r_8 = \infty$ (stop)
    $d_8 = 1.000$
$r_9 = -20.3110$
    $d_9 = 1.600$   $n_5 = 1.51633$   $v_5 = 64.15$
$r_{10} = -10.2600$ (aspherical surface)
aspherical surface coefficients

(1st surface)   $P = 1.1021$, $A_4 = -0.22172 \times 10^{-4}$,
        $A_6 = -0.16080 \times 10^{-5}$,
        $A_8 = -0.19674 \times 10^{-9}$, $A_{10} = 0.00000$
(4th surface)   $P = 1.0813$, $A_4 = -0.24969 \times 10^{-4}$,

APPL-1026 / Page 16 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3660

5,546,236

**9**

-continued

| | | |
|---|---|---|
| | $A_6 = -0.93991 \times 10^{-6}$, | |
| | $A_8 = 0.10642 \times 10^{-6}$, $A_{10} = 0.00000$ | |
| (10th surface) | $P = 1.1596$, $A_4 = -0.63132 \times 10^{-4}$, | |
| | $A_6 = -0.12393 \times 10^{-5}$, | |
| | $A_8 = 0.62992 \times 10^{-7}$, $A_{10} = 0.00000$ | |

$D_R/f = 0.057$, $f_R/f = 1.360$, $(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 0.972$,
$N_p = 1.73$, $r_1a/r_{2b} = 1.578$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -0.864$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -0.366$
Embodiment 5

$f = 35.0$, $f_B = 26.1$, $f/3.6$, $2\omega = 63.°$
$r_1 = 12.1080$

| | | |
|---|---|---|
| | $d_1 = 5.300$ | $n_1 = 1.77250$ | $v_1 = 49.66$ |
| $r_2 = 13.5380$ | | |
| | $d_2 = 1.700$ | |
| $r_3 = -23.9850$ | | |
| | $d_3 = 1.000$ | $n_2 = 1.76182$ | $v_2 = 26.52$ |
| $r_4 = 12.5740$ (aspherical surface) | | |
| | $d_4 = 0.500$ | |
| $r_5 = 13.0530$ | | |
| | $d_5 = 2.600$ | $n_3 = 1.83400$ | $v_3 = 37.16$ |
| $r_6 = -18.9810$ | | |
| | $d_6 = 1.000$ | |
| $r_7 = \infty$ (stop) | | |
| | $d_7 = 1.000$ | |
| $r_8 = = -13.3420$ (aspherical surface) | | |
| | $d_8 = 1.000$ | $n_4 = 1.49241$ | $v_4 = 57.66$ |
| $r_9 = -15.8140$ (aspherical surface) | | |

aspherical surface coefficients

| | | |
|---|---|---|
| (4th surface) | $P = 1.0000$, $A_4 = 0.92446 \times 10^{-4}$, | |
| | $A_6 = 0.37307 \times 10^{-5}$, | |
| | $A_8 = -0.75406 \times 10^{-7}$, | |
| | $A_{10} = 0.47145 \times 10^{-9}$ | |
| (8th surface) | $P = 0.9875$, $A_4 = 0.69862 \times 10^{-3}$, | |
| | $A_6 = -0.12745 \times 10^{-6}$, | |
| | $A_8 = 0.84542 \times 10^{-6}$, | |
| | $A_{10} = -0.19435 \times 10^{-7}$ | |
| (9th surface) | $P = 1.3297$, $A_4 = 0.67651 \times 10^{-3}$, | |
| | $A_6 = -0.22540 \times 10^{-5}$, | |
| | $A_8 = 0.80052 \times 10^{-6}$, | |
| | $A_{10} = -0.11065 \times 10^{-7}$ | |

$D_R/f = 0.029$, $f_R/f = -5.715$, $(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 3.204$,
$N_p = 1.803$, $r_1a/r_{2b} = 0.963$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2b}) = -3.592$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -5.404$
Embodiment 6

$f = 35.0$, $f_B = 24.6$, $F/2.9$, $2\omega = 63.4°$
$r_1 = 12.7340$

| | | |
|---|---|---|
| | $d_1 = 3.500$ | $n_1 = 1.77250$ | $v_1 = 49.66$ |
| $r_2 = 29.8370$ | | |
| | $d_2 = 1.900$ | |
| $r_3 = -54.5190$ | | |
| | $d_3 = 1.000$ | $n_2 = 1.68893$ | $v_2 = 31.08$ |
| $r_4 = 11.5210$ | | |
| | $d_4 = 0.800$ | |
| $r_5 = 24.2500$ | | |
| | $d_5 = 3.000$ | $n_3 = 1.80400$ | $v_3 = 46.57$ |
| $r_6 = -13.3230$ | | |
| | $d_6 = 1.000$ | $n_4 = 1.53172$ | $v_4 = 48.90$ |
| $r_7 = -83.6260$ | | |
| | $d_7 = 1.000$ | |
| $r_8 = \infty$ (stop) | | |
| | $d_8 = 2.000$ | |
| $r_9 = -10.8870$ | | |
| | $d_9 = 2.000$ | $n_5 = 1.51633$ | $v_5 = 64.15$ |
| $r_{10} = -10.8980$ | | |

$D_R/f = 0.057$, $f_R/f = 9.799$, $(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 1.536$,
$N_p = 1.698$, $r_1a/r_{2b} = 1.105$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -3.418$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -1.817$
Embodiment 7

$f = 35.0$, $f_B = 26.9$, $F/2.9$, $2\omega = 63.4°$
$r_1 = 15.6950$

| | | |
|---|---|---|
| | $d_1 = 3.500$ | $n_1 = 1.77250$ | $v_1 = 49.66$ |
| $r_2 = 39.9440$ | | |
| | $d_2 = 3.700$ | |
| $r_3 = -28.1120$ | | |
| | $d_3 = 0.800$ | $n_2 = 1.72825$ | $v_2 = 28.46$ |
| $r_4 = 15.3920$ | | |

**10**

-continued

| | | |
|---|---|---|
| | $d_4 = 1.000$ | |
| $r_5 = 33.2810$ | | |
| | $d_5 = 2.700$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = -19.5090$ | | |
| | $d_6 = 1.000$ | |
| $r_7 = \infty$ (stop) | | |
| | $d_7 = 1.500$ | |
| $r_8 = -9.9290$ | | |
| | $d_8 = 2.000$ | $n_4 = 1.72916$ | $v_4 = 54.68$ |
| $r_9 = -10.4960$ | | |

$D_R/f = 0.057$, $f_R/f = 14.776$, $(r_{2a} - r_{2b})/(r_{3a} + r_{2b}) = 3.420$,
$N_p = 1.779$, $r_1a/r_{2b} = 1.020$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = 5.752$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = 3.833$
Embodiment 8

$f = 100$, $f_B = 62.16$, $F/2.9$, $2\omega = 64.4°$
$r_1 = 27.9430$ (aspherical surface)

| | | |
|---|---|---|
| | $d_1 = 8.6500$ | $n_1 = 1.77250$ | $v_1 = 49.66$ |
| $r_2 = 51.2630$ | | |
| | $d_2 = 2.0700$ | |
| $r_3 = 107.2150$ | | |
| | $d_3 = 2.9600$ | $n_2 = 1.64769$ | $v_2 = 33.80$ |
| $r_4 = 23.3080$ (aspherical surface) | | |
| | $d_4 = 3.3900$ | |
| $r_5 = 38.6670$ | | |
| | $d_5 = 5.9900$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = 978.6600$ | | |
| | $d_6 = 2.9600$ | $n_4 = 1.67270$ | $v_4 = 32.10$ |
| $r_7 = 59.3970$ (aspherical surface) | | |
| | $d_7 = 4.4400$ | |
| $r_8 = \infty$ (stop) | | |
| | $d_8 = 3.1000$ | |
| $r_9 = 2217.5780$ | | |
| | $d_9 = 16.7600$ | $n_5 = 1.77250$ | $v_5 = 49.66$ |
| $r_{10} = -145.0250$ (aspherical surface) | | |

aspherical surface coefficients

| | | |
|---|---|---|
| (1st surface) | $P = 1.0000$, $A_4 = -0.70423 \times 10^{-8}$, | |
| | $A_6 = -0.63984 \times 10^{-10}$, | |
| | $A_8 = 0.26951 \times 10^{-12}$, | |
| | $A_{10} = 0.48715 \times 10^{-15}$ | |
| (4th surface) | $P = 0.7541$, $A_4 = 0.50131 \times 10^{-5}$, | |
| | $A_6 = -0.87449 \times 10^{-8}$, | |
| | $A_8 = 0.96677 \times 10^{-10}$, | |
| | $A_{10} = -0.13800 \times 10^{-12}$ | |
| (7th surface) | $P = 1.0000$, $A_4 = 0.19813 \times 10^{-6}$, | |
| | $A_6 = -0.57451 \times 10^{-9}$, | |
| | $A_8 = -0.52665 \times 10^{-11}$, | |
| | $A_{10} = 0.38267 \times 10^{-14}$ | |
| (10th surface) | $P = 1.0000$, $A_4 = 0.13632 \times 10^{-6}$, | |
| | $A_6 = -0.56110 \times 10^{-9}$, | |
| | $A_8 = -0.20035 \times 10^{-12}$, | |
| | $A_{10} = 0.19542 \times 10^{-14}$ | |

$D_R/f = 0.168$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -0.353$
$N_p = 1.793$, $r_1a/r_{2b} = 1.199$, $f_R/f = 1.768$
$(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 0.643$
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -0.211$
Embodiment 9

$f = 100$, $f_B = 62.22$, $F/2.9$, $2\omega = 64.4°$
$r_1 = 27.3380$

| | | |
|---|---|---|
| | $d_1 = 8.9200$ | $n_1 = 1.77250$ | $v_1 = 49.66$ |
| $r_2 = 44.8430$ | | |
| | $d_2 = 1.7500$ | |
| $r_3 = 68.1190$ | | |
| | $d_3 = 2.9600$ | $n_2 = 1.69895$ | $v_2 = 30.12$ |
| $r_4 = 24.1910$ (aspherical surface) | | |
| | $d_4 = 5.9200$ | |
| $r_5 = 40.7890$ | | |
| | $d_5 = 6.2900$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = -785.4460$ | | |
| | $d_6 = 2.9600$ | $n_4 = 1.60342$ | $v_4 = 38.01$ |
| $r_7 = 47.9990$ | | |
| | $d_7 = 2.9600$ | |
| $r_8 = \infty$ (stop) | | |
| | $d_8 = 3.1000$ | |
| $r_9 = -712.5610$ | | |
| | $d_9 = 15.3600$ | $n_5 = 1.61800$ | $v_5 = 63.38$ |
| $r_{10} = -96.9650$ | | |

5,546,236

**11**

-continued

aspherical surface coefficients

$$P = 0.9680, A_4 = 0.30247 \times 10^{-5},$$
$$A_6 = 0.31266 \times 10^{-8}, A_8 = 0.32717 \times 10^{-10},$$
$$A_{10} = -0.26578 \times 10^{-13}$$

$D_R/f = 0.154$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -0.206$
$N_p = 1.742$, $r_{1a}/r_{2b} = 1.130$, $f_R/f = 1.799$
$(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 0.476$
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -0.081$
Embodiment 10

$f = 100$, $f_B = 68.00$, $F/2.9$, $2\omega = 64.40$
$r_1 = 31.2770$

|  | | | |
|---|---|---|---|
| | $d_1 = 10.7200$ | $n_1 = 1.77250$ | $\nu_1 = 49.66$ |
| $r_2 = 106.4350$ | | | |
| | $d_2 = 1.4800$ | | |
| $r_3 = 274.6030$ | | | |
| | $d_3 = 2.9300$ | $n_2 = 1.67270$ | $\nu_2 = 32.10$ |
| $r_4 = 27.0140$ (aspherical surface) | | | |
| | $d_4 = 6.6800$ | | |
| $r_5 = 65.6480$ | | | |
| $d_5 = 6.8000$ | | $n_3 = 1.80440$ | $\nu_3 = 39.58$ |
| $r_6 = 87.6500$ | | | |
| | $d_6 = 2.3700$ | | |
| $r_7 = \infty$ (stop) | | | |
| | $d_7 = 1.1800$ | | |
| $r_8 = 302.3190$ | | | |
| | $d_8 = 9.1300$ | $n_4 = 1.77250$ | $\nu_4 = 49.66$ |
| $r_9 = -33.7000$ | | | |
| | $d_9 = 2.9600$ | $n_5 = 1.54869$ | $\nu_5 = 45.55$ |
| $r_{10} = 1794.2090$ | | | |

aspherical surface coefficients

$$P = 0.9201, A_4 = 0.28017 \times 10^{-5},$$
$$A_6 = 0.66547 \times 10^{-8}, A_8 = -0.41277 \times 10^{-12},$$
$$A_{10} = 0.18896 \times 10^{-13}$$

$D_r/f = 0.121$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -0.441$
$N_p = 1.783$, $r_{1a}/r_{2b} = 1.158$, $f_R/f = 1.135$
$(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 0.821$
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -0.144$
Embodiment 11

$f = 100$, $f_B = 60.88$, $F/2.9$, $2\omega = 64.4°$
$r_1 = 30.2190$

|  | | | |
|---|---|---|---|
| | $d_1 = 10.1700$ | $n_1 = 1.77250$ | $\nu_1 = 49.66$ |
| $r_2 = 89.6470$ | | | |
| | $d_2 = 2.0700$ | | |
| $r_3 = 284.9810$ | | | |
| | $d_3 = 2.9600$ | $n_2 = 1.64769$ | $\nu_2 = 33.80$ |
| $r_4 = 22.6830$ (aspherical surface) | | | |
| | $d_4 = 1.7000$ | | |
| $r_5 = 30.8330$ | | | |
| | $d_5 = 4.0400$ | $n_3 = 1.80440$ | $\nu_3 = 39.58$ |
| $r_6 = 41.9860$ | | | |
| | $d_6 = 6.5200$ | | |
| $r_7 = \infty$ (stop) | | | |
| | $d_7 = 0.2600$ | | |
| $r_8 = 145.2110$ | | | |
| | $d_8 = 4.8700$ | $n_4 = 1.77250$ | $\nu_4 = 49.66$ |
| $r_9 = -91.6240$ | | | |
| | $d_9 = 17.7100$ | $n_5 = 1.71736$ | $\nu_5 = 29.51$ |
| $r_{10} = -247.6530$ | | | |

aspherical surface coefficients

$$P = 0.9033, A_4 = 0.25938 \times 10^{-5}$$
$$A_6 = -0.60442 \times 10{-8}, 0.43368 \times 10^{-10},$$
$$A_{10} = -0.62848 \times 10{-13}$$

$D_R/f = 0.226$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -0.521$
$N_p = 1.783$, $r_{1a}/r_{2b} = 1.332$, $f_R/f = 1.164$
$(r_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 0.853$
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -0.153$

wherein the reference symbols $r_1$, $r_2$, . . . represent radii of curvature on respective lens elements, the reference symbols $d_1$, $d_2$, . . . designate thicknesses of the respective lens elements and airspaces reserved therebetween, the reference symbols $n_1$, $n_2$, . . . denote refractive indices of the respective lens elements, and the reference symbols $\nu_1$, $\nu_2$, . . . represent Abbe's numbers of the respective lens elements.

The first, second, third, fifth, sixth and seventh embodiments of the wide-angle photographic lens system according to the present invention have compositions illustrated in FIGS. **1**, **2**, **3**, **5**, **6** and **7** respectively, in each of which the wide-angle photographic lens system consists of the following (i): a front lens unit which is composed, in order from the object side, of a first meniscus lens component having a convex surface on the object side, a second biconcave lens component and a third biconvex lens component; (ii) an aperture stop; and, (iii) a rear lens unit which is composed only of a single lens component. In other words, the wide-angle photographic lens system preferred as each of these embodiment consists of four lens components of four lens elements or four lens components of five lens elements. The first embodiment uses two aspherical surfaces, the second embodiment adopts a single aspherical surface, the third embodiment employs a single aspherical surface, the fifth embodiment uses three aspherical surfaces, the sixth embodiment adopts a single aspherical surface and the seventh embodiment employs a single aspherical surface.

Out of these embodiments, each of the first, second, third, sixth and seventh embodiments has a focal length of 35 mm and an aperture ratio of F/2.9, whereas the fifth embodiment has a focal length of 35 mm and an aperture ratio of F/3.6.

Further, the fourth, eighth, ninth, tenth and eleventh embodiments have compositions illustrated in FIGS. **4**, **8**, **9**, **10** and **11** respectively. Each of the wide-angle photographic lens systems preferred as these embodiments consists of the following (i): a front lens unit which is composed of a meniscus lens component having a convex surface on the object side, a second meniscus lens component having a convex surface on the object side, and a third meniscus lens component having a convex surface on the object side; (ii) an aperture stop; and, (iii) a rear lens component which is composed of a single lens element or a cemented lens component. In other words, the wide-angle photographic lens system preferred as each of these embodiments consists of four lens components of four lens elements or four lens component of five lens elements. Out of these embodiments, the fourth embodiment uses a single aspherical surface as the third surface, the eighth embodiment adopts a single aspherical surface as the fourth lens surface, and each of the ninth, tenth and eleventh embodiments employs a single aspherical surface as the first lens surface.

Further, the rear lens unit has a weak negative refractive power in each of the third and fifth embodiments out of the first through eleventh embodiments described above. In addition, the positive lens component or lens element which is to be disposed in the rear lens unit can be made of a resin material such as a plastic material. In a case where the rear lens unit has a weak refractive power as in the second, third, fifth, sixth or seventh embodiment, it is desirable that the positive lens component or lens element is made of a plastic material so as to lessen influences due to temperature and humidity variations and reduce manufacturing cost of the wide-angle photographic lens system according to the present invention.

The aspherical surfaces used in the embodiments of the present invention described above have shapes which are expressed by the formula shown below:

$$z = \frac{y^2/r}{1 + \sqrt{1 - p\,(y/r)^2}} + A_4 y^4 + A_6 y^6 + A_8 y^8 + A_{10} y^{10}$$

wherein the z axis is taken in the direction where rays travel along the optical axis, the y axis is taken as a direction perpendicular to the optical axis, the reference symbol r

5,546,236

## 13

represents a paraxial radius of curvature, and the reference symbols p, $A_4$, $A_6$, $A_8$ and $A_{10}$ designate aspherical surface coefficients.

We claim:

1. A wide-angle photographic lens system comprising, in order from object to image side:

a front lens unit having a positive refractive power, an aperture stop and a rear lens unit;

wherein a distance between said front lens unit and said aperture stop and a distance between said aperture stop and said rear lens unit are substantially constant,

wherein said front lens unit comprises at least one positive lens component and at least one negative lens component,

wherein said rear lens unit consists of a positive meniscus lens component having a convex surface on the image side, and

wherein a relative distance between lens components included in said front lens unit and a relative distance between lens components included in said rear lens unit are substantially constant.

2. A wide-angle photographic lens system according to claim 1 wherein said front lens unit comprises a first positive lens component, a second negative lens component and a third positive lens component.

3. A wide-angle photographic lens system according to claim 2 wherein said first positive lens component is a meniscus lens component having a convex surface on the object side, said second negative lens component is a meniscus lens component having a convex surface on the object side and said third positive lens component is a biconvex lens component.

4. A wide-angle photographic lens system according to claim 3 wherein said third positive lens component is a cemented doublet.

5. A wide-angle photographic lens system according to claim 3 wherein each component disposed in said front lens unit and said rear lens unit is a single lens.

6. A wide-angle photographic lens system according to claim 2 wherein said front lens comprises an aspherical surface.

7. A wide-angle photographic lens system according to claim 2 wherein said first positive lens component is a meniscus lens component having a convex surface on the object side, said second negative lens component is a meniscus lens component having a convex surface on the object side and said third positive lens component is a meniscus lens component having a convex surface on the object side.

8. A wide-angle photographic lens system according to claim 7 wherein said third positive lens component is a cemented doublet.

9. A wide-angle photographic lens system according to claim 7 wherein said front lens unit comprises a plurality of aspherical surfaces.

10. A wide-angle photographic lens system according to claim 7 wherein each of said front lens unit and said rear lens unit comprises an aspherical surface.

11. A wide-angle photographic lens system comprising, in order from the object side: a front lens unit having a positive refractive power, an aperture stop, and a rear lens unit; wherein said front lens unit comprises at least one positive lens component and at least one negative lens component, and wherein said rear lens unit comprises a lens component which has thickness $D_R$ satisfying the following condition (1):

## 14

$$0.1 < D_R/f < 0.3 \tag{1}$$

wherein the reference symbol f represents a focal length of said photographic lens system as a whole.

12. A wide-angle photographic lens system according to claim 11 wherein said front lens unit comprises a first positive lens component, a second negative lens component and a third positive lens component.

13. A wide-angle photographic lens system according to claim 12 wherein said first positive lens component is a meniscus lens component having a convex surface on the object side, said second negative lens component is a meniscus lens component having a convex surface on the object side and said third positive lens component is a meniscus lens component having a convex surface on the object side.

14. A wide-angle photographic lens system according to claim 12 wherein said third positive lens component is a cemented doublet.

15. A wide-angle photographic lens system according to claim 12 wherein each of the lens components which are disposed in said front lens unit and said rear lens unit composing said photographic lens system is composed of a single lens element.

16. A wide-angle photographic lens system according to claim 11 wherein said lens component comprised in said rear lens unit is a cemented lens component.

17. A wide-angle photographic lens system according to claim 12 wherein said front lens unit comprises an aspherical surface.

18. A wide-angle photographic lens system comprising, in order from the object side: a front lens unit having a positive refractive power, an aperture stop and a rear lens unit having a weak negative refractive power; wherein said front lens unit comprises at least one positive lens component and at least one negative lens component, and wherein said rear lens unit satisfies the following condition (2):

$$f_R/f < -5 \tag{2}$$

wherein the reference symbol $f_R$ represents a focal length of said rear lens unit and the reference symbol f designates a focal length of said photographic lens system as a whole.

19. A wide-angle photographic lens system according to claim 18 wherein said front lens unit comprises a first positive lens component, a second negative lens component and a third positive lens component.

20. A wide-angle photographic lens system according to claim 19 wherein said first positive lens component is a meniscus lens component having a convex surface on the object side, said second negative lens component is a biconcave lens component and said third positive lens component is a biconvex lens component.

21. A wide-angle photographic lens system according to claim 3, 7, 13 or 20 wherein said second negative lens component satisfies the following condition (3):

$$0.1 < (r_{2a} - r_{2b})/(r_{2a} + r_{2b}) < 5 \tag{3}$$

wherein the reference symbols $r_{2a}$ and $r_{2b}$ represent radii of curvature on an object side surface and an image side surface respectively of said second negative lens component.

22. A wide-angle photographic lens system according to claim 21 further satisfying the following condition (4):

$$1.6 < N_p \tag{4}$$

APPL-1026 / Page 19 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3663

5,546,236

**15**

wherein the reference symbol $N_p$ represents a mean value of refractive indices of all the lens elements which are disposed in said photographic lens system.

**23.** A wide-angel photographic lens system according to claim **21** satisfying the following condition (5):

$$0.8 < r_{1a}/r_{2b} < 2 \tag{5}$$

wherein the reference symbol $r_{1a}$ represents a radius of curvature on an object side surface of said first lens component.

**24.** A wide-angle photographic lens system according to claim **7** or **13** satisfying the following conditions (6) and (7):

$$-1 < (r_{1b} - r_{2a})/(r_{1b} + r_{2a}) < -0.1 \tag{6}$$

$$-0.6 < (r_{3a} - r_{3b})/(r_{3a} + r_{3b}) < 0 \tag{7}$$

wherein the reference symbol $r_{1b}$ represents a radius of curvature on an image side surface of said first positive lens component, the reference symbol $r_{2a}$ designates a radius of curvature on an object side surface of said second negative lens component, the reference symbol $r_{3a}$ denotes a radius of curvature on an object side surface of said third positive lens component and the reference symbol $r_{3b}$ represents a radius of curvature on an image side surface of said third positive lens component.

**25.** A wide-angle photographic lens system comprising, in order from the object side:

**16**

a front lens unit having a positive refractive power, an aperture stop and a rear lens unit;

wherein said front lens unit comprises a first positive lens component, a second negative lens component and a third positive lens component,

wherein said first positive lens component is a meniscus lens component having a convex surface on the object side, said second negative lens component is a meniscus lens component having a convex surface on the object side and said third positive lens component is a meniscus lens component having a convex surface on the object side, and

wherein said rear lens unit consists of a positive meniscus lens component having a convex surface on the image side.

**26.** A wide-angle photographic lens system according to claim **25** wherein said third positive lens component is a cemented doublet.

**27.** A wide-angle photographic lens system according to claim **25** wherein said front lens unit comprises a plurality of aspherical surfaces.

**28.** A wide-angle photographic lens system according to claim **25** wherein each of said front lens unit and said rear lens unit comprises an aspherical surface.

*    *    *    *    *

APPL-1026 / Page 20 of 20
APPLE INC. v. COREPHOTONICS LTD.

Appx3664

# Kodak EasyShare V610
# dual lens digital camera



## User's guide

www.kodak.com

For interactive tutorials, www.kodak.com/go/howto

For help with your camera, www.kodak.com/go/v610support

APPL-1033 / Page 1 of 87
APPLE INC. v. COREPHOTONICS LTD.

Appx3715

# 9  Appendix

## Camera specifications

For more specifications, visit www.kodak.com/go/v610support.

**CCD—**1/2.5 in. CCD, 4:3 aspect ratio

**Picture size—**

6.0 MP: 2832 x 2128 pixels
5.3 MP (3:2): 2832 x 1888 pixels
4.0 MP: 2304 x 1728 pixels
3.1 MP: 2048 x 1536 pixels
1.1 MP: 1200 x 900 pixels

**Color display—**2.8 in. (7 cm) color hybrid LCD, 960 x 240 (230 K) pixels

**Preview (LCD)—**Frame rate: 30 fps

**Taking lens—**Two Schneider-Kreuznach C-Variogon lenses; combined zoom ratio 10X

**Lens protection—**Built-in

**Focal length—**35 mm equivalent:

Wide: 38–114 mm, f/3.9–4.4
Tele: 130–380 mm, f/4.8

**Digital zoom—**Combined zoom settings 1–4X in 0.2X increments (not supported for movie capture)

**Exposure metering—**TTL-AE; Multi-pattern, Center-spot, Center-weight

**Exposure compensation—**+/-2.0 EV with 1/3 EV step

**ISO speed—**

Auto: 64–400
Selectable: 64, 100, 200, 400, 800


APPL-1033 / Page 68 of 87
APPLE INC. v. COREPHOTONICS LTD.

Appx3782

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.

Patent Owner

———————————

IPR2020-00905 & IPR2020-00906
U.S. Patent 10,255,479

———————————

# DECLARATION OF FRÉDO DURAND, PH.D.
# UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITIONER'S REPLIES

to two different types of Wide POV: "Wide position POV" describes objects

maintaining the same position as in the wide image, and "Wide perspective POV"

describes objects maintaining the same shape. APPL-1005, 5:16-19 ("If the output

image retains the Wide image shape then it has the Wide perspective POV. If it

retains the Wide camera position then it has the Wide position POV."). Critically,

maintaining either one of those types of Wide POV can satisfy the claim language,

which requires only "a" point of view (POV) of the Wide camera. Dr. Hart admits

that the '479 patent contemplates embodiments in which the output image reflects

only the "Wide position POV" _or_ "Wide perspective POV". Ex. 2001, ¶38.

    **4.**      Dr. Hart incorrectly argues, however, that when the '479 patent

"refers to 'Wide POV,' without qualification, it is referring to the complete Wide

POV, both perspective _and_ position." _Id._, ¶45 (emphasis added). Dr. Hart is wrong.

The '479 Patent discloses two alternative embodiments of fusion maintaining Wide

POV: one that maintains both Wide perspective POV and Wide position POV, and

one that maintains only the Wide position POV. Dr. Hart erroneously exclude the

latter embodiment. Specifically, the '479 Patent discusses "Wide POV" in the

context of fusion as the fused image obtained by registering Tele image pixels to a

matching pixel set with in the Wide image pixels, maintaining only the Wide

position POV: "it is possible to register Telephoto image pixels to a matching pixel

set within the Wide image pixels, in which case the output image will retain the

**Wide POV** ('Wide fusion')." APPL-1005, 5:23-26. While this sentence refers to

"Wide POV," the specification continues on to confirm that this embodiment

maintains only Wide *position* POV. Only when an additional function is performed

(the Telephoto image is "shifted" prior to registration mapping) is the Wide

*perspective* POV also retained: "It is also possible to perform the registration after

either sub-camera image is shifted, ***in which case the output image will retain the***

***respective Wide or Tele perspective POV*****.**" *Id.*, 5:30-33 (emphasis added), 5:14-16

("[t]he system output image can have the shape and position of either sub-camera

image **_or_** the shape **_or_** position of a combination thereof."). In other words, an

additional "possible" step is required in order to retain the perspective POV (i.e.,

retain the shapes), and the embodiment that does *not* perform that optional step

maintains only the position POV, not the perspective POV.

**5.**     Consequently, Patent Owner's construction, that requires _both_ the

position (i.e., Wide position POV) _and_ shape (i.e., Wide perspective POV) of

objects be maintained from the wide image, improperly excludes the embodiment

that maintains only the Wide position POV. Patent Owner's construction

erroneously imports an unclaimed limitation, ignoring the specification's teaching

that Wide POV can be only the Wide position POV.

**6.**     Third, Dr. Hart raises a red herring by contrasting the use of "FOV" in

Petitioner's construction with "POV". Ex. 2001, ¶¶ 37-39. This is an immaterial

distinction for present purposes. My previous analysis proposed the construction:

"*fused image that maintains [1] the Wide camera's field of view or [2] the Wide*

*camera's position*." APPL-1003, ¶¶ 32-33. I phrased it this way to reflect that the

Wide camera POV is based on *either* [1] the scene seen through the wide camera's

field of view (i.e., the *position* of objects seen in the camera); *or* [2] how the wide

camera was positioned in 3D space when the image was captured (i.e., determining

the perspective or shape of the objects). Ex. 2036, Durand Depo. at 21:3–7. Thus,

maintaining the Wide camera FOV in my construction would ensure that the

position of objects in the image is that of the Wide camera, as required by Dr.

Hart's construction. Similarly, maintaining the Wide camera 3D position in my

construction would ensure that the perspective/shape of objects in the image is that

of the Wide camera, as required by Dr. Hart's construction.

**7.**     Dr. Hart asserts that FOV can be described using a single number, and

thus cannot be relevant to the POV. Ex. 2001, ¶40. But, as Dr. Hart discusses,

object positions in images depend on multiple factors like the 3D location of the

camera, the orientation of the camera, and its field of view. My original

construction referred to the "fused image" maintaining the Wide camera FOV to

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

———————————

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.,
Patent Owner

———————————

IPR2020-00906
U.S. Patent No. 10,255,479

———————————

**DECLARATION OF JOSÉ SASIÁN, PH.D.
UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITIONER'S REPLY**

## II.    OBVIOUSNESS

### A.    Dr. Moore relies on an incorrect premise that my opinion requires Kawamura and Ogata to be used in a miniature camera module.

**2.**    As explained in my previous declaration, Parulski discloses using a 1/2.5" sensor in its digital still camera modules, and a POSITA would have looked to Kawamura and Ogata as lens designs that could have been scale to the appropriate sizes for this sensors. APPL-1021, ¶¶ 38-39, 44-45. Dr. Moore believes that "one skilled in the art in 2007 or later, looking for 1/2.5-inch sensors for a digital system like Parulski would have looked to lenses designed for miniature digital camera modules." Ex. 2015, ¶¶ 48-49. The evidence does not support this belief.

**3.**    Dr. Moore's belief appears to be based on the chart from Galstain (Ex. 2028) below, and the statement that "a camera module using a 1/2.5" 6 megapixel image sensor would be considered a 'miniature camera module,' as would the smaller camera modules likely to be used in Parulski's mobile phone embodiment:"

**TABLE 1.1   Comparison of Camera Formats**

(a) Miniature Camera Modules, Digital Cameras, and Film Cameras[a]

| Inch-Format | Horizontal (mm) | Vertical (mm) | Diagonal (mm) | Area (mm²) | Megapixels | Minimum Pixel (mm) | Maximum Pixel (mm) | Linear Scale (35 mm ref) (%) | Area Scale (35 mm ref) (%) | Typical Minimum f/number | EFL | Entrance Pupil Diameter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Miniature Camera Modules* | | | | | | | | | | | | |
| 1/6 | 2.32 | 1.74 | 2.90 | 4.04 | 1.3–2 | 0.0014 | 0.0017 | 7 | 0.4 | 2 | 2.28 | 1.14 |
| 1/5 | 2.80 | 2.10 | 3.50 | 5.88 | 2–3 | 0.0014 | 0.0017 | 8 | 0.7 | 2 | 2.75 | 1.37 |
| 1/4 | 3.60 | 2.70 | 4.50 | 9.72 | 3–5 | 0.0014 | 0.0017 | 10 | 1.1 | 2.4 | 3.53 | 1.47 |
| 1/3 | 4.80 | 3.60 | 6.00 | 17.28 | 5–8 | 0.0014 | 0.0017 | 14 | 1.9 | 2.8 | 4.71 | 1.68 |
| *Digital Still Cameras* | | | | | | | | | | | | |
| 1/2.3 | 6.08 | 4.56 | 7.60 | 27.72 | 12–16.6 | 0.0015 | 0.0022 | 18 | 3.1 | 2.8 | 6.0 | 2.1 |
| 1/2 | 6.40 | 4.80 | 8.00 | 30.72 | 16 | 0.0014 | 0.0014 | 18 | 3.4 | 2.4 | 6.3 | 2.6 |
| 1/1.7 | 7.44 | 5.58 | 9.30 | 41.52 | 10–12 | 0.0019 | 0.002 | 21 | 4.6 | 2 | 7.3 | 3.6 |
| 1 | 13.20 | 8.80 | 15.86 | 116.16 | 14.2 | 0.0029 | 0.0029 | 37 | 13 | 2 | 12.5 | 6.2 |
| APS-C | 23.60 | 15.80 | 28.40 | 372.88 | 12.2–24.7 | 0.0039 | 0.0055 | 66 | 43 | 2 | 22.3 | 11.1 |
| FULL | 36.00 | 24.00 | 43.27 | 864.00 | 18.1–24.7 | 0.0059 | 0.0069 | 100 | 100 | 1.4 | 34.0 | 24.3 |
| *Film Cameras* | | | | | | | | | | | | |
| Disc | 11.0 | 8.0 | 13.6 | 88 | | | | 31 | 10 | 2 | 10.7 | 5.3 |
| APS-H | 30.2 | 16.7 | 34.5 | 504 | | | | 80 | 64 | 2 | 27.1 | 13.5 |
| 35 mm | 36.0 | 24.0 | 43.3 | 864 | | | | 100 | 100 | 1.4 | 34.0 | 24.3 |
| 6 × 6 cm | 60.0 | 60.0 | 84.9 | 3600 | | | | 196 | 385 | 2.8 | 66.6 | 23.8 |
| 4 × 5 in. | 127.0 | 101.6 | 162.6 | 12903 | | | | 376 | 1413 | 4.5 | 127.6 | 28.4 |

Ex. 2028, p.4. This chart, however, does not list a 1/2.5" sensor. Dr. Moore

therefore assumes that a 1/2.5" sensor would fall into the "Miniature Camera

Module" category (*see* Ex. 2015, ¶39), but I understand that there's no evidence

provided by Dr. Moore or in the record to support that assumption. To the contrary,

Konno's Example 2 lens system is a miniature camera module using a sensor with

an image height of 5.8 mm, which translates closely to a 1/1.7" sensor which is

also not listed in the miniature camera module group. *See* APPL-1015, Table 1.

    **4.**    Dr. Moore's assumption is incorrect. A 1/2.5" sensor has a diagonal

dimension of about 7.2 mm. *See* APPL-1029; APPL-1030. My previous

declaration cited two 1/2.5" image sensors available to POSITAs at the time with

pixel sizes of 0.00186 mm (see APPL-1029) and 0.00203 mm (see APPL-1030).

camera. Dr. Moore relies on Ex. 2029 for the proposition that "[a] traditional objective lens can not be simply scaled down …." Ex. 2029, p.1. But the immediately preceding sentence limits this statement to "a miniature camera lens module" (*see* Ex. 2029), and is therefore irrelevant to whether a POSITA would have scaled Kawamura for a larger device like a digital camera. Additionally, lens designers as a standard practice scale lenses, adjust, and optimize lenses.

10.    Dr. Moore relies on Ex. 2034 for the proposition that "if the conventional camera lens was simply scaled down to the same focal length of the miniature lens, it would encounter many issues." Ex. 2034, p.79. The miniature lenses discussed in this reference, though, are specific to "mobile platform electronics applications, such as cell phones and tablets," not to larger devices like a digital camera.

11.    Patent Owner relies on Ex. 2033 for the proposition that "Scaling down such a lens will result in a system that is unmanufacturable." Ex. 2033, p.1. But again, this reference is directed to "lenses for cell phone cameras" having "typical lens specifications" of a 1/4" sensor and a total track length of about 5 mm. *See* Ex. 2033, p.3. The combination in my previous analysis, however, is a digital camera with a 1/2.5" sensor and both of my scaled Kawamura and Ogata lenses would have a total track length larger than 5 mm. *See* APPL-1003, ¶¶ 39, 45 (scaling the lenses to a TTL of about 15 mm and 7 mm respectively).

## IV. APPENDIX

### A. Kawamura Example 1 scaled by factor of 14.5 using ZEMAX

Kawamura Example 1 is optimized for plastic elements, an aperture stop near the front, a small F/# of 2.8, and a scaling factor of 14.5 (Focal Length=13.79 mm, TTL=13.49 mm, full angle FOV=24.6°).

| | Surf:Type | Comment | Radius | | Thickness | | Glass | Semi-Diameter | Conic | |
|---|---|---|---|---|---|---|---|---|---|---|
| OBJ | Standard | | Infinity | | Infinity | | | Infinity | 0.000000000 | |
| 1 | Standard | | 3.988907518 | V | 1.240872413 | | E48R | 2.467715234 | 0.635140842 | V |
| 2 | Standard | | 96.96245738 | V | 0.013787471 | | | 2.400286772 | 0.000000000 | |
| STO | Standard | | 14.85207207 | V | 0.275749425 | | OKP4 | 2.356730179 | -40.2614832 | V |
| 4 | Standard | | 5.717331757 | V | 0.000000000 | | | 2.196635630 | 4.037179954 | V |
| 5 | Standard | | 3.430953203 | V | 0.965122988 | | E48R | 2.205724288 | -0.92791552 | V |
| 6 | Standard | | 21.29367771 | V | 0.241280747 | | | 2.137045746 | 56.43491776 | V |
| 7 | Standard | | 11.55143469 | V | 0.206812069 | | E48R | 2.078855228 | 0.000000000 | |
| 8 | Standard | | 1.980977814 | V | 0.827248275 | | | 1.895344097 | -0.82402525 | V |
| 9 | Standard | | Infinity | | 2.054333217 | S | | 1.860569488 | 0.000000000 | |
| 10 | Standard | | 13.30771592 | V | 0.827248275 | | E48R | 2.556957881 | 15.13624973 | V |
| 11 | Standard | | -34.6601654 | V | 6.837925896 | M | | 2.588210818 | 0.000000000 | |
| IMA | Standard | | Infinity | | – | | | 3.083766643 | 0.000000000 | |

Declaration of José Sasián, Ph.D. in support of
Petitioner's Reply in IPR2020-00906









UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

_____

Case No. IPR2020-00905
Case No. IPR2020-00906
U.S. Patent No. 10,225,479

_____

DECLARATION OF JOHN C. HART, Ph.D.
PURSUANT TO 37 C.F.R. § 1.68

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2001
Page 1

when the specification refers to "position POV" in its discussion of "combi-nation" POVs, it is referring to the "position of either sub-camera *image*." (Ex. 1001, '479 patent at 5:14–16.) That is, "position POV" is based on the posi-tions of images, not the positions of cameras. An image position may differ because the camera is located in a different position, but it also may differ because camera, located in the same position, has been pointed in a different direction. For this reason as well, Dr. Durand's proposed construction is in-consistent with how the patent specification uses the relevant terms.

39.    The effect of Dr. Durand's construction is to replace the term "point of view" in the claims with the term "field of view" in his construction. This is not consistent with how a POSITA would understand these phrases or with how they are used in the '479 patent. For example, claim 1 refers to both "a field of view $FOV_W$" of the wide camera and "a point of view (POV)" of the wide camera, with no suggestion they are the same thing or that one term is the antecedent basis for the other. (Ex. 1001, '479 patent at 13:25–26, 13:48.)

40.    In the specification, the '479 patent clearly defines "FOV" as a planar angle, representable in degrees: "As used herein, the FOV is measured from the center axis to the corner of the sensor (i.e. half the angle of the normal

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2001
Page 22

Case Nos. IPR2020-00905, IPR2020-00906
U.S. Patent No. 10,225,479

definition)." (Ex. 1001 at 7:11–13.) Examples of FOV values are given in degrees (id. at 7:20–22), and FOV is used as a parameter to the tangent function, further confirming that it is a simple angle (id. at 7:7–8).

41.    Dr. Durand agreed during his deposition that his construction of "POV" matches what the patent calls field of view:

> Q. So when you're using the term "field of view" in this construction, you're reviewing -- you're referring to how much of the scene is captured by the camera; is that right?
>
> A. This is a vague version of the definition, I would say one definition of the field of view. For example, the horizontal field of view is to look at the angle between the two edges of the -- of the image.

(Ex. 2036 at 22:4–12.)

42.    This is definition matches what the '479 patent specification calls the "normal definition" of FOV (the '479 patent uses half that "normal" value in its formulas). (Ex. 1001, '479 patent at 7:11–13.) As Dr. Durand testified, this FOV is an inherent property of the camera and lens, and independent of where they are pointed or what they see:

> Q. Would you agree that a camera's field of view is a property of the camera that's independent of what direction the camera is pointing?
>
> A. So one definition or understanding of field of view would be -- would indeed be just an angle that's a property of the combination of a camera and the lens.

20

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2001
Page 23

Case Nos. IPR2020-00905, IPR2020-00906
U.S. Patent No. 10,225,479

analysis for limitations [23.3] and [23.4], which simply refers back to these limitations (id. at 63), he relies on three portions of Parulski: (1) 20:1–15, 20:50–59, and 21:34–44 discussing Figure 11; (2) 22:14–42 discussing Figure 14; and (3) 28:45–57 discussing Figure 26.

73.    Figure 11 describes a method "wherein a range map is produced." (Ex. 1005, Parulski at 19:49–51.) The Figure 11 discussion is the only portion of Parulski that Dr. Durand cites as satisfying the "by mapping Tele image pixels to matching pixels within the Wide image" portion of limitation [1.5.2]. (Ex. 1003, Durand Decl. at 52–53.) However, as explained above, nothing in the discussion of Figure 11 describes using the range map as part of a system that outputs a "fused image." Identifying objects within an image, tracking motion, blurring portions of an image, or adjusting gain would all be understood as operations that could utilize a range map, but would not need to fuse image data from two different images. Likewise, the image capture assemblies of Figures 3 and 8, which Parulski says Figure 11's method uses, do not fuse data from two different images. (Ex. 1005, Parulski at 19:49–51.)

74.    Nowhere else does Parulski describe using the Figure 11 method together with image fusion. Indeed, the only reference to using the Figure 11 method (or any "range map") at all in the rest of Parulski describes using the

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2001
Page 42

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

————————

Case No. IPR2020-00905, IPR2020-00906
U.S. Patent No. 10,225,479

————————

DECLARATION OF DUNCAN MOORE, Ph.D.
PURSUANT TO 37 C.F.R. § 1.68

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 1



**FIG. 16A**



**FIG. 16B**

37.     As Dr. Durand and Dr. Sasián note, Parulski refers to the Kodak Easyshare V610 dual lens camera. Ex. 1003, ¶ 48; Ex. 1021, ¶ 38; Ex. 1005 at 5:29. The V610 looks generally similar to the camera in Parulski Figure 2. Ex. 1033, Kodak Easyshare V610 manual at 3–4. The V610 utilized a 1/2.5″ CCD image sensor with 6.0 megapixels.

38.     According to Dr. Durand and Dr. Sasián, a POSITA would understand that Parulski would have considered using 1/2.5″ image sensors. Ex. 1003, ¶

19

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 22

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

48; Ex. 1021, ¶ 38. In my opinion, 1/2.5″ image sensors would have been an option for a camera such as the kind shown in Parulski Figure 2. However, for Parulski's mobile phone camera of Figures 15 and 16, a POSITA would likely have understood that a smaller sensor would have been used.

39.    As shown in the following table, published in 2014, a camera module using a 1/2.5″ 6 megapixel image sensor would be considered a "miniature camera module," as would the smaller camera modules likely to be used in Parulski's mobile phone embodiment:

**TABLE 1.1   Comparison of Camera Formats**

(a) Miniature Camera Modules, Digital Cameras, and Film Cameras°

| Inch-Format | Horizontal (mm) | Vertical (mm) | Diagonal (mm) | Area (mm²) | Megapixels | Minimum Pixel (mm) | Maximum Pixel (mm) | Linear Scale (35 mm ref) (%) | Area Scale (35 mm ref) (%) | Typical Minimum f/number | EFL | Entrance Pupil Diameter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Miniature Camera Modules* | | | | | | | | | | | | |
| 1/6 | 2.32 | 1.74 | 2.90 | 4.04 | 1.3–2 | 0.0014 | 0.0017 | 7 | 0.4 | 2 | 2.28 | 1.14 |
| 1/5 | 2.80 | 2.10 | 3.50 | 5.88 | 2–3 | 0.0014 | 0.0017 | 8 | 0.7 | 2 | 2.75 | 1.37 |
| 1/4 | 3.60 | 2.70 | 4.50 | 9.72 | 3–5 | 0.0014 | 0.0017 | 10 | 1.1 | 2.4 | 3.53 | 1.47 |
| 1/3 | 4.80 | 3.60 | 6.00 | 17.28 | 5–8 | 0.0014 | 0.0017 | 14 | 1.9 | 2.8 | 4.71 | 1.68 |
| *Digital Still Cameras* | | | | | | | | | | | | |
| 1/2.3 | 6.08 | 4.56 | 7.60 | 27.72 | 12–16.6 | 0.0015 | 0.0022 | 18 | 3.1 | 2.8 | 6.0 | 2.1 |
| 1/2 | 6.40 | 4.80 | 8.00 | 30.72 | 16 | 0.0014 | 0.0014 | 18 | 3.4 | 2.4 | 6.3 | 2.6 |
| 1/1.7 | 7.44 | 5.58 | 9.30 | 41.52 | 10–12 | 0.0019 | 0.002 | 21 | 4.6 | 2 | 7.3 | 3.6 |
| 1 | 13.20 | 8.80 | 15.86 | 116.16 | 14.2 | 0.0029 | 0.0029 | 37 | 13 | 2 | 12.5 | 6.2 |
| APS-C | 23.60 | 15.80 | 28.40 | 372.88 | 12.2–24.7 | 0.0039 | 0.0055 | 66 | 43 | 2 | 22.3 | 11.1 |
| FULL | 36.00 | 24.00 | 43.27 | 864.00 | 18.1–24.7 | 0.0059 | 0.0069 | 100 | 100 | 1.4 | 34.0 | 24.3 |
| *Film Cameras* | | | | | | | | | | | | |
| Disc | 11.0 | 8.0 | 13.6 | 88 | | | | 31 | 10 | 2 | 10.7 | 5.3 |
| APS-H | 30.2 | 16.7 | 34.5 | 504 | | | | 80 | 64 | 2 | 27.1 | 13.5 |
| 35 mm | 36.0 | 24.0 | 43.3 | 864 | | | | 100 | 100 | 1.4 | 34.0 | 24.3 |
| 6 × 6 cm | 60.0 | 60.0 | 84.9 | 3600 | | | | 196 | 385 | 2.8 | 66.6 | 23.8 |
| 4 × 5 in. | 127.0 | 101.6 | 162.6 | 12903 | | | | 376 | 1413 | 4.5 | 127.6 | 28.4 |

(Ex. 2028, Galstain at 4.)

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 23

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

mm, substantially larger than the 24 mm width of images on "35 mm" 135

format film.[3] A 6x7 image has a nominal size on the film of 56 mm x 67 mm,

and a 4.5x6 image has a nominal size on the film of 56 mm x 41.5 mm.[4]

Therefore, the numbers in "6x7" and "4.5x6" correspond to the approximate

film dimensions in centimeters. (Ex. 2026, Sasián Deposition at 42:20–43:20.)

43.    The Kawamura lens has "a brightness of about 1:4." (Ex. 1012, Kawa-

mura at 1.) Each of the examples in Kawamura actually have a brightness ratio

of 1:4.1. (Ex. 1012, Kawamura at 3–5.) This brightness ratio is another way

of expressing what is commonly called the "f-number."[5] So, the Kawamura

lenses have a f-number of about f/4.1. For a single lens, the f-number is de-

fined as the effective focal length of the lens divided by the diameter of the

entrance pupil. For a single lens with the aperture stop at the lens, the entrance

pupil diameter is simply the diameter of the lens, which determines how much

---

[3] https://en.wikipedia.org/wiki/120_film, https://en.wikipedia.org/wiki/135_
film

[4] https://en.wikipedia.org/wiki/120_film

[5] https://www.kenrockwell.com/tech/lens-specifications.htm ("f/numbers are
usually expressed as fractions with a slash, like f/5.6, when writing them
and reading EXIF data. Lenses themselves are often marked with a colon,
like 1:2.8. It means the same thing.")

light enters the lens. For multi-element lenses, the calculation is more compli-

cated, but it remains true that the entrance pupil diameter determines how

much light travels through the lens system to the sensor. The f number, in turn,

determines how much light reaches each unit of area on the sensor per unit of

time. Smaller f-number lenses form a brighter image at the sensor. As a result,

the f-number affects how long an exposure must be under given light condi-

tions, i.e., how "fast" the lens is. The f-number also affects the depth of field

of an image and the degree of image aberrations.

44.     A larger film size means a larger camera and larger lenses. The Pentax

6x7 camera is shown in the following photo[6]:

---

[6] http://camera-wiki.org/wiki/Pentax_67

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 26

23

Case No. IPR2020-00905
U.S. Patent No. 10,225,479



50.    Dr. Sasián's Zemax analysis allows us to confirm how long the lenses disclosed in Kawamura are. The lens that he scaled using Zemax was Kawamura's Example 1 lens. Ex. 1021, ¶ 45; Ex. 1012 at 3. The focal length of the unmodified lens is given in Kawamura as 200.079 mm. Ex. 1012 at 3. After scaling in Zemax, the lens had a focal length of 16.330 mm and a total axial length of 15.343 mm. Ex. 1021 at 26. This shows that Dr. Sasián scaled the Kawamura lens by a factor of 200.08 mm / 16.330 mm = 12.25. The original lens thus had a total axial length of 12.25 × 15.34309 mm = 188 mm, or

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 31

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

## C.    Ogata

59.    Ogata was published as U.S. Patent No. 5,546,236 and issued on August 13, 1996. Ex. 1026. It was assigned to Olympus Optical Co., Ltd. and claims priority to Japanese patent applications filed in 1993. Ex. 1026 at 1.

60.    The Ogata lens was not quite as large as the Kawamura lens. Rather than being designed for a medium format film camera, it was designed for a 35 mm format film camera. We can see this from looking at, for example, the focal length, 35 mm, and the angle of view $2\omega = 63.4°$ of Ogata Embodiment 1:

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 38

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

---

Embodiment 1

$f = 35.0$, $f_B = 26.1$, F/2.9, $2\omega = 63.4°$

| | | | |
|---|---|---|---|
| $r_1 = 14.1000$ | | | |
| | $d_1 = 3.700$ | $n_1 = 1.79952$ | $v_1 = 42.24$ |
| $r_2 = 47.5750$ | | | |
| | $d_2 = 1.800$ | | |
| $r_3 = -81.2140$ | | | |
| | $d_3 = 1.000$ | $n_2 = 1.76182$ | $v_2 = 26.52$ |
| $r_4 = 12.0220$ (aspherical surface) | | | |
| | $d_4 = 1.000$ | | |
| $r_5 = 55.8920$ | | | |
| | $d_5 = 3.000$ | $n_3 = 1.83481$ | $v_3 = 42.72$ |
| $r_6 = -11.3420$ | | | |
| | $d_6 = 1.000$ | $n_4 = 1.53172$ | $v_4 = 48.90$ |
| $r_7 = -106.9860$ | | | |
| | $d_7 = 1.000$ | | |
| $r_8 = \infty$ (stop) | | | |
| | $d_8 = 2.000$ | | |
| $r_9 = -10.4990$ | | | |
| | $d_9 = 1.500$ | $n_5 = 1.51633$ | $v_5 = 64.15$ |
| $r_{10} = -9.0360$ (aspherical surface) | | | |

aspherical surface coefficients

| | |
|---|---|
| (4th surface) | $P = 1.0396$, $A_4 = 0.66373 \times 10^{-4}$ |
| | $A_6 = 0.13983 \times 10^{-5}$, $A_8 = -0.97157 \times 10^{-8}$ |
| | $A_{10} = 0.42114 \times 10^{-9}$ |
| (10th surface) | $P = 1.3037$, $A_4 = 0.44302 \times 10^{-4}$ |
| | $A_6 = -0.17498 \times 10^{-5}$, $A_8 = 0.10177 \times 10^{-6}$ |
| | $A_{10} = -0.17446 \times 10^{-8}$ |

$D_R/f = 0.043$.; $f_R/f = 2.660$, $(R_{2a} - r_{2b})/(r_{2a} + r_{2b}) = 1.347$,
$N_p = 1.717$, $r_{1a}/r_{2b} = 1.173$, $(r_{1b} - r_{2a})/(r_{1b} + r_{2a}) = -3.829$,
$(r_{3a} - r_{3b})/(r_{3a} + r_{3b}) = -3.188$

---

Ex. 1026 at 7:35–62. 63.4° is exactly the angle of view of a 35 mm focal-length lens with a 35 mm film frame.[14] This can be confirmed using the formula used by Dr. Durand in his declaration[15]:

---

[14] https://en.wikipedia.org/wiki/Angle_of_view#Calculating_a_camera's_angle_of_view

[15] The formula appears to contain a typographical error, and "HVOF" should read "HFOV." It is also an approximation that is only strictly true for a single-element lens with the stop at the lens.

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 39

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

$$HVOF = arctan\left(\frac{diagonal}{2}/(focal\ length)\right)$$

(Ex. 1003, ¶ 64.)

61.    As Dr. Durand notes, the diagonal size of 35 mm camera film is 43.27 mm. For a 35 mm focal length, this formula gives a HFOV = arctan(43.27 mm / 2 / 35 mm) = arctan(0.618) = 31.7°, i.e. a full angle of view equal to the 63.4° value given in Ogata.

62.    We can confirm this with Dr. Sasián's Zemax analysis. As an initial matter, I note that Dr. Sasián appears to have made at least one error in entering the parameters from the Ogata Embodiment 1 lens. For the third lens element he mistakenly used an Abbe number of 26.5 (the Abbe number of the second lens element), rather than the value 42.72 given in Ogata. Ex. 1021 at 36; Ex. 1026 at 7:45. Because of this error, Dr. Sasián's field curvature, distortion and OPD fan plots on page 35 of his declaration do not accurately reflect the performance of a scaled version of Ogata's Embodiment 1 lens.

63.    To work with a 1/2.5″ sensor Dr. Sasián scaled Ogata embodiment 1 from a focal length of 35 mm to a focal length of 5.724 mm, reducing the size by a factor of 35 mm / 5.724 mm = 6.114.

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 40

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

## VIII. OBVIOUSNESS

### A.    A POSITA Would Not Have Scaled Kawamura to Use in Parulski

68.    I disagree that a POSITA would have been motivated to scale Kawa-mura for use in Parulski. At the time that Parulski was written, Kawamura's design was 26 years old. Substantial improvements in computation power, design techniques, materials, and manufacturing techniques meant that lenses made in 2007 or in 2013 were substantially improved in performance and other characteristics over even high-quality lenses designed in 1981.

69.    Kawamura's lenses were also designed for a different purpose, with different design constraints, than a lens for the Parulski system. As explained above, the Kawamura lens would need to be scaled down by a factor of around 12 (or more than 12 for Parulski's mobile phone examples) in order provide the same field of view on a sensor of the kind contemplated in Parulski.

### 1.    Scaling Lens Designs by a Large Factor Is Not Done in Practice

70.    Dr. Sasián's brief discussion of lens scaling suggests that scaling by large factors is routine and would be expected to result in a well-performing lens. (Ex. 1021, Sasián Declaration, ¶¶ 37, 43.) I disagree. While it is true that from the standpoint of the geometric optics of an ideal lens design, scaling

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 44

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

that design will also scale the aberrations of the design and leave many di-
mensionless properties of the lens design unchanged, that does not does not
mean that the resulting design will be practical or useful. There is more to a
good lens design than the geometric optics of a lens perfectly fabricated to the
design. Scaling a design can dramatically alter the practicality of manufactur-
ing the design and its sensitivity to variations in manufacturing. In addition,
the most important performance characteristics for judging a lens design (in-
cluding parameters such as f-number, field of view, and manufacturing toler-
ances) will change with the scale of a lens, meaning that scaling a good
conventional lens design to a smaller size will often produce a design that is
substantially inferior for its intended purpose to designs that were specifically
created to be used as small lenses.

71.     Dr. Sasián and his Ph.D. students have acknowledged the impracticality
of scaling conventional lens designs to miniature size in their academic writ-
ings, as have others in the field, both prior to Parulski's filing date and after.

72.     For example, Dr. Sasián and his Ph.D. student Dmitry Reshidko wrote
in 2015:

> A traditional objective lens **_can not be simply scaled down_** as a
> lens solution due to fabrication constraints, materials properties,
> manufacturing process, light diffraction and geometrical aberra-
> tions.

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 45

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

(Ex. 2029, Reshidko and Sasián at E216.)

73.     In the same paper, Dr. Sasián wrote that "[t]he practically achievable ratio of the total length to the focal length in lenses for mobile cameras is between 1.15 and 1.3 [12]." (Ex. 2028, Reshidko and Sasián at E217.) This further illustrates the difficulties of scaling conventional lenses to miniature size. Otherwise, Dr. Sasián's statement would make no sense. Telephoto lenses with a ratio of the total length to the focal length less than 1.0 were first achieved in the 1800s and were widely used in film cameras and other applications in the twentieth century.[16] If simple scaling of these conventional lenses would produce practical lenses, then Dr. Sasián would not have written in 2015 that 1.15 was the lowest ratio of the total length to the focal length that was "practically achievable."

74.     Dr. Sasián's student Yufeng Yan[17] explained in his Ph.D. dissertation that "that the design approaches and lens constructions are significantly different between a miniature camera lens and a conventional camera lens" and that "if the conventional camera lens was simply scaled down to the same

---

[16] Many histories credit Thomas Dallmeyer with inventing the telephoto lens in 1891. (https://en.wikipedia.org/wiki/Telephoto_lens)

[17] Dr. Yan currently works as an optical engineer at Apple. https://www.linkedin.com/in/yufengyan/

43

focal length of the miniature lens, it would encounter many issues." (Ex. 2034, Yan at 79.) Yan further explained: "Scaling down a conventional camera lens requires spatial tolerances to scale down with the same ratio, which is about the factor of 7. This creates a huge problem on the tolerance budget of element and surface decenter." (Ex. 2034, Yan at 83.)

75.    The fact that scaling of conventional lens designs to miniature size is impractical was known prior to 2007, as explained a paper by Bareau and Clark that Dr. Sasián cites in his textbook (Ex. 2027, Sasián at 195) and that Apple has relied upon as a prior art reference in another IPR challenging a Corephotonics patent (IPR2018-01146, Ex. 1012). Bareau and Clark state:

> When designing a camera module lens, it is not always helpful to begin with a traditional larger-scale imaging lens. ***Scaling down such a lens will result in a system that is unmanufacturable***. . . . For glass elements, the edge thicknesses will become too thin to be fabricated without chipping. To achieve a successful design we have to modify our lens forms and adjust the proportions of the elements.

(Ex. 2033, Bareau at 1.) Bareau and Clark describe a number of issues that arise when scaling a 35 mm lens to a lens for a 1/4-inch sensor: "smaller entrance pupil" leading to greater depth of field and more sensitivity to diffraction, tighter "surface figure tolerances," tighter "geometric tolerances," tighter

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 47

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

"angular tolerances," "stray light considerations," and "scratch/dig and con-

tamination." (Ex. 2033, Bareau at 3.)

76.    Dr. Sasián further explains the manufacturing problems encountered

when lens designs become smaller in his textbook on lens design. He explains

that for miniature lenses, "lens tolerances for lens thickness and decenter be-

come tighter." (Ex. 2027, Sasián at 187.) Dr. Sasián elaborates:

> "As mentioned before, one problem with the small scale of
> miniature lenses is that lens element thickness and decenter er-
> rors can have a large impact by decreasing performance. For
> example, a thickness error of 0.1 mm can be tolerable in a 50
> mm focal length lens, but not at all in a miniature lens with a
> focal length of 5 mm. Therefore, an important part of the lens
> design is to desensitize as much as possible a given design."

(Ex. 2027, Sasián at 192.)

77.    Bareau and Clark also describe the importance of desensitizing a min-

iature lens design: "One of the most challenging aspects of designing lenses

for camera modules is desensitizing the system. If sensitivity to manufacturing

tolerances is not built into the merit function, ***then the lens will not be man-

ufacturable***." (Ex. 2033, Bareau at 9.)

78.    A POSITA would recognize that a conventional lens designed for me-

dium-format film, such as that in Kawamura, may not be desensitized as re-

quired if it were scaled down by a factor of 12 or more. This is especially true

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

of a lens designed in 1981, when the computer simulation abilities to study and reduce lens sensitivity were limited. For this reason, a POSITA in 2007 or in 2013 would not expect the Kawamura lens to be successful if scaled down for use in Parulski. Dr. Sasián's declaration is silent on this important issue.

79.    A POSITA in or around 2013 simply would not have looked to a 200-mm lens designed in 1981 in selecting a design for Parulski's narrow lens. Rather, the POSITA would look to designs that were purpose-made for miniature cameras and that took advantage of three decades of technological improvement. As Dr. Sasián explains in his textbook, evolutionary development from existing miniature lens designs is the standard approach in the field: "[m]obile phone lenses have been evolutionary, in that every generation increased complexity from the previous one." (Ex. 2027, Sasián at 190.) There was also no shortage of miniature lens designs for a POSITA to use or to improve on: "[t]he patent literature has hundreds of lens design examples for mobile phone lenses and their forerunners, personal digital assistants." (Ex. 2006, Sasián at 190.) A POSITA would not have been motivated to go beyond rich literature of miniature lens designs and try scaling old lenses, designed

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 49

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

for different purposes, with little reason to expect the result would be manu-

facturable.

### 2. A POSITA Selecting a Lens for Parulski Would Have Used an Aspheric Design with Plastic Elements

80. A critical feature that was available in miniature lenses in 2007 or 2013,

but not easily achieved in 1981, is the use of aspheric surfaces, made possible

through the use of molded plastic and glass materials and improved computa-

tion resources. Aspheric surfaces have numerous degrees of freedom to their

shape (compared to a single radius of curvature for a spherical surface), and

adjusting these parameters allows the lens designer to reduce aberrations and

improve the performance of a lens. Because of the superior performance they

provide, aspheric lenses have become ubiquitous, particularly in the design of

miniature lenses.

81. Dr. Sasián and his Ph.D. students have acknowledged that aspheric sur-

faces are a necessary feature of miniature lenses: "Mobile lenses are notorious

by the extensive use of aspheric surfaces. The interaction of multiple aspherics

within the design allows for effectively controlling aberrations." (Ex. 2028,

Reshidko and Sasián at E217.) "To achieve good optical performance for the

miniature cameras, aspherical surfaces are extensively used during the lens

47

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 50

for larger cameras. Why? . . . Plastic materials. For cost, and to allow the aspheric surfaces necessary for performance." (Ex. 2032, Clark at 4.)

87.    Based on a review of patented miniature digital camera lens designs, Clark observed that there are "several characteristics that separate" miniature digital camera lenses from traditional lens designs, including "[e]xtensive use of aspherics, including a large final surface, which is concave in the center and turning back before the edge of the surface." (Ex. 2032, Clark at 4.) He further found that in patented designs, "materials shift[ed] completely to the newer types" of plastics and that use of "high-order aspherics" had become "uninhibited." (Ex. 2032, Clark at 5.) Clark further observes that "[t]he as-phere-dominated design form that has developed for these products appears to have been known for less than twenty years," i.e., since some time after 1994. (Ex. 2032, Clark at 8.)

88.    Both in 2009 and in 2013, a POSITA would have recognized that the best materials for making miniature lens elements were plastics. This is an-other reason that the POSITA would not have looked to scale Kawamura's lens designs. The optical performance of the lens depends on the index of refraction of each lens element, and the aberrations of the lens depend on the

Abbe numbers of each lens element. A significant change in the index of re-

fraction or the Abbe number can change a highly performing lens design into

an unacceptable design.

89.     The indices of refraction and Abbe numbers required by the Kawamura

designs are not available in plastic materials. This can be seen by the follow-

ing "glass map," a plot index of refraction on the vertical axis and Abbe num-

ber on the horizontal axis, taken from Figure 4 of Clark:



Figure 4. Glass map indicating plastic optical materials.

(Ex. 2032, Clark at 4 (red dots added).)

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 54

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

digital camera lenses from traditional lens designs, including that the "[a]per-

ture stop is close to the front of the lens." (Ex. 2032, Clark at 4.)

97.    As explained above, Dr. Sasián's simulations of the Kawamura lenses

show that these lenses were designed to have the aperture stop in the middle

of the lens assembly, between the fourth and five lens elements. (Ex. 1003,

Sasián Decl. at 62–65.) As also explained above, a POSITA would recognize

that this stop location was needed to reduce aberrations in this design lacking

aspheric surfaces and made without the benefit of modern computation. This

is a further reason that a POSITA would not expect scaling of the Kawamura

lens designs to successfully provide a lens with performance suitable for use

in Parulski's system.

### 4.    A POSITA Selecting a Lens for Parulski Would Not Have Used a Lens with F-Number of 4

98.    As explained above, the f-number of the lens determines how bright the

image produced on the sensor is for a given scene, i.e., how much light reaches

each unit of area of the sensor per unit of time. This relationship is independ-

ent of other lens characteristics such as field of view or telephoto ratio.

99.    The brightness varies as one over the square of the f-number, so that a

lens with f-number of 4.0 produces an image roughly one half as bright as a

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 59

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

lens with f-number 2.8. The small size of the pixels in miniature camera sensors means that they require more light per unit area to produce an accurate image. In order to maintain acceptable exposure times, it is important to make the f-number as small as practical.

100.    Dr. Sasián recognized the importance of low f-number in miniature cameras: "Due to the demand of low-light performance of the miniature cameras, larger aperture lenses with lower F/# are desired." (Ex. 2031, Yan and Sasián at 1.) In this paper, Dr. Sasián uses as a "benchmark lens" a lens with f-number equal to 2.2.

101.    The need for small f-numbers was recognized prior to 2009. For example, Bareau and Clark state that "typical lens specifications" for a 1/4-inch sensor format include a f-number of 2.8. (Ex. 2033, Bareau at 3.) They further explain:

> Although most camera module customers specify f/2.8, it is not uncommon to see lenses at f/3.0 and f/3.3 when the increased fno has a significant effect on performance or manufacturability. However, smaller pixel sensors have less light gathering capability and will suffer at slower f/numbers.

(Ex. 2033, Bareau at 4.)

102.    Based on a review of patented miniature digital camera lens designs, Clark observed that there are "several characteristics that separate" miniature

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2015
Page 60

digital camera lenses from traditional lens designs, including that the "f/num-ber is between f/3 and f/2," i.e. that the f-number is between 2 and 3. (Ex. 2032, Clark at 4.)

103.    The f-number of the Kawamura lenses is 4.1. (Ex. 1012 at 3–5.) This is substantially less bright than the f-numbers described as typical for miniature lenses by Dr. Sasián and by Bareau and Clark, e.g., less than half as bright as a lens with f-number 2.8. A POSITA would have recognized the importance of a small f-number lens in the miniature camera of Parulski. This is another reason that a POSITA would have looked to existing miniature lens designs, rather than the old Kawamura design, directed to an entirely different purpose.

### B.    A POSITA Would Not Have Scaled Ogata to Use in Parulski

104.    I also disagree that a POSITA would have scaled Ogata to use in Parul-ski's system, for most of the same reasons I discussed for Kawamura. The issues are not quite as extreme for Ogata as for Kawamura. It was merely 14 years old when Parulski was filed, rather than 26 years old. It "only" requires scaling by a factor of 6 or more, rather than by a factor of 12 or more. It does make very limited use of aspheric surfaces. But, it still is not the kind of a lens that a POSITA would have turned to in 2007 (or in 2013), when numerous lens designs intended for miniature camera modules were available.

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

105. A POSITA would have recognized that it was not practical to scale Ogata down by a factor of 6 or more, for the same reasons I discuss in connection with Kawamura in Section VIII.A.1 above. The teachings of Dr. Sasián, Dr. Yan, and of Bareau and Clark that conventional camera lenses "can not simply be scaled down" and that scaling such lenses "with result in a system that is unmanufacturable" apply equally to Ogata as they do to Kawamura. (Ex. 2029, Reshidko and Sasián at E216; Ex. 2034, Yan at 83; Ex. 2033, Bareau at 1, 9.)

106. Likewise, a POSITA would not have used the Ogata lens design scaled down because they would have instead used a fully aspheric design with plastic elements, for the same reasons I discuss in connection with Kawamura in Section VIII.A.2 above. As discussed in that section, a POSITA at the time of Parulski's patent would have known that to make an acceptable miniature camera lens, it was necessary to make "extensive use of aspheric surface" and plastic lens elements. (Ex. 2028, Reshidko and Sasián at E217; Ex. 2031, Yan and Sasián at 1; Ex. 2034, Yan at 77–78, 83; Ex. 2027, Sasián at 194; Ex. 2033, Bareau at 8; Ex. 2032, Clark at 4, 5, 8.) And as discussed above, the design of Ogata Embodiment 1 could not be made with available plastic materials, whether at original size or scaled down. (Ex. 2032, Clark at 4.)

Case No. IPR2020-00905
U.S. Patent No. 10,225,479

107.   In addition, a POSITA would not have used the Ogata lens design scaled down because they would have understood that placing the stop near the back of the lens assembly as in Ogata's conventional lens design would have led to higher than necessary chief ray angle and poor relative illumination, as I discuss in connection with Kawamura in Section VIII.A.3 above. As Dr. Sasián, Dr. Yan and other emphasize, placing the aperture stop at the front of the lens assembly is necessary (the "first required design change") for a miniature lens. (Ex. 2034, Yan at 80; Ex. 2007, Reshidko and Sasián at E217; Ex. 2033, Bareau at 8; Ex. 2032, Clark at 4.)

## IX.   DECLARATION

108.   I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with knowledge that willful false statements so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code.

Executed on February 4, 2021    _____

Duncan Moore, Ph.D.

60

# Smart
# Mini-Cameras



Edited by

# Tigran V. Galstian



CRC Press
Taylor & Francis Group

**4** ■ *Smart Mini-Cameras*

## TABLE 1.1 Comparison of Camera Formats

(a) Miniature Camera Modules, Digital Cameras, and Film Cameras[a]

| Inch-Format | Horizontal (mm) | Vertical (mm) | Diagonal (mm) | Area (mm²) | Megapixels | Minimum Pixel (mm) | Maximum Pixel (mm) | Linear Scale (35 mm ref) (%) | Area Scale (35 mm ref) (%) | Typical Minimum f/number | EFL | Entrance Pupil Diameter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Miniature Camera Modules* | | | | | | | | | | | | |
| 1/6 | 2.32 | 1.74 | 2.90 | 4.04 | 1.3–2 | 0.0014 | 0.0017 | 7 | 0.4 | 2 | 2.28 | 1.14 |
| 1/5 | 2.80 | 2.10 | 3.50 | 5.88 | 2–3 | 0.0014 | 0.0017 | 8 | 0.7 | 2 | 2.75 | 1.37 |
| 1/4 | 3.60 | 2.70 | 4.50 | 9.72 | 3–5 | 0.0014 | 0.0017 | 10 | 1.1 | 2.4 | 3.53 | 1.47 |
| 1/3 | 4.80 | 3.60 | 6.00 | 17.28 | 5–8 | 0.0014 | 0.0017 | 14 | 1.9 | 2.8 | 4.71 | 1.68 |
| *Digital Still Cameras* | | | | | | | | | | | | |
| 1/2.3 | 6.08 | 4.56 | 7.60 | 27.72 | 12–16.6 | 0.0015 | 0.0022 | 18 | 3.1 | 2.8 | 6.0 | 2.1 |
| 1/2 | 6.40 | 4.80 | 8.00 | 30.72 | 16 | 0.0014 | 0.0014 | 18 | 3.4 | 2.4 | 6.3 | 2.6 |
| 1/1.7 | 7.44 | 5.58 | 9.30 | 41.52 | 10–12 | 0.0019 | 0.002 | 21 | 4.6 | 2 | 7.3 | 3.6 |
| 1 | 13.20 | 8.80 | 15.86 | 116.16 | 14.2 | 0.0029 | 0.0029 | 37 | 13 | 2 | 12.5 | 6.2 |
| APS-C | 23.60 | 15.80 | 28.40 | 372.88 | 12.2–24.7 | 0.0039 | 0.0055 | 66 | 43 | 2 | 22.3 | 11.1 |
| FULL | 36.00 | 24.00 | 43.27 | 864.00 | 18.1–24.7 | 0.0059 | 0.0069 | 100 | 100 | 1.4 | 34.0 | 24.3 |
| *Film Cameras* | | | | | | | | | | | | |
| Disc | 11.0 | 8.0 | 13.6 | 88 | | | | 31 | 10 | 2 | 10.7 | 5.3 |
| APS-H | 30.2 | 16.7 | 34.5 | 504 | | | | 80 | 64 | 2 | 27.1 | 13.5 |
| 35 mm | 36.0 | 24.0 | 43.3 | 864 | | | | 100 | 100 | 1.4 | 34.0 | 24.3 |
| 6 × 6 cm | 60.0 | 60.0 | 84.9 | 3600 | | | | 196 | 385 | 2.8 | 66.6 | 23.8 |
| 4 × 5 in. | 127.0 | 101.6 | 162.6 | 12903 | | | | 376 | 1413 | | | |

APPLE-V COREPHOTONICS
IPR2020-00905
Exhibit 2028
Page 8

E216     Vol. 54, No. 28 / October 1 2015 / Applied Optics     **Research Article**

# applied optics

# Optical analysis of miniature lenses with curved imaging surfaces

**DMITRY RESHIDKO\* AND JOSE SASIAN**

*College of Optical Sciences, The University of Arizona, Tucson, Arizona 85721, USA*
*\*Corresponding author: dmitry@optics.arizona.edu*

*Received 18 May 2015; revised 13 August 2015; accepted 5 September 2015; posted 9 September 2015 (Doc. ID 241176); published 23 September 2015*

Miniature cameras for consumer electronics and mobile phones have been, and continue to be, in fast development. The system level requirements, such as manufacturing cost, packaging, and sensor characteristics, impose unique challenges for optical designers. In this paper, we discuss the potential optical benefits of having a curved image surface rather than a flat one. We show that curved sensor technology allows for optically faster lens solutions. We discuss trade-offs of several relevant characteristics, such as packaging, chief ray angle, image quality, and tolerance sensitivity. A comparison of a benchmark flat field lens, and an evaluation design imaging on a curved surface and working at $f/1.6$, provides useful specific insights. For a given image quality, departing from a flat imaging surface does not allow significantly reducing the total length of a lens.     © 2015 Optical Society of America

*OCIS codes:* (220.3620) Lens system design; (220.1000) Aberration compensation; (220.1010) Aberrations (global).

http://dx.doi.org/10.1364/AO.54.00E216

## 1. INTRODUCTION

Miniature camera lens modules are integrated in a variety of portable devices, including cell phones, tablets, laptops and spy cameras, to mention common applications. The photographic performance of these tiny, always ready-for-action lenses, is remarkable as it rivals that of single-lens reflex cameras. Mobile camera technology and devices is a very fast growing field in the imaging market and is impacting the industry by decreasing the production of larger photographic cameras.

The design and packaging of a miniature camera lens module imposes optical design challenges. A traditional objective lens can not be simply scaled down as a lens solution due to fabrication constraints, materials properties, manufacturing process, light diffraction and geometrical aberrations. The increasing demand for thinner, lighter, and low-cost mobile cameras has thus forced the development of new manufacturing technologies and of lens design solutions with high performance.

The optical advantages of using a curved image sensor have been already discussed in the literature. A general conclusion is that a curved image surface allows designing simpler, more compact, and lower-cost optics [1–3]. Recently several researchers have made progress toward developing curved sensors [4–8].

The curved sensor technology for the format which is suited for mobile cameras is near to being commercialized. On the 2014 VLSI Symposia, Sony officially released two curved sensors. One has a diagonal of 43 mm, which is equivalent to a full-frame sensor. The other has a diagonal of 11 mm, which corresponds to a 2/3 in. sensor format [9]. For reference, a flat

2/3 in. sensor has been used in the Nokia Lumia 1020 smart phone camera module.

In this paper, we analyze how allowing for a curved imaging surface impacts the lens design of compact miniature lenses for mobile applications. In Section 2, we highlight typical optical design specifications of state-of-the-art mobile camera lenses. We derive design requirements by comparing products in the market, from patent data, and from publications in the mobile platform optical design and fabrication sector. We review the first-order imaging properties and discuss aberration correction in this class of miniature lenses. In Section 3, we examine how a curved image surface can benefit the lens design of mobile cameras. In Section 4, we show lens design examples for both flat and curved image surfaces. Section 5 provides a detailed comparison of the designs presented in the previous section. We find that a curved image surface allows producing an equivalently performing design with faster $f/\#$ than a conventional design. We also show that other relevant characteristics, such as aberration balancing, image quality, and chief ray incidence angle on the sensor, are favorably impacted. In addition, we discuss distortion aberration as it relates to a curved imaging surface. Finally, we demonstrate improved sensitivity to manufacturing tolerances. Section 6 concludes this paper.

## 2. REVIEW OF MODERN MOBILE CAMERA LENSES

In this section we present typical optical design requirements and trade-offs of state-of-the-art mobile camera lenses. First,

1559-128X/15/28E216-08$15.00 © 2015 Optical Society of America

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2029
Page 1

SELECTED TOPICS IN NOVEL OPTICAL DESIGN

by

Yufeng Yan

Copyright © Yufeng Yan 2019

A Dissertation Submitted to the Faculty of the

JAMES C. WYANT COLLEGE OF OPTICAL SCIENCES

In Partial Fulfillment of the Requirements

For the Degree of

DOCTOR OF PHILOSOPHY

In the Graduate College

THE UNIVERSITY OF ARIZONA

2019

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2034
Page 1

published as "Miniature camera lens design with a freeform surface" [39], and some of the materials are reused in this dissertation.

## 3.1 Design Challenges of a Miniature Camera Lens

When designing miniature camera lenses, lens designers are facing great challenges compare to designing conventional large-scaler camera lenses. The typical FOV of a primary camera lens on a portable device is about 70 to 75 degrees, with the focal length around 4 mm, and a maximum aperture around F/1.8. Fig 3.2 shows the comparison between a conventional camera lens designed by Nikon [40] and a miniature camera lens designed by Apple [41] with similar FOV and F/#. The detailed specs of these 2 lenses are shown in Table 3.1. Both designs are relatively up to date, with the Nikon patent filed in 2014 and the Apple patent filed in 2016. From Fig 3.2, it is clear that the design approaches and lens constructions are significantly different between a miniature camera lens and a conventional camera lens. Duo to the sensor size difference, the focal length of this miniature camera lens is about one-seventh of the focal length of the conventional camera lens with the same FOV and F/#. However, if the conventional camera lens was simply scaled down to the same focal length of the miniature lens, it would encounter many issues. The most severe issue is the limiting package size. Typically, the total track length (TTL) of a miniature camera today is around 5 mm to 6 mm in order to fit in the portable electronic devices. However, if the Nikon 28 mm lens was simply scaled down to the same focal length with the Apple 4 mm lens, its TTL would still be more than 3 times of the Apple lens and it would not be able to fit inside a modern portable electronic device such as cellphones and tablets. As mentioned in Chapter 2, wide-angle lenses for conventional cameras usually have an inverted telephoto structure with high telephoto ratio (ratio of TTL to focal length). To reduce the telephoto ratio and fit a wide-

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2034
Page 79

dispersion can effectively correct chromatic aberrations in the system. Special designed achromatic doublets, also known as "new achromatic doublets", can benefit with the correction of field curvature as well [42]. For miniature lenses, injection molding is typically used to manufacture the small-scale lens elements with high order aspherical surfaces. In order to maintain the cost, plastics or optical polymers are usually used for injection molding. However, selections of plastic materials are very limited with no ultra-low dispersion option. For example, only 2 different materials (besides the IR filter) were used in the Apple lens design presented in Fig 3.2. The limited choice of lens materials and the lack of ultra-low dispersion plastics make correcting chromatic aberration difficult. In addition, plastic doublets are difficult to manufacture, this further challenges the correction of chromatic aberration and field curvature. Also, even though the extensive use of aspherical surfaces helps with some aberration control, it has no effect on chromatic aberrations either.

Besides the design challenges, miniature lenses at small scales also creates problems during manufacture. The most obvious impact is the tolerance budget. Scaling down a conventional camera lens requires spatial tolerances to scale down with the same ratio, which is about the factor of 7. This creates a huge problem on the tolerance budget of element and surface decenter. Usually a decenter tolerance within couple microns is required for miniature camera lenses. This requires very precise lens molding and system assembly. Angular tolerances such as lens tilt does not scale with the lens, but small defects on mechanical mounts will have a larger effect on tilt.

With the market pressure to make thinner electronic devices and add more cameras per device, the package size constrain gets tighter. However, better optical performance, smaller F/# and larger FOV are also favored by customers, which requires more lens elements to be used. The conflict between these two requirements are really challenging to optical designers. Newer

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2034
Page 83

**CERTIFIED COPY**

1   UNITED STATES PATENT AND TRADEMARK OFFICE

2    BEFORE THE PATENT TRIAL AND APPEAL BOARD

3               ---o0o---

4

5

6

    APPLE, INC.,                      )
7                                     )
                 Petitioner,          )
8                                     )
         vs.                          )    Case No.
9                                     )    IPR2020-00905
    COREPHOTONICS, LTD.,              )    IPR2020-00906
10                                    )
                 Patent Owner.        )    U.S. PATENT
11                                    )    10,225,479

12

13

14   CONFIDENTIAL TRANSCRIPT, ATTORNEYS' EYES ONLY

15   ZOOM VIDEOTAPED DEPOSITION OF FREDO DURAND, PH.D.

16              JANUARY 26, 2021

17

18

19

20

21

22

23

24   BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
     470030

25

**BARKLEY**
Court Reporters
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco      (949) 955-0400 Irvine            (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose           (760) 322-2240 Palm Springs      (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez           (702) 366-0500 Las Vegas         (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills     (702) 366-0500 Henderson         (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn           (518) 490-1910 Albany            (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris           00+1+800 222 1231 Dubai          001+1+800 222 1231 Hong Kong

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2036
Page 1

1    UNITED STATES PATENT AND TRADEMARK OFFICE

2     BEFORE THE PATENT TRIAL AND APPEAL BOARD

3                    ---oOo---

4

5

6
     APPLE, INC.,                      )
7                                      )
                    Petitioner,        )
8                                      )
          vs.                          )    Case No.
9                                      )    IPR2020-00905
     COREPHOTONICS, LTD.,              )    IPR2020-00906
10                                     )
                    Patent Owner.      )    U.S. PATENT
11                                     )    10,225,479

12

13

14                    ---oOo---

15          TUESDAY, JANUARY 26, 2021

16
     ZOOM VIDEOTAPED DEPOSITION OF FREDO DURAND, PH.D.
17
     CONFIDENTIAL TRANSCRIPT, ATTORNEYS' EYES ONLY
18                    ---oOo---

19

20

21

22

23

24
     REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
25

                              2

BARKLEY
Court Reporters
APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2036
Page 2

1               A P P E A R A N C E S

2                    ---oOo---

3

FOR THE PETITIONER:

4

       HAYNES and BOONE, LLP
5      600 Congress Avenue, Suite 1300
       Austin, Texas  78701
6      BY: HONG SHI, ESQ.
       (512) 867-8400
7      hong.shi@haynesboone.com

8      HAYNES and BOONE, LLP
       6000 Headquarters Drive, Suite 200
9      Plano, Texas  75024
       BY: MICHAEL S. PARSONS, ESQ.
10     (972) 739-8611
       michael.parsons@haynesboone.com

11

       COOLEY LLP
12     3175 Hanover Street
       Palo Alto, California  94304-1130
13     BY: PRIYA B. VISWANATH, ESQ.
       (650) 849-7023
14     pviswanath@cooley.com

15

FOR THE PATENT OWNER:

16

       RUSS, AUGUST & KABAT
17     12424 Wilshire Boulevard, 12th Floor
       Los Angeles, California  90025
18     BY: NEIL A. RUBIN, ESQ.
       (310) 826-7474
19     nrubin@raklaw.com

20

ALSO PRESENT:

21

       Phillip Knowles, Barkley Court Reporters

22

23

24

25

                         3

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2036
Page 3

BARKLEY
Court Reporters

1    to measured as an angle?

2        A.    There are different ways to measure the

3    field of view.  An angle is one option.

4        Q.    So when you're using the term "field of

08:17  5    view" in this construction, you're reviewing --

6    you're referring to how much of the scene is

7    captured by the camera; is that right?

8        A.    This is a vague version of the definition,

9    I would say one definition of the field of view.

08:18  10   For example, the horizontal field of view is to

11   look at the angle between the two edges of the --

12   of the image.

13       Q.    So would you agree that two images could

14   not -- well, withdrawn.

08:18  15       Would you agree that a fused image could

16   have the field of view of a particular camera even

17   if none of the objects that are visible to that

18   camera are visible in the fused image?

19       MS. SHI:  Objection; vague.

08:19  20       THE WITNESS:  This is a vague

21   hypothetical.  I am not sure I understand the

22   scenario and how it relates to my declaration.

23       Q.    BY MR. RUBIN:  So would you agree that

24   the -- that if a -- withdrawn.

08:19  25       Would you agree that a camera's field of

22

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2036
Page 22

BARKLEY
Court Reporters

Appx5385

1  view is a property of the camera that's independent

2  of what direction the camera is pointing?

3      A.   So one definition or understanding of

4  field of view would be -- would indeed be just an

08:20  5  angle that's a property of the combination of a

6  camera and the lens.

7          I believe that the -- in the cases we are

8  discussing, a POSITA would understand that the goal

9  is to fuse images of overlapping parts of the

08:20  10  scene.

11          THE REPORTER:  Overlapping parts of the

12  what?

13          THE WITNESS:  Parts of the scene.

14          THE REPORTER:  I apologize.

15          THE WITNESS:  Of the scene, s-c-e-n-e.

16          (Discussion off the record.)

17      Q.   BY MR. RUBIN:  So looking at Column 5 of

18  the '479 patent, you see there's discussion of

19  varying a zoom factor of an output image?

08:22  20          MS. SHI:  Mr. Rubin, can you identify the

21  line?

22          THE WITNESS:  Where are -- where are we in

23  Column 5, sorry?

24      Q.   BY MR. RUBIN:  Sorry.  So Line 3, Line 4,

08:22  25  Line 6, Line 51, Line 52, Line 53.

23

APPLE V COREPHOTONICS
IPR2020-00905
Exhibit 2036
Page 23

BARKLEY
Court Reporters

CONFIDENTIAL

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

```
-------------------------------x
 APPLE, INC.,                   )
                                ) IPR2020-00905
           Petitioner,          ) IPR2020-00906
                                )
        vs.                     )
                                )
 COREPHOTONICS, LTD.,           )
                                )
           Patent Owner.        )
-------------------------------x
```

C O N F I D E N T I A L

Videotaped Deposition of Expert Witness

FREDO DURAND, Ph.D.

Tuesday, June 8, 2021 - 10:05 a.m. (EST)

Reported By:

Mayleen Ahmed, RMR, CRR, CRC, CSR

Job No.: 2491

Corephotonics Exhibit 2041
Apple v. Corephotonics, IPR2020-00877
Page 1 of 93

CONFIDENTIAL

```
 1                    REMOTE APPEARANCES

 2   On behalf of the Petitioner:

 3       STEPHANIE SIVINSKI, ESQ.

 4       HAYNES & BOONE LLP

 5       2323 Victory Avenue - Suite 700

 6       Dallas, Texas 75219

 7       214.651.5078

 8       stephanie.sivinski@haynesboone.com

 9               -and-

10       MICHAEL PARSONS, ESQ.

11       HAYNES & BOONE LLP

12       6000 Headquarters Drive - Suite 200

13       Plano, Texas 75024

14       972.739.8611

15       michael.parsons@haynesboone.com

16

17   On behalf of the Patent Owner:

18       NEIL A. RUBIN, ESQ.

19       RUSS AUGUST & KABAT

20       12424 Wilshire Boulevard - 12th floor

21       Los Angeles, California 90025

22       310.826.7474

23       nrubin@raklaw.com

24

25   ALSO PRESENT:  KIMBERLY VILLALOBOS, Videographer
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Corephotonics Exhibit 2041
Apple v. Corephotonics, IPR2020-00877
Page 2 of 93

Appx5499

Page 52

1          by the Board, Petitioner's construction can

2          be rephrased using Patent Owner's

3          terminology, consistent with the

4          specification, as 'fused image in which the

5          posittions [sic] or shapes of objects reflect

6          those of the wide camera.'"

7                Do you see that?

8          A.    Yes, I see it.

9          Q.    So comparing, I guess, the variation of

10  Patent Owner's construction that you provide in

11  paragraph 2 with the variation on Petitioner's

12  construction you provide in paragraph 8, would you

13  agree that the only difference is that the

14  construction you say reflects Patent Owner's

15  position uses the word "and" between "positions" and

16  "shapes," and the construction you say reflects

17  Petitioner's position uses the word "or" between the

18  words "positions" and "shapes"?

19         A.    Yes.  My opinion is that the conjunction

20  should be "or" here.

21         Q.    And the difference between the two is

22  whether the conjunction is "and" or that conjunction

23  is "or," correct?

24         A.    That's the crux of the dispute, yes.

25         Q.    So you haven't offered any opinion that

Corephotonics Exhibit 2041
Apple v. Corephotonics, IPR2020-00877
Page 52 of 93

1  Parulski or any of the other art that, you know,

2  derives in connection with claims 1 and 23, produced

3  a fused image in which the shapes of objects reflect

4  those of the Wide camera; is that right?

5        A.    I have not offered an opinion about

6  this.  Because under my claim construction, either

7  the position or the shape can be maintained.

8        Q.    So you haven't offered an opinion that

9  Parulski or any of the other references you discuss

10  satisfies claims 1 or 23 under the construction you

11  list in quotes in the last sentence of paragraph 2;

12  is that right?

13        A.    I have not offered an opinion about

14  this.

15        Q.    Your feeling is that Parulski produces

16  fused images in which the positions of objects

17  reflect those of the Wide camera; is that right?

18        A.    Parulski, yes, does -- does produce a

19  fused image in which the position of objects reflect

20  those of the Wide camera.  And I don't see Dr. Hart

21  disagreeing about this.

22        Q.    Turning to paragraph 9.

23              So you explain that you disagree with

24  Dr. Hart when he interprets the limitation from

25  claim 19 as requiring that the "translations between

Corephotonics Exhibit 2041
Apple v. Corephotonics, IPR2020-00877
Page 53 of 93

Page 54

1    matching points in the images to calculate depth

2    information" is used to "create a fused image suited

3    for portrait photos."  Do you see that?

4         A.    Yes.

5         Q.    So you haven't offered any opinion that

6    Parulski or any of the other references that you

7    discuss discloses using "translations between

8    matching points in the images to calculate depth

9    information" -- withdrawn.

10              You haven't offered an opinion that

11   Parulski or any of the other references that you

12   discuss discloses "translations between matching

13   points in the images to calculate depth information"

14   being used "to create a fused image suited for

15   portrait photos"; is that right?

16              MS. SIVINSKI:  Objection.  Vague.

17        A.    If I understand your question correctly,

18   I have not provided an opinion about whether

19   Parulski satisfies Dr. Hart's claim construction

20   because I disagree with Dr. Hart's construction.

21        Q.    That was going to be my next question.

22   I think you understood where I was going.

23              So you recall that the '479 patent

24   specification refers to "perspective POV" and also

25   refers to "position POV"?

Corephotonics Exhibit 2041
Apple v. Corephotonics, IPR2020-00877
Page 54 of 93

UNITED STATES PATENT AND TRADEMARK OFFICE

----------

BEFORE THE PATENT TRIAL AND APPEAL BOARD

----------

APPLE INC,

Petitioner,

vs.

COREPHOTONICS, LTD.,

Patent Owner.

----------

Case No. IPR2020-00877

U.S. Patent No. 10,288,840

Case No. IPR2020-00878

U.S. Patent No. 10,330,897

Case No. IPR2020-00906

U.S. Patent No. 10,225,479

Deposition of JOSÉ SASIÁN, Ph.D.

Friday, May 28, 2021

Reported by:

Pamela Harrison

Job No.: 2407

Corephotonics Exhibit 2042
Apple v. Corephotonics, IPR2020-00878
Page 1 of 159

1     VIDEO RECORDED VIDEOCONFERENCE

2 DEPOSITION OF JOSÉ SASIÁN, PhD, located in Tucson,

3 Arizona, taken on behalf of Patent Owner

4 Corephotonics, Ltd., on the 28th day of May 2021,

5 before Pamela Harrison, RPR, CRR, CRC,

6 MO-CCR #557, IL-CSR #084-003684.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Corephotonics Exhibit 2042
Apple v. Corephotonics, IPR2020-00878
Page 2 of 159

```
 1                A P P E A R A N C E S:

 2

 3   FOR THE PETITIONER: (Via remote)

 4        STEPHANIE SIVINSKI, ESQ.

 5        MICHAEL S. PARSON, ESQ.

 6        JORDAN MAUCOTEL, ESQ.

 7        Haynes and Boone, LLP

 8        2323 Victory Avenue, Suite 700

 9        Dallas, TX 75219

10        214.651.5078

11        stephanie.sivinski@haynesboone.com

12        michael.parsons.ipr@haynesboone.com

13        jordan.maucotel.ipr@haynesboone.com

14

15   FOR THE PATENT OWNER: (Via remote)

16        NEIL RUBIN, ESQ.

17        Russ August & Kabat

18        12424 Wilshire Blvd., 12th Floor

19        Los Angeles, CA 90025

20        310.826.7474

21        Nrubin@raklaw.com

22

23

24

25
```

Corephotonics Exhibit 2042
Apple v. Corephotonics, IPR2020-00878
Page 3 of 159

1    Konno is used as part of the grounds challenging

2    different claims of the '479 patent in the -00905

3    IPR.

4            Is that your understanding, or were you

5    aware of it?

6        A.   Yes.

7        Q.   Okay.  So here, you offer -- turning

8    back to your declaration, your reply declaration

9    in the -00906 IPR, you say that Konno's Example 2

10   lens system is a miniature camera module.

11           Is that right?

12       A.   Yes.

13       Q.   And you say that it has a 1/1.7-inch

14   sensor; is that right?

15       A.   Yes.

16       Q.   And that would be a larger sensor than a

17   1/2.5-inch sensor; is that right?

18       A.   Let me review my declaration.  Just a

19   second.

20           Okay.  What is your question, please?

21       Q.   So my question is:  A 1/1.7-inch sensor

22   is larger than a 1/2.5-inch sensor; is that right?

23       A.   It appears so.

24       Q.   And I'm sorry.  When you say, "it

25   appears so," why do you say "it appears so"?

Corephotonics Exhibit 2042
Apple v. Corephotonics, IPR2020-00878
Page 49 of 159

1      A.    Because I have seen the slight

2   differences on dimensions of sensors.  But looking

3   into my declaration, and taking the diagonal of a

4   1/2.5 inches sensor, which is 7.2 millimeters, or

5   about 7.2 millimeters, that would be a smaller

6   than the diagonal on the Table 1.1 in my

7   declaration, at least a sensor of 1/1.7 to have a

8   diagonal of 9.3 millimeters.  So the 1.7 sensor

9   will have -- will be larger than the 1/2.5-inch

10  sensor.

11      Q.    I'd like to turn to the appendix in your

12  reply declaration.  So here, you -- well, the

13  Section A of this appendix, which is the only

14  section in it, is titled "Kawamura Example 1

15  scaled by a factor of 14.5 using ZEMAX."

16            Do you see that?

17      A.    Yes.

18      Q.    And -- sorry.

19            On page 18 of your declaration, the

20  second page of the appendix, there are certain

21  screen captures from ZEMAX that have a date

22  March 25, 2021, on them.

23            Do you see that?

24      A.    Yes.

25      Q.    And does that date on these screen

Corephotonics Exhibit 2042
Apple v. Corephotonics, IPR2020-00878
Page 50 of 159